UNITED STATES BANKRUPTCY COURT
DISTRICT OF NORTH DAKOTA

---

In re:                                                    Chapter 7
                                                     Bky. No. 24-30167
Pro-Mark Services, Inc.,

                    Debtor.

---

Erik A. Ahlgren, as Chapter 7 Trustee of
Bankruptcy Estate of Pro-Mark Services, Inc.,          Adv. No. _____
and as Administrator of the Pro-Mark
Services, Inc. Employee Stock Ownership
Plan,

                    Plaintiff,                          **COMPLAINT**

v.

Connie Berg, Kyle Berg, Connie Berg
Revocable Living Trust, Kyle R. Berg
Revocable Living Trust, Chad DuBois,
Mandy Grant, and Miguel Paredes,

                    Defendants.

---

1.      The Debtor was a construction and general contracting company that did projects for the federal government.  In August 2020, the Debtor's then-owners, Connie Berg and Kyle Berg, sold their equity interest in the company to its employees via an "ESOP" transaction.  The Bergs received over $31.5 million in total consideration, as well as a $6.2 million equity distribution.  The transaction, however, was fraudulent.  The Bergs failed to disclose that the Debtor's business was built on lies and misrepresentation.  For over a decade, the Bergs had wrongfully enrolled the Debtor in government contracting programs intended for socially or economically disadvantaged individuals, women, and small businesses.  Based on this fraud, the Debtor received millions of dollars in revenue and profits to which it was not entitled.  Had the

Bergs disclosed their scheme, the ESOP transaction never would have closed—let alone at a $31.5 million valuation.

2.      Just two years after the ESOP transaction closed, the Debtor's house of cards collapsed when the federal government raided its headquarters.  Ultimately, in October 2023, the Debtor and the federal government entered into a non-prosecution agreement, under which the Debtor admitted that its misconduct violated federal law and agreed to pay a $949,000 criminal fine.  But the damage was already done.  The Debtor's business was in a tailspin, it could not obtain bonding for its construction projects, and it lost a key contract.  In April 2024, the Debtor filed for chapter 7 bankruptcy protection, reporting just $4.4 million in assets and more than $33.3 million in liabilities.

3.      Plaintiff Erik A. Ahlgren, in his dual capacities as chapter 7 trustee and administrator of the Debtor's ESOP plan, now brings this action to hold the Bergs and others accountable for their breaches of fiduciary duties, misconduct, and fraud.

## JURISDICTION AND VENUE

4.      On April 22, 2024 ("Petition Date"), Pro-Mark Services, Inc. ("Debtor") filed a voluntary petition for relief under chapter 7 of title 11 of the United States Code ("Bankruptcy Code") in the United States Bankruptcy Court for the District of North Dakota ("Bankruptcy Court").  The Debtor's bankruptcy case number is 24-30167.

5.      Plaintiff Erik A. Ahlgren was appointed chapter 7 trustee ("Trustee") of the Debtor's bankruptcy estate.

6.      The Debtor established and is the sponsor of the Pro-Mark Services, Inc. Employee Stock Ownership Plan ("ESOP Plan") and the Pro-Mark Services, Inc. Employee Stock Ownership Trust ("ESOP Trust").  As of the Petition Date, the Debtor or an entity designated by the Debtor

2

served as administrator of the ESOP Plan.  Accordingly, pursuant to 11 U.S.C. § 704(a)(11), the

Trustee is the administrator of the ESOP Plan (in such capacity, "Administrator").

7.      This action arises in, arises under, or relates to a case under the Bankruptcy Code.

8.      This Court has subject matter jurisdiction over this adversary proceeding pursuant

to 28 U.S.C. §§ 157(a), 157(b), and 1334, and 29 U.S.C. § 1132(e).

9.      This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (H), and (O).

10.     This matter involves a federal question under the Employee Retirement Income

Security Act of 1974 ("ERISA"), 29 U.S.C. §1001 et seq., as it concerns conduct relating to the

ESOP Plan and ESOP Trust.

11.     Venue is proper in this District under 28 U.S.C. §§ 1391(b) and 1409.

12.     This Complaint is filed under Federal Rule of Bankruptcy Procedure ("Bankruptcy

Rule") 7001(1), (2), (7), (8), and (9).

13.     Pursuant to Bankruptcy Rule 7008, Plaintiff consents to entry of final orders or

judgment by the Bankruptcy Court.

## **PARTIES**

14.     The Debtor is a North Dakota corporation.  At all relevant times, its principal place

of business was in Fargo, North Dakota.

15.     Plaintiff Erik A. Ahlgren is Trustee of the Debtor's bankruptcy estate and

Administrator of the ESOP Plan.

16.     Defendants Connie and Kyle Berg are natural persons domiciled in North Dakota.

They are married.  At all relevant times before August 31, 2020, Connie Berg was the Debtor's

sole owner, director, and President, and Kyle Berg was an employee of the Debtor.  However, as

detailed below, Kyle Berg was the Debtor's true control person, and Connie Berg had only a nominal role in the business.

17.     Defendant Connie Berg Revocable Living Trust (the "Connie Berg Trust") is a revocable living trust for which Connie Berg is the grantor/settlor.  At all relevant times, the Connie Berg Trust was and is a resident of North Dakota and owns real property in North Dakota.  On information and belief, Connie Berg routinely transfers assets to the Connie Berg Trust.

18.     Defendant Kyle R. Berg Revocable Living Trust (the "Kyle Berg Trust") is a revocable living trust for which Kyle Berg is the grantor/settlor.  At all relevant times, the Kyle Berg Trust was and is a resident of North Dakota and owns real property in North Dakota.  On information and belief, Kyle Berg routinely transfers assets to the Connie Berg Trust.

19.     Defendant Chad DuBois is a natural person domiciled in North Dakota.  From about June 2018 to July 2019, Mr. DuBois was the Debtor's controller.  In July 2019, he was promoted to Vice President.  On August 31, 2020, he was promoted to become the Debtor's President and a director on the Debtor's board.

20.     Defendant Mandy Grant is a natural person domiciled in North Dakota.  Ms. Grant began working at the Debtor in 2011 as the office manager.  In June 2019, she was promoted to Secretary and Treasurer.  On August 31, 2020, she was promoted to become the Debtor's Vice President and a director on the Debtor's board.

21.     Defendant Miguel Paredes is a natural person domiciled in California.  As detailed below, Mr. Paredes served as transactional trustee for the ESOP Trust.

4

## FACTS

22.     Kyle and Connie Berg incorporated the Debtor in 2001.  Connie Berg owned 51% of the company and Kyle Berg owned 49%.  The Debtor's original purpose was specialty retail sales.  Eventually, however, the Debtor became a construction and general contracting company that did work for the federal government.

23.     In or around 2007, the Bergs devised a scheme to use the Debtor to fraudulently obtain federal government set-aside contracts ("Set-Aside Contracts") to which they were not entitled.  Specifically, the Bergs caused the Debtor to wrongfully enroll in the 8(a) Business Development program ("8(a) Program") and the Women Owned Small Business program ("WOSB Program"), each administered by the U.S. Small Business Administration ("SBA").  The Bergs also caused the Debtor to wrongfully register as a "small business."

**A.      Set-Aside Contracts for 8(A) Program Enrollees**

24.     SBA's 8(a) Program aims to award at least 5% of all federal contracting dollars to small businesses owned and controlled by socially and economically disadvantaged individuals.  Businesses enrolled in the 8(a) Program receive various benefits, including the right to bid for Set-Aside Contracts specially "set aside" only for 8(a) Program participants.

25.     Participation in the 8(a) Program is limited to nine (9) years, with the goal that participants can thrive in a competitive bidding environment upon graduation from the program.

26.     To qualify for the 8(a) Program, the applicant business must satisfy three criteria.  First, the business must be at least 51% owned by one or more socially and economically disadvantaged persons. Second, the business must be controlled only by socially and economically disadvantaged persons.  Third, the business must qualify as a "small" business.

ACTIVE 700357335v3

27.    Factors relevant to determining whether an applicant is controlled only by socially and economically disadvantaged persons include whether the purported control person (a) has the requisite management capabilities to, and actually does, manage the business, (b) works full-time for the business during normal business hours, and (c) holds the highest officer position in the company. While a non-disadvantaged individual or entity may be involved in the business, they may not exercise control over the business.

28.    To determine whether the applicant business is a "small" business, SBA measures the company's revenue together with the revenue of any affiliated businesses.  The revenue threshold varies by industry.

29.    To become enrolled in the 8(a) Program, the applicant business must certify to SBA in writing that it is owned and controlled by socially and economically disadvantaged persons and provide documentary evidence for each criterion.  SBA's application form warns that an applicant is subject to criminal prosecution if the applicant provides false information or makes misrepresentations.

30.    Each year, the business must recertify with SBA to maintain eligibility in the 8(a) Program.  Additionally, each time the business applies for Set-Aside Contract via the 8(a) Program, it must certify that it continues to meet the eligibility criteria.

**B.      Set-Aside Contracts for WOSB Program Enrollees**

31.    Similar to the 8(a) Program, SBA's WOSB Program aims to award at least 5% of all federal contracting dollars to women-owned small businesses.  Businesses enrolled in the WOSB Program receive various benefits from the federal government, including the right to bid for Set-Aside Contracts specially "set aside" only for WOSB Program participants.

6

32.     To qualify for the WOSB Program, the applicant business must satisfy three criteria.  First, the business must be at least 51% owned by one or more women. Second, the business must be controlled and managed on a full-time basis only by women.  Third, the business must qualify as a "small" business.

33.     Factors relevant to determining whether an applicant business is controlled only by women include whether (a) a woman holds the highest position in the business, (b) such woman has the management experience necessary to run the business, and (c) such woman is engaged in outside employment that prevents her from controlling the day-to-day business operations. While men or other entities may be involved in managing the business, they may not control the business.

34.     As with the 8(a) Program, to determine whether the applicant business is a "small" business, SBA measures the company's revenue together with the revenue of any affiliated businesses.  The revenue threshold varies by industry.

35.     To become enrolled in the WOSB Program, the applicant business must certify to SBA in writing that it is owned and controlled only by women and provide documentary evidence for each criterion.  SBA's application form warns that an applicant is subject to criminal prosecution if the applicant provides false information or makes misrepresentations.

36.     Until October 2020, applicants could self-certify that they were eligible for the WOSB Program by submitting annual representations to SBA under penalty of perjury. Additionally, each time the business applies for a Set-Aside Contract via the WOSB Program, it must certify that it continues to meet eligibility criteria.

ACTIVE 700357335v3

## C.    Set-Aside Contracts for Small Businesses

37.     In total, SBA aims to award at least 23% of federal contracting dollars to small businesses.  To accomplish this goal, the government "sets aside" certain Set-Aside Contracts that only small businesses can bid for.

38.     As detailed above, whether the applicant business is a "small business" depends on its revenue, plus the revenue of any affiliated businesses.  The revenue threshold various by industry.

39.     Each time a business applies for a Set-Aside Contract designated for small businesses, it must certify that it is, in fact, a small business.

## D.    The Berg's Wrongfully Enroll the Debtor in the 8(a) and WOSB Programs

40.     On August 1, 2007, Kyle Berg gifted his 49% interest in the Debtor to Connie Berg, making her sole owner on paper.  Kyle Berg continued as a full-time employee of the Debtor.

41.     Just over four months later, on December 6, 2007, Connie Berg applied for SBA's 8(a) Program on behalf of the Debtor.  In her application to SBA, Connie Berg claimed social disadvantage based on gender bias.  SBA accepted the Debtor into the 8(a) Program on May 23, 2008.

42.     In the Debtor's initial 8(a) Program application to SBA, Connie Berg certified that (a) she was responsible for all control, management, and business decisions of the Debtor, (b) she was the Debtor's only director, officer, management member, key employee, or owner, and (c) she worked 40 hours per week for the Debtor.  She also certified to SBA that the Debtor earned 100% of its revenue from selling specialty retail clothing.

43.     From 2010 to 2016, the Debtor annually recertified to SBA that it continued to qualify for the 8(a) Program.  Connie Berg signed the recertification forms on the Debtor's behalf

ACTIVE 700357335v3

and certified to SBA that (a) she was the Debtor's president and 100% owner, (b) she dedicated 40 hours per week to managing the company, (c) no one other than an economically and socially disadvantaged individual holds the highest position in the business, and (d) the Debtor had no affiliations with any other businesses.

44.     From 2015 to 2020, Connie Berg also enrolled the Debtor in SBA's WOSB Program.  Each year, Connie Berg, on behalf of the Debtor, self-certified to SBA that (a) she managed and controlled the Debtor's daily business operation, (b) she controlled the Debtors long-term decision making and the day-to-day management and administration of the business operations, (c) she held the highest officer position in the business and managed the Debtor on a full-time basis, and (d) she had the managerial experience of the extent and complexity needed to run the Debtor.

45.     Based on its enrollment in the 8(a) and WOSB Programs, and its purported status as a "small business," the Debtor was awarded thousands of Set-Asides Contracts from the VA, Army, Air Force, and other federal agencies, totaling millions of dollars.  All such Set-Asides Contracts were for construction-related services.

46.     However, the Debtor did not actually qualify for the 8(a) and WOSB Programs, and, in many cases, was not a small business.  Connie Berg's representations to SBA were knowingly false.

47.     Contrary to Connie Berg's repeated certifications to SBA, she did not control the Debtor.  Instead, Kyle Berg—a non-disadvantaged white man—controlled the Debtor.

48.     The Bergs installed Connie as the Debtor's 100% owner, sole director, and president in name only so the Debtor could enroll in the 8(a) and WOSB Programs and obtain preferential access to Set-Aside Contracts.  Her involvement in the business was a pretect.

9

49.     Additionally, the Debtor did not qualify as a "small business" due to its extensive (but undisclosed) affiliations, wrongful joint ventures, and wrongful mentor-protégé relationships with various other entities owned or controlled by Kyle Berg, including, without limitation, Fed Serve, LLC, KRB Holdings, LLC, Marlin Creek Holdings, LLC, MDM Construction, LLC, OK2 Construction, LLC, Razor Consulting Solutions, Inc., Tunheim Holdings, LLC, and Tunheim Construction, LLC.

50.     The Bergs perpetrated this fraud to enrich themselves.  By wrongfully enrolling in the 8(a) and WOSB Programs, and wrongfully representing that it was a small business, the Debtor received thousands of Set-Aside Contracts to which it was not entitled, ensuring a steady stream of revenue and profits to the Bergs.

**E.    Connie Berg Had No Relevant Experience in Government Contracting and Construction**

51.     As noted above, one factor for determining control for both the 8(a) and WOSB Programs is whether the purported control person has the relevant managerial experience to manage the business.

52.     From 2009 through 2020, the Debtor was awarded thousands of Set-Aside Contracts for construction-related services.  However, Connie Berg had no relevant training or experience in construction.

53.     Instead, Connie Berg's professional background was in screen printing fabric and clothing.  Her work experience included employment at Logotech, a company engaged in making custom promotional products, and Creative Imprintz, a branded apparel business.  The Debtor never received any Set-Aside Contracts relating to clothing, screen printing, or retail sales—Connie Berg's areas of experience.  Further, by 2014, less than 1% of the Debtor's annual revenue

10

was attributable to clothing and related retail sales, even though the Debtor's original application

for the 8(a) Program stated that the Debtor's primary business was specialty retail sales.

54.     Kyle Berg, by contrast, had extensive experience in general contracting,

government contracting, and construction.   As of 2007, Kyle Berg had at least 14 years of

construction experience, including employment as a vice president and project manager at CS

DuBois Construction, a construction company that itself graduated from the 8(a) program in July

2007.

55.     Kyle Berg's experience, contrasted with Connie Berg's lack of experience,

demonstrates that Kyle Berg was the Debtor's de facto owner and control person.

**F.      Kyle Berg, a Non-Disadvantaged White Male, Controlled the Debtor**

56.     Consistent with her lack of experience, Connie Berg was not meaningfully involved

in the day-to-day or long-term management of the Debtor.

57.     Contrary to her representations to SBA, Connie Berg (a) did not work 40 hours per

week for the Debtor; (b) had no involvement in selecting, estimating, or structuring the bids that

the Debtor submitted for federal construction contracts, including Set-Aside Contracts; (c) did not

engage in substantive discussions with the government contracting officers responsible for

awarding, evaluating, or overseeing bids; (d) had no involvement in hiring, directing, or managing

the Debtor's employees and subcontractors; (e) had no involvement in managing the Debtor's

business operations, and (f) had no involvement in the Debtor's financials.

58.     In reality, Kyle Berg managed and controlled all aspects of the Debtor's business.

From 2008 through August 2020, he orchestrated the Debtor's fraudulent applications for the 8(a)

and WOSB Programs.   He determined which government contracts the Debtor would bid,

structured the bids, estimated the costs for the bids, directed employees how to complete proposals,

11

and communicated with government contracting officers.  He decided hiring, salaries, and raises for the Debtor's employees.  He directed the activity and work of the Debtor's employees, subcontractors, and suppliers.  And he managed the Debtor's financials, including company bank accounts, loans, and payroll.

59.     The Debtor's employees, including senior employees and construction project managers, openly recognized that Kyle Berg—not Connie Berg—controlled the Debtor.  They considered him to be their immediate or ultimate supervisor, and they looked to him for direction and answers about issues that arose during their employment. The Debtor's employees never sought guidance from Connie Berg regarding the Debtor's construction business.

60.     Connie Berg did not even have an email address with the Debtor, despite being the Debtor's purported sole director, president, and owner.   In the rare instances when she communicated with the Debtor's employees, she used a personal email address.  By contrast, Kyle Berg sent thousands of e-mails from his Debtor-sponsored e-mail address to the Debtor's employees, subcontractors, suppliers, and others concerning the Debtor's strategic and day-to-day construction work, and he received thousands of e-mails from those individuals and entities regarding the Debtor's business at that same e-mail address.

