# __Exhibit A__

THIS INSTRUMENT HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), APPLICABLE STATE SECURITIES LAWS, OR APPLICABLE LAWS OF ANY FOREIGN JURISDICTION.  THIS INSTRUMENT HAS BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO DISTRIBUTION OR RESALE, AND MAY NOT BE SOLD, OFFERED, PLEDGED, HYPOTHECATED, RENOUNCED OR OTHERWISE TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE SECURITIES LAWS AND IN THE ABSENCE OF COMPLIANCE WITH APPLICABLE LAWS OF ANY FOREIGN JURISDICTION, OR AN OPINION OF COUNSEL SATISFACTORY TO PRO-MARK SERVICES, INC. THAT SUCH REGISTRATION IS NOT REQUIRED AND SUCH FOREIGN JURISDICTION'S LAWS HAVE BEEN SATISFIED.

THIS INSTRUMENT AND THE RIGHTS AND OBLIGATIONS EVIDENCED HEREBY ARE SUBORDINATE IN THE MANNER AND TO THE EXTENT SET FORTH IN THAT CERTAIN SUBORDINATION AGREEMENT (THE "SUBORDINATION AGREEMENT") AMONG BANKERS TRUST COMPANY ("BANKERS TRUST"), PRO-MARK SERVICES, INC. AND THE OTHER PARTIES NAMED THEREIN, TO THE SENIOR INDEBTEDNESS (AS DEFINED THEREIN), AS MORE PARTICULARLY DESCRIBED IN THE SUBORDINATION AGREEMENT, AND EACH HOLDER OF THIS INSTRUMENT, BY ITS ACCEPTANCE HEREOF, SHALL BE BOUND BY THE PROVISIONS OF THE SUBORDINATION AGREEMENT.

REDEMPTION NOTE

$12,094,000                                                                                      August 31, 2020

FOR VALUE RECEIVED, the undersigned, PRO-MARK SERVICES, INC., a North Dakota corporation (the "Borrower"), hereby unconditionally promises to pay to the order of CONNIE BERG, an individual resident of the State of North Dakota ("Lender"), at 3275 Oak Ridge Loop E. West Fargo, North Dakota 58078, or such other place as the holder of this Redemption Note (this "Redemption Note") may designate from time to time in writing, in lawful money of the United States of America and immediately available funds, the principal sum of Twelve Million Ninety-Four Thousand and 00/100 Dollars ($12,094,000).

Reference is made to that certain Redemption and ESOP Stock Purchase Agreement among, Borrower, Lender and the Pro-Mark Services Employee Stock Ownership Trust (the "Redemption and ESOP Stock Purchase Agreement") for a statement of the terms and conditions under which the loan evidenced by this Redemption Note is made.  Capitalized terms used herein without definition shall have the definitions set forth in the Redemption and ESOP Stock Purchase Agreement.

The obligations evidenced by this Redemption Note are subordinated according to the terms of the Subordination Agreement in connection with the term loan provided by Bankers Trust to Borrower in connection with the transactions contemplated by the Redemption and ESOP Stock Purchase Agreement ("Senior Indebtedness").

Subject to the terms of the Subordination Agreement, the unpaid principal balance hereof shall bear interest commencing on the date of this Redemption Note as follows (i) interest ("Cash Interest") at the rate of 4% per annum (the "Cash Interest Rate"); and (ii) interest ("Deferred Interest") at the rate of 7.5% per annum (the "Deferred Interest Rate").

The Borrower shall make payments to Lender of principal and interest hereunder accordingly to the provisions set forth in subsections (a) and (b) below, in each subject to the Subordination Agreement and compliance;

    a) From the date hereof until all of the Senior Lender Term Loan Indebtedness has been paid in full:

        i. Borrower shall not be obligated to make payments of principal hereunder.

        ii. Subject to the Subordination Agreement, the Borrower shall make payments of Cash Interest to Lender in quarterly installments (prorated for any partial calendar quarter, beginning on October 1, 2020 and continuing on the first day of each calendar quarter thereafter.

    b) After the Senior Lender Term Loan Indebtedness (or any refinancing of the Senior Lender Term Loan Indenters) has been paid in full, Borrower shall make payments of Cash Interest and principal on a level amortized basis for the remainder of the term of this Redemption Note until the Maturity Date.

    c) Subject to the Subordination Agreement, the unpaid principal amount of this Redemption Note, plus all unpaid Cash Interest and all Deferred Interest shall be and payable in full on the Maturity Date.

Interest on the principal balance outstanding under this Redemption Note will be calculated on the basis of a 365 day year and the actual days elapsed from the date of the funding of the loan evidenced by this Redemption Note (in respect of the initial interest payment) or, for all future interest payments, from the date of the immediately preceding principal payment under this Redemption Note. If any payment due under this Redemption Note becomes payable on a Saturday, Sunday, or legal holiday under the laws of the State of North Dakota or of the United States, the due date shall be the immediately succeeding business day.

Subject to the terms of the Subordination Agreement, the Borrower may prepay this Redemption Note, in whole or in part, without any prepayment penalty or premium. Any prepayments or amounts due under this Redemption Note received by Lender from the Borrower shall be applied first to the payment of interest which is due and payable and only thereafter to the outstanding principal balance of this Redemption Note in inverse order of maturity.

This Redemption Note is subject to adjustment and set-off provisions as set forth in Article II and Article VI of the Redemption and ESOP Stock Purchase Agreement.

Subject to the terms of the Subordination Agreement, upon the occurrence of a Change of Control (as defined below), Lender shall have the right to demand prepayment of all amounts due and payable under this Redemption Note, and upon such demand this Redemption Note shall be due and payable in full. The term "Change of Control" shall mean the occurrence of one of the following events: (a) beneficial ownership of more than fifty percent (50%) of the outstanding capital stock of the Borrower is acquired by a person or group of persons other than the Pro-Mark Services, Inc. Employee Stock Ownership Trust; (b) Borrower is merged with or into another entity, with the effect that immediately after the merger the equity owners of Borrower immediately prior to the merger directly or indirectly hold less than a majority in voting power of Borrower's outstanding capital stock; or (c) all or a majority of the assets of Borrower on a consolidated basis are sold, leased, exchanged, or otherwise transferred to a third party that is not affiliated with the Borrower.

2

It is the intention of the Borrower and Lender to conform strictly to the usury laws, whether state or federal, that are applicable to this Redemption Note.  If under any circumstances Lender shall ever receive an amount deemed interest by applicable law which would exceed the highest lawful interest rate, such amount that would be excessive interest under applicable law shall be applied to the reduction of the principal amount owing hereunder and not the payment of interest, or if such excessive interest exceeds the unpaid balance of principal hereunder, the excess shall be deemed to have been a payment made in error and shall be refunded to the Borrower.

Any of the following events shall constitute an event of default hereunder (each an "Event of Default"):

(a) The failure of the Borrower to pay when due any principal, interest, or other amounts due and payable under this Redemption Note;

(b) if any property of the Borrower, whether real or personal, tangible or intangible, is attached, garnished, seized, subjected to a writ of distress warrant, or is levied upon or comes within the possession of a receiver, trustee, custodian or assignee for the benefit of creditors, the loss of which property would have a material adverse effect on the Borrower's business;

(c) the filing or commencement of any application by or on behalf of the Borrower for dissolution or liquidation;

(d) the filing or commencement of any proceeding in bankruptcy wherein the Borrower is designated as the debtor, or for the reorganization of the Borrower, or for the adjustment of the debts of the Borrower under the federal Bankruptcy Code, as amended from time to time, or under any other act or law, whether state or federal, for the relief of debtors, nor or hereinafter existing, and such proceeding, if involuntary, shall not be discharged within sixty (60) days of such commencement;

(e) the making by the Borrower of an assignment for the benefit of creditors;

(f) if for any reason the Borrower shall make a bulk transfer or otherwise transfer property, whether real or personal, tangible or intangible, other than in the ordinary course of business;

(g) the Borrower shall become insolvent or the failure by the Borrower to pay its debts as they become due and payable or the admission by Borrower, respectively, of its inability to do so;

(i) the Borrower shall be terminated pursuant to judgment, writ or order of any court or governmental authority with jurisdiction over the Borrower; and

(j) the failure of Lender's two nominees to the board of directors of Borrower to be elected to the Board ("Lender's Designees") or the removal of Lender's Designees from the Board other than for willful misconduct or material breach of a director's fiduciary duty, provided that Lender's Designees may include Lender and/or any of Lender's family members.

Upon the occurrence of an Event of Default, Lender shall be entitled to exercise all rights and remedies available to a creditor at law or in equity with respect to the collection of this Redemption Note. No act of omission or commission of Lender, including specifically any failure to exercise any right, remedy or recourse hereunder or otherwise allowed by law, shall be deemed to be a waiver or release of the same, such waiver or release to be effected only through a written document executed by Lender and then only to the extent specifically recited therein.  A waiver or release with reference to any one Event of

Default shall not be construed as continuing, as a bar to, or as a waiver or release of, any subsequent right, remedy or recourse as to a subsequent Event of Default.

Upon the occurrence of an Event of Default, if Lender shall declare the unpaid principal balance and any accrued but unpaid Cash Interest and Deferred Interest due and payable. All costs and expenses incurred by, or on behalf of, Lender (including without limitation attorneys' fees and expenses) which are occasioned by any Event of Default shall become immediately due and payable and shall become additional indebtedness evidenced by this Redemption Note. After the occurrence or existence of an Event of Default, Lender may institute, or cause to be instituted, proceedings for the realization of Lender's rights under this Redemption Note.

This Redemption Note may be amended, modified, or supplemented only by a written agreement signed by Lender and the Borrower.

Whenever in this Redemption Note there is reference made to the Lender or the Borrower, that reference shall be deemed to include, as applicable, a reference to the respective successors and assigns of the Lender and the Borrower. The provisions of this Redemption Note shall be binding upon and shall inure to the benefit of the successors and assigns of the Lender and the Borrower. Any such assignee, endorsed transferee, or purchaser shall have all of the rights and privileges given to the Lender under the provisions of this Redemption Note.

This Redemption Note shall be deemed to have been delivered and made in West Fargo, North Dakota and shall be construed, interpreted, and enforced in accordance with, and governed by, the laws of the State of North Dakota, without regard to the conflict of law principles of such state.

Every provision hereof is intended to be severable. If any provision of this Redemption Note shall be determined by any court of competent jurisdiction to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any we be affected or impaired thereby and each such remaining provision shall be valid and enforced to the fullest extent permitted by law.

BORROWER AGREES THAT JURISDICTION AND VENUE IN ANY ACTION BROUGHT BY LENDER PURSUANT TO THIS REDEMPTION NOTE SHALL PROPERLY (BUT NOT EXCLUSIVELY) LIE IN ANY FEDERAL OR STATE COURT LOCATED IN STATE OF NORTH DAKOTA. BY EXECUTION AND DELIVERY OF THIS REDEMPTION NOTE, BORROWER IRREVOCABLY SUBMITS TO THE JURISDICTION OF SUCH COURTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY WITH RESPECT TO SUCH ACTION AND WAIVES TRIAL BY JURY. BORROWER IRREVOCABLY AGREES THAT VENUE WOULD BE PROPER IN SUCH COURT, AND HEREBY WAIVES ANY OBJECTION THAT SUCH COURT IS AN IMPROPER OR INCONVENIENT FORUM FOR THE RESOLUTION OF SUCH ACTION. BORROWER FURTHER AGREES THAT THE MAILING BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, OF ANY PROCESS REQUIRED BY ANY SUCH COURT SHALL CONSTITUTE VALID AND LAWFUL SERVICE OF PROCESS AGAINST BORROWER, WITHOUT NECESSITY FOR SERVICE BY ANY OTHER MEANS PROVIDED BY STATUTE OR RULE OF COURT.

*[Signature Page Follows]*

IN WITNESS WHEREOF, this Redemption Note has been signed by the party below as of the day and year first above written.

BORROWER

**PRO-MARK SERVICES, INC.**

By: _____
Name: Chad Dubois
Its: Vice President

*[Signature page to the Redemption Note]*

# **Exhibit B**

**THIS INSTRUMENT HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), APPLICABLE STATE SECURITIES LAWS, OR APPLICABLE LAWS OF ANY FOREIGN JURISDICTION.  THIS INSTRUMENT HAS BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO DISTRIBUTION OR RESALE, AND MAY NOT BE SOLD, OFFERED, PLEDGED, HYPOTHECATED, RENOUNCED OR OTHERWISE TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE SECURITIES LAWS AND IN THE ABSENCE OF COMPLIANCE WITH APPLICABLE LAWS OF ANY FOREIGN JURISDICTION, OR AN OPINION OF COUNSEL SATISFACTORY TO PRO-MARK SERVICES, INC. THAT SUCH REGISTRATION IS NOT REQUIRED AND SUCH FOREIGN JURISDICTION'S LAWS HAVE BEEN SATISFIED.**

**THIS INSTRUMENT AND THE RIGHTS AND OBLIGATIONS EVIDENCED HEREBY ARE SUBORDINATE IN THE MANNER AND TO THE EXTENT SET FORTH IN THAT CERTAIN SUBORDINATION AGREEMENT (THE "SUBORDINATION AGREEMENT") AMONG BANKERS TRUST COMPANY ("BANKERS TRUST"), PRO-MARK SERVICES, INC. AND THE OTHER PARTIES NAMED THEREIN, TO THE SENIOR INDEBTEDNESS (AS DEFINED THEREIN), AS MORE PARTICULARLY DESCRIBED IN THE SUBORDINATION AGREEMENT, AND EACH HOLDER OF THIS INSTRUMENT, BY ITS ACCEPTANCE HEREOF, SHALL BE BOUND BY THE PROVISIONS OF THE SUBORDINATION AGREEMENT.**

AMENDED AND RESTATED SELLER NOTE

$10,985,754                                                                           August 31, 2020

FOR VALUE RECEIVED, the undersigned, PRO-MARK SERVICES, INC., a North Dakota corporation (the "Borrower"), hereby unconditionally promises to pay to the order of CONNIE BERG, an individual resident of the State of North Dakota (the "Lender"), at 3275 Oak Ridge Loop E. West Fargo, North Dakota 58078, or such other place as the holder of this Amended and Restated Seller Note (this "Note") may designate from time to time in writing, in lawful money of the United States of America and immediately available funds, the principal sum of Ten Million Nine Hundred Eighty-Five Thousand Seven Hundred Fifty-Four and 00/100 Dollars ($10,985,754).

This Note evidences a loan, the obligations under which were assumed by Borrower pursuant to that certain Seller Note Exchange and ESOP Loan Modification Agreement among Borrower, the Pro-Mark Services, Inc. Employee Stock Ownership Trust (the "Trust") and Lender dated as of even date herewith (the "Exchange and Loan Modification Agreement").  The Exchange and Loan Modification Agreement is incorporated by reference herein.  This Note represents a modification of the terms of an installment obligation and not a disposition or satisfaction of an installment obligation within the meaning of Section 453B(a) of the Internal Revenue Code.

The obligations evidenced by this Note are subordinated according to the terms of the Subordination Agreement in connection with the term loan provided by Bankers Trust to Borrower in connection with the transactions contemplated by the Redemption and ESOP Stock Purchase Agreement ("Senior Indebtedness").

Subject to the terms of the Subordination Agreement, the unpaid principal balance hereof shall bear interest commencing on the date of this Note as follows (i) interest ("Cash Interest") at the rate of 4% per

annum (the "<u>Cash Interest Rate</u>"); and (ii) interest ("<u>Deferred Interest</u>") at the rate of 7.5% per annum (the "<u>Deferred Interest Rate</u>").

The Borrower shall make payments to Lender of principal and interest hereunder accordingly to the provisions set forth in subsections (a) and (b) below, in each subject to the Subordination Agreement and compliance;

    a) From the date hereof until all of the Senior Lender Term Loan Indebtedness has been paid in full:

        i. Borrower shall not be obligated to make payments of principal hereunder.

        ii. Subject to the Subordination Agreement, the Borrower shall make payments of Cash Interest to Lender in quarterly installments (prorated for any partial calendar quarter, beginning on October 1, 2020 and continuing on the first day of each calendar quarter thereafter.

    b) After the Senior Lender Term Loan Indebtedness (or any refinancing of the Senior Lender Term Loan Indenters) has been paid in full, Borrower shall make payments of Cash Interest and principal on a level amortized basis for the remainder of the term of this Note until the Maturity Date.

Subject to the Subordination Agreement, the unpaid principal amount of this Note, plus all unpaid Cash Interest and all Deferred Interest shall be and payable in full on the Maturity Date.

Interest on the principal balance outstanding under this Note will be calculated on the basis of a 365 day year and the actual days elapsed from the date of the funding of the loan evidenced by this Note (in respect of the initial interest payment) or, for all future interest payments, from the date of the immediately preceding principal payment under this Note. If any payment due under this Note becomes payable on a Saturday, Sunday, or legal holiday under the laws of the State of North Dakota or of the United States, the due date shall be the immediately succeeding business day.

Subject to the terms of the Subordination Agreement, the Borrower may prepay this Note, in whole or in part, without any prepayment penalty or premium. Any prepayments or amounts due under this Note received by Lender from the Borrower shall be applied first to the payment of interest which is due and payable and only thereafter to the outstanding principal balance of this Note in inverse order of maturity.

This Note is subject to adjustment and set off as set forth in Article II and Article VI of the Redemption and ESOP Stock Purchase Agreement.

Subject to the terms of the Subordination Agreement, upon the occurrence of a Change of Control (as defined below), the Lender shall have the right to demand prepayment of all amounts due and payable under this Note, and upon such demand this Note shall be due and payable in full. The term "Change of Control" shall mean the occurrence of one of the following events: (a) beneficial ownership of more than fifty percent (50%) of the outstanding capital stock of the Borrower is acquired by a person or group of persons other than the Pro-Mark Services, Inc. Employee Stock Ownership Trust, and/or the Lender; (b) the Borrower is merged with or into another entity, with the effect that immediately after the merger the equity owners of the Borrower immediately prior to the merger directly or indirectly hold less than a majority in voting power of the Borrower's outstanding capital stock; or (c) all or a majority of the assets of the Borrower on a consolidated basis are sold, leased, exchanged, or otherwise transferred to a third party that is not affiliated with the Borrower.

It is the intention of the Borrower and Lender to conform strictly to the usury laws, whether state or federal, that are applicable to this Note.  If under any circumstances Lender shall ever receive an amount deemed interest by applicable law which would exceed the highest lawful interest rate, such amount that would be excessive interest under applicable law shall be applied to the reduction of the principal amount owing hereunder and not the payment of interest, or if such excessive interest exceeds the unpaid balance of principal hereunder, the excess shall be deemed to have been a payment made in error and shall be refunded to the Borrower.

Any of the following events shall constitute an event of default hereunder (each an "Event of Default"):

(a) The failure of the Borrower to pay when due any principal, interest, or other amounts due and payable under this Note;

(b) if any property of the Borrower, whether real or personal, tangible or intangible, is attached, garnished, seized, subjected to a writ of distress warrant, or is levied upon or comes within the possession of a receiver, trustee, custodian or assignee for the benefit of creditors, the loss of which property would have a material adverse effect on the Borrower's business;

(c) the filing or commencement of any application by or on behalf of the Borrower for dissolution or liquidation;

(d) the filing or commencement of any proceeding in bankruptcy wherein the Borrower is designated as the debtor, or for the reorganization of the Borrower, or for the adjustment of the debts of the Borrower under the federal Bankruptcy Code, as amended from time to time, or under any other act or law, whether state or federal, for the relief of debtors, nor or hereinafter existing, and such proceeding, if involuntary, shall not be discharged within sixty (60) days of such commencement;

(e) the making by the Borrower of an assignment for the benefit of creditors;

(f) if for any reason the Borrower shall make a bulk transfer or otherwise transfer property, whether real or personal, tangible or intangible, other than in the ordinary course of business;

(g) the Borrower shall become insolvent or the failure by the Borrower to pay its debts as they become due and payable or the admission by Borrower, respectively, of its inability to do so;

(i) the Borrower shall be terminated pursuant to judgment, writ or order of any court or governmental authority with jurisdiction over the Borrower; and

(j) the failure of Lender's two nominees to the board of directors of Borrower to be elected to the Board ("Lender's Designees") or the removal of Lender's Designees from the Board other than for willful misconduct or material breach of a director's fiduciary duty, provided that Lender's Designees may include Lender and/or any of Lender's family members.

Upon the occurrence of an Event of Default, the Lender shall be entitled to exercise all rights and remedies available to a creditor at law or in equity with respect to the collection of this Note.  No act of omission or commission of the Lender, including specifically any failure to exercise any right, remedy or recourse hereunder or otherwise allowed by law, shall be deemed to be a waiver or release of the same, such waiver or release to be effected only through a written document executed by the Lender and then only to the extent specifically recited therein.  A waiver or release with reference to any one Event of

Default shall not be construed as continuing, as a bar to, or as a waiver or release of, any subsequent right, remedy or recourse as to a subsequent Event of Default.

Upon the occurrence of an Event of Default, if the Lender shall declare the unpaid principal balance and any accrued but unpaid Cash Interest and Deferred Interest due and payable. All costs and expenses incurred by, or on behalf of, the Lender (including without limitation attorneys' fees and expenses) which are occasioned by any Event of Default shall become immediately due and payable, shall bear interest at the Default Rate from the date incurred until paid, and shall become additional indebtedness evidenced by this Note. After the occurrence or existence of an Event of Default, the Lender may institute, or cause to be instituted, proceedings for the realization of the Lender's rights under this Note.

Whenever in this Note there is reference made to the Lender or the Borrower, that reference shall be deemed to include, as applicable, a reference to the respective successors and assigns of the Lender and the Borrower. The provisions of this Note shall be binding upon and shall inure to the benefit of the successors and assigns of the Lender and the Borrower. Any such assignee, endorsed transferee, or purchaser shall have all of the rights and privileges given to the Lender under the provisions of this Note.

This Note shall be deemed to have been delivered and made in West Fargo, North Dakota and shall be construed, interpreted, and enforced in accordance with, and governed by, the laws of the State of North Dakota, without regard to the conflict of law principles of such state.

Every provision hereof is intended to be severable. If any provision of this Note shall be determined by any court of competent jurisdiction to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any we be affected or impaired thereby and each such remaining provision shall be valid and enforced to the fullest extent permitted by law.

BORROWER AGREES THAT JURISDICTION AND VENUE IN ANY ACTION BROUGHT BY LENDER PURSUANT TO THIS NOTE SHALL PROPERLY (BUT NOT EXCLUSIVELY) LIE IN ANY FEDERAL OR STATE COURT LOCATED IN STATE OF NORTH DAKOTA. BY EXECUTION AND DELIVERY OF THIS NOTE, BORROWER IRREVOCABLY SUBMITS TO THE JURISDICTION OF SUCH COURTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY WITH RESPECT TO SUCH ACTION AND WAIVES TRIAL BY JURY. BORROWER IRREVOCABLY AGREES THAT VENUE WOULD BE PROPER IN SUCH COURT, AND HEREBY WAIVES ANY OBJECTION THAT SUCH COURT IS AN IMPROPER OR INCONVENIENT FORUM FOR THE RESOLUTION OF SUCH ACTION. BORROWER FURTHER AGREES THAT THE MAILING BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, OF ANY PROCESS REQUIRED BY ANY SUCH COURT SHALL CONSTITUTE VALID AND LAWFUL SERVICE OF PROCESS AGAINST BORROWER, WITHOUT NECESSITY FOR SERVICE BY ANY OTHER MEANS PROVIDED BY STATUTE OR RULE OF COURT.

*[Signature Page Follows]*

IN WITNESS WHEREOF, this Note has been signed by the party below as of the day and year first above written.

PRO-MARK SERVICES, INC.

By: _____
Name: Chad DuBois
Its:  Vice President

# **<u>Exhibit C</u>**

AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

District of North Dakota ▼

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

The Person, Belongings, and Containers of Kyle Ralph Berg

)
)
)
)
)

Case No.   3:22-mj-107

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ District of _____North Dakota_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 371, 18 U.S.C. § 1001, 18 U.S.C. § 1031, 18 U.S.C. § 1343 | conspiracy to commit offense or to defraud the United States, false statements, major fraud against the United States, wire fraud |

The application is based on these facts:

See Attached Affidavit

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Aaron Dunn, FBI
*Printed name and title*

Sworn to before me and signed in my presence     √ia telephone.

Date March 1, 2022

_____
*Judge's signature*

City and state:  Fargo, North Dakota

Hon. Alice R. Senechal, United States Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT
DISTRICT OF NORTH DAKOTA

IN THE MATTER OF THE SEARCH OF

The Person, Belongings, and Containers of
Kyle Ralph Berg

Case No. _____

3:22-mj-107

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A WARRANT TO SEARCH AND SEIZE**

I, Aaron Dunn, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I am a Special Agent with the Federal Bureau of Investigation (FBI), and have

been since February 27, 2011. I am presently assigned to the FBI's Fargo Resident Agency

where my primary duties and responsibilities consist of conducting investigations of

individuals and businesses for possible violations of federal law. In my course of

employment as a Special Agent, I have received formal training in conducting

investigations of federal crimes, including completion of the FBI's Combating Public

Corruption course in 2017 in which topics covered included investigating various complex

financial crimes. I have conducted and participated in investigations involving, among

other violations, public corruption, cybercrimes, wire fraud, bank fraud, health care fraud,

money laundering, aggravated identity theft, and conspiracy. In the course of my

investigative experience I have learned individuals engaged in schemes to violate federal

law routinely use items such as computers, cellular telephones, and other electronic media

to access personal and business email accounts, and to transmit and receive records

through the Internet. Nearly all of my investigations have involved the seizure and review

1

of various forms of electronic media and/or digital records to identify evidence of violations
of federal law.

2.      This matter is being jointly investigated by the FBI and a number of other federal
agencies.

3.      I have personally participated in the investigation of a conspiracy executed by
Kyle Berg ("Berg") to fraudulently obtain contracts from federal government agencies
intended for small businesses owned by women, minorities, and/or service-disabled
veterans (commonly known as "set-aside contracts") to which he was not entitled. Berg
owns or controls businesses that purport to be owned by women, minorities, or service-
disabled veterans, but these companies are not actually managed and controlled by those
individuals, as required by federal law. All the conclusions and beliefs set forth in this
affidavit are based on my training and experience, and the facts of this investigation
obtained from conversations with other agents and attorneys, interviews conducted, review
of reports and documents in this case (including documents produced pursuant to grand
jury subpoenas), review of information provided by witnesses, and review of law
enforcement databases and publicly available records, among other sources. All the dates,
times, and amounts listed in this affidavit are approximate. This affidavit is intended to
show only that there is sufficient probable cause for the requested warrant and does not set
forth all of my knowledge about this matter.

4.      I have set forth facts that I believe are sufficient to establish probable cause to
believe that evidence, instrumentalities, and fruits of violations of 18 U.S.C. § 371
(conspiracy to commit offense or to defraud the United States), 18 U.S.C. § 1001 (false
statements), 18 U.S.C. § 1031 (major fraud against the United States), and 18 U.S.C.
§ 1343 (wire fraud) can be found on and within the Person, Belongings, and Containers of

Kyle Ralph Berg, which is more specifically described below in Paragraph 5 and in

Attachment A to the search warrant (attached hereto and incorporated herein).

## IDENTIFICATION OF THE PERSON TO BE SEARCHED

5.      I make this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure for a warrant to search the following: the Person, Belongings,

and Containers of Kyle Ralph Berg for documents and records regardless of the form or

medium in which those records are stored or maintained.  These items are more specifically

described below and in Attachment B (attached hereto and incorporated herein).

## JURISDICTION

6.      This Court has jurisdiction to issue the requested warrant because it is "a

magistrate judge with authority in the district" and the property or persons at issue are

"located within the district." Fed. R. Crim. P. 41(b)(1).

## PROBABLE CAUSE

7.      There is probable cause to believe Berg and his co-conspirators fraudulently

participate in the 8(a) Business Development program ("8(a)"), Women Owned Small

Business program ("WOSB"), and Historically Underutilized Business Zone program

("HUBZone") administered by the Small Business Association ("SBA"), and the Service-

Disabled Veteran-Owned Small Business program ("SDVOSB") administered by the

Department of Veterans Affairs ("VA"), to compete for and obtain government set-aside

contracts to which they are not entitled, thereby preventing award of those set-aside

contracts to legitimate 8(a), WOSB, HUBZone, and SDVOSB small businesses. Through the

creation and affiliations of Pro-Mark Services, Inc. ("Pro-Mark"), Razor Consulting

Solutions, Inc. ("Razor") and PMR Services, LLC ("PMR Services"), Fed Serve, LLC ("Fed

Serve"), MDM Construction, LLC ("MDM"), and OK2 Construction, LLC ("OK2"), Berg and

his co-conspirators are able to fraudulently claim 8(a), WOSB, HUBZone, and SDVOSB

statuses for those entities in order to obtain millions in federal government set-aside

contracts for which these entities did not qualify.

## Table of Contents:

BACKGROUND ON SET-ASIDE CONTRACTS ...................................................................... 4

   Table 1: Government Contracting Assistance Programs ...................................................... 6

   8(a) DEVELOPMENT PROGRAM ..................................................................................... 7

   WOMAN-OWNED SMALL BUSINESS PROGRAM ......................................................... 8

   HUBZONE PROGRAM ...................................................................................................... 9

   SERVICE-DISABLED VETERAN-OWNED SMALL BUSINESS PROGRAM .................10

   CONTRACT AWARD REQUIREMENTS ..........................................................................11

FACTS ESTABLISHING PROBABLE CAUSE ......................................................................11

   Table 2: Companies and Entities.......................................................................................13

   Table 3: Individuals ..........................................................................................................14

   PRO-MARK SERVICES, INC...........................................................................................16

   RAZOR CONSULTING SOLUTIONS, INC. & PMR SERVICES, LLC ...........................27

   FED SERVE, LLC.............................................................................................................38

   MDM CONSTRUCTION, LLC .........................................................................................50

   OK2 CONSTRUCTION, LLC ...........................................................................................59

PROBABLE CAUSE TO SEARCH THE PERSON, BELONGINGS, AND CONTAINERS
OF BERG ...............................................................................................................................70

BACKGROUND ON CELLULAR TELEPHONE AND SMARTPHONES............................73

SPECIFICS OF SEARCH AND SEIZURE OF COMPUTERS, CELL PHONES, AND
OTHER ELECTRONIC DEVICES .........................................................................................75

BIOMETRIC ACCESS TO DEVICES....................................................................................78

## BACKGROUND ON SET-ASIDE CONTRACTS

8.    When procuring goods and services, the United States limits competition for

certain federal contracts by setting aside contracts to award to certified and qualified small

businesses. Agencies also can award certain contracts below a monetary threshold to small

business concerns on a sole-source basis ("sole-source contracts").

