# EXHIBIT 1

## <u>TABLE OF CONTENTS</u>

1. *Finstad v. Gord (In re Finstad), 2019 Bankr. LEXIS 4017 (Bankr. D.N.D. Oct. 21, 2019)*

2. *Hans v. Tharaldson, No. 3:05-cv-115, 2011 U.S. Dist. LEXIS 153504 (D.N.D. Oct. 31, 2011)*

3. *Jiangbo Zhou v. Lincoln Elec. Co., 2020 U.S. Dist. LEXIS 85796 (S.D. Oh. May 15, 2020)*

4. *Metro D.C. Paving, Highway & Constr. Materials Council v. Roubin & Janeiro, Inc., 1981 U.S. Dist. LEXIS 10118 (D.D.C. 1981)*

5. *In re Optical Disk Drive Antitrust Litig., 2011 U.S. Dist. LEXIS 101763 (N.D. Cal. 2011)*

6. *Pierce v. Fordham Univ., Inc., 2016 U.S. Dist. LEXIS 71322 (S.D.N.Y. June 1, 2016)*

7. *Redman v. Am. Airlines, Inc., 2023 U.S. Dist. LEXIS 129419 (W.D.N.C. 2023)*

8. *Wheland Foundry, LLC v. Metal Techs., Inc. (In re Wheland Foundry, LLC), 2008 Bankr. LEXIS 4638 (Bankr.* E.D. Tenn. July 29, 2008)

✚ Positive
As of: October 24, 2024 4:17 PM Z

# *Finstad v. Gord (In re Finstad)*

United States Bankruptcy Court for the District of North Dakota

October 21, 2019, Decided

Bankruptcy No. 05-31470, Chapter 12, Adversary No. 18-07060

**Reporter**

2019 Bankr. LEXIS 4017 *

In re: John N. Finstad and Lorie Finstad, Debtors. John N. Finstad and Lorie Finstad, Plaintiffs, v. James Gord and Wendy Gord, and James Gord and Wendy Gord as Assignees of Beresford Bancorporation, Inc., Defendants.

**Subsequent History:** Affirmed by *Finstad v. Gord (In re Finstad), 613 B.R. 180, 2020 Bankr. LEXIS 814 (B.A.P. 8th Cir., Mar. 27, 2020)*

**Counsel:** **[\*1]** For Beresford Bancorporation, Inc., Creditor (3:05bk31470): Jonathan R. Fay, O'Keefe, O'Brien, Lyson & Foss, Ltd., Fargo ND; Brad A. Sinclair, Kaler Doeling, PLLP, Fargo ND.

For CNH America LLC, Creditor (3:05bk31470): Michael M. Thomas, Conmy Feste Ltd., Fargo ND.

For Chrysler, Creditor (3:05bk31470): Robert B McMaster, Riezman Berger, P.C., St. Louis MO.

For DaimlerChrysler Services North America, LLC, Creditor (3:05bk31470): Joel M. Fremstad, Fremstad Law Firm, Fargo ND.

For Ford Motor Credit Company, Creditor (3:05bk31470): Jeremy D Holmes, Michael M. Thomas, Conmy Feste Ltd., Fargo ND.

For John N. Finstad, Debtor (3:05bk31470): Bruce A. Schoenwald, Stefanson Law, Moorhead MN; Lyle P. Thomason, Lead Attorney, Thomason Law Office, PC, Lisbon ND.

For Lorie Finstad, Joint Debtor (3:05bk31470): Bruce A. Schoenwald, Stefanson Law, Moorhead MN; Lyle P. Thomason, Lead Attorney, Thomason Law Office, PC, Lisbon ND.

For James Gord, Wendy Gord, Interested Party (3:05bk31470): Michael Gust, Anderson, Bottrell, Sanden & Thompson, Fargo ND.

For Southeast Water Users District, Interested Party (3:05bk31470): Lowell P. Bottrell, Anderson, Bottrell, Sanden & Thompson, Fargo ND.

Trustee (3:05bk31470): Dale **[\*2]** A. Wein, Bankruptcy Trustee, Aberdeen SD.

For John N. Finstad, Lorie Finstad, Plaintiffs (3:18ap7060): Bruce A. Schoenwald, Lead Attorney, Stefanson Law, Moorhead MN.

For James Gord, Wendy Gord, James Gord, As Assignees of Beresford Bancorporation, Inc., Wendy Gord, As Assignees of Beresford Bancorporation, Inc., Defendants (3:18ap7060): Michael Gust, Anderson, Bottrell, Sanden & Thompson, Fargo ND.

Samuel Weaver

**Judges:** SHON HASTINGS, UNITED STATES BANKRUPTCY JUDGE.

**Opinion by:** SHON HASTINGS

## Opinion

ORDER

## I. INTRODUCTION

Plaintiffs/Debtors John and Lorie Finstad filed a Complaint seeking a judgment declaring that they hold legal and equitable title to certain real property; an order compelling turnover of the real property from Defendants James and Wendy Gord; damages for an alleged violation of the automatic stay by Defendants; interest and other damages. Compl. (#18-7060).[1] The Finstads' causes of action include declaratory relief, trespass, constructive trust, turnover, intentional interference with contract, breach of settlement agreement and conversion. Id.

The Gords filed a Motion to Dismiss, asserting the Finstads failed to state a claim upon which relief can be granted. Doc. 6 (#18-7060).

## II. FACTS

The Court will accept all **[*3]** facts as alleged in the Complaint and will not repeat them here. The following timeline, drawn from the Complaint, attached exhibits and the docket in Bankruptcy Case No. 05-31470, is also helpful to the Court's analysis.

7/20/05 The Finstads petitioned for bankruptcy relief under Chapter 12. Doc. 1.

9/12/05 Beresford Bancorporation, Inc. filed a Motion for Relief from Automatic Stay. Doc. 17.

9/29/05 The Court issued notice of hearing on Motion for Relief from Automatic Stay and other matters. It scheduled the hearing for October 11, 2005. Doc. 26.

10/05/05-10/06/05 The Finstads filed a Motion to Continue the hearing on the Motion for Relief from Automatic Stay, which the Court granted. The Finstads did not request, and the Court did not order, that the stay was extended until the hearing. Docs. 30, 32.

10/12/05 Stay terminated under *11 U.S.C. 362(e)(1)*.

10/24/05 Hearing on the Motion for Relief from Automatic Stay and other matters; the Finstads and Beresford advised the Court they reached a settlement. Doc. 37. The Court did not order that the automatic stay was continued pending submission of settlement documents. The Clerk's

---

[1] All citations to the docket refer to the docket in the main bankruptcy case (#05-31470) unless otherwise designated.

minutes referenced a deed to real estate, including the following comment: "Beresford **[*4]** Corp. will not record the deed until Jan. 2, 2006." Id. at 3.

11/1/05 Beresford filed a Letter of Understanding Regarding Settlement dated October 25, 2005. Doc. 39. In the letter, the Finstads agreed to deliver a quitclaim deed transferring real property in Ransom County, North Dakota, to Beresford.[2] Id.

January 2006 The Finstads delivered the quitclaim deed to Beresford and it was recorded (Finstad-Beresford Deed). Compl. ¶ 16 (#18-7060).

3/20/06 Beresford filed Settlement Agreement and Release signed by Beresford and the Finstads. Doc 71.

3/29/06 The Court approved the Settlement Agreement. Doc. 75.

4/17/06 Order Confirming Debtors' Second Amended Chapter 12 Plan.[3] Doc. 83.

6/11/08 Beresford sent the Finstads a notice of default on the terms of the Settlement Agreement. Compl. ¶ 24 (#18-7060).

8/13/08 Order granting the Finstads a Discharge. Doc. 147.

9/15/08 Bankruptcy Case No. 05-31470 closed.

12/2/08 Beresford delivered quitclaim deed for the Finstads' real property to the Gords (Beresford-Gord Deed). Compl. ¶¶ 30–31 (#18-7060).

Jan 2012 The Finstads brought a quiet title action in North Dakota District Court against Beresford and the Gords. The North Dakota District Court denied the Finstads the **[*5]** relief they sought. The Finstads appealed. The North Dakota Supreme Court affirmed the District Court. _Finstad v. Gord, 2014 ND 72, 844 N.W.2d 913_. Compl. ¶ 34 (#18-7060).

11/20/18 The Finstads filed Motion to Reopen Bankruptcy case, which the Court granted. Docs. 150, 151.

12/10/18 The Finstads filed this adversary case. Compl. (#18-7060).

In their Motion to Dismiss, the Gords argue that this Court is bound by the decisions of the North Dakota courts. Doc. 6-1, at 2–3 (#18-7060). Consequently, a summary of the North Dakota Supreme Court opinion follows.

---

[2] The real property is described in paragraph 7 of the Complaint.

[3] The confirmed plan provided, in pertinent part:

> The Debtors have reached an agreement with Beresford which, in general terms, provides for a deed in lieu of foreclosure as to the farmland, with a release of debt, the Debtors retaining the right to rent the land for five (5) years, with an option to purchase.

> Doc. 77 at 4.

In its decision affirming the District Court, the North Dakota Supreme Court outlined many of the facts included in the Finstads' Complaint in this adversary proceeding. *Finstad v. Gord, 2014 ND 72, 844 N.W.2d 913*. It discussed the Finstads' bankruptcy petition, the settlement agreement that arose in the context of the bankruptcy proceedings, the Finstads' transfer of real estate via quitclaim deed as a part of that settlement agreement, the Bankruptcy **[*6]** Court's approval of the settlement agreement and other details the Finstads argue support their claim that the Finstad-Beresford Deed was "merely a financing vehicle continuing their mortgage relationship rather than an actual change of ownership." Id. at ¶¶ 2–12. In their appeal to the North Dakota Supreme Court, the Finstads argued that the North Dakota District Court improperly excluded evidence regarding the entire agreement between Beresford and the Finstads under the parol evidence rule. Id. at ¶ 12. The North Dakota Supreme Court rejected the Finstads' argument, holding that extrinsic evidence suggesting the Finstad-Beresford deed was not intended to be an actual transfer of ownership may not be considered under the parol evidence rule because "the delivered and recorded Finstad-Beresford deed clearly and unambiguously conveyed all of the Finstads' right, title, and interest in the property to Beresford." Id. at ¶ 21. Accordingly, it concluded that "a subsequent quitclaim deed executed by Beresford to the Gords gave them ownership of the land." Id. at ¶ 1.

The Finstads also appealed the North Dakota District Court's order finding that they did not have standing to challenge the **[*7]** Beresford-Gord deed. Id. at ¶¶ 22–24. The North Dakota Supreme Court held that the "Finstads do not have any interest in the property and therefore do not have standing to challenge the Beresford-Gord deed." Id. at ¶ 24. More specifically, it concluded:

> Because we have already concluded the Gords are owners of the land, we hold the district court did not err in deciding that the Finstads do not have any interest in the property and therefore do not have standing to challenge the Beresford-Gord deed.

Id. The North Dakota Supreme Court rejected the Finstads' other arguments premised on mistake or accident in the delivery of the Beresford-Gord deed because the Finstads lacked standing to challenge this transfer. Id. at ¶ 25.

## III. ANALYSIS

*Rule 12(b)(6) of the Federal Rules of Civil Procedure*, applicable in this adversary proceeding by *Federal Rule of Bankruptcy Procedure 7012(b)*, specifies that a party may move to dismiss a complaint for "failure to state a claim upon which relief may be granted." *Fed. R. Civ. P. 12(b)(6)*. Under *Rule 12(b)(6)*, the Court assumes all facts alleged in the complaint are true and makes reasonable inferences in favor of the nonmoving party. *Ryan v. Ryan, 889 F.3d 499, 505 (8th Cir. 2018)*. Further,

> [t]o avoid dismissal, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)*. "A claim has facial plausibility **[*8]** when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for

the misconduct alleged." *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)*.

Id.

In their Motion to Dismiss, the Gords assert that because the North Dakota Supreme Court decided that the Gords are the true and legal owners of the real property, all of the Finstads' causes of action fail to state a claim against the Gords. Doc. 6-1 at 2 (#18-7060). In response, the Finstads assert that the North Dakota Supreme Court decision "nullifies prior determinations of this Court in the Finstads' Chapter 12 bankruptcy case," and the *Supremacy Clause* demands that federal bankruptcy law preempt state law, voiding the state court judgments and allowing this Court to revisit the facts and make new findings and conclusions. Doc. 7 at 1–2 (#18-7060). For the reasons provided below, the Court declines this invitation.

## A. Bankruptcy Law Does Not Preempt the State Court Decisions or Otherwise Affect the Outcome of These Rulings.

The Finstads argue that the state court decisions in the quiet title action "set up a direct conflict between state law interpretations of deeds and this Court's exclusive jurisdiction over the disposition of property **[*9]** in the Finstad Chapter 12 proceedings." Doc. 7 at 9 (#18-7060). They further argue that the "effect of that exclusive jurisdiction is preemption of conflicting state law that would otherwise effect the bankruptcy case or the property of the debtor." Id. at 11 (#18-7060). More specifically, the Finstads suggest that the Bankruptcy Court has exclusive jurisdiction to interpret the settlement agreement, which was incorporated into the confirmed Chapter 12 plan, and it is not bound by the North Dakota parol evidence rule.[4]

The Finstads misinterpret the law pertaining to state court jurisdiction to interpret a confirmed Chapter 12 plan and the law which applies to breach of plan provisions that are not specifically linked to the Bankruptcy Code or other federal statute or interest. "The federal courts have exclusive jurisdiction over 'all cases under title 11' pursuant to *28 U.S.C. § 1334(a)*, but *§ 1334(b)* confers on the federal courts 'original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.'" *Cawley v. Celeste (In re Athens/Alpha Gas Corp.), 715 F.3d 230, 237 (8th Cir. 2013)* (quoting *28 U.S.C. § 1334(b)*); see also *Mid-City Bank v. Skyline Woods Homeowners Assoc. (In re Skyline Woods Country Club), 636 F.3d 467, 471 (8th Cir. 2011)* ("Federal district courts, and their bankruptcy

---

[4] The Finstads argued:

> The Finstads assert in this adversary proceeding, among other things, that under the *Supremacy Clause*, federal bankruptcy law and this Court's orders in the Main Case must control as to the effect of the Settlement Agreement. Specifically, the Finstads assert that the state-law parol evidence limitations on deed interpretation expressed in Finstad I conflict with the prior express provisions of the automatic stay, settlement agreements and orders of this Court in the Main Case proceedings as to the ownership and control of the Finstad farmland. Under the circumstances here, this Court's determinations override the technical idiosyncrasies of state-law deed interpretation pursuant to this Court's **[*10]** exclusive jurisdiction over the matter.

Doc. 7 at 2 (#18-7060); see also Doc. 16 at 3–4 (#18-7060).

courts by delegation, have exclusive jurisdiction 'of all cases under title 11,' *28 U.S.C. § 1334(a)*, but that provision is limited to the Debtor's Chapter 11 petition and 'the proceedings that follow the filing of a bankruptcy petition.'") (quoting *In re Middlesex Power Equip. & Marine, Inc., 292 F.3d 61, 66 (1st Cir. 2002))*. Bankruptcy courts and state courts have concurrent jurisdiction to interpret plans of reorganization.[5] Likewise, bankruptcy courts and state courts have concurrent jurisdiction to interpret a settlement agreement incorporated into a plan of reorganization. See id.; *Savage & Assocs., P.C. v. Mandl (In re Teligent, Inc.), 459 B.R. 190, 197 (Bankr. S.D.N.Y. 2011)* (stating that although a settlement agreement was **[*11]** blessed by an order of the bankruptcy court, a state court had jurisdiction to determine its meaning and effect). Accordingly, the North Dakota District Court and North Dakota Supreme Court possessed concurrent jurisdiction to interpret the Chapter 12 plan and settlement agreement incorporated in it. They also possessed concurrent jurisdiction to decide that delivery of the Finstad-Beresford deed giving Beresford all rights, title and interest in and to the real estate barred the district court from considering the other extrinsic evidence the Finstads offered that could not be considered under the parol evidence rule. See id.; Finstad, at ¶¶ 18–21.

The Finstads' assertion that technical idiosyncrasies of state-law deed interpretation do not apply to the terms of a confirmed plan in a Chapter 12 bankruptcy case is also incorrect. Upon confirmation, the plan is a new contract between a debtor and the parties whose claims were addressed in the plan. See *McCormick v. Starion Fin. (In re McCormick) 567 B.R. 552, 559–60 (8th Cir. 2017)* ("a confirmed Chapter 11 plan 'acts like a contract that binds the parties that participate in the plan'") (citation omitted). To the extent the Finstads assert **[*12]** that Beresford breached their settlement agreement or the confirmed plan, both state and federal courts apply North Dakota contract law. See *Van Sickle v. Hallmark & Assocs., Inc., 2008 ND 12, ¶ 10, 744 N.W.2d 532* ("A confirmed reorganization plan is essentially a binding contract between the debtor and its creditors, and creditors may bring a state law breach of contract action in state court to enforce plan obligations." (citations omitted)); see also *Hargrave v. Freund (In re LocalBizUSA, Inc.), 2015 Bankr. LEXIS 1666, 2015 WL 2358154 *9 (Bankr. D.N.J. May 14, 2015)* (rev'd on other grounds) ("A Chapter 11 plan is considered a contract between the debtor and its creditors and is therefore subject to the relevant state's laws regarding contract interpretation."); *In re Soldier Summit Recreation & Dev. Co., L.L.C., 2014 Bankr. LEXIS 104, 2014 WL 98701 *2 (Bankr. D. Utah Jan 10, 2014)* ("'a state law breach of contract action may be brought for breach of a chapter 11 plan obligations'" (citation omitted)). The Finstads point to no specific Bankruptcy Code provision preempting North Dakota law on contract or deed

---

[5] See *1905 Commonwealth Ave. Corp. v. Citizens Bank of Mass. (In re 1095 Commonwealth Ave. Corp.), 1999 Bankr. LEXIS 2029, 1999 WL 35128686, at * 2 (B.A.P. 1st Cir. July 14, 1999)* (bankruptcy court and state court have concurrent jurisdiction over plan interpretation); *Washington Mut., Inc. v. XL Specialty Ins. Co. (In re Washington Mut., Inc.), 2012 Bankr. LEXIS 4673, 2012 WL 4755209, at *4 (Bankr. D. Del. Oct. 4, 2012)* (state courts are courts of competent jurisdiction to interpret the language of bankruptcy plans and orders); *In re Landreth Lumber Co., 393 B.R. 200, 205 (Bankr. S.D. Ill. 2008)* (state court had concurrent jurisdiction to interpret a provision of the confirmed plan; *Kmart Creditor Tr. v. Conaway (In re Kmart Corp.), 307 B.R. 586, 596 (Bankr. E.D. Mich. 2004)* ("state courts are qualified to interpret the language of bankruptcy plans and orders and routinely engage in such interpretation."); *Icco v. Sunbrite Cleaners, Inc. (In re Sunbrite Cleaners, Inc.), 284 B.R. 336, 342 (N.D.N.Y. 2002)* ("Because contract interpretation is an issue of state law . . . the state courts are perfectly well-suited to interpret the First Amended Plan.").

interpretation under the circumstances of this case. As the United States Supreme Court explained:

> Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding. Uniform treatment of property **[*13]** interests by both state and federal courts within a State serves to reduce uncertainty, to discourage forum shopping, and to prevent a party from receiving "a windfall merely by reason of the happenstance of bankruptcy."

*Butner v. United States, 440 U.S. 48, 55, 99 S. Ct. 914, 59 L. Ed. 2d 136 (1979)* (quoting *Lewis v. Mfrs. Nat'l Bank, 364 U.S. 603, 609, 81 S. Ct. 347, 5 L. Ed. 2d 323)*. Because this Court must look to state law to determine property interests and must apply state law in contract interpretation, it appears that this Court is equally "constrained by the state-law substantive parol evidence statute" in analyzing the specific settlement provisions and deed transfer restrictions under North Dakota law. Doc. 16 at 3 (#18-7060) (quoting the Finstads' argument). The Finstads offer no persuasive authority suggesting otherwise.

Finally, the Finstads argue that they lacked the power to convey their farmland to Beresford by quitclaim deed because the automatic stay was in effect, and they did not seek or receive permission to convey the real estate prior to the transaction. While it is true that the Finstads (who were debtors-in-possession at the time) signed and delivered the quitclaim deed to Beresford prior to formal court approval of the settlement agreement, this transfer did not violate the automatic stay. Under *section 362(e)(1)*, the automatic **[*14]** stay terminates 30 days after a party files a motion seeking relief from the stay unless the court orders that the stay is continued.[6] On September 12, 2005, Beresford filed a Motion for Relief from Automatic Stay seeking to continue its state court foreclosure proceedings, including a real estate mortgage foreclosure. The Court scheduled a hearing on this motion for October 11, 2005. The Finstads filed a motion to continue the hearing, Beresford consented to the continuance and the Court granted it. The Finstads did not request—and the Court did not order—that the stay continued in effect pending conclusion of the hearing, which the Court rescheduled for October 24, 2005. At the October 24, 2005, hearing, the parties advised the Court that they reached a settlement. Again, the parties did not request—and the Court did not order—that the stay continued in effect

---

[6] *Section 362(e)(1)* provides:

> Thirty days after a request under *subsection (d)* of this section for relief from the stay of any act against property of the estate under *subsection (a)* of this section, such stay is terminated with respect to the party in interest making such request, unless the court, after notice and a hearing, orders such stay continued in effect pending the conclusion of, or as a result of, a final hearing and determination under *subsection (d)* of this section. A hearing under this subsection may be a preliminary hearing, or may be consolidated with the final hearing under *subsection (d)* of this section. The court shall order such stay continued in effect pending the conclusion of the final hearing under *subsection (d)* of this section if there is a reasonable likelihood that the party opposing relief from such stay will prevail at the conclusion of such final hearing. If the hearing under this subsection is a preliminary hearing, then such final hearing shall be concluded not later **[*16]** than thirty days after the conclusion of such preliminary hearing, unless the 30-day period is extended with the consent of the parties in interest or for a specific time which the court finds is required by compelling circumstances.

*11 U.S.C. § 362(e)(1)*. The 2005 version of this statute is the same as the language quoted.

pending Court approval of the settlement. Accordingly, the stay terminated on October 12, 2005, weeks before the Finstads delivered the quitclaim deed to Beresford pursuant to the terms of their settlement, and Beresford recorded it in January 2006. See _11 U.S.C. § 362(e)(1)_; _Bugg v. Gray (In re Gray), 642 F.App'x 641, 643 (8th Cir. 2016)_ (finding that the stay terminated by operation of law when the court **[*15]** failed to comply with the statutorily mandated timeframes in _section 362(e)_). Consequently, the automatic stay did not bar the transfer of the real property to Beresford. Furthermore, the Court ultimately approved the settlement agreement and confirmed the Chapter 12 plan that incorporated its terms.

In summary, bankruptcy law does not stand in the way of the state court decisions or change their outcome. The state court decisions are not preempted by bankruptcy law, and bankruptcy provisions do not void them.


**B. The Rooker-Feldman Doctrine Bars the Court from Exercising Jurisdiction over the Finstads' Claims to Title of the Subject Real Property**.

Under the Rooker-Feldman doctrine, federal courts other than the Supreme Court do not have subject matter jurisdiction over challenges to decisions made by state courts in judicial proceedings. _In re Athens/Alpha Gas, 715 F.3d at 234_ (citations omitted). More specifically, "Rooker—Feldman precludes a federal action if the relief requested in the federal action would effectively reverse the state court decision or void its holding." _Snider v. City of Excelsior Springs, 154 F.3d 809, 811 (8th Cir. 1998)_ (citation omitted). In other words, "Rooker-Feldman forecloses federal jurisdiction when a decision in favor of a federal plaintiff would 'wholly undermine' the state court's ruling." _In re Athens/Alpha Gas, 715 F.3d at 235_ (citation omitted).

The state and **[*17]** federal claims need not be identical. _Goetzman v. Agribank, FCB (In re Goetzman), 91 F.3d 1173, 1177 (8th Cir. 1996)_ (citation omitted). A lower federal court may not consider a claim that is "inextricably intertwined" with a claim addressed by a state court. Id. A federal claim is inextricably intertwined with a state claim "if the federal challenge succeeds only to the extent that the state court wrongly decided the issues before it." _Snider, 154 F.3d at 811_ (citation omitted); _Cawley v. Celeste (In re Athens/Alpha Gas, 463 B.R. 883, 887 (B.A.P. 8th Cir. 2012)_ (quotation omitted), aff'd on other grounds, _715 F.3d 230 (8th Cir. 2013)_. The doctrine applies only in "'limited circumstances' where a party in effect seeks to take an appeal of an unfavorable state-court decision to a lower federal court." _Lance v. Dennis, 546 U.S. 459, 466, 126 S. Ct. 1198, 163 L. Ed. 2d 1059 (2006)_ (quoting _Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 291, 125 S. Ct. 1517, 161 L. Ed. 2d 454 (2005))_.

The Rooker-Feldman doctrine bars the Finstads' claims seeking reversal of the North Dakota courts which ruled against them in their quiet title action. This adversary proceeding is plainly a request to seek remedies the state courts denied. To rule in their favor, this Court would have to find that the quitclaim deed the Finstads delivered to Beresford Bank did not transfer title to Beresford Bank, and that Beresford Bank did not convey title to the real property to the Gords. Such a finding would "wholly undermine" the state court rulings. Accordingly, the Rooker-Feldman doctrine bars **[*18]** the Finstads' claims for declaratory relief, constructive trust and the other causes of action seeking the same relief the state courts denied. See _Athens/Alpha Gas,_

*463 B.R. at 887*–88 ("Where federal relief can only be predicated upon a conviction that the state court was wrong, it is difficult to conceive the federal proceeding as, in substance, anything other than a prohibited appeal of the state-court judgment.") (quotation omitted).

## C. The Finstads' Claims and Causes of Action are Barred by Res Judicata.

The Gords contend that the Finstads' claims and causes of action in this adversary proceeding are barred by the North Dakota courts' rulings. The doctrine of res judicata applies to final orders issued by bankruptcy courts. See generally *Ladd v. Ries (In re Ladd), 319 B.R. 599, 602–07 (B.A.P. 8th Cir. 2005)*, rev'd on other grounds, *450 F.3d 751 (8th Cir. 2006)*; see also *LaBarge v. Ireland (In re Ireland), 325 B.R. 836, 839 (Bankr. E.D. Mo. 2005)*; *In re Allen, 2012 Bankr. LEXIS 874, 2012 WL 693461, at *16 (Bankr. D.N.J. Mar. 2, 2012)*.

> Res judicata, or claim preclusion, prevents relitigation of claims that were raised, or could have been raised, in prior actions between the same parties or their privies. Thus, res judicata means a valid, existing final judgment from a court of competent jurisdiction is conclusive with regard to claims raised, or those that could have been raised and determined, as to [the] parties and their privies in all other **[*19]** actions. Res judicata applies even if subsequent claims are based upon a different legal theory.

*Missouri Breaks, LLC v. Burns, 2010 ND 221, ¶ 10, 791 N.W.2d 33* (quotation omitted). In essence, res judicata bars parties from rehashing issues that were tried or could have been tried by the court in prior proceedings. Id. (citations omitted).

"Under the Full Faith and Credit Act, *28 U.S.C. § 1738*, federal courts 'must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered.'" *Finstad v. Beresford Bancorporation, Inc., 831 F.3d 1009, 1013 (8th Cir. 2016)* (quotation omitted). Consequently, North Dakota law governs whether the North Dakota District Court ruling, followed by the North Dakota Supreme Court opinion in *Finstad v. Gord, 2014 ND 72, 844 N.W.2d 913*, bars the claims pled in this adversary proceeding. See id.

> Under North Dakota law, the doctrine of claim preclusion "prohibits the relitigation of claims or issues that were raised or could have been raised in a prior action between the same parties or their privies and which was resolved by final judgment in a court of competent jurisdiction." *Hofsommer v. Hofsommer Excavating, Inc., 488 N.W.2d 380, 383 (N.D. 1992)*. The North Dakota Supreme Court has adopted a four-part test for determining whether claim preclusion applies:

>> there must be (1) "a final decision on the merits in the first action by a court of **[*20]** competent jurisdiction," (2) "the same parties, or their privies," in the second action as in the first, (3) an issue in the second action that was "actually litigated" or that "should have been litigated in the first action," and (4) "an identity of the causes of action."

*In re Athens/Alpha Gas Corp., 715 F.3d 230, 236 (8th Cir. 2013)* (alterations omitted) (quoting *Mo. Breaks, LLC v. Burns, 2010 ND 221, 791 N.W.2d 33, 39 (N.D. 2010))*.

2019 Bankr. LEXIS 4017, *20

*Finstad, 831 F.3d at 1013*.

Applying the test outlined above, the North Dakota Supreme Court and trial court are courts of competent jurisdiction. They entered final decisions on the merits of the Finstads' claims. The Finstads and the Gords were parties to the North Dakota case. Accordingly, the Gords met their burden of showing the first two elements of res judicata.

They also met their burden of showing the third and fourth elements. The question of whether the Finstad-Beresford deed transferred an ownership interest in the real property at issue was actually litigated before the North Dakota courts. The North Dakota Supreme Court referenced the settlement agreement and understood that it arose in a bankruptcy case. The Finstads argued to both the district court and the North Dakota Supreme Court that the circumstances of the transaction and evidence extrinsic to the quitclaim deed show that the Finstad-Beresford **[\*21]** deed was merely "a financing vehicle continuing their mortgage relationship," and they asked the courts to consider evidence of these facts. The Finstads raised the very same issues before this Court.

In the case before the state courts, the Finstads brought a quiet title cause of action and sought damages for lost value and waste. *Finstad, 2014 ND 72, ¶ 7, 844 N.W.2d 913*. They either pled or argued mistake and accident. Id. at ¶ 25. Additionally, they brought claims challenging the deed from Beresford to Gords. Id. at ¶ 22. While the Finstads alleged claims in this adversary proceeding that they did not plead while before the North Dakota courts, the Finstads' theories of recovery were either brought in the state court proceeding (underlying claim seeking declaratory relief) or could have been brought at the time they filed their state court proceeding (constructive trust, trespass, turnover [or eviction, request for a writ of assistance or any other state law alternatives to turnover], intentional interference with contract, breach of settlement agreement, conversion) because they are based on the same facts. Under North Dakota law, a prior judgment precludes all claims that were raised or could have been raised in the **[\*22]** prior action. *Finstad, 831 F.3d at 1014* (quoting *Ungar v. N.D. State Univ., 2006 ND 185, 721 N.W.2d 16, 20 (N.D. 2006)*) (quotation omitted)). As long as the facts surrounding the "transaction or occurrence" are the same, a plaintiff may be precluded from bringing a claim under different legal theories. Finstad v. Beresford Bancorporation, Inc., 2015 WL 11438182, at *3 (D.N.D. Apr. 29, 2015) (citing *Simpson v. Chicago Pneumatic Tool Co., 2005 ND 55, 693 N.W.2d 612, 617 (N.D. 2005)*). "'[I]f a right of recovery rests on the same state of facts, the cause of action may not be split.'" Id. (quoting *Lucas v. Porter, 2008 ND 160, 755 N.W.2d 88, 96 (N.D. 2008))*.

As the Eighth Circuit Court of Appeals observed in Finstad: "By the time they filed their complaint in Finstad I in January 2012, the Finstads were aware of all of the material facts alleged in this action, and there was no procedural impediment to the Finstads bringing their breach of contract and conversion claims against Beresford in Finstad I." *831 F.3d at 1014*. Likewise, the Finstads could have alleged the claims and causes of action they pled in this adversary proceeding in their lawsuit filed with the North Dakota District Court—including breach of the settlement agreement approved by this Court, eviction, a writ of assistance or any other state law alternative to turnover, and fraudulent transfer under *section 13-02.1-04(1)(b) of the North Dakota Century Code* (which they raise for the first time in their Supplemental Brief in

Opposition to the Motion to Dismiss by asserting a cause of action under *11 U.S.C. § 544*). See Doc. 16 at 6–7 **[*23]** (#18-7060).

Finally, there is an identity of causes of action in the state proceedings and this adversary case because there is an "'identity of the facts creating the right of action and of the evidence necessary to sustain each action.'" *In re Athens/Alpha Gas, 715 F.3d at 238* (quoting *Sanders Confectionery, 973 F.2d at 484*). The case before the North Dakota courts and the adversary proceeding before this Court are based on the same nucleus of operative facts and arise out of the same transaction or occurrence.

Accordingly, the Finstads' claims and causes of action are barred by res judicata.

The Court considered all other arguments and deems them to be without merit or unnecessary to address.


## IV. CONCLUSION

For the reasons stated above, **IT IS ORDERED**:

Defendants' motion to dismiss is GRANTED. This case is dismissed. The Court will enter judgment accordingly.

Dated: October 21, 2019.

/s/ Shon Hastings

SHON HASTINGS, JUDGE

UNITED STATES BANKRUPTCY COURT


## JUDGMENT

Based on the Court's Order dated October 21, 2019, **IT IS ORDERED AND ADJUDGED** that this case is dismissed.

Dated this 21st day of October, 2019.

/s/ Shon Hastings

Shon Hastings, Judge

United States Bankruptcy Court

---

**End of Document**

 Caution
As of: October 24, 2024 4:29 PM Z

# *Hans v. Tharaldson*

United States District Court for the District of North Dakota, Southeastern Division

October 31, 2011, Decided; October 31, 2011, Filed

Civil No. 3:05-cv-115

**Reporter**
2011 U.S. Dist. LEXIS 153504 *; 51 Employee Benefits Cas. (BNA) 2922; 2011 WL 7179644

Raymond Hans, Gayle Herbert, Larry Richman, Donna Walker, Michael Webster, and Tammy Blake, on behalf of themselves, Individually and on behalf of All Others Similarly Situated in the Former Employee Class; and Carlos Gonzales, Donald Klain, Jolene Matheson-Godschalk, and Sidney Lien, on behalf of themselves, Individually and on behalf of All Others Similarly Situated in the Current Employee Class, Plaintiffs, vs. Gary D. Tharaldson, Connie Tharaldson, Roger Tharaldson, Raymond Braun, and James Lochow, as Trustees of the Michelle Tharaldson Trust and as Trustees of the Matthew Tharaldson Trust; South Dakota Trust Company, LLC, as Trustee of the Michelle Lyn Tharaldson Lemaster Dynasty Trust, as Trustee of the Matthew Tharaldson Dynasty Trust, and as Trustee of the Michael Tharaldson Dynasty Trust; and Linda Tharaldson, individually and in her capacity as Trustee for the Michael Tharaldson Trust, Defendants, and Tharaldson Motels, Inc. Employee Stock Ownership Plan, Nominal Defendant.