61.     Connie Berg never disclosed Kyle Berg's involvement with the Debtor to SBA. Instead, Connie Berg, working with and at the direction of Kyle Berg, repeatedly misrepresented to SBA that she controlled the Debtor.

62.     Had the Bergs disclosed to SBA that Kyle Berg controlled the Debtor, the Debtor would not have qualified for the 8(a) and WOSB Programs and would not have been awarded any Set-Aside Contracts.

12

**G.      The Bergs Have a History of Defrauding SBA**

63.      The Bergs have a history, pattern, and practice of defrauding the federal government to obtain Set-Aside Contracts and other benefits.  Their conduct with the Debtor was not a mistake.  It was planned, knowing, and intentional.

**i.      Razor Consulting Solutions, Inc.**

64.      Razor Consulting Solutions, Inc. ("Razor") is majority owned by Carla Schwartzenberger.  Beginning in around 2016, Razor registered to be part of SBA's 8(a) and WOSB Programs based on Schwartzenberger's status as a Native American woman.  Razor then applied for and was awarded numerous Set-Aside Contracts, totaling millions of dollars.

65.      However, Razor did not qualify for the 8(a) or WOSB Programs because Schwartzenberger did not "control" Razor, as required by SBA eligibility regulations.  Similar to the Debtor, Razor and Schwartzenberger were fronts for Kyle Berg and his affiliated entities (including the Debtor) to fraudulently obtain and profit from Set-Aside Contracts to which they were not entitled.

66.      Nearly all of Razor's Set-Aside Contracts were in construction, maintenance, and housekeeping—areas in which Schwartzenberger had no experience.  Instead, her experience was in software design, development, and implementation, and general bookkeeping.

67.      Further, Schwartzenberger was not meaningfully involved in the day-to-day management of Razor's Set-Aside Contracts, as required by SBA regulations.  Schwartzenberger's role in Razor's government contracts was limited to submitting paperwork where her signature was required and some tracking of accounts payable and receivable.

68.      In reality, Kyle Berg and his affiliated entities (including the Debtor) controlled Razor's day-to-day operations, staffing, and strategy.  Tyler Kellen, an employee of the Debtor,

wrote in an October 2019 email that the Debtor "basically do[es] all the work for Razor when it comes to the construction side" and Razor does not "know how to do anything." Kellen also wrote that spent at least 25 hours per week on Razor projects, while Razor employees "spend 0" hours per week on construction projects. Mandy Grant, another employee of the Debtor, wrote in response: "We all work for [the Debtor] so if we all work together we can help each other out and hopefully ease work loads for everyone . . . ."

69. Had Razor disclosed Kyle Berg's involvement in the business, Schwartzenberger's lack of control, and Razor's dependence on Kyle Berg and the Debtor, Razor would not have been eligible for SBA's 8(a) and WOSB Programs. Schwartzenberger and the Bergs conspired to conceal this information from SBA.

70. By using Razor as a front, Kyle Berg and the Debtor were able to wrongfully divert government contracting money to themselves. For each Set-Aside Contract awarded to Razor for construction, maintenance, and housekeeping, Razor shared a substantial portion of its profits with the Debtor. For example, in June 2019, November 2019, January 2020, April 2020, and July 2020, Schwartzenberger emailed quarterly reports to Kyle Berg, Chad DuBois, and Mandy Grant listing profits and losses for Set-Aside Contracts that the government awarded solely to Razor. The statements show that Razor owed 49% of the net income on the contracts to the Debtor. Razor did not disclose this profit-sharing arrangement to SBA.

**ii.    Fed Serve, LLC**

71. Fed Serve, LLC ("Fed Serve") is a general contracting company that is 100% owned by Kyle Berg.

72. In or around 2019, Kyle Berg registered Fed Serve as a "HUBZone small business" with SBA. Fed Serve then used its HUBZone status to apply for and receive various Set-Aside

14

Contracts totaling millions of dollars. However, Fed Serve did not meet HUBZone's eligibility requirements. Instead, Kyle Berg used Fed Serve as a front to fraudulently obtain and profit from Set-Aside Contracts to which he and his entities were not entitled.

73.    Similar to the 8(a) and WOSB Programs, the HUBZone program aims to award 3% of federal contracting dollars to small businesses located in designated historically underutilized business areas (*i.e.*, HUBZones). To be eligible for the HUBZone program, the small business's principal office must be located in a designated HUBZone (although the business may have other offices) and at least 35% of the employees must reside in a HUBZone (although it is not necessary that the employees reside in the same HUBZone as the principal office). Additionally, the business must qualify as a "small" business.

74.    As with the 8(a) and WOSB Programs, SBA measures the applicant's revenue, as well as the revenue of any affiliated businesses, to determine if the applicant is a "small" business.

75.    In Fed Serve's verification to SBA, Kyle Berg listed 3950 25th St., N Fargo, North Dakota, 58102 as its principal office, which falls within a HUBZone. However, Kyle Berg's verification was false. That location was not actually Fed Serve's principal office. Fed Serve leased the location from one of Kyle Berg's other affiliated entities, Tunheim Holdings, LLC ("Tunheim Holdings"), to create an office in a HUBZone.

76.    Further, Kyle Berg falsely represented to SBA that at least 35% of Fed Serve's employees reside in a HUBZone. Fed Serve's sole employee from May 2018 through August 2020 was Anthony Luchsinger, who resided in a HUBZone. However, Luchsinger actually worked for Tunheim Holdings. Fed Serve "employed" Luchsinger as a pretext to satisfy the HUBZone criteria. Although Fed Serve paid Luchsinger a salary, Tunheim Holdings reimbursed Fed Serve for some or all of his salary.

ACTIVE 700357335v3

77.     When Luchsinger moved out of the HUBZone in September 2019, Kyle Berg immediately took him off Fed Serve's payroll—demonstrating that Luchsinger was never really a legitimate Fed Serve employee.  In an email sent on September 2, 2020, Kyle Berg wrote: "[Luchsinger] will be moving out of the HUBZone so this will be his last week he will receive a check."

78.     In Luchsinger's place, Kyle Berg hired his college-enrolled son (Blake Berg), his minor son (Evan Berg), and Chad DuBois's college-enrolled daughter (Paige DuBois) as Fed Serve's new employees.  These hirings were a pretext to falsely maintain Fed Serve's eligibility as a HUBZone business.

79.     Kyle Berg also failed to disclose to SBA Fed Serve's extensive ties to his other business and affiliates, including the Debtor and MDM Construction, LLC.   Fed Serve and the Debtor were marketed as interchangeable companies, they shared resources and employees, and the Debtor provided financial support to Fed Serve.  Additionally, Fed Serve and MDM shared profits, and MDM provided financial support to Fed Serve.  Had Kyle Berg disclosed Fed Serve's affiliations with the Debtor and MDM to SBA, Fed Serve would not have qualified as a "small" business.

**iii.     MDM Construction, LLC**

80.     MDM Construction, LLC ("MDM") is owned by Daniel Walters, a service-disabled military veteran.  Walters formed MDM in 2009.  Before then he worked as a construction project manager for the Debtor and an entity owned by Chad DuBois called CS DuBois.

81.     Beginning in 2011, Walter registered MDM as a service-disabled veteran-owned small business ("SDVOSB") with the VA's Center for Verification and Evaluation ("CVE").

16

MDM then used its SDVOSB status to apply for and receive various Set-Aside Contracts, totaling millions of dollars.

82.    However, MDM did not meet the eligibility requirements for the SDVOSB program.  Instead, Walters and Kyle Berg used MDM as a front to fraudulently obtain and profit from Set-Aside Contracts to which they were not entitled.

83.    Similar to the 8(a), WOSB, and HUBZone programs, the SDVOSB program aims to award about 3% of all federal contracting dollars to SDVOSBs each year.  To be eligible for SDVOSB program, the applicant business must be least 51% unconditionally and directly owned by a veteran with a service disability recognized by the VA or the Department of Defense.

84.    Additionally, the business must be controlled by only service-disabled veterans.  To demonstrate control, the service-disabled veteran must be the highest paid person, hold the highest officer position, and receive at least 51% of profit from the business.  Factors relevant to evaluating whether an applicant is controlled by a non-service-disable veteran individual or ineligible entity include (a) whether the applicant shares employees or resources with another company, (b) whether another entity or individual provides critical financing or bonding support to the applicant, and (c) whether the extent of business relationships with another company leaves the applicant so dependent on the other company that it cannot exercise independent business judgment.

85.    MDM did not qualify for the SDVOSB program because Walters did not actually "control" the business, as required by the eligibility regulations.  Instead, MDM was dependent on and controlled by non-veterans, including Kyle Berg and his affiliated entities.  Among other things, the Debtor, Fed Serve, and other entities affiliated with Kyle Berg routinely bid projects with MDM and shared profits, assets, employees, facilities, and business records.

17

86.     Walters and Kyle Berg affirmatively concealed MDM's connections to Berg and his entities (including the Debtor). Had they made truthful disclosures to the federal government, MDM would not have qualified for the SDVOSB program.

**iv.     OK2 Construction, LLC**

87.     OK2 Construction, LLC ("OK2") is 51% owned by Kenneth Kurk, a service-disabled military veteran. OK2 was formed in 2015 by Kruk, Kyle Berg, and Osvaldo Cruz. Kyle Berg and Cruz are not service-disabled military veterans, and each purportedly owned 24.5% of the company.

88.     Beginning in 2016, OK2 registered as an SDVOSB. OK2 then used its SDVOSB status to apply for and receive various Set-Aside Contracts, totaling millions of dollars. However, OK2 did not meet the eligibility requirements because Kurk did not control the business. Instead, Kurk, Kyle Berg, and Cruz used OK2 as a front to fraudulently obtain and profit from Set-Aside Contracts to which they were not entitled.

89.     OK2 was in fact dependent on and controlled by Cruz, Kyle Berg and Berg's affiliated entities, including the Debtor. Although Kurk was the "majority owner" on paper, Kyle Berg and Cruz provided OK2 with repeated cash injections to support OK2's ability to obtain bonding for the construction projects it bid. Kurk did not provide equivalent amounts of capital. Kyle Berg and Cruz also sought to receive profits from OK2 in excess of their ownership stakes, notwithstanding the SDVOSB requirement that Kurk receive at least 51% of the profits.

90.     Kyle Berg also exercised de facto control over OK2. Kurk routinely deferred to Kyle Berg on business decisions. In addition, OK2 routinely relied on the Debtor's employees to perform office work and bid for government contracts, instead of using personnel employed by

18

OK2. And OK2 routinely used the Debtor's facilities, as well as facilities connected to Kyle Berg and Cruz.

91.     Kyle Berg, Kurk, and Cruz affirmatively concealed that Kurk did not control OK2. Had they made truthful disclosures to the federal government, OK2 would not have qualified for the SDVOSB program.

**H.    The Bergs' Fraudulent Scheme Inflates the Debtor's Value**

92.     The Bergs' fraudulent scheme materially inflated the Debtor's value.

93.     From 2008 through August 2020, millions of dollars of the Debtor's revenue came from Set-Aside Contracts awarded via the 8(a) and the WOSB Programs, and as a result of being a "small business." But for the Berg's fraud, the Debtor would not have been eligible for such contracts.

94.      Additionally, the Debtor received substantial revenue from Kyle Berg's affiliated entities—including, without limitation, Razor, Fed Serve, MDM, and OK2. Similar to the Debtor, Kyle Berg used these entities to defraud SBA and obtain Set-Aside Contracts to which he was not entitled. But for Kyle Berg's fraud, the Debtor would not have received tainted revenue from Razor, Fed Serve, MDM, OK2, and others. This conduct further inflated the Debtor's revenue and profits.

**I.    The Bergs' Orchestrate the ESOP Transaction to Fraudulently Enrich Themselves**

95.     In or around 2019, the Bergs decided that they wanted to monetize Connie Berg's equity interest in the Debtor. The Bergs knew their scheme could not last forever, and they wanted to cash out before their house of cards collapsed.

96.     They elected to do so via an ESOP transaction. ESOP stands for employee stock ownership plan. In a typical ESOP transaction, the existing shareholders sell their equity in the

company to an ESOP trust in exchange for cash, notes, or a combination of both. The employees, who are the beneficiaries of the ESOP trust, then acquire the shares of the company from the ESOP trust over time pursuant to a vesting schedule.

97.     An ESOP transaction has two basic purposes. First, it enables the existing shareholders to monetize their equity interests in the company. It is often used as a business succession tool. Second, it enables the employees of the company to become its owners.

98.     On December 26, 2019, Connie Berg, in her capacity as the Debtor's sole director, executed a written consent authorizing the Debtor to form the ESOP Plan and the ESOP Trust. Connie Berg appointed Kyle Berg as the initial trustee of the ESOP Trust.

99.     The ESOP Plan is governed by a plan document (the "Plan Document") executed on December 26, 2019. Chad DuBois, the Debtor's vice president, executed the Plan Document on behalf of the Debtor. At all relevant times, the Debtor, or someone appointed by the Debtor, has served as administrator of the ESOP Plan.

100.    The ESOP Trust is governed by a Trust Agreement executed on December 26, 2019. Chad DuBois, the Debtor's vice president, executed the Trust Agreement on behalf of the Debtor, and Kyle Berg executed the Trust Agreement in his capacity as trustee.

101.    The ESOP Trust forms part of the ESOP Plan.

**J.      The Bergs Retain Miguel Paredes to Serve as ESOP Trustee**

102.    In May 2020, the Debtor retained Miguel Paredes to take over as trustee of the ESOP Trust. His retention was governed by an engagement letter dated May 19, 2020 (the "Engagement Letter"), which Connie Berg signed for the Debtor in her capacity as President.

103.    Under the Engagement Letter, the parties agreed that Paredes would "act as an independent transactional trustee for the Plan in connection with the proposed ESOP Transaction."

104.     Paredes' role as trustee was to, among other things: "(1) evaluate the proposed purchase of Company stock by the ESOP; (2) perform due diligence with respect to the Company and the proposed ESOP Transaction; and (3) act independently of the Company and its agents and representatives to negotiate on behalf of the ESOP the price, terms, and conditions of the ESOP Transaction."

105.     Additionally, Paredes was charged with ensuring that "the ESOP pays no more than adequate consideration for the Company stock, that [the proposed transaction] is fair to the ESOP from a financial point of view, and that [the proposed transaction] is in accordance with the terms of the Plan and applicable law, including, but not limited to, ERISA and the Internal Revenue Code."

106.     Paredes retained Stout Risius Ross, LLC ("Stout") to serve as the ESOP Trust's financial advisor pursuant to an engagement letter dated May 21, 2022.  Stout's role was render a "written opinion" that, among other things, "[t]he consideration to be paid by the ESOP for its shares of Company stock pursuant to the terms of the Transaction is not greater than the Fair Market Value of such shares" and "[t]he terms and conditions of the Transaction, taken as a whole, are fair to the ESOP from a financial point of view."

107.     On August 27, 2020, Connie Berg, in her capacity as the Debtor's sole director, executed a written consent ratifying the Engagement Letter and the Debtor's appointment of Paredes "as the transactional trustee of the ESOP Trust."

108.     Paredes received a flat fee of $38,000 from the Debtor for serving as trustee of the ESOP Trust.

21

**K.**     **The Parties Negotiate the ESOP Transaction and Connie Berg Receives a $6.2 million Equity Distribution**

109.     Between approximately May 2020 and August 2020, the Bergs and Paredes negotiated the terms of the ESOP transaction, including entering into a non-binding term sheet (the "ESOP Term Sheet").

110.     In the ESOP Term Sheet, the Bergs and Paredes preliminarily agreed that Connie Berg would sell 100% of her shares in the Debtor for an aggregate price of about $31 million, with some of her shares to be purchased by the ESOP Trust and some of her shares to be redeemed by the Debtor.  This valuation was inflated due to the Bergs' fraud.

111.     The Bergs and Paredes also preliminarily agreed that, immediately before the closing of the ESOP Transaction, Connie Berg would receive an equity distribution from the Debtor equal to her accumulated adjustments account balance, or "AAA" balance.  The AAA balance represented the Debtor's accumulated gross income, less expenses, that had not been distributed to Connie Berg.  The distribution was purportedly related to the Debtor's conversion from an S-Corporation to a C-Corporation, which was a precursor to the ESOP transaction.

112.     Consistent with the ESOP Term Sheet, on August 11, 2020, Connie Berg, in her capacities as the Debtor's sole shareholder and sole director, executed a written consent authorizing the Debtor to make a $6,272,060 equity distribution to herself, which represented her AAA balance.  No independent director approved the distribution.  The Debtor then distributed $6,272,060 in cash to Connie Berg on August 27, 2020.

113.     On August 27, 2020, Connie Berg, in her capacity as the Debtor's sole director, executed a written consent authorizing the Debtor to make a $335,000 contribution to the ESOP Trust for the plan year ending December 31, 2019, and a $200,000 contribution to the ESOP Trust

for the plan year ending December 31, 2020.  No independent director approved the contributions.

The Debtor made these contributions to the ESOP Trust on or around August 31, 2020.

**L.      The ESOP Transaction Closes on August 31, 2020**

114.   On August 31, 2020, Connie Berg, in her capacity as the Debtor's sole director,

executed a written consent authorizing the Debtor to consummate the ESOP transaction.  No

independent director approved the transaction.  The ESOP transaction closed that same day, on

August 31, 2020.  On the closing date, the Debtor had approximately 30 employees.