9.      To help small businesses qualify for set-aside and sole-source contracts, the SBA administers contracting assistance programs, including the 8(a) program, the WOSB program, and the HUBZone program. The VA's Center for Verification and Evaluation ("CVE") evaluates whether a business qualified as an SDVOSB. The CVE uses the SBA's regulations to determine whether a business is owned and controlled by a service-disabled veteran.

10.     *Small size*. To qualify for each of the 8(a), WOSB, HUBZone, and SDVOSB programs, a business must qualify as a "small" business. The size standard for small businesses is formulated based on the business's industry classification under the North American Industry Classification System ("NAICS"), revenues, and affiliates. For the industries relevant to this investigation, the SBA determines the size of the business as a three- or five-year average of total annual receipts or gross income. For example, the NAICS code for Commercial and Institutional Building Construction corresponds with a $36.5 million size standard. SBA laws and regulations require a business to report income from all affiliated businesses, as explained below. Affiliated businesses are included within the scope of the size calculation. The SBA's size regulations are primarily contained within 13 C.F.R. Part 121.

11.     *Control*. Generally, the SBA-certified individual or service-disabled veteran who owns the business also must control the business in its strategy and long-term decisions, as well as its day-to-day management. Impermissible control arises when a non-disadvantaged person or business has power to control the applicant small business through ownership, management, or other relationships or dependent contracts. Each program specifies the factors relevant to control in federal regulations.

12.     *Affiliation*. The SBA considers any businesses or individuals affiliated with the applicant small business to determine the applicant's size and whether any individual

5

exercises impermissible control over the small business. Affiliation may exist, for example, when a non-small or non-disadvantaged business provides management or staffing for a new applicant small business in its same industry, or furnishes contracts, financial support, or indemnification on bonds. Patterns of subcontracting; commingling staff, facilities, or funds; and attempts to hide the true nature of a relationship between businesses may indicate impermissible affiliation. The size of an affiliated business (i.e., its annual receipts or gross income) is added to the size of the applicant business for purpose of determining the applicant business's size. For size calculations, the VA relies on SBA determinations of affiliation. To determine control, the VA similarly considers whether an applicant for SDVOSB status is overly dependent on other non-SDVOSB entities.

**Table 1: Government Contracting Assistance Programs**

| Program | Relevance to Scheme |
|---|---|
| 8(a) Business Development | Provides assistance to small businesses unconditionally owned and controlled by one or more socially and economically disadvantaged individuals. |
| Mentor-Protégé | Allows a non-8(a) business to form a joint venture for mentorship purposes with an 8(a) small business to perform a contract for which only the 8(a) small business qualifies, but does not have capacity to perform on its own. |
| Women Owned Small Business | Provides assistance to small businesses unconditionally and directly owned and controlled by one or more women. |
| Historically Underutilized Business Zone | Provides assistance to small businesses located in Historically Underutilized Business Zones to increase employment opportunities, investments, and economic development. |
| Service-Disabled Veteran-Owned Small Business | Provides assistance to small businesses unconditionally and directly owned and controlled by one or more service-disabled veterans. |

**8(a) DEVELOPMENT PROGRAM**

13.     The federal government's goal is to award at least 5% of all federal contracting dollars to small disadvantaged businesses each year. To help meet this goal, the SBA's 8(a) program (named for Section 8(a) of the Small Business Act) provides assistance to small businesses owned and controlled by socially and economically disadvantaged individuals to gain a foothold in government contracting. Participation in the 8(a) program is limited to nine years, with the goal that the 8(a) business can thrive in a competitive business environment after its graduation from the program. SBA regulations governing the 8(a) program are primarily contained within 13 C.F.R. Part 124.

14.     The SBA's 8(a) program requires that a small business applicant has not previously participated in the 8(a) program; is at least 51% unconditionally owned and controlled by one or more socially and economically disadvantaged individuals who are of good character and citizens of and residing in the United States; and demonstrates its potential for success.

15.     *Control*. The small business must be controlled only by socially and economically disadvantaged person(s). Factors relevant to evaluating whether an applicant is controlled by an eligible person include whether a socially and economically disadvantaged person has both the requisite management capabilities to, and actually does, manage the business, works full-time for the business during normal business hours, and holds the highest officer position in the company. While a non-disadvantaged individual or entity may be involved in the business, that individual may not exercise control over the business.

16.     *Certification*. To become certified as an eligible 8(a) business, the applicant business must establish it is owned and controlled by an eligible individual by submitting SBA Form 1010 with supporting documentary evidence, such as its articles of incorporation, operating agreements, personal financial statements of the individual, and a

7

narrative describing the history and nature of the business. SBA Form 1010 warns that an applicant is subject to criminal prosecution if the applicant provides false information or makes misrepresentations. The small business must recertify annually to maintain eligibility in the program.

17.    *Mentor-Protégé Program*. The SBA's Mentor-Protégé program allows a non-8(a) business (the mentor) to form a joint venture with an 8(a) small business (the protégé) to perform a contract for which only the 8(a) small business qualifies, but does not have capacity to perform on its own (e.g., a protégé firm could seek a WOSB set-aside contract with its mentor, provided the protégé firm qualifies as a WOSB, even if the mentor firm would not itself qualify for such a contract). The SBA requires the mentor and protégé businesses to enter into a written joint venture agreement, approved by the SBA, detailing the protégé's needs and the assistance the mentor will provide to meet those needs. For each joint venture agreement, the protégé must be responsible for controlling the day-to-day management and administration of the contract, and the protégé must perform at least 40% of the substantive contractual work. A mentor cannot control the manager of the protégé or otherwise be affiliated with the protégé. Factors relevant to affiliation include management and contractual relationships. Affiliation arises when the same individual exercises control over both the protégé and another small business (such as the mentor company).

**WOMAN-OWNED SMALL BUSINESS PROGRAM**

18.    The federal government's goal is to award at least 5% of all federal contracting dollars to WOSBs each year. Further, certain federal contracts are restricted to WOSBs when the SBA has determined that WOSBs are underrepresented in procurement. The WOSB program assists small businesses owned and controlled by one or more women to

gain federal contracts. Regulations governing the WOSB program are primarily contained within 13 C.F.R. Part 127.

19.    The SBA's WOSB program requires that the small business is at least 51% unconditionally and directly owned and controlled by one or more women who are United States citizens.

20.    *Control*. A WOSB must be controlled and managed on a full-time basis by only women. Factors relevant to evaluating whether a WOSB is controlled by a woman include whether a woman holds the highest position in the business, has the management experience necessary to run the business, and whether the woman is engaged in outside employment that prevents her from controlling the day-to-day business operations. While men or other entities may be involved in managing the business, they may not control the business.

21.    *Certification*. To become certified as a WOSB, the applicant business must establish it is owned and controlled by an eligible individual by submitting SBA Form 1010 with supporting documentary evidence, such as its articles of incorporation, operating agreements, personal financial statements of the individual, and a narrative describing the history and nature of the business. SBA Form 1010 warns that an applicant is subject to criminal prosecution if the applicant provides false information or makes misrepresentations. Until October 2020, WOSBs could self-certify that they were eligible by submitting annual representations under penalty of perjury; after October 2020, the certification process changed and now the SBA certifies eligibility for WOSBs.

**HUBZONE PROGRAM**

22.    The federal government aims to award at least 3% of federal contracting dollars to small businesses located in historically underutilized business areas (HUBZones) such as rural areas, Indian land, and census tracts with low household incomes, to increase

employment opportunities, investments, and economic development in these areas. Regulations governing the HUBZone program are primarily contained within 13 C.F.R. Part 126.

23.    To be eligible for the HUBZone program, the small business must be at least 51% owned and controlled by a United States citizen. Additionally, the applicant's principal office must be located in the HUBZone, although the business may have other offices outside of the HUBZone. At least 35% of the employees must reside in a HUBZone (though it is not necessary that the employees reside in the HUBZone of the principal office location).

24.    *Certification.* To become certified for the HUBZone program, the small business must provide documentation identifying each employee, his/her job location, and his/her payroll information to demonstrate satisfaction of the SBA's definition of employee, and the lease agreement for the principal office to verify its HUBZone location. To maintain its HUBZone status, the business must certify that it will attempt to maintain at least 35% of its employees residing in a HUBZone during performance of a HUBZone contract.

**SERVICE-DISABLED VETERAN-OWNED SMALL BUSINESS PROGRAM**

25.    The federal government aims to award approximately 3% of all federal contracting dollars to SDVOSBs each year. Regulations governing the SDVOSB program are primarily contained within 13 C.F.R. Part 125 and 38 C.F.R. Part 74.

26.    To be eligible for the SDVOSB program, the applicant business must be least 51% unconditionally and directly owned and controlled by a veteran with a service disability recognized by the VA or the Department of Defense.

27.    *Control.* The business must be controlled by only service-disabled veterans. As part of demonstrating control, the service-disabled veteran must be the highest paid person, hold the highest officer position, and receive at least 51% of profit from the business.

10

Factors relevant to evaluating whether an applicant is controlled by a non-service-disabled veteran individual or ineligible entity include whether the applicant shares employees or resources with another company, whether another entity or individual provides critical financing or bonding support to the applicant, and whether the extent of business relationships with another company leaves the applicant so dependent on the other company that it cannot exercise independent business judgment.

28.    *Certification*. To become certified as an SDVOSB, the applicant business must establish it is owned and controlled by an eligible individual by submitting VA Form 0877 with supporting documentary evidence. Form 0877 warns that an applicant is subject to criminal prosecution if the applicant provides false information or makes misrepresentations. Prior to 2011, the SDVOSB could self-certify its eligibility for the program. Since 2011, the CVE has verified eligibility by relying on the truthfulness and accuracy of documentation provided by the SDVOSB applicant. After verification, SDVOSBs must seek reverification periodically.

**CONTRACT AWARD REQUIREMENTS**

29.    To seek a contract or purchase agreement with the federal government, a business must be registered with the General Services Administration ("GSA") through their online portal, the System for Award Management ("SAM"), accessible online at www.SAM.gov.  Businesses must regularly renew or update their SAM registration to continue to seek federal government contracts. Contracting officers for government agencies, including the VA, the Department of Defense, GSA, Department of Health and Human Services, Department of Interior, and Department of Agriculture, rely upon the certifications of eligibility in SAM to award set-aside contracts.

## FACTS ESTABLISHING PROBABLE CAUSE

30.    GSA opened this investigation in September 2018 when information found during

11

a routine proactive initiative revealed that two seemingly unaffiliated companies—Pro-Mark and OK2—were both updating their company information in the SAM website from a common computer in Fargo, North Dakota. Pro-Mark is a retail and construction business headquartered in North Dakota, incorporated there in June 2001, and owned at the time by Connie Berg ("Connie"), who applied for and was accepted into the 8(a) program based on gender bias. Pro-Mark also later self-certified as a WOSB. OK2 is a construction business headquartered in Texas, incorporated there in June 2015, and majority owned by Kenneth Kurk, who is a service-disabled veteran. The common connection between these two entities appears to be Berg—Connie's husband and a minority owner of OK2.

31.    The investigation has revealed that the day-to-day operations and long-term decision making of Pro-Mark and OK2 are not actually managed and controlled by their woman and service-disabled owners as is required by the relevant federal regulation. Instead, Berg—a white, non-disadvantaged, non-service-disabled-veteran man who is not eligible for government set-aside contracts—manages and controls both companies. The investigation has further revealed that Berg exercises impermissible control over several more 8(a), WOSB, HUBZone, and SDVOSB businesses.

32.    On November 4, 2020, the United States District Court for the District of North Dakota issued a search warrant ordering Microsoft Corporation, USA ("Microsoft") to disclose information associated with business email accounts for Berg and his co-conspirators' various 8(a), WOSB, HUBZone, and SDVOSB businesses involved in the scheme to obtain government set-aside and sole-source contracts. The warrant applied to information associated with the following Pro-Mark, Fed Serve, and OK2 employee accounts: Kyle Berg (kyle@gopromark.com, kyle@ok2construction.com, kyle@fedservllc.com), Chad DuBois (chad@gopromark.com), Mandy Grant (mandy@gopromark.com, mandy@ok2construction.com), Kevin Pietruszewski

12

(kevin@gopromark.com, kevin@ok2construction.com), Kenneth Kurk

(kenneth@ok2construction.com), and Osvaldo "Ozzie" Cruz (ozzie@ok2construction.com).

Review of these emails and documents provides the basis for a number of the facts recited

below.

33.    Additional emails and documents were obtained from federal agencies, including

copies of Pro-Mark, Razor, Fed Serve, MDM, and OK2's applications and certifications

submitted to the SBA or VA purportedly establishing eligibility for these federal programs.

Review of these emails and documents provides the basis for additional facts recited below.

**Table 2: Companies and Entities**

| Company or Entity | Role in Scheme |
|---|---|
| BAD Investments | Real estate development company partially owned by Kyle Berg (50%). |
| CS DuBois Construction | Construction company owned by Chad DuBois that previously was enrolled in the 8(a) program. Berg and Walters worked at CS Dubois simultaneously. |
| DJW Holdings, LLC | Property company owned by Dan Walters. |
| FedGenius, LLC | Company owned by Mallely Kurk (70%) and Kenneth Kurk (30%). |
| Fed Serve, LLC | HUBZone company owned by Kyle Berg. |
| KRB Holdings, LLC | Property company represented by Kyle Berg. |
| Marlin Creek Holdings, LLC | Property company owned by Kyle Berg and Dan Walters. |
| MDM Construction, LLC | SDVOSB company owned by Daniel Walters. |
| OAC Action Construction Corp. | Company owned by Orlando Cruz, Sr. and Ozzie Cruz that previously was enrolled in the 8(a) program. |
| OAC Group Properties, LLC | Property company represented by Ozzie Cruz. |
| OK2 Construction, LLC | SDVOSB company owned by Kenneth Kurk (51%), Kyle Berg (24.5%), and Ozzie Cruz (24.5%). |
| PMR Services, LLC | Joint venture between Pro-Mark and Razor under mentor-protégé agreement. |

Case 24-07211-jw Doc 1071 ARS Filed 09/25/24 Entered 03/09/25 16:42 of 81 Desc
Case 24-07211-jw Doc 1071 Filed 09/25/24 Page 6 42 of 8 Desc
Exhibits A-E    Page 28 of 130

| PMR Services II, LLC | Joint venture between Pro-Mark and Razor under mentor-protégé agreement. |
|---|---|
| Pro-Mark Services, Inc. | 8(a) and WOSB company owned by Connie Berg until August 2020. |
| Razor Consulting Solutions, Inc. | 8(a) and WOSB company owned by Carla Schwartzenberger (51%) and Eric Mauch (49%). Had mentor-protégé agreement with Pro-Mark. |
| Tunheim Construction | 8(a) company with which Pro-Mark had a mentor-protégé agreement. |
| Tunheim Holdings, LLC | Owns Tunheim Construction. Berg leases Fed Serve's principal office from Tunheim Holdings. |

**Table 3: Individuals**

| Individual | Role in Scheme |
|---|---|
| Melissa Beer | Razor employee. |
| Blake Berg | Son of Kyle and Connie Berg. Part-time Fed Serve employee. |
| Connie Berg | Former owner of Pro-Mark and spouse of Kyle Berg. Purported to control Pro-Mark but actually had very limited role. |
| Evan Berg | Son of Kyle and Connie Berg. Part-time Fed Serve employee. |
| Kyle Berg | Former Vice President of Pro-Mark. Owner of Fed Serve. Minority owner of OK2. Controlled Pro-Mark and OK2 and exerted substantial control over Razor and MDM. |
| Orlando Cruz, Sr. | Majority owner of OAC Action Construction Corp and father of Ozzie Cruz. |
| Osvaldo "Ozzie" Cruz | Minority owner of OK2 and OAC Action Construction Corp. |
| Chad Davis | Pro-Mark employee who was represented as an OK2 employee. |
| Joey Dawson | Tunheim Construction employee. |
| Dave Dietrich | Pro-Mark employee who was later moved to MDM. |
| Chad DuBois | Pro-Mark employee who acted as controller of OK2 and did work for Fed Serve. |
| Paige DuBois | Daughter of Chad DuBois. Part-time Fed Serve employee. |
| Melanie Foley | Pro-Mark employee who was later moved to MDM. |

| | |
|---|---|
| Mandy Grant | Pro-Mark employee who did work for Razor, Fed Serve, and OK2 and represented herself as an OK2 and Razor employee. |
| Kari Hazer | MDM employee. |
| Tyler Kellen | Pro-Mark employee who represented himself as a Razor and Fed Serve employee. |
| Will Klinke | Pro-Mark employee hired to work on Razor, PMR, and PMR II projects. Did work for Fed Serve. |
| Kenneth Kurk | Service-disabled veteran. Majority owner of OK2 and minority owner of FedGenius. Nominally in control of OK2, but in reality substantially dependent on Berg and Pro-Mark. |
| Mallely Kurk | Spouse of Kenneth Kurk and majority owner of FedGenius. |
| Anthony Luchsinger | Fed Serve employee whose salary was at least partially reimbursed by Tunheim Construction. |
| Denise Luther | External accountant for Pro-Mark, Fed Serve, MDM, and OK2. |
| Jason Luther | External accountant for Pro-Mark, Fed Serve, MDM, and OK2. |
| Eric Mauch | Minority owner of Razor. |
| Lily Mendoza | OAC Action Construction Corp. employee who represented OK2 at a bid meeting. |
| Dan Noyes | Pro-Mark employee who did work for Fed Serve. |
| Larry Peihl | Pro-Mark employee who represented himself as an MDM employee and was later moved to MDM. |
| Darin Perius | Razor employee hired to manage government contracts. |
| Kevin Pietruszewski | Pro-Mark employee who did work for OK2 and Razor, and represented himself as a Razor employee. |
| Willy Reina | OAC Action Construction Corp. employee who did work for OK2. |
| Carla Schwartzenberger | Native American majority owner of Razor. |
| Tammy Stavenes | Pro-Mark employee who did work for Razor and was later moved to MDM. |
| Jason Tejral | Pro-Mark employee who did work for Fed Serve and Razor. |
| Billy Thomas | OK2 employee who received a vehicle and expenses from OAC Action Construction Corp. |

15

| Christopher Tunheim | Ultimate owner of Tunheim Construction; reimbursed Berg for wages of an employee of Fed Serve. |
| Tyler Walker | Pro-Mark employee who did work for Razor. |
| Daniel Walters | Service-disabled veteran owner of MDM. |

## PRO-MARK SERVICES, INC.

34.     According to documents Connie Berg submitted to the SBA on behalf of Pro-Mark during its application to the 8(a) program, Pro-Mark was incorporated by Kyle and Connie Berg under the laws of North Dakota on June 26, 2001, for the purpose of specialty retail sales. On August 1, 2007, Berg transferred his 49% ownership of Pro-Mark to Connie, making her Pro-Mark's sole owner. After gifting his stock to Connie, Berg continued as a full-time employee of Pro-Mark. According to documents obtained from the prior search warrant to Microsoft, including Pro-Mark board materials, internal emails, and financial statements, and a publicly available press release, Connie owned Pro-Mark until August 31, 2020, when the company was sold through an Employee Stock Ownership Plan ("ESOP") for over $28 million to Pro-Mark's employees.

35.     Just three months after Berg transferred the business to her in full, on December 6, 2007, Connie applied to the 8(a) program on behalf of Pro-Mark, claiming status as an economically and socially disadvantaged individual. In her application to the SBA, Connie claimed social disadvantage on the basis of gender bias. On May 23, 2008, the SBA accepted Pro-Mark into the 8(a) program, based on the facts Connie presented in her application. In her 8(a) application, Connie stated that she was responsible for "all control, management, and business decisions relating of Pro-Mark." The application also certified that she was the only director, officer, management member, key employee, or owner of the company, and that she worked 40 hours per week for Pro-Mark. The application indicated that Pro-Mark earned 100% of its revenue in NAICS code 448190 (Other Clothing Stores).

16

Case 3:24-mj-00107-ARS    Document 1-1    Filed 03/09/24    Page 6 of 21
Case 3:21-cv-00114    Document 251    Filed 03/12/24    Page 42 of 81   Desc
Exhibits A-E    Page 31 of 130

36. From 2010 to 2016, Pro-Mark filed SBA Form 1010 annually to recertify for the 8(a) program. In her capacity as "President/CEO/Proprietor/Management Member/General Partner," Connie apparently signed and certified these forms, which each represented that she was the president and 100% owner of Pro-Mark and dedicated 40 hours per week to managing the company. Connie also certified that no one other than "an economically and socially disadvantaged individual. . .hold[s] the highest position in the business," the individual holding the highest position in the small business works full-time at the business, and that Pro-Mark had no affiliations. Each of these forms contain a certification that the responses to the questions are true and complete, and an acknowledgement that the SBA is relying on the form to determine the small business's 8(a) program eligibility. The forms warn that an applicant is subject to criminal prosecution for providing false information or making misrepresentations.

37. Beginning in 2015, in addition to its 8(a) status, Pro-Mark self-certified its status as a WOSB (self-certification was permitted for the WOSB program until October 2020 when the SBA's regulations changed). The certifications included that "management and daily business operations of the concern are controlled by one or more women. Control means that both the long-term decision making and the day-to-day management and administration of the business operations are conducted by one or more women"; a "woman holds the highest officer position in the concern and her resume evidences that she has the managerial experience of the extent and complexity needed to run the concern"; and "[t]he woman who holds the highest officer position of the concern manages it on a full-time basis and devotes full-time to the business concern during [normal] working hours." These representations were submitted under warning that an applicant is subject to criminal prosecution if the applicant provides false information or makes misrepresentations.

17

38.     For each bid that Pro-Mark submitted for WOSB set-aside or sole-source
contracts, a Pro-Mark employee was generally required to certify that the company met all
SBA standards, including that a woman controlled the small business. These
representations were submitted under warning that the individual certifier is subject to
criminal prosecution if the individual certifier provides false information or makes
misrepresentations on behalf of the bidding company.

39.     By virtue of its set-aside statuses, Pro-Mark has received hundreds of
government contracts from the VA, Army, Air Force, and other agencies totaling millions of
dollars.

40.     This investigation, however, has uncovered evidence that Pro-Mark is not
controlled by Connie or any other disadvantaged individual as required by the 8(a)
program, or any other woman per WOSB requirements. Rather, Connie's role in the
business is nominal. Her husband—Berg, a non-disadvantaged, white man— manages and
controls all day-to-day operations of the business. Berg's level of involvement in and control
over the business have not been disclosed to the SBA.

41.     Evidence shows that nearly all of Pro-Mark's work is in construction. Per 8(a) and
WOSB program requirements, having the requisite management experience is one factor
for determining control; Connie appears to lack the experience necessary to manage a
construction company.

   a.   Pro-Mark registered for specialty retail sales upon incorporation and indicated in its
        8(a) program application that it earned 100% of its revenue in NAICS Code "Other
        Clothing Stores." According to the resume that Connie submitted to the SBA with
        her 8(a) application, Connie's background is in screen-printing fabric and clothing.
        Her prior experience includes employment at Logotech, a company engaged in
        making custom promotional products, and Creative Imprintz, a branded apparel

18

business. Connie has never indicated to the SBA that she has any experience or training in construction.

b.   Berg has significant past experience in construction. He was previously employed as a vice president and project manager at CS DuBois Construction ("CS DuBois") through December 2008, according to Berg's resume that OK2 submitted to the CVE when seeking verification as an SDVOSB in April 2016. CS DuBois graduated from the 8(a) program in July 2007.

c.   According to emails between an SBA employee and a North Dakota state employee regarding Pro-Mark's new status as an 8(a) firm, the same year it was accepted into the 8(a) program, Pro-Mark had more business in construction than in Other Clothing Stores—the NAICS code that Connie indicated Pro-Mark earned 100% of its revenue from in its 8(a) application.

d.   In a business plan Pro-Mark submitted to the SBA in 2009, Pro-Mark explained that "to increase Pro-Mark's functionality and diversity and make the most of Kyle's 14 years of experience, Pro-mark [sic] started construction activity in 2007. Pro-Mark's main goal is to continue to grow and tap into federal government business opportunities. With Connie's experience in promotional and clothing and Kyle's experience within the construction industry and government contracts, a unique mix is found." This business plan was apparently signed by Connie Berg in her capacity as Pro-Mark's president.

e.   By 2014, an independent audit of Pro-Mark's accounts showed that the clothing component of the business accounted for less than 1% of its annual revenue.

f.   From 2009 through 2021, Pro-Mark has obtained over 2,000 government contracts for a variety of construction-related services. Not a single government contract identified to date relates to clothing or retail sales.

19

42.    Documents, including emails obtained from the prior search warrant to Microsoft, indicate that the marketing arm of Pro-Mark is viewed as entirely separate from Pro-Mark's primary construction business:

    a.  In a January 2018 email, Kurk, co-owner of one of Berg's other businesses, inquired if Berg's "wife's marketing company" produced printed marketing materials, referring to Connie's work at Pro-Mark as if it were an entirely separate business.

    b.  In a January 2019 email, Pro-Mark's external accountant, Jason Luther, stated that he recorded $897 of sales for custom jerseys and shorts "in Connie's retail books."

    c.  Connie indicated she is in the "Retail Sales and Marketing Division" of Pro-Mark in a resume she submitted to the SBA in 2020.

43.    Pro-Mark emails obtained from the prior search warrant to Microsoft indicate that Connie was not involved in the day-to-day management or long-term strategy goals of the business. Rather, Berg—a white, non-disadvantaged man—directed all day-to-day operations and strategy of Pro-Mark's business. Even after Pro-Mark was sold through the ESOP in August 2020, Berg continued to exercise control over the business.

44.    For example, Connie was not meaningfully involved in daily email communications regarding Pro-Mark's business. Connie rarely communicated with Pro-Mark employees, let alone about government contracts, according to an analysis of all emails retrieved from the search warrant. However, according to that same analysis, Pro-Mark employees did email Berg extensively about the day-to-day management of Pro-Mark, and conducted a large volume of business strategy and planning activities relating to government contracts via email without involving Connie. Pro-Mark employees

Case 24-07221-mj-001-011A RS File 09/25/24 Entered 03/09/25 22:46:24 of 81 Desc
Case 24-07221-mj-001-011A RS File 09/25/24 Entered 03/09/25 22:46:24 Page 242 of 81 Desc
Exhibits A-E    Page 35 of 130

infrequently emailed Connie's personal email account (berg_connie@hotmail.com), and even less frequently emailed her Pro-Mark business account, as shown below:

a. Chad DuBois was Pro-Mark's controller until he was promoted to vice president in July 2019. According to a review of emails available from a search of his Pro-Mark email account, DuBois had no emails in his account to or from Connie's Pro-Mark business email account. DuBois had only three emails in his account corresponding with Connie's personal email: one was related to the ESOP; one was purely social in nature; and one was an email Connie forwarded from an insurance company asking why Connie and Pro-Mark had not responded to comply with a required audit.

b. By way of comparison, DuBois's business account contained over 3,000 emails received from Berg's business email accounts and 7,343 emails sent to Berg's business email accounts.

c. Similarly, Mandy Grant, Pro-Mark's office manager who was ultimately promoted to treasury/secretary in July 2019, had no emails in her account to or from Connie's business email account. Grant's business account contained eight emails corresponding with Connie's personal Hotmail account related to custom clothing orders for Connie's screen-printing business.

d. By way of comparison, Grant had over 1,000 emails from Berg's business email accounts and 369 emails sent to Berg's business email accounts in her business email account.

e. In the limited instances in which Connie was sent a business-related email, she forwarded such emails to Berg or other Pro-Mark employees without comment. For example, in February 2020, Connie forwarded a notice purportedly from SAM to Berg with no comment. In July 2020, Connie forwarded a satisfaction

survey from the Defense Finance and Accounting Service to Berg with no comment.

45.    Berg determined which government contracts Pro-Mark would bid and directed employees how to complete proposals, based on a review of emails obtained from the prior search warrant. For example, Connie was not included on any of the below emails sent by Berg:

a. In August 2018, Berg circulated a project to-do list for Ellsworth Air Force Base detailing the status of a number of open items, flagging key dates, identifying areas for which to hire subcontractors, and circulating progress schedules and budgets.

b. In October 2019, Berg instructed employees not to include specific dollar amounts for cost savings in a proposal for barrier work at Offutt Air Force Base.

c. In December 2019, Berg instructed employees to bid a job even though Pro-Mark lacked the resources to do so, noting, "we will bring new people in."

d. In April 2020, Berg provided specific instructions to Pro-Mark employees assigning tasks and detailing how to complete past performance questionnaires and other informational worksheets for a project for Dyess Air Force Base. Berg also managed communications with the architecture and engineering firm involved in putting together this bid.

e. In April 2020, Berg again provided employees with detailed instructions of what to include with a bid sheet for a project for Langley Air Force Base. Berg directed the employees how to frame the proposal scope letter and address how Pro-Mark solicited subcontractors and suppliers; what to include in the preliminary schedule; how to break out the bid sheet with specific overhead, profit, and bond

rates, and account for state taxes; and to include subcontractor and supplier quotes.

f.  On numerous occasions, Berg instructed Pro-Mark employees to sign official documents, such as government contracting proposals and joint venture documents, on Connie's behalf. Review of the emails obtained from the search warrant has uncovered no evidence that Connie saw, reviewed, or approved these documents; she was not included on such communications.

g.  For example, in May 2019, Berg asked Pro-Mark's then-office manager Mandy Grant to sign Connie's name on a teaming agreement between OK2 and Pro-Mark for a VA project proposal.

h.  For another example, in August 2019, Berg asked Grant to sign an addendum for a joint venture between Pro-Mark and Razor Consulting Solutions on Connie's behalf.

46.    Berg was in direct contact with the government on behalf of Pro-Mark with no indication that Connie was involved in or provided input into these discussions, according to a review of government files, government emails, and emails obtained from the search warrant.

a.  In April 2017, Berg—not Connie—submitted a letter to the SBA clarifying Pro-Mark's teaming agreement with Tunheim Construction.

b.  In March 2018, Berg—not Connie—submitted certifications to the SBA for a size determination.

c.  In October 2020, Berg—not Connie—received an automatic notification from a Nebraska regulator, informing him that Pro-Mark's contractor registration expired and the company could be subject to fines.