**Subsequent History:** Motion granted by, Motion denied by, Motion to strike granted by, in part, Motion to strike denied by, in part *Hans v. Tharaldson, 2011 U.S. Dist. LEXIS 151083 (D.N.D., Dec. 23, 2011)*

**Prior History:** *Hans v. Tharaldson, 2010 U.S. Dist. LEXIS 127426 (D.N.D., Aug. 27, 2010)*

**Counsel:**  [*1] For Raymond Hans, on behalf of him, Individually and on Behalf of All Others Similarly Situated, Chuck LeBlanc, on behalf of him, Individually and on Behalf of All Others Similarly Situated, Gayle Herbert, on behalf of her, Individually and on Behalf of All Others Similarly Situated, Jeremy Jackey, on behalf him, Individually and on Behalf of All Others Similarly Situated, Plaintiffs: Alan Baker, Stacey Elizabeth Tjon Bossart, LEAD ATTORNEYS, SOLBERG STEWART MILLER & TJON, FARGO, ND; Bruce F. Rinaldi, PRO HAC VICE, R. Joseph Barton, Robyn Swanson, Whitney R. Case, LEAD ATTORNEYS, COHEN MILSTEIN SELLERS & TOLL PLLC, WASHINGTON, DC; Gary A. Gotto, KELLER ROHRBACK L.L.P., SEATTLE, WA; Marc I. Machiz, PRO HAC VICE, Cohen Milstein Sellers & Toll PLLC, PHILADELPHIA, PA.

For Larry Richman, on behalf of him, Individually and on Behalf of All Others Similarly Situated, Plaintiff: Alan Baker, Stacey Elizabeth Tjon Bossart, LEAD ATTORNEYS, SOLBERG STEWART MILLER & TJON, FARGO, ND; Bruce F. Rinaldi, PRO HAC VICE, R. Joseph Barton, Robyn Swanson, Whitney R. Case, LEAD ATTORNEYS, COHEN MILSTEIN SELLERS & TOLL PLLC, WASHINGTON, DC; Alton L. Gwaltney, III, MOORE & VAN ALLEN PLLC, CHARLOTTE, NC; Gary  [*2] A. Gotto, KELLER ROHRBACK L.L.P., SEATTLE, WA; Marc I. Machiz, PRO HAC VICE, Cohen Milstein Sellers & Toll PLLC, PHILADELPHIA, PA.

For Donna Walker, on behalf of her, Individually and on Behalf of All Others Similarly Situated, Plaintiff: Alan Baker, Stacey Elizabeth Tjon Bossart, LEAD ATTORNEYS, SOLBERG STEWART MILLER & TJON, FARGO, ND; Bruce F. Rinaldi, PRO HAC VICE, Robyn Swanson, Whitney R. Case, LEAD ATTORNEYS, R. Joseph Barton, COHEN MILSTEIN SELLERS & TOLL PLLC, WASHINGTON, DC; David J. Ko, LEAD ATTORNEY, Gary A. Gotto, KELLER ROHRBACK L.L.P., SEATTLE, WA; Alton L. Gwaltney, III, MOORE & VAN ALLEN PLLC, CHARLOTTE, NC; Marc I. Machiz, PRO HAC VICE, Cohen Milstein Sellers & Toll PLLC, PHILADELPHIA, PA.

For Michael Webster, on behalf of him, Individually and on Behalf of All Others Similarly Situated, Plaintiff: Alan Baker, Stacey Elizabeth Tjon Bossart, LEAD ATTORNEYS, SOLBERG STEWART MILLER & TJON, FARGO, ND; Bruce F. Rinaldi, PRO HAC VICE, R. Joseph Barton, Robyn Swanson, Whitney R. Case, LEAD ATTORNEYS, COHEN MILSTEIN SELLERS & TOLL PLLC, WASHINGTON, DC; Alton L. Gwaltney, III, MOORE & VAN ALLEN PLLC, CHARLOTTE, NC; Gary A. Gotto, KELLER ROHRBACK L.L.P., SEATTLE, WA; Marc I. [*3] Machiz, PRO HAC VICE, Cohen Milstein Sellers & Toll PLLC, PHILADELPHIA, PA.

For Carlos Gonzales, class representative of the Current Employee Class, Donald Klain, class representative of the Current Employee Class also known as Don Klain, Jolene Matheson-Godschalk, class representative of the Current Employee Class, Sidney Lien, class representative of the Current Employee Class, Plaintiffs: David J. Ko, Derek W. Loeser, Gary A. Gotto, Lynn L. Sarko, LEAD ATTORNEYS, KELLER ROHRBACK L.L.P., SEATTLE, WA; Gary D. Greenwald, Ron Kilgard, LEAD ATTORNEYS, KELLER ROHRBACK P.L.C., PHOENIX, AZ.

For Gary D. Tharaldson, as the Trustee of the Michelle Tharaldson Trust and as Trustee of the Matthew Tharaldson Trust, Defendant: Charles F. Seemann, III, PRO HAC VICE, Howard Shapiro, PRO HAC VICE, Michael D. Spencer, PRO HAC VICE, Robert W. Rachal, PRO HAC VICE, LEAD ATTORNEYS, PROSKAUER ROSE LLP, NEW ORLEANS, LA; Michael S. Raum, Robert B. Stock, LEAD ATTORNEYS, VOGEL LAW FIRM, FARGO, ND.

For James Lochow, as the Trustee of the Michelle Tharaldson Trust and as Trustee of the Matthew Tharaldson Trust, Linda Tharaldson, individually and in her capacity as Trustee for the Michael Tharaldson Trust, Roger [*4] Tharaldson, as the Trustee of the Michelle Tharaldson Trust and as Trustee of the Matthew Tharaldson Trust, Raymond Braun, as the Trustee of the Michelle Tharaldson Trust and as Trustee of the Matthew Tharaldson Trust, South Dakota Trust Company, LLC, as Trustee of the Michelle Lyn Tharaldson Lemaster Dynasty Trust, as Trustee of the Matthew Tharaldson Dynasty Trust and as Trustee of the Michael Tharaldson Dynasty Trust, Defendants: Michael S. Raum, Robert B. Stock, LEAD ATTORNEYS, VOGEL LAW FIRM, FARGO, ND.

For Connie Tharaldson, as the Trustee of the Michelle Tharaldson Trust and as Trustee of the Matthew Tharaldson Trust, Defendant: Charles F. Seemann, III, Howard Shapiro, LEAD ATTORNEYS, PRO HAC VICE, PROSKAUER ROSE LLP, NEW ORLEANS, LA; Michael S. Raum, Robert B. Stock, LEAD ATTORNEYS, VOGEL LAW FIRM, FARGO, ND; Michael D. Spencer, Robert W. Rachal, LEAD ATTORNEYS, PROSKAUER, NEW ORLEANS, LA.

For Tharaldson Motels, Inc. ESOP, Tharaldson Motels, Inc. Employee Stock Ownership Plan, Defendant: Alton L. Gwaltney, III, Benjamin P. Fryer, LEAD ATTORNEYS, PRO HAC VICE, MOORE & VAN ALLEN PLLC, CHARLOTTE, NC; Eric S. Waxman, Peter B. Morrison, PRO

HAC VICE, LEAD ATTORNEYS, SKADDEN ARPS SLATE  [*5] MEAGHER & FLOM LLP, LOS
ANGELES, CA.

For North Star Trust Co., in its capacity as trustee for the Tharaldson Motels, Inc. Employee
Stock Ownership Plan, Intervenor: Alton L. Gwaltney, III, Benjamin P. Fryer, Mark A. Nebrig,
LEAD ATTORNEYS, PRO HAC VICE, MOORE & VAN ALLEN PLLC, CHARLOTTE, NC; Peter
B. Morrison, LEAD ATTORNEY, PRO HAC VICE, SKADDEN ARPS SLATE MEAGHER &
FLOM LLP, LOS ANGELES, CA; Gary A. Gotto, KELLER ROHRBACK L.L.P., SEATTLE, WA.

**Judges:** Ralph R. Erickson, Chief United States District Judge.

**Opinion by:** Ralph R. Erickson

## Opinion

***AMENDED*SEALED** MEMORANDUM OPINION AND ORDER ON SUMMARY JUDGMENT
**MOTIONS**

Before the Court are the following summary judgment motions: (1) North Star Trust Company's
motion for *partial* summary judgment (Doc. #557); (2) the "Nonfiduciary Selling Shareholders'
motion for summary judgment (Doc. #561); (3) Gary D. Tharaldson's motion for summary
judgment (Doc. #569); (4) the "Current Employee Class' motion for *partial* summary judgment
(Doc. #572); and (5) the Former Employee Class' motion for *partial* summary judgment (Doc.
#577). Also, pending before the Court are two motions for a hearing on the summary judgment
motions (Docs. #565 & 575). Because the parties subsequently withdrew  [*6] their requests for
a hearing on the summary judgment motions immediately following the *Daubert* hearing held in
August 2011, those motions are dismissed as **MOOT.** The Court, having carefully considered
the evidence in the record, the arguments of the parties, and the briefs of the parties, now
issues the following sealed memorandum opinion and order.

## SUMMARY OF DECISION

   A. Pursuant to the plain language of the trust agreements, the Investment Committee for the
   Dynasty Trusts had the authority to bind the sale of trust assets in December 1999. As such,
   the sale of TMI stock held by the Dynasty Trusts was part of a single integrated transaction
   (SIT) occurring on December 27, 1999.

   B. ERISA prohibits certain transactions involving the exchange of assets belonging to a
   "party in interest" or the transfer of plan assets for the benefit of a "party in interest." *ERISA
   § 406*. The Dynasty Trusts are not "parties in interest" under the definition set forth in *ERISA
   § 3(14)*. Thus, as to the transactions involving the Dynasty Trusts, Gary Tharaldson did not
   breach his fiduciary duties under ERISA as a matter of law. (The same analysis would also
   apply to the Michelle Tharaldson Trust, Matthew Tharaldson  [*7] Trust, Michael Tharaldson
   Trust as well).

C. In light of the conflicting expert opinions and testimony, genuine issues of material fact preclude this Court from finding the ESOP Notes are "cash equivalents" and must be valued at their face amount.

D. The stock purchase agreements executed in December 1998 were executory under North Dakota law based on a failure to fulfill a condition concurrent. Their re-execution in December 1999 under "revised" stock purchase agreements was part of a single integrated transaction (SIT). Accordingly, there was no pre-existing ESOP debt prior to December 1999.

E. Plaintiffs have failed to raise a genuine issue of material fact demonstrating the Nonfiduciary Selling Shareholders had actual or constructive knowledge of the alleged fiduciary breaches by Gary Tharaldson. They are entitled to be dismissed as defendants in this action.

F. Genuine issues of material fact preclude summary judgment on the issue of whether Gary Tharaldson breached his fiduciary duties under ERISA by selling TMI stock to the ESOP on December 27, 1999.

G. Genuine issues of material fact preclude summary judgment on the issue of whether Gary Tharaldson breached his fiduciary duties **[*8]** under ERISA by failing to ensure all conditions set forth in the 1998 stock purchase agreements were met.

H. The Anti-Cutback provision contained in ERISA does not apply here where there was no amendment to the plan and no elimination or reduction in benefits between the 1998 transaction and the 1999 transaction. Any loss to the plan resulting from the "revised" transaction can be determined as damages upon sufficient evidence being presented at trial.

I. ERISA preemption does not preclude this Court from applying basic North Dakota contract rules when the state laws at issue do not "relate to" the administration of an employee benefit plan, and any connection to the plan is tenuous, at best.

J. Gary Tharaldson's acts between the time he learned the 1998 transaction might not be enforceable and the execution of the 1999 transaction did not amount to waiver of his right to claim the 1998 transaction was an unenforceable obligation. Moreover, the acts at issue do not constitute a ratification of the contracts.

Despite the number of contentions raised by the parties, the Court believes the issues boil down to a relatively focused area of ERISA law: (1) whether Gary Tharaldson breached his **[*9]** fiduciary duties in failing to ensure all contractual conditions that were part of the 1998 transactions were fulfilled; (2) Whether Gary Tharaldson breached his fiduciary duties - either by causing the ESOP to pay more than "adequate consideration" and/or by failing to act in good faith - when he executed the "revised" 1999 transaction; and (3) if liability is found, what are the losses to the ESOP plan. All other named defendants are dismissed from this action. It remains possible, however, that Gary Tharaldson could be personally responsible for losses to the plan caused by the sale of TMI stock by the Nonfiduciary Selling Shareholders if the evidence at trial establishes that these dismissed defendants were controlled by Mr. Tharaldson to such an extent that they are properly viewed as his "alter egos."

To further separate the wheat from the chaff, the Court reiterates the following rulings: (1) the sale of all TMI stock to the ESOP occurred as of December 27, 1999, as part of a single integrated transaction; (2) there is no pre-existing ESOP debt that Gary Tharaldson, as trustee and fiduciary of the ESOP plan, had to consider when executing the 1999 transaction; (3) at trial the **[\*10]** Court will determine the fair market value of the ESOP Notes, which might or might not be their face amount; and (4) Plaintiffs have the burden of showing breach of fiduciary duty and a prima facie case of loss to the ESOP plan while Gary Tharaldson bears the burden of demonstrating the acquisition of TMI stock by the ESOP was for "adequate consideration".

## FACTUAL BACKGROUND

Because the parties are familiar with the facts and procedural history and this Court has recited this information in previous decisions, the facts are not restated in this memorandum except as necessary to explain the decision.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c)(2)*; *Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. The burden is on the moving party to establish the basis for its motion. *Donovan v. Harrah's Md. Heights Corp., 289 F.3d 527, 529 (8th Cir. 2002)*. It is axiomatic that the evidence is viewed in a light most favorable to the nonmoving party, and the nonmoving party enjoys the benefit of all reasonable inferences to be drawn from the facts. **[\*11]** See, e.g., *Vacca v. Viacom Broad. of Mo., Inc., 875 F.2d 1337, 1339 (8th Cir. 1989)*. If the moving party shows there are no genuine issues of material fact, the burden shifts to the nonmoving party to set forth facts showing a genuine issue for trial. *Donovan, 289 F.3d at 529*. The nonmoving party, "may not rely merely on allegations or denials in its own pleading; rather, its response must...set out specific facts showing a genuine issue for trial." *Fed. R. Civ. P. 56(e)(2)*. When the unresolved issues in a case are primarily legal rather than factual, summary judgment is particularly appropriate. *Mansker v. TMG Life Ins. Co., 54 F.3d 1322, 1326 (8th Cir. 1995)*.

## ANALYSIS

### I. North Star Trust Company's Motion for Partial Summary Judgment

Before the Court is North Star Trust Company's motion for partial summary judgment (Doc. # 557). North Star brings the motion, not in its corporate capacity, but in its representative capacity advocating for the interests of the Current Employee Class and as a fiduciary of the Tharaldson Motels, Inc. Employee Stock Ownership Plan ("TMI ESOP" or "ESOP"). North Star contends Gary Tharaldson breached his fiduciary duties by (1) failing to obtain a valuation **[\*12]** for the purchase of the "Dynasty Trust Shares" in July 2000, and (2) engaging in a "prohibited transaction" under *ERISA § 406*.

*A. Failure to Obtain an Updated Valuation in July 2000*

The TMI ESOP paid approximately $26.3 million for 506,691 shares of TMI stock sold by the Dynasty Trusts. [1] North Star alleges the TMI ESOP overpaid for the stock purchased at $52 per share. It asserts the valuations conducted in December 1999 were based on information that was "stale, inaccurate, and unreliable" and should not have been relied on by Gary Tharaldson to determine the price paid by the TMI ESOP. North Star further asserts Gary Tharaldson's direction to the valuator in December 1999 to assume the TMI ESOP would purchase all TMI shares on December 27, 1999 "simultaneously" and that there was no ESOP-related loans in existence rendered the valuation invalid, as the stock was not purchased in a single block and, as such, did not take into account prior acquisition debt of the TMI ESOP.

Gary Tharaldson contends the sale of TMI shares from the Dynasty Trusts to the ESOP occurred on December 27, 1999, as part of a single integrated transaction ("SIT"). He asserts that members of the Investment Committee had discretion and authority to sell the shares and executed valid agreements to sell the stock on December 27, 1999. Tharaldson claims it is immaterial that the necessary paperwork to finalize the transaction was not completed by Citicorp, the "directed" trustee until July 2000.

Resolution of the dispute depends on whether Mark Knutson and Colleen Haugen, members of the Investment Committee for the Dynasty Trusts, entered into binding agreements to sell the shares of TMI stock on December 27, 1999, or whether the sale occurred some six months later when Citicorp signed off on the stock purchase agreements. North Star contends Citicorp is the sole party with the authority to bind the Dynasty Trusts and thus the sale did not occur until July 2000, six months after Tharaldson had obtained a valuation for the stock. The Dynasty Trust Agreements ("Agreements") entrenched the trustee, **[*14]** Citicorp Trust South Dakota ("Citicorp"), with the management and control of the trusts, specifically authorizing the trustee:

    1. To sell, exchange, transfer or convey . . . all or any party of said trust estate upon such terms and conditions it sees fit. . .

(Doc. #560-2, p. 7 of 102). However, the Agreements also provided for the creation of a "Distribution Committee" and an "Investment Committee". The Agreements modified the duties and responsibilities of the trustee, in relevant part, as follows:


VI


ADVISORY COMMITTEES
During the term of this trust the following provisions shall apply to supercede or modify the general powers of the Trustee as set forth in other Articles of this instrument . . .:
* * *

---

[1] The Michael Tharaldson Dynasty Trust owned 185,631 shares of TMI stock; the Michelle Tharaldson LeMaster Dynasty Trust owned 160,530 shares of TMI stock; and the Matthew Tharaldson Dynasty Trust owned 160,530 shares **[*13]** of TMI stock. The Court will refer to these three trusts collectively as the "Dynasty Trusts."

2. Mark Knutson and Colleen Haugen shall be the initial members of the Investment Committee . . . If at any time there is no Investment Committee acting hereunder, then the Trustee shall exercise all rights and powers of the Investment Committee. Despite the general powers of the Trustee, the following provisions shall apply, where the context admits, during any period in which the Investment Committee shall be acting:

> (a) The Trustee shall follow the written directions of the Investment  **[*15]** Committee with respect to the retention, purchase, sale, or encumbrance of trust property and the investment and reinvestment of principal and income held hereunder, the sole authority and discretion for which shall belong to the Investment Committee (provided, however, that the Investment Committee shall not be authorized to direct the Trustee to purchase any asset that would violate federal, state, or local law, or the provisions of this agreement), and accordingly the Trustee shall have no duty to review or monitor trust investments while the Investment Committee is acting. The Investment Committee shall have full authority to direct the Trustee to take any action with respect to the trust assets that the Trustee is authorized to take under Section II of this Agreement.

(Doc. #560-2, pp. 26-27 of 102).

As a "directed" trustee, Citicorp informed the grantors of the Dynasty Trusts that it "serves without responsibility for the selection or retention of investments and does not advise on the merits of investment proposals or make recommendations regarding any trust assets." (Doc. #598-1, p. 2 of 4). Citicorp further advised the grantors that it must be included as a signing party for  **[*16]** all transactions involving trust assets and all note payments must be handled by Citicorp to allow Citicorp to track the payments and reflect them in the trust's records. Id.

The Agreements designated the situs of the trusts as the State of South Dakota, unless changed by the trustee (Doc. #560-2, p. 41 of 102). It also provided that South Dakota law governed the management, administration, and investment of the trusts. When interpreting contracts under South Dakota law:

> The entire contract and all its provisions must be given meaning if that can be accomplished consistently and reasonably. However, when provisions conflict and full weight cannot be given to each, the more specific clauses are deemed to reflect the parties' . . . intentions - a specific provision controls a general one.

*Tri-State Financial LLC v. First Dakota Nat'l Bank, 538 F.3d 920, 925 (8th Cir. 2008)* (quoting *State v. Pursley, 2007 SD 22, 729 N.W.2d 351, 355 (S.D. 2007))*. Contracts are to be read and understood "according to the natural and obvious import of the language without resorting to subtle and forced construction for the purposes of either limiting or extending their operation." *Lindskov v. Lindskov, 2011 SD 34, 800 N.W.2d 715, 718 (S.D. 2011)*  **[*17]** (quoting *Lillibridge v. Meade Sch. Dist. #46-1, 2008 SD 17, 746 N.W.2d 428, 431 (S.D. 2008))*.

The plain language of the Section II of the Agreements vested the trustee with the power to sell or convey any part of the TMI shares held by the Dynasty Trusts. However, Section IV explicitly modified the trustee's powers. The trustee no longer had the sole authority to purchase, sell, or encumber trust property when an Investment Committee was in existence. In such a case, the

Agreements obligated the trustee to follow the written directions of the Investment Committee, provided the requested transaction did not violate the law or another provision in the Agreement. Hence, the trustee, Citicorp, was a "directed" trustee with limited authority to reject the purchase or sale of trust property entered into by the Investment Committee.

The Court finds that Investment Committee had the authority to dispose of Dynasty Trust assets in December 1999. [2] By submitting stock purchase agreements to Citicorp, the Investment Committee bound the Dynasty Trusts, pending final authorization from Citicorp. Citicorp had the responsibility of ensuring the transaction did not violate the law or another provision of the Agreement **[*18]** and completing the paperwork to consummate the transaction. Citicorp's obligations were finalized in July 2000. Notably, after conducting its due diligence and approving the stock purchase agreements, Citicorp designated December 27, 1999, as the effective date for the sale. It is also undisputed that Citicorp accepted interest payments accruing as of December 27, 1999. All further evidence that the Investment Committee had the authority to bind the Dynasty Trusts in December 1999.

The Court further finds the sale of TMI stock held by the Dynasty Trusts was effective December 27, 1999, as part of a SIT. The Court has not overlooked the fact that Tharaldson and the grantors **[*19]** of the Dynasty Trusts signed IRS statements in March 2000 indicating they owned shares of TMI stock. These documents may be dispositive for resolution of tax questions, but carry much less weight on the legal issue of whether the Investment Committee had the authority to bind the Dynasty Trusts, particularly when in March 2000, Citicorp had not yet signed off on the stock purchase agreements and no money or notes had changed hands - ownership of the stock was in limbo pending final approval by Citicorp. North Star's claim that Gary Tharaldson breached his fiduciary duties, as a matter of law, by not obtaining an updated valuation of the stock in July 2000 fails in light of the Court's finding that the sale was part of a SIT occurring in 1999. North Stars motion for partial summary judgment on this issue is **DENIED** and Gary Tharaldson's motion for summary judgment on this issue is **GRANTED.**


*B. Whether the Dynasty Trusts are "Parties in Interest"*

*ERISA § 406(a)(1)* prohibits a fiduciary from engaging in a sale or exchange of property between an ESOP and a "party in interest," and from transferring plan assets for the benefit of a "party in interest." North Star asserts the Dynasty Trusts **[*20]** are "parties in interest" under the plain language of ERISA. Alternatively, North Star contends that a fiduciary may be liable under *§ 406(a)(1)* when it causes an ESOP to engage in a transaction with a non-party in interest in which he knows or should know uses plan assets for the benefit of a "party in interest." Tharaldson counters that the Dynasty Trusts were not "parties in interest" as defined under ERISA.

---

[2] The fact that Haugen and Knutson signed the stock purchase agreements as "trustees" instead of Investment Committee members does not alter the result. The unambiguous language in the Agreements permitted Haugen and Knutson to dispose of trust property. Moreover, under South Dakota law, unless otherwise provided in an agreement, an investment trust advisor has the power to "[d]irect the trustee with respect to the retention, purchase, sale, or encumbrance of trust property. . . ." *S.D. Codified Laws § 55-1B-10 (1)*.

Under *ERISA § 406(a)(1)(A)*, it is a "prohibited transaction" for a fiduciary to sell or exchange property of an ESOP plan with a "party in interest." *29 U.S.C. § 1106(a)(1)(A)*. It is also a "prohibited transaction" to transfer to or use by or for the benefit of a "party in interest" any assets of the plan. *29 U.S.C. § 1106(a)(1)(D)* (*ERISA § 406(a)(1)(D)*). Such transactions are prohibited "because of the obvious conflicts of interest and the high potential for abuse and injury to the plan." *Herman v. South Carolina Nat'l Bank, 140 F.3d 1413, 1418 (11th Cir. 1998)*. A "party in interest" encompasses "those entities that a fiduciary might be inclined to favor at the expense of the plan's beneficiary." *Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc., 530 U.S. 238, 242, 120 S. Ct. 2180, 147 L. Ed. 2d 187 (2000)*. **[*21]** While all fiduciaries are parties in interest under the meaning of the statute, not all parties in interest are fiduciaries. *In re Luna, 406 F.3d 1192, 1203 (10th Cir. 2005)*.

The Court must determine whether Tharaldson, as trustee of the ESOP, engaged in a sale with a "party in interest" or a transfer of plan assets for the benefit of a "party in interest." North Star relies on *ERISA § 3(14)(F)* while Tharaldson cites to *§ 3(14)(G)*.

*ERISA § 14* provides, in relevant part:

> **(14)** The term "party in interest" means, as to an employee benefit plan —
>
> > **(A)** any fiduciary (including, but not limited to, any administrator, officer, trustee, or custodian), counsel, or employee of such employee benefit plan;
> >
> > **(B)** a person providing services to such plan;
> >
> > **(C)** an employer any of whose employees are covered by such plan;
> >
> > **(D)** an employee organization any of whose members are covered by such plan;
> >
> > **(E)** an owner, direct or indirect, of 50 percent or more of —
> >
> > > **(I)** the combined voting power of all classes of stock entitled to vote or the total value of shares of all classes of stock of a corporation.
> > >
> > > **(ii)** the capital interest or the profits interest of a partnership, or
> > >
> > > **(iii)** the beneficial interest of a trust or unincorporated **[*22]** enterprise,
> > > which is an employer or an employee organization described in subparagraph (C) or (D);
> >
> > **(F)** a relative (as defined in paragraph 15) of any individual described in subparagraph (A), (B), (C), or (E);
> >
> > **(G)** a corporation, partnership, or trust or estate of which (or in which) 50 percent or more of —
> >
> > > **(I)** the combined voting power of all classes of stock entitled to vote or the total value of shares of all classes of stock of such corporation,
> > >
> > > **(ii)** the capital interest or profits interest of such partnership, or

**(iii)** the beneficial interest of such trust or estate,
is owned directly or indirectly, or held by persons described in subparagraph (A), (B), (C), (D), or (E);

The term "relative" includes "a spouse, ancestor, lineal descendant, or spouse of a lineal descendant." *ERISA § 3(15)*.

Gary Tharaldson's children established the Dynasty Trusts. The beneficiaries are the grandchildren of Gary Tharaldson. While the persons establishing the trusts and the beneficiaries of the trusts are lineal descendants of, and thus by definition relatives of, Gary Tharaldson, the statute contains a special provision dealing with trusts. *Section 3(14)* includes as parties in interest certain trusts that **[*23]** are "owned directly or indirectly, or held by persons described in *subparagraphs (A)*, *(B)*, *(C)*, *(D)*, or *(E)*." The owners of the Dynasty Trusts do not fall into any of these categories. Notably absent is any reference to *subparagraph (F)* dealing with relatives.

*Section 3(14) of ERISA* provides a long and carefully crafted definition of those persons or entities that are considered a "party in interest." North Star's interpretation would in effect add an additional category. North Star seeks to supplant the requirements relating to trusts with a requirement that the Dynasty Trusts need only be owned or held by relatives of a fiduciary. Congress could have easily included *subparagraph (F)* in *section 3(14) (G)*, as it did with *subparagraphs (A)*, *(B)*, *(C)*, *(D)*, or *(E)*, but it did not do so. ERISA is a detailed statute and North Star's interpretation would upset the legislative scheme reflected in *§ 3(14)*. The Court rejects North Star's argument that the Dynasty Trusts are parties in interest, as defined in *§ 3(14) of ERISA*. Consequently, the sale of the Dynasty Trusts' shares of TMI stock to the ESOP was not a prohibited transaction, as a matter of law, under *ERISA § 406(a)(1)(A)*.

Turning to **[*24]** the second issue of whether Gary Tharaldson, as trustee of the ESOP, transferred for the benefit of a "party in interest" assets of the plan, the Court finds instructive *Reich v. Compton, 57 F.3d 270 (3d 1995)*. In Reich, the court determined that in order to establish a violation under *ERISA 406(a)(1)(D)*, as North Star alleges there was, there must be proof of a subjective intent to benefit a party in interest. *Id. at 279*. The court explained:

In ordinary usage, if something is done "for the benefit of" x, it is done for the purpose of benefitting x. If something is not done for the purpose of benefitting x but has that unintended effect, it cannot be said that it was done "for the benefit of" x. . . . If "for the benefit of" is read to mean "having the effect of benefitting," section 406(a)(1)(D) would appear to prohibit a fiduciary from causing a plan to engage in any transaction that he or she should know would result in any form or degree of benefit for any party in interest, even if the transaction would be highly advantageous for the plan and the benefit for the party in interest would be unintended, indirect, and slight.

*Id. at 279*.

North Star has not posited evidence of proof **[*25]** of subjective intent to benefit a party in interest. Rather, it presumes Gary Tharaldson used plan assets for the benefit of his grandchildren because one can infer that by receiving the notes in exchange for their shares of TMI stock, the grandchildren benefitted. On this record, the Court is unable to determine that the

stock purchase agreements were executed with the purpose of benefitting a "party in interest." Undoubtedly, the sale of the stock had the effect of benefitting Gary Tharaldson's grandchildren, but to find something had the effect of benefitting a party in interest is different than finding something was done "for the benefit of" a party in interest. Because a violation of § 406(a)(1)(D) requires proof of a subjective intent to benefit a party in interest and there is a lack of such evidence in the record, Plaintiffs have failed to establish liability on the part of the Dynasty Trusts and they are entitled to be dismissed as defendants. [3] North Star's motion for summary judgment on this issue is **DENIED** and Gary Tharaldson's motion for summary judgment on this issue is **GRANTED.** See _Reich, 57 F.3d at 280_. [4]

## II. Gary Tharaldson's Motion for Summary Judgment

Before the Court is Gary Tharaldson's motion for summary judgment (Doc. **[*27]** #569). Tharaldson seeks summary judgment on the following issues: (A) whether the fair market value of the ESOP Notes is the appropriate method of determining if the ESOP paid more than "adequate consideration" along with whether the ESOP Notes' fair market value is at least 37% to 42% less than their face amount; (B) whether the failure to fund and pay $50 million in cash to the Selling Shareholders negated the December 1998 transaction; (C) whether the ESOP's debt from any earlier sale reduced the non-ESOP Selling Shareholders' equity value dollar-for-dollar; and (D) whether there was a binding agreement to sell the Dynasty Trust shares in December 1999. Plaintiffs [5] contest each issue, arguing they are entitled to summary judgment on these issues or, at a minimum, there are disputed issues of fact precluding summary judgment.

## A. Appropriate Method of Valuing the ESOP **[*28]** Notes

Gary Tharaldson asserts TMI was acquired with ESOP Notes having a fair market value less than their face amount. Plaintiffs contend the ESOP Notes must be treated as "cash equivalents" and must be valued at their face amount.

_ERISA § 408(e)(1)_ provides that an ESOP may acquire employer stock "if such acquisition, sale, or lease is for adequate consideration." _29 U.S.C. § 1108(e)(1)_. ERISA defines "adequate

---

[3] This Court's finding as to the Dynasty Trust defendants does **[*26]** not obviate Gary Tharaldson's alleged liability regarding the sale of the Dynasty Trust shares. There are genuine issues of material fact regarding whether Tharaldson acted in such a way that establishes the Dynasty Trust defendants are the "alter egos" of Mr. Tharaldson. To apply the alter ego doctrine, there must be unity of interest such that separate personalities do not in reality exist. See _Red River Wings, Inc. v. Hoot, Inc., 2008 ND 117, 751 N.W.2d 206, 221 (N.D. 2008)_. If Gary Tharaldson is found personally liable for the sale of these shares, he may have a contribution claim against these defendants. No such claim has been presented in the current action.

[4] Moreover, even if the Dynasty Trusts were "parties in interest" under the statute, there are genuine issues of material fact with regard to whether the TMI ESOP paid more than "adequate consideration" for the stock. The connection between a breach and loss in the ERISA context is a fact-intensive inquiry that is not susceptible to summary judgment. _Roth v. Sawyer-Cleator Lumber Co., 16 F.3d 915, 919 (8th Cir. 1994)_.

[5] Plaintiffs and North Star filed a consolidated brief in opposition to Tharaldson's motion for summary judgment. Where Plaintiffs are referred to in this section, it includes Plaintiffs and North Star in its representative capacity to advocate for the interests of the Current Employee Class and as fiduciary of the ESOP.

consideration" as the "fair market value of the asset as determined in good faith by the trustee or named fiduciary pursuant to the terms of the plan and in accordance with regulation promulgated by the Secretary [of Labor]." *ERISA § 3(18)(B)*. Nonetheless, even where a trustee fails to make a good faith effort to determine the fair market value of stock, "he is insulated from liability if a hypothetical prudent fiduciary would have made the same decision anyway." *Herman v. Mercantile Bank, N.A., 143 F.3d 419, 421 (8th Cir. 1998)* (quoting *Roth v. Sawyer-Cleator Lumber Co., 16 F.3d 915, 919 (8th Cir. 1994))*.

The determination of adequate consideration has two facets: the "fair market value" part and the "good faith" part. [6] *Chao v. Hall Holding Co., Inc. 285 F.3d 415, 436 (6th Cir. 2002)*;  **[*29]** see *Mercantile Bank, 143 F.3d at 425* (Bright, J., dissenting) ("The definition of 'adequate consideration' under ERISA imposes a two-fold requirement: (1) the price paid must reflect the fair market value of the asset, and (2) the trustee must conduct a careful and independent investigation of the circumstances prevailing at the time of the investment."). The term "fair market value" is often recited as

the price at which an asset would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, and both parties are able, as well as willing, to trade and are well-informed about the asset and the market for that asset.