115.   The terms of the ESOP transaction mirrored those from the ESOP Term Sheet.

Connie Berg received $31,559,000 of total consideration from the ESOP Trust and the Debtor in

exchange for her 100% equity stake in the Debtor.   The step-by-step details of the ESOP

transaction are set forth below.

116.   Pursuant to a Redemption and ESOP Stock Purchase Agreement dated August 31,

2020 (the "ESOP Purchase Agreement"), Connie Berg sold 37,683 shares of the Debtor's stock

back to the Debtor for redemption and cancellation.  In exchange, she received a promissory note

from the Debtor in the original principal amount of $12,094,000 (the "Redemption Note").  A true

and correct copy of the Redemption Note is attached as **Exhibit A** and is incorporated by reference.

117.   Also pursuant to the ESOP Purchase Agreement, Connie Berg sold her remaining

62,317 shares of the Debtor's stock to the ESOP Trust for $10,985,754 in seller financing and

$9,014,246 in cash.

118.   To evidence the seller financing, Connie Berg and the ESOP Trust entered into an

Initial Seller/ESOP Loan Agreement (the "Initial Seller/ESOP Loan Agreement") and an Initial

Seller/ESOP Note (the "Initial Seller/ESOP Note"), each dated August 31, 2020.

119.    As for the cash payment, the ESOP Trust funded it entirely with money from the Debtor.  The Debtor obtained an $8,479,246 term loan from Bankers Trust (the "Term Loan"), then immediately loaned the funds to the ESOP Trust pursuant to an Initial Company/ESOP Loan Agreement (the "Initial Company/ESOP Loan Agreement") and an Initial Company/ESOP Note (the "Initial Company/ESOP Note"), each dated August 31, 2020.  The Debtor obtained the Term Loan for the sole purpose of funding the payment to Connie Berg.  For the remaining balance of the cash purchase price, the ESOP Trust used the Debtor's plan contributions for 2019 and 2020, which were $335,000 and $200,000, respectively.

120.    Connie Berg signed the ESOP Purchase Agreement in two capacities: on behalf of the Debtor as its "President" and individually as the "Seller" of the Debtor's stock.  Paredes signed the ESOP Purchase Agreement on behalf of the ESOP Trust in his capacity as ESOP trustee.

121.    Immediately after entering into the ESOP Purchase Agreement, the Debtor, the ESOP Trust, and Connie Berg entered into a Seller Note Exchange and ESOP Loan Modification Agreement dated August 31, 2020 (the "ESOP Modification Agreement"), pursuant to which they agreed to modify, restructure, and consolidate certain obligations relating to the ESOP transaction.

122.    First, in accordance with the ESOP Modification Agreement, the Debtor agreed to assume the ESOP Trust's obligations to Connie Berg under the Initial Seller/ESOP Note and the Initial Seller/ESOP Loan Agreement—so that the Debtor would be directly liable to Connie Berg rather than the ESOP Trust.  To evidence such assumption, Connie Berg assigned all her rights under Initial Seller/ESOP Note and the Initial Seller/ESOP Loan Agreement to the Debtor, and the Debtor issued to Connie Berg an Amended and Restated Seller Note dated August 31, 2020 (the "A&R Seller Note"), in the original principal amount of $10,985,754.  A true and correct copy of the A&R Seller Note is attached as **Exhibit B** and is incorporated by reference.

123.    Second, the ESOP Trust and the Debtor entered into an Amended and Restated ESOP Loan Agreement (the "A&R ESOP Loan Agreement") and an Amended and Restated ESOP Note (the "A&R ESOP Note"), each dated August 31, 2020, to consolidate all the ESOP Trust's obligations to the Debtor into one loan.  The original principal amount of the A&R ESOP Note was $19,465,000, reflecting the $10,985,754 of original principal under the Initial Seller/ESOP Note and the $8,479,246 of original principal under the Initial Company/ESOP Note.

124.    Connie Berg signed the ESOP Modification Agreement in two capacities: on behalf of the Debtor as its "President" and individually as "Lender."  Paredes signed the ESOP Purchase Agreement on behalf of the ESOP Trust in his capacity as trustee.

125.    To comply with ERISA and the IRS code, the ESOP Trust's payment obligations to the Debtor under the A&R ESOP Note are limited.  Pursuant to Section 2.1 of the A&R ESOP Loan Agreement, the ESOP Trust may only make repayments to the Debtor using, among other things, employee contributions to the ESOP Trust and earnings thereon.

126.    As a result of the ESOP transaction, the ESOP Plan and ESOP Trust became the Debtor's sole equity owner, holding 62,317 shares.  The Debtor's eligible employees, meanwhile, had the right to acquire shares over time by contributing a portion of their wages to the ESOP Trust. Each pay period, the Debtor was to withhold funds from each eligible employee's paycheck and contribute the money to the ESOP Trust.  In return, the eligible employees would receive shares of the Debtor's stock from the ESOP Plan and ESOP Trust, which would vest after a specified period.

127.    From the ESOP transaction, Connie Berg received total consideration of $31,559,000 for her 100% equity interest in the Debtor, comprised of (a) $9,014,246 of cash, (b) the Redemption Note from the Debtor in the original principal amount of $12,094,000, and

(c) the A&R Seller Note from the Debtor in the original principal amount of $10,985,754.  As detailed above, Connie Berg also received a $6,272,060 equity distribution from the Debtor four days before the ESOP transaction closed.

128.    The Debtor either funded or is the primary obligor for all distributions and consideration given to Connie Berg in connection with the ESOP transaction.

129.    The following diagram depicts the Debtor's capital and equity structure immediately after the ESOP transaction:



## M.    The Bergs Affirmatively Concealed Their Fraud from Paredes and the ESOP Plan

130.    During the ESOP negotiations, the Bergs never disclosed to Paredes or the ESOP Trust that (a) millions of dollars of the Debtor's historical revenue and profits were attributable to their fraud on the federal government; (b) the Debtor had fraudulently enrolled in the 8(a) and WOSB Programs and was not a qualifying small business; (c) the Debtor had been fraudulently

26

awarded thousands of Set-Aside Contracts, totaling millions of dollars; (d) the Debtor received fraudulent revenue from Razor, Fed Serve, MDM, OK2, and other entities affiliated with or controlled by Kyle Berg; and (e) the Debtor's $31,559,000 valuation for the ESOP transaction was materially inflated.

131.    Instead, the Bergs repeatedly made false representations to Paredes and the ESOP Trust, to conceal their fraud.

132.    For example, Connie Berg made numerous false representations in the ESOP transaction documents.

133.    In Section 3.2(g) of the ESOP Purchase Agreement, Connie Berg represented to the ESOP Trust and the Debtor as follows: "There is no claim, legal action, suit, arbitration, governmental investigation or other legal or administrative proceeding, nor any order, decree or judgment, in progress, pending, in effect, or to the Knowledge of the Seller, threatened relating to this Agreement or the transactions contemplated by this Agreement, and the Seller does not know of any reason for, nor have any reason to be aware of, any basis for the same."

134.    These representations were false because Connie Berg knew that a material amount of the Debtor's revenue was attributable to fraudulently obtained Set-Aside Contracts and the ESOP valuation was, therefore, inflated.  These facts were a "basis" for various claims, legal actions, suits, arbitrations, government investigations, or other legal or administrative proceedings relating to the Debtor and the ESOP transaction, including breach of contract claims, breach of fiduciary duty claims, ERISA claims, investigations by the FBI, DOJ, and Department or Labor, and related criminal and civil claims and legal proceedings.

135.    In Section 3.3(g)(i) of the ESOP Purchase Agreement, Connie Berg represented to the ESOP Trust that the Debtor's financial statements "present fairly the financial position of the

Company of such date and the results of the operations of the Company for such period in all materials respects" and "contain no untrue statements of material fact, do not omit any material fact necessary to make such Financial Statements not misleading."

136.    These representations were false because Connie Berg knew that a material amount of the Debtor's revenue was attributable to fraudulently obtained Set-Aside Contracts and, therefore, the financial statements did not fairly present the Debtor's financial position and results, contained untrue statements of material fact, and omitted material facts necessary to make such financial statements not misleading.

137.    In Sections 3.3(g)(ii) and 3.3(g)(v) of the ESOP Purchase Agreement, Connie Berg represented to the ESOP Trust that the Debtor had no undisclosed liabilities or obligations, other than those disclosed in those sections and the corresponding disclosure sections.

138.    These representations were false because Connie Berg failed to disclose that the Debtor faced substantial liability to the federal government for, without limitation, its actions in defrauding SBA, the 8(a) Program, and the WOSB Program.

139.    In Section 3.3(g)(iii) of the ESOP Purchase Agreement, Connie Berg represented to the ESOP Trust as follows: "The financial projections furnished by the Company to the Trustee in connection with the transaction contemplated hereunder are reasonable and complete, and (1) reflect the Company's best efforts to accurately and correctly project the future operations of the Company; and (2) to the Seller's Knowledge there are no material adjustments that should be made to such financial projections to make the financial projections reasonable and complete."

140.    These representations were false because Connie Berg knew that the Debtor's financial projections, among other things, (a) were inflated, (b) were based on fraudulent revenues

28

that the Debtor could not legally maintain, and (c) did not account for the significant legal risks and liabilities the Debtor would face when their fraud was inevitably discovered.

141.     In Section 3.3(h) of the ESOP Purchase Agreement, Connie Berg represented to the ESOP Trust that the Debtor "has complied in all respects with the eligibility and other requirements of any License or Permit."

142.     This representation was false because Connie Berg knew that the Debtor did not qualify for the 8(a) and WOSB Programs, was not a small business, and was not eligible for associated Set-Aside Contracts.

143.     In Section 3.3(j) of the ESOP Purchase Agreement, Connie Berg represented to the ESOP Trust that "[n]either the Seller nor the directors and officers nor the employees with responsibility for litigation matters of the Company have any reason to believe that any such action, suit, proceeding, hearing, or investigation may be brought or threatened against the Company."

144.     These representations were false because Connie Berg knew that a material amount of the Debtor's revenue was attributable to fraudulently obtained Set-Aside Contracts and the ESOP valuation was, therefore, inflated.  These facts were a basis for various actions, suits, proceedings, hearings, or investigations that could by brought against the Debtor, including breach of contract claims, breach of fiduciary duty claims, ERISA claims, investigations by the FBI, DOJ, and Department or Labor, and related criminal and civil claims and legal proceedings.

145.     In Section 3.3(m) of the ESOP Purchase Agreement, Connie Berg represented to the ESOP Trust that the Debtor "is in compliance with all applicable laws."

146.     This representation was false because Connie Berg knew that the Debtor did not qualify for the 8(a) and WOSB Programs, was not a small business, and was not eligible for associated Set-Aside Contracts.

147.     In Section 3.3(o) of the ESOP Purchase Agreement, Connie Berg represented to the ESOP Trust that each "Material Contract is legal, valid, binding, [and] enforceable" and will continue to be "legal, valid, binding, [and] enforceable ... on identical terms following the consummation of the transactions contemplated by the [Purchase] Agreement."

148.     These representations were false.  Many of the "Material Contracts" were Set-Aside Contracts that the Debtor was awarded by virtue of its enrollment in the 8(a) or WOSB Programs, or purported status as a small business.  Connie Berg therefore knew that these Material Contracts were not legal, valid, binding, and enforceable, and would be terminated upon discovery of the Bergs' fraud.

149.     In Section 5.1 of the Initial Seller/ESOP Loan Agreement, Connie Berg represented to the ESOP Trust that "[t]he ESOP has been properly established in accordance with all applicable laws, regulations, and rulings, and the ESOP is an 'employee stock ownership plan' within the meaning of Section 4975(e)(7) of the Code."

150.     This representation was false because Connie Berg knew that the ESOP transaction was a prohibited transaction under 29 U.S.C. § 1106(a)(1)(A).

151.     Had the Bergs truthfully disclosed to Paredes, the ESOP Trust, and ESOP Plan that Debtor's business was a house of cards, predicated on more than a decade of fraud, the ESOP transaction never would have closed, let alone at a $31.5 million valuation.

**N.     Paredes Would Have Discovered the Bergs' Fraud with Basic Due Diligence**

152.     Paredes' job as trustee of the ESOP Trust, among other things, was to conduct due diligence into the Debtor and the proposed ESOP transaction to ensure that (a) the ESOP price, terms, and conditions were fair, (b) the ESOP Trust received adequate consideration from Connie Berg, and (c) the ESOP transaction complied with ERISA and other applicable law.

153.    Paredes did not fulfill these duties.  Although the Bergs concealed their fraud from Paredes, he could have discovered the fraud with basic due diligence.

154.    A material amount of the Debtor's historical revenue was attributable to Set-Aside Contracts that the Debtor received via the 8(a) and WOSB Programs, and as a small business. Additionally, the Debtor's *entire* business revolved around federal contracting.  Thus, Paredes had every reason to investigate and vet the Debtor's Set-Aside Contracts and its eligibility for SBA's contracting programs.

155.    With just basic diligence, Paredes would have discovered that Connie Berg did not actually control the Debtor and that the Debtor had substantial affiliations with numerous entities controlled by Kyle Berg, rendering it ineligible for these programs and contracts.  Had Paredes conducted this basic due diligence, he would have discovered that the Debtor's $31,559,000 valuation was inflated, and the ESOP Trust did not receive adequate consideration.

156.    Instead, because of Paredes' deficient due diligence and investigation, the ESOP Plan, the ESOP Trust, and its participants have suffered substantial losses from the ESOP transaction.

**O.    Chad DuBois and Mandy Grant Knowingly Facilitated the Bergs' Fraud**

157.    Two of the Debtor's officers—Chad DuBois and Mandy Grant—also breached their duties in connection with the ESOP transaction.

158.    ***Chad Dubois***.  The Debtor hired DuBois in June 2018 as its controller.  In July 2019, he was promoted to Vice President.  On August 31, 2020, immediately after the ESOP transaction closed, DuBois was promoted to the Debtor's President and director.

ACTIVE 700357335v3

159.    During his time as the Debtor's Vice President, DuBois was intimately involved in bidding for Set-Aside Contracts.  On his LinkedIn profile, DuBois touts that he "[o]versaw" the Debtor's "highly successful bidding processes."

160.    Given his role as the Debtor's Vice President, DuBois knew that the Debtor was enrolled in the WOSB Program, had been enrolled in the 8(a) Program, designated itself as a small business, and had applied for and received Set-Aside Contracts on those bases.

161.    DuBois also knew that the Debtor did not actually qualify for the WOSB and 8(a) Programs, was not a small business due to its various affiliations, and was not entitled to the associated Set-Aside Contracts.

162.    First, DuBois had extensive experience with and knowledge of SBA's socio-economic programs and Set-Aside Contracts, including eligibility requirements.  From 1996 to 2017, DuBois was the owner and president of CS DuBois Construction, Inc. ("CS DuBois"), where he employed Kyle Berg for over a decade.  Like the Debtor, CS DuBois was enrolled in SBA's 8(a) Program, graduating in 2007.

163.    Second, DuBois knew that Kyle Berg—not Connie Berg—controlled and managed the Debtor.  In his role as Vice President, DuBois necessarily witnessed first-hand that Connie Berg had no involvement in the business and that Kyle Berg was in charge.  Indeed, DuBois and Kyle Berg exchanged thousands of emails regarding the Debtor, while DuBois never emailed with Connie Berg regarding the Debtor except on two occasions.

164.    Third, DuBois knew that Kyle Berg had a practice of wrongfully circumventing eligibility requirements.  As detailed above, in September 2020, DuBois' 21-year-old, college-enrolled daughter began "working" at Fed Serve as a pretext so the company could maintain eligibility for SBA's HUBZone program.  On September 9, 2020, DuBois emailed Kyle Berg a

ACTIVE 700357335v3

copy of his daughter's residential lease, writing: "This is Paiges lease.  Let me know if it works."
Kyle Berg replied: "Yep – dead center of the HUBZone."

165.    Fourth, at the Debtor's 341 meeting, DuBois acknowledged that both he and Mandy
Grant knew the Bergs had been applying for government contracts on the basis of the Debtor being
woman owned/controlled and that it was general knowledge within the company.

166.    Although DuBois knew that the Bergs had fraudulently enrolled the Debtor in the
WOSB and 8(a) Programs and was not a small business, he never disclosed these facts to the ESOP
Trust or Paredes.  Instead, he affirmatively concealed the Bergs' fraud.

167.    On August 31, 2020, in connection with the closing of the ESOP transaction,
DuBois delivered a "Statement of Representation" to Stout, which included various
representations regarding the Debtor.

168.    DuBois certified that the information contained in his Statement of Representation
was "true and correct" and he acknowledged that Stout would be relying on such information "to
render a fairness opinion" to Paredes regarding the ESOP transaction.  But DuBois' Statement of
Representation contained numerous material falsehoods and omissions.

169.    DuBois represented that "[a]ll operating, competitive, historical financial, and other
factual information disclosed to you by us is complete and accurate in all material respects, and
represents the expectations of management as to the operations, prospects, competitive position,
and financial results of the Company."

170.    These representations were false.  DuBois' disclosures were incomplete and
inaccurate because he did not disclose that the Debtor had fraudulently enrolled in the WOSB and
8(a) Programs and was not a qualifying small business.

171.    DuBois represented that "the historical financial statements for the Company for the fiscal years ended December 31, 2015 through the fiscal year ended December 31, 2019, as well as the interim financials for the six month period ended June 30, 2019, the six month period ended June 30, 2019, June 30, 2020, and the seven month period ended July 31, 2020 (the "Interim Statements", attached herein as Appendix A), provided to you are fairly presented in accordance with U.S. GAAP and fairly present, in all material respects, the financial condition and results of operations of the Company as of the dates and for the periods indicated therein, and we know of nothing material that has occurred since the date of the most recent financial statements listed that would lead us to believe that such information is misleading or inaccurate or that require consideration as adjustments to or disclosures in the financial statements."