23

Case 8:24-mj-01011-ARS Document 1-1 Filed 03/01/24 Page 42 of 81
Case 24-07021-mj-001 JARS Filed 08/25/41 Entered 03/01/25 24 Page 42 of Desc
Exhibits A-E    Page 38 of 130

47.    According to a review of internal Pro-Mark emails obtained from the prior search warrant, Berg decided employee hiring, salary, and raises. Connie was not included on these emails and did not appear to have any input into these decisions, as shown below:

a.    In July 2019, Berg directed Pro-Mark's external accountants, Denise and Jason Luther, to implement raises for newly appointed Pro-Mark Vice President Chad DuBois and Secretary/Treasurer Mandy Grant.

b.    In September 2019, Berg agreed to decrease DuBois's salary by $5,000 and pay him that money in a lump sum instead. Berg further agreed to instruct Pro-Mark's accountant to pay the sum as a wage not a bonus; not to take taxes out of the check; and to print DuBois a check, rather than issuing a direct deposit.

c.    In May 2020, Berg assessed a job candidate for a Construction Project Manager position for Pro-Mark for a project on MacDill Air Force Base. Berg reviewed the application, communicated directly with the candidate, and evaluated his qualifications.

d.    In July 2020, Berg instructed Grant (now Secretary/Treasurer) and DuBois (now Vice President) what salary and benefits to offer a Pro-Mark employee.

48.    Berg managed Pro-Mark's financials, including company bank accounts, loans, and payroll, according to emails obtained via search warrant and grand jury subpoenas to financial institutions.

a.    For example, in June 2019, Berg instructed bankers at the Capital Credit Union—where both Pro-Mark and Berg personally held accounts—to "transfer $60,000 from Pro-Mark into my personal account and wire the funds," asking for the transfer to be done by 11 a.m.

b.    In November 2019, Berg instructed bankers at the Capital Credit Union to "transfer 137,526.34" from Marlin Creek Holdings, LLC ("Marlin Creek

24

Holdings") to Pro-Mark Services checking." Marlin Creek Holdings is another company Berg partially owns with Dan Walters, according to documents Marlin Creek Holdings submitted to the SBA pursuant to a disaster loan application.

c.  In December 2019, Berg instructed his bankers at the Capital Credit Union to start an automatic payment from Pro-Mark to BAD Investments each month for $2,500. BAD Investments is a real estate development company Berg partially owns, according to documents BAD Investments submitted to the SBA pursuant to a disaster loan application. According to bank records received pursuant to grand jury subpoenas to financial institutions, these transfers ultimately started in May 2020.

d.  In January 2020, Berg requested a $1 million transfer from Pro-Mark's bank account into the account of another company he controlled, KRB Holdings, LLC ("KRB Holdings").

e.  In March 2020, Pro-Mark's 401(k) provider asked Berg to review the 401(k) activity for the previous year, as well as the plan renewal letter. The provider also asked Berg to remit payment for the plan. In June 2020, the 401(k) provider sent a request to Berg to e-sign and file the IRS form for the year. The body of the email is addressed to Connie, yet she was not included as an addressee on the email or provided the link for e-signing.

f.  In May 2020, Berg applied for an SBA Paycheck Protection Program loan on Pro-Mark's behalf. The servicing bank reminded Kyle to obtain Connie's signature on the application.

49.  Employees openly recognized that Kyle Berg—not Connie—controlled Pro-Mark. For example, in October 2019, Pro-Mark employee Tyler Kellen wrote to Berg and other Pro-Mark employees regarding a change order that resulted in greater profit for Pro-Mark.

25

Kellen stated, "Accidentally made Kyle another $13k." Berg replied, "Tyler – You made Pro-Mark – not Kyle!!!!!" Kellen replied, "Sorry we did it for Connie. That's what I meant to say, computer autocorrected for some reason. Have to get IT to look into that."

50.    The Bergs sold their ownership interest in Pro-Mark to an ESOP in August 2020 for $28 million. Kyle Berg had no formal ownership role in Pro-Mark, according to documents submitted to the SBA. Yet the investment banking advisor that handled the ESOP transaction issued a press release dated March 2020, describing Pro-Mark as a "general construction contractor" and referring to "Pro-Mark owners Connie and Kyle Berg." Following the ESOP, Berg—who no longer held an executive title at the company—appeared to remain heavily involved in managing Pro-Mark's day-to-day operations, as shown below:

    a.    In early October 2020, Berg emailed Pro-Mark employee Jason Tejral asking him to "take another stab at" drafting the past performance section of a proposal for Pro-Mark because Berg "want[ed] to make sure our proposal is one of the best one's for this contract!!!"

    b.    In late October 2020, Grant included Berg on an email to an Air Force employee, asking her to complete a past performance questionnaire for Pro-Mark. Berg followed up with Grant asking whether the Air Force employee sent the questionnaire to Ellsworth Air Force base and advising Grant to follow up accordingly.

    c.    In November 2020, Tejral sent Berg and DuBois a list of questions he planned to submit in conjunction with a request for information for a roof repair project, asking if Berg or DuBois had any questions to add to the list.

    d.    Also in November 2020, Berg handled the communications with a subcontractor for an Air Force bid, including sending the subcontractor dates for site visits and

26

proposal due dates, and instructing the subcontractor that Pro-Mark would need
a breakdown of pricing.

51.    Pro-Mark continues to actively seek and receive government contracts.  Its
registration in SAM was most recently renewed in August 2021 according to information
from SAM.gov.  It was awarded a federal contract as recently as January 2022 according to
information in the Federal Procurement Data System.

52.    Given the foregoing evidence, there is a probable cause to conclude that Connie
and Kyle Berg, as well as Pro-Mark, have misrepresented the extent to which Berg controls
Pro-Mark. Such misrepresentations were material to the determination of whether Pro-
Mark qualified for the 8(a) and WOSB programs and therefore was eligible to receive 8(a)
and WOSB set-aside contracts.

## RAZOR CONSULTING SOLUTIONS, INC. & PMR SERVICES, LLC

53.    Razor is a computer-services company majority-owned by Carla
Schwartzenberger, which participated in the SBA's 8(a) and WOSB programs. This
investigation has uncovered evidence that Schwartzenberger does not actually control the
business operations that perform Razor's government contracts, as required by 8(a)
program requirements and WOSB requirements. Rather, Razor's government contracting
services are so dependent on non-socially-disadvantaged men, namely Berg and companies
controlled by Berg, including Pro-Mark, that Razor would not qualify for 8(a) or WOSB
status but for material misrepresentations.

54.    According to forms that Razor filed with the SBA, Razor was incorporated under
the laws of North Dakota December 30, 2012, by Carla Schwartzenberger as 51% owner
and Eric Mauch as 49% owner. Schwartzenberger and Mauch previously worked together
at Microsoft, and Microsoft was Razor's primary client for several years. According to tax

returns Razor filed for 2013, the company identified its business activity as "software developer."

55.    Between July 13 and October 17, 2016, Schwartzenberger completed SBA Form 1010 to apply to the 8(a) program on behalf of Razor, claiming status as an economically and socially disadvantaged individual as a Native American woman. According to its application, Razor "seeks projects including custom software design and development, business process analysis, and Business Process Outsourcing (BPO)." SBA Form 1010 contains a certification that the responses to the questions are true and complete, and an acknowledgement that the SBA is relying on the form to determine the firm's 8(a) program eligibility. The form warns that an applicant is subject to criminal prosecution for providing false information or making misrepresentations.

56.    On January 9, 2017, the SBA accepted Razor into the 8(a) program and approved its primary NAICS code as 541519 (Computer Related Services). Schwartzenberger signed a participation agreement acknowledging that Razor risked termination if the disadvantaged individual failed to maintain full-time day-to-day management and control, as well as if Razor failed to disclose to the SBA the extent to which non-disadvantaged persons participated in the management of the business.

57.    In addition to its 8(a) status, Razor self-certified its status as a minority-owned small business and a WOSB until October 2020, when the regulation changed to no longer allow self-certification.

58.    Evidence obtained from federal agencies shows that nearly all of Razor's government contracts are in construction, maintenance, and housekeeping (which includes waste removal, pest control, and food services)—not computer services. Per 8(a) and WOSB program requirements, having the requisite management experience is one factor for

determining control. Schwartzenberger has no requisite experience necessary to manage a construction, maintenance, or housekeeping company.

a. According to Razor's initial self-certification on SAM.gov, as of January 26, 2017, it listed a primary NAICS code of 541611 (Administrative Management and General Management Consulting Services). Among the 23 NAICS codes that Razor identified as its secondary industries, none related to construction, physical maintenance, or housekeeping services.

b. Schwartzenberger's resume, which she submitted with her 8(a) application to the SBA, demonstrated prior employment in software design, development, and implementation, and general bookkeeping. Eric Mauch's resume claimed competencies in business consulting and software development. Neither resume indicated any experience, training, or licensing in construction, maintenance, or housekeeping-related services.

c. Four months after it was accepted into the 8(a) program, in April 2017, Razor signed a mentor-protégé agreement with Pro-Mark, which was subsequently submitted to the SBA, by which terms Pro-Mark's Vice President and Business Development Manager committed to assisting Razor "to expand its core competencies and pursue new opportunities within the federal government sector." Berg signed the agreement on behalf of Pro-Mark as its Vice President.

d. As part of the SBA's mentor-protégé program, Razor formed a number of joint ventures with Pro-Mark, including PMR Services, LLC ("PMR") in May 2018 and PMR Services II, LLC ("PMR 2") in November 2019. Under SBA rules, Pro-Mark was permitted to assist Razor with only the specific contracts governed by these joint venture agreements. Pro-Mark could assist on those contracts based on the SBA's evaluation that Razor had a need for assistance with the contract and Pro-

Mark could offer valuable mentorship for the contract. Absent these joint-
venture agreements, the mentor-protégé program does not provide an avenue for
a mentor to assist a protégé in performing a contract.

e. An SBA official interviewed during this investigation explained that the mentor-
protégé agreement is focused on business development that benefits and assists
in growing a small 8(a) company. The agreement is not meant as a contracting
program, in which a large business enters the program with the purpose of
winning a contract. The SBA official further explained that a mentor-protégé
agreement may be problematic if a mentor found a company that had an 8(a)
certification, and the mentor paired with it to use the protégé's certification to
win contracts. The SBA official pointed out that the program does not allow a
protégé to take on contracts that the protégé cannot self-perform or manage on
its own.

f. While protégés are required to disclose everything they are doing to the SBA,
particularly related to ownership, assets, structure, and NAICS code, the SBA
official interviewed during this investigation noted that many business dealings
between mentors and protégés are done behind the scenes, and the SBA is
unaware of businesses operating differently from their submitted plan until it is
too late. In other words, the official said that it is possible for mentors and
protégés to submit something to meet the "letter of the law," that is, a plan that
adheres to the mentor-protégé program requirements, but not necessarily follow
that submission or to make external agreements that are not submitted for SBA
review.

g. According to an annual review conducted by the SBA, after one year in the
mentor-protégé agreement with Pro-Mark, Razor had expanded into commercial

30

building construction, extermination and pest control, and landscaping services.
Those contracts were awarded solely to Razor, not to a joint venture with Pro-
Mark—meaning that Pro-Mark should not have been assisting with such
contracts.

h. From July 2017 to at least June 2021, Razor has obtained dozens of government
contracts for a variety of construction and housekeeping related services, worth
millions of dollars.

i. Razor has won only two contracts in its primary NAICS code 541519 (Computer
Related Services), collectively worth less than $200,000, for providing customer
service support for various Microsoft products to the National Park Service.

59.     Despite SBA rules prohibiting affiliation— determined by evaluating whether one
employee exercises control over both the protégé and another small business (here, Pro-
Mark)—documents obtained from the prior search warrant and government sources
indicate that Berg and other non-disadvantaged, white men direct day-to-day operations
and strategy of government contracts. Schwartzenberger is not involved in the day-to-day
management or long-term strategy goals of Razor's government contracting arm.

60.     Schwartzenberger's role in Razor's government contracts is limited to submitting
paperwork where her signature is required and some tracking of accounts payable and
receivable. Also according to emails obtained via search warrant, Schwartzenberger defers
to Pro-Mark employees' instructions regarding performing government contracting work.
For example, Pro-Mark employee Tyler Kellen indicated that Pro-Mark "basically do[es] all
the work for Razor when it comes to the construction side," and Razor doesn't "know how to
do anything," leading to Kellen stating that he spent at least 25 hours per week on Razor
projects, while Razor employees "spend 0" hours per week on the construction projects. In

response, Pro-Mark employee Mandy Grant provided, "We all work for Pro-Mark so if we all work together we can help each other out and hopefully ease work loads for everyone. . ."

61.    Schwartzenberger is not meaningfully involved in the day-to-day management relating to Razor's government contracts. Perius (Razor's government contracts employee and a man) emails Berg and Pro-Mark employees extensively and defers to their judgment about the day-to-day managing of government contracts, according to emails obtained via search warrant.

    a.    In February 2020, Berg emailed Mauch, Kellen, and Perius at their Razor email addresses, asking if Razor had any luck advertising a position for a Project Manager and if "we" still have the ad out. Berg pointed out that Kellen could not handle more Razor work and needed to concentrate on his Pro-Mark work.

    b.    In March 2020, a GSA government employee circulated a contact list for contractors working on the project to renovate the federal courthouse, a contract awarded solely to Razor. The list included Kellen, Grant, and Perius. It did not include Carla Schwartzenberger.

    c.    In April 2020, Kellen emailed Berg, explaining that Razor did not know how to send invoices for government contracts and saying "I don't think Razor billing is all that similar to this anyways." Kellen then stated that he would create the invoices to send to the government on behalf of Razor for contracts that, according to government records, were awarded solely to Razor.

    d.    In July 2020, an official with the Air Force contacted Schwartzenberger, Mauch, and Perius to schedule a time to discuss a potential $4 million sole-source contract to Razor. Perius forwarded the scheduling request to Berg, Grant, and Jason Tejral, a Pro-Mark employee. Schwartzenberger appears to have never

Case 24-07021-njl Claim 1 ARS Filed 06/25/24 Pg 46 of 81 Desc
Case 24-07021-mj-001011 ARS Doc 09/15/24 Filed 03/09/25 24 Page 632 of 81 Desc
Exhibits A-E    Page 47 of 130

responded. After Berg and Grant provided their availability, Mauch commented that he had more limited availability and "will defer to Darin/Mandy/Kyle."

e.  In August 2020, Tejral collected quotes from subcontractors for a contract bid by Razor. Tejral told the subcontractors that a Pro-Mark employee would be the point of contact for the project, and he further directed the subcontractors to cc: Tejral on all correspondence. Tejral did not mention Razor as the prime contractor or provide any contact information for any Razor employee.

f.  In September 2020, Tejral sent quotes from subcontractors to Perius so that Perius could provide the quotes to the Air Force on behalf of Razor.

g.  Razor maintains an email account, razorgov@gotorazor.com, that is used to receive communications from government contracting officers. The account apparently automatically forwards emails to Berg, Grant, and Pietruszewski at their Pro-Mark email address. For example, in January 2020, the SBA notified Razor employees that Razor won a contract for renovation. A Razor employee forwarded the email to razorgov@gotorazor.com. Berg responded from his Pro-Mark email address, "Perfect."

h.  At times, Grant manages the razorgov@gotorazor.com email address. In April 2020, Grant used the razorgov@gotorazor.com email address (according to the email signature block) to submit a bid solely from Razor to Indian Health Services for a construction project. A government employee replied, requesting additional information about a subcontractor. The email was forwarded from razorgov@gotorazor.com to Berg and Pietruszewski at their Pro-Mark email addresses—not to Schwartzenberger—seeking their input.

i.  In August 2020, Grant, again using the razorgov@gotorazor.com email address according to the signature block, sent a government contracting officer at Indian

Health Services an email, attaching a signed copy of Form SF1413, which
identified subcontractors used on a project awarded to Razor. Grant explained
that Pro-Mark was not a subcontractor on the project. A subsequent email from
the razorgov@gotorazor.com address told Indian Health Services officials that
"we" will review the project facility, order construction materials, and create a
project schedule. In another string of the email, Pietruszewski—a Pro-Mark
employee—claimed to have written the "we" email on behalf of
razorgov@gotorazor.com. Pietruszewski explained to Pro-Mark employee Will
Klinke, a project manager Pro-Mark hired to work on PMR Services and Razor-
related projects, that Pietruszewski had written the email regarding materials
and scheduling from the razorgov@gotorazor.com email address.
Schwartzenberger does not appear to respond to any of the 79 emails as part of
this conversation chain regarding Razor's contract with Indian Health Services,
which were identified through computer analysis.

62.    Non-disadvantaged, white men—not Schwartzenberger, despite representations
to the contrary—determine staffing to Razor's government contracting work, according to a
review of emails obtained via search warrant.

a.    For example, in November 2018, Berg emailed Daniel Walters, who owns
MDM—an SDVOSB over which Berg exercises impermissible control (as detailed
below starting in Paragraph 77)—regarding employee Tammy Stavenes. At the
time, Stavenes was working for Pro-Mark, and Berg wanted to determine how to
share her across multiple companies. Berg commented "I would think she could
make me more money running other projects for either Pro-Mark, Tunheim,
Razor, or OK2 Construction. With . . . Razor (CBP project) she should stay pretty
busy."

34

b.  In September 2018, Schwartzenberger received a purchase order from a
    government contracting official for a contract awarded to Razor by the U.S.
    Customs and Border Protection. Schwartzenberger forwarded the email to
    Stavenes asking what the purchase order was for. Stavenes replied, explaining
    that Razor was awarded a contract by the U.S. Customs and Border Protection.
    Stavenes said she would check with Grant to see "who is going to do the
    contracts." Grant later received the email communication and forwarded it to
    Berg.

c.  In May 2019, Stavenes sent a bid to Customs and Border Protection for lawn
    mowing services, using her Razor email account. She copied Berg at his Pro-
    Mark address.

d.  In September 2019, Schwartzenberger forwarded an email chain regarding
    Razor's contract to renovate the federal courthouse to Kellen at his Pro-Mark
    email address. In response, Kellen emailed Razor employees that a Pro-Mark
    superintendent would handle the project, and he copied Berg on the email. Berg
    replied confirming that plan.

e.  In October 2019, Berg used his Fed Serve email account to email a painting
    subcontractor to confirm a contract for a project awarded to PMR Services. Berg
    explained to the subcontractor,

> Sorry I didn't explain the arrangement with PMR JV (Pro-
> Mark/Razor). Since we graduated from the 8a program and Pro-
> Mark is too large for the painting size standard we have an
> approved Mentor Protégé Agreement with them through the
> SBA. We are working on our 2nd JV with them. They are an
> 8a/women owned firm . . . I also know one of the owners pretty
> well."

f.  In February 2020, Berg used his Pro-Mark email address to email
    Schwartzenberger to inform her that Pro-Mark would invoice Razor and PMR for

35

work that Pro-Mark employee Tyler Kellen spent on Razor or PMR projects, including the project for renovations at the federal courthouse.

g. In March 2020, Razor employees Mauch, Perius, and Beer discussed an interview for a job candidate for a project manager for Razor. Schwartzenberger was not included in the email communications. Mauch forwarded the email chain to DuBois and Berg at their Pro-Mark email addresses and asked for feedback. DuBois responded, saying "Ultimately up to you and Kyle."

h. In July 2020, Berg emailed Grant using their Pro-Mark email addresses to ask what additional information Grant needed to submit a bid to the government on behalf of Razor. Grant replied that "we" need to include resumes of "our" key personnel, as well as descriptions of performance on past contracts. Grant reminded Berg, "Remember this has to be on Razor[.]"

i. In July 2020, Grant, using her Pro-Mark email address, emailed Schwartzenberger, Mauch, and others at Razor and copied Berg at his Fed Serve email address. Grant announced that Pro-Mark employee Tyler Walker would bid a project on behalf of Razor for the National Park Service. Grant explained that she would put the bid package together, "but if someone from [R]azor could email it in the day it's due that would be great." Mauch replied to confirm that Razor would submit it. Later in the email chain, Walker provided the names of the only two employees assigned to the project. According to other Pro-Mark internal emails from 2020, both of those employees had a Pro-Mark email address, reported their working hours to Pro-Mark, and received company credit cards from Pro-Mark. Schwartzenberger does not appear to have responded to any of these email communications.

36

j. In August 2020, Berg emailed Schwartzenberger, Mauch, and Perius at their Razor email addresses and Grant at her Pro-Mark email address to introduce a new project manager, Will Klinke, who would be in "our" office "strictly working on PMR/Razor projects." Berg said Klinke would work on "Bismarck" and "Eagle Butte" unless Razor had a project manager before work began. According to contract files of the government, "Bismarck" and "Eagle Butte" refer to a contract for construction projects for the Indian Health Services agency awarded solely to Razor on account of its 8(a) status.

k. In February 2020, Kellen used his Razor email address to email a co-worker, and complained about Berg assigning him to Razor. Kellen later continued, ". . .[I] wanted to do a good job and make him [i.e., Berg] money." Kellen also referenced that Mandy Grant and Chad DuBois (who are employed by Pro-Mark) control his time clock and direct deposit of his paycheck.

63.     Pro-Mark employees represent themselves as Razor employees to government contracting officers, according to emails obtained from government agencies and from the search warrant, as shown below. An SBA official interviewed during this investigation said that she would be concerned about fraud if a mentor's employees had email addresses and signature blocks from the protégé's company and used them to send emails to government contracting officers.

a. As of 2020, Kellen represented himself as working as a project manager for both Pro-Mark and Razor per his email addresses for each company.

b. As of 2020, Grant represented herself as working for both Pro-Mark and Razor per her email signature and use of the email address razorgov@gotorazor.com.

c. As of 2020, Pietruszewski emailed government officials on behalf of Razor from the email address razorgov@gotorazor.com.

37

d. From at least September 2018 to October 2019, Stavenes, who was at the time was paid by Pro-Mark, was working for both Pro-Mark and Razor per her email addresses for each company.

64. Evidence contained in emails obtained from the prior search warrant to Microsoft shows that Razor shares profits with Pro-Mark on government set-aside contracts awarded solely to Razor for construction, maintenance, and housekeeping.

a. In June 2019, November 2019, January 2020, April 2020, and July 2020, Schwartzenberger emailed quarterly reports to Berg, DuBois, and Grant listing profits and losses for contracts that the government awarded solely to Razor. The statements show that Razor owed 49% of net income on the contracts to Pro-Mark.

b. In April 2020, Berg emailed Grant and Kellen at their Pro-Mark email addresses to clarify how much to bill to Razor for contracts at the federal courthouse, which according to the contract records of the government, were awarded solely to Razor on account of its 8(a) status.

65. Given the foregoing evidence, there is probable cause to conclude that Razor misrepresents who controls Razor's government contracting business and the extent to which Razor is influenced by and dependent on businesses controlled by Berg, such as Pro-Mark. Such misrepresentations were material to the determination of whether Razor qualified as owned and controlled by a disadvantaged individual or woman, and therefore was eligible to receive 8(a) or WOSB set-aside contracts.

**FED SERVE, LLC**

66. Fed Serve is a general contracting company 100% owned by Berg that has been certified as a HUBZone small business. Evidence establishes, however, that Fed Serve affirmatively misrepresents to the SBA that it meets HUBZone requirements when, in fact

(1) its actual principal office location is not in a HUBZone; (2) it does not meet the requirements to employ individuals residing in a HUBZone; and (3) it has undisclosed affiliations with Berg's other businesses such that Fed Serve likely does not qualify as a "small" business for set-aside contracts, but for these material omissions.

67.    Fed Serve was incorporated in March 2017 under the laws of North Dakota, according to state records. On the SBA's website, Fed Serve's experience is listed as follows: construction and remodeling, maintenance, housing, concrete, excavation, painting, roofing, and remodeling. The SBA certified Fed Serve as a HUBZone small business in February 2019. When Berg electronically verified the HUBZone application for Fed Serve, he certified to the SBA that Fed Serve complied with all HUBZone eligibility requirements, including the principal office requirement and that no material change in HUBZone employee percentage occurred since the time the business was certified as a HUBZone. Similarly, according to government records of bid submissions, each bid submitted on behalf of Fed Serve generally required Berg to submit a representation certifying Fed Serve's size for the relevant NAICS code. These representations were submitted under warning that an applicant is subject to criminal prosecution if the applicant provides false information or makes misrepresentations. By virtue of its set-aside status, Fed Serve has received numerous government contracts, including from the Air Force and the Army, totaling millions of dollars.

68.    This investigation, however, has uncovered evidence that Fed Serve misrepresented the location of its principal office as being in a HUBZone. SBA regulations require that a HUBZone business's principal office location be located in the HUBZone; "principal" is defined as "the place where the greatest number of employees perform their work." In his verification to the SBA, Berg listed Fed Serve's principal address as 3950 25th St. N Fargo, North Dakota, 58102, which falls within a qualified HUBZone, as

demonstrated by the screenshot of the SBA's official HUBZone map, included for reference

below (the HUBZone-qualified area is indicated in gray). Evidence indicates that this is not

Fed Serve's principal place of business. Rather, Berg runs Fed Serve out of his other

business locations, none of which are located in the HUBZone, as demonstrated below.





    a. According to documentation that Berg submitted to the SBA to certify Fed Serve

       as a HUBZone business, Fed Serve's purported principal address, 3950 25th St.

       N Fargo, North Dakota, 58102, is 600 square feet of office space that Berg rents

       within a commercial building owned by Tunheim Holdings, LLC for $450 per

       month. Tunheim Holdings also owns Tunheim Construction – an 8(a) entity with

which Pro-Mark has a mentor-protégé agreement, according to a contracting
officer with GSA.

b.  As further detailed below, the wages for Fed Serve's sole claimed employee (other
    than Berg) from May 2018 through August 2020, Anthony Luchsinger, appear to
    have been reimbursed, at least in part, by Tunheim Construction, raising a
    question as to whether Luchsinger was a legitimate Fed Serve employee
    performing any work for the company or whether Fed Serve claimed him as an
    employee for the purpose of establishing the company's purported principal
    office.

c.  In an August 2019 email, Berg told a group of social acquaintances to meet "at
    Fed Serve Office: 3271 Oak Ridge Loop E West Fargo." This is the address of
    another business represented by Kyle Berg—a real estate company, KRB
    Holdings—which leased this location to OK2 in March 2019, according to a lease
    agreement submitted to the CVE pursuant to OK2's reverification process as an
    SDVOSB in 2019. This address is not in the HUBZone, according to the SBA's
    official HUBZone map.

d.  On April 14, 2020, Berg also listed Fed Serve's address as 3247 Oak Ridge Loop
    E on Fed Serve's Paycheck Protection Program loan application promissory note,
    which he submitted to the SBA.

e.  A review of criminal mail cover request results covering November 22, 2021
    through November 29, 2021 and December 2, 2021 through December 14, 2021
    indicate that neither Fed Serve nor Berg received mail at 3950 25th St. N Fargo,
    North Dakota, 58102, Fed Serve's purported principal address. Mail sent to that
    address during that period was addressed to Tunheim Construction, various
    members of the Tunheim family (e.g., Gabby Tunheim,  Gayelynn Tunheim, and

41

Christopher Tunheim), and other individuals and businesses unrelated to Fed
Serve or Berg.

f.  A review of criminal mail cover request results from dates in September 2020,
    August 2020, and April 2021 indicate that Fed Serve receives mail at 3271 Oak
    Ridge Loop E., West Fargo, North Dakota, 58078, which is OK2's address,
    according to a lease submitted to the CVE during OK2's reverification process;
    3275 Oak Ridge Loop E., West Fargo, North Dakota 58078, which is Pro-Mark's
    address, according to government contracts awarded to Pro-Mark; and 5012 2nd
    St. E., West Fargo, North Dakota 58078, which is the Berg's home address,
    according to surveillance and state records.

g.  A review of criminal mail cover request results also indicated that in December
    2021, Fed Serve sent mail to Tunheim Construction at the 3950 25th St. N Fargo
    address, Fed Serve's own purported address.  Fed Serve's return address on the
    mail was the Berg's home address.