*Henry v. Champlain Enterprises, Inc., 445 F.3d 610, 619 (6th Cir. 2006)* (quoting Proposed Regulation, 53 Fed.Reg. at 17,634). The fair market value of an asset might not be the same as its face value. See *Gonzalez v. United States, No. C 08-3189 SBA, 2011 U.S. Dist. LEXIS 21928, 2011 WL 835554, *2 (N.D.Cal. Mar. 4, 2011)* (stating that the fair market value of the bonds exceeded their face value due to the high interest rates); *Agway, Inc., Employees' 401(k) Thrift Investment Plan v. Magnuson, No. 5:03-CV-1060 (HGM/DEP), 2006 U.S. Dist. LEXIS 74670, *17, 2006 WL 2934391, *6 (N.D.N.Y. Oct. 12, 2006)* **[*30]**  (noting that company acknowledged that the face values of the securities held by the fund did not represent an accurate measure of the fair market value of the instruments held in the fund).

Plaintiffs' assertion that the Court must only look at the fair market value of the stocks when determining whether there was "adequate consideration" for the transaction isolates half of the transactional equation. In order to determine whether there was "adequate consideration" for the purchase, one must look at the fair market value of the asset being sold in relation to the price paid by the purchaser - that is, the price at which an asset would change hands between a willing buyer and a willing seller. Both sides  **[*31]** in this litigation have made statements on the fair market value of the ESOP Notes, indicating the value could be less than the face amount. Compare Doc. #351-2, Messina Decl. p. 6 of 19, plaintiffs' expert - "the notes, if sold on the open market, would be discounted by between 75% and 42% and the fair market value of the $120 million in notes would be between $29 million and $70 million" with Doc. #580-3, Reilly Expert Report ¶ 78, defendants' expert - "the fair market value of the promissory notes . . . was as follows: a. $260 million (i.e. an approximate 42 percent price discount from the stated face

---

[6] Tharaldson contends that when determining whether a fiduciary breached his duties with regard to an acquisition on behalf of an ESOP, "price, not process controls" (Doc. #575-1, p. 29 of 45). Such a contention is an understatement of the analysis. Not only must the price paid reflect the fair market value of the asset, but the trustee must conduct a good faith investigation to determine the fair market value of the transaction.

value) based on the actual terms of the notes. . . .) b. $283 million (i.e. an approximate 37 percent price discount from the state [sic] face value) assuming the notes are fully amortized . . .). In addition, Plaintiffs have proffered evidence that the ESOP Notes are exempted from ERISA's fair market value analysis. Likewise, both sides dispute whether the ESOP Notes are "cash equivalents." Compare Lee Bloom's testimony at the *Daubert* hearings with Jeffrey Krenzel's testimony.

Despite the volume of conflicting opinions, both sides appear to believe the dispute can be decided on summary **[*32]** judgment. Plaintiffs rely heavily on *Neil v. Zell, 767 F.Supp.2d 933 (N.D.Ill. 2011)* to support their assertion that the ESOP Notes are "cash equivalents" and must be valued at their face amount. This Court does not read the case in the same way as Plaintiffs do. In *Neil*, the district court considered the measure of damages under ERISA when the ESOP purchased $250 million worth of Tribune common stock with a promissory note to be paid over thirty years using expected contributions from the Tribune Company. The Tribune Company made a cash contribution of $15.3 million to the ESOP ($2.8 million in principal and $12.5 million in interest). Subsequently, the Tribune Company entered bankruptcy, rendering the shares held by the ESOP worthless.

In Neil, the defendant urged that damages should be capped at "out of pocket loss," which would amount to no more than $15.3 million. The plaintiffs proposed three possible measures of damages, all of which likely would result in an award of more than the alleged "out of pocket loss." Those methods included: "(1) the difference between the amount paid for the stock and its actual value; (2) the difference between the performance of the ESOP investment **[*33]** and a hypothetical prudent investment; and (3) the total amount lost due to an improper investment." *Id. at 944*. Noting ERISA grants to courts the power to fashion an award so as to make the injured plan whole, the court did not exclude any of the plaintiffs' proposed methods at the summary judgment stage, finding there were disputed facts that needed to be resolved prior to a determination on damages.

While analyzing the proposed methods of calculating damages, the district court compiled several cases and drew the conclusion that the purchase price includes the full amount of the debt incurred, even if the transaction was completed with the aid of debt financing. *Id. at 946*. No one in this litigation has claimed that the debt financing should not be considered: rather the dispute is over the value of the ESOP Notes in relation to the financing terms.

The court further explained "[a]t this stage in the litigation, the court cannot say that Defendant would be liable for the entire difference between the hypothetical prudent investment and the now-worthless investment of $250 million in Tribune Company stock." *Id. at 947*. Likewise, the court could not conclude that there was an amount **[*34]** less than the total investment -$15.3 million - which would limit recovery. Id. In allowing all three theories of recovery to proceed, the court remained cognizant that a plaintiff is not entitled to a "windfall." Rather, the maximum recovery that may be awarded under ERISA is limited to that which would put the "employees in the place they would have been in had the $250 million been prudently, properly, and legally invested." *Id. at 949*.

Plaintiffs bear the burden of showing breach of fiduciary duty and a prima facie case of loss to the plan. *Roth, 16 F.3d at 920*. Here, Plaintiffs ask this Court to draw the conclusion from the

analysis in Neil that the fair market value of the ESOP Notes cannot be considered when determining whether the ESOP acquired TMI stock for "adequate consideration." Plaintiffs also rely on Ernst & Young's opinion that the 1998 Notes were cash equivalents for purposes of § 1042 tax treatment. [7] However, the parties have presented dueling expert opinions on the matter. The Court also heard extensive testimony during the *Daubert* hearing that TMI was an anomaly in that it was "cash rich," providing a unique basis for the structure of the transaction.

If at trial liability lies with Gary Tharaldson, in shaping an award the Court must be mindful of the competing concerns **[*36]** - on the one hand, the "windfall" concerns which Tharaldson appears to be expressing, and, on the other hand, recognition that the ESOP investment was real and represented an investment that may have resulted in foregone opportunities and/or loss to participants if more than "adequate consideration" was paid. It is not until after the Court hears all of the evidence that it will be in a position to determine whether the ESOP Notes should be valued at something less than face amount. At this stage in the proceedings, the Court cannot find that, as a matter of law, the ESOP Notes must be deemed "cash equivalents" and must be valued at their face amount. Likewise, in light of the conflicting evidence in the record, the Court cannot say at this stage in the proceedings that the ESOP Notes are valued at 37% to 42% less than their face amount. The fair market value of the ESOP Notes is a question of fact for trial.

As to the second facet of the analysis - whether Tharaldson conducted a good faith investigation before valuing the notes - he has failed to show that there are no genuine issues of material fact regarding the reasonableness of his conduct. To say a decision is objectively reasonable **[*37]** requires taking into account everything the trustee knew and should have known at the time of the decision. *Roth, 16 F.3d at 919*. The Court cannot say at this stage in the proceedings that Tharaldson fulfilled his fiduciary duties as a matter of law. Whether the ESOP paid "adequate consideration" for the stock it purchased at the behest of Gary Tharaldson is a question of fact, not one for which Plaintiffs or Defendants are entitled to judgment as a matter of law.

### B. Agreement in December 1998 to Purchase 50% of TMI

In December 1998, Gary Tharaldson and other stock owners ("the Selling Shareholders") attempted to set up an ESOP for TMI in a tax-advantaged transaction under which the Selling Shareholders could defer the recognition of the capital gains they would otherwise incur under the Internal Revenue Code. Ernst & Young set up the transaction, anticipating the Selling Shareholders collectively would sell $250 million worth of their shares to the ESOP for $50 million in cash and $200 million in notes. The Selling Shareholders agreed to provide $50 million

---

[7] Plaintiffs **[*35]** seek to estop Tharaldson from arguing the ESOP Notes were worth less than their face amount because his argument contradicts representations made to the IRS on personal income tax returns. The Former Employee Class asserts a similar argument with respect to TMI stock purchased as qualified replacement property in November 2000. Quasi-estoppel prevents a party from asserting a position in a judicial proceeding different than what was reported on their income tax returns. *Amtrust Inc. v. Larson, 388 F.3d 594, 601 (8th Cir. 2004)*. Undoubtedly, Tharaldson represented to the IRS that the fair market value of the ESOP Notes was their face amount in order to qualify for § 1042 tax-free treatment. Plaintiffs' argument that it would be "unconscionable" to allow Tharaldson to contest the fair market value of the ESOP Notes in these proceedings is an exaggeration in light of the conflicting expert testimony on the issue. The Court will allow evidence as to the fair market value of the ESOP Notes, including any tax forms, and then give that evidence whatever weight it deserves.

in cash in exchange for a $50 million note to pay the Selling Shareholders since the ESOP had no cash to consummate the transaction. [*38] Under these terms, the ESOP would then have the cash to pay the Selling Shareholders. On December 17, 1998, the Selling Shareholders and the ESOP executed the stock purchase agreements. The agreements provided, in relevant, part as follows:

> 1. Sale of Stock. (A) Shareholder hereby agrees to sell the Stock to the ESOP, and the ESOP hereby agrees to purchase the Stock from Shareholder, for an aggregate purchase price of the lesser of . . . or the fair market value of the Stock as finally determined by a qualified independent appraiser.
>> (B) Upon surrender to the ESOP of the stock certificates representing the Stock, duly endorsed in blank, free and clear of all liens, claims, encumbrances, and security interests, the ESOP shall pay to Shareholder the purchase price for the Stock by delivery of a promissory note from the ESOP in the form of Exhibit A attached hereto, in the principal amount of . . . ("the "Note") and Cash equal to . . .

(Doc. #588-5, 575-13).

On December 17, 1998, TMI was a Subchapter C Corporation. Ernst & Young advised TMI to convert from a C Corporation to an S Corporation. Gary Tharaldson executed the forms necessary to elect conversion of TMI from a C Corporation to an [*39] S Corporation, to be effective January 1, 1999. Ernst & Young realized in the fall of 1999 that the transaction was not fully executed as planned. The elections needed for the TMI shareholders to receive § 1042 tax treatment under the Internal Revenue Code from the sale had not been filed. In addition, the $50 million cash payment that was supposed to be part of the transaction was not paid. In an effort to salvage the 1998 transaction and correct the tax issues, Ernst & Young suggested TMI and the Selling Shareholders reexecute the stock purchase agreements.

The "revised" transaction executed on December 27, 1999, provided that the ESOP would acquire 50% of the shares of TMI at $50 per share (the price set in the 1998 stock purchase agreements) plus 48% of the shares at $52 per share, and 2% of the shares for $35 per share. [8] Ernst & Young prepared the tax documents necessary to effectuate the sale of the shares to the ESOP, allowing the favorable tax treatment under § 1042. The transaction was structured so that the ESOP financed the acquisition with a TMI bank loan of $50 million and approximately $450 million in ESOP Notes (Doc. #857-2, ¶ 23). Gary Tharaldson personally guaranteed [*40] the TMI bank loan. Id. The earlier $50 million in TMI notes were replaced with ESOP Notes having terms ranging from 20 to 30 years. Id.

Plaintiffs contend the December 17, 1998, stock purchase agreements were a valid and enforceable obligation of the ESOP and should have been deemed fully performed on or before December 27, 1999, when Gary Tharaldson executed the "revised" agreements selling 100% of TMI stock. Plaintiffs further contend that Gary Tharaldson's failure to take into account the debt resulting from the 1998 agreements caused the ESOP to pay more than "adequate consideration" for TMI stock in 1999. Gary Tharaldson asserts the 1998 stock purchase

---

[8] In 1999, Tharaldson donated 200,000 shares (2% of TMI) to the Fargo-Moorhead Area Foundation (Doc. #575-2, 22). The Foundation sold its shares to the ESOP on December 27, 1999, for $35 per share. Id.

agreements were executory under North Dakota law because all concurrent conditions had not been met.

A contract in writing may be altered by a contract in writing. *N.D. Cent. Code § 9-09-06*. A contract becomes executed when the object of which is fully performed. *N.D. Cent. Code § 9-01-03*. All other contracts are executory. Id. Ernst & **[*41]** Young proposed using a multi-step transaction to create an ESOP involving TMI, TMI shareholders, and the ESOP. The stock purchase agreements in December 1998 contemplated the ESOP acquiring a 50% non-controlling interest of TMI. As part of the proposed transaction, it was anticipated that the Selling Shareholders would loan TMI $50 million in cash in exchange for a promissary note from TMI, and TMI would then loan the ESOP the $50 million cash in exchange for a promissory note. The intended result was to put five million shares of TMI stock in the coffer of the ESOP in exchange for $50 million in cash and $200 million in promissory notes from the ESOP. The $50 million cash payment, however, was never made.

Plaintiffs have not pointed the Court to any evidence to suggest Gary Tharaldson, the other Selling Shareholders, or Ernst & Young, acted with fraud or intend to defraud. Gary Tharaldson assumed the transaction was executed as planned. The undisputed evidence demonstrates that the failure to file the appropriate tax documents and to make the $50 million payment was simply an oversight discovered in the fall of 1999. [9] The "revised" transaction in December 1999 included sale of the **[*42]** same quantity of stocks for the same per share price contemplated in 1998, plus sale of the remaining shares of stock.

Under North Dakota law, when determining the enforceability of contractual obligations, a party must fulfill all conditions precedent [10] and all conditions concurrent [11] before the obligation is enforceable. *N.D. Cent. Code § 9-01-16*. The question of whether the ESOP had entered into a valid and enforceable obligation on December 17, 1998 is critical to determining the fair market value of the transactions on December 27, 1999. Plaintiffs contend "substantial performance" on the agreement occurred in 1998 and consideration in the form of TMI notes rather than cash in the amount of $50 million is a discrepancy that makes no difference because legal title to stock passes to a purchaser upon delivery of the stock certificates. Even assuming legal title passed, the failure to make the $50 million cash payment was a failure to fulfill all concurrent **[*43]** conditions under the terms of the stock purchase agreements. As such, there was no enforceable obligation under North Dakota law prior to December 27, 1999.

---

[9] Although there is no evidence of fraud or intent to defraud, genuine issues of material fact exist as to whether Gary Tharaldson breached his fiduciary duties in failing to ensure the 1998 transaction was executed as planned.

[10] "A condition precedent is a condition which is to be performed before some right dependent thereon accrues or some act dependent thereon is performed." *N.D. Cent. Code § 9-01-11*.

[11] "Conditions concurrent are those which are mutually dependent and are to be performed at the same time." *N.D. Cent. Code § 9-01-12*.

In resolving a discovery dispute related to this case, [12] another district court judge and a magistrate judge found that the 1998 transaction was not successfully executed under North Dakota law. (Doc. #576-21 & #576-22). This Court finds their analyses consistent with North Dakota law and supported by the facts and circumstances arising in this case. Thus, before December 27, 1999, there was no enforceable obligation of the ESOP as a matter of law, and thus there was no pre-existing ESOP acquisition debt in 1999 when the transaction was "revised" and ultimately closed. The Court finds that the original 1998 agreement and the revised 1999 agreement were part of a single integrated transaction ("SIT"). [13] Gary Tharaldson's [*44] motion for summary judgment on this issue is **GRANTED.**

## C. Non-ESOP Selling Shareholder's Equity Value

Gary Tharaldson seeks a determination on whether the ESOP's debt from any earlier purchase destroyed the non-ESOP Selling Shareholders' equity value proportionately dollar-for-dollar. He contends that how a party finances acquisition of stock should have no bearing on the other shareholders and thus the acquisition debt of the ESOP did not destroy the equity value dollar-for-dollar of the non-ESOP shareholders, consisting of Gary and his family. Here, Gary Tharaldson asserts the transaction was structured so that shareholder distributions were to be used to pay the ESOP loan and as such [*45] only the ESOP shareholders pay the costs of the acquisition debt.

Gary Tharaldson raises this claim in response to Plaintiffs' assertion that the $250 million in ESOP acquisition debt from the 1998 sale destroyed, proportionally, the equity value of the non-ESOP shareholders. Plaintiffs contend that ESOP-related debt from the 1998 transaction must be deducted from total invested capital in calculating the equity value to be paid by the ESOP in a subsequent stock purchase, whether or not the plan is to make distributions or contributions to the ESOP. In light of the Court's finding that the 1998 transaction is part of a SIT consummated in 1999, this claim has been rendered moot and any opinion on the merits would result in an improper advisory opinion.

## D. Effective Date of the ESOP's purchase of the Dynasty Trust Shares

Gary Tharaldson contends as part of his summary judgment motion that the ESOP entered into binding stock purchase agreements on December 27, 1999, with the Dynasty Trusts. Plaintiffs argue the sale did not occur until July 2000. This issue has been fully analyzed and resolved as part of North Star Trust's motion for partial summary judgment in the first section of the memorandum. [*46] For the reasons stated earlier, the Court finds the purchase of the Dynasty Trust shares by the ESOP occurred as part of a SIT on December 27, 1999. Gary Tharaldson's motion for summary judgment on this issue is **GRANTED.**

---

[12] Plaintiffs brought a motion to compel production of documents prepared by Ernst & Young in the District of Minnesota. Ernst & Young objected to disclosure of the privileged documents, a non-party in the action. Following an in camera review of the documents, the court denied Plaintiffs' motion to compel.

[13] Likewise, the Court found in the previous section examining North Star Trust's motion for partial summary judgment that the ESOP's purchase of the Dynasty Trust shares was also part of the same SIT.

## III. The "Nonfiduciary Selling Shareholders' Motion for Summary Judgment

Before the Court is a motion for summary judgment by Defendants Connie Tharaldson; Roger Tharaldson; Raymond Braun and James Lochow, as the Trustees of the Michelle Tharaldson Trust and the Matthew Tharaldson Trust; South Dakota Trust Company, LLC, as Trustee of the Michelle Lyn Tharaldson Lemaster Dynasty Trust, the Matthew Tharaldson Dynasty Trust, and Michael Tharaldson Dynasty Trust; and Linda Tharaldson, individually and in her capacity as Trustee for the Michael Tharaldson Trust (collectively referred to as the "Nonfiduciary Selling Shareholders") (Doc. #561). The Nonfiduciary Selling Shareholders assert they are entitled to summary judgment because they had no actual or constructive knowledge of the alleged fiduciary breaches by Gary Tharaldson.

Plaintiffs [14] contend Gary Tharaldson acted as the agent of the "Nonfiduciary Selling Shareholders" during the transactions. [15] They further assert **[*47]** the Nonfiduciary Selling Shareholders had actual knowledge that the sale of the stock to the ESOP was for more than "adequate consideration." Alternatively, Plaintiffs' contend the Nonfiduciary Selling Shareholders should remain parties in this action because, at a minimum, they "intentionally remained ignorant" and blindly followed the instructions of Gary Tharaldson.

Under ERISA, nonfiduciaries may be liable if they **[*48]** are "parties in interest" and, with actual or constructive knowledge, they participate in a fiduciary's breach of its duties by engaging in a prohibited transaction between the plan and a "party in interest." [16] _In re Enron Corp. Securities, Derivative & ERISA Litigation, 284 F. Supp. 2d 511, 571 (S.D.Tex. 2003)._ The remedy, however, is limited to "appropriate equitable relief." Id. (citations omitted).

In _Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc., 530 U.S. 238, 120 S. Ct. 2180, 147 L. Ed. 2d 187 (2000)_, the Supreme Court held the ERISA section allowing a participant, beneficiary, or fiduciary to **[*49]** bring a civil action for equitable relief extends to nonfiduciary parties who engage in a "prohibited transaction." The parties dispute the implications of Harris Trust in this case. The Nonfiduciary Selling Shareholders interpret Harris Trust as meaning liability to nonfiduciaries extends only if they had actual or constructive knowledge of a breach by a fiduciary. Plaintiffs contend all that is required under Harris Trust is the transferee must have actual or constructive knowledge of the circumstances that render the transaction

---

[14] Plaintiffs and North Star Trust, in its representative capacity to advocate for the interests of the Current Employee Class and as fiduciary of the ESOP, filed a consolidated opposition brief. Plaintiffs in this section refers to both Plaintiffs and North Star Trust.

[15] Plaintiffs contend Gary Tharaldson was the agent during the 1998 transaction and the 1999 transaction. However, in light of the Court's ruling that the 1998 transaction was part of a SIT and there is no indication that Tharaldson's involvement in the transactions was somehow different during the 1998 transaction than the 1999 transaction, the Court finds it unnecessary to analyze each transaction separately and instead considers Mr. Tharaldson's actions collectively as occurring in one overall transaction.

[16] In Section I, the Court found that the Dynasty Trusts were not "parties in interest" within the meaning of ERISA. The same reasoning would apply to the Michelle Tharaldson Trust, the Matthew Tharaldson Trust, and the Michael Tharaldson Trust. The Nonfiduciary Selling Shareholders contend the Eighth Circuit has not yet decided whether a nonfiduciary who is not a party in interest may be liable under ERISA for knowingly participating in a fiduciary breach. In light of the Court's other reasons dismissing the Nonfiduciary Selling Shareholders, the Court need not reach this potentially independent basis for dismissal.

prohibited under § 406(a) without regard to whether an exemption under § 408 might apply. The Supreme Court in Harris Trust stated:

> Only a transferee of ill-gotten trust assets may be held liable, and then only when the transferee (assuming he has purchased for value) knew or should have known of the existence of the trust and the circumstances that rendered the transfer in breach of the trust. Translated to the instant context, the transferee must be demonstrated to have actual or constructive knowledge of the circumstances that rendered the transaction unlawful. Those circumstances, in turn, involve a showing that the *plan fiduciary*, with actual or constructive **[\*50]** knowledge of the facts satisfying the elements of a § 406(a) transaction, caused the plan to engage in the transaction. (citation omitted).

*Id. at 251*.

The Court begins its analysis with the statutory language. *ERISA § 406(a)* contains a list of prohibited transactions, specifically exempting transactions that fall under § 408. *29 U.S.C. §§ 1106*, *1108*. While the Supreme Court in Harris Trust did not make specific mention of the exemptions to § 406(a), the exemptions are incorporated by specific reference in the statute. This Court does not believe the exemptions should be ignored when determining nonfiduciary liability under ERISA, or that the Supreme Court intended such a result. See *Nat'l Sec. Sys., Inc. v. Iola, Civil No. 00-6293 (AET), 2007 U.S. Dist. LEXIS 71470, 2007 WL 2868634, \*2 (D.N.J. Sept. 26, 2007)* (interpreting Harris Trust as holding that a nonfiduciary party in interest may be sued under ERISA for engaging in a transaction barred by § 406(a) and not exempted by § 408); *Keach v. United States Trust Co., N.A., 244 F.Supp.2d 968, 976 (C.D.Ill. 2003)* ("there can be no liability of non-fiduciary parties-in-interest absent the existence of a prohibited transaction under § 406(a) which does not qualify for **[\*51]** exemption under *§ 408(e)*").

Moreover, in Harris Trust the court noted the "case comes to us on the assumption that . . . a party in interest . . . entered into a transaction prohibited by § 406(a) and not exempted by § 408." *530 U.S. at 242*. The defendant preserved for remand the issue of whether there was a non-exempted § 406(a) prohibited transaction. Plaintiffs' overly narrow interpretation of *Harris Trust* does not comport with the plain language of the ERISA statute, the Supreme Court's language in Harris Trust, or other case law. Assuming for the sake of argument that there are Nonfiduciary Selling Shareholders who are in fact "parties in interest," Plaintiffs must come forward with evidence to raise a genuine issue for trial that the nonfiduciaries have actual or constructive knowledge that the fiduciary engaged in a prohibited transaction under § 406(a) that was not exempted under *§ 408(e)*.

If a plaintiff meets its burden of establishing that the purchase of stock by an ESOP constituted a "prohibited transaction" under § 406, the nonfiduciary defendants can invoke "the substantive equivalent of a modified bona fide purchaser defense by establishing that they gave value for the **[\*52]** trust property." *Keach v. U.S. Trust Co., N.A., 256 F.Supp.2d 818, 822 (C.D.Ill. 2003)*. If the nonfiduciaries are able to make such a showing, a presumption of good faith attaches, and the burden shifts back to the plaintiff to establish the nonfiduciary defendants acted in "bad faith or had actual or constructive notice of the circumstances that rendered the transaction unlawful." Id.

Viewing the evidence in the light most favorable to the non-moving party, the Court assumes Plaintiffs have demonstrated the purchase of TMI stock on December 27, 1999, was a "prohibited transaction" and not exempted under *ERISA § 408(e)*. [17] The record is clear that the Nonfiduciary Selling Shareholders gave value for the property - the question is whether the value was sufficient, or in other words was for "adequate consideration." Plaintiffs thus bear the burden of establishing the Nonfiduciary Selling Shareholders acted in bad faith or had actual or constructive notice of the circumstances rendering the transaction unlawful. *Keach, 256 F.Supp.2d at 822*.

Plaintiffs have not alleged the Nonfiduciary Selling Shareholders acted in bad faith. Turning to the question of knowledge, there is a lack of evidence that any of the Nonfiduciary Selling Shareholders were in a position that afforded him or her access to the same information that was available to Gary Tharaldson, the plan fiduciary. Plaintiffs have not pointed to any evidence that any of the Nonfiduciary Selling Shareholders drafted any of the documents, made any recommendations as to the structure of the transactions or the value of the stock, or participated in discussions or meetings in contemplation of the transactions. Rather, the undisputed evidence is essentially that they signed where they were told to sign.

The best Plaintiffs can muster is that the Nonfiduciary Selling Shareholders were placed on notice that they were participating in a "prohibited transaction" because they surrendered their stock certificates to Gary Tharaldson, executed loan agreements, or signed other various documents as part of the transactions, which ultimately allowed Tharaldson to transfer the stock to the ESOP (Doc. #588, p. 30 of 47). Undisputedly, this is evidence of the transaction **[*54]** but certainly does put knowledge of material facts of the transaction in the heads of the Selling Shareholders such that they knew or should have understood that Tharaldson might be engaging in a transaction prohibited under ERISA. The deposition testimony of the Selling Shareholders is replete with comments that Gary Tharaldson structured the transaction, they relied on him and other professionals retained by him, and they signed the paperwork he (or persons hired by him) asked them to sign. While the Nonfiduciary Selling Shareholders authorized the transaction by signing their name, there is simply a lack of evidence to support a conclusion that they had actual knowledge of the circumstances that the stock purchase could be unlawful for failure to provide "adequate consideration." Instead, the evidence creates a genuine issue for trial on whether the people and/or entities were Gary Tharaldson's "alter egos" in the course of the ERISA transactions.

With regard to constructive knowledge, North Dakota law frames this Court's analysis:

> Every person who has actual notice of circumstances sufficient to put a prudent person upon inquiry as to a particular fact and who omits to make such **[*55]** inquiry with reasonable diligence is deemed to have constructive notice of the fact itself.

*N.D. Cent. Code § 1-01-25*. Thus, Plaintiffs must show "actual notice of the circumstances" giving rise to the alleged unlawful transaction. The evidence in the record demonstrates the Nonfiduciary Selling Shareholders did not know, or inquire into, the specific underlying details of

---

[17] The Court makes this assumption under the standard applicable to summary judgment motions. The issue is one that ultimately must be resolved by the **[*53]** trier of fact.

the transaction, none the least of which involve complex valuation principles. Plaintiffs have pointed to no evidence to suggest the Nonfiduciary Selling Shareholders should have questioned the form of the transaction or that they should have known their reliance on Ernst & Young or an independent ESOP valuation professional was unreasonable. The shear number of experts and conflicting opinions on the issue is an indication that its alleged unlawfulness would not be apparent to lay persons. To hold otherwise would require counterparties to a transactions with an ESOP plan to monitor for compliance with ERISA's intricate details - something the Supreme Court in Harris Trust cautioned against.

Construing the evidence in a light most favorable to the Plaintiffs and drawing any reasonable inferences from it, there is a **[*56]** paucity of evidence to support a conclusion that any individual Nonfiduciary Selling Shareholder had sufficient information about the transaction such that he or she could be deemed to have actual or constructive knowledge of the potential unlawfulness of the stock purchase under technical and complex ERISA provisions. Finding no genuine issues for trial, the Nonfiduciary Selling Shareholders are entitled to be dismissed from the action as a matter of law.

In another effort to keep the Nonfiduciary Selling Shareholders in this action, Plaintiffs rely on agency principles. They contend that Gary Tharaldson acted as their agent throughout the transactions. The Nonfiduciary Selling Shareholders have denied the existence of an agency relationship with Gary Tharaldson.

There is a presumption that a person acts for himself and not as the agent of another. *Farmers Union Oil Co. of Dickinson v. Wood, 301 N.W.2d 129, 133 (N.D. 1980)*. When an agency relationship is denied, the burden of proof is on the party asserting its existence. Id. The burden of persuasion is the heighten standard of clear and convincing. *Id. at 133-34*. The evidence before the Court by way of deposition testimony indicates **[*57]** each of the Nonfiduciary Selling Shareholders authorized the stock purchase agreements (Doc. #567-1, Braun Dep. pp. 57, 115-16, 123 of 154; Doc. #567-2, Lochow Dep. pp. 22, 96 of 127; Doc. #567-3, C. Tharaldson Dep. pp. 22-23, 27, 45, 48 of 67; Doc. #567-4, R. Tharaldson Dep. pp. 47, 55, 77, 110-111, 113 of 132; Doc. #567-5, L. Tharaldson Dep. pp. 52, 145-46, 149, 175 of 181). No one does, nor can they, seriously dispute that Gary Tharaldson, along with professionals retained by him, was responsible for structuring the transactions and the Nonfiduciary Selling Shareholders signed the paperwork based on Tharaldson's representations or recommendations.

Plaintiffs thus hang their hats on the "Assignments Separate from Certificate" executed by the Nonfiduciary Selling Shareholders (Doc. #588-4). The Assignments transferred the stock to Gary Tharaldson, as trustee of the TMI ESOP and "appoint[ed] Gary D. Tharaldson the attorney-in-fact to transfer the stock on the books of said corporation with full power of substitution in the premises." (Doc. #588-4). It is axiomatic that a power of attorney creates an agency relationship whereby the agent holding the power of attorney is the attorney-in-fact. **[*58]** *State v. Barendt, 2007 ND 164, 740 N.W.2d 87, 90-91 (N.D. 2007)*. The interpretation of an attorney-in-fact's authority is controlled by the rules for construing contracts, unless the fiduciary relationship requires the application of a different rule. *Id. at 91* (citations omitted). Accordingly, the language of the contract governs its interpretation and words are construed in their ordinary sense. Id. (quotation omitted).

The Assignments at issue authorized Gary D. Tharaldson to effectuate the transfer of TMI stock to the ESOP. It was a limited power of attorney. Put in context, the deposition testimony of the Nonfiduciary Selling Shareholders makes clear that they authorized and signed - albeit based at least in part on Tharaldson's advice - the stock purchase agreements, which designated the number of shares to be sold, the price to be paid, and the terms. They gave Tharaldson the authority to transfer the stock held in their names to the ESOP. While Plaintiffs are correct in that the Assignments create an agency relationship, they overstate the authority that was vested in Tharaldson in that relationship. The act of transferring the stock to the ESOP was the final administrative step in the process. **[*59]** The Assignments do not cause Tharaldson's knowledge regarding the structure of the transactions, the appraised value of the stock, the financial condition of the company, or other information held by Gary Tharaldson to be imputed to them. Plaintiffs' argument that the Nonfiduciary Selling Shareholders should be kept in this action under agency principles is unavailing. For all of the reasons stated above, the Nonfiduciary Selling Shareholders' motion for summary judgment is **GRANTED.** Defendants Connie Tharaldson; Roger Tharaldson; Raymond Braun and James Lochow, as the Trustees of the Michelle Tharaldson Trust and the Matthew Tharaldson Trust; South Dakota Trust Company, LLC, as Trustee of the Michelle Lyn Tharaldson Lemaster Dynasty Trust, the Matthew Tharaldson Dynasty Trust, and Michael Tharaldson Dynasty Trust; and Linda Tharaldson are hereby **DISMISSED** as parties in this action.


## IV. The "Current Employee Class'" Motion for Partial Summary Judgment

Before the Court is a motion for partial summary judgment by the Current Employee Class Representatives Carlos Gonzales, Donald Klain, Jolene Matheson-Godschalk, and Sidney Lien (collectively the "Current Employee Class") (Doc. #572). The **[*60]** Current Employee Class seeks summary judgment as to Gary Tharaldson's liability. They contend he breached his fiduciary duties as a matter of law by engaging in a "prohibited transaction" under ERISA in December 1999. They also contend that he breached his fiduciary duties as a matter of law by not ensuring the 1998 transaction was consummated.


### A. The December 1999 Transaction

*ERISA § 406(a)* prohibits a fiduciary from causing a plan to enter into certain transactions with a "party in interest," including the direct or indirect sale or exchange of property between the plan and a "party in interest." *29 U.S.C. § 1106(a)*. The trustee or fiduciary engaging in a transaction with a "party in interest" and relying on the "adequate consideration" exemption, bears the burden of establishing the ESOP paid no more than fair market value of the asset in question and that the fair market value was determined in good faith. See *Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 600 (8th Cir. 2009)*; *Keach v. U.S. Trust Co., 419 F.3d 626, 636 (7th Cir. 2005)*; *Lowen v. Tower Asset Management, Inc., 829 F.2d 1209, 1215 (2d Cir. 1987)*; *Donovan v. Cunningham, 716 F.2d 1455, 1467-68 (5th Cir. 1983)*.

The parties **[*61]** dispute whether the 1999 transaction was one prohibited under ERISA. Many experts have been retained and offered opinions on the fair market value of the sale of TMI stock. At the *Daubert* evidentiary hearing held in August 2011, the Court received a preview of

the extensive testimony that is likely to be presented on the issue. Genuine issues of material fact abound whether the purchase price was for fair market value. Genuine issues of material fact exist as to whether Gary Tharaldson acted in "good faith." Simply stated, the issue of whether Gary Tharaldson breached his fiduciary duties by engaging in the December 1999 transaction is not one in which the Court can decide as a matter of law. Plaintiffs' motion for partial summary judgment on liability regarding the 1999 transaction is **DENIED.**

### B. The December 1998 Transaction

The Current Employee Class contends Gary Tharaldson breached his fiduciary duties by not ensuring the 1998 transaction closed. The loss to the plan, according to the Current Employee Class, is that the ESOP paid "an inflated price" in December 1999 for the second block of TMI stock.