172.    These representations were false.  DuBois knew that a material amount of the Debtor's revenue was attributable to fraudulently obtained Set-Aside Contracts and, therefore, the historical financial statements did not fairly present the Debtor's financial position and results, contained untrue statements of material fact, omitted material facts, and required adjustments and additional disclosures.

173.    DuBois represented that "[t]he projected financial results of the Company provided to you by us (attached herein as Appendix B) were prepared in food faith and represent, to the best of our knowledge and belief, reasonable estimations of future financial performance for the periods indicated based upon assumptions that are reasonable and appropriate."

174.    These representations were false.  DuBois knew that the Debtor's financial projections, among other things, (a) were inflated, (b) were based on fraudulent revenues that the Debtor could not legally maintain, and (c) did not account for the significant legal risks and liabilities the Debtor would face when the fraud was inevitably discovered.

34

175.    DuBois represented that "[w]e have disclosed to you all material information regarding the Company and the proposed Transaction necessary to assist you in rendering your Opinion and we have not omitted any information that would render any other information we have provided to you misleading, or withheld information that, in our view, could reasonably be expected to affect your analysis or the outcome of your Opinion."

176.    These representations were false. DuBois omitted material information that was directly relevant to the ESOP transaction, including that the Debtor had fraudulently enrolled in the WOSB and 8(a) Programs and designated itself as a small business.

177.    Had DuBois truthfully disclosed to Stout, Paredes, and the ESOP Trust that Debtor's business was a house of cards, predicated on more than a decade of fraud by the Bergs, the ESOP transaction never would have closed, let alone at a $31.5 million valuation.

178.    ***Mandy Grant***. Mandy Grant began working at the Debtor in 2011 as the office manager. In June 2019, she was promoted to Secretary and Treasurer. After the ESOP transaction closed, she was promoted to Vice President and director.

179.    In addition to working for the Debtor, Grant also periodically did work for other Kyle Berg-controlled entities, including Razor, Fed Serve, and OK2.

180.    As one of the Debtor's most senior employees and officers, Grant knew that the Debtor was enrolled in the WOSB Program, had been enrolled in the 8(a) Program, designated itself as a small business, and had applied for and received Set-Aside Contracts on those bases. Grant was intimately involved in preparing and submitting bids for Set-Aside Contracts, for both the Debtor and Kyle Berg's other entities.

ACTIVE 700357335v3

181.     Grant also knew that the Debtor did not actually qualify for the WOSB and 8(a) Programs, was not a qualifying small business, and was not entitled to any associated Set-Aside Contracts.

182.     First, Grant knew that Kyle Berg—not Connie Berg—controlled and managed the Debtor.  In her roles as office manager and later Treasurer/Secretary, Grant necessarily witnessed first-hand that Connie Berg had no involvement in the business and that Kyle Berg was in charge.  Indeed, Grant and Kyle Berg exchanged thousands of emails regarding the Debtor, while Grant never emailed with Connie Berg regarding the Debtor's construction business.

183.     Second, Grant knew that Kyle Berg had a practice of wrongfully circumventing eligibility requirements, and routinely assisted him in doing so.

184.     In June 2020, Grant, from her Debtor email address, emailed a contracting opportunity from the Air Force to Kyle Berg, at his Fed Serve email address, and DuBois, at his Debtor email address.  In the email, Grant wrote: "Would have to bid under Fed Serve due to size $15M."

185.     In July 2020, Grant and Kyle Berg exchanged emails using their Debtor email addresses regarding a bid that Razor would be submitting to the government.  In one email, Grant reminded Kyle Berg: "Remember this has to be on Razor."

186.     In July 2020, Grant prepared a bid package for the National Park Service on behalf of Razor.  Using her Debtor email address, Grant notified Kyle Berg and others that she would put the bid package together, "but if someone from [R]azor could email it in the day it's due that would be great."

187.    Although Grant knew that the Bergs had fraudulently enrolled the Debtor in the WOSB and 8(a) Programs and designated itself a small business, she never disclosed these facts to the ESOP Trust or Paredes.

188.    Had Grant truthfully disclosed to Paredes and the ESOP Trust that Debtor's business was a house of cards, predicated on more than a decade of fraud by the Bergs, the ESOP transaction never would have closed, let alone at a $31.5 million valuation.

**P.    The Debtor and the Federal Government Enter into a Non-Prosecution Agreement in Which the Debtor Admits that the Bergs Defrauded SBA**

189.    In September 2018—two years before the ESOP transaction closed—the federal government began secretly investigating whether the Debtor had fraudulently enrolled in the 8(a) and WOSB Programs.  The investigation was prompted by the government's discovery that both the Debtor and OK2—two seemingly unaffiliated entities—were updating their company information in the government's contract procurement portal from the same computer in Fargo, North Dakota.

190.    On November 4, 2020, the United States District Court for the District of North Dakota issued a search warrant ordering Microsoft to provide access to various email accounts associated with the Debtor, Fed Serve, and OK2, including Kyle Berg, Chad DuBois, Mandy Grant, Kenneth Kruk, and Osvaldo Cruz.

191.    The government's investigation became public in March 2022.  On March 1, 2022, the FBI obtained a search warrant from the United States District Court for the District of North Dakota, authorizing it to search the person, belongings, and containers of Kyle Berg, and to seize various records and communications related to Kyle Berg, the Debtor, Razor, Fed Serve, MDM, and OK2.  A true and correct copy of the search warrant is attached as **Exhibit C** and incorporated by reference into this Complaint.

192.    Also in or around March 2022, the federal government obtained a grand jury subpoena directed at the Debtor relating to the Berg's fraudulent scheme.

193.    On March 3, 2022, FBI agents raided the Debtor's and MDM's offices and seized records and information covered by the search warrant.

194.    Ultimately, on October 26, 2023, the Debtor entered into a Non-Prosecution Agreement with the United States Department of Justice's Antitrust Division and the United States Attorney's Office for the District of North Dakota (the "Non-Prosecution Agreement"). A true and correct copy of the Non-Prosecution Agreement is attached as **Exhibit D** and incorporated by reference into this Complaint.

195.    The Debtor's independent board members, Mark Kragness and Jack Carroll, approved the Non-Prosecution Agreement.

196.    Under the Non-Prosecution Agreement, the Debtor stipulated that it had violated federal criminal law—including 18 U.S.C. §371 (Conspiracy to Commit Offense or to Defraud United States)—by fraudulently enrolling in the 8(a) and WOSB Programs and applying for associated Set-Aside Contracts. The Debtor further agreed to pay a $949,000 criminal penalty to the federal government.

197.    As part of the Non-Prosecution Agreement, the Debtor stipulated and admitted to the following incriminating facts:

a.    "[T]he Company misrepresent[ed] its status and eligibility for certain government contracting programs set aside for socially or economically disadvantaged individuals and/or women, amounting to approximately $70 million in federal contracts awarded to the Company from 2008 to

2020. This conduct occurred at the direction of [Kyle Berg and Connie Berg] who originally managed and owned the Company."

b.  "From 2008 through 2020 Pro-Mark, along with [Kyle Berg] and [Connie Berg] voluntarily and intentionally reached an agreement to defraud the United States, including through interfering with and obstructing in one of the United States' lawful government functions through false and fraudulent pretenses to obtain 8(a) and WOSB contracts to which they were not entitled, including by falsely claiming [Connie Berg] controlled Pro-Mark and therefore that Pro-Mark was qualified for such contracts, when Pro-Mark was not eligible to receive such contracts because it was controlled by [Kyle Berg]. Pro-Mark, through false representations made or directed by [Kyle Berg and Connie Berg] between 2008 and 2020, misrepresented its status and eligibility for those programs and set-aside contracts to the SBA and to the government agencies administering the relevant contracts."

c.  "Between 2008 and 2020, [Connie Berg] was held out as the President of Pro-Mark who ran and controlled the business, when in reality she did not control or manage Pro-Mark. She was not the decision-maker at Pro-Mark with regard to federal construction projects or one of its key officers or employees. She did not manage or work 40 hours per week for Pro-Mark. In sum, [Connie Berg] did not exercise strategic or day-to-day control over Pro-Mark and had no role in making operational decisions for the Company pertaining to its federal construction business. For example, she had no role in selecting, estimating, or structuring the bids that Pro-Mark submitted for

39

federal construction contracts, engaging in substantive discussions with the contracting officers responsible for awarding, evaluating, or overseeing bids or subsequent contracts, or in hiring or directing Company employees or subcontractors."

d.  "During that same period, [Kyle Berg], who is a non-disadvantaged man, was the individual in control of Pro-Mark who made or delegated all the strategic and day-to-day decisions concerning Pro-Mark and its federal construction business. From 2008 through 2020, Pro-Mark was not eligible for either the 8(a) or WOSB Programs because [Kyle Berg], not [Connie Berg], controlled and managed Pro-Mark. [Kyle Berg] selected which set-aside contracts Pro-Mark would bid on (including 8(a) and WOSB contracts), and he was extensively involved in structuring those bids, estimating their costs, and routinely directed the hiring of, activity, and work of Pro-Mark employees, subcontractors, and suppliers. Finally, he managed the Company's financials, including its bank accounts."

e.  "In August 2020, [Connie Berg] sold her entire ownership interest in Pro-Mark to Pro-Mark's employees via an ESOP for approximately $32 million. While [Connie Berg] was the sole owner of Pro-Mark on paper, [Kyle Berg] was the primary point of contact for all aspects of the ESOP transaction."

198.  The Debtor and the federal government entered into the Non-Prosecution Agreement, in part, to help the Debtor preserve its business for the benefit of the ESOP Plan, the ESOP Trust, and the Debtor's employees—who were innocent victims of the Bergs' fraud.  The Non-Prosecution Agreement provides, in pertinent part, as follows:

"[A]t least in part because of circumstances arising from the Office's investigation, Pro-Mark was unable to continue to secure bonding, which is critical to performing federal construction contracts. A conviction or a deferred prosecution agreement likely would result in the Company's continued inability to secure bonding as well as potential suspension and debarment from federal contracting, which would likely result in substantial consequences to the Company's employees and customers. This Agreement may allow the Company to preserve its financial viability, remain a viable competitor in the federal construction market, and allow employees to access their retirement benefits which have not yet vested pursuant to the ESOP . . . ."

**Q.    The Debtor Loses Millions of Dollars in Revenue by Failing to Respond to Information Requests from SBA**

199.    In October 2022, while the federal investigation was ongoing, the Debtor applied for a Set-Aside Contract from the Air Force.  The Air Force's RFP contemplated the award of multiple indefinite delivery/indefinite quantity contracts.  Bidding was reserved for "small businesses"—like the Debtor—with less than $39.5 million of average annual receipts.  The Air Force advertised that the total value of the contracts could reach $75 million.

200.    On February 10, 2023, Air Force announced that the Debtor and four other parties had been awarded the contract.  The award represented millions of dollars of future revenue for the Debtor, which the Debtor critically needed given the then ongoing federal investigation and its issues obtaining bonding.

201.    On February 14, 2023, one of the other awardees, Greenstone Construction, Inc. ("Greenstone"), filed a "size protect" with SBA asserting that the Debtor was not a "small business" and therefore not eligible for the Air Force contract.  Greenstone pointed to the Debtor's

41

past affiliations with various entities associated with or controlled by Kyle Berg, including OK2, MDM, Razor, Fed Serve, and others.  In determining whether an applicant business is "small," SBA considers the average annual revenue of the applicant *and* its affiliates.

202.    Greenstone's size protest had no basis, as the Debtor's average annual revenue was less than $39.5 million and it was no longer affiliated with Kyle Berg's entities after the ESOP transaction.  However, the Debtor lost the size protest, and the Air Force contract, because it failed to respond to information requests from SBA.

203.    After Greenstone filed the size protest, SBA requested information from the Debtor to assist it in evaluating whether the Debtor was affiliated with Kyle Berg's entities.  However, the Debtor declined to respond to many of SBA's requests and provided incomplete responses to others.  Based on the Debtor's failure to respond and deficient responses, SBA drew an "adverse inference" that the missing information would have shown that the Debtor was not small.  On this basis, SBA upheld Greenstone's size protest and found that the Debtor was not "small."

204.    The Debtor appealed the size determination to SBA's Office of Hearing and Appeals ("OHA"), but OHA affirmed the decision, finding that the adverse inference was appropriate.  A true and correct copy of OHA's decision is attached as **Exhibit E** and incorporated by reference into this Complaint.

205.    Had the Debtor and its officers and directors—including Mandy Grant, Chad DuBois, Jack Carroll, and Mark Kragness—simply responded to SBA's information requests, it would have prevailed in the size protest and retained the Air Force contract.  Instead, the Debtor lost millions of dollars of future revenue.

ACTIVE 700357335v3

**R.      The Debtor Files for Bankruptcy in April 2024**

206.    The public revelation of the Berg's fraud in March 2022 had catastrophic impacts on the Debtor's business and the ESOP.  These impacts where the natural and likely consequences of the Berg's fraud.

207.    The Debtor incurred millions of dollars in legal fees, professional fees, and other costs responding to the search warrant and grand jury subpoena, defending itself in connection with the federal investigation, and negotiating the Non-Prosecution Agreement.

208.    After the public revelation, the Debtor also lost its ability to secure bonding for its construction projects.  Bonding is critical to performing federal construction contracts, and bonding companies were unwilling to do business with the Debtor while it was under federal investigation for fraud.  Without bonding, the Debtor lost millions of dollars of revenue.

209.    The Debtor also could not maintain its pre-ESOP revenue due to its ineligibility for the 8(a) and WOSB Programs.

210.    The Debtor was also encumbered with substantial debt obligations that it could never repay, including the Bankers Trust loan (as refinanced), obligations to the ESOP, and obligations to Connie Berg.

211.    Ultimately, the Debtor filed for bankruptcy in April 2024, reporting just $4.4 million in assets and more than $33.3 million in liabilities.

**COUNT 1**
**Breach of Fiduciary Duties (State Law)**
**Plaintiff:  Erik A. Ahlgren, as Chapter 7 Trustee**
**Defendant:  Connie Berg**

212.    All paragraphs in this Complaint are incorporated by reference.

213.    Connie Berg, as the Debtor's president and director, owed fiduciary duties of care, loyalty, and good faith to the Debtor.

ACTIVE 700357335v3

214.    Connie Berg breached these fiduciary duties by, without limitation, (a) causing the Debtor to fraudulently enroll in the Debtor in the 8(a) and WOSB Programs; (b) causing the Debtor to fraudulently obtain Set-Aside Contracts to which the Debtor was not entitled; (c) conspiring with other entities controlled by Kyle Berg to defraud the federal government, including Razor, Fed Serve, MDM, OK2, and the Tunheim entities; (d) causing the Debtor to make a $6,272,060 equity distribution to herself; (e) causing the Debtor to enter into the ESOP transaction at an inflated valuation; (f) causing the Debtor to redeem 37,683 shares of her stock in the Debtor at an inflated valuation; (g) causing the Debtor to incur about $11.9 million of secured debt to Bankers Trust to fund the ESOP consideration payable to herself; (h) concealing and failing to disclose in connection with the ESOP transaction that a material amount of the Debtor's revenue was attributable to fraudulently obtained Set-Aside Contracts; and (i) personally participating in the ESOP transaction to enrich herself and Kyle Berg.

215.    Connie Berg's breaches of fiduciary duties were knowing, intentional, willful, and done with actual malice.

216.    As a direct and proximate cause of Connie Berg's breaches of fiduciary duties, the Debtor has suffered damages in an amount to be determined at trial.

**COUNT 2**
**Breach of Fiduciary Duties (State Law)**
**Plaintiff:  Erik A. Ahlgren, as Chapter 7 Trustee**
**Defendant:  Kyle Berg**

217.    All paragraphs in this Complaint are incorporated by reference.

218.    At all relevant times, Kyle Berg exercised actual control over the Debtor, including over its operations, management, and finances.

219.    By virtue of such control, Kyle Berg owed fiduciary duties of care, loyalty, and good faith to the Debtor.

44

220.    Kyle Berg breached these fiduciary duties by, without limitation, (a) causing the Debtor to fraudulently enroll in the Debtor in the 8(a) and WOSB Programs; (b) causing the Debtor to fraudulently obtain Set-Aside Contracts to which the Debtor was not entitled; (c) conspiring with other entities he controlled to defraud the federal government, including Razor, Fed Serve, MDM, OK2, and the Tunheim entities; (d) causing the Debtor to make a $6,272,060 equity distribution to Connie Berg; (e) causing the Debtor to enter into the ESOP transaction at an inflated valuation; (f) causing the Debtor to redeem 37,683 shares of Connie Berg's stock in the Debtor at an inflated valuation; (g) causing the Debtor to incur about $11.9 million of secured debt to Bankers Trust to fund the ESOP consideration payable to Connie Berg; (h) concealing and failing to disclose in connection with the ESOP transaction that a material amount of the Debtor's revenue was attributable to fraudulently obtained Set-Aside Contracts; and (i) personally participating in the ESOP transaction with Connie Berg to enrich themselves.

221.    Kyle Berg's breaches of fiduciary duties were knowing, intentional, willful, and done with actual malice.

222.    As a direct and proximate cause of Kyle Berg's breaches of fiduciary duties, the Debtor has suffered damages in an amount to be determined at trial.

**COUNT 3**
**Aiding and Abetting Breach of Fiduciary Duties (State Law)**
**Plaintiff:  Erik A. Ahlgren, as Chapter 7 Trustee**
**Defendant:  Kyle Berg**

223.    All paragraphs in this Complaint are incorporated by reference.

224.    As detailed in Count 2 above, Kyle Berg owed fiduciary duties of care, loyalty, and good faith to the Debtor, and he breached these duties.