69.  Documents indicate that Fed Serve falsely represents that 35% of its employees
live in the HUBZone. Fed Serve kept at least one employee on its payroll to make it appear
that he worked for Fed Serve, when, in fact, another company was reimbursing Fed Serve
for the employee's wages. When that employee moved out of the HUBZone, Fed Serve hired
Berg and Chad DuBois's college-aged children to satisfy the HUBZone residency
requirement, as explained below.

a.  In documents submitted to the SBA pursuant to the HUBZone-certification
    process, Berg listed Luchsinger as the only Fed Serve employee, besides himself,
    and indicated that Luchsinger worked 40 hours per month for Fed Serve.
    Luchsinger's pay stubs, which Berg also submitted to the SBA, listed

42

Case 24-07021-mj-001017 ARS Filed 08/25/21 Entered 03/09/22 Page 643 of 81 Desc
Case 3:21-mj-00101 ARS Doc 1-1 Filed 03/12/24 Page 643 of 1 Desc
Exhibits A-E    Page 57 of 130

Luchsinger's address as 555 40th St. S. 236, Fargo, North Dakota 58103, which is located within a HUBZone, according to the SBA's official HUBZone map.

b. Payroll records for Fed Serve obtained via grand jury subpoena indicate that the only employee Fed Serve paid from January 1, 2019 through August 24, 2020 was Luchsinger.

c. Although Fed Serve represented that it employed Luchsinger, Tunheim Construction—not Fed Serve—paid Luchsinger's wages, at least for a portion of the period he was employed by Fed Serve. According to an email obtained via the prior search warrant to Microsoft, in September 2019, Berg asked his external accountants, Denise and Jason Luther, to "add up Tony's wages thru August 2018 for what Fed Serve has paid Tony. I need to send Chris an invoice for this amount so I can clean it up." In the email, Berg appears to be referring to Chris Tunheim, the ultimate owner of Tunheim Construction.

d. During this time, evidence shows that Luchsinger was also an employee of Tunheim Construction. According to Tunheim's payroll records, Luchsinger was receiving his regular paychecks from Tunheim for the entire time that Fed Serve was claiming him as an employee. Additionally, Luchsinger had a business email address with the Tunheim Construction account, according to emails obtained via the prior search warrant to Microsoft. According to a review of emails available from a search of the Fed Serve email account, Luchsinger did not have a Fed Serve business email address. Moreover, Tunheim Construction affirmatively represented Luchsinger as an employee; for example, Tunheim Construction listed him as an employee on an Entry Authorization List Request submitted to the Minot Air Force Base in March 2020.

e.  According to payroll records, Fed Serve's last paycheck to Luchsinger was on
    August 31, 2020. According to payroll records, until August 24, 2020, Luchsinger
    was the only employee Fed Serve was paying (other than Kyle Berg). Per an
    email obtained via the prior search warrant to Microsoft, sometime around this
    time, Luchsinger moved out of the HUBZone On September 2, 2020, Berg wrote,
    "Tony will be moving out of the HUBZone so this will be his last week he will
    receive a check. Let's put Scott (current Pro-Mark employee) on Fed Serve
    payroll." (Later emails from Berg indicated that "Scott" was not moved to Fed
    Serve's payroll and stopped working for both Pro-Mark and Fed Serve for
    reasons that are unclear.)

f.  According to payroll records from January 8, 2019 through June 14, 2021,  Fed
    Serve's only employees, other than Luchsinger and Berg, were Berg's sons—
    college-enrolled Blake and minor Evan Berg—and Chad DuBois's college-
    enrolled daughter—Paige DuBois. According to Fed Serve's payroll records, Fed
    Serve put Blake and Evan on the company's payroll on August 31, 2020 and
    Paige on the company's payroll on September 14, 2020. As detailed below, Paige
    lives in a HUBZone and Blake potentially live in HUBZones: claiming Paige and
    Blake as employees allowed Fed Serve to maintain the requirement that 35% of
    employees reside in a HUBZone.

g.  Less than a week after Luchsinger moved out of the HUBZone, on September 9,
    2020, DuBois emailed Berg, a copy of the residential lease of his 21-year-old
    college-enrolled daughter, Paige. DuBois wrote, "This is Paiges lease. Let me
    know if it works." Berg replies, "Yep – dead center of the HUBZone." According
    to additional email correspondence from Berg, Fed Serve appears to have hired
    Paige for 10 hours per week at minimum wage shortly thereafter. Payroll records

44

show Fed Serve paid Paige from September 14, 2020 through at least June 14, 2021.

h.  Berg represented his college-enrolled son, Blake, as a Fed Serve employee in his application to the SBA for a Paycheck Protection Program loan. According to payroll records, Fed Serve paid Blake from August 31, 2020 through at least June 14, 2021. According to emails obtained from the search warrant, Blake was enrolled as a student at St. John's University and presumably living in Collegeville, Minnesota, during this time. Collegeville, Minnesota is a two-and-a-half-hour drive from Fed Serve's location in Fargo, but it directly borders a HUBZone, as indicated in the below screenshot from the SBA's official HUBZone map. If Blake lived in a HUBZone while enrolled in college, he would qualify for the 35% HUBZone residency requirement.



70.    Evidence also indicates that Fed Serve intentionally tried to avoid an appearance of affiliation with other companies, despite extensive connections with Berg's other businesses, primarily Pro-Mark and MDM. These connections include financial support and shared employees, which were not disclosed to the SBA. This level of dependency on and

45

connection with other companies likely qualifies as an undisclosed affiliation with those companies. An undisclosed affiliation—particularly where the affiliated business does not qualify as "small" under the relevant NAICS code—is a material misrepresentation to the SBA. For example, Berg omitted disclosure of Fed Serve's potential affiliations in a discussion with an SBA official in February 2019. At the time, Berg was in the process of certifying Fed Serve as HUBZone-eligible. He inquired what the SBA would need "for affiliated info," noting that he was "trying to do everything so there is no affiliation." In response, the Business Opportunity Specialist explained, "If there isn't an affiliation I don't need anything – I just check the NO box." Berg did not further clarify or address why he was concerned about affiliation. On Fed Serve's HUBZone application, Berg did not disclose any affiliations. In subsequent certifications submitted pursuant to government contracts, Berg affirmatively represented Fed Serve as a HUBZone-eligible small business concern, which is defined in these representations as "a concern, including its affiliates, that…qualified as a small business under the criteria in 13 CFR Part 121 and size standards in this solicitation."

71.    Documents obtained from Pro-Mark and Fed Serve indicate that employees marketed Fed Serve and Pro-Mark as interchangeable companies. Employees offered Fed Serve as an alternative to Pro-Mark, when Pro-Mark would not qualify for the contracting opportunity based on the small business size corresponding to the NAICS code, as shown in the following examples of emails obtained through the Microsoft search warrant:

a.    In April 2017, a GSA contracting specialist emailed Berg and Mandy Grant, Pro-Mark's then-office manager, noting that the bids he received from Pro-Mark and Fed Serve contained the same offer amount. The contracting specialist stated that he was aware that Berg was affiliated with both companies. Berg replied "Pro-Mark does not meet size standard so that should not have been sent in. Fed

Serve bid it due [to] this so Pro-Mark pricing should be removed from competition."

 b. In August 2019, a representative from the U.S. Department of Agriculture emailed a Pro-Mark employee a request for a small business set-aside contract to paint a stairway. The Pro-Mark employee responded that, while Pro-Mark was not small enough to take the job, Fed Serve provided "an avenue to award this work." The employee further noted, "My boss Kyle owns this company and it would still be us doing the work."

 c. On numerous occasions in 2019 and 2020, Pro-Mark employees decided to use Fed Serve to bid a given contract, according to emails, because the size of the contract rendered Pro-Mark ineligible to bid, including on contracts for the Air Force and the U.S. Department of Agriculture. For example, in June 2020, Mandy Grant used her Pro-Mark email address to send a contracting opportunity from the Air Force for NAICS Code 238330 (Flooring Contractors) to Chad DuBois, at his Pro-Mark email address, and Berg at his Fed Serve email address. She wrote, "Would have to bid under Fed Serve due to size $15M."

72. Evidence indicates that Pro-Mark provided undisclosed financial support to Fed Serve. Beginning in January 2019, Pro-Mark made automated monthly payments to Fed Serve of $15,000 per month, according to an email obtained through the search warrant to Microsoft and confirmed by bank records obtained through a grand jury subpoena.

73. Pro-Mark and Fed Serve freely shared employees and resources and did not distinguish between employees of one company or another, as demonstrated in internal emails obtained through the search warrant to Microsoft.

 a. In September 2019, Grant asked how Berg wanted to handle a Fed Serve project from the U.S. Department of Agriculture. Berg replied, "Dan Noyes will be doing

this as a Pro-Mark employee. We will have to do cert payrolls for him." Fed Serve has never paid Noyes, according to Fed Serve's payroll records obtained via grand jury subpoena; Pro-Mark, however, paid Noyes just over $2,000 in September 2019, according to Pro-Mark's payroll records obtained via grand jury subpoena.

b.   In September 2020, a contracting officer from the U.S. Department of Agriculture emailed Berg requesting a proposal from Fed Serve. Berg emailed Pro-Mark employee Will Klinke at his Pro-Mark email address, asking him to complete the documents. Klinke completed the proposal and then asked Berg to forward them on "under the FedServe [sic] email." Fed Serve has never paid Klinke, according to Fed Serve's payroll records; yet Pro-Mark paid Klinke approximately $4,800 in September 2020, according to Pro-Mark's payroll records.

c.   In April 2020, Pro-Mark employee Jason Tejral sent a list of employees who had base passes to a contracting officer for Offutt Air Force Base. Tejral stated that the eight employees were from "Pro-Mark Services/Fed Serve," with no distinction between which employee worked for what entity. Other than Berg, none of these employees ever received compensation from Fed Serve, according to Fed Serve's payrolls records.

d.   As of 2020, Tyler Kellen represented himself as a project manager for both Pro-Mark and Fed Serve per his email signature and email account for each company. According to Fed Serve's payroll records, the company has never paid Kellen; according to Pro-Mark's payroll records, in 2020, Pro-Mark paid Kellen over $60,000.

Case 3:24-mj-00107-ARS   Document 1   Filed 03/01/24   Page 64 of 81
Case 3:21-cr-00107-ARS   Document 141   Filed 09/25/24   Page 642 of 81   Desc
Exhibits A-E    Page 63 of 130

   e.    Mandy Grant performed work for Fed Serve, in addition to the work she was doing for Pro-Mark and OK2. For example, emails obtained in the prior search warrant show that she submitted numerous bids to GSA in 2017 on behalf of Fed Serve, assisted in completing experience questionnaires for contracting opportunities in May 2020, ordered bid bonds in July 2020, and prepared indemnities in September 2020. Fed Serve's payroll records indicate that Fed Serve has never paid Grant.

   f.    In a bid submitted to the National Park Services in May 2020, Berg claimed Pro-Mark employees Grant and Tyler Walker as Fed Serve employees. Fed Serve's quarterly federal tax returns for this period, which Fed Serve submitted to the SBA for a Paycheck Protection Program loan, listed neither Grant nor Walker as employees; Fed Serve's payroll records indicate that Fed Serve has never paid Walker.

   g.    In August 2020, Berg emailed Grant and Chad DuBois—Pro-Mark employees—asking them to "move the employee that failed his drug test to Fed Serve payroll just in case something happens down the road." Fed Serve's quarterly federal tax returns for this period, which Fed Serve submitted to the SBA for a Paycheck Protection Program loan, did not list DuBois as an employee; Fed Serve's payroll records indicate that Fed Serve has never paid DuBois.

   h.    In September 2020, in an attempt to secure health insurance through Fed Serve, Berg suggested putting a current Pro-Mark employee on Fed Serve's payroll to meet the requirements for health insurance that Fed Serve have two W-2 employees.

74.    As discussed in more detail below, starting at Paragraph 77, MDM is a company owned by Daniel Walters that has been certified as an SDVOSB. Evidence establishes,

however, that Berg exercises impermissible control over MDM. Documents obtained from
Fed Serve and MDM indicate that MDM and Fed Serve share profits and MDM provides
financial support to Fed Serve, as demonstrated below:

    a.   In October 2019, an MDM employee emailed Chad DuBois and Berg asking if the
profit payments MDM had made to Fed Serve to date matched their records. Per
this email, MDM made a profit payment of $64,000 to Fed Serve relating to a
project at an Air Force base.

    b.   Starting in November 2019, MDM began paying Fed Serve $10,000 per month
for "Profession Fees."

75.    Fed Serve continues to actively seek and receive government contracts.  Its
registration in SAM was most recently renewed in June 2021 according to information from
SAM.gov.  It was awarded a federal contract as recently as January 2022 according to
information in the Federal Procurement Data System.

76.    Given the foregoing evidence, there is probable cause to conclude that Fed Serve
and Berg have misrepresented Fed Serve's eligibility as a HUBZone small business,
including its principal office location, its employees who live within the HUBZone, and its
affiliations with other entities controlled by Berg such as Pro-Mark. Such
misrepresentations were material to the determination of whether Fed Serve was eligible
for HUBZone certification and therefore was eligible to receive HUBZone and small-
business set-aside contracts.

**MDM CONSTRUCTION, LLC**

77.    MDM is a company owned by Daniel Walters that has been certified as an
SDVOSB. Evidence establishes that, contrary to Walters's representations to CVE, MDM is
entwined with and so dependent on companies controlled by Berg, including Pro-Mark and

50

Fed Serve, that MDM likely would not qualify as an SDVOSB but for the material misrepresentations.

78.    According to state documents submitted to the VA, MDM was organized under the laws of North Dakota in 2009. Walters, who claims service-disabled veteran status, was its organizer and registered agent. In 2011, 2013, 2015, and 2018, Walters filed VA forms 0877 affirming that he owned 100% of MDM and that "at least 51% of the business is owned and controlled . . . by Veterans or service-disabled Veterans." MDM was first certified as an SDVOSB in 2011 and has been recertified several times since. For example, in 2018, CVE personnel concluded that based on the information provided by MDM, there was no indication that MDM was unduly influenced or dependent on any non-veteran or entity. By virtue of its set-aside status, MDM has received numerous government contracts from the VA, Air Force, and other agencies totaling millions of dollars.

79.    This investigation, however, has uncovered evidence that MDM does not qualify as controlled by Walters because of its extensive connections and dependency on Berg and Pro-Mark. These connections have not been disclosed to CVE. A CVE official interviewed during this investigation indicated that reliance on another business, potentially shown through the sharing of personnel, equipment, or management, would make it unlikely a company could be certified as an SDVOSB.

80.    According to his resume submitted to the VA, prior to MDM, Walters worked as a Construction Project Manager at CS DuBois from March to June 2008. Kyle Berg also worked at CS DuBois at the time Walters worked there and Chad DuBois was its owner, according to a resume submitted by Berg to the VA and information submitted to the SBA. CS DuBois was previously enrolled in the SBA's 8(a) program and graduated in 2007. Following CS DuBois, Walters worked at Pro-Mark as a Construction Project Manager from June 2008 until July 2009, around the time he incorporated MDM.

51

81.     Documents obtained via search warrant from Pro-Mark and Berg's company Fed
Serve indicate that MDM not only subcontracted work to Pro-Mark and Fed Serve but also
bid projects in conjunction with them, shared access to business records with them, and
shared profits with them:

a.   In June 2019, Berg, who was not an owner of MDM and was not on its payroll,
     requested from MDM's external accountant, Jason Luther, (who also serves as
     the accountant for Pro-Mark and Fed Serve,) that he send MDM's first quarter
     in-house financials to Berg. Walters was copied on the email and in response told
     the accountant that he should have all the information needed to provide them.

b.   Later in June, Berg, Walters, Mandy Grant, then Pro-Mark's office manager, and
     Kari Hazer, who performed office and bookkeeping functions for MDM, discussed
     a set of projects that Pro-Mark and MDM were working on. Berg wrote that "I
     assume we (Pro-Mark) will be bidding and you (MDM) will be putting proposals
     together?" Walters confirmed that MDM could prepare the proposals.

c.   In a July 2019 email, Berg and Walters apparently agreed that Pro-Mark and
     MDM would split the payment for supervising a VA contract. MDM subsequently
     sent Pro-Mark a subcontract for the project.

d.   In October 2019, Hazer emailed Berg and Chad DuBois, then a vice president of
     Pro-Mark, that MDM had made "payments for profit" approximately $114,000 to
     Pro-Mark and $64,000 to Fed Serve relating to a project at an Air Force base.

e.   In November 2019, Hazer emailed MDM's external accountant, Luther, and
     asked him to set up a recurring monthly payment of $10,000 from MDM to Fed
     Serve for "Profession Fees." In an email relating to the monthly payments, Berg
     joked "[t]his is just to buy some additional friendship for a long period of time!!!"

    f.  In May 2020, Walters sent Berg and DuBois a report of MDM profits for work on three contracts awarded to MDM at an Air Force base and offered to send Pro-Mark a check at the end of the second quarter when the amount would be larger.

82.    Evidence also indicates that MDM and Pro-Mark freely shared employees and resources, and frequently did not distinguish between assets and employees of one company or the other, as demonstrated in internal emails obtained through the search warrant to Microsoft. At times, Pro-Mark and MDM apparently shared or freely transferred several employees between them, as shown below:

    a.  In July 2018, DuBois emailed Berg a list of employees who should have access to project management software used by Pro-Mark. The list was titled "employeelist" and included Walters and Hazer of MDM. DuBois subsequently sent the list to the software vendor, representing it as a list of Pro-Mark employees who needed access to the software.

    b.  In November 2018, Berg emailed Walters regarding one employee, Tammy Stavenes, to determine how Pro-Mark and MDM could split her cost fairly.

    c.  In June 2019 another employee, Larry Peihl, used a signature block in his emails sent from an MDM domain indicating that he was a superintendent for "Pro-Mark Services Inc/MDM Const." Payroll records indicate that Peihl was paid by Pro-Mark until January 2019, when he began to be paid only by MDM.

    d.  Later in June, Hazer informed a U.S. Department of Agriculture contracting officer that two Pro-Mark employees would attend a bid meeting on behalf of MDM. In response to Hazer's email, one of the Pro-Mark employees emailed to ask Walters and Berg for help on how they should represent their relationship with MDM to the agency.

e.  In August 2019, Berg emailed Walters and Hazer, among others, to discuss
moving Pro-Mark employee Dave Dietrich to work for MDM. Berg asked whether
Dietrich should continue to use his Pro-Mark credit card for the time being and
requested confirmation that Dietrich would receive the same pay and benefits.
Hazer responded that the benefits should be roughly the same, as they were for
two Pro-Mark employees who had apparently joined MDM earlier, including
Peihl. Walters responded that they would do whatever they needed to do to
equalize Dietrich's current benefits.

f.  In September 2019, Walters asked Pro-Mark personnel including Berg and
DuBois whether a Pro-Mark employee, Melanie Foley, who would be doing work
on an MDM project, could be put on the MDM payroll. Walters pointed out it
"[h]elps us get our percentage" and MDM would likely take her for a later project
anyway. By percentage, Walters may have meant the percentage of work the
prime contractor was required to do on a contract per certain government
contracting requirements. DuBois indicated that she could not change to MDM's
payroll because she was receiving Pro-Mark health insurance.

g.  In October 2019, Hazer, DuBois, Berg, and Walters emailed with Luther, MDM
and Pro-Mark's accountant, to facilitate the transfer of Pro-Mark employees
Foley and Stavenes from Pro-Mark's payroll to MDM's. In a separate discussion
later in the month, DuBois, Berg, and Walters agreed that Pro-Mark would
transfer the vehicle Stavenes was using for work to MDM for $10,000.

83.    Evidence from documents submitted by MDM to CVE and emails obtained from the prior search warrant indicates that MDM used facilities and paid rent to a company owned in part by Berg and may have shared those facilities with Pro-Mark. MDM appears to have been concerned that the close connection between its facilities and Berg and Pro-Mark would have been viewed as dependency and a potential problem by CVE. For example:

    a.    MDM submitted documents to CVE indicating that beginning in February 2019, it leased 3,500 square feet in a property at 2215 Sheyenne Street in West Fargo, for a term of three years from Marlin Creek Holdings, at a rent of $2,000 per month. Tax records submitted to the SBA indicate that Marlin Creek Holdings is 50% owned by Walters and 50% owned by Berg. Berg signed the lease on behalf of Marlin Creek Holdings. In a March 2019 letter to CVE Walters confirmed that MDM had paid Marlin Creek Holdings rent starting in February 2019.

    b.    MDM also submitted documents to CVE indicating that it signed a subsequent lease for the same property, 2215 Sheyenne Street, with DJW Holdings LLC ("DJW"). The lease dated October 1, 2019, was for the same 3,500 square feet, now for a monthly rent of $2,250. The term was three years. In a March 2017 interview with a CVE examiner, Walters had reported he was the 100% owner of DJW. Local assessor records confirm that DJW purchased the property in 2017.

    c.    Based on the above, it appears that MDM and Walters were paying Marlin Creek Holdings, part owned by Berg, rent for a property that Marlin Creek Holdings did not own and was in fact owned by DJW, a company wholly owned by Walters.

    d.    In addition, beginning in July 2019, MDM subsequently rented 1,500 square feet in a property at 2261 Sheyenne Street, down the street from its office at 2215

Sheyenne Street, in West Fargo from Marlin Creek Holdings. The lease had a term of five years and monthly rent of $2,500.

e.    Emails indicate that Marlin Creek paid Pro-Mark for construction work; Marlin Creek Holdings paid Pro-Mark approximately $229,000 in May 2019.

f.    In a series of emails from October 2019, Walters told Berg that a contractor working on behalf of the VA had stopped by the MDM offices. Berg expressed concern, and Walters explained that the contractor "[a]sked why we were sub leasing an office to someone (Mandy) I don't think it was a big thing. There were no PM stuff around." The email appeared to indicate that MDM was allowing Mandy Grant, at the time the secretary and treasurer of Pro-Mark, to use its space and that there was frequently Pro-Mark "stuff" in MDM's offices.

g.    In emails from April and May 2020, Pro-Mark and MDM personnel discussed switching offices, indicating that MDM had swapped from 2215 Sheyenne to 2261 Sheyenne and Pro-Mark had taken over the 2215 Sheyenne space. In one email Walters asked Grant to confirm when Pro-Mark had changed its address on government sites because he did not "wont [sic] both of us to pop up with the same address."

84.    In the fall of 2019, Walters and Berg attempted to sell a portion of MDM to Berg, but rescinded the deal when CVE asked a number of questions about Berg's other interests, which raised questions about potential affiliation.

a.    In October 2019, MDM submitted a bill of sale to CVE indicating that Walters had sold 49% of MDM to Berg for $1.5 million.

b.    In conjunction with the sale, MDM submitted documentation to CVE showing the change in ownership. Walters submitted a VA form 0877 certifying that he

56

was now a 51% owner of MDM but that the company continued to be at least 51% owned and controlled by a service-disabled veteran.

c.  MDM also submitted a resume to CVE for Berg showing that he was the owner of Fed Serve but misrepresented that his involvement in Pro-Mark had ended in December 2018. Previously in July 2019, Berg had emailed Pro-Mark employees to tell them that DuBois had taken over his role as vice president of Pro-Mark. Berg wrote, "I'm not going anywhere but will be more in the background and more of a 'Business Development Consultant' sort of speak. More of the day to day will be done by Chad. I'm involved with different entities and need to make some separation between these entities." The resume also failed to show Berg's ownership and involvement with OK2, another SDVOSB.

d.  In November 2019, CVE requested additional information from MDM regarding Berg's purchase of a portion of MDM. CVE noted that Berg's tax returns showed interests in Pro-Mark, OK2, Fed Serve, Marlin Creek Holdings, and other entities and asked MDM to provide a signed letter of explanation setting out any business relationship between MDM and the other entities in which Berg had interests. Walters emailed Berg and Hazer the request, noting, "Need to be very diligent in our answers on this one!"

e.  Following CVE's letter, Berg emailed Walters a list of the businesses he owned so that he and Walters could consider how to respond to CVE. Berg included some language he had apparently copied from SBA regulations regarding affiliation between companies. Berg wrote, "Not sure if we want to scrap the idea of me buying in?????" Walters responded, "As I read this again I think we violate this with MCH, and also financial assistance. I'm not sure man . . . I don't want to scrap it but if violate these rules I definitely don't want to get booted or make

57

the news . . ." (ellipses in original) MCH is an apparent reference to Berg's and

Walter's company Marlin Creek Holdings.

    f.   In December 2019, MDM provided a letter to CVE signed by Walters and Berg

        indicating that the sale had been canceled and Walters would remain 100%

        owner.

85.    Despite apparently recognizing that the close relationships and resource sharing

between their companies could raise dependency concerns for CVE, MDM and Pro-Mark

continued to share employees and resources:

    a.   For example, in January 2020, DuBois emailed Walters and Hazer

        documentation reflecting the number of days two Pro-Mark employees had

        worked on MDM projects in South Dakota. Each employee had worked more

        than 10 days in December and January on MDM projects.

    b.   In September 2020, DuBois emailed Hazer to ask about the status of defensive

        driving certificates that she was apparently preparing for Pro-Mark ahead of a

        worker's compensation audit.

86.    MDM continues to actively seek and receive government contracts. Its

registration in SAM was most recently renewed in December 2021 according to information

from SAM.gov. It was awarded a federal contract as recently as January 2022 according to

information in the Federal Procurement Data System.

87.    Given the foregoing evidence, there is a probable cause to conclude that MDM,

Walters, and Berg have misrepresented control over MDM and the extent to which it is

influenced by and dependent on businesses controlled by Berg, such as Pro-Mark. Such

misrepresentations were material to the determination of whether MDM qualified as

veteran owned and controlled and therefore was eligible to receive SDVOSB set-aside

contracts.

58

## OK2 CONSTRUCTION, LLC

88.    OK2 is a company purportedly majority-owned and controlled by Kenneth Kurk that has been certified as an SDVOSB. Evidence establishes that, contrary to Kurk's representations to CVE, OK2 is not controlled by him but is instead controlled by non-veterans, including Berg. OK2 is so entwined with companies controlled by two non-veterans that that OK2 likely would not qualify as an SDVOSB but for the material misrepresentations made by Kurk and others.

89.    OK2 was organized under the laws of Texas in June 2015, according to documentation it submitted to CVE. Its certificate of formation listed Berg as its organizer and listed three governing persons: Berg; Kurk of Cleburne, Texas, who claims service-disabled veteran status; and Osvaldo "Ozzie" Cruz of Miami, Florida.

90.    Kurk also owns FedGenius LLC ("FedGenius"), a Texas-based consulting company. Tax records from 2015 to 2019 submitted to the SBA indicate that Kurk owned 30% of FedGenius and his wife Mallely Kurk owned 70%. FedGenius appears to have had a history of working projects with Berg and Cruz.

91.    Cruz, who does not claim to be a veteran, is an owner of several other businesses based in Miami. Tax records submitted to the SBA indicate that Cruz owns approximately 49% of OAC Action Construction Corp. ("OAC"), a general contracting company, with the remainder of the company owned by his father Orlando Cruz, Sr. OAC graduated from the 8(a) program in August 2012.

92.    OK2 sought verification as an SDVOSB in April 2016. In conjunction with its verification, Berg, Kurk, and Cruz filed VA forms 0877 indicating that Kurk owned 51% of OK2 and that Berg and Cruz each owned 24.5%. All three also affirmed on the forms that "at least 51% of the business is owned and controlled . . . . by Veterans or service-disabled Veterans."

93.    As part of the verification process, CVE requested additional information on the other businesses tied to Kurk, Cruz, and Berg. In response, Kurk wrote a May 2016 letter to CVE stating that he owned and worked at both OK2 and FedGenius. With regard to Pro-Mark and OAC, Kurk wrote that OK2 had no business relationship with the other companies and did not share facilities or employees with the other companies. Kurk represented, "OK2 Construction, LLC furnishes and pays for all of its own facilities/equipment/employees/etc, and does not rely on these other two companies for any resources." Kurk also wrote that, as he was the 51% owner of OK2, he was "the only individual with management powers" and that Berg and Cruz reported to him. Kurk finally denied that OK2 shared work or contracts with OAC or Pro-Mark, although he indicated it might in the future engage either of the two for subcontracts.

94.    In June 2016, CVE verified OK2 as an SDVOSB based on the information OK2 presented in its application and subsequent documents.

95.    In August 2019, OK2 applied for reverification as an SDVOSB, submitting a VA Form 0877 on which Kurk, Berg, and Cruz again affirmed their ownership in the company and that it was 51% owned and controlled by a service-disabled veteran.

96.    OK2 has used its SDVOSB status to receive numerous government set-aside contracts, including from the Air Force, worth millions of dollars.

97.    Contrary to these representations, this investigation has found evidence indicating that Berg and Cruz exercised considerable control over OK2, and that OK2 was influenced by and dependent on Pro-Mark and OAC for employees and other resources. According to a CVE official interviewed during this investigation, reliance on another business, through the sharing of personnel, equipment, or management, would raise red flags for CVE and make it unlikely a company could be certified as an SDVOSB.

98.    Emails obtained via search warrant as well as bank records obtained via grand jury subpoena indicate that, despite Kurk's majority ownership of OK2, Berg and Cruz provided it with repeated cash injections to support OK2's ability to obtain bonding for the construction projects it bid. Kurk did not provide equivalent amounts of capital, despite his purported majority ownership. OK2's dependency on Berg and Cruz meant that Kurk, the only veteran owner of OK2, could not actually exercise the control that CVE required. Kurk, Berg, and Cruz also manipulated the amount of money in OK2's bank account to obtain those bonds.

    a.  Review of emails and bank records has identified at most only two instances in which Kurk provided capital to OK2, both in 2015 and together totaling only $3,500.

    b.  In June 2016, Berg and Cruz each provided OK2 $50,000, with OK2 signing promissory notes to repay the amount, so OK2 could seek performance bonds.

    c.  In October 2016 Berg wrote to Kurk and Cruz, "I personally need to inject $100k into checking prior to 11/1 and then will transfer back the first part of November. Bonding wants to see that we have injected $200k total. Not a big deal already did it once." Bank records show that Berg made a $100,000 deposit to OK2's account on October 31, 2016 and that the $100,000 was transferred back to Berg's account on November 2.

    d.  In December 2018, Berg wrote to Chad DuBois, who worked for Pro-Mark and was involved in its bookkeeping, and Pro-Mark's external accountant, Jason Luther, who was also the accountant for OK2, "I took a $300k distribution from Pro-mark to Kyle and Connie personal checking. I then deposited the $300k into OK2 checking for the year end books. After the 1st of the year I will distribute that $300k back to personal and then back to Pro-Mark." Bank records show that

61

on December 31, 2018 Berg received $300,000 from Pro-Mark's account into his personal account, and then transferred the funds to OK2's account the same day. On January 10, 2019, Berg received $100,000 from OK2's account into his personal account and subsequently transferred the funds to Pro-Mark's account.

e. In January 2019, Berg, Cruz, and Kurk discussed that Berg would contribute an additional $200,000 and Cruz $100,000 to support OK2's bonding. Berg also wrote that he and Cruz would be paid $50,000 from OK2 on April 1, apparently in repayment of some of their cash injections, "this way it will stay on the books for the 1st quarter financials of 2019" and that otherwise the money would be placed in an OK2 money market account and would not be touched.

f. OK2's 2019 financial statements listed OK2 as having $400,000 in 6% notes payable to Berg and Cruz, with no principal repayment terms but interest payments due monthly.

99. Evidence also indicates that Berg and Cruz sought to receive profits from OK2 in apparent excess of or without regard for their formal ownership stakes in the company or Kurk's representation to CVE that he was the 51% owner of OK2. The true information regarding OK2's distribution of profits was material to CVE, which determines whether a veteran controls a business in part by determining whether the veteran received at least 51% of the profits.

a. In November 2018, Kurk discussed with Berg and DuBois that Cruz expected to receive "50% of net profit on first 4 projects" by OK2 at an Air Force base, but that Kurk was hoping to reduce Cruz's role going forward.

b. In discussing how to move forward with the OK2 business, a few days later, Berg wrote to Kurk and Cruz that he needed an "[e]ven split of profits 1/3 for each at the end of the day" and stated that if Cruz and Kurk did not agree to that he

62

would look to "other SDVO opportunities with some local companies in the area and figure out how I exit OK2." In the same email, Berg enumerated a number of other things he wanted to discuss in more detail, including unemployment, worker's compensation, a cash injection, and administrative fees for OAC and Pro-Mark. After listing these items Berg seemed to acknowledge the risk of affiliation, writing "Affiliation – As long as we are not continually paying OAC and Pro-Mark we will be fine and after the 50% splits there should be no reason to be paying OAC or Pro-Mark."