Plaintiffs must not only establish that Tharaldson breached his fiduciary duties **[*62]** but also that the breach caused a loss to the plan. The connection between a breach and loss in the ERISA context is a fact-intensive inquiry that is not susceptible to summary judgment. *Roth, 16 F.3d at 919*. Thus, even assuming Plaintiffs can establish at trial that Gary Tharaldson's failure to oversee the 1998 transaction amounts to a breach of his fiduciary duties, genuine issues of material fact regarding the loss to plan render Plaintiffs' claim improper for summary judgment. Id. Plaintiffs' motion for summary judgment on liability regarding the 1998 transaction is **DENIED.**

### C. ERISA Anti-Cutback and Preemption Issues

"Congress enacted ERISA to ensure that an employee would not lose fully vested, accrued benefits in the event the employer terminated or amended its pension plan." *Hunger v. AB, 12 F.3d 118, 119 (8th Cir. 1993)* (citation omitted). ERISA was amended in 1984 to add *§ 204(g)*, the "anti-cutback rule," as a way to prevent retirement plans from being amended to reduce or eliminate a participant's early retirement subsidy. Id. *Section 204(g)* prohibits decreases in a participant's accrued benefit through amendment of the plan on the following bases:

**(A)** eliminating or reducing **[*63]** an early retirement benefit or a retirement-type subsidy (as defined in regulations), or

**(B)** eliminating an optional form of benefit,
with respect to benefits attributable to service before the amendment shall be treated as reducing accrued benefits.

*29 U.S.C. § 1054(g)(2)*.

The "reversal" in 1999 of the 1998 transaction did not amount to an "amendment" of the plan. Rather, it affected benefits that were supposed to be in the plan. Nonetheless, the Current Employee Class contends the anti-cutback provision comes into play because the ESOP and TMI had made interest payments to the Selling Shareholders on or before August 1999, thereby

entitling ESOP participants to accrued benefits. [18] In making this argument, the Current Employee Class fails to acknowledge that the "reversal" of the 1998 transaction also consisted of a re-execution of the transaction in December 1999 for the same number of stock shares at the same price. In addition, the interest payments made to the Selling Shareholders were treated as part of the contributions to the ESOP.

Moreover, the argument becomes rather circular when analyzed in conjunction with the Court's finding that the 1998 transaction was not an enforceable obligation. Nonetheless, it appears certain payments were made before the parties realized there was no enforceable obligation. In any event, the "reversal" of the 1998 transaction simply did not amend the plan or eliminate or reduce a benefit guaranteed to TMI ESOP participants. There is no violation of ERISA's anti-cutback rule. Instead, the loss to the plan, if any, is an amount to be determined as damages at trial.

Additionally, the Current Employee Class argues ERISA preempts application of North Dakota contract law and Gary Tharaldson should have obtained "competent" advice with regard to this preemption issue. Gary Tharaldson counters that preemption is not an issue because there is no state law at issue that relates to an employee benefit plan.

*ERISA § 514(a)* contains an express preemption provision superceding any and all state law "insofar as they may now or hereafter relate to any employee benefit  **[*65]** plan." *29 U.S.C. § 1144(a)*. The Supreme Court has said that a law "relates to" an employee benefit plan if it (1) expressly refers to it, or (2) has a connection to such a plan." *Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 96-97, 103 S. Ct. 2890, 77 L. Ed. 2d 490 (1983)*. Following <u>Shaw</u>, the Supreme Court clarified that state statutes of general applicability, while imposing some burdens on the administration of ERISA plans, do not necessarily "relate to" a plan within the meaning of the statute. *De Buono v. NYSA-ILA Med. & Clinical Servs. Fund, 520 U.S. 806, 815, 117 S. Ct. 1747, 138 L. Ed. 2d 21 (1997)*.

The Eighth Circuit has listed seven factors courts should consider in determining whether a state law claim has a connection to an employee benefit plan, including whether the state law: (1) negates an ERISA plan provision; (2) affects relations between primary ERISA entities; (3) impacts the structure of ERISA plans; (4) impacts the administration of ERISA plans; (5) has an economic impact on ERISA plans; (6) is consistent with other ERISA provisions if preemption applies; and (7) is an exercise of traditional state power. *Eckelkamp v. Beste, 315 F.3d 863, 870 (8th Cir. 2002)*.

At issue are basic North Dakota contract principles embodied in state law.  **[*66]** ERISA does not contain a provision detailing when a stock purchase agreement or other contract involving an ESOP is enforceable. The Current Employee Class points to no authority to support their argument that ERISA preempts state laws of general application when there is, at most, only a tenuous connection to the plan. Even so, applying the seven factor test, it is clear that ERISA preemption is not at issue here. The contract principles applied by the Court do not negate an

———————————

[18] Gary Tharaldson asserts the Court should not consider this argument because it is not alleged in the Fourth Amended Complaint or in any of the preceding  **[*64]** pleadings. While there are issues regarding the timeliness of the claim, the Court has considered it out of completeness for the record.

ERISA plan provision, affect relations between ERISA entities, or impact the structure, administration, or economic impact of ERISA plans. The Current Employee Class' claim that preemption prevents this Court from determining whether the stock purchase agreements executed in 1998 was an enforceable obligation under North Dakota law is unavailing.

### D. Failure to Obtain a Fairness Opinion or Further Investigation

According to the Current Employee Class, in December 1999, Gary Tharaldson should have retained an independent financial advisor for a "fairness opinion" and should have conducted a more thorough investigation. A "fairness opinion" is an evaluation by an independent financial advisor to help an ESOP fiduciary **[*67]** make an informed business judgment (Doc. #580-1, Reilly Dep. p. 129).

The issue of whether a "fairness opinion" was necessary in this case is in dispute. Gary Tharaldson's expert, Robert Reilly, testified at his deposition that he has recommended "fairness opinions" but is aware of no requirement that one be obtained. Id. He further testified at the *Daubert* hearing that "fairness opinions" were less common in 1999 than they are today.

A district court may not weigh the evidence at the summary judgment stage. *Eckelkamp,315 F.3d at 869*. In order to determine whether Gary Tharaldson breached his fiduciary duties by failing to obtain a "fairness opinion," the Court would be improperly weighing the conflicting evidence. Likewise, whether Gary Tharaldson inadequately investigated the value of the 1999 transaction or its potential ramifications to ESOP participants are issues to be decided at trial. Moreover, even where a trustee fails to make a good faith effort to determine the fair market value of stock, "he is insulated from liability if a hypothetical prudent fiduciary would have made the same decision anyway." *Herman 143 F.3d at 421* (quoting *Roth, 16 F.3d at 919*). In light of the conflicting **[*68]** evidence, genuine issues of material fact preclude summary judgment on the issue of whether Gary Tharaldson should have obtained a "fairness opinion" or conducted an inadequate investigation before purchasing stock on behalf of the ESOP.

### E. Directions to APEX to Disregard Existing Debt

Gary Tharaldson's directions to APEX to disregard the debt from the 1998 transaction, according to the Current Employee Class, caused the expert to make a valuation based on incomplete and inaccurate information. This argument has been rendered moot by the Court's finding that the 1998 transaction was part of a SIT finalized in 1999.

The record is replete with disputed facts and the Court cannot find Gary Tharaldson breached his fiduciary duties as a matter of law and, therefore, the Current Employee Class' motion for partial summary judgment on the issue of liability is **DENIED.**

## V. The "Former Employee Class'" Motion for Partial Summary Judgment

Before the Court is a motion for partial summary judgment by Former Employee Class Representatives Raymond Hans, Gayle Herbert, Jeremy Jackey, Chuck LeBlanc, Larry

Richman, Donna Walker, and Michael Webster (Doc. #577). The Former Employee Class asserts they are entitled **[*69]** to summary judgment on the issue of whether Gary Tharaldson breached his fiduciary duties in the December 1999 transaction.

For the reasons stated in the previous sections, the Court finds there are genuine issues of material fact that preclude summary judgment on whether Gary Tharaldson breached his fiduciary duties under ERISA, either in failing to oversee the closing of the 1998 transaction or in the execution of the "revised" 1999 transaction. The Court's analysis, therefore, focuses on any new issues raised by the Former Employee Class that have not been previously discussed.

### A. Waiver and Ratification of the Right to Assert the 1998 Transaction Did Not Close

The Former Employee Class contends that Gary Tharaldson's actions of assigning the $200 million in ESOP Notes to HMI on December 16, 1999, for the purchase of HMI common stock as qualified replacement property was inconsistent with his determination that the 1998 transaction did not close. Tharaldson also pledged the 1998 ESOP Notes as collateral to secure a bank loan on December 20, 1999, which the Former Employee Class contends is inconsistent with the decision that the 1998 transaction was incomplete. Lastly, Tharaldson and **[*70]** the Selling Shareholders represented to the bank that they were holders of the 1998 ESOP Notes in order to secure $50 million in financing from the bank for the 1999 transaction. Based on these actions, the Former Employee Class seeks a determination from the Court that Gary Tharaldson either waived his right to contest the closing of the 1998 transaction or, alternatively, that his conduct amounts to a ratification of the transaction.

A waiver is "a voluntary and intentional relinquishment of a known existing advantage, right, privilege, claim, or benefit." *First Int'l Bank & Trust v. Peterson, 2009 ND 207, 776 N.W.2d 543, 548 (N.D. 2009)* (quoting *Tormaschy v. Tormaschy, 1997 ND 2, 559 N.W.2d 813 (N.D. 1997))*. The right, privilege, claim, or benefit must be one the party could have enjoyed, but for the waiver. Id. A waiver can be made expressly or inferred from conduct. *Gale v. North Dakota Board of Podiatric Medicine, 2001 ND 141, 632 N.W.2d 424, 429 (N.D. 2001)* (citing *Tormaschy v.Tormaschy, 1997 ND 2, 559 N.W.2d 813 (N.D. 1999))*. While the issue of waiver is typically a finding of fact, when there is no dispute as to the material facts and reasonable persons can draw only one conclusion from the facts, a court may decide the **[*71]** issue as a matter of law. *First Int'l Bank, 776 N.W.2d at 548*.

In the commercial context, courts generally require a "high degree of specificity for upholding waivers." *Stuart v. Stammen, 1999 ND 38, 590 N.W.2d 224, 228 (N.D. 1999)*. A legal flaw exists in the Former Employee Class' claim that waiver applies. Here, the rights, claims, privileges, or benefits under the stock purchase agreements executed in 1998 were not one Gary Tharaldson enjoyed because they arise from an unenforceable obligation under North Dakota law due to the failure to fulfill a concurrent condition.

An executory contract is not an operative, binding contract. *Gerhardt v. Fleck, 256 N.W.2d 547, 552 (N.D. 1977)*. Even when most of the contractual requirements are met, but a party fails to make the requisite payment under the terms of the contract, the contract is not binding on the parties because of lack of consideration. Id. While Gary Tharaldson's actions between

December 1, 1999, when Ernst & Young told him the 1998 transaction might not be an enforceable obligation, and December 27, 1999, when the "revised" transaction was executed, are inconsistent with a determination that the 1998 transaction did not close, he erroneously [*72] and improperly asserted rights and benefits under the stock purchase agreements which he did not legally possess. These erroneous assertion of rights do not rise to the requisite "high degree of specificity" to constitute waiver of the right to legally contest the enforceability of the 1998 transaction. Because reasonable persons can reach only one conclusion, the Court finds the Former Employee Class' claim of waiver unavailing.

Alternatively, the Former Employee Class asserts this same conduct amounted to ratification of the 1998 stock purchase agreements. The "fundamental test of ratification by conduct . . . is whether the [party] with full knowledge of the material facts entitling him to rescind, has engaged in some unequivocal conduct giving rise to a reasonable inference that he intended the conduct to amount to a ratification." *Mitzel v. Schatz, 175 N.W.2d 659, 674 (N.D. 1970)*.

It is apparent Tharaldson's actions were consistent with conduct of a person trying to fix the tax problems that occurred because of Ernst & Young's failure to file the appropriate tax forms or as a way to obtain financing for the "revised" transaction, not as a method of ratifying the stock purchase agreements [*73] executed in 1998. Notably, Tharaldson did not cure the defect rendering the stock purchase agreements executory. Surely then he might have ratified the stock purchase agreements executed in 1998. See *St. Paul Foundry Co. v. Burnstad Sch. Dist. No. 31, 67 N.D. 61, 269 N.W. 738, 740 (N.D. 1936)* (holding contract which was unenforceable because of a failure to observe a requirement for competitive bidding was not ratified by subsequent conduct since the there was at no time any attempt to comply with the statutory requirements for competitive bidding). Tharaldson's actions did not turn an otherwise unenforceable obligation into an enforceable one. The 1998 transaction failed because all concurrent conditions were not met. Nothing Tharaldson did prior to the "revised" transaction amounted to a ratification of the otherwise unenforceable obligation.

The Court finds neither waiver nor ratification preclude Gary Tharaldson from contending the 1998 transaction did not close. Accordingly, the Court reaffirms its earlier ruling that the sale of all TMI stock to the ESOP occurred on December 27, 1999, as part of a single integrated transaction.

## CONCLUSION

For the foregoing reasons, North Star Trust Company's [*74] motion for partial summary judgment (Doc. #557) is **DENIED.** The Nonfiduciary Selling Shareholders' motion for summary judgment (Doc. #561) is **GRANTED** and they are **DISMISSED** as parties in this action. Defendant Gary Tharaldson's motion for summary judgment (Doc. #569) is **GRANTED in part** and **DENIED in part**. The Current Employee Class' and the Former Employee Class' motion for partial summary judgment (Doc. #572, 577) are **DENIED.** The motions for a hearing on the summary judgment motions (Docs. #565, 575) are dismissed as **MOOT** since the parties agreed to a decision on the motions without a hearing.

2011 U.S. Dist. LEXIS 153504, *74

## RULE 54(B) CERTIFICATION

Pursuant to *Fed. R. Civ. P. 54(b)*, a court may direct entry of final judgment as to one or more but fewer than all parties when it "expressly determines that there is no just reason for delay." At the status conference held on October 31, 2011, the parties agreed certification under *Rule 54(b)* is appropriate. The Court, finding no just reason for delay, directs the Clerk to enter final judgment dismissing the "Nonfiduciary Selling Shareholders" from this action under *Fed. R. Civ. P. 54(b)*.

**IT IS SO ORDERED.**

   **LET JUDGMENT DISMISSING ALL DEFENDANTS OTHER THAN GARY THARALDSON [*75] BE ENTERED ACCORDINGLY.**

Dated this 31st day of October, 2011.

*/s/ Ralph R. Erickson*

Ralph R. Erickson, Chief Judge

United States District Court

---

**End of Document**

 Caution
As of: October 24, 2024 4:30 PM Z

## *Jiangbo Zhou v. Lincoln Elec. Co.*

United States District Court for the Southern District of Ohio, Western Division

May 15, 2020, Filed

Case No.: 1:20-cv-00018

**Reporter**

2020 U.S. Dist. LEXIS 85796 *; 2020 WL 2512865

Jiangbo Zhou, et al., Plaintiffs, vs. The Lincoln Electric Co., et al., Defendants.

**Counsel:** **[*1]** For Jiangbo Zhou, Yinu Wang, Plaintiffs: Zachary M. Mandell, PRO HAC VICE, Mandell, Boisclair & Mandell, Ltd., Providence, RI; Louis Carl Schneider, Thomas Law Offices, PLLC, Cincinnati, OH.

For The Lincoln Electric Company, J.W. Harris Co., Inc., Defendants: Jeffrey W. DeBeer, Scott A Kane, LEAD ATTORNEYS, Squire Patton Boggs (US) LLP, Cincinnati, OH; Marissa Black, LEAD ATTORNEY, Cleveland, OH; Marques P.D. Richeson, LEAD ATTORNEY, Squire Patton Boggs (US) LLP, Cleveland, OH.

**Judges:** Michael R. Barrett, United States District Judge.

**Opinion by:** Michael R. Barrett

## Opinion

<u>**ORDER**</u>

This matter is before the Court on Defendant The Lincoln Electric Company's Motion to Dismiss pursuant to *Fed. R. Civ. P. 12(b)(6).* (Doc. 9). Plaintiffs have filed an "objection" (Doc. 15), to which Defendant has replied (Doc. 18). For the reasons that follow, Defendant's Motion will be GRANTED.

## I. BACKGROUND[1]

Plaintiffs Jiangbo Zhou and Yinu Wang, husband and wife, bring their Complaint under federal diversity jurisdiction, *28 U.S.C. § 1332*. (Doc. 1 ¶¶ 1, 2, 5).

---

[1] Defendant's Motion is brought pursuant to **Fed. R. Civ. P. 12(b)(6)**. For purposes of deciding it, therefore, and except as qualified *infra*, the Court accepts as true the factual allegations made by Plaintiffs in their Complaint. *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*.

Case 24-07014   Doc 30-2   Filed 10/25/24   Entered 10/25/24 18:26:36   Desc Exhibit
1 - Unpublished Cases   Page 43 of 95

Page 2 of 7
2020 U.S. Dist. LEXIS 85796, *1

On January 11, 2018, Zhou was working as a welder at Senesco Marine, LLC, located in North Kingstown, Rhode Island. (*Id.* ¶ 7). Specifically, he was welding frames and brackets for structural support in a ship's void tank **[*2]** when an explosion occurred. (*Id.* ¶¶ 8, 9). Zhou was transported to a hospital, where he was diagnosed with bone fractures and burns to 40% of his body. (*Id.* ¶ 24).

At the time of the explosion, Zhou was using a welding torch "designed, built, assembled, tested, manufactured, advertised, distributed and sold" by Defendant J.W. Harris Co., Inc., d/b/a The Harris Products Group. (*Id.* ¶¶ 3, 8). The cause of the explosion was a "flashback" that occurred inside the welding torch. (*Id.* ¶ 12). A flashback occurs when a flame is propogated back into the torch and ignites the fuel source, resulting in an explosion. (*Id.*). Flashbacks are a known hazard of welding torches. (*Id.* ¶ 18). The "well-known and proven" way to prevent flashbacks is by the use of a flashback "arrestor." (*Id.*). A flashback arrestor prevents a flame from reaching the fuel source and causing an explosion. (*Id.* ¶ 13).

Defendant Harris Products' welding torch was "designed, manufactured and sold" without a flashback arrestor. (*Id.*). Rather, it was "designed, manufactured and sold" with only a "Flash Guard" 88-6CVTL reverse flow check valve, which was not capable of suppressing a flashback flame from reaching the fuel source. **[*3]** (*Id.* ¶¶ 20, 21).

Harris Products "designs, manufactures and sells" flashback arrestors at an additional cost, however. (*Id.* ¶ 15). Harris Products states on its website that flashback arrestors "are used to prevent damage to equipment, but more importantly to prevent personal injury." (*Id.* ¶ 19). Harris Products states in its online catalog that flashback arrestors "are an important product in making the operator and industry a much safer workplace." (*Id.* ¶ 16).

Plaintiffs' filed an eight-count Complaint against two Defendants, Harris Products and The Lincoln Electric Company. Counts One through Four are against Defendant Harris Products alleging, with regard to the welding torch: (1) defective design (*Ohio Rev. Code § 2307.75*); (2) defective manufacturing (*Ohio Rev. Code § 2307.74*); (3) inadequate warning or instruction (*Ohio Rev. Code § 2307.76*); and (4) misrepresentation (*Ohio Rev. Code § 2307.77*). (Doc. 1 ¶¶ 28-77). Plaintiff Wang, as spouse, claims loss of consortium as to all counts. (*Id.*). Counts Five through Eight are against Defendant Lincoln Electric and mirror Counts One through Four. (*See id.* ¶¶ 78-128). Plaintiffs attach to their Complaint (as Exhibit 1) two documents: a purchase order dated 03/03/2015 from Senesco Marine LLC (Zhou's employer) addressed to Total Welding **[*4]** Supply, Inc. and an invoice dated March 5, 2015 from Total Welding Supply referencing Senesco's purchase order. All parts listed begin with the prefix "HAR" followed by a number.

Harris Products timely filed an answer to Plaintiff's Complaint. (*See* Doc. 11). Lincoln Electric, however, has filed a Motion to Dismiss all four claims asserted against it. This matter is fully briefed and ripe for review.


## II. LEGAL STANDARD

*Rule 12(b)(6)* allows a party to move to dismiss a complaint for "failure to state a claim upon which relief can be granted." *Fed. R. Civ. P. 12(b)(6)*. To withstand a dismissal motion, a

2020 U.S. Dist. LEXIS 85796, *4

complaint must contain "more than labels and conclusions [or] a formulaic recitation of the elements of a cause of action." *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*. The Court does not require "heightened fact pleading of specifics, but only enough facts to state a claim for relief that is **plausible** on its face." *Id. at 570* (emphasis added). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)*. A district court examining the sufficiency of a complaint must accept **[*5]** the well-pleaded allegations of the complaint as true. *Id.*; *DiGeronimo Aggregates, LLC v. Zemla, 763 F.3d 506, 509 (6th Cir. 2014)*.

## III. ANALYSIS

The original premise of Lincoln Electric's Motion argued that, from the face of the Complaint, Plaintiffs are suing for injuries Zhou sustained while using Harris Products' (and not Lincoln Electric's) welding torch. (Doc. 9 at PageID 46-47). Lincoln Electric was sued because Plaintiffs claim, mistakenly, that Lincoln Electric is Harris Products' "parent" company. (*Id.* at PageID 46-48). Regardless, under Ohio law, parent companies can be held liable for the torts of their subsidiaries *only* if there is a basis for piercing the corporate veil, which Plaintiffs have failed to allege. (*Id.* at PageID 49-50 (citing *Flowers v. Oglebay Norton Co., No. 1:09CV697, 2009 U.S. Dist. LEXIS 141638, 2009 WL 10689432, at *2 (N.D. Ohio Nov. 17, 2009))*. Thus, Plaintiffs' allegations against Lincoln Electric fail to state a claim upon which relief can be granted.

Lincoln Electric misstates the allegations in their Complaint, according to Plaintiffs. (Doc. 15 at PageID 82). They refer the Court to paragraph 4 of their Complaint, which states "**Defendant Lincoln Electric** designed, built, assembled, tested, manufactured, advertised, distributed, and sold welding products, including the welding torch at issue in **[*6]** this case that caused catastrophic injury to Plaintiff Jiangbo Zhou." (*Id.* (quoting Doc. 1 ¶ 4) (emphasis added)). Plaintiffs contend that Counts Five through Eight address all the necessary factors under the *Ohio Product Liability Act ("OPLA")*, and thus they have pled claims for direct—as opposed to derivative—liability against Lincoln Electric. (*Id.* at PageID 82-83 (citing Doc. 1 ¶¶ 78-128)). Plaintiffs also offer to amend their Complaint to properly name Harris Products' parent company, Lincoln Electric Holdings, Inc. (*Id.* at PageID 83).[2]

Lincoln Electric makes three points in its reply. First, Plaintiffs should not be allowed to amend their Complaint to substitute Lincoln Electric Holdings, Inc. as a defendant because any such amendment would be futile. (Doc. 18 at PageID 92). Second, Plaintiffs' claim that Lincoln Electric is the manufacturer of the welding torch and thus they have a direct product liability

---

[2] By way of explanation as to why they named "The Lincoln Electric Company" as a defendant, Plaintiffs attach to their brief an invoice dated June 12, 2015 from The Harris Product Group (referencing Senesco's purchase order dated 03/03/2015) that bills to Total Welding and ships to Senesco. The Harris Products' invoice contains this disclaimer at the bottom:

YOU MUST COMPLY WITH APPLICABLE U.S. EXPORT LAWS WHEN SHIPPING GOODS PURCHASED FROM **THE LINCOLN ELECTRIC COMPANY**.

(Doc. 15-1 at PageID 86 (emphasis added)).

claim against it are "belied" by the purchase orders attached to the Complaint and to Plaintiffs' brief in opposition. (*Id.* at PageID 91-92). Finally, because it **[*7]** is impossible for Harris Products and Lincoln Electric to both have manufactured the same welding product, the Court is not required, under *Twombly*, to accept as true these inconsistent factual assertions. (*Id.* at PageID 90-91). Lincoln Electric is correct all around.

## A. Plaintiffs Will Not Be Allowed to Amend the Complaint to Substitute the Correct Parent Company

As a preliminary matter, Lincoln Electric asks the Court to take judicial notice that it is not the parent company of Harris Products. (Doc. 9 at PageID 46 n.1 (citing *Fed. R. Evid. 201(b)(2)* ("The court may judicially notice a fact this is not subject to reasonable dispute because it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.") & *Fed. R. Evid. 201(c)(2)* ("The court must take judicial notice if a party requests it and the court is supplied with the necessary information.")). Rather, it explains that Lincoln Electric Holdings, Inc. is the parent company of Harris Products:

> Lincoln Electric Holdings, Inc. is the parent company of both Harris and Lincoln Electric. Lincoln Electric began operations in 1895. See Lincoln Electric Holdings SEC Form 10-K, Dec. 31, 2018, available at https://ir.lincolnelectric.com/static-files/c50451cb-e9cb-4740-9a13-b40d045b5f05. **[*8]** Lincoln Electric reorganized in 1998 into a holding company structure, and Lincoln Electric Holdings, Inc. became the publicly-held parent of Lincoln Electric. *See id.* Lincoln Electric Holdings, Inc. then acquired Harris in 2005. *See Lincoln Electric Holdings Acquires J. W. Harris*, Jan. 4, 2005, https://mergr.com/lincoln-electric-holdings-acquires-j.w.-harris .

(Doc. 9 at PageID 46 n.1). The Court has reviewed these sources and concludes that their accuracy cannot be reasonably questioned. Accordingly, and observing that Plaintiffs appear to not object, the Court takes judicial notice that the parent company of Defendant The Lincoln Electric Company and Defendant J.W. Harris Co., Inc., d/b/a The Harris Products Group is Lincoln Electric Holdings, Inc. The Court also takes judicial notice that the current defendants, Lincoln Electric and Harris Products, are sister companies.

With these corporate formalities settled, the Court now considers whether Plaintiffs "willingness" to amend their Complaint to substitute the "correct corporate name" should be allowed. The Court concludes it should not, because any such amendment would be futile.

No formal motion to amend has been filed. But were **[*9]** Plaintiffs to file one, "[t]he court should freely give leave when justice so requires. *See Fed. R. Civ. P. 15(a)(2)*. A motion to amend may be denied, however, where there is "futility of amendment[.]" *Riverview Health Inst. LLC v. Med. Mut. of Ohio, 601 F.3d 505, 520 (6th Cir. 2010)* (quoting *Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962))*. "A proposed amendment is futile if the amendment could not withstand a *Rule 12(b)(6)* motion to dismiss." *Rose v. Hartford Underwriters Ins. Co., 203 F.3d 417 420 (6th 2000)* (citation omitted).

Plaintiffs agree that they allege no factual basis for piercing the corporate veil in the Complaint. Instead, they claim to sue Harris Products' parent—whatever the correct corporate name—for

direct product liability under the OPLA. Yet as discussed *infra*, the Court is not required to accept as true inconsistent factual allegations concerning the identity of the manufacturer of the welding torch used by Plaintiff Zhou. Thus, any such amendment could not withstand a *Rule 12(b)(6)* motion to dismiss.

**B. The Court is Not Required to Accept as True Inconsistent Factual Allegations Concerning the Identity of the Manufacturer of the Welding Torch within this Complaint and in a Related Action**

On a *Rule 12(b)(6)* motion, a district court "may consider exhibits attached [to the complaint], public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred **[*10]** to in the complaint and are central to the claims contained therein, without converting the motion to one for summary judgment." *Rondigo, L.L.C. v. Twp. of Richmond, 641 F.3d 673, 681 (6th Cir. 2011)* (internal quotation and citation omitted). Thus, the Sixth Circuit has taken a liberal view of what matters fall within the pleadings for purposes of *Rule 12(b)(6)*. *See Armengau v. Cline, 7 F. App'x 336, 344 (6th Cir. 2001)*. The ability of the court to consider supplementary documentation has limits, however, in that it must be "clear that there exist no material disputed issues of fact concerning the relevance of the document." *Mediacom Se. LLC v. BellSouth Telecomms., Inc., 672 F.3d 396, 400 (6th Cir. 2012)* (internal quotation and citation omitted).

Before the Court are three documents—all central to Plaintiffs' claims—that purport to trace the purchase of the welding torch used by Plaintiff Zhou[3]: a Senesco purchase order sent to Total Welding Supply, Total Welding Supply's return invoice to Senesco, and a Harris Products' invoice to Total Welding Supply that ships product to Senesco. All parts listed on each document begin with the prefix "HAR" followed by a number. Also before the Court is a complaint filed on February 18, 2020 in the District of Rhode Island, captioned *Zhou, et al. v. Total Welding Supply, Inc.*, No 1:20-cv-00082.[4] In that complaint, which sues over the same welding torch explosion, **[*11]** Plaintiffs allege, "Total Welding designed, built, assembled, tested, manufactured, advertised, distributed and sold **the Harris Products welding torch** (hereafter "welding torch") at issue in this case that caused catastrophic injury to Plaintiff Jiangbo Zhou." (Doc. 18-1, Rhode Island Complaint ¶ 35 (emphasis added)).

In this civil action, Plaintiffs allege identical claims against both Defendants. That is, they allege that *both* Harris Products *and* Lincoln Electric manufactured the welding torch that caused injury to Plaintiff Zhou. *Cf.* (Doc. 1 ¶ 29 (Count One), ¶ 48 (Count Two), ¶ 59 (Count Three), ¶ 71 (Count Four)) *with* (Doc. 1 ¶ 79 (Count Five), ¶ 98 (Count Six), ¶ 109 (Count Seven), ¶ 121 (Count Eight)). Obviously, this is not possible. As Lincoln Electric correctly points out, the Court is not required to accept as true inconsistent factual allegations concerning the identity of the manufacturer. *See Pierce v. Fordham Univ., Inc., No. 15-CV-4589, 2016 U.S. Dist. LEXIS 71322, 2016 WL 3093994, at *2 n.1 (S.D.N.Y June 1, 2016)* ("It is well established that, where a

─────────────────────

[3] (*See* Doc. 1 ¶ 8).

[4] This Court may—and does—take judicial notice of the Rhode Island litigation in resolving the instant motion to dismiss without converting it to one for summary judgment. *See Rodic v. Thistledown Racing Club, Inc., 615 F.2d 736, 738 (6th Cir. 1980)*.

plaintiff's own pleadings are internally inconsistent, a court is neither obligated to reconcile nor accept the contradictory allegations in the pleadings as true in deciding a motion to dismiss.") (internal quotation marks and citation **[\*12]** omitted), *aff'd*, _692 F. App'x 644 (2d Cir. 2017)_. And on this basis, the Court could dismiss the OPLA claims altogether:

> The inconsistent factual statements of the Omnibus Complaint are not saved by the Federal Rules of Civil Procedure's allowance of alternative pleading. While _Rule 8(d)(3)_ allows inconsistent claims—a plaintiff may, for example, bring claims for both intentional and unintentional torts, even where recovery on both would be impossible—it does not allow what Plaintiffs are attempting to do here—namely, to make "**clashing factual assertions . . . in the context of the same claim**."

_Aaron v. Medtronic, Inc., 209 F. Supp. 3d 994 (S.D. Ohio 2016)_ (quoting _Nat'l W. Life Ins. Co. v. Merrill Lynch, Pierce, Fenner & Smith, 175 F. Supp. 2d 489, 492 (S.D.N.Y. 2000)_ (dismissing fraud claim where plaintiff made contradictory factual allegations as to knowledge)) (emphasis added). Here, Plaintiffs do not allege alternative theories of recovery, but, rather, "clashing factual assertions" as to which entity is liable under the OPLA for manufacturing the welding torch.

But dismissal of the OPLA claims altogether, that is as to *both* Defendants, is not the relief sought. Harris Products and Lincoln Electric are represented by the same counsel. As noted, Harris Products filed an answer to Plaintiffs' Complaint. Only Lincoln Electric seeks dismissal, pointing out that, in the Rhode Island litigation, **[\*13]** Plaintiffs allege that the welding torch is identified as a "Harris Products welding torch." This allegation, read in connection with the purchase orders and invoices attached to the Complaint and the memoranda filed in connection with the instant Motion, allows the plausible inference that Harris Products, and not Lincoln Electric, manufactured the welding torch that injured Plaintiff Zhou. To rule otherwise would allow Plaintiffs to make clashing factual assertions in this case, and then contradict those clashing assertions in a different case. *See* _Munno v. Town of Orangetown, 391 F. Supp. 2d 263, 268 (S.D.N.Y. 2005)_ (courts may take judicial notice of "admissions in pleadings and other documents in the public record filed by a party in other judicial proceedings that contradict the party's factual assertions in a subsequent action.") (citation and quotation omitted).


## IV. CONCLUSION

Consistent with the foregoing, Defendant The Lincoln Electric Company's Motion to Dismiss pursuant to *Fed. R. Civ. P. 12(b)(6)* (Doc. 9) is hereby **GRANTED**. Counts Five through Eight of Plaintiffs' Complaint are **DISMISSED with PREJUDICE**. This product liability case will proceed solely against Defendant J.W. Harris Co., Inc.[5] A follow-up status conference will be set by separate notice.

**IT IS SO ORDERED [\*14]** .

/s/ *Michael R. Barrett*

---

[5] Should newly-discovered evidence indicate that The Lincoln Electric Company actually played a role in the design or manufacture of the welding torch, the Court will entertain a motion to reconsider its ruling.

2020 U.S. Dist. LEXIS 85796, *14

Michael R. Barrett, Judge

United States District Court

---

**End of Document**

 Positive
As of: October 24, 2024 4:31 PM Z

## Metro D.C. Paving, Highway & Constr. Materials Council v. Roubin & Janeiro, Inc.

United States District Court for the District of Columbia.

May 26, 1981.

Civil Action No. 80-699.

**Reporter**
1981 U.S. Dist. LEXIS 10118 *; 93 Lab. Cas. (CCH) P13,443

Metro D.C. Paving, Highway and Construction Materials Council, AFL-CIO, Plaintiff v. Roubin & Janeiro Inc. et al., Defendants.