45

225.     Alternatively, if and to the extent that Kyle Berg is found not to have owed fiduciary duties to the Debtor, he is nonetheless liable for having aided and abetted Connie Berg's breaches of fiduciary duties as detailed in Count 1 above.

226.     Kyle Berg had actual knowledge of the facts and circumstances alleged in support of Count 1 above and rendered substantial assistances to Connie Berg, thereby aiding and abetting her breaches of fiduciary duties to the Debtor.

227.     Kyle Berg's conduct in aiding and abetting Connie Berg's breaches of fiduciary duties was knowing, intentional, willful, and done with actual malice.

228.     As a direct and proximate cause of Kyle Berg aiding and abetting Connie Berg's breaches of fiduciary duties, the Debtor has suffered damages in an amount to be determined at trial.

**COUNT 4**
**Breach of Fiduciary Duties (State Law)**
**Plaintiff:  Erik A. Ahlgren, as Chapter 7 Trustee**
**Defendant:  Chad DuBois**

229.     All paragraphs in this Complaint are incorporated by reference.

230.     Chad DuBois, as the Debtor's Vice President and later President and director, owed fiduciary duties of care, loyalty, and good faith to the Debtor.

231.     DuBois breached his fiduciary duties of care, loyalty, good faith by, without limitation, (a) concealing and failing to disclose in connection with the ESOP transaction that a material amount of the Debtor's revenue was attributable to fraudulently obtained Set-Aside Contracts and (b) making false statements and material omissions in the Statement of Representation.

ACTIVE 700357335v3

232.     DuBois also breached his fiduciary duties of care, loyalty, and good faith by, without limitation, permitting, causing, or allowing the Debtor to ignore or deficiently respond to the Area Office's information requests relating to the Greenstone size protest.

233.     As a direct and proximate cause of DuBois' breaches of fiduciary duties, the Debtor has suffered damages in an amount to be determined at trial.

**COUNT 5**
**Breach of Fiduciary Duties (State Law)**
**Plaintiff:  Erik A. Ahlgren, as Chapter 7 Trustee**
**Defendant:  Mandy Grant**

234.     All paragraphs in this Complaint are incorporated by reference.

235.     Mandy Grant, as the Debtor's Secretary and Treasurer, and later Vice President and director, owed fiduciary duties of care, loyalty, and good faith to the Debtor.

236.     Grant breached her fiduciary duties of care, loyalty, and good faith by, without limitation, concealing and failing to disclose in connection with the ESOP transaction that a material amount of the Debtor's revenue was attributable to fraudulently obtained Set-Aside Contracts.

237.     Grant also breached her fiduciary duties of care, loyalty, and good faith by, without limitation, permitting, causing, or allowing the Debtor to ignore or deficiently respond to the Area Office's information requests relating to the Greenstone size protest.

238.     As a direct and proximate cause of Grant's breaches of fiduciary duties, the Debtor has suffered damages in an amount to be determined at trial.

ACTIVE 700357335v3

**COUNT 6**
**Breach of Contract**
**Plaintiff:  Erik A. Ahlgren, as Chapter 7 Trustee**
**Defendant:  Connie Berg**

239.    On August 31, 2020, the Debtor, Connie Berg, and the ESOP Trust entered into the
ESOP Purchase Agreement, which was and is a binding and enforceable contract.

240.    In Section 3.2(g) of the ESOP Purchase Agreement, Connie Berg, in her individual
capacity as "Seller," made the following representation and warranty to the Debtor:

[As of August 31, 2020, t]here is no claim, legal action, suit, arbitration,
governmental investigation or other legal or administrative proceeding, nor any
order, decree or judgment, in progress, pending, in effect, or to the Knowledge of
the Seller, threatened relating to this Agreement or the transactions contemplated
by this Agreement, and the Seller does not know of any reason for, nor have any
reason to be aware of, any basis for the same.

241.    This representation was false and, therefore, Connie Berg breached Section 3.2(g)
of the ESOP Purchase Agreement.  Specifically, a material amount of the Debtor's revenue was
attributable to fraudulently obtained Set-Aside Contracts and the ESOP valuation was, therefore,
inflated.   These facts were a "basis" for various claims, legal actions, suits, arbitrations,
government investigations, or other legal or administrative proceedings relating to the Debtor and
the ESOP transaction, including breach of fiduciary duty claims, ERISA claims, investigations by
the FBI, DOJ, and Department or Labor, and related claims and legal proceedings.

242.    But for Connie Berg's breach of Section 3.2(g) of the ESOP Purchase Agreement,
the Debtor would not have entered into and consummated the ESOP transaction.

243.    As a direct and proximate result of Connie Berg's breach of contract, the Debtor
has suffered damages in amount to be proven at trial.

48

**COUNT 7**
**Breach of Contract**
**Plaintiff:  Erik A. Ahlgren, as Chapter 7 Trustee**
**Defendant:  Connie Berg**

244.    All paragraphs in this Complaint are incorporated by reference.

245.    On August 31, 2020, the Debtor, Connie Berg, and the ESOP Trust entered into the ESOP Modification Agreement, which was and is a binding and enforceable contract.

246.    In Section 6 of the ESOP Modification Agreement, Connie Berg, in her individual capacity as "Lender," represented and warranted to the Debtor as follows: "[A]s of time of the delivery to the Company of [Connie Berg's] Initial Seller/ESOP Loan Documents, . . . no default or defaults have occurred with respect to the Initial Seller/ESOP Note[ or] the Initial Seller/ESOP Loan Agreement . . . ."

247.    This representation was false because defaults had occurred with respect to the Initial Seller/ESOP Loan Agreement.  Therefore, Connie Berg breached Section 6 of the ESOP Modification Agreement.

248.    In Section 5.1 of the Initial Seller/ESOP Loan Agreement, Connie Berg made the following representations and warranties to the ESOP Trust and Paredes, as trustee:

a.      "The ESOP has been properly established in accordance with all applicable laws, regulations, and rulings . . . ."

b.      "The execution, delivery, and performance of this Agreement by the Seller does not and will not . . . violate any law, regulation, judgment, or order applicable to the Seller."

249.    These representations were false because the ESOP transaction was a prohibited transaction under 29 U.S.C. § 1106(a)(1)(A) and Connie Berg's execution, delivery, and

ACTIVE 700357335v3

performance of the Initial Seller/ESOP Loan Agreement breached her fiduciary duties under state law and ERISA.

250.    Thus, a default had occurred under Section 5.1 of the Initial Seller/ESOP Loan Agreement, which in turn constituted a breach of Connie Berg's representation in Section 6 of the ESOP Modification Agreement.

251.    But for Connie Berg's false representation in Section 6 of the ESOP Modification Agreement, the Debtor would not have entered into and consummated the ESOP transaction.

252.    As a direct and proximate result of Connie Berg's breach of contract, the Debtor has suffered damages in amount to be proven at trial.

**COUNT 8**
**Common Law Fraud**
**Plaintiff:  Erik A. Ahlgren, as Chapter 7 Trustee**
**Defendant:  Connie Berg**

253.    On August 31, 2020, the Debtor, Connie Berg, and the ESOP Trust entered into the ESOP Purchase Agreement and the ESOP Modification Agreement.

254.    In Section 3.2(g) of the ESOP Purchase Agreement, Connie Berg, in her individual capacity as "Seller," made the following representation and warranty to the Debtor:

[As of August 31, 2020, t]here is no claim, legal action, suit, arbitration, governmental investigation or other legal or administrative proceeding, nor any order, decree or judgment, in progress, pending, in effect, or to the Knowledge of the Seller, threatened relating to this Agreement or the transactions contemplated by this Agreement, and the Seller does not know of any reason for, nor have any reason to be aware of, any basis for the same.

255.    In Section 6 of the ESOP Modification Agreement, Connie Berg, in her individual capacity as "Lender," made the following representation and warranty to the Debtor: "[A]s of time

50

of the delivery to the Company of [Connie Berg's] Initial Seller/ESOP Loan Documents, . . . no default or defaults have occurred with respect to the Initial Seller/ESOP Note[ or] the Initial Seller/ESOP Loan Agreement . . . ."

256.    Connie Berg's representations to the Debtor were knowingly false.

257.    In contravention of her representation in Section 3.2(g) of the ESOP Purchase Agreement, Connie Berg knew of numerous undisclosed facts that were a basis for claims, legal actions, suits, arbitrations, government investigations, and other legal or administrative proceedings relating to the Debtor and the ESOP transaction, including breach of fiduciary duty claims, ERISA claims, fraud claims, investigations by the FBI, DOJ, and Department or Labor, and related claims and legal proceedings.  Without limitation, Connie Berg knew that a material amount of the Debtor's revenue was attributable to fraudulently obtained Set-Aside Contracts, the ESOP valuation was inflated, and the ESOP transaction was a prohibited transaction under ERISA.

258.    In contravention of her representation in Section 6 of the ESOP Modification Agreement, Connie Berg knew that defaults had occurred with respect to the Initial Seller/ESOP Loan Agreement.  Specifically, in Section 5.1 of the Initial Seller/ESOP Loan Agreement, Connie Berg made the following representations and warranties to the ESOP Trust and Paredes, as trustee:

a.    "The ESOP has been properly established in accordance with all applicable laws, regulations, and rulings . . . ."

b.    "The execution, delivery, and performance of this Agreement by the Seller does not and will not . . . violate any law, regulation, judgment, or order applicable to the Seller.

259.    But, as Connie Berg knew, these representations were false.  The ESOP transaction was a prohibited transaction under 29 U.S.C. § 1106(a)(1)(A) and Connie Berg's execution,

51

delivery, and performance of the Initial Seller/ESOP Loan Agreement breached her fiduciary duties under state law and ERISA.  Thus, as Connie Berg knew, a default had occurred under Section 5.1 of the Initial Seller/ESOP Loan Agreement.

260.    Connie Berg made these false representations to induce the Debtor to enter into the ESOP transaction, so she could monetize her equity interest at an inflated valuation.

261.    The Debtor reasonably relied on Connie Berg's representations in agreeing to and consummating the ESOP transaction.

262.    Connie Berg acted intentionally, willfully, and with actual malice.

263.    As a result of Connie Berg's misrepresentations, the Debtor has suffered damages in amount to be proven at trial.

**COUNT 9**
**Fraudulent Transfer (Actual Fraud)**
**11 U.S.C. § 544(b) and N.D. Cent. Code § 13-02.1-04(1)(a)**
**Plaintiff:  Erik A. Ahlgren, as Chapter 7 Trustee**
**Defendants:  Connie Berg, Kyle Berg, Connie Berg Trust, Kyle Berg Trust**

264.    All paragraphs in this Complaint are incorporated by reference.

265.    On August 27, 2020, the Debtor made an equity distribution of $6,272,060 to Connie Berg, paid in cash.

266.    The Debtor made this equity distribution with actual intent to hinder, delay, or defraud creditors.  The transfer was an immediate precursor to, and part of, the ESOP transaction, which the Bergs orchestrated to monetize Connie Berg's equity interest in the Debtor at a knowingly inflated valuation.  The Bergs acted to enrich themselves, while placing all risk on the Debtor's creditors.  By the time the federal government discovered their scheme to defraud SBA—which was the natural outcome of their actions—the Bergs would have already depleted the Debtor

of substantial cash via the equity distribution and ESOP transaction.  Creditors, meanwhile, would be left holding the bag—which is exactly what happened.

267.     The equity distribution had numerous badges of fraud.  First, the transfer was to or for the benefit of insiders, Connie Berg and Kyle Berg.  Second, the Bergs concealed material information regarding the Debtor's assets, liabilities, and enterprise value.  Third, the Debtor did not receive reasonable equivalent value from Connie Berg.  The transfer was simply a dividend on account of Connie Berg's equity interest in the Debtor, and the Berg's scheme to defraud the federal government and ESOP Trust negate any value she provided to the Debtor as its "owner."  Fourth, the Debtor incurred substantial debt immediately after the transfer, including the secured debt to Bankers Trust, seller financing from Connie Berg, and the obligations to the ESOP Trust.  Fifth, the transfer left the Debtor insolvent, unable to pay its debts when due, and/or with unreasonably small capital.

268.     Connie Berg was the initial transferee of the equity distribution.

269.     Kyle Berg, as Connie Berg's husband and the Debtor's *de facto* owner and true control person, was an intended beneficiary of the equity distribution.  Additionally, on information and belief, Kyle Berg was an immediate transferee of some or all of the equity distribution from Connie Berg, and was not a good faith transferee for value.

270.     On information and belief, the Connie Berg Trust and/or the Kyle Berg Trust were immediate or mediate transferees of some or all the equity distribution, and were not good faith transferees for value.

271.     As required by 11 U.S.C. § 544(b), the Debtor has creditors with allowed unsecured claims that arose before and/or after the Debtor made the equity distribution to Connie Berg that could avoid such transfer, including, without limitation: Firelake Construction, Inc. (Claim No. 1);

M & K Porta Potties (Claim No. 2); Right Choice Electric Inc. (Claim No. 5); LaCreek

Development Corporation (Claim No. 14); and Steptoe LLP (Claim No. 16).

272.    Based on the foregoing, the Debtor's $6,272,060 equity distribution to Connie Berg

is avoidable under 11 U.S.C. § 544(b) and N.D. Cent. Code § 13-02.1-04(1)(a).  Plaintiff may

avoid and recover the equity distribution from Connie Berg, Kyle Berg, the Connie Berg Trust,

and/or the Kyle Berg Trust.

**COUNT 10**
**Fraudulent Transfer (Constructive Fraud)**
**11 U.S.C. § 544(b) and N.D. Cent. Code § 13-02.1-04(1)(a)**
**Plaintiff:  Erik A. Ahlgren, as Chapter 7 Trustee**
**Defendants:  Connie Berg, Kyle Berg, Connie Berg Trust, Kyle Berg Trust**

273.    All paragraphs in this Complaint are incorporated by reference.

274.    On August 27, 2020, the Debtor made an equity distribution of $6,272,060 to

Connie Berg, paid in cash.

275.    The Debtor did not receive reasonably equivalent value from Connie Berg.  The

transfer was simply a dividend on account of her equity interest in the Debtor, and her scheme to

defraud the federal government and ESOP Trust negate any value she provided to the Debtor as

its "owner."

276.    When the Debtor made the transfer, (a) it was engaged or was about to engage in a

business or a transaction for which the remaining assets of the Debtor were unreasonably small in

relation to the business or transaction or the debtor intended to incur and/or (b) believed or

reasonably should have believed that the Debtor would incur, debts beyond the Debtor's ability to

pay as they became due.  The transfer depleted the Debtor of substantial cash just four days before

it incurred $11.9 million of secured debt to Banker Trust, millions of dollars of seller financing

obligations to Connie Berg, and obligations to the ESOP Trust. As a result of the Bergs' fraudulent scheme, the Debtor also faced substantial undisclosed criminal liability to the federal government.

277.    Connie Berg was the initial transferee of the equity distribution.

278.    Kyle Berg, as Connie Berg's husband and the Debtor's *de facto* owner and true control person, was an intended beneficiary of the equity distribution.   Additionally, on information and belief, Kyle Berg was an immediate transferee of some or all of the equity distribution from Connie Berg.

279.    On information and belief, the Connie Berg Trust and/or the Kyle Berg Trust were immediate or mediate transferees of some or all the equity distribution.

280.    As required by 11 U.S.C. § 544(b), the Debtor has creditors with allowed unsecured claims that arose before and/or after the Debtor made the equity distribution to Connie Berg that could avoid such transfer, including, without limitation: Firelake Construction, Inc. (Claim No. 1); M & K Porta Potties (Claim No. 2); Right Choice Electric Inc. (Claim No. 5); LaCreek Development Corporation (Claim No. 14); and Steptoe LLP (Claim No. 16).

281.    Based on the foregoing, the Debtor's $6,272,060 equity distribution to Connie Berg is avoidable under 11 U.S.C. § 544(b) and N.D. Cent. Code § 13-02.1-04(1)(b).  Plaintiff may avoid and recover the equity distribution from Connie Berg, Kyle Berg, the Connie Berg Trust, and/or the Kyle Berg Trust.

**COUNT 11**
**Fraudulent Transfer (Actual Fraud)**
**11 U.S.C. § 544(b) and N.D. Cent. Code § 13-02.1-04(1)(a)**
**Plaintiff:  Erik A. Ahlgren, as Chapter 7 Trustee**
**Defendants:  Connie Berg, Kyle Berg, Connie Berg Trust, Kyle Berg Trust**

282.    All paragraphs in this Complaint are incorporated by reference.

ACTIVE 700357335v3

283.    On August 31, 2020, the Debtor transferred $335,000 to the ESOP Trust as a plan contribution for the fiscal year ending 2019.  The ESOP Trust then immediately transferred the $335,000 to Connie Berg as partial payment for her 62,317 shares of the Debtor's stock.

284.    The Debtor transferred $335,000 to the ESOP Trust with actual intent to hinder, delay, or defraud its creditors.  The sole purpose of the transfer was to fund the ESOP Trust's acquisition of the Debtor's stock from Connie Berg, and the transfer amount was based on the Debtor's purported valuation of about $31.5 million.  However, in authorizing and causing the transfer, the Bergs knew that the valuation was inflated because a material amount of the Debtor's revenue was attributable to fraudulently obtained Set-Aside Contracts.  The Bergs orchestrated the transfer to enrich themselves, while placing all risk on the Debtor's creditors.  By the time the federal government discovered their scheme to defraud SBA—which was the natural outcome of their actions—the Bergs would have already depleted the Debtor of cash via the equity distribution and the ESOP transaction.  Creditors, meanwhile, would be left holding the bag—which is exactly what happened.