100.    Evidence indicates that Berg exercised de facto control over OK2, and that Kurk deferred to him regarding business decisions, as demonstrated below:

   a.  In July 2016, Kurk requested Berg consent to provide a $500 sponsorship that Kurk thought might be good marketing, writing, "Kyle you're in charge of money for OK2."

   b.  Kurk did not appear to have access to SAM.gov, the system through which the federal government lists contract opportunities and collects eligibility certifications, until 2020. In January 2017, Kurk asked Berg to enter an address for OK2 into SAM.

   c.  In September 2017, Kurk sent Berg an expense report for Kurk's own business travel for Berg to approve for $1,640.37. Once Berg approved, Kurk asked his wife Mallely to write the OK2 check.

   d.  In January 2018, Kurk told Berg that he needed $36,000 to pay his taxes and asked if OK2 could afford to pay him the money.

   e.  In February 2019, Kurk again needed money from OK2 to pay for his taxes, and Berg wrote to him and Cruz that they could not touch the funds Berg and Cruz had injected into OK2 or its line of credit. Cruz agreed.

101.   The United States has also discovered evidence of a number of instances where OK2 relied on employees of Pro-Mark and OAC to perform office work and bid for and obtain government contracts, instead of using personnel employed by OK2. Emails obtained via search warrant demonstrate the following instances:

a.   In July 2016, Kurk and OAC employee Willy Reina exchanged emails suggesting that Reina was bidding projects for OK2 and seeking out subcontractors.

b.   In February 2017 emails, Kurk and Reina worked to prepare OK2 bids for a number of projects, including a bid for a VA project.

c.   In June 2017 emails, Reina and Kurk discussed that Reina was working on pricing an OK2 proposal for a VA project.

d.   In a September 2017 email, Kurk asked a business partner to use Reina's OK2 email address "moving forward on matters related to OK2."

e.   In a December 2017 email, Reina submitted an OK2 bid for an Air Force project, using an OK2 email address to submit the bid, and including a signature block that identified him as an OK2 employee.

f.   In August 2018, Reina submitted an OK2 bid for an Air Force project, from an OK2 email address and with a signature block that identified him as an OK2 employee.

g.   Payroll records for OK2 received via grand jury subpoena show that Reina was not paid by OK2 until July 2019. At that time, Kurk emailed Pro-Mark office manager Mandy Grant to ask her to start paying Reina from OK2 part-time.

h.   In June 2016, Kurk forwarded an OK2 bid to Grant to have pricing terms and bid bond information inserted into it.

i.  In July 2016, Grant submitted an OK2 bid to the U.S. Fish and Wildlife Service, using an OK2 email address and with a signature block that stated she worked for OK2.

j.  In August 2016, Berg requested that the external accountants shared by Pro-Mark and OK2, Jason and Denise Luther, make payments to Grant and several other Pro-Mark employees for hours worked on behalf of OK2.

k.  In January 2017, Kurk emailed Grant to ask her to order a bid bond for an OK2 project. Grant responded it had already been ordered.

l.  Payroll records for OK2 indicate that Grant was paid approximately $138 per week by OK2 between August 2016 and May 2017, but then nothing until May 2020, when the same weekly payment resumed.

m.  In January 2018, Grant submitted documents relating to a National Park Service project from an OK2 email address. The documents included a letter in Grant's name as a representative of OK2, identifying the OK2 project manager and superintendent for the project. According to payroll records for OK2 and Pro-Mark obtained via grand jury subpoena, the identified project manager, Chad Davis, has never been paid by OK2 but was paid at the time by Pro-Mark.

n.  In June 2018, Grant submitted further documents to the National Park Service on behalf of OK2 from an OK2 email address, and with a signature block that stated she was an OK2 employee.

o.  In April 2019 emails, Grant submitted payroll for OK2 to one of OK2's external accountants, Denise Luther, and resolved complaints from an OK2 employee that he was not paid for all his hours.

p.  In February 2020 emails, Grant again submitted payroll for OK2 to one of OK2's external accountants, Denise Luther.

65

q. Pro-Mark controller Chad DuBois assembled financial statements for OK2. For example, in August 2018, DuBois emailed Cruz and Kurk seeking documentation on a number of projects, because he was putting together end of quarter financial statements for OK2.

r. In October 2018, DuBois again emailed with Kurk and Cruz because he was putting together OK2's financial statements, with DuBois this time stating that it was at the bonding company's request.

s. In January 2019, DuBois emailed with Kurk, Cruz, and Berg, stating that he was working on OK2 financials and needed some additional invoice paperwork.

t. In 2019, OK2 submitted 20 check images to CVE as part of its reverification application. The checks date from January and February 2019 and are all signed by DuBois. When asked by CVE who had signed the checks, Kurk provided a letter of explanation on June 12, 2019 to CVE stating that the checks were signed by DuBois, "who serves as the financial controller for OK2 Construction, LLC." OK2 did not pay DuBois at the time he worked on the above financial statements for OK2 or prepared the checks OK2 submitted to CVE.

u. In late March 2019, Berg emailed OK2's external accountants, the Luthers, to state that OK2 would begin paying DuBois $700 per month.

v. Payroll records for OK2 indicate that DuBois was not paid by OK2 until May 2019. After an initial payment of $591, he began receiving weekly payments of approximately $139.

w. In June 2017, Kurk emailed Cruz and Reina stating that he had been surprised to learn a Miami VA project OK2 was interested in had a site visit the next day, and asked Cruz if he could send someone to the site visit. Cruz responded that OAC employee Lily Mendoza would be attending.

x.  Payroll records for OK2 obtained via grand jury subpoena indicate it has never paid Lily Mendoza.

y.  In August 2018, a Pro-Mark project manager, Kevin Pietruszewski, wrote to an Indian Health Services employee regarding Pro-Mark's design drawings for a project. The next day, Pietruszewski followed up with the employee from his OK2 email explaining that because of "issues with our Pro-Mark Services Email," he was resending the email "from another company that we have." Pietruszewski's signature block on his OK2 email also indicated that he was a Project Manager for OK2.

z.  Payroll records for OK2 indicate that it paid Pietruszewski $135 per week from August 2016 through May 2017, but Pietruszewski was not receiving payment as of August 2018, the time of his corresponding with Indian Health Services on behalf of OK2.

102.   At the same time that OK2 was making use of Pro-Mark employee Grant and OAC employee Reina to perform OK2 work, Kurk also listed Grant and Reina as references for past performances on government proposals. In July 2016, Kurk emailed Grant and Reina, copying their employers Berg and Cruz, to inform them that they had been listed as references for OK2 and that he had "provided a response that I would appreciate you would respond with." The proposed reference script required Grant and Reina to rate Kurk and OK2's performance as "Good to Excellent." Kurk subsequently sent Reina two written references to submit for OK2 in Reina's name, relating to OK2 bids for Air Force contracts. The references prepared by Kurk stated that OAC and Reina had worked with OK2, which was founded in 2015, since 2011 and rated OK2 as "Exceptional" in all applicable categories.

103. Finally, evidence indicates that OK2 used Pro-Mark and OAC facilities, as well as other facilities connected to Berg and Cruz. Evidence indicates that the offices were initially conceived as virtual offices or facades, as shown below from emails obtained via search warrant:

a. In August 2016, Kurk wrote to Berg, Cruz, and Grant, "Just about every single contract we've bid the contracting officer has called me to quiz me on OK2's knowledge and ability to perform in ND/SD/MN and FL/GA/MS with the Texas address. I really think we should figure out a way to create an OK2 address in ND and FL. So far, I believe I've been able to eliminate concerns they have about OK2's Texas address but it's obvious to me, it's a red flag for them."

b. In January 2017, Kurk again emailed with Berg, Cruz, and Grant. He asked Berg, who apparently controlled access to SAM for OK2, to add a Miami address into SAM for OK2: 11980 SW 144 Court, Suite 102. Kurk wrote,

> Ozzie has several offices and this one he has that we can use for OK2. In the past — I've had the contracting office from Robbins AFB and Miami VA, specifically state to me that our office address in Texas was a concern and suggested it would better that we had a local office.

Kurk continued that Berg should also think about obtaining an address for OK2 in North Dakota as well. At that time, Cruz's email signature for his OAC email address noted that OAC had a new address, 11980 SW 144 Ct, Suite 101 in Miami.

c. In November 2018, Kurk wrote in an internal OK2 performance report he sent to Berg and DuBois that OK2 employee Billy Thomas, who was working in Florida, was "supported with OAC truck/gas card/office expenses" and a goal for 2019 was to get Thomas an OK2 office.

d. In March 2019, OK2 signed a two-year lease with OAC Group Properties, LLC for 1,000 square feet of office space at 11980 SW 144 Ct, Suite 103 in Miami. The monthly payment was $900 per month. The notice address for OAC Group Properties was next door, 11980 SW 144 Ct, Suite 101, with notice to be directed to the attention of Cruz. Kurk signed on behalf of OK2 and Cruz signed on behalf of OAC Group Properties, LLC.

e. Also in March 2019, OK2 signed a two-year lease with Berg's real estate company, KRB Holdings, for 1,000 square feet of space in West Fargo, North Dakota at 3271 Oak Ridge Loop E. Rent was also $900 per month. The notice address for KRB Holdings was the same, 3247 Oak Ridge Loop E, with notice to be directed to the attention of Berg. Kurk signed on behalf of OK2 and Berg signed on behalf of KRB Holdings.

f. After the leases were provided to CVE, CVE asked OK2 to disclose any business relationship between OK2, KRB Holdings, and OAC Group Properties, LLC. In June 2019, Kurk wrote a letter to CVE stating that OK2 did not have a business relationship with either company or share or pay for services with the companies. The letter did not discuss the connection of each property company to OK2's minority owners, or any connections between the companies owned by each minority owner.

g. In May 2021, a competitor of OK2's protested to the SBA that OK2 was not a small business because of its affiliation with a number of other entities, including OK2's relationship with Pro-Mark, based on Berg's position with Pro-Mark and his wife Connie's ownership of Pro-Mark. The documentation supporting the protest relied primarily on publicly available information. In June 2021, OK2 provided a response signed by Kurk. Kurk wrote that, while Berg had

worked for Pro-Mark previously, he had stepped down in August 2020 and that

Connie Berg was no longer the owner of Pro-Mark. The letter did not address

OK2's financial dependence on Berg and Cruz or its reliance on employees and

facilities of Pro-Mark and OAC (neither had been raised by the initial protest).

The SBA subsequently rejected the challenge.

104.   OK2 continues to actively seek and receive government contracts.  Its registration

in SAM was most recently renewed in November 2021 according to information from

SAM.gov.  It was awarded a federal contract as recently as January 2022 according to

information in the Federal Procurement Data System.

105.   Given the foregoing evidence, there is probable cause to conclude that OK2, Kurk,

Berg, and Cruz have misrepresented who controls OK2 and the extent to which it is

influenced by and dependent on businesses controlled by Berg and Cruz such as Pro-Mark

and OAC. Such misrepresentations were material to the determination of whether OK2

qualified as veteran owned and controlled and therefore was eligible to receive SDVOSB

set-aside contracts.

### PROBABLE CAUSE TO SEARCH THE PERSON, BELONGINGS, AND CONTAINERS OF BERG

106.   There is probable cause to believe that Berg possesses a cellular telephone or

smart phone that he uses to conduct business and effectuate the above schemes in

conjunction with Pro-Mark, Fed Serve, Razor, MDM, and OK2 (the "Companies"), including

sending text messages and emails to others involved with these companies.

107.   Information obtained from Verizon in response to a grand jury subpoena in June

2021 indicates that the phone number (701) 261-8189 has been continuously subscribed to

by Berg—first on behalf of Pro-Mark since at least September 2010, and then on behalf of

Fed Serve, since at least September 2020.

108.    Information provided in response to the subpoena also indicates that the number (701) 261-8189 had extensive texts and calls with numbers associated with others involved in the Companies' business and the schemes described above.

a.  DuBois, a Pro-Mark employee who also acted as a controller of OK2 and did work for Fed Serve, uses the number (701) 412-3147, according to the email signatures on his Pro-Mark and OK2 email accounts.

b.  From June 2020 to June 2021, this number and Berg's number exchanged more than 865 text messages, more than 1,700 picture or video messages, and more than 2,240 calls or attempted calls.

c.  Grant, a Pro-Mark employee who did work for Razor, Fed Serve, and OK2, and represented herself as an OK2 and Razor employee, uses the number (701) 361-7969, according to the email signatures on her Pro-Mark, Fed Serve, and Razor email accounts. From June 2020 through June 2021, this number and Berg's exchanged more than 300 text messages, more than 70 picture or video messages, and more than 590 calls or attempted calls.

d.  Pietruszewski, a Pro-Mark employee who did work for OK2 and Razor, uses the number (701) 238-1518, according to the email signatures on his Pro-Mark and OK2 email accounts. From June 2020 to June 2021, this number and Berg's exchanged more than 340 text messages, more than 320 picture or video messages, and more than 450 calls or attempted calls.

e.  Kurk, who is a 51% owner of OK2, uses the number (817) 964-2509, according to information received from AT&T in response to a grand jury subpoena in October 2021. Between March 2019 and October 2021, this number and Berg's exchange more than 1,800 text messages between them and more than 400 calls or attempted calls.

71

Case 24-07021-m-j-001-01 ARS Filed 09/25/41 Entered 03/09/25 22 14 46 7.22 of 81 Desc
Case 24-07021-mj-001-01 ARS Doc 09/25/41 Filed 03/09/25 24 Page 46 7.22 of 81
Exhibits A-E    Page 86 of 130

f.  Walters, who is the service-disabled veteran owner of MDM, uses the number
(701) 238-2273, according to the email signature on his MDM email account.
Between June 2020 and June 2021, this number and Berg's exchanged more
than 480 text messages, more than 3,000 picture or video messages, and more
than 2,225 calls or attempted calls.

109.   Emails obtained from the prior search warrant indicate that at times Berg sends
emails from his various business email addresses that contain a disclaimer, "Sent from my
Verizon, Samsung Galaxy smartphone," including in May 2019 (from his OK2 email)
address); in October 2020 (from his Fed Serve email address); and in November 2020 (from
his Pro-Mark email address).

110.   Documents obtained from the prior search warrant and from government
agencies indicate that Berg provides the number (701) 261-8189 as a contact number. For
example:

a.  In April 2020, Berg submitted a Paycheck Protection Program loan application
on behalf of Fed Serve to the SBA, providing (701) 261-8189 as his business
phone number.

b.  In May 2020, Berg, on behalf of Fed Serve, submitted a bid and experience
questionnaire to the National Parks Service. Berg's signature blocks listed (701)
261-8189 as his phone number.

c.  In October 2020, Berg emailed with representatives from the Air Force regarding
Fed Serve's work on a contract. Berg's signature block listed (701) 261-8189  as
his phone number.

d.  Also in October 2020, Berg emailed with representatives from the U.S.
Department of Agriculture regarding a project proposal submitted by Fed Serve.
Berg's signature block listed (701) 261-8189  as his phone number.

111.    A review of criminal mail covers from December 2021 indicate that Fed Serve

sent mail to Tunheim Construction, and included in its return address on the envelope the

address of Berg's residence at 5012 2nd St E West Fargo, North Dakota 58708, followed by

the phone number (701) 261-8189.

### BACKGROUND ON CELLULAR TELEPHONE AND SMARTPHONES

112.    Based on my training and experience, I know that a "smartphone" such as an

iPhone, Android, Blackberry, etc., is a high-end cellular telephone that combines the

function of a personal digital assistant and a mobile phone. This includes the ability to

communicate with other cell phones by using a text-messaging feature, email, or an

Internet-based instant messaging application. Most smartphones also have the ability to

connect to the Internet via Wi-Fi and mobile broadband access. I know from my training

and experience that cell phones, including smartphones, are capable of storing large

amounts of data, including call histories (showing the date, time, and destination/origin

phone number dialed), emails, the contents of text and chat messages, photographs, video

and audio files, and documents. Cell phones are relatively small, are easily concealed, and

are frequently carried on someone's person or in their vehicle.

113.    I know from my training and experience that, in part because of their storage

capacity and frequent use, users infrequently attempt to remove information from a

smartphone or cell phone and that information may be stored on the device for a

considerable period of time.  In addition, smartphone providers offer methods by which a

user can transfer information from one phone to another when the user acquires a new

smartphone, so the information on a smartphone may predate the purchase of the

smartphone itself.

114.    I know from my training and experience that obtaining cellular telephone records

stored in a cell phone or smartphone may be helpful to law enforcement in many ways,

including the following: identifying suspects, co-conspirators, or persons involved in or related to criminal activity; identifying victims; helping to establish a timeline of events surrounding criminal activity; and documenting contact between co-conspirators.

115.   In my training and experience, cell phones and smartphones contain numerous categories of information that may advance the investigation. For example:

   a.   Telephone, text, chat, and email records provide information regarding who device users communicated with in the course of the scheme, and the contents of the communications.

   b.   Contact lists or address books identify other individuals whom the device user knew or with whom the user communicated.

   c.   Photographs and files stored on the device may contain draft or final documents, including bids and submissions to government agencies.

   d.   Photographs and videos on the devices may identify device users and the individuals with whom they associated, as well as indicating where and with whom they worked.

   e.   Notes and word processing applications may contain contemporaneous notes of device user's state of mind or plans or drafts and final versions of documents or communications.

   f.   Information on applications accessed or downloaded may provide information on other methods of communication used by the device user and identify financial and other accounts used by the device user.

   g.   Location history may provide information on whether the device user regularly went to an office or job site, as well as information on whether the device user was in the same location at the same time as other individuals involved in the scheme.

74

h.   Search history records may provide information on the device user's knowledge and mental state.

116.   Therefore, this application requests permission to search the entire contents of any mobile phone or smartphone that may be seized in Attachment A for the information identified in Attachment B.

117.   I know from my training and experience that specialized software and computer hardware can be used to examine the contents of mobile phone and smartphones. I know this software is capable of retrieving call history, text message history, and details, pictures, and videos from numerous types of mobile phones and smartphones. In some cases, the software is able to retrieve previously stored data even after a user has deleted it from the phone's memory.

## SPECIFICS OF SEARCH AND SEIZURE OF COMPUTERS, CELL PHONES, AND OTHER ELECTRONIC DEVICES

118.   Based on my training and experience, I know that during the execution of a search warrant it is not always possible to search computer equipment, cell phones, and other electronic storage devices for data for a number of reasons, including the following:

a.   Searching computer systems, cell phones, and electronic storage devices is a highly technical process that requires specific expertise and specialized equipment. There are so many types of electronic hardware and software in use today that it is impossible to bring to the search site all of the technical manuals and specialized equipment necessary to conduct a thorough search of every possible electronic device that may be found. In addition, it may also be necessary to employ or consult with personnel who have specific expertise in the type of electronic device or software application or operating system being searched;

b. Searching electronic devices requires the use of precise, scientific procedures that are designed to maintain the integrity of the evidence and to recover "hidden" erased, compressed, encrypted, or password-protected data. Electronic hardware and software may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since electronic data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted;

c. The volume of data stored on many electronic devices will typically be so large that it will be highly impractical to search for data during the execution of a search warrant; and

d. Users of electronic devices can attempt to conceal data within the devices through a number of methods, including the use of innocuous or misleading filenames and extensions, or by employing encryption or data-wiping software. Therefore, a substantial amount of time is necessary to extract and sort through data found on electronic devices to locate any data that may be concealed or encrypted and to determine what data constitutes evidence, fruits, contraband or instrumentalities of a crime.

119. Based on my own experience and my consultation with other agents who have been involved in searches of electronic devices, searching digital information for evidence, fruits, or instrumentalities of a crime also requires the seizure of all peripheral devices, related software, documentation, and data security devices (including electronically stored and written passwords) so that a qualified computer expert can accurately retrieve all electronic data stored within in a laboratory or other controlled environment.

76

120.    The search procedure of electronic data contained in the hardware and software of any cellphone or smart phone seized pursuant to this warrant may include the following techniques (the following is a non-exclusive list, as other search procedures may be used):

a.  on-site triage to determine what, if any, peripheral devices or other electronic devices have been connected to the seized device;

b.  on-site forensic imaging of devices that may be partially or fully encrypted, in order to preserve unencrypted electronic data that may, if not immediately imaged on-scene, become encrypted and accordingly unavailable for examination; such imaging may require several hours to complete and require law enforcement agents to secure the search scene until that imaging can be completed;

c.  examination of all of the data contained in each device's hardware, software, or memory storage to view the data to determine whether that data falls within the items to be seized as set forth herein;

d.  searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not evidence of the offenses specified above);

e.  surveying various file directories and the individual files they contain;

f.  opening files in order to determine their contents;

g.  a preliminary scan of image files contained on the devices to help identify relevant evidence, as well as a scan for encryption software;

h.  scanning storage areas;

77

i.  performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are likely to appear in the evidence described in Attachment B; and

j.  performing any other data analysis technique that may be necessary to locate and retrieve the evidence described in Attachment B.

121.    I am aware that individuals often keep their cell phones on their person. Today, many people's cell phones are some form of "smart phone" which has the capability of connecting to the Internet. As noted above, any device that can connect to the Internet and transmit commands could have been used to send texts, emails, and access other online accounts. For these reasons I seek permission to search the person, belongings, and containers of the person described in Attachment A for the items described in Attachment B, including those items stored on a cell phone or smartphone.

## BIOMETRIC ACCESS TO DEVICES

122.    The warrant I am applying for would permit law enforcement to obtain from the person in Attachment A the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock devices subject to search and seizure pursuant to this warrant. I seek this authority based on the following:

a.  I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

78

b. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c. If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID." During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

d. In my training and experience, users of digital devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

e.  As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

f.  I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours *and* the passcode or password has not been entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

123.   Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of the person listed in Attachment A to the fingerprint scanner of the device; (2) hold the device in front

80

of the face of the person listed in Attachment A and activate the facial recognition feature,

for the purpose of attempting to unlock the device in order to search its contents as

authorized by this warrant. In general, unsuccessful attempts to use biometric

characteristics to unlock the devices will not damage them.

## CONCLUSION

124.   I submit that this affidavit supports probable cause for a warrant to search the

person, belongings, and containers of the individual described in Attachment A and seize

the items described in Attachment B.


Respectfully submitted,


_____
**Aaron Dunn**
Special Agent
FBI


Subscribed and sworn to before me on March 1, 2022, via telephone.


_____
Honorable Alice R. Senechal
UNITED STATES MAGISTRATE JUDGE

**<u>Attachment A</u>**

**<u>Person, Belongings and Containers to be Searched</u>**

A search warrant for the person, belongings, and containers of Kyle Ralph BERG, a 52-

year-old white male, standing approximately 6" tall, and weighing approximately 175 lbs,

who resides at 5012 2nd St E, West Fargo, North Dakota 58078, including all personal items

and containers in his physical possession, on his person, or in areas within his immediate

control, to include any documents or digital devices, including a cellular telephone in the

possession of or belonging to BERG, with the assigned phone number of  (701) 261-8189.

BERG is depicted in the photograph below:



Case 2:24-mj-00107-ARS   Document 1-3   Filed 09/25/24   Page 42 of 4
Case 0:24-mj-00107-ARS   Document 1-3   Filed 09/25/24   Page 42 of Desc
Exhibits A-E    Page 97 of 130

**Attachment B**

**Items to be Seized**

The following materials, in any format or medium, which constitute evidence, instrumentalities, and fruits of criminal violations of 18 U.S.C. § 371 (conspiracy to commit offense or to defraud the United States), 18 U.S.C. § 1001 (false statements), 18 U.S.C. § 1031 (major fraud against the United States), or 18 U.S.C. § 1343 (wire fraud), those violations involving Pro-Mark Services, Inc., Razor Consulting Solutions, Inc., Fed Serve, LLC, MDM Construction, LLC, and OK2 Construction, LLC  (the "COMPANIES") and by or through their employees, agents, and principals, including, but not limited to Kyle Berg, occurring after December 1, 2007 to the present, including but not limited to the following matters:

1. Any and all records, including communications, relating to the COMPANIES' structure, ownership, control, and employees.

2. Any and all records, including communications, relating to the COMPANIES' financial condition, including revenue, expenses, profits, wages paid, payments to vendors and other companies, and distribution of profits.

3. Any and all records, including communications, relating to the COMPANIES' involvement with government contracts, including estimates, bonds, bids, proposals, management, performance, subcontracting, sourcing, and marketing or administrative functions.

4. Any and all records, including communications, relating to the COMPANIES' application or eligibility for any set-aside status, including the 8(a) Business Development program, the Woman Owned Small Business program, the Historically Underutilized Business Zone program, and the Service-Disabled Veteran-Owned Small Business program.

5. For any digital device which is capable of containing and reasonably could contain fruits, evidence, or instrumentalities as described in the search warrant affidavit and above, hereinafter the "Device(s)":

    a. evidence of who used, owned, or controlled the Device(s) at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, chat, instant messaging logs, photographs, and correspondence;

    b. evidence of software, or the lack thereof, that would allow others to control the Device(s), such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    c. evidence of the attachment to the Device(s) of other storage devices or similar containers for electronic evidence;

    d. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Device(s);

    e. evidence of the times the Device(s) was used;

    f. passwords, encryption keys, and other access devices that may be necessary to access the Device(s);

    g. documentation and manuals that may be necessary to access the Device(s) or to conduct a forensic examination of the Device(s);

    h. records of or information about Internet Protocol addresses used by the Device(s);

    i. records of or information about the Device(s)'s Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite"

web pages, search terms that the user entered into any Internet search

engine, and records of user-typed web addresses; and

j.   routers, modems, and network equipment used to connect computers to the

Internet.

During the execution of the search described in Attachment A, law enforcement

personnel are also specifically authorized to obtain from Kyle Berg the compelled display of

any physical biometric characteristics (such as fingerprint/thumbprint, facial

characteristics, or iris display) necessary to unlock any Device(s) requiring such biometric

access subject to seizure pursuant to this warrant for which law enforcement has

reasonable suspicion that the aforementioned person(s)' physical biometric characteristics

will unlock the Device(s), to include pressing fingers or thumbs against and/or putting a

face before the sensor, or any other security feature requiring biometric recognition for the

purpose of attempting to unlock the Device(s)'s security features in order to search the

contents as authorized by this warrant.

As used above, the terms "records" and "information" includes all forms of creation

or storage, including any form of computer or electronic storage (such as hard disks or other

media that can store data); any handmade form (such as writing); any mechanical form

(such as printing or typing); and any photographic form (such as microfilm, microfiche,

prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term digital device includes any electronic system or device capable of storing or

processing data in digital form, including central processing units; desktop computers,

laptop computers, notebooks, and tablet computers; personal digital assistants; wireless

communication devices, such as telephone paging devices, beepers, mobile telephones, and

smart phones; digital cameras; peripheral input/output devices, such as keyboards,

printers, scanners, plotters, monitors, and drives intended for removable media; related

communications devices, such as modems, routers, cables, and connections; digital storage

media, such as hard disk drives, floppy disks, USB flash drives, memory cards, optical

disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS);

security devices; and any other type of electronic, magnetic, optical, electrochemical, or

other high speed data processing devices performing logical, arithmetic, or storage

functions.

Pursuant to Rule 4l(e)(2)(B) of the Federal Rules of Criminal Procedure, this

warrant authorizes the removal of digital devices, electronic digital storage media, and

cellular phones and copying of electronically stored information found during the execution

of the search warrant as described in Attachment A so that they may be reviewed in a

secure environment for the information consistent with the warrant.

This warrant authorizes a review of electronic digital storage media and

electronically stored information seized, copied, or disclosed pursuant to this warrant in

order to locate evidence, fruits, and instrumentalities described in this warrant.  The

review of this electronic data may be conducted by any government personnel assisting in

the investigation, who may include, in addition to law enforcement officers and agents,

attorneys for the government, attorney support staff, and technical experts.  Pursuant to

this warrant, the seizing agency may deliver a complete copy of the seized, copied, or

disclosed electronic data to the custody and control of attorneys for the government,

attorney support staff, and technical experts for their independent review.

# **<u>Exhibit D</u>**



**U.S. Department of Justice**

*Antitrust Division*
*Chicago Office*

*Rookery Building*                                    *312/984-7200*
*209 South LaSalle Street, Ste. 600*
*Chicago, IL  60604*

October 26, 2023

Iris Bennett
Steptoe & Johnson LLP
1330 Connecticut Avenue, NW
Washington, DC  20036
(Counsel for Pro-Mark Services, Inc.)

Re:  Pro-Mark Services, Inc., Non-Prosecution Agreement

Dear Ms. Bennett:

The United States Department of Justice's Antitrust Division and the United States Attorney's Office for the District of North Dakota (collectively, "the United States") and Pro-Mark Services, Inc. ("Pro-Mark" or "the Company"), a corporation organized under the laws of North Dakota and headquartered in North Dakota, pursuant to authority granted by the Special Committee of the Pro-Mark Board of Directors enter into this Non-Prosecution Agreement (the "Agreement").  Pro-Mark agrees to certain terms and obligations as set forth below.