**Counsel:  [*1]**  Jeffrey Freund (Van Arkel, Kaiser, Gressman, Rosenberg & Driesen), Washington, D.C., for Plaintiff.  Eugene Ebert, Phyllis J. Dobin, David J. Lloyd, Washington, D.C., for Defendants.

**Opinion by:** SIRICA

# Opinion

SIRICA, D.J.: This matter is before the Court on the motions of the defendants, Roubin and Janeiro, Inc. (Roubin) and G & C Construction Corporation (G & C) to dismiss the plaintiff's complaint.

The complaint sets forth three causes of action against the defendants.  The first of these alleges that the defendants, which are construction companies, breached a collective bargaining agreement with the plaintiff, a labor organization, in violation of Section 301 of the Labor-Management Relations Act, *29 U.S.C.  § 185 (1976)*. More specifically, it is alleged that G & C is a sham corporation created, operated, and controlled by Roubin as its alter ego for the sole purpose of avoiding Roubin's obligations under the collective bargaining agreement with the plaintiff.

The second cause of action incorporates the allegations of the first and further alleges that the actions of the defendants tortiously interfered with the contractual relationship between the plaintiff and the defendant **[*2]**  Roubin.

The third cause of action also incorporates the allegations of the first and further alleges that the defendants have conspired to cause the defendant Roubin to breach its agreement with the plaintiff.

The plaintiff's assertion of the jurisdiction of this Court over the first cause of action is nominally premised on *42 U.S.C.  § 1331* and *29 U.S.C.  § 185*. However, it appears that the plaintiff has erred in citing the Code and actually intended to invoke the federal question jurisdiction under *28*

Samuel Weaver

U.S.C. § 1331, rather than 42 U.S.C. § 1331. As the error is clerical and not prejudicial to the defendants, the Court will grant leave to the plaintiff to amend its complaint accordingly. Jurisdiction over the second and third causes of action is alleged on the basis of the Court's pendent jurisdiction over non-federal claims.

With respect to the plaintiff's first cause of action, the defendant G & C seeks dismissal alleging lack of subject matter jurisdiction. For there to be jurisdiction under 29 U.S.C. § 185, the action must involve a violation of a contract or collective bargaining agreement and the suit must be between the employer and the labor organization. **[*3]** Martin v. Parkhill Pipeline, Inc., 364 F. Supp. 474, 477 (N.D. Ill. 1973). G & C argues that the complaint itself establishes that it was an entirely separate legal entity from Roubin and was not a signatory to any contract with the plaintiff so as to subject it to the provisions of 29 U.S.C. § 185. The Court finds this argument unpersuasive.  Construing the complaint in the light most favorable to the plaintiff and taking its allegations as true, Jenkins v. McKeithen, 395 U.S. 411, 421-22 (1969), it is evident that the plaintiff is claiming that G & C was so organized and controlled and its business was conducted in such a manner as to have made it the alter ego of Roubin so that its separate identity was but a fiction created for the purpose of avoiding Roubin's contractual obligations.  Inasmuch as the plaintiff is a labor organization alleging the breach of a collective bargaining agreement by Roubin, an employer, the further allegation that Roubin and G & C are a single, indistinguishable entity is sufficient to state a claim against G & C and provide subject matter jurisdiction pursuant to 29 U.S.C. § 185. See Plumbers Local Union 519 v. Service Plumbing Co., Inc., 401 F. **[*4]** Supp. 1008 (S.D. Fla. 1975); Bugher v. Frash, 98 L.R.R.M. 3010 (S.D. Inc. 1978). See also International Union, UAW v. Caldwell Manufacturing Co., Inc., 416 F. Supp. 1267 (D. Kan. 1976).

In the alternative, G & C has moved to dismiss the plaintiff's first cause of action on the grounds that the collective bargaining agreement at issue is presently expired and 29 U.S.C. § 185 does not provide subject matter jurisdiction in such an instance.  The defendant Roubin joins in this argument.  In support of this position, the defendants rely upon the decision in Rae v. United Parcel Service, 356 F. Supp. 465 (E.D. Pa. 1973). However, he Court finds the Rae case to be clearly distinguishable from the matter presently before it. In Rae there was no contract in force when violations were supposed to have occurred.  Noting that in order to show a contract violation, there must first be a contract, the Rae Court concluded that 29 U.S.C. § 185 could not provide jurisdiction for alleged contract violations which had occurred after an agreement had been terminated.  356 F. Supp. at 468. By contrast, in the present instance, the alleged violations of the collective bargaining agreement were supposed **[*5]** to have occurred during the existence of the agreement, even though that agreement has subsequently expired.

The defendants Roubin and G & C have also moved to dismiss the second cause of action, alleging tortious interference by the defendants with the contractual relationship between the plaintiff and Roubin.  The four elements comprising this tort are (1) the existence of a contract, (2) knowledge of the contract, (3) intentional procurement of its breach by the defendants, and (4) damages resulting from the breach.  Alfred A. Altimont, Inc. v. Chatelain, Samperton & Nolan, 374 A.2d 284, 288 (D.C. App. 1977).

The plaintiff's second cause of action incorporates by reference the allegations contained in the first, indicating that the same contract and breach thereof is alleged in both.As such, Roubin, a

party to that contract, must be dismissed as a defendant from the second cause of action, since a defendant's breach of his own contract does not provide a basis for tortious interference with that same contract.  Prosser, Torts § 129 at 934 (1971).

Similarly, G & C must be dismissed as a defendant in the second cause of action. The plaintiff alleges only one breach of contract **[*6]** in satisfaction of the third essential element of its claim for tortious interference, and that is the breach set forth in the first cause of action and incorporated into the second.  Since the essence of that alleged breach is the plaintiff's assertion that Roubin and G & C were one and the same entity, G & C likewise cannot be said to interfere with its "own" contract.  Despite the plaintiff's arguments that _Rule 8(e)(2) of the Federal Rules of Civil Procedure_ permits pleading in the alternative, the simple fact remains that at no point in the plaintiff's second cause of action does it actually plead in the alternative that G & C as a non-party induced the breach of a contract between the plaintiff and Roubin.

Accordingly, the second cause of action in the complaint will be dismissed, although that dismissal shall be without prejudice as to the claim against G & C so as to permit a proper alternative pleading. [1]

Defendants have also moved for the dismissal of the plaintiff's third cause **[*7]** of action, which asserts conspiracy by the defendants to breach the collective bargaining agreement referred to in the first cause of action of the complaint.  In this regard, it is to be noted that there is no recognized independent tort action for civil conspiracy in the _District of Columbia, Waldon v. Covington, 415 A.2d 1070, 1074 n.14 (D.C. App. 1980)_, and the plaintiff concedes that it has been unable to locate any District of Columbia decision recognizing the tort of conspiracy to breach of contract. Thus, the plaintiff is seeking to have this Court create a new local cause of action and then exercise its discretion to assume pendent jurisdiction over that new claim. However, the plaintiff has failed to convince the Court that it should take such action, and accordingly, the third cause of action in the complaint shall be dismissed.

An appropriate order accompanies this memorandum.

---

**End of Document**

---

[1] Of course, the Court's dismissal on these grounds would not foreclose the defendants from reasserting other defenses should the plaintiff decide to file a new second cause of action.



**User Name:** Samuel Weaver

**Date and Time:** Thursday, October 24, 2024 12:32:00□PM EDT

**Job Number:** 236883918

## Document (1)

1. *In re Optical Disk Drive Antitrust Litig.*

   **Client/Matter:** -None-

   **Search Terms:**

   **Search Type:** Natural Language

   **Narrowed by:**

   | Content Type | Narrowed by |
   |---|---|
   | | -None- |

 Caution
As of: October 24, 2024 4:32 PM Z

# *In re Optical Disk Drive Antitrust Litig.*

United States District Court for the Northern District of California, San Francisco Division

August 3, 2011, Decided; August 3, 2011, Filed

CASE NO. 3:10-md-2143 RS

**Reporter**
2011 U.S. Dist. LEXIS 101763 *; 2011 WL 3894376

IN RE OPTICAL DISK DRIVE ANTITRUST LITIGATION;This Document Relates to: ALL ACTIONS

**Subsequent History:** Motion denied by *In re Optical Disk Drive Antitrust Litig., 2012 U.S. Dist. LEXIS 55300 (N.D. Cal., Apr. 19, 2012)*

**Prior History:** *In re Optical Disk Drive Prods. Antitrust Litig., 701 F. Supp. 2d 1382, 2010 U.S. Dist. LEXIS 33622 (J.P.M.L., Apr. 2, 2010)*

**Counsel:** [*1] For CMP Consulting Services, Inc., Plaintiff: Christopher T. Heffelfinger, Berman DeValerio, Palm Beach Gardens, FL; Joseph Richard Saveri, Lieff, Cabraser, Heiman & Bernstein, LLP, San Francisco, CA; Kevin Bruce Love, Hanzman Criden & Love, P.A., South Miami, FL; Laurence D. King, Linda M. Fong, Kaplan Fox & Kilsheimer LLP, San Francisco, CA; Michael E. Criden, Criden & Love P.A., South Miami, FL; Steven Noel Williams, Cotchett Pitre & McCarthy LLP, Burlingame, CA.

For KI, Inc., Plaintiff: Jonathan Whitcomb, Siserio Martin O'Connor & Castiglioni LLP, Stamford, CT; Joseph Richard Saveri, Lieff, Cabraser, Heiman & Bernstein, LLP, San Francisco, CA; Laurence D. King, Linda M. Fong, Kaplan Fox & Kilsheimer LLP, San Francisco, CA; Robert N. Kaplan, Kaplan Fox & Kilsheimer LLP, New York, NY.

For Lieff, Cabraser, Heimann & Bernstein, LLP, Plaintiff: Sarah Robin London, Lieff Cabraser Heimann & Bernstein LLP, San Francisco, Ca.

For Rokas Beresniovas, Plaintiff: Rosemary M. Rivas, Finkelstein Thompson LLP, San Francisco, CA.

For Patrick Keyes, Plaintiff: Christopher T. Heffelfinger, Berman DeValerio, Palm Beach Gardens, FL; Joseph Richard Saveri, Lieff, Cabraser, Heiman & Bernstein, LLP, San Francisco, [*2] CA.

For Prisco Electronic Company, Inc., Plaintiff: Aron K. Liang, Joseph W. Cotchett, Steven Noel Williams, Cotchett Pitre & McCarthy LLP, Burlingame, CA; Cadio R. Zirpoli, Guido Saveri, Richard Alexander Saveri, Saveri & Saveri, Inc., San Francisco, CA; Joseph M. Alioto, Sr., Theresa Driscoll Moore, Alioto Law Firm, San Francisco, CA; Joseph Richard Saveri, Lieff, Cabraser, Heiman & Bernstein, LLP, San Francisco, CA; Niki B. Okcu, Cotchett Pitre & McCarthy, LLP, San Francisco Airport Office Center, Burlingame, CA.

Samuel Weaver

For Heather Tremblay, Plaintiff: Lee Albert, Murray Frank LLP, New York, NY; Sylvia M. Sokol, Moscone Emblidge & Sater LLP, San Francisco, CA.

For Technology Depot of La Mesa, Plaintiff: Sylvia M. Sokol, Moscone Emblidge & Sater LLP, San Francisco, CA.

For Christopher Johnson, Larson Group, Plaintiffs: Elizabeth Cheryl Pritzker, LEAD ATTORNEY, Girard Gibbs LLP, San Francisco, CA.

For Matthew Slavin, Plaintiff: Arthur Nash Bailey, Jr., Christopher L. Lebsock, Michael Paul Lehmann, HAUSFELD LLP, San Francisco, CA; Christopher T. Heffelfinger, Berman DeValerio, Palm Beach Gardens, FL; Eugene A. Spector, Spector Roseman Kodroff & Willis, PC, Philadelphia, PA; Jeffrey Lawrence Spector, **[*3]** Spector Roseman Kodroff & Willis P.C., Philadelphia, PA; Joseph Richard Saveri, Lieff, Cabraser, Heiman & Bernstein, LLP, San Francisco, CA; Michael D. Hausfeld, Hausfeld LLP, Washington, DC; Robert G. Eisler, Grant & Eisenhoffer PA, Wilmington, DE; William G. Caldes, Spector, Roseman, Kodroff & Willis, P.C., Philadelphia, PA.

For Warren S. Herman, Plaintiff: Christopher T. Heffelfinger, Berman DeValerio, Palm Beach Gardens, FL; Joseph Richard Saveri, Lieff, Cabraser, Heiman & Bernstein, LLP, San Francisco, CA; Lawrence Walner, PRO HAC VICE, The Walner Law Firm, Ltd., Chicago, IL; Richard Alexander Saveri, Saveri & Saveri, Inc., San Francisco, CA.

For David Carney, Jr., Plaintiff: Aaron M. Sheanin, LEAD ATTORNEY, Elizabeth Cheryl Pritzker, Girard Gibbs LLP, San Francisco, CA.

For L.E. Hoover Co., Plaintiff: Elizabeth R. Odette, LEAD ATTORNEY, Lockridge Grindal Nauen P.L.L.P., Minneapolis, MN; W. Joseph Bruckner, LEAD ATTORNEY, Lockridge Grindal Nauen P.L.L.P., Minneapolis, MN; Clinton Paul Walker, Damrell Nelson Schrimp Pallios Pache, Modesto, CA.

For JLK Systems Group, Inc., Plaintiff: Allan Steyer, Donald Scott Macrae, Steyer Lowenthal Boodrookas Alvarez & Smith LLP, San Francisco, CA; **[*4]** Arthur Nash Bailey, Jr., Christopher L. Lebsock, Michael Paul Lehmann, HAUSFELD LLP, San Francisco, CA; Bruce Lee Simon, Pearson Simon Warshaw & Penny, LLP, San Francisco, CA; Christopher T. Heffelfinger, Berman DeValerio, Palm Beach Gardens, FL; Douglas A. Millen, PRO HAC VICE, Freed Kanner London & Millen LLC, Bannockburn, IL; Guido Saveri, Saveri & Saveri, Inc., San Francisco, CA; Joseph Richard Saveri, Lieff, Cabraser, Heiman & Bernstein, LLP, San Francisco, CA; Michael D. Hausfeld, Hausfeld LLP, Washington, DC; Patrick Howard, Saltz Mongeluzzi Barrett & Bendesky, Philadelphia, PA; Robert G. Eisler, Grant & Eisenhoffer PA, Wilmington, DE; Simon Bahne Paris, Saltz Mongeluzzi Barrett and Bendesky, Philadelphia, PA.

For Univisions-Crimson Holding Inc., Plaintiff: Christopher T. Heffelfinger, Daniel Bushell, Marc Jeffrey Greenspon, Berman DeValerio, Palm Beach Gardens, FL; Joseph Richard Saveri, Lieff, Cabraser, Heiman & Bernstein, LLP, San Francisco, CA; Joseph J. Tabacco, Jr., Matthew W Ruan, Todd Anthony Seaver, Berman DeValerio, San Francisco, CA; Manuel Juan Dominguez, Cohen Milstein Sellers & Toll, Palm Beach Gardens, FL.

For Diana Saed, Plaintiff: Michael M. Goldberg, LEAD ATTORNEY, **[*5]** Glancy Binkow & Goldberg LLP, Los Angeles, CA; Susan Gilah Kupfer, Glancy Binkow & Goldberg LLP, San Francisco, CA.

2011 U.S. Dist. LEXIS 101763, *5

For Amber Nikkel, on behalf of herself and all others similarly situated, Plaintiff: Adam J. Levitt, Michael D Yanovsky, Wolf Haldenstein Adler Freeman Herz LLC, Chicago, IL; Christopher T. Heffelfinger, Berman DeValerio, Palm Beach Gardens, FL; Francis M. Gregorek, Wolf Haldenstein Adler Freeman & Herz LLP, San Diego, CA; Mary Jane Edelstein Fait, Wolf Haldenstein Adler Freeman Herz LLP, Chicago, IL.

For Ann Carney, Plaintiff: Craig C. Corbitt, Francis Onofrei Scarpulla, Qianwei Fu, Zelle Hofmann Voelbel & Mason LLP, San Francisco, CA.

For Don Cheung, Plaintiff: Amy Harrington, Law Office of Amy Harrington, San Francisco, CA; Julio J Ramos, Law Offices of Julio J. Ramos, San Francisco, CA.

For Tina Corse, Plaintiff: John Dmitry Bogdanov, Cooper & Kirkham, P.C., San Francisco, CA.

For Alec Berezin, Plaintiff: Brendan Patrick Glackin, Eric B. Fastiff, Joseph Richard Saveri, LEAD ATTORNEYS, Lieff, Cabraser, Heiman & Bernstein, LLP, San Francisco, CA; Andrew Scirica Kingsdale, Lieff Cabraser Heimann & Bernstein, San Francisco, CA.

For The Stereo Shop, Plaintiff: Brendan Patrick **[*6]** Glackin, Eric B. Fastiff, Joseph Richard Saveri, LEAD ATTORNEYS, Lieff, Cabraser, Heimann & Bernstein, LLP, San Francisco, CA; Andrew Scirica Kingsdale, Lieff Cabraser Heimann & Bernstein, San Francisco, CA; Christopher T. Heffelfinger, Berman DeValerio, Palm Beach Gardens, FL; Daniel E. Gustafson, PRO HAC VICE, Gustafson Gluek PLLC, Minneapolis, MN; Jason Kilene, Minneapolis, MN.

For Bay Area Systems, LLC, Plaintiff: Brad Yamauchi, Derek G. Howard, Jack Wing Lee, Minami Tamaki LLP, San Francisco, CA.

For Aaron Wagner, Plaintiff: George W. Sampson, Steve W. Berman, Hagens Berman Sobol Shapiro LLP, Seattle, WA; Jeff D Friedman, Shana E. Scarlett, Hagens Berman Sobol Shapiro LLP, Berkeley, CA; Robert William Finnerty, Girardi Keese, Los Angeles, CA.

For Mr. Cullen Byrne, Parish & Small, Plaintiff: William Henry Parish, LEAD ATTORNEY, Parish & Small, Stockton, CA.

For Freud Reia, Ben Flaccus, Charles Zakin, Brent Pickett, Plaintiffs: Terry Gross, Gross & Belsky LLP, San Francisco, CA.

For Alireza Tabatabai, Plaintiff: Robert M. Partain, LEAD ATTORNEY, O'Donnell & Associates, Los Angeles, CA.

For Mary Jane Garland, Plaintiff: Casey Ann Hatton, Wilkes & McHugh, P.A., Long Beach, CA; James Lewis **[*7]** Wilkes, Wilkes & McHugh, Tampa, FL; Timothy Charles McHugh, Wilkes & McHugh, Long Beach, CA.

For Beth O'Donnell, Plaintiff: Brian Joseph Barry, Esq., LEAD ATTORNEY, Law Offices of Brian Barry, Los Angeles, CA; Jennifer Sarnelli, LEAD ATTORNEY, Gardy & Notis, LLP, Englewood Cliffs, NJ.

For Vanessa Stark, Scott Druschke, Alex Afanasyev, Jerred Cook, Plaintiffs: Jennifer Sarnelli, LEAD ATTORNEY, Gardy & Notis, LLP, Englewood Cliffs, NJ.

For Gregory Sinigiani, Plaintiff: Mario N. Alioto, LEAD ATTORNEY, Trump Alioto Trump & Prescott, LLP, San Francisco, CA; Sherman Kassof, LEAD ATTORNEY, Law Offices of

Sherman Kassof, Lafayette, CA; Joseph Mario Patane, Law Office of Joseph M. Patane, San Francisco, CA; Lauren Clare Russell, Trump, Alioto, Trump & Prescott, LLP, San Francisco, CA.

For Aimee Brock, Christopher Smith, Frank Warner, Patrick Piper, Goeffrey Korwan, Cynthia Saia, Sidney Plitnik, Raymond F. Barbush, William Craig Stephenson, Plaintiffs: Mario N. Alioto, LEAD ATTORNEY, Trump Alioto Trump & Prescott, LLP, San Francisco, CA; Joseph Mario Patane, Law Office of Joseph M. Patane, San Francisco, CA; Lauren Clare Russell, Trump, Alioto, Trump & Prescott, LLP, San Francisco, CA; Sherman Kassof, **[*8]** Law Offices of Sherman Kassof, Lafayette, CA.

For EMW, Inc., Plaintiff: Lingel Hart Winters, Law Offices of Lingel H. Winters, San Francisco, CA.

For Aaron Deshaw, Plaintiff: Ernest Warren, LEAD ATTORNEY, Walker & Warren, Portland, OR.

For David Knight, Debra Knight, Plaintiffs: Mark A. Friel, Stoll Stoll Berne Lokting Shlachter PC, Portland, OR.

For James P. Ito-Adler, Plaintiff: Charles E. Tompkins, LEAD ATTORNEY, Shapiro Haber & Urmy LLP, Boston, MA.

For Sony Corporation, Defendant: John F. Cove, Jr., LEAD ATTORNEY, Alexis Jane Loeb, Beko Osiris Ra Reblitz-Richardson, Boies Schiller & Flexner LLP, Oakland, CA; Steven Christopher Holtzman, Boies, Schiller & Flexner LLP, Oakland, CA.

For Sony Optiarc America, Inc., Defendant: Alexis Jane Loeb, Beko Osiris Ra Reblitz-Richardson, John F. Cove, Jr., Steven Christopher Holtzman, Boies Schiller & Flexner LLP, Oakland, CA.

For Sony Optiarc, Inc., Defendant: John F. Cove, Jr., LEAD ATTORNEY, Alexis Jane Loeb, Beko Osiris Ra Reblitz-Richardson, Steven Christopher Holtzman, Boies Schiller & Flexner LLP, Oakland, CA.

For Hitachi, Ltd., Defendant: Craig P. Seebald, Vinson & Elkins LLP, Washington, DC; Matthew J. Jacobs, Vinson & Elkins LLP, Palo Alto, **[*9]** CA.

For LG Electronics, Inc., Defendant: Christopher B. Hockett, Davis Polk & Wardwell, Menlo Park, CA; Samuel R. Miller, Sidley Austin LLP, San Francisco, CA; Sandra D West, Davis Polk Wardwell, Menlo Park, CA.

For Hitachi-LG Data Storage, Inc., Defendant: Thad Alan Davis, LEAD ATTORNEY, Ropes & Gray LLP, East Palo Alto, CA; Jane E. Willis, Michelle L. Visser, Ropes & Gray LLP, Boston, MA; Mark Samuel Popofsky, Ropes & Gray LLP, Washington, DC.

For Toshiba Corporation, Defendant: Casandra Leann Thomson, LEAD ATTORNEY, Latham & Watkins, Los Angeles, CA; Daniel Murray Wall, LEAD ATTORNEY, Brendan Andrew McShane, Latham & Watkins LLP, San Francisco, CA; Deana Louise Cairo, LEAD ATTORNEY, DLA Piper LLP (US), Washington, DC; Belinda S. Lee, Latham & Watkins, San Francisco, CA.

For Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., Defendants: Ian T Simmons, LEAD ATTORNEY, O'Melveny & Myers LLP, Washington, DC.

For Toshiba Samsung Storage Technology Corporation, Defendant: Casandra Leann Thomson, LEAD ATTORNEY, Latham & Watkins, Los Angeles, CA; Daniel Murray Wall, LEAD ATTORNEY, Brendan Andrew McShane, Latham & Watkins LLP, San Francisco, CA; Belinda S. Lee, Latham & Watkins, [*10] San Francisco, CA.

For Koninklijke Philips Electronics N.V., Philips & Lite-On Digital Solutions USA, Inc., Philips & Lite-On Digital Solutions Corporation, Lite-On It Corporation, Defendants: Evan Werbel, William Lavery, PRO HAC VICE, Baker Botts LLP, Washington, DC; James G. Kress, John M. Taladay, BAKER BOTTS L.L.P., Washington, DC; Jon Vensel Swenson, Baker Botts L.L.P., Palo Alto, CA.

For Teac Corporation, Defendant: David H. Bamberger, LEAD ATTORNEY, DLA Piper LLP, Washington, DC; Erin Gail Frazor, DLA Piper LLP (US), San Francisco, CA; Paolo Morante, DLA Piper LLP (US), New York, NY.

For Teac America, Inc., Defendant: David H. Bamberger, Deana Louise Cairo, DLA Piper LLP, Washington, DC; Erin Gail Frazor, DLA Piper LLP, San Francisco, CA; Paolo Morante, DLA Piper LLP (US), New York, NY.

For Hitachi-LG Data Storage, Korea, Inc., Defendant: Michelle L. Visser, Ropes & Gray LLP, Boston, MA; Thad Alan Davis, Ropes & Gray LLP, East Palo Alto, CA.

For NEC Corporation, Defendant: Jonathan Edward Swartz, Laura Ann Guillen, Paul R. Griffin, Robert Benard Pringle, Winston & Strawn LLP, San Francisco, CA.

For Toshiba Samsung Storage Technology Corp. Korea, Toshiba America Information Systems, [*11] Inc., Defendants: Belinda S. Lee, LEAD ATTORNEY, Latham & Watkins, San Francisco, CA.

For Quanta Storage Inc, Defendant: Bruce G. Chapman, LEAD ATTORNEY, Connolly Bove Lodge & Hutz LLP, Los Angeles, CA; Keith Douglas Fraser, Connolly, Bove, Lodge & Hutz LLP, Los Angeles, CA; Minda R. Schechter, Connolly Bove Lodge and Hutz LLP, Los Angeles, CA; Zhun Lu, PRO HAC VICE, Connolly Bove Lodge and Hutz LLP, Wilmington, DE.

For BenQ Corporation, BenQ America Corp., Defendants: Joel Barry Kleinman, LEAD ATTORNEY, Washington, DC; Lisa Marie Kaas, Dickstein Shapiro LLP, Washington, DC.

For Sony Computer Entertainment America, Inc., Sony Electronics, Inc., Defendants: John F. Cove, Jr., LEAD ATTORNEY, Alexis Jane Loeb, Boies Schiller & Flexner LLP, Oakland, CA.

For LG Electronics USA, Inc., Defendant: Christopher B. Hockett, Davis Polk & Wardwell, Menlo Park, CA; Sandra D West, Davis Polk Wardwell, Menlo Park, CA.

For Quanta Storage America, Inc., Defendant: Bruce G. Chapman, Connolly Bove Lodge & Hutz LLP, Los Angeles, CA; Keith Douglas Fraser, Connolly, Bove, Lodge & Hutz LLP, Los Angeles, CA; Minda R. Schechter, Connolly Bove Lodge and Hutz LLP, Los Angeles, CA; Zhun Lu, PRO HAC VICE, Connolly Bove [*12] Lodge and Hutz LLP, Wilmington, DE.

For Panasonic Corporation, Defendant: A. Paul Victor, LEAD ATTORNEY, Dewey & LeBoeuf LLP, New York, NY; David L. Greenspan, Jeffrey L. Kessler, LEAD ATTORNEYS, Dewey & LeBouef LLP, New York, NY; Matthew C Oxman, Dewey Leboeuf LLP, New York, NY; Susannah P. Torpey, Dewey and LeBoeuf LLP, New York, NY.

For Panasonic Corporation of North America, Defendant: A. Paul Victor, LEAD ATTORNEY, Dewey & LeBoeuf LLP, New York, NY; David L. Greenspan, Jeffrey L. Kessler, LEAD ATTORNEYS, Dewey & LeBouef LLP, New York, NY; Matthew C Oxman, Dewey Leboeuf LLP, New York, NY; Matthew McDonnell Walsh, Dewey and LeBoeuf LLP, Los Angeles, CA; Susannah P. Torpey, Dewey and LeBoeuf LLP, New York, NY.

For Gregory Starrett, Interested Party: Jeffrey B. Gittleman, LEAD ATTORNEY, Barrack Rodos & Bacine, Philadelphia, PA; Christopher T. Heffelfinger, Berman DeValerio, Palm Beach Gardens, FL; Joshua D. Snyder, Boni & Zack LLC, Bala Cynwyd, PA; Kimberly Ann Kralowec.

For U.S. Department of J Antitrust Division, Intervenor: Sidney A. Majalya, LEAD ATTORNEY, Lara Meredith Kroop, USDOJ - Antitrust Division, San Francisco, CA; Manish Kumar, Antitrust Division, Deparment of Justice, San **[*13]** Francisco, CA.

**Judges:** RICHARD SEEBORG, UNITED STATES DISTRICT JUDGE.

**Opinion by:** RICHARD SEEBORG

## Opinion

### ORDER GRANTING MOTIONS TO DISMISS, WITH LEAVE TO DISMISS, WITH LEAVE TO AMEND

I. INTRODUCTION

This Multi-District Litigation arises from an alleged conspiracy beginning in 2006 among defendants to fix the prices of "Optical Disc Drives" ("ODDs") and "Optical Disc Drive Products" ("ODD Products"). Two "master" consolidated complaints have been filed—one on behalf of a putative class of "direct" purchasers of ODDs and ODD Products, and one on behalf of "indirect" purchasers. Defendants who have appeared have jointly filed, or joined in, motions to dismiss each of the complaints. Various smaller groupings of defendants have filed separate additional motions to dismiss, raising arguments particular to each of them. Because plaintiffs have not alleged a plausible factual basis for inferring the existence of a conspiracy of the scope and nature alleged, the complaints must be dismissed, with leave to amend.

II. BACKGROUND[1]

A. The products

An optical disc is a medium for storing data. Familiar forms include CDs (compact discs) typically containing music or computer software, and DVDs (digital video disc or, officially, Digital Versatile Disc), often containing movies or other video content, and also used for computer software. When first introduced to the public, optical discs only contained data files that were recorded onto them during the manufacturing process—they could be "read" but not written to,

_____

[1] This factual background is largely derived from the allegations of the direct purchasers' complaint. Although substantially similar, the indirect purchasers' complaint defines the alleged conspiracy **[*14]** somewhat differently, and contains some additional factual allegations. These differences are discussed further in Section IV B. below.

much like phonograph records of an earlier time ("read only discs"). As the technology advanced, optical discs were developed that allowed an end user to record data on a one-time basis ("recordable discs"). Eventually optical discs appeared on the market that permitted data to be recorded and re-recorded indefinitely ("rewritable discs"), which are analogous to magnetic tape, or hard and floppy computer discs. In a broad sense, the technology evolved generationally from CDs to DVDs to Blu-Ray Discs ("BDs"), each with the same progression moving from read only, to recordable, **[*15]** and then to rewritable.

ODDs are devices that allow data to be read from and, where applicable, written to, optical discs. ODDs are typically "backwards-compatible," – that is, an ODD that is designed to read (and perhaps write to) a more recently-developed format of optical disc usually will also be able to process older formats as well. ODDs have applications in a variety of consumer electronic devices, including desktop and laptop computers, game consoles, and camcorders. In these applications, the ODD is typically a built-in component of the device. Some television sets are also sold with built-in ODDs.

ODDs are also available as "stand alone" devices, in at least two forms. First, consumers have been able to purchase stand alone CD, DVD, and Blu-Ray "players" (which may or may not also include recording capabilities), primarily designed for enjoying music or video entertainment, through personal headphones, stereo equipment, or television sets. Second, stand alone ODDs are available that are configured to be connected to computers lacking built-in ODDs, primarily for the purpose of storing data or accessing optical disc-based software, but which can also be used to play music or **[*16]** video on the computers. In such a "stand alone" product, the ODD is the primary component, as contrasted, for example, to an ODD built into a computer that contains many other components performing various functions. Nevertheless, even in such "stand alone" products, the ODD itself can still be thought of as a separate component from such other elements as the power supply, interface circuitry, and the case.[2]

To this point, the term "ODD" has been used to refer to the optical disc drive component itself, whether built-in to another device such as a computer or camcorder, or only incorporated with a power supply and sufficient additional circuitry to function as a "stand alone" device. The Direct Purchasers' Consolidated Complaint, however, defines "ODD" differently. Specifically, plaintiffs allege that an "ODD" is *either* a "drive[] built to be incorporated into notebook and desktop computers, camcorders and/or game consoles" *or* a "stand-alone **[*17]** drive[]"—i.e., a drive component assembled with a power supply and interface circuitry in a case. The distinction is significant for this reason. There is no dispute that in the case of computers, for example, numerous other nondefendant companies purchase ODDs from defendants to be built into those other companies' computers. As discussed below, consequences flow from whether plaintiffs can legitimately be considered "direct purchasers" of the ODDs in such instances. It is unclear from the complaints whether there also exist manufacturers of "stand alone" DVD, CD, and Blu-Ray players who obtain the actual ODD components from defendants rather than manufacturing their own, but there appears to be no reason why that could not occur. In such circumstances,

---

[2] For example, the indirect purchasers' complaint describes how a "consumer DVD player" can be designed simply by incorporating a "computer-type" ODD with a power supply and interface board in a case. Indirect Purchasers' First Amended Complaint ¶¶ 82-83.

the same issue would arise regarding whether plaintiffs can be considered "direct purchasers" or not.

Furthermore, regardless of whether or not there is any significant number of non-defendant companies producing stand alone DVD, CD, and Blu-Ray players incorporating ODDs made by defendants, there is simply no logical reason to analyze those products separately from other devices that include "built-in" ODDs, such as computers, game **[*18]** consoles, and camcorders. Rather, the only useful distinction is between *any* product that includes an ODD on the one hand, and the actual ODD component on the other hand, regardless of whether it is built into a stand-alone player or into a more complex device with other functions.

The Direct Purchasers' Consolidated Complaint also contains another definitional anomaly that complicates the analysis. As noted above, the direct purchasers allege a conspiracy to fix prices of both ODDs (as they define them) *and* "ODD Products." The latter term is defined as inclusive of the former. Thus, "ODD Product" as used by plaintiffs not only refers to the ODDs themselves, but also to any computer, game console, or camcorder containing an ODD manufactured by defendants. While the actual ODD components in issue in this litigation are only those manufactured by defendants, the computers, game consoles, and camcorders implicated by the complaint include those manufactured by numerous third parties. Again, because it has implications for plaintiffs' designation as "direct purchasers," it is necessary to distinguish between the actual ODD components and other products that incorporate them. Defining "ODD **[*19]** Products" to include "ODDs" impedes that distinction.