285.    The transfer had numerous badges of fraud.  First, the transfer was for the benefit of insiders, the Bergs.  Second, the Bergs concealed material information regarding the Debtor's assets, liabilities, and enterprise value.  Third, the Debtor did not receive reasonably equivalent value.  Fourth, the Debtor incurred substantial debt immediately before and after the transfer, including the secured debt to Bankers Trust, seller financing from Connie Berg, and the obligations to the ESOP Trust.  Fifth, the transfer left the Debtor insolvent, unable to pay its debts when due, and/or with unreasonably small capital.

286.    The ESOP Trust was the initial transferee of the transfer.

287.     Connie Berg was the immediate transferee from the ESOP Trust, and she was not a good faith transferee for value.

288.     On information and belief, Kyle Berg was an immediate transferee of some or all of the $335,000 transfer from Connie Berg, and he was not a good faith transferee for value.

289.     On information and belief, the Connie Berg Trust and/or the Kyle Berg Trust were immediate or mediate transferees of some or all of the $335,000 transfer, and were not good faith transferees for value.

290.     As required by 11 U.S.C. § 544(b), the Debtor has creditors with allowed unsecured claims that arose before and/or after the Debtor made the transfer to the ESOP Trust that could avoid such transfer, including, without limitation: Firelake Construction, Inc. (Claim No. 1); M & K Porta Potties (Claim No. 2); Right Choice Electric Inc. (Claim No. 5); LaCreek Development Corporation (Claim No. 14); and Steptoe LLP (Claim No. 16).

291.     Based on the foregoing, the Debtor's $335,000 transfer to the ESOP Trust is avoidable under 11 U.S.C. § 544(b) and N.D. Cent. Code § 13-02.1-04(1)(a).  Plaintiff may avoid the transfer and, pursuant to N.D. Cent. Code § 13-02.1-08(a)(2), recover it from Connie Berg, Kyle Berg, the Connie Berg Trust, and/or the Kyle Berg Trust.

### COUNT 12
### Fraudulent Transfer (Actual Fraud)
### 11 U.S.C. § 544(b) and N.D. Cent. Code § 13-02.1-04(1)(a)
### Plaintiff:  Erik A. Ahlgren, as Chapter 7 Trustee
### Defendants:  Connie Berg, Kyle Berg, Connie Berg Trust, Kyle Berg Trust

292.     All paragraphs in this Complaint are incorporated by reference.

293.     On August 31, 2020, the Debtor transferred $200,000 to the ESOP Trust as a plan contribution for the fiscal year ending 2020.  The ESOP Trust then immediately transferred the $200,000 to Connie Berg as partial payment for her 62,317 shares of the Debtor's stock.

294.    The Debtor transferred $200,000 to the ESOP Trust with actual intent to hinder, delay, or defraud its creditors.  The sole purpose of the transfer was to fund the ESOP Trust's acquisition of the Debtor's stock from Connie Berg, and the transfer amount was based on the Debtor's purported valuation of about $31.5 million.  However, in authorizing and causing the transfer, the Bergs knew that the valuation was inflated because a material amount of the Debtor's revenue was attributable to fraudulently obtained Set-Aside Contracts.  The Bergs orchestrated the transfer to enrich themselves, while placing all risk on the Debtor's creditors.  By the time the federal government discovered their scheme to defraud SBA—which was the natural outcome of their actions—the Bergs would have already cashed out Connie Berg's equity interest via the ESOP transaction.  Creditors, meanwhile, would be left holding the bag—which is exactly what happened.

295.    The transfer had numerous badges of fraud.  First, the transfer was for the benefit of insiders, the Bergs.  Second, the Bergs concealed material information regarding the Debtor's assets, liabilities, and enterprise value.  Third, the Debtor did not receive reasonably equivalent value.  Fourth, the Debtor incurred substantial debt immediately before and after the transfer, including the secured debt to Bankers Trust, seller financing from Connie Berg, and the obligations to the ESOP Trust.  Fifth, the transfer left the Debtor insolvent, unable to pay its debts when due, and/or with unreasonably small capital.

296.    The ESOP Trust was the initial transferee of the transfer.

297.    Connie Berg was the immediate transferee from the ESOP Trust, and she was not a good faith transferee for value.

298.    On information and belief, Kyle Berg was an immediate transferee of some or all of the $200,000 transfer from Connie Berg.  Further, he was not a good faith transferee for value.

58

299.     On information and belief, the Connie Berg Trust and/or the Kyle Berg Trust were immediate or mediate transferees of some or all of the $200,000 transfer, and were not good faith transferees for value.

300.     As required by 11 U.S.C. § 544(b), the Debtor has creditors with allowed unsecured claims that arose before and/or after the Debtor made the transfer to the ESOP Trust that could avoid such transfer, including, without limitation: Firelake Construction, Inc. (Claim No. 1); M & K Porta Potties (Claim No. 2); Right Choice Electric Inc. (Claim No. 5); LaCreek Development Corporation (Claim No. 14); and Steptoe LLP (Claim No. 16).

301.     Based on the foregoing, the Debtor's $200,000 transfer to the ESOP Trust is avoidable under 11 U.S.C. § 544(b) and N.D. Cent. Code § 13-02.1-04(1)(a).  Plaintiff may avoid the transfer and, pursuant to N.D. Cent. Code § 13-02.1-08(a)(2), recover it from Connie Berg, Kyle Berg, the Connie Berg Trust, and the Kyle Berg Trust.

**COUNT 13**
**Fraudulent Transfer/Obligation (Actual Fraud)**
**11 U.S.C. § 544(b) and N.D. Cent. Code § 13-02.1-04(1)(a)**
**Plaintiff:  Erik A. Ahlgren, as Chapter 7 Trustee**
**Defendants:  Connie Berg, Kyle Berg, Connie Berg Trust, Kyle Berg Trust**

302.     All paragraphs in this Complaint are incorporated by reference.

303.     On August 31, 2020, the Debtor "loaned" $8,479,246 to the ESOP Trust pursuant to the terms of the ESOP Purchase Agreement, the Initial Company/ESOP Loan Agreement, the Initial Company/ESOP, and the A&R Seller Note (collectively, the "Loan Documents").  The ESOP Trust then immediately transferred the $8,479,246 in cash to Connie Berg as partial payment for her 62,317 shares of the Debtor's stock.

304.     The Debtor incurred the obligation to loan $8,479,246 to the ESOP Trust under the Loan Documents, and then transferred $8,479,246 to the ESOP Trust, with actual intent to hinder,

ACTIVE 700357335v3

delay, or defraud its creditors. The sole purpose for incurring the obligation and making the transfer was to fund the ESOP Trust's acquisition of the Debtor's stock from Connie Berg. The transfer amount was based on the Debtor's purported valuation of about $31.5 million. However, in authorizing and causing the Debtor to incur the obligation and make the transfer, the Bergs knew that this valuation was inflated because a material amount of the Debtor's revenue was attributable to fraudulently obtained Set-Aside Contracts. The Bergs orchestrated the obligation and transfer to enrich themselves, while placing all risk on the Debtor's creditors. By the time the federal government discovered their scheme to defraud SBA—which was the natural outcome of their actions—the Bergs would have already cashed out Connie Berg's equity interest via the ESOP transaction. Creditors, meanwhile, would be left holding the bag—which is exactly what happened.

305. The obligation and transfer had numerous badges of fraud. First, they were for the benefit of insiders, Connie Berg and Kyle Berg. Second, the Bergs concealed material information regarding the Debtor's assets, liabilities, and enterprise value. Third, the Debtor did not receive reasonably equivalent value. Fourth, the Debtor incurred substantial debt immediately before and after incurring the obligation and making the transfer, including the secured debt to Bankers Trust, seller financing from Connie Berg, and the obligations to the ESOP Trust. Fifth, obligation and transfer left the Debtor insolvent, unable to pay its debts when due, and/or with unreasonably small capital.

306. The ESOP Trust was the initial obligee and transferee.

307. Connie Berg was the immediate transferee of $8,479,246 from the ESOP Trust, and she was not a good faith transferee for value.

60

308.    On information and belief, Kyle Berg was an immediate transferee of some or all of the $8,479,249 transfer from Connie Berg, and he was not a good faith transferee for value.

309.    On information and belief, the Connie Berg Trust and/or the Kyle Berg Trust were immediate or mediate transferees of some or all of the $8,479,246 transfer, and were not good faith transferees for value.

310.    As required by 11 U.S.C. § 544(b), the Debtor has creditors with allowed unsecured claims that arose before and/or after the Debtor incurred the obligation and made the transfer that could avoid them, including, without limitation: Firelake Construction, Inc. (Claim No. 1); M & K Porta Potties (Claim No. 2); Right Choice Electric Inc. (Claim No. 5); LaCreek Development Corporation (Claim No. 14); and Steptoe LLP (Claim No. 16).

311.    Based on the foregoing, the Debtor's obligation under the Loan Documents to transfer $8,479,246 to the ESOP Trust, and its subsequent transfer of $8,479,246 to the ESOP Trust, are avoidable under 11 U.S.C. § 544(b) and N.D. Cent. Code § 13-02.1-04(1)(a).  Plaintiff may avoid such obligation and transfer and, pursuant to N.D. Cent. Code § 13-02.1-08(a)(2), recover the transfer from Connie Berg, Kyle Berg, the Connie Berg Trust, and/or the Kyle Berg Trust.

**COUNT 14**
**Fraudulent Transfers/Obligation (Actual Fraud)**
**11 U.S.C. § 544(b) and N.D. Cent. Code § 13-02.1-04(1)(a)**
**Plaintiff:  Erik A. Ahlgren, as Chapter 7 Trustee**
**Defendants:  Connie Berg, Kyle Berg, Connie Berg Trust, Kyle Berg Trust**

312.    All paragraphs in this Complaint are incorporated by reference.

313.    On August 31, 2020, the Debtor executed the Redemption Note and other related agreements and instruments in favor of Connie Berg and incurred an obligation thereunder to pay her $12,094,000 plus interest (the "Redemption Obligation").  From and after August 31, 2020,

61

the Debtor then made periodic principal and/or interest payments to Connie Berg on account of the Redemption Obligation pursuant to the terms of the Redemption Note (the "Redemption Obligation Payments"). The Debtor incurred the Redemption Obligation, and then made the Redemption Obligation Payments, with actual intent to hinder, delay, or defraud its creditors.

314. The Debtor incurred the Redemption Obligation to purchase and redeem 37,683 shares of the Debtor's stock from Connie Berg as part of the ESOP transaction. However, the obligation amount was based on the Debtor's purported valuation of about $31.5 million, which Connie Berg knew was inflated because a material amount of the Debtor's revenue was attributable to fraudulently obtained Set-Aside Contracts. Connie Berg, with assistance from Kyle Berg, orchestrated the Redemption Obligation, and subsequent Redemption Obligation Payments, to enrich herself, while placing all risk on the Debtor's creditors. By the time the federal government discovered their scheme to defraud SBA—which was the natural outcome of their actions—the Bergs would have already cashed out Connie Berg's equity interest via the ESOP transaction and received the Redemption Obligation Payments. Creditors, meanwhile, would be left holding the bag—which is exactly what happened.

315. The Redemption Obligation and Redemption Obligation Payments had numerous badges of fraud. First, they were to or for the benefit of insiders, Connie Berg and Kyle Berg. Second, the Bergs concealed material information regarding the Debtor's assets, liabilities, and enterprise value in connection with the Debtor's incurrence of the Redemption Obligation. Third, the Debtor did not receive reasonably equivalent value. The shares were worth materially less than $12,094,000. Fourth, the Debtor incurred substantial debt immediately before and after incurring the Redemption Obligation, including the secured debt to Bankers Trust, other seller financing from Connie Berg, and the obligations to the ESOP Trust. Fifth, Redemption Obligation

and the Redemption Obligation Payments left the Debtor insolvent, unable to pay its debts when due, and/or with unreasonably small capital.

316.    Connie Berg was the obligee of the Redemption Obligation and the initial transferee of the Redemption Obligation Payments.

317.    On information and belief, Kyle Berg was an immediate transferee of some or all the Redemption Obligation Payments from Connie Berg, and he was not a good faith transferee for value.

318.    On information and belief, the Connie Berg Trust and/or the Kyle Berg Trust were immediate or mediate transferees of some or all of the Redemption Obligation Payments, and were not good faith transferees for value.

319.    As required by 11 U.S.C. § 544(b), the Debtor has creditors with allowed unsecured claims that arose before and/or after the Debtor incurred the Redemption Obligation and made the Redemption Obligation Payments to Connie Berg that could avoid them, including, without limitation: Firelake Construction, Inc. (Claim No. 1); M & K Porta Potties (Claim No. 2); Right Choice Electric Inc. (Claim No. 5); LaCreek Development Corporation (Claim No. 14); and Steptoe LLP (Claim No. 16).

320.    Based on the foregoing, the Redemption Obligation and each of the Redemption Obligation Payments are avoidable under 11 U.S.C. § 544(b) and N.D. Cent. Code § 13-02.1-04(1)(a).  Plaintiff may avoid the Redemption Obligation and Redemption Obligation Payments and, pursuant to N.D. Cent. Code § 13-02.1-08(a)(2), recover the Redemption Obligation Payments from Connie Berg, Kyle Berg, the Connie Berg Trust, and/or the Kyle Berg Trust.

ACTIVE 700357335v3

**COUNT 15**
**Fraudulent Transfers/Obligation (Actual Fraud)**
**11 U.S.C. § 544(b) and N.D. Cent. Code § 13-02.1-04(1)(a)**
**Plaintiff:  Erik A. Ahlgren, as Chapter 7 Trustee**
**Defendants:  Connie Berg, Kyle Berg, Connie Berg Trust, Kyle Berg Trust**

321.    All paragraphs in this Complaint are incorporated by reference.

322.    On August 31, 2020, the Debtor executed the A&R Seller Note and other related agreements and instruments in favor of Connie Berg and incurred an obligation thereunder to pay her $10,985,754 plus interest (the "Seller Obligation").  From and after August 31, 2020, the Debtor then made periodic principal and/or interest payments to Connie Berg on account of the Seller Obligation pursuant to the terms of the A&R Seller Note (the "Seller Obligation Payments"). The Debtor incurred the Seller Obligation, and then made the Seller Obligation Payments, with actual intent to hinder, delay, or defraud its creditors.

323.    The Debtor incurred the Seller Obligation as part of the ESOP transaction. However, the obligation amount was based on the Debtor's purported valuation of about $31.5 million, which Connie Berg knew was inflated because a material amount of the Debtor's revenue was attributable to fraudulently obtained Set-Aside Contracts.  Connie Berg, with assistance from Kyle Berg, orchestrated the Seller Obligation, and subsequent Seller Obligation Payments, to enrich herself, while placing all risk on the Debtor's creditors.  By the time the federal government discovered their scheme to defraud SBA—which was the natural outcome of their actions—the Bergs would have already cashed out Connie Berg's equity interest and received the Seller Obligation Payments.  Creditors, meanwhile, would be left holding the bag—which is exactly what happened.

324.    The Seller Obligation and Seller Obligation Payments had numerous badges of fraud.  First, they were to or for the benefit of insiders, Connie Berg and Kyle Berg.  Second, the

ACTIVE 700357335v3

Bergs concealed material information regarding the Debtor's assets, liabilities, and enterprise value in connection with the Debtor's incurrence of the Seller Obligation. Third, the Debtor did not receive reasonably equivalent value. Fourth, the Debtor incurred substantial debt immediately before and after incurring the Seller Obligation, including the secured debt to Bankers Trust, other seller financing from Connie Berg, and the obligations to the ESOP Trust. Fifth, the Seller Obligation and the Seller Obligation Payments left the Debtor insolvent, unable to pay its debts when due, and/or with unreasonably small capital.

325.    Connie Berg was the obligee of the Seller Obligation and the initial transferee of the Seller Obligation Payments.

326.    On information and belief, Kyle Berg was an immediate transferee of some or all the Seller Obligation Payments from Connie Berg, and he was not a good faith transferee for value.

327.    On information and belief, the Connie Berg Trust and/or the Kyle Berg Trust were immediate or mediate transferees of some or all of the Seller Obligation Payments, and were not good faith transferees for value.

328.    As required by 11 U.S.C. § 544(b), the Debtor has creditors with allowed unsecured claims that arose before and/or after the Debtor incurred the Seller Obligation and made the Seller Obligation Payments to Connie Berg that could avoid them, including, without limitation: Firelake Construction, Inc. (Claim No. 1); M & K Porta Potties (Claim No. 2); Right Choice Electric Inc. (Claim No. 5); LaCreek Development Corporation (Claim No. 14); and Steptoe LLP (Claim No. 16).

329.    Based on the foregoing, the Seller Obligation and each of the Seller Obligation Payments are avoidable under 11 U.S.C. § 544(b) and N.D. Cent. Code § 13-02.1-04(1)(a). Plaintiff may avoid the Seller Obligation and Seller Obligation Payments and, pursuant to N.D.

Cent. Code § 13-02.1-08(a)(2), recover the Seller Obligation Payments from Connie Berg, Kyle

Berg, the Connie Berg Trust, and the Kyle Berg Trust.

**COUNT 16**
**Fraudulent Transfer (Constructive Fraud)**
**11 U.S.C. § 544(b) and N.D. Cent. Code § 13-02.1-04(1)(b)**
**Plaintiff:  Erik A. Ahlgren, as Chapter 7 Trustee**
**Defendants:  Connie Berg, Kyle Berg, Connie Berg Trust, Kyle Berg Trust**

330.     All paragraphs in this Complaint are incorporated by reference.

331.     On August 31, 2020, the Debtor transferred $335,000 to the ESOP Trust as a plan

contribution for the fiscal year ending 2019.  The ESOP Trust then immediately transferred the

$335,000 to Connie Berg as partial payment for her 62,317 shares of the Debtor's stock.