1.  The United States enters into this Agreement based on the individual facts and circumstances presented by this case and the Company, including:

    a.  The nature and seriousness of the offense that, among other things, involved the Company misrepresenting its status and eligibility for certain government contracting programs set aside for socially or economically disadvantaged individuals and/or women, amounting to approximately $70 million in federal contracts awarded to the Company from 2008 to 2020. This conduct occurred at the direction of Individual A and Individual B who originally managed and owned the Company, respectively (collectively, "the Original Owners"). This conduct is further described in Attachment A, the Statement of Facts;

    b.  The Company cooperated with the Office's investigation, including by making certain key personnel available for interviews, and by providing all non-privileged facts relating to individual involvement in the conduct described in the Statement of Facts, and conduct disclosed to the United States prior to the Agreement;

    c.  Pro-Mark was sold by Individual B, the sole owner of the Company at the time, to its employees via an Employee Stock Ownership Plan ("ESOP") for approximately $32

million in August 2020, before the United States became aware of the Original Owners' criminal conduct. Under the ESOP, Pro-Mark's current employees will be eligible to draw retirement benefits from Pro-Mark after those benefits vest (five years from the date of the ESOP). None of these employees had a meaningful role in the criminal conduct described in Paragraph 1(a) of this Agreement and in the attached Statement of Facts. Additionally, at least in part because of circumstances arising from the Office's investigation, Pro-Mark was unable to continue to secure bonding, which is critical to performing federal construction contracts. A conviction or a deferred prosecution agreement likely would result in the Company's continued inability to secure bonding as well as potential suspension and debarment from federal contracting, which would likely result in substantial consequences to the Company's employees and customers. This Agreement may allow the Company to preserve its financial viability, remain a viable competitor in the federal construction market, and allow employees to access their retirement benefits which have not yet vested pursuant to the ESOP;

d. While the Original Owners continued to have a role in the Company through a series of consulting agreements following the ESOP, since at least April 2022, the Original Owners have had no role in managing or operating the Company. The terms of Individual A's consulting agreement effective as of July 2022 confirmed that neither the Original Owners nor a separate company wholly owned by Individual A had any rights, power, or authority to control Pro-Mark or otherwise act on behalf of or bind Pro-Mark.  As of March 2023, the Original Owners had no role acting as consultants to the Company;

e. The Company engaged in extensive remedial measures by taking steps to enhance its governance structure and improve its compliance, ethics, and training program, commensurate with its size.  These steps have included: (i) engaging independent outside counsel to advise the Company, (ii) adding an additional outside independent director to its Board of Directors, (iii) establishing a Special Committee of the Board of Directors made up of two outside independent directors to monitor the Company's response to the United States' investigation, (iv) adopting a Code of Ethics applicable to all employees and specific to government contracting, and (v) instituting an annual Company-wide training program that is focused on government contracting;

f. The Company has no criminal history.  In April 2023, the SBA's local Area Office upheld a size protest initiated by a competitor against Pro-Mark and found Pro-Mark to be "other than small" in reliance on allegations concerning the time period when the Original Owners controlled Pro-Mark.  Pro-Mark's appeal of that determination was denied by the SBA's Office of Hearings and Appeals on July 18, 2023. Pro-Mark has no other disciplinary history; and

g. The Company has agreed to continue to cooperate with the United States in any ongoing investigation of the conduct of the Company and its current or former owners, officers, directors, employees, agents, business partners, and consultants relating to violations of relevant laws.

2. Accordingly, after considering (a) through (g) in Paragraph 1 above, as well as other factors, the United States has determined that the appropriate resolution of the case regarding Pro-Mark is a non-prosecution agreement with the Company and requiring a criminal monetary penalty of $949,000 ("the Penalty"), which represents profits the Company realized from the relevant set-aside contracts that were illegally awarded during the period prior to 2020, when the Original Owners were involved in the Company and that the Company continued performance on following the ESOP.

3. Pro-Mark admits, accepts, and acknowledges that, as a corporate entity, it is responsible under United States law for the acts of its current and former owners, officers, directors, employees, and agents as set forth in the attached Statement of Facts, which are incorporated by reference into this Agreement, and that the facts described therein are true and accurate. Pro-Mark also admits, accepts, and acknowledges that the facts described in the attached Statement of Facts constitute a criminal violation of federal law, including 18 U.S.C. §371 (Conspiracy to Commit Offense or to Defraud United States).

4. Pro-Mark agrees that it shall not, through present or future attorneys, owners, officers, directors, employees, agents or any other persons authorized to speak for Pro-Mark, make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by Pro-Mark set forth above or in the attached Statement of Facts. Pro-Mark agrees that if it issues a press release or holds any press conference in connection with this Agreement, Pro-Mark shall first consult the United States to determine (a) whether the text of the release or proposed statements at the press conference are true and accurate with respect to matters relating to this Agreement and (b) whether the United States has any objection to the release or proposed statements.

5. Pro-Mark's obligations under this Agreement shall have a term of three years from the date on which the Agreement is executed (the "Term"), except for the Cooperation Obligations as set forth in Paragraph 6 below. Pro-Mark agrees, however, that, in the event the United States determines, in its sole discretion, that Pro-Mark has knowingly violated any provision of this Agreement or has failed to completely perform or fulfill each of its obligations under this Agreement, an extension or extensions of the Term may be imposed by the United States, in its sole discretion, for up to a total additional time period of one year, without prejudice to the United States' right to proceed as provided in Paragraph 10 of this Agreement. Any extension of the Agreement extends all terms of this Agreement for an equivalent period. Conversely, in the event the United States finds, in its sole discretion, that there exists a change in circumstances and that the provisions of this Agreement have otherwise been satisfied, the Agreement may be terminated early. In such event, however, Pro-Mark's cooperation obligations described in Paragraph 6 below shall continue until the date upon which all investigations and prosecutions are concluded as determined in the sole discretion of the United States.

6. Pro-Mark shall cooperate fully with the United States in any and all matters relating to the conduct described in this Agreement and the attached Statement of Facts and any other conduct under investigation by the United States at any time during the Term. This cooperation shall continue until the later of (i) the date the Term ends, as the Term may be extended by the United States or (ii) the date upon which all investigations and prosecutions arising out of such

3

conduct are concluded, as determined in the sole discretion of the United States. At the request of the United States, Pro-Mark shall also cooperate fully with other domestic or foreign law enforcement and regulatory authorities and agencies, including any civil authorities and agencies, in any investigation of Pro-Mark or any of its present or former owners, officers, directors, employees, agents, and consultants, or any other party, in any and all matters relating to the conduct described in this Agreement and the attached Statement of Facts and any other conduct under investigation by the United States at any time during the Term. Pro-Mark's cooperation pursuant to this Paragraph is subject to applicable law and regulations, as well as valid claims of attorney-client privilege or attorney work product doctrine; however, Pro-Mark must provide to the United States a summary log of any information or cooperation that is not provided based on an assertion of law, regulation, or privilege, and Pro-Mark shall have the burden of establishing the validity of any such assertion. Pro-Mark agrees that its cooperation shall include, but not be limited to, the following:

a. Pro-Mark represents that it has truthfully disclosed all factual information with respect to its activities and those of its present and former owners, directors, officers, employees, agents, and consultants described in this Agreement and in the attached Statement of Facts. Pro-Mark shall truthfully and in a timely manner disclose all factual information not protected by a valid claim of attorney-client privilege or work product doctrine with respect to its activities, and those of its present and former owners, directors, officers, employees, agents, and consultants, including any evidence or allegations and internal or external investigations, about which Pro-Mark has any knowledge or about which the United States may inquire in its sole discretion in connection with any federal proceeding. This obligation of truthful disclosure includes, but is not limited to, the obligation of Pro-Mark to promptly provide to the United States any document, record, or other tangible evidence in the Company's possession, custody, or control that the United States may request from Pro-Mark, including evidence that is responsive to any requests made prior to the execution of this Agreement.

b. Upon request of the United States, Pro-Mark shall designate knowledgeable employees, agents, or attorneys to provide the United States the information and materials described above on behalf of Pro-Mark. It is further understood that Pro-Mark and its designees must at all times provide complete, truthful, and accurate information.

c. Pro-Mark shall use its best efforts to make available for interviews or testimony, as requested by the United States and at the expense of Pro-Mark, present and former owners, officers, directors, employees, agents, and consultants of Pro-Mark. This obligation includes, but is not limited to, sworn testimony before a federal grand jury or in federal trials, as well as interviews with domestic authorities. Cooperation under this Paragraph shall also include identification of witnesses who, to the best knowledge of Pro-Mark, may have material information regarding the matters under investigation or about which the United States may inquire.

d. With respect to any information, testimony, documents, records, or other tangible evidence provided to the United States by Pro-Mark pursuant to this Agreement, Pro-

Mark consents to any disclosures by the United States, subject to applicable law and regulations, to other governmental authorities, including any other United States criminal or civil authorities, of such materials as the United States, in its sole discretion, deem appropriate.

e. During the Term, should Pro-Mark learn of any evidence or allegation that may constitute a violation of U.S. federal law, Pro-Mark shall promptly report such evidence or allegation to the United States.

f. No later than thirty days prior to the end of the Term, Pro-Mark, by the independent members of its Board of Directors, shall certify in writing to the United States that Pro-Mark has met its disclosure obligations pursuant to Paragraph 6(e) of this Agreement. Consistent with Attachment B, that certification shall be deemed a material statement and representation by Pro-Mark and the independent members of its Board of Directors to the United States for purposes of 18 U.S.C. §§ 1001 and 1519 and shall be deemed to have been made in the District of North Dakota. Pro-Mark and the independent members of its Board of Directors understand and acknowledge that this certification constitutes a significant and important component of this Agreement and the United States' determination whether Pro-Mark has satisfied its obligations under the Agreement.

7. Pro-Mark represents that it has implemented and will continue to implement, throughout the Company, a compliance and ethics program, including, but not limited to, a company-wide training program and the adoption of an all-employee Code of Ethics, designed to detect and prevent violations of federal law in connection with government contracting.[1] Pro-Mark agrees that it shall report to the United States in writing within 30 days of the execution of this Agreement, and then annually during the Term thereafter, regarding its progress in implementing this compliance and ethics program. Pro-Mark agrees that it shall promptly answer any questions about its compliance and ethics program asked by the United States and agrees to meet with the United States regarding that program as may be requested by the United States during the Term. Pro-Mark understands and acknowledges that its voluntary adoption of this compliance and ethics program, and Pro-Mark's timely response to inquiries about it from the United States, constitutes a significant and important component of this Agreement and the United States' determination whether Pro-Mark has satisfied its obligations under the Agreement.

8. Pro-Mark agrees to pay the Penalty of $949,000, plus interest beginning ten business days after the execution of this agreement and computed daily at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date on which the first payment is due, to the U.S. Crime Victims Fund. The Penalty represents profits the Company realized from the illegally awarded set-aside contracts during the period prior to 2020 when the Original Owners were involved in the Company and that the Company continued to perform following

---

[1] The United States recognizes that pursuant to FAR 52.203-13, small businesses are exempt from having a "business ethics awareness and compliance program and internal control system." Pursuant to this Agreement, the Company will complete development and implementation of its compliance program consistent with its size and structure.

the ESOP and the termination of the Original Owners' involvement. Pro-Mark shall pay the penalty to the United States Treasury payable in installments according to the following schedule: within ten business days of the execution of this Agreement, one-third (1/3) of the penalty amount; at the one-year anniversary of the execution of this Agreement, one-third (1/3) of the penalty amount plus interest; and at the two-year anniversary of the execution of this Agreement, one-third (1/3) of the penalty amount plus interest. The Company may prepay the monetary penalty in full or in part at any time and in one or more installments. There shall be no prepayment fees charged nor any discounts granted for prepayment. All payments made by the Company shall be applied first to interest accrued through the date of payment, and any excess shall be applied to the outstanding principal balance of the monetary penalty, with such excess portion of the payments allocated to principal being applied in chronological order to the scheduled installments described in this Paragraph. Interest shall be calculated hereunder using the rate set forth above on a simple, non-compounding basis.

a. Pro-Mark acknowledges that no tax deduction may be sought in connection with payment of any part of the Penalty. The Company shall not seek or accept, directly or indirectly, reimbursement or indemnification from any source of the Penalty amount that the Company shall pay pursuant to this Agreement or pursuant to any other agreement entered into by Pro-Mark with any enforcement authority or regulator concerning the facts set forth in the attached Statement of Facts.

b. Nothing in this Agreement is intended to preclude Pro-Mark or its current employees from pursuing claims they may have against the Original Owners under any provision of state or federal law or against any party under the Employee Retirement Income Security Act of 1974. Payment of the Penalty set out in this Paragraph, however, is not contingent in any way on any such recovery.

c. Nothing in this Agreement shall be deemed an agreement by the United States that the Penalty is the maximum penalty that may be imposed in any future prosecution, and the United States is not precluded from arguing in any future prosecution that a court should impose any type of monetary penalty, including a criminal fine, restitution, disgorgement or civil or criminal forfeiture, or the amount of any such monetary penalty.

9. In exchange for Pro-Mark's good faith performance of its promises and obligations set out in this Agreement, including its full and truthful cooperation as detailed in Paragraph 6, the United States agrees, except as described below, that it will not bring any criminal charges against Pro-Mark relating to any of the conduct described in the attached Statement of Facts.

a. The United States may use any information related to the conduct described in the attached Statement of Facts against Pro-Mark (a) in a prosecution for subornation of perjury (18 U.S.C. § 1622) or obstruction of justice (18 U.S.C. § 1503 *et seq.*), (b) in a prosecution for making a false statement (18 U.S.C. § 1001), (c) in a prosecution or other proceeding relating to any crime of violence, or (d) contempt, or conspiracy to commit such offenses (18 U.S.C. §§ 401–402). This Agreement also does not apply to civil matters of any kind, any civil or criminal violation of the federal tax or securities laws, or conspiracy to commit such offenses.

b. This Agreement does not provide any protection (a) against prosecution for any future conduct by Pro-Mark or (b) against prosecution of Pro-Mark for conduct that is not set forth in the attached Statement of Facts, such conduct will not be exempt from prosecution and is not within the scope of or relevant to this Agreement.

c. This Agreement does not provide any protection against prosecution of any individuals, regardless of their present or past affiliation with Pro-Mark, including any of Pro-Mark's present or former owners, officers, directors, employees, and agents.

10. If, during the Term, Pro-Mark (a) commits any felony under U.S. federal law; (b) knowingly provides in connection with this Agreement any false, incomplete, or misleading information, including in connection with its disclosure of information about individual culpability; (c) fails to cooperate as set forth in this Agreement; (d) fails to implement or maintain a compliance and ethics program as set forth in Paragraph 7 of this Agreement; or (e) otherwise fails specifically to perform or to fulfill completely each of Pro-Mark's obligations under this Agreement, regardless of whether the United States becomes aware of such a breach after the Term is complete, Pro-Mark shall thereafter be subject to prosecution for any federal crime of which the United States has knowledge, including, but not limited to, the conduct described in the attached Statement of Facts, which may be pursued by the United States in the United States District Court for the District of North Dakota or any other appropriate venue.

a. Determination of whether Pro-Mark has breached the Agreement and whether to pursue prosecution of Pro-Mark shall be in the United States' sole discretion. Any such prosecution may be premised on information provided by Pro-Mark or any individual affiliated with Pro-Mark.

b. Any such prosecution relating to the conduct described in the attached Statement of Facts or relating to conduct known to the United States prior to the date on which this Agreement was executed that is not time-barred by the applicable statute of limitations on the date of the execution of this Agreement may be commenced against Pro-Mark, notwithstanding the expiration of the statute of limitations, between the execution of this Agreement and the expiration of the Term plus one year. Accordingly, by signing this Agreement, Pro-Mark agrees that the statute of limitations with respect to any such prosecution that is not time-barred on the date of the execution of this Agreement shall be tolled for the Term plus one year. In addition, Pro-Mark agrees that the statute of limitations as to any violation of federal law that occurs during the Term will be tolled from the date upon which the violation occurs until the earlier of the date upon which the United States is made aware of the violation or the duration of the Term plus five years, and that this period shall be excluded from any calculation of time for purposes of the application of the applicable statute of limitations.

c. In the event the United States determines that Pro-Mark has breached this Agreement, they agree to provide Pro-Mark with written notice of such breach prior to instituting any prosecution resulting from the breach. Within thirty days of receipt of such notice, Pro-Mark shall have the opportunity to respond to the United States in writing to explain the nature and circumstances of the breach, as well as actions Pro-Mark has

taken to address and remediate the situation, which explanation the United States shall consider in determining whether to pursue prosecution of Pro-Mark.

d.   In the event the United States determines that Pro-Mark has breached this Agreement, Pro-Mark agrees (a) that all statements made by or on behalf of Pro-Mark to the United States, including those statements made in the attached Statement of Facts, information the United States obtained through interviews of current or former employees, and any testimony given by Pro-Mark, its current or former employees before a grand jury, a court, or any tribunal, whether prior or subsequent to the execution of this Agreement, and any leads or evidence derived from such statements or testimony, shall be admissible in evidence in any criminal proceeding brought by the United States against Pro-Mark and (b) that Pro-Mark shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that any such statements or testimony made by or on behalf of Pro-Mark, or any leads or evidence derived therefrom, should be suppressed or are otherwise inadmissible. The decision whether conduct or statements of any current director, officer or employee, or any person acting on behalf of, or at the direction of, the Company, will be imputed to the Company for the purpose of determining whether the Company has violated any provision of this Agreement shall be in the sole discretion of the United States. Further, in the event the United States determines that Pro-Mark has breached this Agreement, Pro-Mark, having been advised by counsel, waives its right to indictment and agrees that criminal proceedings under Paragraph 10 of this Agreement may be by information, rather than indictment.

11. Except as may otherwise be agreed by the United States and Pro-Mark in connection with a particular transaction, Pro-Mark agrees that in the event that, during the Term, it undertakes a change in corporate form, including if it sells, merges, or transfers business operations as they exist as of the date of the execution of this Agreement, whether such change is structured as a sale, asset sale, merger, transfer, or any other change in corporate form, including dissolution, Pro-Mark shall include in any contracting document for such change a provision binding the purchaser, or any successor in interest thereto, to the obligations described in this Agreement. Pro-Mark shall obtain prior approval from the United States at least thirty days prior to undertaking any such sale, merger, transfer, or other change in corporate form, including dissolution, in order to give the United States an opportunity to determine if such change in corporate form would affect the terms or obligations of the Agreement. If such a change in corporate form has the effect of circumventing or frustrating the enforcement purposes of this Agreement, as determined in the sole discretion of the United States, it shall be deemed a breach of this Agreement and the provisions of Paragraph 10 of this Agreement shall apply.

12. This Agreement is binding on Pro-Mark and the United States, but it does not bind any other component of the Department of Justice, other federal agencies, or any state, local, or foreign law enforcement or regulatory agency, including any civil agencies such as, but not limited to, any agency charged with assessing Pro-Mark's fitness to be a government contractor. The Company understands that it may be subject to suspension or debarment action by state or federal agencies based upon this Agreement, and that this Agreement in no way controls what action, if any, other agencies may take. However, the United States agrees that, if requested

in writing by Pro-Mark, they will advise the appropriate officials of any governmental agency considering such action of the fact, manner, and extent of the cooperation and remediation of the Company as a matter for that agency to consider before determining what action, if any, to take.  By agreeing to provide this information to such agencies, the United States is not agreeing to advocate on behalf of the Company, but rather is agreeing to provide facts to be evaluated independently by such agencies.

13. Pro-Mark represents that the undersigned independent members of its Board of Directors are authorized to execute this Agreement and has the authority, granted by the Special Committee of the Pro-Mark Board of Directors, to bind Pro-Mark to its terms, as certified by counsel in Attachments C and D.  Likewise, the undersigned representatives of the United States represent that they have the authority to bind the United States to this Agreement's terms.

14. This Agreement, including all attachments thereto, sets forth all of the terms of the agreement between the United States and Pro-Mark and, except as set forth in the Agreement, there are no promises, understandings, or agreements of any kind between the United States and Pro-Mark or Pro-Mark's counsel.  No amendments, modifications, or additions to the Agreement may be entered into unless they are in writing and signed by the United States, Pro-Mark, and Pro-Mark's counsel.

15. This Agreement is covered by the laws of the United States.  Pro-Mark agrees that exclusive jurisdiction and venue for any dispute arising under it is in the United States District Court for the District of North Dakota.

16. It is understood that Pro-Mark and the United States may disclose this Agreement to the public.

17. All notices and reports to the United States required or permitted under this Agreement shall be in writing and sent by overnight mail and e-mail, addressed to the United States as follows:

> United States Department of Justice, Antitrust Division
> Chicago Office
> Attn: M. Claire Nicholson, Trial Attorney
> 209 South Lasalle Street, Suite 600
> Chicago, IL  60604
> Mary.Nicholson2@usdoj.gov
>
> United States Attorney's Office for the District of North Dakota
> Attn:  Matthew Greenley, Assistant United States Attorney
> 655 First Avenue North, Suite 250
> Fargo, ND  58102
> Matthew.Greenley@usdoj.gov

18. This Agreement may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same agreement.  Faxed or electronically-submitted signatures are acceptable and binding signatures for purposes of this Agreement.

Date: _____        BY: MARY NICHOLSON

Digitally signed by MARY NICHOLSON
Date: 2023.10.26 16:33:15 -05'00'

M. Claire Nicholson
Trial Attorney
United States Department of Justice
Antitrust Division

BY: MATTHEW GREENLEY

Digitally signed by MATTHEW GREENLEY
Date: 2023.10.26 16:35:31 -05'00'

Matthew Greenley
Assistant United States Attorney
United States Attorney's Office for the District of
North Dakota

AGREED AND CONSENTED TO:

Pro-Mark Services, Inc.

Date: _____        BY: _____

Mark Kragnes
Independent member of
Pro-Mark Services, Inc.'s
Board of Directors

Date: _____        BY: _____

Jack Carroll
Independent member of
Pro-Mark Services, Inc.'s
Board of Directors

Date: _10/30/2023_        BY: _____

Iris Bennett
Steptoe & Johnson LLP

10

Date: _____  BY:  **MARY**
**NICHOLSON**    Digitally signed by MARY
NICHOLSON
Date: 2023.10.26 16:33:15
-05'00'

M. Claire Nicholson
Trial Attorney
United States Department of Justice
Antitrust Division

BY:  **MATTHEW**
**GREENLEY**    Digitally signed by MATTHEW
GREENLEY
Date: 2023.10.26 16:35:31
-05'00'

Matthew Greenley
Assistant United States Attorney
United States Attorney's Office for the District of
North Dakota

AGREED AND CONSENTED TO:

Pro-Mark Services, Inc.

Date: 10/30/23  BY: _____

Mark Kragnes
Independent member of
Pro-Mark Services, Inc.'s
Board of Directors

Date: _____  BY: _____

Jack Carroll
Independent member of
Pro-Mark Services, Inc.'s
Board of Directors

Date: _____  BY: _____

Iris Bennett
Steptoe & Johnson LLP

10

Date: _____

BY: **MARY NICHOLSON**   Digitally signed by MARY NICHOLSON
Date: 2023.10.26 16:33:15 -05'00'

M. Claire Nicholson
Trial Attorney
United States Department of Justice
Antitrust Division

BY: **MATTHEW GREENLEY**   Digitally signed by MATTHEW GREENLEY
Date: 2023.10.26 16:35:31 -05'00'

Matthew Greenley
Assistant United States Attorney
United States Attorney's Office for the District of
North Dakota

AGREED AND CONSENTED TO:

Pro-Mark Services, Inc.

Date: _____

BY: _____

Mark Kragnes
Independent member of
Pro-Mark Services, Inc.'s
Board of Directors

Date: 10/30/23

BY: _____

Jack Carroll
Independent member of
Pro-Mark Services, Inc.'s
Board of Directors

Date: _____

BY: _____

Iris Bennett
Steptoe & Johnson LLP

10

ATTACHMENT A

## STATEMENT OF FACTS

The following Statement of Facts is incorporated by reference as part of the non-prosecution agreement entered into by the United States Department of Justice's Antitrust Division and the United States Attorney's Office for the District of North Dakota and Pro-Mark Services, Inc. ("Pro-Mark" or "the Company") dated October 26, 2023, (the "Agreement"). Pro-Mark hereby agrees and stipulates that the following information is true and accurate. Pro-Mark also admits, accepts, and acknowledges that it is responsible for the acts of its current and former owners, officers, directors, employees, and agents as set forth in this Statement of Facts.

## Background and Relevant Entities and Individuals

The SBA Programs

1. The United States Small Business Administration's ("SBA") Section 8(a) Business Development Program ("the 8(a) Program") was designed to help socially and economically disadvantaged business owners gain access to and succeed in the marketplace for federal government contracts. A means by which the SBA achieved this goal was by creating a set of reserved, or set-aside, federal contracting opportunities for participants in the 8(a) Program. The federal government's goal is to award at least 5% of all federal contracting dollars to small disadvantaged businesses each year through its 8(a) Program.

2. To be eligible for the 8(a) Program, a small business was required, among other things, to be unconditionally owned and controlled by one or more socially and economically disadvantaged individuals. An 8(a) Program participant was required to maintain its eligibility throughout its tenure in the program and to inform the SBA of any changes that would alter its eligibility for the 8(a) Program. Once admitted, a small business was eligible to participate in the 8(a) Program for nine years, after which it was deemed to have graduated from the program.

3. Similar to the program for businesses owned by economically and socially disadvantaged individuals, the SBA also allowed small businesses that were owned by women to compete for certain set-aside contracts. Until October 2020, a women-owned small business ("WOSB") could self-certify to the SBA that it met the criteria to participate in the WOSB program. Among other criteria, to be eligible to receive contracts set aside for WOSBs, the business had to certify that it was unconditionally owned and controlled by one or more women and to inform the SBA of any changes that would alter its eligibility to compete for federal contracts set aside for WOSBs. The federal government's goal is to award at least 5% of all federal contracting dollars to WOSBs each year.

Pro-Mark Services, Inc.

4. Pro-Mark was incorporated in North Dakota in 2001 for the purpose of engaging in specialty and retail sales. Pro-Mark was originally owned by husband (Individual A) and wife (Individual B) (collectively, "the Original Owners"), with Individual B serving as the president of the Company. In August 2007, Individual A transferred his 49% share in Pro-Mark to Individual B, making her both the president and sole owner.

5. In December 2007, Individual B and Pro-Mark applied to the 8(a) Program for economically and socially disadvantaged individuals on the basis of gender bias. In the 8(a) Program application submitted on behalf of Pro-Mark, Individual B represented that Pro-Mark earned 100% of its revenue in the field of specialty and retail sales and that Pro-Mark was established to furnish clothing and promotional items to area businesses, organizations, and colleges. The business plan further provided that these promotional items could be customized through logos, screen-printing, and/or embroidery. Individual B also represented to the SBA that she was Pro-Mark's only director, officer, management member, key employee, or owner; that she worked 40 hours per week for Pro-Mark; and that she was responsible for "all control, management, and business decisions relating to Pro-Mark." Based on its application, Pro-Mark was accepted into the 8(a) Program in 2008.

6. After being accepted into the 8(a) Program, Pro-Mark submitted annual forms from 2008 to 2017 to the SBA certifying that it remained eligible for the program. These forms were signed and submitted by Individual B, who represented that she remained Pro-Mark's president; continued to dedicate 40 hours per week to Pro-Mark's business; and that no one other than a socially or economically disadvantaged individual held the highest position at Pro-Mark and that the individual holding that highest position at Pro-Mark worked full time at Pro-Mark. Pro-Mark continued to participate in the 8(a) Program until it graduated in 2017.

7. Beginning in 2015 and continuing until 2020, Pro-Mark, through Individual B, also began to self-certify annually to the SBA that Pro-Mark was a WOSB. In these certifications, Individual B, on behalf of Pro-Mark, represented that "management and daily business operations of [Pro-Mark] are controlled by one or more women;" that a "woman holds the highest officer position in [Pro-Mark] and her resume evidences that she has the managerial experience of the extent and complexity needed to run [Pro-Mark];" and that she "manages [Pro-Mark] on a full-time basis and devotes full-time to [Pro-Mark] during working hours."

8. Individual A held the title of Vice President of Pro-Mark from 2007 until July 2019. From 2019 through at least 2022, Individual A maintained similar roles and responsibilities as he did while Vice President of Pro-Mark in his role as a "consultant" to Pro-Mark, the terms of which were set out in a series of written consulting agreements between Pro-Mark and Company A, a company wholly owned by Individual A. Through this consulting agreement, Individual A was paid at least $30,000 more than what Individual B was making at Pro-Mark annually in 2019. In July 2019, after Individual A nominally stepped down as Pro-Mark Vice President, Employee A became Pro-Mark's Vice President and Employee B another long-time Pro-Mark employee, became its Secretary and Treasurer. Following a change in ownership of Pro-Mark effected by an Employee Stock Ownership Plan ("ESOP") in August 2020, Employee A became President of Pro-Mark in September 2020 and Employee B became Vice President of Pro-Mark in October 2022.

9. From the time it was accepted into the 8(a) Program and despite what it had represented to the SBA in its application, the majority of Pro-Mark's business was in the construction field, not the specialty and retail sales field. In June 2008, in a business plan submitted to the SBA on behalf of Pro-Mark by Individual B, Pro-Mark told the SBA that the Company, in addition to its retail and specialty sales business, had begun, in 2007, engaging in and bidding on contracts for "construction activity" to "make the most of [Individual A's] 14 years of experience." In

2014, the specialty retail sales component of Pro-Mark's business accounted for less than 1% of its annual revenue.

10. Based on its participation in the 8(a) Program and its claimed status as a WOSB, between 2008 and 2020, Pro-Mark was awarded approximately $70 million in federal government 8(a) and WOSB set-aside contracts. All of these contracts were in the field of general contracting and construction, not specialty and retail sales.

### The Criminal Scheme

11. From 2008 through 2020 Pro-Mark, along with Individual A and Individual B voluntarily and intentionally reached an agreement to defraud the United States, including through interfering with and obstructing in one of the United States' lawful government functions through false and fraudulent pretenses to obtain 8(a) and WOSB contracts to which they were not entitled, including by falsely claiming Individual B controlled Pro-Mark and therefore that Pro-Mark was qualified for such contracts, when Pro-Mark was not eligible to receive such contracts because it was controlled by Individual A. Pro-Mark, through false representations made or directed by the Original Owners between 2008 and 2020, misrepresented its status and eligibility for those programs and set-aside contracts to the SBA and to the government agencies administering the relevant contracts.

12. Between 2008 and 2020, Individual B was held out as the President of Pro-Mark who ran and controlled the business, when in reality she did not control or manage Pro-Mark. She was not the decision-maker at Pro-Mark with regard to federal construction projects or one of its key officers or employees. She did not manage or work 40 hours per week for Pro-Mark. In sum, Individual B did not exercise strategic or day-to-day control over Pro-Mark and had no role in making operational decisions for the Company pertaining to its federal construction business. For example, she had no role in selecting, estimating, or structuring the bids that Pro-Mark submitted for federal construction contracts, engaging in substantive discussions with the contracting officers responsible for awarding, evaluating, or overseeing bids or subsequent contracts, or in hiring or directing Company employees or subcontractors.

13. During that same period, Individual A, who is a non-disadvantaged man, was the individual in control of Pro-Mark who made or delegated all the strategic and day-to-day decisions concerning Pro-Mark and its federal construction business. From 2008 through 2020, Pro-Mark was not eligible for either the 8(a) or WOSB Programs because Individual A, not Individual B, controlled and managed Pro-Mark. Individual A selected which set-aside contracts Pro-Mark would bid on (including 8(a) and WOSB contracts), and he was extensively involved in structuring those bids, estimating their costs, and routinely directed the hiring of, activity, and work of Pro-Mark employees, subcontractors, and suppliers. Finally, he managed the Company's financials, including its bank accounts.