Although plaintiffs' factual allegations must be accepted as true on a motion to dismiss, there is no requirement to adopt the nomenclature of the complaint, particularly where doing so would obfuscate rather than illuminate the dispositive issues. Accordingly, in the balance of this order, the term "ODDs" will be used to refer to optical disk drive mechanisms built to be incorporated into either (1) stand-alone CD, DVD, or Blu-Ray players and recorders, whether for audiovisual or computer use, (2) computers, (3) game consoles, or (4) camcorders. The term "ODD devices" will mean all such products (including the stand-alone players and recorders) that include ODDs.[3]

B. The alleged conspiracy

The charging allegations of the Direct Purchasers' Consolidated Complaint assert that beginning in January of 2004, "Defendants and their Co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section One of the Sherman Act." Specifically, defendants allegedly had meetings and conversations in which they "agreed to charge prices at specified levels and otherwise to fix, increase, stabilize and/or maintain prices of ODD Products sold in the United States," and they thereafter in fact sold "ODD Products" at those artificially inflated prices. Defendants also allegedly engaged in bid rigging, allocation of customers and markets, and artificial limiting of supplies.

––––––––––––––––––––––––

[3] Defendants' joint motion to dismiss uses the term "Finished ODD products" similarly, although it is not entirely clear where they would categorize the stand-alone devices. Plaintiffs criticize defendants for using a term not found in the complaint, and suggest they have mischaracterized the nature of the conspiracy allegations by doing so. Because plaintiffs' definitions conflate products made by defendants with those that are not, however, more precise terminology is **[*20]** needed.

As support for these charges, the complaint comprises over fifty pages of description of various aspects of the ODD and ODD devices industry, which plaintiffs assert support an inference of price-fixing. The allegations include all of the following:

• The "ODD industry" is highly concentrated. Four of the named defendants jointly controlled over 80% of worldwide shipments of CD, DVD, and BD drives by volume in 2008, **[*21]** with another two defendants controlling over 13%. Market concentration has been increasing as the result of certain acquisitions and joint ventures. Some of the defendants are also major producers of ODD devices. Sony, as an example, markets Playstation game consoles, which have a large market share.

• Specific joint-ventures and other collaborative efforts between Taiwanese and Korean defendants on the one hand, and Japanese defendants who held key intellectual property rights on the other hand, resulted in forcing most of Taiwan's "second-tier" manufacturers and virtually all of China's manufacturers out of the "ODD industry."

• Various manufacturing and technological issues present high barriers to entry into the market, including high licensing costs imposed by patent pools among the defendants.

• Defendants participate in various specified trade associations that facilitate their alleged anticompetitive conduct and the making of price-fixing agreements.

• Defendants regularly attend certain trade shows, similarly giving them further opportunity to communicate and conspire.

• "ODD Products" are highly standardized, permitting consumers to view them as interchangeable, which "makes it **[*22]** easier to form and sustain a cartel."

• Many of the defendants have been investigated for antitrust violations involving other technology products, and in some cases found guilty.

• Several defendants engaged in bid-rigging in connection with auctions run by Dell and Hewlett-Packard for contracts to supply ODDs for use in their computers. Such bid-rigging occurred over several years, but included three auctions identified by specific dates.

• The U.S. Department of Justice is presently investigating possible criminal antitrust violations in the ODD industry.

• Certain defendants employ "Minimum Advertised Price" policies imposing limits on the prices retailers may actively promote for ODD devices.

• Some economic data purportedly shows that the "ODD market" has experienced unnatural price stability and periods of upward trends.

## III. LEGAL STANDARD

Under *Federal Rule of Civil Procedure 12(b)(6)*, a district court must dismiss a complaint that fails to state a claim upon which relief may be granted. To survive a *Rule 12(b)(6)* motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*. **[*23]** This "facial plausibility" standard requires the plaintiff to allege facts that add up to "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009)*. While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly, 550 U.S. at 544, 555*.

In deciding whether the plaintiff has stated a claim upon which relief may be granted, the Court must assume that the plaintiff's allegations are true and must draw all reasonable inferences in the plaintiff's favor. *See* *Usher v. City of Los Angeles, 828 F.2d 556, 561 (9th Cir.1987)*. However, the Court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig., 536 F.3d 1049, 1055 (9th Cir. 2008)*.[4]

IV. DISCUSSION

A. The Direct Purchasers' Consolidated Complaint

*1. Illinois Brick*

The parties vigorously dispute whether the specific factual allegations of the complaint are sufficient to support the conclusions advanced by plaintiffs that a price-fixing conspiracy existed, or instead whether those allegations amount to no more than a description of ordinary and legal industry activities, combined with irrelevant accusations of unrelated wrongdoing and the inconclusive fact that a DOJ investigation is pending. Underlying those disputes, however, is a more fundamental disagreement as to whether plaintiffs can plausibly allege a conspiracy to fix not only ODD prices, but also those of ODD Devices, and whether plaintiffs can be seen as "direct purchasers" at all.

The distinction between direct purchasers and indirect purchasers is of critical import as a result of the Supreme Court's holding in *Illinois Brick Co. v. Illinois, 431 U.S. 720, 97 S. Ct. 2061, 52 L. Ed. 2d 707 (1977)*. In *Illinois Brick,* the Court confronted the problem that in a manufacturing chain, the increased cost of one component of a product resulting from a **[*25]** price-fixing violation may very well be "passed-on" to a consumer further down the chain. Concluding that allocating damages among those potentially injured by the price-fixing would present unworkable complexity, the Court instead adopted a bright line rule that only direct purchasers have standing under federal law to seek damages for price-fixing violations. *See* *id. at 745-746*; *Del. Valley Surgical Supply Inc. v. Johnson & Johnson, 523 F.3d 1116, 1120-21 (9th Cir. 2008)* ("a bright line rule emerged from *Illinois Brick:* only direct purchasers have standing under *§ 4* of the Clayton Act to seek damages for antitrust violations.")

The *Illinois Brick* rule presents a fatal problem to the complaint as it is presently constituted. As noted, plaintiffs have defined "ODD Products" to include *any* ODD device containing an ODD manufactured by one of the named defendants. The allegations make clear, however, that a significant percentage of defendants' ODDs are sold to *other* companies, who are neither named as defendants nor directly affiliated with the named defendants, for incorporation into the ODD devices manufactured and sold by those other companies. All of the named plaintiffs are individuals **[*26]** or companies who allege only that they each purchased "ODD Products" from one or more of the defendants. While under plaintiffs' definitions it is at least possible that some

---

[4] Subsequent to the hearing, the parties have submitted several statements of recent decisions they contend bear on the issues in this action. In at least one instance, such a statement was simply filed, in others, they were accompanied by requests for leave to submit them, as is required **[*24]** by Civil **Local Rule 7-3(d)**. All the statements of recent decision will be deemed properly filed.

plaintiffs may have purchased actual ODDs from a defendant for incorporation into an ODD device manufactured by such plaintiffs, the likelihood is that most, if not all, the plaintiffs only purchased ODD devices.[5] Furthermore, the named plaintiffs unquestionably do *not* include such major makers of ODD devices as HP and Dell.

Thus, while the complaint presently attempts to encompass ODD devices manufactured and sold by non-defendant companies, plaintiffs simply are not direct purchasers of such devices within the meaning of *Illinois Brick.* Even in the event that one or more named plaintiff contends it is a purchaser of actual ODDs (for its own manufacturing of ODD devices or for replacing a failed ODD), such facts would have to be alleged.

Plaintiffs' response to this *Illinois Brick* conundrum  **[*27]** is two-fold. First, plaintiffs invoke a "co-conspirator exception" to *Illinois Brick* permitting suit by persons who would otherwise be considered indirect purchasers if they can allege that the actual direct purchaser conspired with the defendant to set the prices the plaintiffs paid. *See Arizona v. Shamrock Foods Co., 729 F.2d 1208, 1211 (9th Cir. 1984).* Plaintiffs then argue they have alleged such cooperation between defendants and unnamed co-conspirators here. The paragraph of the complaint on which plaintiffs rely, however, only alleges that, "Some of the Defendants and their Co-conspirators are also major producers of products that contain ODDs." Other complaint paragraphs that specifically identify three alleged "Co-conspirators" by name fall well short of alleging facts supporting the contention that they conspired with defendants to set consumer prices of DVD devices.

Moreover, even if the allegations were sufficient as to those particular "co-conspirators," plaintiffs have defined "ODD Products" to include devices sold by an untold number of other companies. Not only are there no facts to show such companies were also "co-conspirators," some of the facts specifically pleaded  **[*28]** and relied upon by plaintiffs for other purposes are to the contrary. Specifically, plaintiffs plead that HP and Dell were *victims* of the alleged bid-rigging. While pleading in the alternative is permissible in some circumstances, those allegations are flatly incompatible with a theory that HP and Dell were co-conspirators in fixing prices of the ODD devices they sold.

Plaintiffs' second argument against the applicability of *Illinois Brick* relies on the principle that its rule, "does not bar an indirect purchaser's suit where the direct purchaser is a division or subsidiary of a co-conspirator." *Royal Printing Co. v. Kimberly Clark Corp., 621 F.2d 323, 326 (9th Cir. 1980).* Plaintiffs embrace that safe harbor by insisting "defendants include verticallyintegrated manufacturers that make ODD Products" and the complaint purportedly "explains the corporate relationships among Defendants and the joint ventures they formed." Fatally, however, that argument at most applies to those ODD devices sold by subsidiaries and affiliates of the defendants. Once again, by defining "ODD Products" to include ODD devices sold by unrelated third parties, plaintiffs have overreached.

Furthermore, even with  **[*29]** respect to ODD devices sold by subsidiaries of the defendants, *Royal Printing* merely permits suit under federal law by *indirect* purchasers notwithstanding

---

[5] One other somewhat more likely possibility arises. A plaintiff may have purchased an ODD as a replacement for a failed drive in an existing ODD device. In such circumstances, the plaintiff would qualify as a direct purchaser.

*Illinois Brick;* it does not somehow transform indirect purchasers into direct purchasers. This complaint, however, was brought on behalf of a putative class of direct purchasers, by counsel given an interim appointment to represent such persons, not indirect purchasers. While potentially curable, either by expanding this complaint to include indirect purchasers who contend they have standing to assert damage claims under the Sherman Act, or by expanding the indirect purchasers' complaint to allege such claims on behalf of a subclass, amendment of the pleadings will be necessary.[6]

Accordingly, plaintiffs have not shown, and cannot show that the claims they have currently pleaded are viable in light of *Illinois Brick.* For this reason alone, **[*30]** the Direct Purchasers' Consolidated Complaint must be dismissed.


*2. Plausibility*

The direct purchasers' attempt to include in "ODD Products" devices made and sold by unrelated third parties gives rise to an additional problem, independent of the standing barrier of *Illinois Brick.* Plaintiffs allege that a relatively small number of defendants manufacture and sell nearly all the ODDs presently on the market. Assuming sufficient facts were pleaded to support a conspiracy inference, it likely would be at least plausible that such a group could and would engage in price fixing *of ODDs.* By positing price-fixing of *ODD devices,* however, plaintiffs vastly increase the number of entities that would have to be participating in such a conspiracy, and implicate a far broader range of markets and marketing channels that the conspirators would have to be shown to control. It is one thing to say that a small number of entities have conspired to fix the prices of particular products they directly sell; it is quite another to suggest that those entities have somehow agreed with unnamed parties to fix the prices of products each sells.

Plaintiffs contend that defendants have mischaracterized the complaint **[*31]** by pointing out the implausibility of such a vast conspiracy across different markets and involving so many unnamed co-conspirators. Rather, they insist their allegation is but a "single, intertwined, overarching" conspiracy involving "ODD products" (as they define that term). The issue, however, is not whether there are multiple conspiracies or one, but whether plaintiffs have pleaded facts to make any such "overarching" conspiracy plausible. Plaintiffs rely on *Knevelbaard Dairies v. Kraft Foods, Inc., 232 F.3d 979 (9th Cir. 2000)* for the proposition that a price-fixing conspiracy may involve a number of arguably different products. The alleged conspiracy in *Knevelbaard,* however, did not depend for its success on the cooperation of an untold number of additional entities who have the power to set prices for the products in dispute.

Plaintiffs also suggest that courts in this district have "routinely" accepted conspiracy allegations involving price-fixing of both an electronic component and the "finished product" containing the component. The cases on which plaintiffs rely, however, do not go as far as they suggest. For example, in *In re Cathode Ray Tube (CRT) Antitrust Litigation, 738 F.Supp.2d 1011 (N.D.Cal.*

---

[6] Plaintiffs' counsel for the two groups should decide between them which approach is preferable, if the claims are to be pursued. Should a modification to the interim appointment order be required, the parties make seek one by stipulation or administrative motion brought under Civil **Local Rule 7-11**.

_2010)_ **[\*32]** the court declined to dismiss allegations of a conspiracy to fix the price not only of cathode ray tubes ("CRTs") but also of television and computer monitors that incorporated CRTs. The court specifically noted that the purported direct purchaser plaintiffs' allegations of price fixing of finished products arose "in the case of vertically integrated manufacturers who produced both CRTs and CRT Products." _738 F.Supp.2d at 1018_. Once again, the problem here is that plaintiffs are attempting to extend the price-fixing conspiracy to finished products _not_ produced by the defendants, an issue not expressly addressed in _Cathode Ray_.[7]

Plaintiffs' citation to _In re TFT-LCD (Flat Panel) Antitrust Litigation, 586 F.Supp.2d 1109 (N.D.Cal. 2008)_, is no more helpful to them. There the court merely relied on allegations of purchases of finished products directly from alleged members of the **[\*33]** cartel to reject an argument that plaintiffs lacked standing. _Id. at 1119_. As discussed above, while plaintiffs in this case do not have a standing problem with respect to any ODD devices they may have purchased directly from defendants, that does not address the plausibility of a purported price-fixing conspiracy extending even to ODD devices sold by unrelated third parties.

Finally, plaintiffs fare no better in pointing to the class certification order in the _TFT-LCD_ case. _See 267 F.R.D. 291 (N.D.Cal.2010)_. That decision reveals that the direct purchaser plaintiffs sought to define the class as only those persons who purchased "TFT-LCD panels or a product containing a TFT-LCD panel in the United States from the named defendants, any subsidiaries or affiliates thereof, or any co-conspirators as identified in the complaint." _Id. at 298_. While it is not clear from the opinion the extent to which there may in fact have been other producers of finished TFT-LCD products in the market, that narrow class definition largely avoided putting in issue the existence of a broad conspiracy between the named defendants and unnamed third parties.

In short, while there is no rule that a conspiracy to **[\*34]** fix prices of both a particular component and the finished product containing that component can never exist or be successfully pleaded, there must be a plausible factual basis for contending that the sellers of the finished products were in fact in conspiracy together with the named defendants. Once again, plaintiffs' allegations here suggest the _opposite,_ if anything. At least in the specific instance of ODD devices manufactured and sold by Dell and HP, plaintiffs have alleged that those third party sellers were unwitting dupes of the illegal activity, not co-conspirators. The most reasonable inference is that most, if not all, of the other sellers of ODD devices who are not directly affiliated with defendants likewise were victims of any agreement to fix ODD prices, not participants in a conspiracy to fix prices of the ODD devices they sold.

Although not clearly articulated by plaintiffs, it may be they are contending that defendants _in effect_ fixed the prices of ODD devices sold by unaffiliated third parties by overcharging for the component ODDs incorporated in those devices, even without their knowledge or cooperation. Any such argument, however, would represent an impermissible **[\*35]** end-run around the _Illinois Brick_ rule. Indeed, one of the precise underpinnings of that rule is that it can be very difficult to determine how much, if any, of the inflated cost of a price-fixed component will

---

[7] The _indirect purchasers_' complaint in _Cathode Ray_ also described an economic mechanism whereby the defendants allegedly were able to affect the prices charged by third parties for finished products incorporating defendants' CRTs. _Id._ The direct purchasers' complaint here does not include any similar allegations.

ultimately be passed on to the consumer who buys the finished product. *See* <u>Illinois Brick, 431 U.S. at 731-733</u>. Given the uncertainties discussed in *Illinois Brick* as to when and under what circumstances the price of a finished product will reflect the effects of any price-fixing of a component, it simply would not be reasonable to infer from the facts alleged here that defendants' conduct *necessarily* affected the retail prices of all ODD devices, even if there was price-fixing of ODDs.

Accordingly, plaintiffs have not pleaded sufficient facts to make plausible their claim of a conspiracy to fix prices of both ODDs and ODD devices, including those made and sold by unaffiliated third parties. For this reason as well, the complaint must be dismissed.


*3. Other Plausibility and Specificity Issues*

Apart from the issue regarding the scope of the conspiracy discussed in the preceding section, to proceed on *any* conspiracy theory plaintiffs must also plead "enough factual matter (taken **[\*36]** as true) to suggest that an agreement was made" because a "conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." <u>Twombly, 550 U.S. at 556-557</u>. There is no doubt that the existing factual allegations are insufficient to support the inference of a price-fixing agreement among defendants and third party sellers of ODD devices, for the reasons discussed above. It would be premature to reach a definitive conclusion whether allegations substantially similar to those in the existing complaint might be sufficient to support a claim of a narrower conspiracy involving only an agreement by defendants to fix ODD prices. Nevertheless, it is appropriate to offer some observations.

Most of the existing allegations may serve to explain why a price-fixing agreement might be *possible,* and describe avenues of communication through which defendants could carry out such a plan, it is far from apparent that such averments would suffice to "nudge" plaintiffs' "claims across the line from conceivable to plausible." <u>Twombly, 550 U.S. at 570</u>. Allegations that defendants participated in industry trade associations and attended trade shows represent particularly **[\*37]** weak support for the existence of any conspiracy. *See* <u>id., at 567 n. 12</u> (rejecting suggestion that similar allegations were of particular significance). Pricing trends and economic data present a potentially fertile ground for inferences of price manipulation, but the information plaintiffs have presented at this juncture is ambiguous at best, and does not permit reliable conclusions to be drawn about the pricing of ODDs in particular.

The allegations regarding contraction and consolidation among ODD manufacturers, and the market share held by defendants, as well as their participation in patent pools and various joint ventures, may very well be necessary predicates to showing that defendants had the *power* to fix prices, but they do not show that defendants in fact did so. Descriptions of *other* instances in which some of these defendants were found to have engaged in price-fixing is provocative, but plaintiffs have not shown enough commonalities between those circumstances and the present case to make those allegations probative. *Cf.* <u>In re Static Random Access Memory (SRAM) Antitrust Litigation, 580 F.Supp.2d 896, 903 (N.D.Cal. 2008)</u> (finding conspiracy claim to be supported by allegations **[\*38]** that the "same actors" associated with defendants were responsible for marketing the products in each instance). Similarly, the allegations that defendants are presently targets of a DOJ investigation is a "non-factor," because, "[i]t is

unknown whether the investigation will result in indictments or nothing at all [and] the scope of the investigation is pure speculation." *In re Graphics Processing Units Antitrust Litigation, 527 F.Supp.2d 1011, 1024 (N.D.Cal. 2007)*.

Finally, plaintiffs' allegations of bid-rigging on three specifically-identified occasions perhaps come closest to providing the requisite support for *a* conspiracy, particularly because no alternative innocent explanation for such conduct is readily apparent. Indeed, at oral argument defendants virtually conceded such allegations likely would be sufficient to support the existence of a conspiracy with respect to at least those particular auctions. As defendants point out, however, those auctions involved only a small subset of defendants. Even assuming those auctions, and perhaps others, were rigged, that is a far cry from establishing plausibility for a broad six year continuing agreement among all defendants to fix the **[*39]** prices of all ODDs sold through innumerable other channels.[8]

In sum, while the allegations of the existing complaint are actually *inconsistent* with the existence of a conspiracy to fix prices on all ODD devices, they do suggest that a conspiracy to fix ODD prices is at least conceivable. Further allegations of fact, however, likely would be required to cross the line into the realm of the plausible, even if plaintiffs elect to limit their claims to alleged price fixing of ODDs.

## 4. FTAIA

Defendants further contend that the Direct Purchaser's Consolidated Complaint should also be dismissed for failure to plead sufficient facts to establish subject matter jurisdiction under the Foreign Trade Antitrust Improvement Act ("FTAIA"), *15 U.S.C. § 6a*. FTAIA generally excludes from the reach of **[*40]** the Sherman Act anti-competitive conduct that causes only foreign injury. *See In re Dynamic Random Access Memory (DRAM) Antitrust Litig., 546 F.3d 981, 985 (9th Cir. 2008)*. Because the existing compliant fails to allege a plausible conspiracy of the scope claimed at all, it is technically not possible to say that plaintiffs have alleged a conspiracy with the requisite domestic effects to support jurisdiction under FTAIA. The failure, however, lies more in the issues identified above than in any particular requirement of FTAIA. Unless and until the parameters of any plausible conspiracy plaintiffs may be able to allege is known, the potential impact of FTAIA cannot be meaningfully evaluated.

## 5. Leave to amend

Defendants urge dismissal without leave to amend, pointing out that plaintiffs have had ample time and the benefit of filing a consolidated complaint to articulate a plausible claim. As the preceding discussion reflects, however, while it is far from apparent that plaintiffs necessarily will be able to address the identified defects successfully, it is not a foregone conclusion that they cannot advance facts sufficient to support a conspiracy of a more limited scope, assuming any

---

[8] Of course, as set out above, the Direct Purchaser plaintiffs do not even have standing to pursue claims arising from any bid-rigging at those auctions. While that does not necessarily foreclose them from pointing to defendants' alleged conduct at those auctions as support for the possible existence of a broader agreement to fix prices generally, it does somewhat lessen the significance of those allegations.

**[\*41]** of them can allege they bought ODDs or ODD devices directly from any defendants or co-conspirators. Accordingly, leave to amend will be granted.

B. The Indirect Purchasers' First Amended Complaint

*1. Plausibility*

Recognizing that they are barred by *Illinois Brick* from recovering damages under federal law, the indirect purchasers instead assert claims for, (1) *injunctive* relief under the Sherman Act, (2) damages, under a proposed nation-wide class that would rely on California state antitrust and unfair competition law, and (3) in the alternative, damages, under 29 proposed state-specific classes that would rely on the antitrust laws, and in some instances, unfair competition laws, of those states.[9]

The indirect purchasers define ODDs and ODD Products in substantially the same way as do the direct purchasers, although they do not expressly make the latter term inclusive of the former. While those definitions leave some room for ambiguity, it appears that the indirect purchasers intend to bring their claims on behalf of persons who purchased ODD devices from third parties, other than the named defendants, their affiliates, and any co-conspirators.[10] It does not appear that any of the indirect purchasers are claiming that they purchased ODDs that were not already incorporated into ODD devices.

The opening paragraphs of the Indirect Purchasers' First Amended Complaint suggest that they may intend to allege only a conspiracy to fix prices of ODDs, and that their injuries would arise from the fact that some or all of the allegedly inflated price of the ODDs may have been passed through to them when they purchased ODD devices. Read as a whole, however, the complaint plainly advances a claim of an alleged conspiracy to fix prices of both ODDs and ODD devices. See, *e.g.* ¶ 317 ("Defendants and their co-conspirators . . . agree[d] to manipulate prices and supply of ODDs and ODD Products.").

For the same reasons as discussed above, plaintiffs have alleged no plausible basis for inferring a conspiracy between defendants and unnamed independent third parties who manufacture and sell ODD Devices. Again, the allegations of bid-rigging in auctions conducted by HP and Dell actually support a strong inference to the contrary. While the indirect purchasers point to factual details in their complaint that go beyond those offered by the direct purchasers (regarding defendants' participation in patent pools, trade associations, and pricing and economic data),

_____

[9] Each of the 29 states is a so-called "*Illinois Brick* repealer" jurisdiction, having by statute or judicial decision expressed a determination that standing under that state's law is not to be limited by the rule announced in *Illinois Brick*. Because *Illinois Brick* addressed federal prudential standing issues, individual states are free to adopt a contrary rule under their own laws. Such state statutes and judicial decisions, of course, could not "repeal" the Supreme Court's holding in a literal **[\*42]** sense.

[10] It may be that at this juncture there could be uncertainty as to whether a particular manufacturer or seller of ODD devices constitutes an affiliate or co-conspirator or can only be seen as an independent third party, and therefore it might not be clear whether persons who purchased from such entities are potential members of a direct purchaser class or an indirect purchaser class. Any such questions will have to be resolved eventually, because a person who purchased an ODD device from a particular entity should either be deemed a direct purchaser or an indirect purchaser as to that **[\*43]** particular purchase, but not both.

**[\*44]** those allegations do not fill the gap. At best, the indirect purchasers have come closer to alleging a factual predicate that might support a claim of a conspiracy to fix ODD prices than have the direct purchasers. Even for such a more circumscribed conspiracy, however, the barometer points to conceivable, rather than plausible. Accordingly, the complaint must be dismissed, with leave to amend.

### 2. Associated General Contractors

In *Associated General Contractors of California, Inc. v. California State Council of Carpenters, 459 U.S. 519, 103 S. Ct. 897, 74 L. Ed. 2d 723 (1983)* ("*AGC*"), the Supreme Court articulated a multi-factor balancing test for evaluating a plaintiff's standing to bring antitrust claims under federal law generally. Because of the bright-line *Illinois Brick* rule that indirect purchasers lack standing to bring damages claims in price-fixing cases, resort to an *AGC* analysis ordinarily is not necessary with respect to federal claims. Defendants argue, however, that the *AGC* factors can and do apply to indirect purchasers' price-fixing claims under state law in any jurisdiction that has generally embraced the *AGC* antitrust standing requirements. Listing eighteen states that they contend have in fact adopted **[\*45]** the *AGC* test, defendants move to dismiss those particular state law claims for lack of antitrust standing.

Plaintiffs respond that defendants are effectively attempting to override the decisions made in the legislatures or courts of those states to reject *Illinois Brick* as a bar to indirect purchasers' claims under state law. Defendants, in turn, argue that the *Illinois Brick* and *AGC* courts were addressing different sets of policy and legal issues, and that there is no conflict in applying *AGC* to preclude an indirect purchaser from going forward even in a state that declines to follow *Illinois Brick.* While defendants may be correct that the issues the *Illinois Brick* and *AGC* addressed were not co-extensive, the application of the *AGC* test they advocate would appear, in effect, to "repeal" the *Illinois Brick* "repealers," as it is difficult to imagine an indirect purchaser ever having antitrust standing under defendants' formulation.

Defendants' basic contention that *AIG* may bar claims in circumstances like these has gained some traction in this district. *See, e.g., In re Dynamic Random Access Memory (DRAM) Antitrust Litigation* ("*DRAM I* "), *516 F.Supp.2d 1072 (N.D. Cal.2007)*, and *DRAM II, 536 F.Supp.2d 1129 (N.D.Cal. 2008)*. **[\*46]** The careful and persuasive analysis in *In re TFT-LCD (Flat Panel) Antitrust Litigation, 586 F.Supp.2d 1109 (N.D.Cal. 2008)*, however, warrants the conclusion that plaintiffs' claims here should not be dismissed for lack of antitrust standing under *AIG.* As explained in more detail in *TFT-LCD,* this is both because "it is inappropriate to broadly apply the *AGC* test to plaintiffs' claims under the repeater states' laws in the absence of a clear directive from those states' legislatures or highest courts," and because even if the *AGC* test were to be applied, it does not conclusively rule out standing, at least at the pleading stage, on facts like those present here. *See TFT-LCD, 586 F.Supp.2d at 1123-24*.

### 3. FTAIA

As in **[\*47]** the case of the direct purchasers, the indirect purchasers' failure to allege a plausible conspiracy at all necessarily means they have failed to allege a conspiracy with the

requisite domestic effects to permit jurisdiction over their Sherman Act claims under the FTAIA. Whether the FTAIA will continue to stand as a bar to Sherman Act claims under any plausible conspiracy plaintiffs may ultimately be able to allege will depend on the contours and details of such purported conspiracy.

As plaintiffs point out, on its face, the FTAIA only serves to limit the jurisdictional reach of the Sherman Act. As such, it is not immediately apparent that it would serve as a bar to claims brought under state law in any event. Defendants, however, have advanced an argument that under the Foreign *Commerce Clause*, the congressional policy expressed in FTAIA should effectively preempt state antitrust law from having a greater reach than that of the Sherman Act. Because defendants' arguments on this point have not been fully developed, at this juncture the FTAIA cannot be said to foreclose plaintiffs' state law claims. Defendants are not precluded, however, from raising the point again in any subsequent **[*48]** motion practice should it otherwise be appropriate to do so.

### 4. Nationwide class under California law

The Supreme Court's decision in *Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 105 S. Ct. 2965, 86 L. Ed. 2d 628 (1985),* precludes nation-wide class actions based on the laws of a particular state where there is a material conflict of law between the forum jurisdiction and that of other states. Here, the fact that plaintiffs do not even attempt to advance claims under the laws of non-"repealer" states highlights the substantial difference between those jurisdictions and California. Non-"repealer" states have effectively endorsed *Illinois Brick's* prohibition against indirect purchasers recovering antitrust damages.[11] As plaintiffs point out, however, it is not immediately apparent that such states have any particular interest in protecting out-of-state parties such as the defendants here from such suits. The issue calls for a careful analysis under conflict of laws principles. While *Shutts* provides the foundational rule that nationwide classes are permissible only in the absence of a material conflict, it is too factually dissimilar to provide guidance as to whether a material conflict exists in this instance or not.

Because of the number of substantive issues raised in these motions, the parties have not been able to brief the conflict of law issues sufficiently to permit a definitive determination on whether or not a nationwide class under California law can proceed. Accordingly, this prong of the motion to dismiss will be denied, without prejudice to defendants' right to raise the issue again either in a subsequent motion to dismiss or at the class certification stage.

### 5. Representative resident plaintiffs

Defendants have adequately shown that dismissal of state law claims is appropriate with respect to those jurisdictions in which none of the named class representatives reside, notwithstanding plaintiffs' arguments that it would not contravene standing requirements to allow those claims to

---

[11] Although **[*49]** not every non-"repealer" state necessarily elected to follow *Illinois Brick* through a conscious balancing of policy interests, at least some have. See *Vacco v. Microsoft Corp., 260 Conn. 59, 793 A.2d 1048, 1059-60 (Conn. 2002)* (noting that Connecticut's legislature has declined several times to enact bills that would have provided for an *Illinois Brick* "repealer").

proceed. *See In re Flash Memory Antitrust Litig., 643 F. Supp.2d 1133, 1164 (N.D. Cal. 2009)* **[\*50]** ("Where, as here, a representative plaintiff is lacking for a particular state, all claims based on that state's laws are subject to dismissal."). Plaintiffs represent that they have found additional class representatives that can be added to represent Hawaii and Nebraska, and they request time to locate representatives for the remaining jurisdictions. In view of the time plaintiffs have already had since defendants raised this issue, the thirty days leave to amend being afforded by this order is sufficient.

*6. Other individual state claims*

Defendants level a scattershot of additional arguments directed at particular individual state claims. In light of the fact that the entire complaint must be dismissed, the sufficiency of the existing allegations to withstand any or all of these arguments does not warrant further examination. Plaintiffs are advised, however, that in preparing any amended complaint, they should plead with an eye to addressing the arguments defendants have made, whether or not any of them would warrant dismissal, standing alone.

C. Additional motions to dismiss

A series of separate motions have been filed by various defendants arguing, in essence, that regardless of whether **[\*51]** the complaints might be adequate to state a claim against *some* defendants, they do not state sufficient facts to implicate the moving parties. Several of these motions were each filed by two or more related entities, and one is a joint motion by defendants who contend they were named for no reason other than that they are each a parent or a subsidiary of a more-directly involved defendant.

Even assuming that some or all of these motions have merit with respect to the allegations as the conspiracies as presently pleaded, as plaintiffs are being given leave to amend, it would serve little purpose to engage in a detailed analysis of the current allegations made against each moving party, particularly given that any subsequent complaints may significantly alter the scope of the claimed conspiracy. In pleading any amended complaints, however, plaintiffs should bear in mind that while, as they note, detailed "defendant by defendant" allegations are not required, they nonetheless "must allege that each individual defendant joined the conspiracy and played some role in it because, at the heart of an antitrust conspiracy is an agreement and a conscious decision by each defendant to join it." **[\*52]** *In re TFT-LCD (Flat Panel) Antitrust Litigation, supra, 586 F.Supp.2d at 1117* (quoting *In re Elec. Carbon Prods. Antitrust Litig., 333 F.Supp.2d 303, 311-12 (D.N.J. 2004)*. As such, plaintiffs must "include allegations specific to each defendant alleging that defendant's role in the alleged conspiracy." *Id.*

V. CONCLUSION

The Direct Purchasers' Consolidated Complaint and the Indirect Purchasers' First Amended Complaint are dismissed for the reasons set out above, with leave to amend. Any amended complaints shall be filed within 30 days.

IT IS SO ORDERED.

Dated: 8/3/11

2011 U.S. Dist. LEXIS 101763, *52

/s/ Richard Seeborg

RICHARD SEEBORG

UNITED STATES DISTRICT JUDGE

---

**End of Document**

Positive
As of: October 24, 2024 4:32 PM Z

## *Pierce v. Fordham Univ., Inc.*

United States District Court for the Southern District of New York

June 1, 2016, Decided; June 1, 2016, Filed

15-CV-4589 (JMF)

**Reporter**
2016 U.S. Dist. LEXIS 71322 *; 2016 WL 3093994

EMILY PIERCE, Plaintiff, -v- FORDHAM UNIVERSITY, INC., GRADUATE SCHOOL OF SCIENCES, et al., Defendants.

**Subsequent History:** Affirmed by *Pierce v. Fordham Univ., 2017 U.S. App. LEXIS 10729 (2d Cir. N.Y., June 15, 2017)*

**Counsel:  [*1]** For Emily Pierce, Plaintiff: Andrea Risoli, Risoli Law Offices, Eastchester, NY; Andrew C Risoli, Eastchester, NY.

For Fordham University, Inc., Graduate School of Social Services, President Rev Joseph McShane, Dean Debra M. McFee, PhD., Dean Susan Egan, Dean Keith Eldredge, Defendants: John T.A. Rosenthal, Kevin James Harrington, Harrington Ocko & Monk, LLP, White Plains, NY.

For U.S. Department of Education Office of Civil Rights, Acting Director Rachel Pomerantz, Esq., Ronald M. Scott, Esq., New York Enforcement Office, Defendants: Christine Schessler Poscablo, LEAD ATTORNEY, U.S. Attorney Office SDNY, New York, NY.