332.     The Debtor did not receive reasonably equivalent value from the ESOP Trust.

333.     When the Debtor made the transfer, (a) it was engaged or was about to engage in a

business or a transaction for which the remaining assets of the Debtor were unreasonably small in

relation to the business or transaction or the debtor intended to incur and/or (b) believed or

reasonably should have believed that the Debtor would incur, debts beyond the Debtor's ability to

pay as they became due.  The transfer depleted the Debtor of cash at the same time that the Debtor

transferred millions of dollars to the ESOP Trust to pay Connie Berg for stock in the Debtor, made

a $6.2 million equity distribution to Connie Berg, incurred $11.9 million of secured debt to Banker

Trust, incurred millions of dollars of seller financing obligations to Connie Berg, and incurred

other obligations to the ESOP Trust. As a result of the Bergs' fraudulent scheme, the Debtor also

faced substantial undisclosed criminal liability to the federal government.

334.     The ESOP Trust was the initial transferee of the transfer.

335.     Connie Berg was the immediate transferee from the ESOP Trust, and she was not

a good faith transferee for value.

66

336.    On information and belief, Kyle Berg was an immediate transferee of some or all of the $335,000 transfer from Connie Berg. Further, he was not a good faith transferee for value.

337.    On information and belief, the Connie Berg Trust and/or the Kyle Berg Trust were immediate or mediate transferees of some or all of the $335,000 transfer, and were not good faith transferees for value.

338.    As required by 11 U.S.C. § 544(b), the Debtor has creditors with allowed unsecured claims that arose before and/or after the Debtor made the transfer to the ESOP Trust that could avoid such transfer, including, without limitation: Firelake Construction, Inc. (Claim No. 1); M & K Porta Potties (Claim No. 2); Right Choice Electric Inc. (Claim No. 5); LaCreek Development Corporation (Claim No. 14); and Steptoe LLP (Claim No. 16).

339.    Based on the foregoing, the Debtor's $335,000 transfer to the ESOP Trust is avoidable under 11 U.S.C. § 544(b) and N.D. Cent. Code § 13-02.1-04(1)(b). Plaintiff may avoid the transfer and, pursuant to N.D. Cent. Code § 13-02.1-08(a)(2), recover it from Connie Berg, Kyle Berg, the Connie Berg Trust, and the Kyle Berg Trust.

### COUNT 17
**Fraudulent Transfer (Constructive Fraud)**
**11 U.S.C. § 544(b) and N.D. Cent. Code § 13-02.1-04(1)(b)**
**Plaintiff: Erik A. Ahlgren, as Chapter 7 Trustee**
**Defendants: Connie Berg, Kyle Berg, Connie Berg Trust, Kyle Berg Trust**

340.    All paragraphs in this Complaint are incorporated by reference.

341.    On August 31, 2020, the Debtor transferred $200,00 to the ESOP Trust as a plan contribution for the fiscal year ending 2020. The ESOP Trust then immediately transferred the $200,000 to Connie Berg as partial payment for her 62,317 shares of the Debtor's stock.

342.    The Debtor did not receive reasonably equivalent value from the ESOP Trust.

67

343.    When the Debtor made the transfer, (a) it was engaged or was about to engage in a business or a transaction for which the remaining assets of the Debtor were unreasonably small in relation to the business or transaction or the debtor intended to incur and/or (b) believed or reasonably should have believed that the Debtor would incur, debts beyond the Debtor's ability to pay as they became due.  The transfer depleted the Debtor of cash at the same time that the Debtor transferred millions of dollars to the ESOP Trust to pay Connie Berg for her stock in the Debtor, made a $6.2 million equity distribution to Connie Berg, incurred $11.9 million of secured debt to Banker Trust, incurred millions of dollars of seller financing obligations to Connie Berg, and incurred other obligations to the ESOP Trust. As a result of the Bergs' fraudulent scheme, the Debtor also faced substantial undisclosed criminal liability to the federal government.

344.    The ESOP Trust was the initial transferee of the transfer.

345.    Connie Berg was the immediate transferee from the ESOP Trust, and she was not a good faith transferee for value.

346.    On information and belief, Kyle Berg was an immediate transferee of some or all of the $200,000 transfer from Connie Berg.  Further, he was not a good faith transferee for value.

347.    On information and belief, the Connie Berg Trust and/or the Kyle Berg Trust were immediate or mediate transferees or some or all of the $200,000 transfer, and were not good faith transferees for value.

348.    As required by 11 U.S.C. § 544(b), the Debtor has creditors with allowed unsecured claims that arose before and/or after the Debtor made the transfer to the ESOP Trust that could avoid such transfer, including, without limitation: Firelake Construction, Inc. (Claim No. 1); M & K Porta Potties (Claim No. 2); Right Choice Electric Inc. (Claim No. 5); LaCreek Development Corporation (Claim No. 14); and Steptoe LLP (Claim No. 16).

349.     Based on the foregoing, the Debtor's $200,000 transfer to the ESOP Trust is avoidable under 11 U.S.C. § 544(b) and N.D. Cent. Code § 13-02.1-04(1)(b).  Plaintiff may avoid the transfer and, pursuant to N.D. Cent. Code § 13-02.1-08(a)(2), recover it from Connie Berg, Kyle Berg, the Connie Berg Trust, and the Kyle Berg Trust.

### COUNT 18
**Fraudulent Transfer/Obligation (Constructive Fraud)**
**11 U.S.C. § 544(b) and N.D. Cent. Code § 13-02.1-04(1)(b)**
**Plaintiff:  Erik A. Ahlgren, as Chapter 7 Trustee**
**Defendants:  Connie Berg, Kyle Berg, Connie Berg Trust, Kyle Berg Trust**

350.     All paragraphs in this Complaint are incorporated by reference.

351.     On August 31, 2020, the Debtor "loaned" $8,479,246 to the ESOP Trust pursuant to the terms of the ESOP Purchase Agreement, the Initial Company/ESOP Loan Agreement, the Initial Company/ESOP, and the A&R Seller Note (collectively, the "Loan Documents").  The ESOP Trust then immediately transferred the $8,479,246 in cash to Connie Berg as partial payment for her 62,317 shares of the Debtor's stock.

352.     The Debtor incurred the obligation to loan $8,479,246 to the ESOP Trust under the Loan Documents, and then transferred $8,479,246 to the ESOP Trust, but did not receive reasonably equivalent value in return from the ESOP Trust.

353.     When the Debtor incurred the obligation and made the transfer, (a) it was engaged or was about to engage in a business or a transaction for which the remaining assets of the Debtor were unreasonably small in relation to the business or transaction or the debtor intended to incur and/or (b) believed or reasonably should have believed that the Debtor would incur, debts beyond the Debtor's ability to pay as they became due.  The transfer depleted the Debtor of cash at the same time that the Debtor transferred substantial funds to the ESOP Trust to pay Connie Berg for her stock in the Debtor, made a $6.2 million equity distribution to Connie Berg, incurred $11.9

million of secured debt to Banker Trust, incurred millions of dollars of seller financing obligations to Connie Berg, and incurred other obligations to the ESOP Trust. As a result of the Bergs' fraudulent scheme, the Debtor also faced substantial undisclosed criminal liability to the federal government.

354.    The ESOP Trust was the initial obligee and transferee.

355.    Connie Berg was the immediate transferee of $8,479,246 from the ESOP Trust, and she was not a good faith transferee for value.

356.    On information and belief, Kyle Berg was an immediate transferee of some or all of the $8,479,246 transfer from Connie Berg, and he was not a good faith transferee for value.

357.    On information and belief, the Connie Berg Trust and/or the Kyle Berg Trust were immediate or mediate transferees of some or all of the $8,479,246 transfer, and were not good faith transferees for value.

358.    As required by 11 U.S.C. § 544(b), the Debtor has creditors with allowed unsecured claims that arose before and/or after the Debtor incurred the obligation and made the transfer that could avoid them, including, without limitation: Firelake Construction, Inc. (Claim No. 1); M & K Porta Potties (Claim No. 2); Right Choice Electric Inc. (Claim No. 5); LaCreek Development Corporation (Claim No. 14); and Steptoe LLP (Claim No. 16).

359.    Based on the foregoing, the Debtor's obligation under the Loan Documents to transfer $8,479,246 to the ESOP Trust, and its subsequent transfer of $8,479,246 to the ESOP Trust, are avoidable under 11 U.S.C. § 544(b) and N.D. Cent. Code § 13-02.1-04(1)(b). Plaintiff may avoid such obligation and transfer and, pursuant to N.D. Cent. Code § 13-02.1-08(a)(2), recover the transfer from Connie Berg, Kyle Berg, the Connie Berg Trust, and/or the Kyle Berg Trust.

70

**COUNT 19**
**Fraudulent Transfers/Obligation (Constructive Fraud)**
**11 U.S.C. § 544(b) and N.D. Cent. Code § 13-02.1-04(1)(b)**
**Plaintiff:  Erik A. Ahlgren, as Chapter 7 Trustee**
**Defendants:  Connie Berg, Kyle Berg, Connie Berg Trust, Kyle Berg Trust**

360.    All paragraphs in this Complaint are incorporated by reference.

361.    On August 31, 2020, the Debtor executed the Redemption Note and other related agreements and instruments in favor of Connie Berg and incurred an obligation thereunder to pay her $12,094,000 plus interest (the "Redemption Obligation").  From and after August 31, 2020, the Debtor then made periodic principal and/or interest payments to Connie Berg on account of the Redemption Obligation pursuant to the terms of the Redemption Note (the "Redemption Obligation Payments").

362.    The Debtor incurred the Redemption Obligation, and then made each of the Redemption Obligation Payments, but did not receive reasonably equivalent value from Connie Berg.  The Debtor incurred the Redemption Obligation and made the Redemption Obligation Payments to purchase and redeem 37,683 shares of the Debtor's stock from Connie Berg.  But the shares were worth a fraction of that amount.  The share valuation was inflated because a material amount of the Debtor's revenue was attributable to fraudulently obtained Set-Aside Contracts.

363.    When the Debtor incurred the Redemption Obligation and then made each of the Redemption Obligation Payments, (a) it was engaged or was about to engage in a business or a transaction for which the remaining assets of the Debtor were unreasonably small in relation to the business or transaction or the debtor intended to incur and/or (b) believed or reasonably should have believed that the Debtor would incur, debts beyond the Debtor's ability to pay as they became due.  The Debtor incurred the obligation at the same time that it transferred substantial funds to the ESOP Trust to pay Connie Berg for her remaining stock in the Debtor, made a $6.2 million

71

equity distribution to Connie Berg, incurred $11.9 million of secured debt to Banker Trust, incurred millions of dollars of other seller financing obligations to Connie Berg, and incurred other obligations to the ESOP Trust. As a result of the Bergs' fraudulent scheme, the Debtor also faced substantial undisclosed criminal liability to the federal government.

364.    Connie Berg is the obligee of the Redemption Obligation and the initial transferee of the Redemption Obligation Payments.

365.    On information and belief, Kyle Berg was an immediate transferee of some or all the Redemption Obligation Payments from Connie Berg, and he was not a good faith transferee for value.

366.    On information and belief, the Connie Berg Trust and/or the Kyle Berg Trust were immediate or mediate transferees of some or all of the Redemption Obligation Payments, and were not good faith transferees for value.

367.    As required by 11 U.S.C. § 544(b), the Debtor has creditors with allowed unsecured claims that arose before and/or after the Debtor incurred the Redemption Obligation and made the Redemption Obligation Payments to Connie Berg that could avoid them, including, without limitation: Firelake Construction, Inc. (Claim No. 1); M & K Porta Potties (Claim No. 2); Right Choice Electric Inc. (Claim No. 5); LaCreek Development Corporation (Claim No. 14); and Steptoe LLP (Claim No. 16).

368.    Based on the foregoing, the Redemption Obligation and each of the Redemption Obligation Payments are avoidable under 11 U.S.C. § 544(b) and N.D. Cent. Code § 13-02.1-04(1)(b).  Plaintiff may avoid the Redemption Obligation and Redemption Obligation Payments and, pursuant to N.D. Cent. Code § 13-02.1-08(a)(2), recover the Redemption Obligation Payments from Connie Berg, Kyle Berg, the Connie Berg Trust, and/or the Kyle Berg Trust.

ACTIVE 700357335v3

**COUNT 20**
**Fraudulent Transfers/Obligation (Constructive Fraud)**
**11 U.S.C. § 544(b) and N.D. Cent. Code § 13-02.1-04(1)(b)**
**Plaintiff:  Erik A. Ahlgren, as Chapter 7 Trustee**
**Defendants:  Connie Berg, Kyle Berg, Connie Berg Trust, Kyle Berg Trust**

369.    All paragraphs in this Complaint are incorporated by reference.

370.    On August 31, 2020, the Debtor executed the A&R Seller Note and other related agreements and instruments in favor of Connie Berg and incurred an obligation thereunder to pay her $10,985,754 plus interest (the "Seller Obligation").  From and after August 31, 2020, the Debtor then made periodic principal and interest payments to Connie Berg on account of the Seller Obligation pursuant to the terms of the A&R Seller Note (the "Seller Obligation Payments").

371.    The Debtor incurred the Seller Obligation, and then made each of the Seller Obligation Payments, but did not receive reasonably equivalent value from Connie Berg.   The Debtor incurred the Seller Obligation and made the Seller Obligation Payments in connection with the ESOP Trust's purchase of 62,317 shares of the Debtor's stock from Connie Berg.  But the shares were worth a fraction of that amount.  The share valuation was inflated because a material amount of the Debtor's revenue was attributable to fraudulently obtained Set-Aside Contracts.

372.    When the Debtor incurred the Seller Obligation and then made each Seller Obligation Payment, (a) it was engaged or was about to engage in a business or a transaction for which the remaining assets of the Debtor were unreasonably small in relation to the business or transaction or the debtor intended to incur and/or (b) believed or reasonably should have believed that the Debtor would incur, debts beyond the Debtor's ability to pay as they became due.  The Debtor incurred the obligation at the same time that it transferred substantial funds to the ESOP Trust to pay Connie Berg for her remaining stock in the Debtor, made a $6.2 million equity distribution to Connie Berg, incurred $11.9 million of secured debt to Banker Trust, incurred

millions of dollars of other seller financing obligations to Connie Berg, and incurred other obligations to the ESOP Trust. As a result of the Bergs' fraudulent scheme, the Debtor also faced substantial undisclosed criminal liability to the federal government.

373.    Connie Berg was the obligee of the Seller Obligation and the initial transferee of the Seller Obligation Payments.

374.    On information and belief, Kyle Berg was an immediate transferee of some or all the Seller Obligation Payments from Connie Berg, and he was not a good faith transferee for value.

375.    On information and belief, the Connie Berg Trust and/or the Kyle Berg Trust were immediate or mediate transferees of some or all of the Seller Obligation Payments, and were not good faith transferees for value.

376.    As required by 11 U.S.C. § 544(b), the Debtor has creditors with allowed unsecured claims that arose before and/or after the Debtor incurred the Seller Obligation and made the Seller Obligation Payments to Connie Berg that could avoid them, including, without limitation: Firelake Construction, Inc. (Claim No. 1); M & K Porta Potties (Claim No. 2); Right Choice Electric Inc. (Claim No. 5); LaCreek Development Corporation (Claim No. 14); and Steptoe LLP (Claim No. 16)

377.    Based on the foregoing, the Seller Obligation and each of the Seller Obligation Payments are avoidable under 11 U.S.C. § 544(b) and N.D. Cent. Code § 13-02.1-04(1)(b). Plaintiff may avoid the Seller Obligation and Seller Obligation Payments and, pursuant to N.D. Cent. Code § 13-02.1-08(a)(2), recover the Seller Obligation Payments from Connie Berg, Kyle Berg, the Connie Berg Trust, and/or the Kyle Berg Trust.

**COUNT 21**
**Breach of Fiduciary Duty (ERISA)**
**11 U.S.C. § 704(a)(11) and 29 U.S.C. §§ 1104, 1106, 1109, 1132**
**Plaintiff:  Erik A. Ahlgren, as ESOP Plan Administrator**
**Defendant:  Miguel Paredes**

378.    All paragraphs in this Complaint are incorporated by reference, except the paragraphs comprising Counts 25-27.

379.    At the time of the commencement of this bankruptcy case, the Debtor (or an entity designated by the Debtor) served as the administrator of the ESOP Plan, which is an employee benefit plan.  Thus, under 11 U.S.C. § 704(a)(11), Plaintiff is authorized and empowered to "continue to perform the obligations required of the administrator."

380.    As a plan fiduciary, Plaintiff has statutory standing to bring this civil action pursuant to 11 U.S.C. § 704(a)(11) and 29 U.S.C. § 1132(a)(2), (3).

381.    Under 29 U.S.C. § 1104(a)(1)(B), a fiduciary of an ERISA plan must discharge his or her duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

382.    Under 29 U.S.C. §§ 1106(a)(1)(A), (D) and 1108(b)(17)(A), "[a] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . (A) sale or exchange, or leasing, of any property between the plan and a party in interest [or] . . . (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan," unless "in connection with such transaction the plan receives no less, nor pays no more, than adequate consideration."  "Adequate consideration" is defined as "the fair market value of the asset as determined in good faith by the trustee or named

fiduciary pursuant to the terms of the plan and in accordance with regulations promulgated by the Secretary." 11 U.S.C. § 1002(18).