14. Individual B's background, as reflected in her past experience and resumes submitted to the SBA and uploaded to SAM.gov, was in screen-printing fabric and clothing and that she was responsible for Pro-Mark's *de minimis* "Retail Sales and Marketing Division." To the extent she had any meaningful business experience or managerial experience, it was for companies engaged in making custom promotional products or clothing sales. She lacked the expertise to

operate, manage, or control a construction company, especially one that was able to complete multi-million-dollar construction contracts for the U.S. government successfully. In sum, she had no control of or meaningful role in Pro-Mark's construction business.

15. In contrast, Individual A had an extensive background in general contracting, government contracting, and construction, including through employment prior to Pro-Mark as a vice president and project manager at a different construction company engaged in federal construction contracts. When Pro-Mark began doing work in construction in 2007, Individual A had 14 years of construction experience.

16. Nothing in Individual A's regular direction to Pro-Mark employees indicates that Individual B had a role in any of the decision-making at Pro-Mark, and employees were not aware that Individual B was ever the source, directly or indirectly, for the directions he gave.

17. Employees at Pro-Mark, including senior employees as well as construction project managers, recognized that Individual A, not Individual B, was in control of the Company.  They considered Individual A to be their immediate or ultimate supervisor, and they looked to Individual A for direction and answers about issues that arose during the course of their employment. Employees never sought guidance from Individual B regarding Pro-Mark's construction business.

18. Unlike Individual A or other Pro-Mark employees, Individual B did not have a Pro-Mark-sponsored e-mail address.  To the extent she communicated with Pro-Mark employees at all, Individual B used a personal e-mail address, and the subjects of her infrequent communications rarely, if ever, the performance of the construction contracts that made up the vast majority of Pro-Mark's business.

19. In contrast, Individual A sent thousands of e-mails from his Pro-Mark sponsored e-mail address to Pro-Mark employees, subcontractors, suppliers, and others concerning the strategic and day-to-day construction work of Pro-Mark, and he received thousands of e-mails from those individuals and entities regarding Pro-Mark's business at that same e-mail address.

20. In August 2020, Individual B sold her entire ownership interest in Pro-Mark to Pro-Mark's employees via an ESOP for approximately $32 million.  While Individual B was the sole owner of Pro-Mark on paper, Individual A was the primary point of contact for all aspects of the ESOP transaction.

ATTACHMENT B

## <u>CERTIFICATION OF PRO-MARK</u>

To: United States Department of Justice
  Antitrust Division
  Attention: Kalina Tulley, Chief, Chicago Office

Re: Non-Prosecution Agreement Disclosure Certification

  The undersigned certifies, pursuant to Paragraph 6(f) of the Non-Prosecution Agreement (the "Agreement") executed on October 26, 2023, by and between the United States Department of Justice's Antitrust Division and the United States Attorney's Office for the District of North Dakota (collectively, "the United States") and Pro-Mark Services, Inc. ("Pro-Mark" or "the Company"), that the undersigned is aware of Pro-Mark's disclosure obligations under Paragraph 6(e) of the Agreement and that Pro-Mark has disclosed to the United States any and all evidence or allegations of conduct required pursuant to Paragraph 6(e) of the Agreement, which includes evidence or allegations that may constitute a violation of the U.S. laws ("Disclosable Information"). The obligation to disclose information extends to any and all Disclosable Information that has been identified through Pro-Mark's compliance and ethics program, whistleblower channels, internal audit reports, due diligence procedures, investigation process, or other Company sources and processes. The undersigned further acknowledges and agrees that the reporting requirement contained in Paragraph 6(e) and the representations contained in this Certification constitute a significant and important component of the Agreement and the United States's determination whether Pro-Mark has satisfied its obligations under the Agreement.

  The undersigned hereby certifies that they are current independent members of Pro-Mark's Board of Directors, that they have been duly authorized by the Company's Board of Directors to sign this Certification on behalf of Pro-Mark, and that they do so, having been advised by counsel, pursuant to Paragraph 6(f) of the Agreement.

  This Certification shall constitute a material statement and representation by the undersigned and by, on behalf of, and for the benefit of, Pro-Mark to the executive branch of the United States for purposes of 18 U.S.C. § 1001, and such material statement and representation shall be deemed to have been made in the District of North Dakota. This Certification shall also constitute a record, document, or tangible object in connection with a matter within the jurisdiction of a department and agency of the United States for purposes of 18 U.S.C. § 1519, and such record, document, or tangible object shall be deemed to have been made in the District of North Dakota.

Date: _____   BY: _____
             Mark Kragnes
             Independent member of
             Pro-Mark Services, Inc.'s
             Board of Directors

Date: _____   BY: _____
             Jack Carroll
             Independent member of
             Pro-Mark Services, Inc.'s
             Board of Directors

ATTACHMENT C

## CERTIFICATE OF COUNSEL
## FOR THE SPECIAL COMMITTEE OF THE PRO-MARK BOARD OF DIRECTORS

1.  The undersigned is counsel for the Special Committee of the Board of Directors of Pro-Mark Services, Inc. ("Pro-Mark" or "the Company") in the matter covered by the Non-Prosecution Agreement (the "Agreement").

2.  On May 3, 2022, the Board of Directors of Pro-Mark assigned to the Special Committee responsibility for addressing and supervising, on behalf of the Company, any and all issues relating to the investigation being conducted by the United States Department of Justice's Antitrust Division and the United States Attorney's Office for the District of North Dakota (collectively, "the United States").

3.  I have reviewed relevant Company documents and discussed the terms of this Agreement with the Special Committee. Further, I have carefully reviewed the terms of this Agreement with the Special Committee and have fully advised them of the rights of the Company, of possible defenses, and of the consequence of entering into this Agreement.

4.  The Special Committee, having conferred with me, has voted to authorize the Company to execute the Agreement. To my knowledge, the decision of the Special Committee to authorize the Company to enter into the Agreement is an informed and voluntary one.

Joel Bertocchi
Akerman LLP
71 South Wacker Drive, 47th Floor
Chicago, IL 60606
(Counsel to the Special Committee of the Pro-Mark Board of Directors)

Dated: 10/27/23

# **<u>Exhibit E</u>**

THOMSON REUTERS
**WESTLAW**  Small Business Administration Office

---

*SIZE APPEAL OF: PRO-MARK SERVICES, INC., APPELLANT*

SBA No. SIZ-6228, 2023
2023 WL 5322773

July 18, 2023

SBA No. SIZ-6228, 2023 (S.B.A.), 2023 WL 5322773

Small Business Administration (S.B.A.)

Office of Hearings and Appeals
[Size Appeal]

*1 SIZE APPEAL OF: **PRO - MARK SERVICES**, INC., APPELLANT

*1
SBA No. SIZ-6228
*1
Appealed from Size Determination No. 05-2023-009
*1 July 18, 2023

**Appearances**
*1 Paul R. Hurst, Esq.
*1 Amba M. Datta, Esq.
*1 Steptoe & Johnson LLP
*1 Washington, D.C.
*1 For Appellant
*1 Tim Connelly, Esq.
*1 Tim Connelly Law PLLC
*1 Edina, Minnesota
*1 Mark J. Blando, Esq.
*1 Robert T. Dube Jr., Esq.
*1 Jared M. Reams, Esq.
*1 Eckland & Blando LLP
*1 Minneapolis, Minnesota
*1 For Greenstone Construction, Inc.

DECISION[1]

I. Introduction and Jurisdiction

*1 On April 6, 2023, the U.S. Small Business Administration (SBA) Office of Government Contracting — Area V (Area Office) issued Size Determination No. 05-2023-009, concluding that **Pro - Mark Services**, Inc. (Appellant) is not a small business under the size standard associated with the subject procurement. The Area Office found that Appellant did not adequately respond to the Area Office's requests for additional information, and therefore drew an adverse inference that the missing information would have shown that Appellant is not small. On appeal, Appellant contends that the adverse inference was improper, and urges that SBA's Office of Hearings and Appeals (OHA) remand the matter for a new size determination. For the reasons discussed *infra*, the appeal is denied and the size determination is affirmed.

*1 OHA decides size determination appeals under the Small Business Act of 1958, 15 U.S.C. § 631 *et seq.*, and 13 C.F.R. parts 121 and 134. Appellant filed the instant appeal within 15 days of receiving the size determination, so the appeal is timely. 13 C.F.R. § 134.304(a). Accordingly, this matter is properly before OHA for decision.

II. Background

A. The Solicitation

*1 On August 1, 2022, the U.S. Department of the Air Force (Air Force) issued Request for Proposals (RFP) No. FA465922R0003 for construction projects at Grand Forks Air Force Base, North Dakota. The RFP contemplated the award of multiple indefinite delivery/indefinite quantity contracts. Specific work would be defined in task orders issued after award of the base contracts. The Contracting Officer (CO) set aside the procurement entirely for small businesses, and assigned North American Industry Classification System (NAICS) code 236220, Commercial and Institutional Building Construction, which at that time had a corresponding size standard of $39.5 million average annual receipts.[2] (RFP at 47.) Proposals were due October 17, 2022. (RFP, Amendment 0004 at 1.) Appellant and Greenstone Construction, Inc. (Greenstone) submitted timely proposals. Upon evaluating offers, the Air Force selected five awardees, including Appellant and Greenstone.

B. Protest and Area Office Proceedings

*2 On February 10, 2023, the Air Force announced the identity of the five awardees. On February 14, 2023, Greenstone filed a protest with the CO challenging Appellant's size. The protest alleged that Appellant is not small due to affiliation with "several other companies". (Protest at 1.) More specifically, Appellant's President, Mrs. Connie Berg, and her husband, Mr. Kyle Berg, are associated with a number of other businesses. (*Id.*) The protest noted the following connections:

*2 · Mr. Berg is named as a "beneficial owner" of both OK2 Construction, LLC (OK2) and Marlin Creek Holdings, LLC (Marlin Creek). (*Id.* at 1-2.)

*2 · Marlin Creek owns the property where MDM Construction (MDM) is located, and Mr. Berg is listed as one of the payees of property taxes. (*Id.* at 2.)

*2 · Marlin Creek also owns the property for the offices of Appellant, as well as other property in Florida. (*Id.*)

*2 · Appellant is listed as the taxpayer for a property owned by KRB Holdings (KRB). (*Id.*)

*2 · Mr. Berg owns KRB. (*Id.*)

*2 · FedServe, LLC (FedServe) is listed as a payee of property taxes for one of the properties owned by KRB. (*Id.*)

*2 · Appellant has entered into a joint venture with Quinn Construction Inc. (QCI). (*Id.*)

*2 · Appellant has entered into three joint ventures with Razor Consulting, which are named PMR **Services** LLC, PMR **Services** II LLC and PMR **Services** III LLC. (*Id.*)

*2 · Mr. Berg formerly worked and shared an office space with Mr. Chad DuBois, a former owner of CS DuBois Construction (CS DuBois). (*Id.*)

*2 · Messrs. Berg and DuBois were partners in 1794 Investments LLC and/or 1774 Investments LLC. (*Id.*)

*2 · MDM was a former tenant of a property owned by Messrs. Berg and DuBois, and Mr. Dan Walters, President of MDM, is a former employee of CS DuBois, Appellant, and Estoria Homes (Estoria). (*Id.*) Mr. Berg is a co-owner of Estoria. (*Id.*)

*2 · Mr. Berg is the registered agent of Ostrom Painting and Sandblasting, Inc. (Ostrom Painting). (*Id.* at 3.)

*2 · Mr. Berg owns Fed Pro LLC (Fed Pro). (*Id.*)

*2 · Mrs. Berg owns PM2 LLC. (*Id.*)

*2 · Mr. Berg owns FedServe. (*Id.*) Tunheim Construction (Tunheim) is located at the same address as FedServe. (*Id.*)

*2 · Appellant has a "mentor-protégé relationship" with GSL Enterprises LLC (GSL). (*Id.*)

*2 · Mr. Berg co-owns N40GB LLC (N420GB) with Mr. Walters and Mr. Chris Tunheim. (*Id.*)

*2 · Mr. DuBois is listed as Appellant's President on Appellant's website. He also is Controller of OK2. (*Id.*)

*2 · MDM and Appellant were formerly joint venturers. (*Id.*)

*2 · Mr. Kevin Pietruszewksi, a Project Manager for Appellant, is also listed as a Project Manager for OK2. (*Id.*)

*2 · Ms. Kari Hazer has worked for CS DuBois, Appellant, and MDM. (*Id.*)

*2 · Ms. Tammy Stavenes has worked concurrently for Appellant and MDM. (*Id.*)

*3 · Mr. Osvaldo Cruz, the registered agent of Marlin Creek and a beneficial owner of OK2, also owns OAC Action Construction Corp. (OAC Action) and several other businesses. (*Id.*)

*3 (*Id.* at 2-3.) Greenstone alleged that the combined receipts of Appellant and one or more of the concerns discussed in the protest likely exceed the size standard applicable to the subject procurement. (*Id.* at 3-4.) Therefore, affiliation with these entities renders Appellant not small. (*Id.* at 4.)

*3 The CO forwarded the protest to the Area Office for review. On February 27, 2023, Appellant responded to the protest, and submitted a sworn SBA Form 355, corporate records, and other supporting documents. Appellant denied Greenstone's allegations in their entirety, arguing that many of Greenstone's allegations are premised on inaccurate or outdated information, and even if true, would not articulate valid grounds for affiliation. (Protest Response at 5-6.) Appellant self-certified as small for the instant procurement on October 15, 2022. (*Id.* at 1, 26.) Appellant's average annual receipts over the preceding five fiscal years were $35,139,154.20, and thus do not exceed the size standard. (*Id.* at 2, 23.)

*3 Appellant explained that it is a North Dakota corporation originally founded by the Bergs. (*Id.* at 2.) Mrs. Berg previously owned 100% of Appellant and served as Appellant's President and sole director. (*Id.*) In August 2020, however, Mrs. Berg sold her ownership interest in Appellant and resigned her position as Appellant's President. (*Id.* at 2-4.) Since August 2020, Appellant has been fully-owned by its employees through an Employee Stock Ownership Plan (ESOP). (*Id.*) On August 31, 2020, Mr. DuBois became Appellant's President,

replacing Mrs. Berg, and she has had no further involvement in the management of Appellant. (*Id.*) Mr. Berg simultaneously resigned as Appellant's Vice President. (*Id.* at 4, 7.) Currently, Ms. Mandy Grant is Secretary, Treasurer, Office Manager, and Vice President of Appellant. (*Id.* at 4.) According to Appellant's Bylaws, the President, Mr. DuBois, "is the chief executive officer" and has "management powers of the corporation". (*Id.*) Mr. DuBois, thus, has the power to control Appellant. (*Id.*) Because the Bergs no longer have any ability to control Appellant, there can be no affiliation through common ownership and/or common management stemming from their other business interests. (*Id.* at 15-16.)

**\*3** Next, none of the entities or individuals identified in Greenstone's protest, nor their alleged connections to Mr. Berg, Mr. DuBois, and/or Appellant, establish control over Appellant or *vice versa*, or that Mr. Berg has control over Appellant or any of the alleged entities. (*Id.* at 6-18.) In so arguing, Appellant emphasized that the Bergs no longer hold any ownership or managerial interest in Appellant. Although Mr. Berg works as a consultant for Appellant, his role, according to a Strategic Consulting Agreement (SCA) between Appellant and FedServe, is "'limited to marketing, business development, proposal review, and estimating **services** for prospective contracts or subcontracts'D', and thus gives him no control or power to control Appellant. (*Id.* at 7-8, citing Protest Response Exh. 13.) Mr. Berg is no longer Ostrom Painting's registered agent. (*Id.* at 14.) Mr. DuBois also stopped serving as OK2's Controller in March 2022, and this role, in any event, does not give Mr. DuBois any power to control OK2. (*Id.* at 16.) Furthermore, the mere fact that Appellant leases, or previously has leased, office space from Marlin Creek and/or KRB Holdings does not establish that Appellant is affiliated with either of those entities. (*Id.* at 8-13, citing *Size Appeal of A & H Contractors, Inc.*, SBA No. SIZ-5459 (2013).)

**\*4** With regard to Greenstone's allegations of affiliation through joint ventures, Appellant argued that its "historic joint venture" with QCI "does not give rise to affiliation". (*Id.* at 11, citing *Size Appeals of Safety & Ecology Corp.*, SBA No. SIZ-5177 (2010).) In fact, this joint venture was dissolved in March 2020 without submitting an offer for a federal contract. (*Id.*) The joint venture between MDM and Appellant likewise was dissolved in 2016 without receiving a contract award. (*Id.* at 17.) Appellant's three joint ventures with Razor Consulting were "established pursuant to an approved SBA Mentor/Protégé relationship between Razor Consulting and [Appellant]", and thus cannot give rise to affiliation. (*Id.* at 12, 19-20, citing 13 C.F.R. §§ 121.103(b)(6) and (h)(1)(ii), 124.520(b) and (d)(4) (2020); *Size Appeal of Prof'l Performance Dev. Group, Inc.*, SBA No. SIZ-5398 (2012); *Size Appeal of Am. Sec. Programs*, SBA No. SIZ-4797 (2006).) Greenstone's claim that Appellant formed a mentor-protégé relationship with GSL is false, as Appellant and GSL have no such relationship. (*Id.* at 16.)

**\*4** Appellant stated that Fed Pro is not owned directly by Mr. Berg but rather is a joint venture between FedServe and Appellant. (*Id.* at 15.) Fed Pro is "not currently active" and has generated no revenues since its inception. (*Id.*)

**\*4** Appellant added that CS DuBois was a corporation formerly owned by Mr. DuBois but "became inactive" in 2018, whereas Estoria was administratively dissolved in 2009. (*Id.* at 14.) While Mr. Berg and Appellant's "current officers and directors, Mr. DuBois and Ms. Grant, previously had shared business investments", they currently have "no common investments". (*Id.*) Past investments do not give rise to affiliation through identity of interest. (*Id.*, citing *Size Appeal of Chu & Gassman, Inc.*, SBA No. SIZ-5291, at 4-5 (2011).)

**\*4** Relying on OHA's precedent, Appellant maintained that "'the mere sharing of one or two employees does not create affiliation' and that where shared employees were indicative of affiliation, the common employees held important or key positions in both companies." (*Id.* at 18, quoting *Size Appeal of GPA Techs., Inc.*, SBA No. SIZ-5307, at 9 (2011).) Appellant asserted that Ms. Hazer worked for CS DuBois, MDM, and Appellant "at different times", but that she was not an officer or director at any of these entities. (*Id.* at 17-18.) Moreover, she is not currently employed by Appellant, and was not employed by Appellant as of the relevant date to determine size. (*Id.* at 18.) Similarly, Ms. Stavenes "'never" was an officer or director at Appellant, and was not employed by Appellant as of October 15, 2022. (*Id.* at 18.) The particular project on which Greenstone alleges Ms. Stavenes worked concurrently for Appellant and MDM happened in 2015. (*Id.*) Mr. Cruz apparently is no longer President or CEO of OAC Action, and Appellant and OAC Action "do not currently, and did not as October 15, 2022, have common ownership or management". (*Id.* at 19.)

**\*5** Lastly, Appellant stated that, because it is not affiliated with the concerns identified in the protest, Appellant "cannot verify the accuracy of [[alleged] annual revenues" for MDM, Razor, OK2, OAC Action, PMR **Services** , FedServe, Tunheim, and Ostrom Painting. (*Id.* at 20-22.) Appellant qualifies as small for the subject procurement, based on its own annual revenues for the five most recently completed fiscal years. (*Id.* at 23.)

**\*5** In its SBA Form 355 accompanying its protest response, Appellant disclosed that, in conjunction with the sale of Mrs. Berg's ownership interest in Appellant to the ESOP, Appellant issued a promissory note to Mrs. Berg in the "aggregated principal amount of approximately $[XXXX]." (SBA Form 355, Attach. at 8.) Furthermore, pursuant to a Strategic Consulting Agreement (SCA) between Appellant and FedServe, "[i]n July 2022, Mr. and Mrs. Berg agreed to provide indemnification for performance and payment bonds issued for [Appellant's] benefit in the amount of $[XXXX]." (*Id.* at 10.) Appellant acknowledged that "the Bergs' indemnity agreement enabled [Appellant] to obtain bonding and continue bidding on federal construction work". (*Id.*)

**\*5** Appellant provided the Area Office a copy of a Fed Pro "Teaming Agreement", signed by Mr. Berg on behalf of FedServe and Mr. DuBois on behalf of Appellant. (Protest Response, Exh. 46.) The Teaming Agreement stipulates that "[b]y entering into this Teaming Agreement, the Parties agree[] not to participate with any other party as a subcontractor, participate as part of a separate legal entity, or establish a separate team in response to an identified opportunity without the prior written consent of the other Party." (*Id.* at 1.) The Teaming Agreement indicates that "Fed Pro, LLC is controlled by Fed Serve, LLC." (*Id.* at 7.)

**\*5** On March 13, 2023, the Area Office directed Appellant to produce additional information by March 17, 2023, [3] including: a list of all properties Appellant has occupied or utilized since 2017, with copies of past and present lease agreements and "all records of payments made"; identify, describe, and provide "documented evidence" of the steps taken by Appellant to ensure that all leases were conducted through arm's-length transactions; a complete list of all joint ventures involving Appellant since 2017, and whether "any of the identified JVs made payments to any other firm in which Kyle Berg or Connie Berg are owners, officers, or directors"; a "detailed explanation of the duties, roles, and responsibilities" of the Bergs during their involvement with Appellant, and "a detailed accounting of all payments (in any form) made by [[Appellant]] to the Bergs in the three years prior to their resignations; a ""detailed description of what duties, roles, and

responsibilities [Mr.] Berg currently has as a consultant to Appellant, and whether Mr. Berg has "ever violated the terms of [his] consulting agreement"; "a complete list of all offices where [Appellant] shared an office with another firm", and whether any of 29 named individuals or entities had an equity interest in, or were officers or directors, of firms with which Appellant shared office space; whether Appellant has ever shared employees, equipment, or other resources with any other firm "identified in the protest or not"; whether "[Appellant], its owner, officers, or directors provided financial assistance to another firm" since 2017; whether "any of the individuals listed in the protest ever worked with or for" Appellant, either currently or in the past; and whether Ms. Grant, Ms. Stavenes, and/or several other named individuals ever worked for Razor or "any of the other firms listed in the protest". (E-mail from M. Fagley to C. DuBois (Mar. 13, 2023).) The Area Office warned that failure to produce the requested information, or submission of "incomplete information", could result in an adverse inference under 13 C.F.R. § 121.1008(d). (Id.)

*6 On March 20, 2023, Appellant responded to the Area Office's requests. Appellant emphasized that its "responses address the questions posed as of October 15, 2022", the date Appellant self-certified as valid for the subject procurement, and were based upon information "currently available to Mr. DuBois during his tenure as President". (Letter from C. DuBois to M. Fagley (Mar. 20, 2023), at 1.)

*6 At the outset, Appellant expressed "serious concerns" about the scope of the questions posed by the Area Office. (Id. at 2.) The Area Office's requests were "so overly broad and vague that they fail to provide sufficient notice of actual grounds challenging [Appellant's] size status as of October 15, 2022 and factual allegations to support this challenge ...". (Id.) Due process and notice requirements therefore have not been met. (Id., citing Size Appeal of Alutiiq Int'l Solutions, LLC, SBA No. SIZ-5069 (2009) and Size Appeal of Magnum Opus Techs., Inc., SBA No. SIZ-5372 (2012).)

*6 Appellant argued that its protest response included "detailed records demonstrating a change in control" in August 2020 through the ESOP transaction. (Id.) The Area Office, nevertheless, made numerous requests for information pre-dating Mrs. Berg's departure, "including one request about a change in NAICS code dating back to 2008, or [] asking for information that is only available to [Appellant's] prior owner", without explaining "why those requests are relevant or how such historical information would bear on [[Appellant's] size status as of October 15, 2022." (Id.) Such requests are contrary to OHA precedent that "'historic ties between a challenged concern and an alleged affiliate do not establish current affiliation when the historic ties no longer exist as of the date to determine size.'" (Id. at 2-3, quoting Size Appeal of Atlantic Diving Supply, Inc., SBA No. SIZ-6005, at 14 (2019).)

*6 Appellant posited that many of the Area Office's requests "could not reasonably be needed" to determine Appellant's size as of October 15, 2022, but instead "likely relate to an investigation being conducted by the U.S. Department of Justice (DOJ)". (Id. at 3.) The Area Office, for example, posed "a series of mentor-protégé related questions" that the Area Office would have "no jurisdiction to resolve", which "strongly suggests" that the Area Office is "'improperly using this size protest proceeding, at least in part, as a vehicle to obtain evidence for a criminal prosecution" in an effort to assist DOJ. (Id.)

*7 Appellant further argued that the Area Office could not properly draw an adverse inference, because doing so would fail at least two elements of the three-part adverse inference test. (Id. at 3-4.) Requests for information dating back to 2017 on the Bergs and their alleged connections to other firms have no relevance to Appellant's size as of October 15, 2022. (Id. at 4.) Likewise, questions pertaining to prior joint ventures "fail to relate to specific facts or allegations challenging [Appellant's] size status". (Id.) Furthermore, much of the requested information is "held by third parties" or not within Appellant's "possession, custody, or control", so Appellant cannot reasonably be expected to produce such information, "particularly within the short time frame provided." (Id., citing Size Appeal of Action Servs. Group, Inc., SBA No. SIZ-5208 (2011).)

*7 Appellant proceeded to respond to questions it considered "relevant" to the Area Office's size determination. (Id.) Appellant acknowledged that it had entered into a teaming agreement with OK2 in 2021, while Mr. DuBois served as OK2's Controller but with no ability to control OK2. (Id. at 5.) Mr. DuBois stopped serving as OK2's Controller in March 2022, and Appellant "never" performed any work under the teaming agreement with OK2. (Id.)

*7 Appellant provided: (1) a list of eight properties Appellant leased as October 15, 2022, with dates of occupation (between 2017 to present) and lessors; (2) signed copies of each lease "in effect ... as of October 15, 2022"; (3) accounting records reflecting lease payments from August 31, 2020 (ESOP transaction) through the end of 2022; and (4) the ESOP Purchase Agreement. (Id. at 6-7.) Appellant declined to produce "historic" information predating October 15, 2022 and pertaining to Appellant's former's owners, officers, or directors, asserting that such requests are "overly burdensome" and "irrelevant", and seek information that is beyond Appellant's possession, custody, or control. (Id.)

*7 Appellant acknowledged three joint ventures with Razor (PMR Services) as of October 15, 2022, and provided a list of federal contracts awarded to the joint ventures, but denied having any ownership interest in or sharing any current or former personnel with Razor. (Id. at 7-9.) Appellant declined to provide information pertaining to "'all' other historic joint ventures" as "overly burdensome and irrelevant". (Id. at 8-11.) Appellant also declined to identify whether the joint ventures have any agreements with other firms in which the Bergs are owners, officers, or directors as "improperly" seeking information that is not in Appellant's "current possession, custody, or control". (Id. at 12.) Appellant also asserted that the Area Office "lacks subject matter jurisdiction" to review Appellant's compliance with 8(a) mentor-protégé regulations because jurisdiction over such matters falls on the Director of SBA's Office of Business Development. (Id. at 9-11, citing Size Appeal of Alutiiq Diversified Servs., LLC, SBA No. SIZ-5318 (2012).) With regard to the Area Office's request for information pertaining to joint venture payments made to FedServe and/or Mr. Berg, Appellant stated that it is not aware of any payments made by the PMR Services joint ventures to FedServe and/or Mr. Berg. (Id. at 11.) Appellant maintained, however, that such request is seeking information that is not in Appellant's "current possession, custody, or control" and is irrelevant to the size determination. (Id. at 11-12.)

*8 Appellant declined to produce additional information regarding Mrs. Berg's relationship with Appellant prior to her resignation in August 2020; a detailed accounting of all payments made by Appellant to the Bergs during the years before their departures; and Mr. Berg's prior involvement with Appellant, including employment dates and a detailed description of duties, roles, and responsibilities. (Id. at 13-14.) Appellant reiterated that the Bergs resigned from their officer positions in August 2020, following the ESOP transaction. (Id.) The Area Office

is thus seeking "historic information or documents" pending Appellant's motion, which is not relevant to Appellant's size as of October 15, 2022, nor is the information in Appellant's "current possession, custody or control". (*Id.*)

*8 With regard to the Area Office's questions about Mr. Berg's consulting arrangement with Appellant, Appellant stated that Mr. Berg was brought on as a consultant under a consulting agreement and with limited responsibilities. (*Id.* at 15-16.) Furthermore, Mr. Berg was not eligible for performance-based bonuses as of October 15, 2022. (*Id.* at 16.) Appellant stated that the terms of the consulting agreement do not enable Mr. Berg to control Appellant; rather Appellant is controlled by its President, Mr. DuBois. (*Id.* at 15-16.) Appellant declined to respond to additional inquiries on the basis that they were vague, ""overly burdensome", and irrelevant. (*Id.*)

*8 After review of Appellant's protest response, the Area Office had requested a written description of how leased office space was "physically separated from the office space leased to MDM", as well as specific lease terms that "identify the different physical spaces occupied by [Appellant]". (*Id.* at 17.) Appellant emphasized, *inter alia*, that Appellant moved out of this particular office space in January 2020, well before the date for determining size. (*Id.*) As of October 15, 2022, Appellant did not share office space with any other firm. (*Id.* at 16.)

*8 The Area Office also had inquired about Appellant's payment of taxes on behalf of entities or individuals other than itself. (*Id.* at 17-18.) The Area Office specifically requested Appellant to identify the types of taxes owed by other entities or individuals; a detailed explanation for why Appellant assumed these tax responsibilities; any agreement(s) detailing the arrangements; documentation of all tax payments including dates and amounts; and documentation that leases for the properties in question were "fair and consistent with market value" as Appellant had asserted in its protest response. (*Id.*) Appellant partially responded to these inquiries, stating that as of October 15, 2022 it was responsible for paying real estate taxes on two properties owned by KRB and one owned by Marlin Creek, and providing records of tax payments for the three leased properties. (*Id.*) Appellant objected to providing information about leases that were not in effect on October 15, 2022 as "overly burdensome" and irrelevant. (*Id.*)

*9 Appellant stated that "it would not be feasible" to fully respond to the Area Office's inquiries regarding shared employees, equipment and/or resources with other firms because such requests were "vague, overly broad, and ambiguous". (*Id.* at 18.) Appellant asserted:

*9 [The Area Office's requests] appear[] to encompass any number of circumstances under which [Appellant] worked for or with another firm for the purposes of bidding for or performing work pursuant to actual or proposed teaming agreements, prime-sub relationships, or joint ventures—all of which are common in the construction industry.