For Ronald M. Scott, Scott Ronald, ADR Providers: Christine Schessler Poscablo, LEAD ATTORNEY, U.S. Attorney Office SDNY, New York, NY.

**Judges:** JESSE M. FURMAN, United States District Judge.

**Opinion by:** JESSE M. FURMAN

# Opinion

OPINION AND ORDER

JESSE M. FURMAN, United States District Judge:

Plaintiff Emily Pierce brings claims against Fordham University, Inc., Graduate School of Social Services ("Fordham" or "Fordham University"); the United States Department of Education Office of Civil Rights ("OCR"); and several people affiliated with one or the other of those entities — from Fordham, President Joseph **[*2]**  McShane, Dean Debra M. McFee, Dean Susan Egan, and Dean Keith Eldredge (the "Fordham Individual Defendants" and, together with Fordham University, the "Fordham Defendants"); and from OCR, Acting Director Rachel Pomerantz and the Director of the New York Enforcement Office, Ronald M. Scott (together with OCR, the

"Government Defendants"). Plaintiff alleges that the Fordham Defendants discriminated against her based on her mental disability and retaliated against her for lodging complaints with respect to that discriminatory treatment; with respect to the Government Defendants, she seeks to compel action on a related complaint that she filed with OCR. All Defendants move, pursuant to *Rule 12(b) of the Federal Rules of Civil Procedure*, to dismiss the Second Amended Complaint ("SAC" or "Complaint"). (Docket Nos. 34, 39). For the reasons that follow, the motions are granted, and the Complaint is dismissed in its entirety.

## BACKGROUND

The following facts — which are taken from the SAC, documents it incorporates, and matters of which the Court may take judicial notice — are construed in the light most favorable to Plaintiffs. *See, e.g., Kleinman v. Elan Corp., 706 F.3d 145, 152 (2d Cir. 2013); LaFaro v. N.Y. Cardiothoracic Grp., PLLC, 570 F.3d 471, 475 (2d Cir. 2009); Aurecchione v. Schoolman Transp. Sys., Inc., 426 F.3d 635, 638 (2d Cir. 2005).*

In the Spring of 2011, Plaintiff enrolled in Fordham's Masters of Social Work Graduate of Social Services **[*3]** Program ("MSW Program"). (Second Am. Compl. ¶ 16). The following Spring, Plaintiff took a leave of absence due to a medical condition (the "2012 Absence"), and returned to the MSW Program in the Fall of 2012. (*Id.* ¶¶ 18-19). Upon her return, Plaintiff requested additional loans to cover her medical expenses; according to the Complaint, Fordham's financial aid office demanded that Plaintiff turn over her medical records in order to apply for such financial aid. (*Id.* ¶¶ 19-20). It is unclear whether Plaintiff complied but, in any event, she told the financial aid office that she felt being required to do so violated her rights under the Americans with Disabilities Act ("ADA"). (*Id.* ¶ 20). Plaintiff then "*drafted* a formal *pro se* [c]omplaint" addressed to the Civil Rights Division of the U.S. Department of Justice ("DOJ"), to the same effect. (*Id.* ¶ 21 (emphasis added)). There is no allegation, however, that she *filed* any complaint at that time — and Plaintiff makes clear in her memorandum of law that she did not. (*See* Mem. Law Opp'n Fordham Defs.' & Government Defs.' Mot. To Dismiss (Docket No. 44) ("Pl.'s Opp'n") 20 ("[I]n June 2013, Plaintiff lodged her formal complaint."); *id.* at 21 ("Plaintiff lodged her **[*4]** original complaint . . . in June 2013."); *see also* Mem. Law Supp. Defs.' Mot. To Dismiss Pl.'s Second Am. Compl. (Docket No. 35) ("Fordham Defs.' Mem.") 21 ("[T]here is no allegation that upon drafting a *pro se* Complaint, she actually filed that Complaint with the Department of Justice or made Fordham aware that she had.")).).

The following year, from February 21, 2013, to March 13, 2013, Plaintiff "suffered complications that necessitated a psychiatric hospitalization." (SAC ¶ 22). As a result, on March 13, 2013, she took a second medical leave of absence from the MSW Program (the "2013 Absence"). (*Id.* ¶ 23). In April 2013, Plaintiff "repeatedly and continuously" attempted to secure re-entry into the MSW Program. (*Id.* ¶ 24). According to the SAC, she provided documentation from her treating psychiatrist stating that she was ready, willing, and able to re-enter the program; was willing to be examined by one of Fordham's psychologists if her attorney could be present; and was prepared to have her treating psychiatrist fill out an "overboard 2013 Community Provider Form." (*Id.* ¶ 26). Plaintiff alleges that the Fordham Defendants not only refused to accept those things, but also "became irate **[*5]** and unreasonable seeking more and more overboard and excessive documentation from Plaintiff." (*Id.*). Emails attached to the Complaint, however, make

plain that from the very beginning Plaintiff opted not to comply with Fordham's "reentry process" for students seeking to return from mental health leaves of absence by refusing to provide the required forms. (*Id.*, Ex. 6, at 1 (email from Plaintiff to Dean Eldredge stating "I will not be supplying Fordham with the forms")).[1]

With respect to the Government Defendants, Plaintiff's claim focuses on the alleged delay in their **[*6]** acting on the complaint that she appears to have filed in June 2013 with DOJ — a complaint that was subsequently transferred to OCR. (*Id.* ¶ 29; *see id.*, Ex. 4, at 1 (letter from DOJ stating that "[i]n June 2013, we referred a complaint against Fordham University, which we received directly from Ms. Pierce, to the U.S. Department of Education"); *see also* Pl.'s Opp'n 20-21). On June 26, 2013 and July 1, 2013, OCR's New York Enforcement Office contacted Plaintiff to investigate her claim, and she and her attorney provided further information. (*Id.* ¶ 29; *id.*, Ex. 3, at 1). In a July 11, 2013 letter, OCR informed Plaintiff of its determination that two of her allegations were appropriate for investigation, but one was not. (SAC ¶ 46; *see id.*, Ex. 3). Pursuant to its Early Complaint Resolution Program, OCR held a mediation between Plaintiff and Fordham in August 2013, which was unsuccessful. (*Id.* ¶ 47). With respect to OCR's investigation, Plaintiff alleges in her Complaint that OCR "stated that it should have a determination as an earmarked internal deadline in December 2013," but "has to date refused to complete its investigation and/or share the results of that investigation and determination **[*7]** with Plaintiff," despite repeated inquiries from Plaintiff and her counsel (and, apparently, from a Congressman inquiring on Plaintiff's behalf). (*Id.* ¶¶ 48, 50-54).

On June 12, 2015, Plaintiff filed this lawsuit. (Docket No. 1). Her claims are somewhat hard to pin down because her pleadings are confusing and, at times, contradictory. But the essence of her claims is that (1) the Fordham Defendants intentionally discriminated against her and retaliated against her in connection with her attempts to reenter the MSW Program after her 2013 Absence, in violation of the ADA, *42 U.S.C. § 12101 et seq.*, and the Rehabilitation Act of 1973, *29 U.S.C. § 791 et seq.*; and (2) the Government Defendants abdicated their duties, in violation of some combination of the ADA, the Rehabilitation Act, and the Administrative Procedure Act, *5 U.S.C. § 701 et seq.* (SAC ¶¶ 3, 5). Both sets of Defendants moved to dismiss the Complaint and by January 18, 2016, both motions were fully briefed. (*See* Docket Nos. 45, 47). On March 24, 2015, the Government filed a letter indicating that, on March 3, 2016, OCR had issued a determination with respect to Plaintiff's administrative complaint and asked the Court to dismiss all claims against the Government Defendants as moot. (Docket No. **[*8]** 48). On March 28, 2016, Plaintiff filed a letter in response. (Docket No. 50).


## CLAIMS AGAINST THE GOVERNMENT DEFENDANTS

---

[1] It is well established that, where a plaintiff's "own pleadings are internally inconsistent, a court is neither obligated to reconcile nor accept the contradictory allegations in the pleadings as true in deciding a motion to dismiss." *Nationwide Mut. Ins. Co. v. Morning Sun Bus Co., No. 10-CV-1777 (ADS) (AKT), 2011 U.S. Dist. LEXIS 10131, 2011 WL 381612, at *6 (E.D.N.Y. Feb. 2, 2011)*; see*, e.g., Hirsch v. Arthur Andersen & Co., 72 F.3d 1085, 1095 (2d Cir. 1995)* (upholding dismissal where "attenuated allegations" supporting the claim were "contradicted both by more specific allegations in the Complaint and by facts of which [the court] may take judicial notice"); *Salahuddin v. Jones, 992 F.2d 447, 449 (2d Cir. 1993)* (per curiam) (affirming the dismissal of a claim based on "wholly conclusory and inconsistent allegations").

2016 U.S. Dist. LEXIS 71322, *8

The Court begins with Plaintiff's claims against the Government Defendants. Although the allegations in the Complaint are somewhat rambling and disjointed, Plaintiff made plain in her opposition brief that she "amend[ed] her complaint to seek only injunctive relief from the Government Defendants" — namely, "answers and a completion of her investigation, which is over two and a half years old." (Pl.'s Opp'n 14). As the Government's letter of March 24, 2016, advised the Court, OCR provided Plaintiff with what she was seeking on March 3, 2016. (Docket No. 48). It follows that Plaintiff's claims against the Government Defendants are moot and must be dismissed. *See, e.g., Kim v. Aguirre, No. 03-CV-6494 (RJH) (KNF), 2004 U.S. Dist. LEXIS 15915, 2004 WL 1773432, at *1 (S.D.N.Y. July 1, 2004)* (dismissing the plaintiffs' complaint where they had received the relief they sought after the filing of the lawsuit); *see also, e.g., Boucher v. Syracuse Univ., 164 F.3d 113, 117-18 (2d Cir. 1999)* (holding that female students' claims were moot because the university they were suing had already established a women's lacrosse team, which was the relief the students had originally sought).

Plaintiff does not dispute that the sole relief her Complaint **[*9]** sought from the Government Defendants was a determination of her administrative complaint and that OCR issued such a determination on March 3, 2016. (*See* Pl.'s Ltr. Of March 26, 2016 (Docket No. 50)). Strangely, however, she does not concede that her claims against the Government Defendants are moot; instead, she contends that the Government Defendants issued "an unfavorable and untimely determination" as retaliation for this lawsuit and that OCR "should be compelled to produce the corroboration and supporting documentation from its investigation" because "[w]ithout proper discovery, it [sic] renders this determination as [sic] arbitrary and capricious." (*Id.* at 2). Such claims, however, do not appear in the Complaint. *See, e.g., Disabled in Action of Metro. N.Y. v. Trump Intern. Hotel & Tower, 2003 U.S. Dist. LEXIS 5145, 2003 WL 1751785, at * 13 (S.D.N.Y. Apr. 2, 2003)* ("A claim for relief may not be amended by the briefs in opposition to a motion to dismiss." (internal quotation marks omitted)). Further, the Federal Rules of Civil Procedure do "not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions," let alone for a plaintiff whose claims are moot. *Ashcroft v. Iqbal, 556 U.S. 662, 678-79, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)*. In any event, to the extent Plaintiff takes issue with OCR's apparent determination not to pursue an enforcement action, and suggests possible relief under **[*10]** the APA, it is meritless; such a decision by OCR is committed to agency discretion by law and not subject to judicial review under the APA. *See Heckler v. Chaney, 470 U.S. 821, 832-33, 105 S. Ct. 1649, 84 L. Ed. 2d 714 (1985)*. Lastly, Plaintiff's closing request that the Government Defendants be sanctioned for providing the relief sought in her lawsuit is frivolous. If anything, it is Plaintiff's letter that comes close to warranting Rule 11 sanctions.

## CLAIMS AGAINST THE FORDHAM DEFENDANTS

The Court turns, then, to the Fordham Defendant's motion to dismiss, which is brought pursuant to *Rule 12(b)(6)*. A *Rule 12(b)(6)* motion tests the legal sufficiency of a complaint and requires a court to determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a plausible claim for relief. *See Iqbal, 556 U.S. at 679*. When ruling on a *Rule 12(b)(6)* motion, a court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See, e.g., Holmes v. Grubman, 568 F.3d 329, 335 (2d Cir. 2009)*. To survive such a motion, however, the plaintiff must plead sufficient

facts "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*. A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the **[\*11]** misconduct alleged." *Iqbal, 556 U.S. at 678* (citing *Twombly, 550 U.S. at 556*). A plaintiff must show "more than a sheer possibility that a defendant has acted unlawfully," *id.*, and cannot rely on mere "labels and conclusions" to support a claim, *Twombly, 550 U.S. at 555*. If the plaintiff's pleadings "have not nudged [his or her] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Id. at 570*.

The inquiry here is made more difficult by the fact that Plaintiff's papers are somewhat incoherent, frequently contradictory, and at least partially frivolous. For example, Plaintiff's Complaint indicates that her claims against the Fordham Defendants are brought pursuant to, among other statutes, Title VI of the Civil Rights Act (*see* SAC 9, 12), but in her opposition brief, Plaintiff states that she is not pursuing any Title VI claim. (Pl.'s Opp'n 22-23). (That concession is well founded, as Title VI provides that "[n]o person in the United States shall, *on the ground of race, color, or national origin*, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance," *42 U.S.C. § 2000d* (emphasis added), and Plaintiff does not allege discrimination based on **[\*12]** her race, color, or national origin.) Additionally, Plaintiff repeatedly alleges that the Fordham Defendants' actions violated the Health Insurance Portability and Accountability Act ("HIPAA"), *42 U.S.C. § 1320d et seq.*, but she does not appear to bring an actual cause of action for such a violation in her Complaint. (*See* SAC ¶¶ 19, 21, 44; *see also* Pl.'s Opp'n 19 (claiming that Fordham's actions were "in violation of HIPPA [sic] confidentiality laws")). (Again, that is well founded, as HIPAA does not create a private right of action. *See, e.g., Jackson v. Ramirez, No. 15-CV-0617 (GHW), 2016 U.S. Dist. LEXIS 21619, 2016 WL 796854, at \*10 (S.D.N.Y. Feb. 22, 2016).*)[2] And while Plaintiff appears to bring claims against the Fordham Defendants under both Title II and Title III of the ADA (*see* SAC ¶¶ 11, 33), it is plain that Title II does not apply because that title is limited to "public entities" and none of the Fordham Defendants qualifies as such an entity. *See 42 U.S.C.A. § 12131*.

Thus, the Court construes Plaintiff's SAC to raise against the Fordham Defendants only claims under Title **[\*13]** III of the ADA and the Rehabilitation Act. (SAC ¶¶ 11, 33). Title III of the ADA provides that in relevant part that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns . . . or operates" the public accommodation. *42 U.S.C. § 12182*. Similarly, *Section 504* of the Rehabilitation Act states that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." *29 U.S.C. § 794*.[3] Because "the standards adopted by Title[] . . . III

---

[2] DOJ referred Plaintiff's "complaint pertaining to HIPAA violations to the Department of Health and Human Services (HHS) because the Centers for Medicare and Medicaid Services, under HHS, administers and enforces the rules pertaining to HIPAA." (SAC, Ex. 4, at 2-3).

of the ADA are, in most cases, the same as those required under the Rehabilitation Act," courts typically "consider the merits of these claims together." *Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 85 (2d Cir. 2004)*, *opinion corrected by 511 F.3d 238 (2d Cir. 2004)*; *see also Henrietta D. v. Bloomberg, 331 F.3d 261, 272 (2d Cir. 2003)* ("[U]nless one of th[e] subtle distinctions is pertinent to a particular case, we treat claims under the two statutes identically."). Accordingly, the Court will analyze the claims under the two Acts together. *See, e.g., [*14] Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis., 804 F.3d 178, 187 (2d Cir. 2015)* (analyzing together claims under both Acts against a private postgraduate school). The Court begins with Plaintiff's discrimination claim and then turns to her retaliation claim.

## A. Disparate Treatment

To state a claim of discrimination under the ADA or the Rehabilitation Act, a plaintiff must allege "(1) that she is a qualified individual with a disability; (2) that the defendants are subject to one of the Acts; and (3) that she was denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or was otherwise discriminated against by defendants, by reason of her disability." *Powell, 364 F.3d at 85* (internal quotation marks and alterations omitted); *accord Shomo v. City of N.Y., 579 F.3d 176, 185 (2d Cir. 2009)*. With respect to the third element, "a plaintiff can base a disability discrimination claim on any of 'three available theories: (1) intentional discrimination (disparate treatment); [*15] (2) disparate impact; and (3) failure to make a reasonable accommodation.'" *Brief v. Albert Einstein Coll. of Med., 423 F. App'x 88, 90 (2d Cir. 2011)* (quoting *Fulton v. Goord, 591 F.3d 37, 43 (2d Cir. 2009)*); *see also Krist v. Kolombos Rest. Inc., 688 F.3d 89, 95 (2d Cir. 2012)* (agreeing with the district court that if a plaintiff proves failure to accommodate she "need not also prove that discrimination was intended," and noting that the ADA was not "intended to allow recovery *only* for intentional discrimination" (emphasis added)). Where, as here, a plaintiff bases her claim on a theory of intentional discrimination, she may raise an inference of discrimination by alleging that the defendants treated her "less favorably than a similarly situated" student "outside h[er] protected group." *Mandell v. Cty. of Suffolk, 316 F.3d 368, 379 (2d Cir. 2003)* (internal quotation marks omitted).

Applying those standards here, Plaintiff fails to state a claim for intentional discrimination. In particular, the facts Plaintiff alleges do not give rise to any inference "that defendants harbored some discriminatory animus against [her] disabilit[y]." *Forziano v. Indep. Grp. Home Living Program, Inc., 613 F. App'x 15, 18 (2d Cir. 2015)* (summary order). Nor do they provide any indication that Plaintiff was singled out. To the contrary, the Complaint itself suggests that *any* student who, like Plaintiff, took a leave of absence for mental health problems was required to complete the reentry process and that Plaintiff was denied readmission [*16] because she refused to comply with that process. (*See* SAC, Ex. 2, at 2 (letter from OCR to Fordham stating that, "[w]ith respect to students returning from a medical withdrawal related to mental health concerns, University staff acknowledged that its practice is to require all such students to satisfy"

---

[3] Both Title III of the ADA and the Rehabilitation Act apply to Fordham as an educational institution that receives federal funding. (*See* SAC, Ex. 3, at 2; Fordham Defs.' Mem. 20-21 (implicitly conceding receipt of federal funding)). *See 42 U.S.C. § 12181(7)(J)* (defining "public accommodation" to include, among other things, a "postgraduate private school").

the reentry procedures of which Plaintiff complains); *id.*, Ex. 6, at 2 (email from Plaintiff stating "I will not be supplying Fordham with the forms")). Notably, Plaintiff herself concedes that Fordham had a justification for its reentry procedure having nothing to do with animus towards the mentally disabled. As Plaintiff herself puts it, "given the world as it is today relating to terrorism, mentally ill [sic], and gun control, *it is understandable* that a university would be engaged in the practice of insuring that a student — who was suffering from a mental disability as well as a recent psychiatric admission — is not a danger to herself or others." (Pl.'s Opp'n 19 (emphasis added)). It follows that the Fordham Defendants' denial of readmission to Plaintiff when she refused to complete the reentry procedure was, to use Plaintiff's own phrase, "understandable." *Cf. Perry v. NYSARC, Inc., 424 F. App'x 23, 25 (2d Cir. 2011)* (holding that where "the **[*17]** complaint itself reveals that the actions taken by" the defendant, an employer, "were job related," the plaintiff "has failed to allege facts that would support an inference of discrimination"); *Silk v. City of Chi., 194 F.3d 788, 800 (7th Cir. 1999)* (holding that a police department's prohibiting an officer from holding a second job was not evidence of ADA discrimination or retaliation when "department rules prohibit *all* officers" from doing so and there was no "evidence that the policy was applied inconsistently"); *Shurb v. Univ. of Tex. Health Sci. Ctr. at Houston-Sch. of Med., 63 F. Supp. 3d 700, 708* (granting summary judgment, in favor of a university that denied the plaintiff-student reentry, based on "the plaintiff's *own* admissions regarding his lack of cooperation and failure to provide a certification of fitness from his treating psychiatrist").

Plaintiff's counterarguments are without merit. First, although Plaintiff repeatedly alleges in summary fashion that she was "treated . . . differently than other students similarly situated" (SAC ¶¶ 24, 43), it is well established that "conclusory allegations devoid of any factual matter" are insufficient to state a claim for relief. *Jordan v. Forfeiture Support Assocs., 928 F. Supp. 2d 588, 608 (E.D.N.Y. 2013)*; *see Kajoshaj v. N.Y.C. Dep't of Ed., 543 F. App'x 11, 14 (2d Cir. 2013)* (applying Title VI and holding that the plaintiffs' "'naked allegation' that they were treated differently from non-Muslim, non-Albanians **[*18]** cannot demonstrate a plausible entitlement to . . . relief" (citing *Albert v. Carovano, 851 F.2d 561, 572 (2d Cir. 1988))*. Second, while the Complaint includes allegations concerning the experiences of two other students — identified as "Student #1" and "Student #2" — those allegations do nothing to advance Plaintiff's cause. (SAC ¶ 43). For one thing, it is not even apparent that the two students were treated in a meaningfully different manner than Plaintiff. (*See id.* (alleging Student #1 had to go through the reentry process); *id.* (alleging only that Student #2 was schizophrenic and "had to take multiple leaves of absence")). Additionally, even assuming they were treated differently (that is, more favorably) than Plaintiff, that would not help her show that she was treated less favorably *based on* her disability; instead, it would indicate just the opposite, as the "preferred" students are alleged to have had the same sort of disability that Plaintiff has. *Cf. Doe v. Pfrommer, 148 F.3d 73, 83 (2d Cir. 1998)* ("[T]he central purpose of the ADA and *§ 504* of the Rehabilitation Act is to assure that disabled individuals receive 'evenhanded treatment' *in relation to the able-bodied.*" (emphasis added)). Finally, although Plaintiff makes allegations with respect to her first leave of absence (in 2012) and **[*19]** the related loan dispute, Plaintiff herself attested to the irrelevance of those allegations by asserting that the earlier incident was "*not related to the re-entry process called into question here* for a psychiatric hospitalization." (SAC ¶ 18 (emphasis added)).

Accordingly, the Fordham Defendants' motion must be and is granted with respect to Plaintiff's discrimination claims.[4]

## B. Retaliation

The Court turns then to Plaintiff's retaliation claims. Plaintiff asserts that "the Fordham administration [*20] retaliated against her for the first complaint to OCR as well as her interaction and verbal communications with the Fordham financial aid office as a result of her first medical leave of absence and the events that followed from that re-entry and a subsequent request for additional financial aid due to medical and school financial obligations." (SAC ¶ 24).[5] To state a claim of retaliation under either the ADA or the Rehabilitation Act, however, a plaintiff must allege that (1) she was engaged in protected activity; (2) the alleged retaliator knew that she was engaged in protected activity; (3) an adverse decision or course of action was taken against her; and (4) a causal connection exists between the protected activity and the adverse action. *Weixel v. Bd. of Educ. of City of N.Y., 287 F.3d 138, 148-49 (2d Cir. 2002)*; *see also 42 U.S.C. § 12203 (ADA)*; *29 C.F.R. § 1614.101(b)* (Rehabilitation Act). Measured against these standards, Plaintiff's claims fall short.

Plaintiff's first contention — that the Fordham Defendants retaliated against her for filing the OCR complaint — does not withstand scrutiny for the simple reason that she filed that complaint *after* the Fordham Defendants denied her reentry in the spring of 2013; indeed, the complaint expressly alleged that Fordham had discriminated against Plaintiff "by conditioning [her] readmission to the [MSW Program] following a medical leave of absence, upon [her] consent to release" her medical records. (SAC, Ex. 3; *see also* Pl.'s Opp'n 21 ("Plaintiff lodged her original complaint . . . in June 2013.")). Thus, although the OCR complaint undoubtedly qualifies as "protected activity," Plaintiff "cannot establish that [her] protected activity caused" the allegedly adverse actions against her. *Roggenbach v. Touro Coll. of Osteopathic Med., 7 F. Supp. 3d 338, 346 (S.D.N.Y. 2014)*. Second, although Plaintiff contends that she informally complained to the Fordham financial aid office (SAC ¶ 24), she alleges no facts to suggest that those complaints were shared with anyone at Fordham involved in taking (or deciding to take) the allegedly adverse actions against [*22] her. Conclusory allegations aside (*see, e.g., id.* ¶ 39), the only suggestion in the Complaint that anyone involved in the reentry process was aware of Plaintiff's complaints to the financial aid office is an email she attaches from December 2012 in which she asked Dean Heyman to "please speak to Mr. Cirillo in the financial Aid Office because I believe there is a *HIPPA* [sic] issue here when the school is asking for medical information that

---

[4] In the Complaint, Plaintiff also appears to base her claims against the Fordham Defendants on a 2011 resolution agreement between Fordham and OCR regarding a student's complaints about Fordham's policies governing student reentry after a medical leave of absence. (SAC ¶¶ 55-60; *see id.*, Ex. 2). But that 2011 resolution agreement cannot form an independent basis for any of Plaintiff's claims. Among other things, the agreement itself states that, as a "letter of finding," it (1) "contain[s] fact-specific investigative findings," (2) "is intended to address [only] this individual OCR case," and (3) "should not be relied upon, cited, or construed as" a formal statement of OCR policy. (SAC, Ex. 2, at 5).

[5] The Complaint includes other (rather repetitive) allegations regarding retaliation (*see* SAC ¶¶ 3, 27, 32, 34, 36, 37, 39, 42, 43, 46, 59, 61), but they are either conclusory or irrelevant as a matter of law. For example, Plaintiff appears to suggest that Fordham retaliated against her for the psychiatric hospitalization itself. (*Id.* ¶¶ 38, 46). [*21] But being institutionalized does not qualify as "protected activity" for purposes of a retaliation claim under the Acts here.

is private and not required." (SAC, Ex. 6, at 10 (emphasis added)). But that complaint (if it can be called a complaint) pertained to HIPAA, not the ADA or the Rehabilitation Act, and thus cannot, as a matter of law, give rise to a claim of retaliation under either of the Acts involved here. *See, e.g.,* *42 U.S.C. § 12203* (protecting opposition to "any act or practice made unlawful *by this chapter*" (emphasis added)); *Hong Yin v. N. Shore LIJ Health Sys., 20 F. Supp. 3d 359, 375 (E.D.N.Y. 2014)*; *cf.* *Risco v. McHugh, 868 F. Supp. 2d 75, 110 (S.D.N.Y. 2012)* ("[I]nformal complaints must be sufficiently specific to make it clear that the employee is complaining about conduct prohibited *by Title VII*." (emphasis added)).

In her opposition, Plaintiff suggests for the first time that the Fordham Defendants' supposed refusal "to compromise, negotiate, and discuss any resolution" of her OCR complaint is an alternative **[*23]** basis for her retaliation claim (Pl.'s Opp'n 20), but that suggestion borders on frivolous. For one thing, a plaintiff may not amend her complaint through her opposition to a motion to dismiss. *See, e.g.,* *Wright v. Ernst & Young LLP, 152 F.3d 169, 178 (2d Cir. 1998)*. Additionally, Plaintiff herself immediately undermines the argument's factual premise by noting that the Fordham Defendants "attended an early mediation session with" her and her attorney in August 2013. (Pl.'s Opp'n 21). And finally, even if the Fordham Defendants did refuse to discuss a resolution (and there were any evidence that such refusal was in retaliation for engaging in protected activity, a rather dubious proposition), such unwillingness is not an adverse action that can form the basis of a retaliation claim. *See, e.g.,* *Gupta v. Florida Bd. of Regents, 212 F.3d 571, 589 (11th Cir. 2000)* (observing that "[a]ny action or inaction in regard to settlement of a claim cannot be retaliation for making the claim in any meaningful sense"), *abrogated on other grounds by* *Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006)*. Accordingly, Plaintiff's retaliation claims fail, and the Fordham Defendants' motion to dismiss is granted in full.[6]


**LEAVE TO AMEND THE COMPLAINT**

In the final pages of her opposition, Plaintiff asks for leave to amend her complaint for a third time in the event that the Court grants any part of the Defendants' motions to dismiss. (Pl.'s Opp'n 33-34). Under *Rule 15 of the Federal Rules of Civil Procedure*, "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." *Fed. R. Civ. P. 15(a)(2)*. The Second Circuit has held that a *Rule 15(a)* motion — as the Court construes Plaintiff's request — "should be denied only for such reasons as undue delay, bad faith, futility of the amendment, and perhaps most important, the resulting prejudice to the opposing party." *Aetna Cas. & Sur. Co. v. Aniero Concrete Co., 404 F.3d 566, 603 (2d Cir. 2005)* (internal **[*25]** quotation marks omitted); *see also* *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC, 797 F.3d 160, 190 (2d Cir. 2015)*

---

[6] In light of the fact that Plaintiff fails to state a valid claim against the Fordham Defendants, the Court need not — and does not — reach their separate arguments for **[*24]** dismissal of all claims against the Fordham Individual Defendants and all claims for monetary damages. (Fordham Defs.' Mem. 15, 19-20; Reply Mem. Law Further Supp. Defs.' Mot. To Dismiss (Docket No. 47) 2). Those arguments, however, appear to be well founded. *See, e.g.,* *Nelson v. City of New York, No. 11-CV-2732 (JPO), 2013 U.S. Dist. LEXIS 117742, 2013 WL 4437224, at *14 (S.D.N.Y. Aug. 19, 2013)* (noting that "[i]t is well established that there is no individual liability under the ADA or the Rehabilitation Act" in the circumstances presented here); *Krist, 688 F.3d at 94* ("Title III . . . authorizes private actions only for injunctive relief, not monetary damages.").

("leav[ing] unaltered" prior case law on denial of leave to amend, including the rule that "leave may be denied where amendment would be futile"). At the same time, "the grant or denial of an opportunity to amend is within the discretion of the District Court." *Williams v. Citigroup Inc., 659 F.3d 208, 214 (2d Cir. 2011)* (internal quotation marks omitted).

Applying those principles here, the Court concludes that leave to amend is not warranted because further amendment would be futile. First, "better pleading will not cure" the mootness of Plaintiff's claims against the Government Defendants. *Cuoco v. Moritsugu, 222 F.3d 99, 112 (2d Cir. 2000)*. Second, Plaintiff cannot in good faith plead her way to a revival of the claims against the Fordham Defendants; if Plaintiff had better facts to allege, it is safe to assume that she would have alleged them. That is, Plaintiff fails to give "any indication that [she] is in possession of facts that would cure the problems identified in this opinion." *Clark v. Kitt, No. 12-CV-8061 (CS), 2014 U.S. Dist. LEXIS 113494, 2014 WL 4054284, at *15 (S.D.N.Y. Aug. 15, 2014)*. And, as Plaintiff's claims failed in no small part due to the documentary evidence that she herself attached to her Complaint, it is more than safe to assume that such facts do not exist. Notably, although Plaintiff's SAC more than doubled in length (exclusive of attachments) from **[\*26]** the Amended Complaint, in substance it added only a handful of new, and irrelevant, allegations (regarding "Student #1" and "Student #2" and a 2011 resolution agreement (*see supra* note 4)), as well as equally irrelevant causes of action (such as a since-abandoned Title VI claim); otherwise, the Complaint's additional length came from largely repetitive (and increasingly disjointed) allegations. Finally, the fact that Plaintiff already amended her complaint once in response to the deficiencies raised in the Fordham Defendants' initial motion to dismiss — a motion that, notably, raised many of the same arguments as the motion addressed in this Opinion and Order (*see* Docket No. 27) — and that she was expressly cautioned that she would "not be given any further opportunity to amend the complaint to address issues raised by" the earlier motion (Docket No. 28), underscores the futility of further amendment. *See, e.g., Ruotolo v. City of N.Y., 514 F.3d 184, 191 (2d Cir. 2008)* (affirming the district court's denial of leave to amend in part because of the previous opportunities that the plaintiff had received to amend the complaint). Plaintiff's request for leave to amend once again is therefore denied.

**CONCLUSION**

For the reasons discussed above, **[\*27]** Defendants' motions to dismiss are granted. More specifically, all claims against the Government Defendants are dismissed as moot, and all claims against the Fordham Defendants are dismissed for failure to state a claim. The Clerk of Court is directed to terminate Docket Nos. 34 and 39, and to close this case.

SO ORDERED.

Date: June 1, 2016

New York, New York

/s/ Jesse M. Furman

JESSE M. FURMAN

2016 U.S. Dist. LEXIS 71322, *27

United States District Judge

---

**End of Document**

**i** Cited
As of: October 24, 2024 4:34 PM Z

## *Redman v. Am. Airlines, Inc.*

United States District Court for the Western District of North Carolina, Charlotte Division

July 25, 2023, Decided; July 26, 2023, Filed

3:22-cv-00515-RJC-DCK

**Reporter**
2023 U.S. Dist. LEXIS 129419 *; 2023 WL 4768696

BARBARA REDMAN, Plaintiff, v. AMERICAN AIRLINES, INC. and MARCOS SANTANA, Defendants.

**Counsel:** **[*1]** For Barbara Redman, Plaintiff: Amanda Christina Dure, Joseph Lafayette Anderson, LEAD ATTORNEYS, Pangia Law Group, Washington, DC.

For American Airlines, Inc., Marcos Santana, Defendants: William M. Starr, LEAD ATTORNEY, Nelson, Mullins, Riley & Scarborough, LLP, Charlotte, NC.

**Judges:** Robert J. Conrad, Jr., United States District Judge.

**Opinion by:** Robert J. Conrad, Jr.

## Opinion

### <u>ORDER</u>

**THIS MATTER** is before the Court on Defendant American Airlines, Inc.'s and Defendant Marcos Santana's Motion for Judgment on the Pleadings. (Doc. No. 4). Because Redman fails to allege a duty owed, negligent conduct, or extreme and outrageous conduct by American Airlines or Santana, and because she fails to allege her own severe emotional distress, Defendants' Motion for Judgment on the Pleadings, (Doc. No. 4), is **GRANTED**.