383.    At all relevant times, Paredes was trustee of the ESOP Trust and, therefore, a plan fiduciary.

384.    Paredes breached his duties under 29 U.S.C. §§ 1104(a)(1)(B) and 1106(a)(1)(A), (D) by causing the ESOP Trust to enter into a prohibited transaction with Connie Berg.

385.    First, Connie Berg was a party in interest with respect to the ESOP Plan and ESOP Trust because she owned more than 10% of the Debtor and was an employee, officer, and director of the Debtor.  *See* 29 U.S.C. § 1002(14)(A), (H).

386.    Second, Paredes caused the ESOP Plan and ESOP Trust to enter into a transaction with Connie Berg covered by 29 U.S.C. § 1106(a)(1)(A) and (D).  Specifically, the ESOP Trust purchased the Debtor's stock from Connie Berg.

387.    Third, the ESOP Plan and ESOP Trust did not receive "adequate consideration" from Connie Berg in exchange for the Debtor's stock.  The shares were substantially overvalued because a material amount of the Debtor's revenue was attributable to fraudulently obtained Set-Aside Contracts, and the Debtor faced substantial undisclosed liabilities relating to the fraud.

388.    Fourth, Paredes did not determine the fair market value of the Debtor's stock in good faith.  The Debtor's entire business involved bidding on government contracts.  Had Paredes conducted even basic due diligence, he would have discovered that it did not actually qualify for the 8(a) and WOSB Programs, was not a small business, received thousands of Set-Aside Contracts to which it was not entitled, could not sustain its revenue, and faced substantial undisclosed liabilities relating to the Bergs' fraud.

ACTIVE 700357335v3

389.    As a result of the Paredes' breaches of fiduciary duties, Plaintiff is entitled to recover damages, restitution, and other relief in accordance with 29 U.S.C. § 1109(a), in amount(s) to be determined at trial.

390.    Pursuant to 29 U.S.C. § 1132(g)(1), Plaintiff is also entitled to recover reasonable attorneys' fees and costs.

**COUNT 22**
**Breach of Fiduciary Duty (ERISA)**
**11 U.S.C. § 704(a)(11) and 29 U.S.C. §§ 1104, 1106, 1109, 1132**
**Plaintiff:  Erik A. Ahlgren, as ESOP Plan Administrator**
**Defendants:  Connie Berg and Kyle Berg**

391.    All paragraphs in this Complaint are incorporated by reference.

392.    At the time of the commencement of this bankruptcy case, the Debtor (or an entity designated by the Debtor) served as the administrator of the ESOP Plan, which is an employee benefit plan.  Thus, under 11 U.S.C. § 704(a)(11), Plaintiff is authorized and empowered to "continue to perform the obligations required of the administrator."

393.    As a plan fiduciary, Plaintiff has standing to bring this civil action pursuant to 11 U.S.C. § 704(a)(11) and 29 U.S.C. § 1132(a)(2), (3).

394.    Under 29 U.S.C. § 1104(a)(1)(B), a fiduciary of an ERISA plan must discharge his or her duties "solely in the interest if the participants and beneficiaries" and "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

395.    Additionally, an ERISA fiduciary has a duty to ensure that the plan does not engage in a prohibited transaction under 29 U.S.C. § 1106.

ACTIVE 700357335v3

396.    Additionally, those who appoint ERISA plan fiduciaries have an ongoing fiduciary duty under ERISA to monitor the activities of their appointees.

397.    At all relevant times, Connie Berg was a fiduciary of the ESOP Plan because she exercised authority and/or control over the management of the ESOP Plan and over the management and disposition of the ESOP Plan's assets.  The Debtor served as the plan administrator, and she was the Debtor's sole shareholder, director, and president.  Together with Kyle Berg, she also proposed the ESOP transaction and its structure, and appointed Paredes as trustee of the ESOP Trust.

398.    At all relevant times, Kyle Berg was also a fiduciary of the ESOP Plan because he likewise exercised authority and/or control over the management of the ESOP Plan and over the management and disposition of the ESOP Plan's assets.  Although Connie Berg was the Debtor's sole shareholder, director, and president on paper, Kyle Berg actually managed and controlled the Debtor.  Together with Connie Berg, he proposed the ESOP transaction and its structure, and orchestrated the appointment of Paredes as trustee of the ESOP Trust.

399.    Connie Berg and Kyle Berg breached their fiduciary duties of loyalty, care, skill, prudence, diligence, and monitoring by allowing the ESOP transaction to close, even though they knew that (a) the Debtor's shares were substantially overvalued, (b) the ESOP did not receive adequate consideration in the transaction, and (c) the ESOP transaction was a prohibited transaction under 29 U.S.C. § 1106.  The Bergs never disclosed to Paredes that a material portion of the Debtor's revenue was attributable to fraudulently obtained Set-Aside Contracts.  The Bergs could have stopped the ESOP transaction or ensured that the ESOP received adequate consideration but concealed the truth to enrich themselves.

400.    Because the Bergs breached their fiduciary duties of loyalty, care, skill, prudence, diligence, and monitoring, Plaintiff is entitled to recover damages, restitution, and other relief in accordance with 29 U.S.C. § 1109(a), in amount(s) to be determined at trial.

401.    Pursuant to 29 U.S.C. § 1132(g)(1), Plaintiff is also entitled to recover reasonable attorneys' fees and costs.

**COUNT 23**
**Breach of Fiduciary Duty (ERISA)**
**11 U.S.C. § 704(a)(11) and 29 U.S.C. §§ 1105, 1109, 1132**
**Plaintiff:  Erik A. Ahlgren, as ESOP Plan Administrator**
**Defendants:  Connie Berg and Kyle Berg**

402.    All paragraphs in this Complaint are incorporated by reference.

403.    At the time of the commencement of this bankruptcy case, the Debtor (or an entity designated by the Debtor) served as the administrator of the ESOP Plan, which is an employee benefit plan.  Thus, under 11 U.S.C. § 704(a)(11), Plaintiff is authorized and empowered to "continue to perform the obligations required of the administrator."

404.    As a plan fiduciary, Plaintiff has standing to bring this civil action pursuant to 11 U.S.C. § 704(a)(11) and 29 U.S.C. § 1132(a)(2), (3).

405.    As detailed above in Count 21, Paredes breached his fiduciary duties under ERISA by causing the ESOP Trust to enter into a prohibited transaction in violation of 29 U.S.C. § 1106.

406.    Under 29 U.S.C. § 1105(a), "a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (2) if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to

79

commit a breach; or (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."

407.   At all relevant times, Connie Berg was a fiduciary of the ESOP Plan because she exercised authority and/or control over the management of the ESOP Plan and over the management and disposition of the ESOP Plan's assets.   The Debtor served as the plan administrator, and she was the Debtor's sole shareholder, director, and president.   Together with Kyle Berg, she also proposed the ESOP transaction and its structure, and appointed Paredes as trustee of the ESOP Trust.

408.   At all relevant times, Kyle Berg was also a fiduciary of the ESOP Plan because he likewise exercised authority and/or control over the management of the ESOP Plan and over the management and disposition of the ESOP Plan's assets.   Although Connie Berg was the Debtor's sole shareholder, director, and president on paper, Kyle Berg actually managed and controlled the Debtor.   Together with Connie Berg, he proposed the ESOP transaction and its structure, and orchestrated the appointment of Paredes as trustee of the ESOP Trust.

409.   Pursuant to 29 U.S.C. § 1105(a), Connie Berg and Kyle Berg, each as a co-fiduciary of Paredes, are liable for Paredes' breaches of fiduciary duties.

410.   First, the Bergs knowingly participated in and concealed the fact that Paredes caused the ESOP Trust to enter into a prohibited transaction.   The Bergs knew, but concealed, that the ESOP transaction price was inflated and that the ESOP Trust did not receive adequate consideration.

411.   Second, the Bergs breached their duties of loyalty and monitoring, and those breaches enabled Paredes to breach his own fiduciary duties.   The Bergs could have stopped the

ESOP transaction or ensured that the ESOP Trust received adequate consideration, but concealed the truth and failed to monitor Paredes to enrich themselves.

412.    Third, the Bergs had actual knowledge that Paredes was breaching his fiduciary duties by causing the ESOP Trust to enter into a prohibited transaction, but did nothing to remedy the breach.  Instead, they permitted and concealed the breach.

413.    Based on the foregoing, Plaintiff is entitled to recover from the Bergs damages, restitution, and other relief in accordance with 29 U.S.C. § 1109(a), in amount(s) to be determined at trial.

414.    Pursuant to 29 U.S.C. § 1132(g)(1), Plaintiff is also entitled to recover reasonable attorneys' fees and costs.

### COUNT 24
#### Prohibit Transaction / Non-Fiduciary (ERISA)
#### 11 U.S.C. § 704(a)(11) and 29 U.S.C. §§ 1106, 1132
#### Plaintiff:  Erik A. Ahlgren, as ESOP Plan Administrator
#### Defendants:  Connie Berg and Kyle Berg

415.    All paragraphs in this Complaint are incorporated by reference.

416.    At the time of the commencement of this bankruptcy case, the Debtor (or an entity designated by the Debtor) served as the administrator of the ESOP Plan, which is an employee benefit plan.  Thus, under 11 U.S.C. § 704(a)(11), Plaintiff is authorized and empowered to "continue to perform the obligations required of the administrator."

417.    As a plan fiduciary, Plaintiff has standing to bring this civil action pursuant to 11 U.S.C. § 704(a)(11) and 29 U.S.C. § 1132(a)(3).

418.    As detailed above in Counts 22 and 23, the Bergs were plan fiduciaries, they are liable for their own breaches of fiduciary duties under ERISA, and they are liable for Paredes' breaches of fiduciary duties under ERISA as his co-fiduciaries.

ACTIVE 700357335v3

419.   Alternatively, if and to the extent that the Bergs were not plan fiduciaries, they are liable for restitution and disgorgement for knowingly participating in Paredes' breaches of fiduciary duties under ERISA.

420.   As detailed above in Count 21, Paredes breached his fiduciary duties under ERISA by causing the ESOP Trust to enter into a prohibited transaction in violation of 29 U.S.C. § 1106.

421.   Under 29 U.S.C. § 1132(a)(5), Plaintiff may seek restitution and disgorgement from a non-fiduciary who knowingly participates in a fiduciary's breach of fiduciary responsibility. *See Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238 (2000).

422.   The Bergs, if and to the extent they were not plan fiduciaries, knowingly participated in Paredes' breaches of fiduciary duties.  The Bergs knew that the ESOP transaction price was inflated, that the ESOP Trust did not receive adequate consideration, and that the transaction was prohibited. But they concealed these facts to enrich themselves.  From the ESOP transaction, the Bergs received a windfall, including a $6,272,060 equity distribution from the Debtor, $9,014,246 in cash from the ESOP Trust when the ESOP transaction closed, millions of dollars in promissory notes and corresponding payments, and additional consideration.

423.   Based on the foregoing, all funds received by the Bergs in connection with their knowing participation is subject to a constructive trust and Plaintiff is entitled to restitution and disgorgement.

424.   Pursuant to 29 U.S.C. § 1132(g)(1), Plaintiff is also entitled to recover reasonable attorneys' fees and costs.

ACTIVE 700357335v3

**COUNT 25**
**Common Law Fraud**
**Plaintiff: Erik A. Ahlgren, as ESOP Plan Administrator**
**Defendant: Connie Berg**

425.   All paragraphs in this Complaint are incorporated by reference, except paragraphs 152-156 and the paragraphs comprising Count 21.

426.   At the time of the commencement of this bankruptcy case, the Debtor ((or an entity designated by the Debtor) served as the administrator of the ESOP Plan, which is an employee benefit plan. Thus, under 11 U.S.C. § 704(a)(11), Plaintiff is authorized and empowered to "continue to perform the obligations required of the administrator."

427.   Plaintiff, in his capacity as Administrator of the ESOP Plan, has standing to bring this claim on behalf of the ESOP Trust, which forms part of the ESOP Plan.

428.   As detailed above, Connie Berg's representations to the ESOP Trust in Sections 3.2(g), 3.3(g)(i), 3.3(g)(ii), 3.3(g)(iii), 3.3(g)(v), 3.3(h), 3.3(j), 3.3(m), 3.3(o) of ESOP Purchase Agreement, Sections 5.1 and 5.3(c) of the Initial Seller/ESOP Loan Agreement, and Section 6(d) of the ESOP Modification Agreement were knowingly false and omitted material information.

429.   Connie Berg made these false representations and omissions to induce the ESOP Trust to enter into the ESOP transaction, so she could monetize her equity interest in the Debtor at an inflated valuation and siphon millions of dollars to herself.

430.   The ESOP Plan and ESOP Trust reasonably relied on Connie Berg's representations in agreeing to and consummating the ESOP transaction.

431.   Connie Berg acted intentionally, willfully, and with actual malice.

432.   As a result of Connie Berg's fraudulent misrepresentations and omissions, the ESOP Plan and ESOP Trust have suffered damages in amount to be proven at trial.

**COUNT 26**
**Aiding and Abetting Common Law Fraud**
**Plaintiff:  Erik A. Ahlgren, as ESOP Plan Administrator**
**Defendant:  Kyle Berg**

433.    All paragraphs in this Complaint are incorporated by reference, except paragraphs 152-156 and the paragraphs comprising Count 21.

434.    At the time of the commencement of this bankruptcy case, the Debtor (or an entity designated by the Debtor) served as the administrator of the ESOP Plan, which is an employee benefit plan.  Thus, under 11 U.S.C. § 704(a)(11), Plaintiff is authorized and empowered to "continue to perform the obligations required of the administrator."

435.    Plaintiff, in his capacity as Administrator of the ESOP Plan, has standing to bring this claim on behalf of the ESOP Trust, which forms part of the ESOP Plan.

436.    As detailed above in Count 25, Connie Berg committed and is liable to the ESOP Trust and ESOP Plan for common law fraud.

437.    Kyle Berg aided and abetted Connie Berg's fraud because he had knowledge of it and provided substantial assistance.  Kyle Berg controlled and managed all aspects of the Debtor's business.  He orchestrated the scheme to defraud SBA.  Together with Connie Berg, he proposed the ESOP transaction and its structure, and directed the appointment of Paredes as trustee of the ESOP Trust.  Additionally, he was the primary point of contact for all aspects of the ESOP transaction.

438.    Kyle Berg acted intentionally, willfully, and with actual malice.

439.    As a result of Kyle Berg aiding and abetting Connie Berg's fraud, the ESOP Trust and ESOP Plan have suffered damages in amount to be proven at trial.

ACTIVE 700357335v3

**COUNT 27**
**Common Law Fraud**
**Plaintiff:  Erik A. Ahlgren, as ESOP Plan Administrator**
**Defendant:  Chad DuBois**

440.    All paragraphs in this Complaint are incorporated by reference, except paragraphs 152-156 and the paragraphs comprising Count 21.

441.    At the time of the commencement of this bankruptcy case, the Debtor (or an entity designated by the Debtor) served as the administrator of the ESOP Plan, which is an employee benefit plan.  Thus, under 11 U.S.C. § 704(a)(11), Plaintiff is authorized and empowered to "continue to perform the obligations required of the administrator."

442.    Plaintiff, in his capacity as Administrator of the ESOP Plan, has standing to bring this claim on behalf of the ESOP Trust, which forms part of the ESOP Plan.

443.    As detailed above, Chad DuBois' representations in the Statement of Representation were knowingly false and he omitted material information.

444.    DuBois made these false representations and omissions to induce the ESOP Trust to enter into the ESOP transaction.  He knew that Stout would be relying on his representations to render an opinion that the ESOP transaction was for adequate consideration, which Paredes, as trustee, and the ESOP Trust would, in turn, rely on to approve and consummate the ESOP transaction.

445.    Stout, Paredes, and the ESOP Trust reasonably relied on Chad DuBois' misrepresentations and omissions.

446.    As a result of Chad DuBois' fraudulent misrepresentations and omissions, the ESOP Trust and ESOP Plan have suffered damages in amount to be proven at trial.

ACTIVE 700357335v3

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against the Defendants as follows:

A.      Enter judgment in Plaintiff's favor against each Defendant;

B.      On Counts 1-8, award Plaintiff monetary damages in amounts to be determined at trial;

C.      On Counts 9-20, avoid the fraudulent transfers and obligations alleged therein, and grant the recovery of all avoided transfers from the applicable Defendants, in amounts to be determined at trial;

D.      On Counts 21-27, award Plaintiff monetary damages, restitution, and/or disgorgement, in amounts to be determined at trial;

E.      On Count 24, impose a constructive trust on the funds received by Defendants Connie Berg and Kyle Berg, and award Plaintiff restitution and/or disgorgement of such funds;

F.      Award Plaintiff his fees, costs, disbursements, and expenses, including reasonable attorneys' fees;

G.      Award Plaintiff pre- and post-judgment interest to the greatest extent allowed by law; and

H.      Grant any other relief, including equitable relief, that may be just, proper, and equitable.

ACTIVE 700357335v3

Date:  August 26, 2024

/s/ Erik A. Ahlgren
Erik A. Ahlgren (North Dakota #09561)
Ahlgren Law Office, PLLC
220 W. Washington Ave. Suite 105
Fergus Falls, MN  56537
Telephone: (218) 998-2775
Email: erik@ahlgrenlawoffice.net

*and*

Michael B. Fisco (Minnesota #0175341)
(*Pending Bankrupty Court Approval of Retention and Pro Hac Vice Admission*)
Peter D. Kieselbach (Minnesota #0397531)
(*Pending Bankrupty Court Approval of Retention and Pro Hac Vice Admission*)
Greenberg Traurig, LLP
90 South Seventh Street, Suite 3500
Minneapolis, MN 55402
Telephone: (612) 259-9700
Email: fiscom@gtlaw.com
        kieselbachp@gtlaw.com