*9 (*Id.* at 18-19, citing Federal Acquisition Regulation (FAR) subpart 9.6.) Appellant added that any shared employees, equipment, or resources prior to the date for determining size would be irrelevant. (*Id.* at 19.) Appellant, nevertheless, acknowledged that it provided labor to work on federal contracts performed by the PMR Services joint ventures, and also "shared equipment and resources with Razor in the course of performing subcontract work for Razor or contracts awarded to the PMR joint ventures". (*Id.* at 19-20.) Appellant maintained, though, that "the mere sharing of a few employees does not create affiliation". (*Id.*, citing *GPA Techs.*, SBA No. SIZ-5307, at 10.) Appellant also reiterated that the joint ventures were established pursuant to an SBA-approved mentor-protégé relationship between Razor and Appellant, and thus do not give rise to affiliation. (*Id.* at 20.) Likewise, Appellant partially responded to the Area Office's request to provide a list of "anyone other than" Appellant's own employees who utilized Appellant's e-mail addresses. (*Id.*) While acknowledging that Mr. Berg utilized Appellant's e-mail, Appellant declined to provide any other e-mail addresses used by individuals prior to the date for determining size as "overly burdensome" and irrelevant. (*Id.*)

*9 To the Area Office's inquiry as to whether Appellant, its owners, officers, or directors provided financial assistance to another firm since 2017, Appellant declined to respond to the extent that the request was seeking information about its "**former** owner, officers, or directors" as "overly burdensome" and irrelevant. (*Id.*, emphasis Appellant's.) Appellant also objected as "vague and ambiguous" to the Area Office's request to describe whether any individuals listed in the protest ever worked with or for Appellant. (*Id.* at 20-22.)

*9 Lastly, Appellant argued that the Area Office's inquiry regarding a change of primary NAICS code, which occurred in 2008, "demonstrates that the Area Office is improperly abusing this process for purposes unrelated to a size protest." (*Id.* at 22.)

C. Size Determination

*10 On April 6, 2023, the Area Office issued Size Determination No. 05-2023-009, concluding that Appellant is not a small business. The Area Office found that Appellant did not adequately respond to the Area Office's requests for additional information posed on March 13, 2023, and therefore drew an adverse inference that the missing information would have shown that Appellant is not small. (Size Determination at 12-13.)

*10 Based on the information provided by Appellant in response to the protest, the Area Office determined that Appellant is a corporation founded by the Bergs in North Dakota in June 2001. (*Id.* at 5.) At the time of its founding, Mrs. Berg, President and Treasurer of Appellant, owned 51% of Appellant, and Mr. Berg, Vice President and Secretary, owned the remaining 49%. (*Id.*) Mrs. Berg became the sole owner of Appellant in 2007, and in 2020, sold her entire ownership interest to an ESOP. (*Id.*) Currently, Appellant's employees own 100% of its stock via the ESOP, which is managed and administered by a trustee, Ms. Kayla Adams of Alturas Fiduciary Services. (*Id.*) The Bergs do not currently hold any ownership interest in Appellant. (*Id.* at 5-6.)

*10 Using federal tax returns for the most recently completed five fiscal years prior to October 15, 2022, the date for determining size, the Area Office performed an annual receipts calculation. (*Id.* at 6.) The Area Office found that Appellant's own receipts do not exceed the size standard; however, the Area Office must consider the size of Appellant's affiliates. (*Id.*)

*10 Because the protest and Appellant's response indicated "ongoing relationship[[s]" between Appellant and several other entities and/or individuals, the Area Office on March 13, 2023 instructed that Appellant produce "additional information based on previous responses and

publicly available allegations against [Appellant]". (*Id.*) Although Appellant submitted a timely response, the response was incomplete because "[Appellant] declined to provide information on several inquiries". (*Id.* at 8.)

*10 The Area Office addressed several contentions raised by Appellant in its March 20, 2023 response. (*Id.* at 8.) The Area Office, first, denied using the instant proceeding to assist DOJ. (*Id.*) The Area Office explained that SBA regulations permit an area office to consider "information not raised in the protest to make its determination", and stated that the investigation of Appellant and Mr. Berg is "public knowledge". (*Id.* at 8-9, citing 13 C.F.R. § 121.1009(b).) The Area Office added:

*11 As noted in [a] public news article, "Court papers state over 4 million records were seized in the raid, and say more than 30 people and a dozen businesses are involved in the scheme." If there are questions and concerns about the breadth and depth of [the Area Office's] request it is because there are many more connections between [Appellant], related individuals, and other related businesses, than one would normally encounter. The same allegations are present in the protest.

*11 (*Id.* at 9.) Given these circumstances, the Area Office's "requests were reasonable and related to the issue of analyzing possible affiliation". (*Id.*)

*11 Next, the Area Office addressed Appellant's contention that the Area Office should have limited its requests only "to information on relationships as of October 2022 [the date for determining size] and/or August 2020 [the date Appellant transitioned to an ESOP]". (*Id.*) The Area Office acknowledged that it "would not normally look at previous relationships when there is a complete change in ownership", but in this case "there is clear evidence that there are relationships that existed prior to 2020, that continued after the change in ownership". (*Id.*) Appellant "has not severed all relationships with its previous owners and officers", particularly Mr. Berg who continues to work as a consultant for Appellant. (*Id.*) "Understanding these relationships and how they actually work is essential for the [Area Office] to determine if [[Appellant] is affiliated with other companies, especially other companies that are involved or related to [Mr. and Mrs.] Berg." (*Id.*) In addition, "there is evidence of leases and shared office space with firms related to [Mr.] Berg", which "existed prior to 2020, and have continued." (*Id.*) The requested information was needed to further examine "the nature of all these interconnected entities and individuals", which the Area Office was unable to explore due to Appellant's refusal to fully respond to the inquiries. (*Id.*)

*11 The Area Office defended its requests for information dating back to 2017, stating that: (1) the year 2017 is within the relevant five-year period of measurement; and (2) "the evidence indicates that relationships existed between the various parties both before and after the August 2020 creation of the ESOP ownership structure." (*Id.* at 10.)

*12 The Area Office addressed its requests pertaining to past and present lease arrangements, as well as information pertaining to whether "any current or former owners, officers, or directors" of Appellant have an interest in the lessors. (*Id.*) Appellant declined to respond on the basis that information related to former owners, officers, or directors is not in its possession, custody, or control, and would be overly burdensome and irrelevant. (*Id.*) Mr. Berg, nevertheless, still works as a consultant for Appellant. (*Id.*) The Area Office further stated:

> *12 While a one-off lease with a related company may not be an issue, a pattern of using lease agreements with intertwined and related entities can be used along with other evidence to establish that affiliation between the parties does exist. In this case there is evidence of other relationships between the parties related to the leases. For example, it is not customary for firms to pay taxes for unrelated companies, or have their own taxes paid by other companies or individuals, as is the case with [Appellant] and firms and individuals involved with it, and its consultant, [Mr.] Berg.

*12 (*Id.*) Moreover, an area office "considers factors such as ownership, management, **previous relationships** with or ties to another concern, and contractual relationships, in determining whether affiliation exists." (*Id.*, quoting 13 C.F.R. § 121.103(a)(2) (emphasis added by the Area Office).)

*12 With regard to the instruction to produce "evidence that these leases with related firms are arm's-length transactions", Appellant offered a copy of its ESOP agreement, and maintained that "the Seller [*i.e.*, Mrs. Berg] was required to provide support for such representation and warranty in a form and substance satisfactory to the ESOP Trustee". (*Id.* at 11.) The Area Office, however, was not provided the information that was made available to the Trustee. Appellant's conclusory response alone is "not evidence that these are arm's-length transactions". (*Id.*)

*12 Greenstone's protest had alleged that Appellant "routinely shared employees with other related firms". (*Id.*) The Area Office's request for information pertaining to current and past practices of sharing employees was reasonable in order to examine "the formality of those relationships" alleged in the protest—whether "these relationships are common, and if they have been going on for some time to determine if there is a pattern and practice that might be more indicative of affiliated companies". (*Id.*)

*13 The protest also alleged that Appellant has been involved in "numerous joint ventures" with other firms, and that the other joint venturers appear to be related to current or former owners and officers of Appellant. (*Id.*) In disagreeing with Appellant's position that "all information from joint ventures should be off limits" due to the exception to affiliation for mentor-protégé joint ventures, the Area Office asserted that the protest and Appellant's protest response "demonstrated that there are relationships and connections between [Appellant] and some of the identified and related companies that go beyond the 'solely' language identified in [SBA] regulation." (*Id.* at 11-12, citing 13 C.F.R. § 121.103(b)(6).)

*13 Having determined that Appellant did not submit all necessary information, the Area Office drew an adverse inference that the missing information would have shown that Appellant is not small. (*Id.* at 12.) OHA has utilized a three-factor test to determine whether an adverse inference is appropriate: (1) the information sought by the Area Office is relevant to an issue in the size determination, (2) there is a level of

connection between the entity being protested and the entity the Area Office is seeking information from, and (3) the Area Office's request for information was specific. (*Id.*, citing *Size Appeal of Clarity Commc'ns Group, LLC*, SBA No. SIZ-6011, at 11 (2019).)

*13 In the instant case, all three elements of the adverse inference test are met:

*13 First, the [Area Office] clearly explained in its [March 13, 2023 e-mail] why it was requesting this information, and why it believed it was relevant to the size determination. Given the various and numerous formal and possible informal relationships of the various parties, general principles of affiliation were raised (§ 121.103(a)), as well as more specific issues such as common management (§ 121.103(e)), identity of interest (§ 121.103(f)), newly organized concern (§ 121.103(g)), and numerous joint venture issues.

*13 Secondly, [Appellant's] initial response to the protest, and publicly available information, clearly identified that there were both formal and possible informal relationships with many, if not all, of the identified individuals and firms for which the [Area Office] asked additional questions. There was evidence of past and ongoing business relationships with these firms and individuals, office and employee sharing, paying each other's tax debts, and numerous other clear and identified connections that have existed throughout the time period of the [Area Office's] request. The [Area Office] does not believe that [Appellant's] change of ownership should render these inquiries improper when there is evidence to support those relationships that existed prior to that transaction, continued to exist after the transaction. The evidence does not support the conclusion that the change in ownership created the clear separation of relationships and interests that [Appellant] asserts.

*14 Finally, the [Area Office] believes that its request was specific. While there were a significant number of questions, and a request for a significant amount of information, it was not due to the questions being vague. As mentioned before, the volume of the request may be due more to the large number of firms and individuals related to [Appellant].

*14 (*Id.* at 13.) The Area Office concluded that Appellant is not a small business, due to Appellant's failure to fully produce the requested documentation or information of Appellant and other entities and/or individuals necessary for the Area Office to determine affiliation and size. (*Id.*)

### D. Appeal

*14 On April 21, 2023, Appellant appealed Size Determination No. 05-2023-009 to OHA. Appellant contends that the size determination is "clearly erroneous on the law and the facts". (Appeal at 1.)

*14 Appellant argues, first, that the Area Office denied Appellant adequate due process. (*Id.* at 5.) While the Area Office "repeatedly references 'evidence' of business ties between [Appellant] and other entities", it failed to make factual findings based on "this supposedly 'clear evidence'D', nor did the Area Office disclose such evidence to Appellant before concluding that Appellant was other than small. (*Id.*)

*14 Appellant argues that the Area Office's March 13, 2023 requests for additional information were "overly broad" and "vague". (*Id.*) The Area Office "never once said that [it] was relying on 'clear evidence' it had gathered from public reports of an investigation" against Appellant. (*Id.* at 5-6.) Moreover, the Area Office "never followed-up with [Appellant] to clarify the requests or otherwise advise [Appellant] that its responses were deficient". (*Id.* at 6.)

*14 Appellant further asserts that it was not given "adequate notice of the relevant time frame under consideration" when the Area Office requested information "dating back to [Appellant]'s founding in 2001" and information regarding Mr. Berg's "employment history". (*Id.*) Such information is irrelevant and has no bearing on Appellant's size as of October 15, 2022. (*Id.*)

*14 The Area Office "never acknowledges that [Appellant] demonstrated it has no current relationship with many of the alleged 'connections'D'. (*Id.*) According to Appellant, some of the Area Office's requests related to 8(a) program eligibility, which are not appropriately before the Area Office. (*Id.* at 7.) Furthermore, the Area Office's request for copies of Appellant's subcontracts and joint venture agreements was not based on protest allegations, but rather "on allegedly 'clear evidence' [the Area Office] obtained from news reports about 'connections between [Appellant], related individuals and other related businesses'D'. (*Id.*) The Area Office "failed to adequately provide [Appellant] notice of [its] concerns in these areas". (*Id.*) Appellant was "never advised" that it did not satisfy the Area Office's concerns relating to leasing companies. (*Id.* at 8.) The Area Office likewise failed to provide Appellant with a meaningful opportunity to respond to "the alleged evidence" or its specific concerns. (*Id.*) For instance, the Area Office "never requested" tax returns for the leasing entities, which the Area Office "concluded" were affiliated with Appellant. (*Id.*)

*15 Next, Appellant argues that the Area Office failed to advise Appellant on what basis it found affiliation with the alleged affiliates, and in relying on business ties between these entities as indicative of affiliation without making factual findings establishing control. (*Id.*) The Area Office failed to identify individuals or businesses that control and are affiliated with Appellant. (*Id.* at 9.) Appellant "established that many of these entities or individuals were not relevant because the connection was no longer in existence as of the date for determining size". (*Id.*) The Area Office erred by failing to "indicate whether these historic connections were included in its affiliation analysis" or to "identify on what basis [it] concluded [Appellant] was affiliated". (*Id.*) The Area Office also failed to make "any factual findings regarding control". (*Id.*) While the Area Office "repeatedly" alluded to "'evidence' for business relationships between [Appellant] and the alleged affiliates", it "**never disclosed the evidence against [Appellant], and to this day, [Appellant] does not know the factual basis for the Size Determination.**" (*Id.*, emphasis Appellant's.) Even if a proper affiliation analysis had been performed, the record does not support the conclusion that Appellant is affiliated with any of the entities identified in the protest. (*Id.* at 10.) Specifically, Mr. DuBois alone has control over Appellant; the Area Office made "no finding regarding control of the alleged affiliated entities or individuals"; and "the Area Office did not conduct a "detailed assessment of whether [Mr.] Berg had control or the power to control the alleged affiliates or [Appellant]". (*Id.*) The Area Office "appears to have been influenced by the number of business ties that [Mr.] Berg has, without appreciating that such connections are common in the construction industry or that the sheer number of connections is not an adequate substitute for a reasoned analysis of affiliation". (*Id.* at 10-11.)

*15* Appellant avers that the adverse inference lacked factual and legal support. (Id. at 11.) First, the Area Office improperly applied an adverse inference where Appellant provided appropriate responses to the Area Office's relevant inquiries. (Id. at 11-17.) Specifically, Appellant submitted over 60 exhibits containing "detailed, sworn, and specific written responses". (Id. at 11.) Contrary to the Area Office's analysis, Appellant "identified the companies from which it was leasing space as of October 15, 2022 and produced copies of those leases"; disclosed that Mr. Berg had ownership interest in those leasing companies; provided an accounting of lease payments made since August 2020; and described the steps Appellant had taken to ensure that those leases were arm's-length transactions. (Id. at 11-12.)

*16* Although Appellant objected to the vagueness of the questions about sharing employees with certain alleged affiliates or employees working for Razor, it nevertheless answered those inquiries and acknowledged that some personnel "had worked **with** Razor as [Appellant's] employees, and that [[Appellant] is aware of one shared employee with Razor in a construction position (without the ability to control either entity)". (Id. at 13, emphasis Appellant's.) "The Area Office **never** clarified its use of vague terms and **never** asked [Appellant] to clarify its response". (Id., emphasis Appellant's.)

*16* With regard to shared office space, Appellant maintains that, as of October 15, 2022, Appellant was "not sharing office space with any of the alleged affiliates (except in the context of the mentor-protégé joint ventures with Razor)." (Id. at 14.) Turning to the questions regarding joint ventures, despite Appellant's objections, Appellant nonetheless produced "substantial data on its joint venture relationships", including copies of joint venture agreements. (Id.) Appellant also urged the Area Office to seek accounting records pertaining to the mentor-protégé joint ventures from Razor because Razor is responsible for maintaining such records. (Id. at 15.)

*16* While the Area Office claims that Appellant "declined to produce information about other relationships with the alleged affiliates", Appellant actually provided "substantial information and documents about leasing arrangements, employees, and joint ventures, as well as its subcontracting relationships with alleged affiliates", particularly information about Razor, OK2, other "defunct entities", and Mr. Berg. (Id. at 15-16.)

*16* Appellant contends that the adverse inference is erroneous as a matter of law because the information requested was "not relevant, lacked the requisite level of connection, or was non-specific". (Id. at 17.) The Area Office incorrectly relied on Appellant's "historic ties" with other entities without properly establishing affiliation. (Id. at 17-18.) The Area Office also erred in ""applying an adverse inference based on historic shared office arrangements". (Id. at 18.)

*16* Lastly, Appellant maintains that the Area Office clearly erred as a matter of law when it exceeded its jurisdiction and deemed the mentor-protégé relationship between Appellant and Razor to be indicative of affiliation. (Id. at 19-20.)

### E. Greenstone's Response

*16* On May 10, 2023, Greenstone responded to the appeal. Greenstone contends Appellant has not shown clear error in the size determination. The appeal therefore should be denied.

*17* Greenstone, first, disputes Appellant's claim that the Area Office found that Appellant currently is controlled solely by Mr. DuBois. (Response at 2.) While the Area Office acknowledged that Mr. DuBois is now Appellant's President, the Area Office did not foreclose the possibility that other entities or individuals also might exercise control over Appellant, notwithstanding Mr. DuBois' authority. (Id.)

*17* Greenstone highlights that, according to documentation provided by Appellant itself in response to the protest, and as of October 15, 2022, Appellant owed very substantial debt to Mrs. Berg, in the amount of approximately $[XXXX], stemming from the sale of Mrs. Berg's ownership interest in Appellant to the ESOP. (Id. at 10.) The Bergs had the power to revoke their personal guarantees supporting the bonding Appellant required to bid on and complete its government contracts, including the procurement at issue here. (Id. at 4-5, 13, citing Appellant's Protest Response Exh. 13.) Furthermore, according to the Fed Pro ""Teaming Agreement", Appellant required advance written permission from FedServe — an entity owned and controlled by Mr. Berg — to bid on government contracts. (Id. at 5-6, citing Appellant's Protest Response Exh. 46.) Appellant also leased office space from companies owned by the Bergs, and Mr. Berg, via Fed Serve, acted as a "consultant" to Appellant. (Id. at 4.) These circumstances gave the Area Office ample cause for concern that Appellant remained controlled by, and/or dependent upon, the Bergs. As a result, "the Area Office questions about the Bergs and Fed Serve were clearly relevant, connected with [Appellant] and specific." (Id.)

*17* Greenstone maintains that the Area Office correctly concluded that Appellant did not adequately respond to the Area Office's requests for additional information. Appellant, for example, "ignored completely the Area Office request for an explanation of why [Mr.] Berg was made a consultant", or the duties he actually performs, and instead merely "regurgitated the text of the [[Strategic Consulting Agreement (SCA)] itself". (Id. at 7.) Although the SCA stipulates that "[a]ny effort by Fed Serve to control or bind [Appellant] shall be a material breach of the Agreement", Appellant declined to reveal whether any such efforts actually had transpired. (Id. at 8-9.) Furthermore, Appellant did not provide the Area Office a copy of the promissory note owed to Mrs. Berg. "[Appellant's] failure to provide the note meant that the Area Office could not review its terms for covenants that [Appellant] may have agreed to that would directly limit its ability to take on debt, encumber assets or issue new stock — all typical day to day decisions for a construction contractor." (Id. at 10.)

*18* Greenstone reiterates that "[Appellant's] identity of interest with the Bergs, its dependence on the Bergs for bonding, and its relationship with Fed Serve and [Mr.] Berg all raised various affiliation issues. The Area Office asked [Appellant] relevant, specific question[s], and [Appellant] chose to evade them, or provide incomplete or misleading answers. [Appellant's] pattern of obfuscation clearly warranted an adverse inference." (Id. at 11.) Additionally, insofar as Appellant is controlled by, and affiliated with, the Bergs and/or FedServe, Appellant also would be affiliated with other concerns they control. The Area Office's inquiries as to other related persons and entities were thus relevant and appropriate. "Because [Appellant's] refusals related to multiple entitles and persons, and frustrated the ability of the Area Office to complete a proper size determination, [Appellant's] sweeping refusal to provide candid, complete answers to clearly relevant questions justified an adverse inference." (Id. at 13.)

*18 Lastly, Greenstone argues that Appellant's claim that it was denied due process is meritless. Appellant had access to, and was aware of, publicly available evidence, such as the media report discussed in the size determination. (*Id.* at 13.) Moreover, the Area Office did not rely upon facts or relationships not already included in the protest or Appellant's own protest response. (*Id.* at 14.) Nor did the Area Office alter the focus of its review, as Appellant's relationships with the Bergs and their associated companies were at the crux of Greenstone's protest. (*Id.* at 14-15.)

III. <u>Discussion</u>

A. <u>Standard of Review</u>

*18 Appellant has the burden of proving, by a preponderance of the evidence, all elements of the appeal. Specifically, Appellant must prove the size determination is based upon a clear error of fact or law. 13 C.F.R. § 134.314. OHA will disturb an area office's size determination only if, after reviewing the record, the administrative judge has a definite and firm conviction that the area office erred in making its key finding of fact or law. *Size Appeal of Taylor Consultants, Inc.*, SBA No. SIZ-4775, at 11 (2006).

B. <u>Analysis</u>

*18 Appellant has not demonstrated that the Area Office clearly erred in drawing an adverse inference against Appellant. As a result, this appeal must be denied.

*18 When a concern's small business status is protested, "[t]he concern whose size is under consideration has the burden of establishing its small business size." 13 C.F.R. § 121.1009(c). Furthermore:

> *18 If a concern whose size status is at issue fails to submit a completed SBA Form 355, responses to the allegations of the protest, or other requested information within the time allowed by SBA, or if it submits incomplete information, SBA may presume that disclosure of the information required by the form or other missing information would demonstrate that the concern is other than a small business. A concern whose size status is at issue must furnish information about its alleged affiliates to SBA, despite any third party claims of privacy or confidentiality, because SBA will not disclose information obtained in the course of a size determination except as permitted by Federal law.

*19 *Id.* § 121.1008(d); *see also* § 121.1009(d). OHA has developed a three-factor test to determine whether an adverse inference is appropriate: (1) the information sought by the area office is relevant to an issue in the size determination; (2) there is a level of connection between the entity being protested and the entity the area office is seeking information from; and (3) the area office's request for information was specific. *Size Appeal of D & B Homecare, Inc.*, SBA No. SIZ-5096, at 2 (2009). "If all of these criteria are met, the challenged business must submit the information to the area office or suffer an adverse inference that the information would show that the challenged business was other than small." *Id.* (quoting *Size Appeal of Firewatch Contracting of Florida, LLC*, SBA No. SIZ-4994, at 6 (2008)).

*19 Here, upon reviewing Greenstone's protest and Appellant's response thereto with the accompanying exhibits, the Area Office could properly seek additional information as to Appellant's continuing relationships with its former owners, the Bergs. In response to the protest, Appellant disclosed that, as of October 15, 2022, the date for determining size, Appellant still owed [XXXX] debt to Mrs. Berg, stemming from the sale of her ownership interest in Appellant to the ESOP. Section II.B, *supra*. The Bergs also had the power to revoke their personal guarantees supporting Appellant's bonding, which Appellant acknowledged to be crucial for Appellant to "continue bidding on federal construction work". *Id.* Appellant provided the Area Office a copy of a ""Teaming Agreement" between itself and FedServe — an entity owned and controlled by Mr. Berg — barring either firm from "participat[ing] with any other party as a subcontractor, participat[ing] as part of a separate legal entity, or establish[ing] a separate team in response to an identified opportunity without the prior written consent of the other Party." *Id.* Under this agreement, then, FedServe, and thus ultimately Mr. Berg, apparently could exert negative control over Appellant by refusing to provide the advance written consent necessary for Appellant to conduct business. Appellant additionally noted the Area Office that it leases, and previously has leased, office space from companies owned by the Bergs, and that Mr. Berg, while no longer an officer of Appellant, continues to act as a "consultant" to Appellant. *Id.* Given these circumstances, all of which apparently remained in effect as of October 15, 2022, the Area Office could appropriately seek additional information to ascertain whether Appellant is controlled by or dependent upon, and thus affiliated with, the Bergs, FedServe, or other entities the Bergs may own or control.

*20 Although Appellant produced some documentation and responses to the Area Office's inquiries, Appellant declined to provide more comprehensive information on the grounds that the Area Office's requests were overly burdensome and irrelevant. Section II.B, *supra*. Appellant highlighted in particular that, since August 2020, the Bergs no longer have held any formal ownership interest or officer positions in Appellant, and that the terms of Appellant's Strategic Consulting Agreement with FedServe do not enable Mr. Berg to control Appellant. *Id.* As the Area Office recognized, however, the issues referenced by Appellant are not the only possible mechanisms by which the Bergs might exert control over Appellant. Indeed, as discussed above, the Area Office was confronted with substantial evidence, much of which was produced by Appellant itself, that Appellant might, for example, be dependent upon the Bergs for bonding, or might be subject to negative control through Appellant's contractual relationship with FedServe. Furthermore, while it is true that Appellant's past connections with the Bergs and their associated companies might have been irrelevant if Appellant had severed its relationships with the Bergs prior to the date for determining size, such was plainly not the case here, as Appellant still had many active ties with the Bergs as of October 15, 2022. The Area Office could appropriately conclude, therefore, that Appellant's responses were insufficient to fully examine the scope of Appellant's relationships the Bergs, FedServe, and other associated entities, thereby justifying an adverse inference. It is well-settled that "when a challenged firm fails to produce enough information to properly assess whether there are grounds for affiliation, an adverse inference may appropriately be applied." *Size Appeal of Step Constr., Inc.*, SBA No. SIZ-5483, at 6 (2013); *see also Size Appeal of Juliet Constr., LLC*, SBA

No. SIZ-5974 (2018); *Size Appeal of OxyHeal Med. Sys., Inc.*, SBA No. SIZ-5737 (2016); *Size Appeal of Erickson Helicopters, Inc.*, SBA No. SIZ-5704 (2016).

**\*20** On appeal, Appellant complains that the Area Office made findings of affiliation without advising Appellant of the basis for such findings, and without making factual findings on the question of control. Section II.D, *supra*. These arguments reflect a misinterpretation of the size determination. The Area Office explained that its requests for additional information were necessary to examine potential affiliation, and that the Area Office was unable to complete this analysis, *i.e.*, to comprehensively ascertain the nature of the relationships between Appellant, the Bergs, and other identified entities and individuals, due to Appellant's refusal to fully comply with several of its inquiries. Section II.C, *supra*. The Area Office thus found Appellant not small as a result of an adverse inference—that the missing information would have shown that Appellant is not small. *Id.*

**\*21** In sum, Appellant has not demonstrated that the Area Office erred in drawing an adverse inference. Applying OHA's three-factor test, the additional information sought by the Area Office was relevant to the question of Appellant's size, because the Area Office requested information pertaining to Appellant's relationships with the Bergs, FedServe, and other alleged and potential affiliates, that apparently had active ties with Appellant as of October 15, 2022. Sections II.B and II.C, *supra*. Second, the requested information was largely Appellant's own or within Appellant's control or possession. *Id.* Lastly, although the Area Office's requests were voluminous, the Area Office clearly communicated to Appellant what information was being requested, explaining how the requests pertained to the protest allegations and/or Appellant's protest response, and warning that failure to fully respond could result in an adverse inference. *Id.* Under these circumstances, I see no basis to disturb the adverse inference.

**\*21** Appellant also argues that the Area Office denied Appellant proper due process, because although OHA has long held that SBA area offices are empowered to explore new issues beyond those set forth in a size protest, due process requires that the challenged concern be given notice of new issues and an opportunity to respond. Section II.D, *supra*. These arguments fail because the Area Office's requests for additional information were grounded in Greenstone's initial protest — which alleged, *inter alia*, that Appellant remains controlled by the Bergs and their associated companies — and Appellant's own protest response. Section II.B, *supra*. The Area Office thus did not introduce new issues, or alter the focus of its review, in a manner that would have required additional notice to Appellant and an opportunity to respond. *Cf., Size Appeal of Alutiiq Int'l Solutions, LLC*, SBA No. SIZ-5069, at 3 (2009) ("an Area Office must provide notice to the protested concern of any change in focus and request a response."). Appellant's claim that the Area Office improperly attempted to assist a DOJ investigation is speculative and unsupported by the record. Furthermore, while Appellant complains that the Area Office did not advise Appellant that its responses were inadequate, SBA regulations do not require any such notification, and the Area Office did inform Appellant that the Area Office might draw an adverse inference based on any failure to completely respond to the Area Office's inquiries. Section II.B, *supra*. Accordingly, Appellant's due process arguments are unavailing.

### IV. <u>Conclusion</u>

**\*21** Appellant has not shown clear error of fact or law in the size determination. The appeal therefore is DENIED and the size determination is AFFIRMED. This is the final decision of the Small Business Administration. See 13 C.F.R. § 134.316(d).

**\*22** Kenneth M. Hyde
**\*22** Administrative Judge

### Footnotes

1    This decision was initially issued under a protective order. Pursuant to 13 C.F.R. § 134.205, OHA afforded counsel an opportunity to file a request for redactions if desired. OHA received one or more timely requests for redactions and considered any requests in redacting the decision. OHA now publishes a redacted version of the decision for public release.

2    SBA subsequently increased the size standard for NAICS code 236220 to $45 million. 87 Fed. Reg. 69,118, 69,121 (Nov. 17, 2022).

3    Appellant subsequently requested, and was granted, an extension of the deadline until March 20, 2023. (E-mail from M. Fagley to C. DuBois (Mar. 17, 2023).)

SBA No. SIZ-6228, 2023 (S.B.A.), 2023 WL 5322773

---

END OF DOCUMENT