### I. BACKGROUND

On August 1, 2021, Barbara Redman boarded an American Airlines flight in Charlotte, North Carolina and settled into seat 1A. Soon after Redman took her seat, Marcos Santana, the flight's lead attendant, advised Redman through the intercom that she would need to relocate from her seat to the back of the plane for "weight and balance" reasons. Redman moved while the other passengers watched. Embarrassed, Redman **[*2]** filed the instant action for negligent and intentional infliction of emotional distress against American Airlines and Santana, alleging that Santana's "intent ...was to imply that [she] was fat" and that American Airlines was vicariously liable. (Doc. No. 1, at 2). American Airlines and Santana moved for judgment on the pleadings.

Case 24-07014    Doc 30-2    Filed 10/25/24    Entered 10/25/24 18:26:36    Desc Exhibit
1 - Unpublished Cases    Page 85 of 95

Page 2 of 7
2023 U.S. Dist. LEXIS 129419, *2

## II. STANDARD OF REVIEW

"After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings." *Fed. R. Civ. P. 12(c)*. The same standard governs both motions for judgment on the pleadings and motions to dismiss brought under *Rule 12(b)(6)*, *Occupy Columbia v. Haley, 738 F.3d 107, 115 (4th Cir. 2013)*, testing the "legal sufficiency of the complaint" but "not resolv[ing] contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992)*. The complaint will survive if it contains enough facts "to state a claim to relief that is plausible on its face," or, stated differently, if the allegations allow the court to draw a reasonable inference that the defendant is liable for the misconduct alleged. *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)* (quoting *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*). Under such standards, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

A plausible claim requires **[*3]** only "a short and plain statement of the claim showing that the pleader is entitled to relief," *Fed. R. Civ. P. 8(a)(2)*, and thus, specific facts are not necessary; the statement need only "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Twombly, 550 U.S. at 545* (quoting *Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 775, 104 S. Ct. 2731, 81 L. Ed. 2d 628 (1984)*). When ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint, *Erickson v. Pardus, 551 U.S. 89, 93-94, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007)* (quoting *Twombly, 550 U.S. at 555-56*), but a court need not accept as true legal conclusions couched as factual allegations. *Papasan v. Allain, 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L. Ed. 2d 209 (1986)*.

Courts cannot weigh facts or determine credibility in ruling on motions for judgment on the pleadings, but neither must they credit "allegations that offer only 'naked assertions devoid of further factual enhancement.'" *Lowe v. Johnson, 797 F. App'x 791, 792 (4th Cir. 2020)* (quoting *Iqbal, 556 U.S. at 678*). Instead, the court "should view the complaint in the light most favorable to the plaintiff" and draw reasonable inferences in the plaintiff's favor. *Mylan Laboratories, Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993)*. A court may grant a motion for judgment on the pleadings when no disputed facts remain and the moving party is entitled to judgment as a matter of law. *Deutsche Bank Nat'l Tr. Co. Tr. for IndyMac INDX Mortg. Loan Tr. 2006-AR12 v. Fegely, 767 F. App'x 582, 583 (4th Cir. 2019)*.

In evaluating motions for judgment on the pleadings, the court may consider the complaint, answer, and any materials attached to those pleadings or motions **[*4]** for judgment on the pleadings "so long as they are integral to the complaint and authentic." *Philips v. Pitt Cty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009)*; *see also Fed. R. Civ. P. 10(c)* ("[A]n exhibit to a pleading is part of the pleading for all purposes.").

## III. DISCUSSION

## A. Redman's Negligent Infliction of Emotional Distress Claim Fails

To state a claim for negligent infliction of emotional distress ("NIED") under North Carolina law, a plaintiff must allege that "(1) the defendant negligently engaged in conduct, (2) it was reasonably foreseeable that such conduct would cause the plaintiff severe emotional distress ..., and (3) the conduct did in fact cause the plaintiff severe emotional distress." *Johnson v. Ruark Obstetrics & Gynecology Assocs., P.A., 327 N.C. 283, 304, 395 S.E.2d 85, 97 (1990)*. Whether the plaintiff alleged the necessary elements is a matter of law. *See Horne v. Cumberland Cnty. Hosp. Sys., Inc., 228 N.C. App. 142, 148, 746 S.E.2d 13, 19 (2013)*.

As a threshold requirement, the plaintiff must actually allege each element in her complaint. For example, to survive a motion to dismiss under the first element, a plaintiff must allege that "defendant failed to exercise due care in the performance of some legal duty owed to the plaintiff under the circumstances." *Horne, 228 N.C. App. at 148, 746 S.E.2d at 19* (brackets omitted). Thus, an NIED claim cannot stand without any allegation of "a duty owed by the defendant to the plaintiff." *Id.*

Redman notes that "every person owes a general **[*5]** duty of care to others," (Doc. No. 8, at 4), but Redman's legal primer on negligence misses one important point: Redman never alleged that American Airlines or Marcos Santana owed such a duty. Instead, Redman's NIED claim includes five paragraphs, of which three are factual, (¶¶ 5, 6, and 8), one alleges general negligence, (¶ 7), and one addresses causation and emotional damage. (¶ 9). In *Horne v. Cumberland County Hospital System*, the North Carolina Court of Appeals rejected a nearly identical NIED claim comprising seven paragraphs because "[n]owhere ... in her complaint does plaintiff reference any duty owed to her by [defendant]," and the "failure to allege such a duty owed by the defendant to the plaintiff is fatal to an NIED claim." *228 N.C. App. at 149, 746 S.E.2d at 19*; *see also Guthrie v. Conroy, 152 N.C. App. 15, 25, 567 S.E.2d 403, 411 (2002)* (affirming grant of summary judgment where "[P]laintiff alleges no duty that [defendant] owed plaintiff"). Thus, without any allegation of a duty owed, American Airlines and Santana are entitled to judgment as a matter of law.

Moreover, to state a claim for negligent infliction of emotional distress, Redman must allege that American Airlines and Santana negligently engaged in some conduct. *Horne, 228 N.C. App. at 149, 746 S.E.2d at 19* ("Allegations of intentional conduct ... even **[*6]** when construed liberally on a motion to dismiss, cannot satisfy the negligence element of an NIED claim."); *see also Mitchell v. Lydall, Inc., 16 F.3d 410 (4th Cir. 1994)* (per curiam) (table) (affirming dismissal where "the material factual allegations charge nothing but intentional acts"). She fails to do so. In lieu of allegations, Redman spars with American Airlines over the logic of such allegations — according to Redman, a plaintiff might allege that the same act was both intentional and negligent, because the import of those charges is whether the defendant intended to cause emotional distress, not whether the defendant acted intentionally. (Doc. No. 8, at 5).

Redman is incorrect. The nature of the act, rather than the defendant's intent in its effect, controls NIED claims under North Carolina law. *Horne, 228 N.C. App. at 149, 746 S.E.2d at 19* (upholding NIED dismissal where employer intentionally terminated employee); *see also Shinaberry v. Town of Murfreesboro N.C., No. 2:17-CV-7-D, 2018 U.S. Dist. LEXIS 63287, 2018*

*WL 1801417, at \*4 (E.D.N.C. Apr. 16, 2018)* (applying North Carolina law to dismiss NIED claim based on intentional seizure of property); *Justice v. Dimon, No. 3:10CV413, 2011 U.S. Dist. LEXIS 60127, 2011 WL 2183146, at \*6-7 (W.D.N.C. June 6, 2011)* (applying North Carolina law to dismiss NIED claim based on intentional breach of contract).

The concept is straightforward in certain scenarios. For example, federal courts interpreting North Carolina law note with near uniformity that acts of discrimination **[*7]** and harassment, because they are inherently intentional, cannot form the basis of an NIED claim; such claims simply allege no negligent conduct.[1] The act at issue here — Santana announcing that Redman must relocate — is described only as an intentional act: "Marcus Santana, the lead flight attendant, made a public announcement over the intercom, the clear intent of which was to imply that the passenger in seat 1A was fat." (Doc. No. 1, ¶ 6). Such allegations of intentional conduct are incompatible with negligence, and Redman cannot rest her negligence claim thereon.

By engaging in this line-drawing (as required by North Carolina law), the Court takes care not to prohibit Redman from pleading in the alternative. *See Fed. R. Civ. P. 8(d)(2)*. Redman is free to so plead, but her "complaint and alleged facts must support that alternative claim." *Barrow v. Branch Banking & Tr. Co., No. 316CV00675RJC-DCK, 2017 U.S. Dist. LEXIS 150999, 2017 WL 4124180, at \*3 (W.D.N.C. Sept. 18, 2017)* (Conrad, J.). Thus, where a plaintiff alleges only intentional conduct, her complaint and alleged facts cannot support a negligence claim. *See id; see also Justice, 2011 U.S. Dist. LEXIS 60127, 2011 WL 2183146, at \*7* ("While the court recognizes that pleading matters in the alternative is permissible ... simply re-labeling conduct that is intentional as negligent will not suffice without a plausible factual foundation"). **[*8]** Thus, without any allegation of negligent conduct, American Airlines and Santana are entitled to judgment as a matter of law.

Redman's action suffers from one final defect: she fails to properly allege severe emotional distress. To survive a motion for judgment on the pleadings, Redman must do more than simply invoke the words "severe emotional distress" — she must allege some "emotional or mental disorder, such as, for example, neurosis, psychosis, chronic depression, phobia, or any other type of severe and disabling emotional or mental condition which may be generally recognized

---

[1] *See, e.g., Mitchell v. Lydall, Inc., 16 F.3d 410 (4th Cir. 1994)* (per curiam) (table); *Bonham v. Wolf Creek Acad., 767 F. Supp. 2d 558, 573 (W.D.N.C. 2011)*; *Bratcher v. Pharm. Prod. Dev., Inc., 545 F. Supp. 2d 533, 545 (E.D.N.C. 2008)*; *Barbier v. Durham County Bd. of Educ., 225 F. Supp. 2d 617, 631 (M.D.N.C. 2002)*; *Thomas v. N. Telecom, Inc., 157 F. Supp. 2d 627, 638 (M.D.N.C. 2000)*; *McBride v. Monroe Crossing Owner, LLC, No. 3:21CV637-GCM, 2022 U.S. Dist. LEXIS 82164, 2022 WL 1446674, at \*1 (W.D.N.C. May 6, 2022)*; *Fisher v. Frontline Nat'l, No. 118CV00193MOCWCM, 2019 U.S. Dist. LEXIS 34948, 2019 WL 1048848, at \*4 (W.D.N.C. Mar. 5, 2019)*; *Barrow v. Branch Banking & Tr. Co., No. 316CV00675RJCDCK, 2017 U.S. Dist. LEXIS 150999, 2017 WL 4124180, at \*3 (W.D.N.C. Sept. 18, 2017)*; *Hall v. Rockingham Cnty., No. 1:15CV938, 2016 U.S. Dist. LEXIS 132166, 2016 WL 5400413, at \*8 (M.D.N.C. Sept. 27, 2016)*; *Lingle v. Pain Relief Centers, P.A., No. 5:11-CV-168, 2013 U.S. Dist. LEXIS 178318, 2013 WL 6732120, at \*11 (W.D.N.C. Dec. 19, 2013)*; *Thomas v. Goodwill Indus. of the S. Piedmont, Inc., No. 3:13-CV-00005-MOC, 2013 U.S. Dist. LEXIS 102100, 2013 WL 3816614, at \*3 (W.D.N.C. July 22, 2013)*; *Reid v. Dalco Nonwovens, LLC, No. 5:13CV105-RLV, 2014 U.S. Dist. LEXIS 98642, 2014 WL 3571711, at \*6 (W.D.N.C. July 21, 2014)*; *Wilson v. Gaston Cnty., No. 3:13-CV-58-GCM, 2013 U.S. Dist. LEXIS 64333, 2013 WL 1891276, at \*4 (W.D.N.C. May 6, 2013)*; *Gauthier v. Shaw Grp., Inc., No. 3:12-CV-00274-GCM, 2012 U.S. Dist. LEXIS 172551, 2012 WL 6043012, at \*8 (W.D.N.C. Dec. 4, 2012)*; *Thomas v. Duke Univ., No. 3:11-CV-00387-W, 2012 U.S. Dist. LEXIS 143699, 2012 WL 4753299, at \*5 (W.D.N.C. Oct. 4, 2012)*; *McMahon v. Synthron, Inc., No. CIV. 1:05CV324, 2006 U.S. Dist. LEXIS 3015, 2006 WL 149054, at \*5 (W.D.N.C. Jan. 18, 2006)*.

and diagnosed by professionals trained to do so." *Horne, 228 N.C. App. at 149, 746 S.E.2d at 19-20*; *see also Holleman v. Aiken, 193 N.C. App. 484, 501, 668 S.E.2d 579, 590 (2008)* (upholding dismissal of NIED claim because "plaintiff has failed to make any specific allegations as the nature of her 'severe emotional distress.'"). In her complaint, Redman recites a string of template harms: "injury, emotional distress, fright, pain, horror, anguish, and shock," (Doc. No. 1, ¶ 9), but she fails to explain how these harms manifested, and she offers no insight into the injuries she allegedly suffered.

In response to the instant motion, Redman invokes *Demarco v. Charlotte-Mecklenburg Hosp. Auth., 268 N.C. App. 334, 343, 836 S.E.2d 322 (2019)*, claiming that there the North Carolina Court of Appeals upheld a bare allegation **[*9]** of "severe and grievous mental and emotional suffering, fright, anguish, shock, nervousness, and anxiety." (Doc. No. 8, at 8). That was far from *Demarco*'s only allegation, however; there, the plaintiff also alleged "'depression, stress, anxiety, unbridled fear, and emotional distress' which ... manifested in other maladies such as loss of hair, sleeplessness, extreme exhaustion, decreased energy levels, and paranoia." *Demarco, 268 N.C. App. at 343, 836 S.E.2d at 329*. Redman appears to confuse *Demarco*'s facts with those of *Acosta v. Byrum, 180 N.C. App. 562, 638 S.E.2d 246 (2006)*, in which the North Carolina Court of Appeals upheld an NIED claim alleging "severe emotional distress, humiliation and mental anguish," because, according to the *Acosta* court, "[that] allegation alone, when combined with [plaintiff's] other factual claims, placed defendant on notice of the nature and basis of plaintiff's claim." *Id. at 570, 638 S.E.2d at 252* (cleaned up).

Fortunately, the North Carolina Court of Appeals recently addressed *Horne, Holleman*, and *Acosta*'s apparent inconsistencies in *Cauley v. Bean, 282 N.C. App. 443, 871 S.E.2d 870 (2022)*. There, the court clarified that even where a defendant may have notice of the nature and basis of a plaintiff's claim, "under *Holleman* and *Horne*, without any factual allegations regarding the type, manner, or degree of severe emotional distress she claims to have experienced, we are **[*10]** constrained to hold that Plaintiff's complaint fails to state a valid claim for NIED." *Id. at 451, 871 S.E.2d at 876*. Thus, because Redman's complaint is "devoid of factual allegations regarding the type, manner, or degree of severe emotional distress she claims to have experienced," she too fails to establish her NIED claim. *Id., 871 S.E.2d at 876*.

Therefore, because Redman alleges neither negligent conduct, nor a duty owed to her by American Airlines or Santana, nor severe emotional distress, American Airlines and Santana are entitled to judgment as a matter of law on her claim for negligent infliction of emotional distress.

## B. Redman's Intentional Infliction of Emotional Distress Claim Fails

To state a claim for intentional infliction of emotional distress ("IIED") under North Carolina law, a plaintiff must allege "1) extreme and outrageous conduct by the defendant 2) which is intended to and does in fact cause 3) severe emotional distress." *Waddle v. Sparks, 331 N.C. 73, 82, 414 S.E.2d 22, 27 (1992)*. Whether the plaintiff alleged "severe emotional distress" and whether conduct could reasonably be considered "extreme and outrageous" are both questions of law. *See id. at 85, 414 S.E.2d at 28*; *Hogan v. Forsyth Country Club Co., 79 N.C. App. 483, 493-94, 340 S.E.2d 116, 122-23 (1986)*.

The standard under which conduct becomes unlawful is a demanding one. In fact, North Carolina courts impose liability for IIED **[\*11]** "only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Hogan, 79 N.C. App. at 493, 340 S.E.2d at 123* (quoting *Restatement (Second) of Torts, § 46 comment (d)* (1965)). Accordingly, liability for IIED "clearly does not extend to mere insults, indignities, threats," and though plaintiffs will find some such insults and indignities distasteful, they must be "hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate or unkind." *Id.*

Redman's allegation involves a single implication about her weight. That subtextual remark falls short of the type of "extreme and outrageous" conduct for which the law provides remedy — as this Court has observed, "[t]here is no occasion for the law to intervene in every case where some one's feelings are hurt. There must still be freedom to express an unflattering opinion, and some safety valve must be left through which irascible tempers may blow off relatively harmless steam." *Boggess v. Roper, No. 3:04CV92, 2006 U.S. Dist. LEXIS 63057, 2006 WL 2569206, at \*7 (W.D.N.C. Sept. 1, 2006)* (Conrad, J.) (quoting *Hogan, 79 N.C. App. at 493, 340 S.E.2d at 123*). *Cf. Radcliffe v. Avenel Homeowners Ass'n, Inc., 248 N.C. App. 541, 565, 789 S.E.2d 893, 910 (2016)* (holding "multi-year systematic pattern of harassment, intimidation, and abuse" could constitute extreme and outrageous behavior, as compared **[\*12]** to "isolated incidents of insults.").[2]

Admittedly, "[t]he rough edges of our society are still in need of a good deal of filing down," *Hogan, 79 N.C. App. at 493, 340 S.E.2d at 123*, and the legal process is one tool society will use to polish out its imperfections. Here, however, the indignities Redman suffered are not so extreme and atrocious as to constitute intentional infliction of emotional distress, and thus, American Airlines and Santana are entitled to judgment as a matter of law.

Redman's complaint fails in one final measure: she alleges no severe emotional distress stemming from those activities she alleges to be intentional. (Doc. No. 1, ¶¶ 10-12). As it is to her claim for negligent infliction of emotional distress, such failure is fatal to Redman's claim for intentional infliction of emotional distress. *See Cauley, 282 N.C. App. at 451, 871 S.E.2d at 876*; *Moschos v. Moschos, 287 N.C. App. 162, 167, 882 S.E.2d 401, 404 (2022)* (upholding trial court's dismissal of IIED claim because the "allegations fail to identify a severe and disabling emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so, and fail to allege sufficient facts concerning the type, manner, or degree of severe emotional distress Plaintiff claims to have experienced."). **[\*13]**

---

[2] Redman argues that the wealth of North Carolina law carving isolated insults from the definition of extreme and outrageous conduct is inapposite because Santana "held a position of control in the aircraft." (Doc. No. 8, at 7). North Carolina courts do consider "unfair power relationship[s]" in IIED claims based on sexual harassment, *Guthrie, 152 N.C. App. at 23, 567 S.E.2d at 409*, but the same courts have also rejected non-sexual IIED claims where the defendant exercised a degree of control over the plaintiff. *See, e.g., Ausley v. Bishop, 133 N.C. App. 210, 221, 515 S.E.2d 72, 80 (1999)* (holding employee failed to establish IIED claim for employer's misdeeds); *Best v. Duke Univ., 112 N.C. App. 548, 556, 436 S.E.2d 395, 401 (1993)*, *aff'd in part, rev'd on other grounds*, *337 N.C. 742, 448 S.E.2d 506 (1994)* (holding citizen failed to establish IIED claim against officers who handcuffed and arrested him in front of coworkers). Santana's relative control over Redman, while pertinent, is far from controlling here.

Therefore, because Redman alleges neither extreme and outrageous conduct nor severe emotional distress, American Airlines and Santana are entitled to judgment as a matter of law on her claim for negligent infliction of emotional distress.

### C. Redman's Respondeat Superior Claim Fails

Vicarious liability necessarily rests on an underlying cause of action, and once that underlying action fails, claims for vicarious liability fail with it. *Berkeley Fed. Sav. & Loan Ass'n v. Terra Del Sol, Inc., 111 N.C. App. 692, 708-09, 433 S.E.2d 449, 458 (1993)*. Because Redman's underlying causes of action — negligent and intentional infliction of emotional distress — both fail, so too does her claim for vicarious liability.

### IV. CONCLUSION

**IT IS, THEREFORE, ORDERED** that:

1. Defendants' Motion for Judgment on the Pleadings, (Doc. No. 4), is **GRANTED**.

Signed: July 25, 2023

/s/ Robert J. Conrad, Jr.

Robert J. Conrad, Jr.

United States District Judge

JUDGMENT IN CASE

DECISION BY COURT. This action having come before the Court and a decision having been rendered;

IT IS ORDERED AND ADJUDGED that Judgment is hereby entered in accordance with the Court's July 26, 2023 Order.

July 26, 2023

---

**End of Document**



Neutral
As of: October 24, 2024 4:34 PM Z

## *Wheland Foundry, LLC v. Metal Techs., Inc. (In re Wheland Foundry, LLC)*

United States Bankruptcy Court for the Eastern District of Tennessee, Southern Division

July 29, 2008, Decided; July 29, 2008, Filed

No. 06-10904, Chapter 11, Adv. No. 08-1037

**Reporter**
2008 Bankr. LEXIS 4638 *; 2008 WL 2952483

In re: WHELAND FOUNDRY, LLC, Debtor;WHELAND FOUNDRY, LLC, Plaintiff v. METAL TECHNOLOGIES, INC., Defendant

**Counsel:  [*1]** For Wheland Foundry, LLC, as Debtor-In-Possession, Kennedy, Koontz & Farinash, Chattanooga, TN, Plaintiff: James Robert Mckoon, LEAD ATTORNEY, McKoon, Williams & Haun, Chattanooga, TN; John R Hegeman, McKoon, Williams and Haun, Chattanooga, TN.

For Metal Technologies, Incorporated, Auburn, IN, Defendant: David W. Houston, IV, Burr & Forman, Nashville, TN; Lawrence R. Ahern, III, Burr & Forman LLP, Nashville, TN.

**Judges:** John C. Cook, UNITED STATES BANKRUPTCY JUDGE.

**Opinion by:** John C. Cook

## Opinion

### MEMORANDUM

This proceeding is before the court on a motion by the defendant, Metal Technologies, Inc. ("MTI"), to dismiss three counts of a five-count complaint filed against it by the plaintiff and debtor-in-possession, Wheland Foundry, LLC ("Wheland"). Having considered the motion and the briefs filed by the parties, the court is of the opinion that the motion is well taken and should be granted.

The complaint's factual allegations can be summarized as follows. Defendant MTI and another company, Livingston Company of Chattanooga ("Livingston"), the principal owner of Wheland, entered into an agreement for the acquisition and management of Wheland, subject to the good faith negotiation of a formal Asset Purchase Agreement  **[*2]** that would result in MTI purchasing Wheland. At the time, MTI represented that it had another foundry that was closing and that it would shift those customers to Wheland, thus increasing Wheland's customer base. While the purchase agreement was being finalized, it was agreed that MTI would operate Wheland pursuant to a management contract. During its management of Wheland, MTI did not shift customers from its closed foundry to Wheland but rather it shifted those customers to a rival foundry owned by MTI. The purchase agreement between MTI and Livingston was never

consummated and MTI was eventually replaced as Wheland's management. A few weeks later, Wheland was forced to cease operations because of its poor financial condition. A substantial portion of the business previously performed at Wheland had been and continued to be shifted to the rival foundry owned by MTI.

The complaint alleges that MTI's conduct resulted in five torts against Wheland: (1) breach of fiduciary duty; (2) intentional interference with its contracts; (3) intentional interference with its business relationships; (4) usurpation of corporate opportunity; and (5) deepening insolvency. MTI's motion seeks the dismissal **[*3]** of the two counts involving intentional interference with contract and business relationship and the count alleging deepening insolvency on the grounds that each fails to state a claim for which relief can be granted. Both parties agree that the law of Georgia applies in this case.

A.

Taking up first the two counts relating to intentional interference with contract and business relationship, Georgia is very clear in its requirement that an alleged interferer, either with a contract or a business relationship, must be a virtual interloper and stranger both to the contract in question and the business relationship out of which the contract grew. *Atlanta Market Ctr. Mgmt. Co. v. McLane, 269 Ga. 604, 503 S.E.2d 278 (Ga. 1998)*. "One is not a stranger to the contract just because one is not a party to the contract . . . . The defendant must be a stranger to both the contract *and* the business relationship giving rise to and underpinning the contract." *Id. at 283*. The Supreme Court of Georgia went on in the strongest language to state its specific intention to reduce the number of plaintiffs who could qualify as strangers:

> We endorse the Court of Appeals' line of cases which, in effect, reduce **[*4]** the number of entities against which a claim of tortious interference with contract may be maintained. We reiterate that in order to be liable for tortious interference, one must be a stranger to both the contract at issue and the business relationship giving rise to and underpinning the contract. In other words, all parties to an interwoven contractual arrangement are not liable for tortious interference with any of the contracts or business relationships.

*Id. at 283* (citation omitted). In the course of its opinion, the court also held that the applicability of the "stranger doctrine" is the same for the tort of interference with business relationships as it is for the tort of interference with contractual relationships. *Id. at 283 n.2*.

MTI argues that Wheland's complaint fails to allege any facts that might support the idea that MTI was a stranger to the contracts between Wheland and its customers or the business relationship between Wheland and its customers and that therefore the complaint fails to state a claim under *Fed. R. Civ. P. 12(b)(6)*. A review of the complaint's specific factual allegations clearly shows MTI's managerial role at Wheland: Paragraph 8 ("MTI entered into a **[*5]** management contract with Livingston to operate Wheland . . ."); Paragraph 9 ("The purpose of the JV Agreement was to place MTI in control of operations and management over Wheland . . ."); Paragraph 10 ("MTI began to immediately exercise control over Wheland . . ."); Paragraph 14 ("Under the management by MTI . . ."); Paragraph 16 ("MTI was replaced as management of Wheland."); Paragraph 19 ("The relationship between MTI and Livingston constituted a joint venture for the purposes of managing Wheland."); Paragraph 20 ("MTI

exerted actual control over the day to day operations of Wheland, Wheland's finances, and Wheland's relationship with its customers."); Paragraph 25 ("MTI mismanaged Wheland in an attempt to alienate the customers that Wheland had . . ."). By contrast, there is no allegation anywhere to the effect that MTI was a stranger to Wheland's contracts or business. Instead the complaint merely alleges in conclusory fashion that MTI tortiously interfered with Wheland's contracts and business relationships.

Wheland excuses its failure to plead "strangeness" by adverting to _Fed. R. Civ. P. Rule 8(d)_ and its provisions that a party may plead in the alternative and may state inconsistent **[*6]** claims. While this is true as a general matter, the permission given by the rule to plead in the alternative requires _actually_ pleading in the alternative rather than merely resorting to legal conclusions in the alternative. In two cases almost identical to the case at bar, federal district courts have decided that the failure to allege "strangeness" was fatal to counts in complaints attempting to allege tortious interference, particularly where it also appeared that the defendants were involved in the plaintiff's contractual or business affairs. In _Aioi Seiki, Inc. v. JIT Automation, Inc., 11 F. Supp. 2d 950 (E.D. Mich. 1998)_, the court noted that, under Michigan law, in order "to maintain a positive action for tortuous interference, a plaintiff must establish that the defendant was a 'third party' to the contract or business relationship." _Id. at 954_. The plaintiff had pled that two of the defendants were instrumentalities and alter egos of the third defendant and attempted to pierce the corporate veil in that regard. However, it also claimed that two of these defendants interfered with the plaintiff's contract with the third defendant. Noting this, the district court said:

> Despite **[*7]** the fact that _Fed.R.Civ.P. 8(e)(2)_ permits pleading in the alternative, at no point in the Count II [_sic_] does plaintiff assert that JIT Illinois or JIT Ontario are third parties to the contract. In fact, plaintiff, in P 27 of the complaint, re-asserts the allegations made in Count I, including its claim that the entities co-exist. Therefore, this claim on its face is defective.

_Id. at 954_. Thus, in dismissing the count at issue, the district court focused on two things: first, that the _complaint alleged_ the defendants were all mixed up with the plaintiff in a business relationship, and second, that the plaintiff had _failed to allege_ their strangeness. The plaintiff's con-clusory claim that the defendants were tortious interferers (and thus necessarily strangers) contradicted its express allegations that all the defendants were involved in the business relationship with the plaintiff. The claim was doubly defective in failing to allege strangeness and then in contradicting the specific allegations of the complaint.

The _Aioi_ court relied on another district court case that had rejected a plaintiff's "alternative pleading" excuse in a tortious interference case. In _Metro D.C. Paving, Highway and Construction Materials Council, AFL-CIO v. Roubin & Janeiro, Inc., No. 80-699, 1981 U.S. Dist. LEXIS 10118, 1981 WL 2392 (D.D.C. May 26, 1981)_, **[*8]** Judge Sirica dismissed a tortious interference count because —

> [d]espite the plaintiff's arguments that _Rule 8(e)(2) of the Federal Rules of Civil Procedure_ permits pleading in the alternative, the simple fact remains that at no point in the plaintiff's second cause of action _does it actually plead in the alternative_ that G & C as a non-party induced the breach of a contract between the plaintiff and Roubin.

_1981 U.S. Dist. LEXIS 10118, [WL] at *2_ (emphasis added).

In the case at bar, the court is asked to accept conclusory pleadings of tortious interferences that directly contradict the alleged facts. While it is true that the court will read the complaint in the light most favorable to the plaintiff and will generally accept the pleader's description of what happened to it, "the court will not accept conclusory allegations concerning the legal affect of the events plaintiff has set out if these allegations do not reasonably follow from his description of what happened, or if these allegations are contradicted by the description itself." 5B Charles Allen Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (3d ed. 2004); *see Browning v Clinton, 292 F.3d 235, 242, 352 U.S. App. D.C. 4 (D.C. Cir. 2002)* **[\*9]** (holding that court will not accept inferences or legal conclusions unsupported by facts set out in complaint); *Briscoe v. LaHue, 663 F.2d 713, 723 (7th Cir. 1981)* ("[C]onclusory allegations unsupported by any factual assertions will not withstand a motion to dismiss."), *aff'd, 460 U.S. 325, 103 S. Ct. 1108, 75 L. Ed. 2d 96 (1983)*.

In its complaint, Wheland repeatedly alleges that MTI was its manager and specifically that MTI managed Wheland's relationship with its customers. But Wheland never alleges that MTI was a stranger to Wheland's business relationship with its customers. Therefore, not only has Wheland failed to allege a necessary element of its case — strangeness, but its conclusory counts alleging tortious interference with contract and business opportunity actually contradict its specification of the underlying facts. The court finds that Wheland has failed to state a claim with respect to its counts alleging tortious interference with contract and business relationship, and accordingly these counts will be dismissed.

B.

Defendant MTI has also moved to dismiss the last count of Wheland's complaint, which is captioned "Deepening Insolvency." It avers that MTI caused Wheland **[\*10]** to take on additional debt while Wheland was insolvent and that this was detrimental to Wheland's creditors. It appears, however, that Georgia has not recognized the supposed tort of deepening insolvency. Neither party to this litigation has cited any Georgia case even remotely touching on this subject, and this court's own research has discovered no indication of any kind concerning Georgia's possible stance toward this new and debatable tort of deepening insolvency. Under these circumstances the court believes that it would be inappropriate to identify a whole new state cause of action and inflict it for the first time on the parties to this litigation. It is simply not "the function of the federal court to expand the existing scope of state law." 19 Charles A. Wright, Arthur R. Miller, Edward H. Cooper, *Federal Practice and Procedure* § 4507 (2d ed. 1996); *accord, Barfield v. Madison County, 212 F.3d 269, 272 (5th Cir. 2000)* (stating that the court "will not create 'innovative theories of recovery or defense' under local law, but will rather merely apply it 'as it currently exists.'"); *Dean v. Dean, 821 F.2d 279, 284 (5th Cir. 1987)* ("Moreover, as a federal court attempting to determine **[\*11]** state law, we are especially hesitant to invent a new cause of action or even to extend the existing case law and establish a right to recover damages . . . .").

It is also significant to note the recent criticism of the concept of deepening insolvency as an actionable tort. In *Trenwick America Litigation Trust v. Ernst & Young, L.L.P., 906 A.2d 168, 206 (Del. Ch. 2006)*, the court refused to recognize the supposed tort of deepening insolvency and criticized "those federal courts that became infatuated with [and] did not look closely enough at the object of their ardor." *Id. at 206*. The court went on to explain:

Case 24-07014   Doc 30-2   Filed 10/25/24   Entered 10/25/24 18:26:36   Desc Exhibit
1 - Unpublished Cases   Page 95 of 95

Page 5 of 5
2008 Bankr. LEXIS 4638, *11

None of those decisions explains the rationale for concluding that deepening insolvency should be recognized as a cause of action or how such recognition would be consistent with traditional concepts of fiduciary responsibility. In a more recent decision, the Third Circuit has taken a more skeptical view of the deepening insolvency concept, a view consistent with the outcome reached in this decision. In fact, many of the decisions that seem to embrace the concept of deepening insolvency do not clarify whether the concept is a stand-alone cause of action or a measurement of damages **[*12]** (the extent of deepening) for other causes of action.

*Id. at 206-07*.

The Supreme Court of Delaware, presumptively well schooled in the nuances of business law, affirmed *Trenwick* "on the basis of and for the reasons assigned by the court of chancery in its opinion . . . ." *Trenwick America Litigation Trust v. Billett, 931 A.2d 438 (Del. 2007)*. Other reasons to refrain from recognizing deepening insolvency as a new tort may be found in Sabin Willet, *The Shallows of Deepening Insolvency*, *60 Bus. Law 549 (2005)*.

Considering the complete absence of Georgia law indicating the possible existence of this tort, the sensible warnings of courts and commentators that the role of federal courts is not to create new state causes of action, and considering further that the trend of the decisions may be unfavorable to the continued recognition of this supposed tort, the court declines to hold that the tort of deepening insolvency is an actionable tort under Georgia law. Accordingly the count alleging "deepening insolvency" will be dismissed for failure to state claim upon which relief can be granted.

The defendant's motion to dismiss will be granted, and an appropriate order will enter.

**SIGNED this 29  [*13] day of July, 2008.**

/s/ John C. Cook

**John C. Cook**

**UNITED STATES BANKRUPTCY JUDGE**

---

**End of Document**