# EXHIBIT 2

*Execution Version*

REDEMPTION AND ESOP STOCK PURCHASE AGREEMENT

THIS REDEMPTION AND ESOP STOCK PURCHASE AGREEMENT (the "Agreement") is made and entered into this 31st day of August, 2020 by and among Pro-Mark Services, Inc., a North Dakota corporation (the "Company"), the Pro-Mark Services, Inc. Employee Stock Ownership Trust (the "Trust"), which forms a part of the Pro-Mark Services, Inc. Employee Stock Ownership Plan (the "Plan" and collectively with the Trust, the "ESOP"), Connie Berg (the "Seller" and collectively with the Company and the Trust shall be referred to herein as the "Parties").

RECITALS

WHEREAS, the Company has established the ESOP to be effective as of January 1, 2019 for the benefit of its employees of the Company and the ESOP is designed to invest primarily in the common stock of the Company ("Company Stock");

WHEREAS, the Company has made contributions to the ESOP in the amount of $535,000 (the "ESOP Contributions");

WHEREAS, the Seller owns 100,000 shares of Company Stock which currently constitutes all of the issued and outstanding shares of Company Stock;

WHEREAS, the Seller desires to sell and the Company desires to purchase and redeem 37,683 shares of Company Stock (the "Redemption Shares") from the Seller in exchange for a promissory note in the principal amount of $12,094,000 (the "Redemption Note"), as the same may be adjusted as set forth in this Agreement (the "Redemption Transaction");

WHEREAS, simultaneously with the Redemption Transaction, the Trust desires to purchase and the Seller desires to sell 62,317 shares of Company Stock (referred to herein as the "ESOP Shares") to the Trust for an amount equal to the Purchase Price (as such term is defined in Section 2.1(b)) (the "ESOP Stock Purchase Transaction"), to be paid by the Trust to the Seller partially in cash with the ESOP Contributions and the proceeds of a loan from the Company to the Trust in the amount of $8,479,246 (the "Initial Company/ESOP Loan") made pursuant to that certain Initial Company/ESOP Loan Agreement by and between the Company and the Trust dated as of the date hereof (the "Initial Company/ESOP Loan Agreement") which shall be evidenced by a promissory note dated as of the date hereof issued by the Trust to the Company in the principal amount of $8,479,246 (the "Initial Company/ESOP Note") and which Initial Company/ESOP Note shall be secured by a security interest granted by the Trust in favor of the Company in and to 26,420 of the ESOP Shares purchased with the proceeds of the Initial Company/ESOP Loan pursuant to the terms set forth in that certain Initial Company/ESOP Stock Pledge Agreement executed by and between the Company and the Trust dated as of the date hereof (the "Initial Company/ESOP Pledge Agreement") and the remainder of the Purchase Price to be paid by the Trust by issuing to the Seller a promissory note dated as of the date hereof in the aggregate principal amount of $10,985,754 (the "Initial Seller/ESOP Note") pursuant to the terms set forth in that certain Initial Seller/ESOP Loan Agreement by and among the Seller and the Trust dated as of the date hereof (the "Initial Seller/ESOP Loan Agreement") which Initial Seller/ESOP Note shall be secured by a security interest granted by the Trust in favor of the Seller in and to 34,230 of the ESOP Shares purchased in exchange for issuing the Initial Seller/ESOP Note pursuant to the terms set forth in that certain Initial Seller/ESOP Stock Pledge Agreement executed by and between the Company and the Trust dated as of the date hereof (the "Initial Seller/ESOP Stock Pledge Agreement");

WHEREAS, subsequent to the Closing of the Trust's purchase of the ESOP Shares, the Parties intend to refinance the indebtedness evidenced by the Initial Seller/ESOP Note (the "Initial Seller/ESOP Loan") and to consolidate the Initial Company/ESOP Loan with the refinanced Initial Seller/ESOP Loan into one new loan from the Company to the Trust (the "Consolidated Amended and Restated ESOP Loan") pursuant to the terms and conditions set forth in the Seller Note Exchange and ESOP Loan Modification Agreement (as such term is defined below);

WHEREAS, following the close of the Redemption Transaction and the ESOP Stock Purchase Transaction, the ESOP will own 100% of the issued and outstanding shares of Company Stock;

WHEREAS, the Trust is purchasing the ESOP Shares exclusively for the benefit of the participants and beneficiaries of the Plan;

WHEREAS, the Parties intend for the obligations of the Trust as set forth in this Agreement to be consistent with the "primary benefits" requirement contained in Section 4975(d) of the Code and Section 54.4975-7(b)(3) of the Treasury Regulations;

WHEREAS, the Parties intend for the purchase of the ESOP Shares by the Trust to be exempt from the prohibited transaction rules for purchases of qualifying employer securities pursuant to Section 4975 of the Code and Section 406 of ERISA; and

WHEREAS, the Parties intend that the Initial Company/ESOP Loan, the Initial Seller/ESOP Loan and the Consolidated Amended and Restated ESOP Loan will each constitute an "exempt loan" for the purpose of section 4975(d)(3) of the Code, Treasury Regulations section 54.4975-7(b), section 408(b)(3) of ERISA, and Department of Labor Regulations section 2550.408b-3 (together, the "Exempt Loan Rules"), and satisfy the applicable requirements of section 404 of ERISA.

NOW, THEREFORE, in consideration of the premises and the mutual covenants, agreements, and representations contained herein, and intending to be legally bound hereby, the Parties agree as follows:

Article 1<br>Definitions

1.1    Definitions.  As used in this Agreement such terms as defined in the premises of this Agreement shall have the meanings ascribed therein and the following terms shall have the respective meanings set forth below.  Any of the terms, unless the context otherwise requires, may be used in the singular or plural, depending upon the reference:

"2020/2021 EBITDA Lower Limit" shall mean $4,542,200.

"2020/2021 EBITDA Upper Limit" shall mean $6,813,600.

"Accountants" shall have the meaning set forth in Section 2.4 of this Agreement.

 "Affiliate" shall mean with respect to any Person, any other Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person.  For the purposes of this definition, the terms "controls," "is controlled by" and "under common control with" mean the possession of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by Contract or otherwise.

2

"Aggregate Transaction Consideration" shall mean the sum of the Redemption Price and the Purchase Price.

"Amended and Restated ESOP Loan Agreement" shall mean that certain Amended and Restated ESOP Loan Agreement to be executed by the Company and the Trust upon the consummation of Initial ESOP Loan Refinancing Transaction to govern the terms of the Consolidated Amended and Restated ESOP Loan.

"Amended and Restated ESOP Loan Documents" shall mean, collectively, the Amended and Restated ESOP Loan Agreement, the Amended and Restated ESOP Note and the Amended and Restated Stock Pledge Agreement.

"Amended and Restated ESOP Note" shall mean that certain Amended and Restated ESOP Note to be executed by the Trust in favor of the Company upon the consummation of Initial ESOP Loan Refinancing Transaction which shall evidence the Trust's obligations with respect to the Consolidated Amended and Restated ESOP Loan.

"Amended and Restated ESOP Stock Pledge Agreement" shall mean that certain Amended and Restated ESOP Stock Pledge Agreement to be executed by the Company and the Trust upon the consummation of Initial ESOP Loan Refinancing Transaction to evidence the pledge of the ESOP Shares by the Trust to secure the repayment of the Consolidated Amended and Restated ESOP Loan.

"Amended and Restated Seller Note" shall mean that certain promissory note to be issued by the Company in favor of the Seller upon the consummation of the Initial ESOP Loan Refinancing Transaction.

"Average 2020/2021 EBITDA" shall mean the average earnings before interest, taxes, depreciation and amortization of the Company for the 2020 and 2021 fiscal years of Company as adjusted to not take into account (a) all transaction expenses related to the Redemption Transaction and ESOP Stock Purchase Transaction; (b) any costs incurred by the Company in connection with ESOP-related benefits associated with the ESOP Stock Purchase Transaction;  and (c) any other costs incurred by the Company for implementing any programs related to the transactions contemplated by this Agreement not included in the financial projections provided by the Company to the Independent Financial Advisor in connection with the transactions contemplated by this Agreement.

"Basket" shall have the meaning set forth in Section 6.4(b) of this Agreement.

"Benefit Plan" shall mean any bonus, severance, change in control, deferred compensation, hospitalization, or other medical, stock option, stock purchase, pension, life or other insurance, profit-sharing or retirement plan, program, policy, or arrangement and each other employee benefit plan, program, policy, or arrangement maintained by the Company as of the Closing Date or with respect to which the Company reasonably expects to incur any direct or indirect material liability, whether contingent or otherwise, including, without limitation, (i) any pension plan, 401(k) plan, profit-sharing plan, health or welfare plan, and any other employee benefit plan within the meaning of Section 3(3) of the ERISA (or any comparable provision of any other applicable Laws), and (ii) any other benefit arrangement, obligation, or practice, whether or not legally enforceable, to provide benefits, other than currently-paid salary, as compensation for services rendered, to one or more present or former employees, directors, agents, or independent contractors, including employment agreements, offer letters, severance policies or agreements.

"Board" shall mean the Board of Directors of the Company.

"Business Day" shall mean any day other than a Saturday, Sunday or other day on which commercial banks in the State of North Dakota are authorized or required by Law to be closed.

"CARES Act" means the Coronavirus Aid, Relief, and Economic Security Act (Public Law 116-136), as amended from time to time and applicable rules, requests, guidelines, directives and/or regulations thereunder or issued by the Small Business Administration or any other Government Entity in connection therewith, in each case as in effect from time to time.

"Closing" shall have the meaning set forth in Section 2.3 of this Agreement.

"Closing Balance Sheet" shall mean a balance sheet of the Company (without giving effect to the transactions contemplated by this Agreement) as of the Closing Date.

"Closing Cash" shall mean the cash of the Company as of the Closing Date.

"Closing Date" shall have the meaning set forth in Section 2.3 of this Agreement.

"Closing Working Capital" shall have the meaning set forth in Section 2.4 of this Agreement.

"Code" means the Internal Revenue Code of 1986, as amended.

"Company" shall have the meaning set forth in the preamble.

"Company Stock" shall have the meaning set forth in the recitals to this Agreement.

"Consolidated Amended and Restated ESOP Loan" shall have the meaning set forth in the recitals to this Agreement.

"Contract" means any agreement, contract, commitment, guaranty, lease, mortgage, Licenses and Permits, note or other instrument that is legally binding, whether oral or written.

"Damages" shall mean all demands, claims, actions or causes of action, assessments, losses, damages, costs, expenses, liabilities, judgments, awards, fines, sanctions, penalties, charges and amounts paid in settlement, including, without limitation: reasonable attorneys', accountants', investigators', and experts' fees and expenses, sustained or incurred pursuing such claim or in connection with the defense or investigation of any claim. All such Damages shall be net of any recovery under any applicable insurance policies.

"Data Site" means the virtual data room maintained by Lazear Capital Partners for the Company.

"Disclosure Schedule" shall have the meaning set forth in Section 3.1 of this Agreement.

"EBITDA Price Increase Adjustment" shall have the meaning set forth in Section 2.6(c).

"EBITDA Price Reduction Adjustment" shall have the meaning set forth in Section 2.6(b).

"Employment and Labor Laws" shall mean any federal, state, or local laws, statutes, regulations, ordinances, rules, standards, or common law, or any judgment, order, ruling, writ, notice, decree, permit, license, approval, or injunction relating to employment, terms and conditions of employment, equal employment opportunity, nondiscrimination, immigration, employee privacy, wages, hours, benefits, collective bargaining, the payment of social security and similar taxes, occupational safety and health, and plant closing, including, without limitation, the Age Discrimination in Employment Act, the Older Workers

Benefit Protection Act of 1967, Title II of the Civil Rights Act of 1964, the Equal Pay Act, the Americans with Disabilities Act, the Worker Adjustment and Retraining Notification Act, the Fair Labor Standards Act, the National Labor Relations Act, the Civil Rights Act of 1991, the Family and Medical Leave Act of 1993, and their applicable state law counterparts, each as they have been amended from time to time prior to Closing.

"Environmental, Health and Safety Laws" shall mean any federal, state, or local laws, statutes, regulations, ordinances, rules, common law, or standards, currently in effect, or any judgment, order, writ, notice, decree, permit, license, approval, or injunction relating to public health and safety, worker health and safety, pollution, or protection of the Environment and including, without limitation, all those relating to the release, deposit, discharge, emission, leaking, spilling, seeping, migrating, injection, pumping, pouring, emptying, escaping, dumping, disposing, or other movement of any Hazardous Substance into the environment (a "Release"), as well as all those relating to the presence, production, generation, labeling, testing, Release or threatened Release, control, cleanup, manufacture, processing, distribution, use, treatment, storage, disposal, transport, or handling of Hazardous Substances, pollutants, pesticides, pollutants, contaminants, toxic chemicals, petroleum products or byproducts, contaminants, or chemical, industrial, hazardous, or toxic materials or wastes into the environment as well as, without limitation, the Clean Air Act, the Toxic Substance Control Act, the Clean Water Act, the Oil Pollution Act of 1990, the Comprehensive Environmental Response, Compensation and Liability Act, the Resource Conservation and Recovery Act, and the Occupational Safety and Health Act of 1970, and their applicable state law counterparts, each as they have been amended from time to time prior to Closing.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

"ESOP" shall have the meaning set forth in the premises of this Agreement.

"ESOP Contributions" shall have the meaning set forth in the recitals of this Agreement.

"ESOP Indemnified Parties" has the meaning set forth in Section 6.1(a) of this Agreement.

"ESOP Shares" shall have the meaning set forth in the recitals of this Agreement.

"ESOP Stock Purchase Transaction" shall have the meaning set forth in the recitals of this Agreement.

"Estimated Adjustment Amount" shall mean the Estimated Closing Cash less the Existing Debt.

"Estimated Adjustment Statement" shall mean the Estimated Adjustment Statement attached as hereto as Exhibit A.

"Estimated Closing Cash" shall mean the amount of cash as set forth in the Estimated Adjustment Statement.

"Exempt Loan Rules" shall have the meaning set forth in the recitals of this Agreement.

"Existing Debt" shall mean the debt obligations of the Company as of the Closing Date but excluding (i) the ESOP Contributions, (ii) the senior financing, including the term loan and/or line of credit used for payment of all transaction expenses related to the Redemption Transaction and ESOP Stock Purchase Transaction; and (iii) the PPP Loan. The balance of Existing Debt shall be set forth in the Estimated Adjustment Statement.

"Fairness Opinion" shall mean the opinion prepared by the Independent Financial Advisor, dated as of the date hereof, and delivered to the Trust pursuant to Section 4.2(d) of this Agreement.

"Filing or Filings" shall have the meaning set forth in Section 3.3(h) of this Agreement.

"Financial Statements" shall have the meaning set forth in Section 3.3(g)(i) of this Agreement.

"Fundamental Representations" shall have the meaning set forth in Section 6.4 of this Agreement.

"GAAP" shall mean generally accepted accounting principles in effect from time to time within the United States, consistently applied.

"Governmental Entity" shall mean the government of the United States, the government of any state or territory of the United States, District of Columbia, or political subdivision thereof, or any agency or instrumentality of any of the foregoing, including without limitation school districts.

"Hazardous Substances" shall mean any substances defined, regulated, or listed as hazardous, dangerous or toxic, or potentially hazardous, dangerous, or toxic, or defined as waste, pollutants, or contaminants under the Environmental, Health and Safety Laws, including, without limitation, any substance within the meaning of § 101(14) of the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601, et seq. ("CERCLA"), or defined or listed as "waste," "hazardous substances," "hazardous materials," "toxic substances," "oil," "contaminant," or "pollutant" under any other Environmental, Health and Safety Laws.

"Indemnified Party" has the meaning set forth in Section 6.3 of this Agreement.

"Indemnifying Party" has the meaning set forth in Section 6.3 of this Agreement.

"Independent Financial Advisor" shall mean Stout Risius Ross, LLC or such other independent financial advisor as may be engaged by the Trustee on behalf of the Trust.

"Initial Company/ESOP Loan Agreement" shall have the meaning set forth in the Recitals of this Agreement.

"Initial Company/ESOP Loan Documents" shall mean, collectively, the Initial Company/ESOP Loan Agreement, the Initial Company/ESOP Note and the Initial Company/ESOP Stock Pledge Agreement.

"Initial Company/ESOP Stock Pledge Agreement" shall have the meaning set forth in the Recitals of this Agreement.

"Initial ESOP Loans" shall mean, collectively, the Initial Company/ESOP Loan and the Initial Seller/ESOP Loan.

"Initial ESOP Notes" shall mean, collectively, the Initial Company/ESOP Note and the Initial Seller/ESOP Notes.

"Initial ESOP Loan Refinancing Transaction" shall mean the assignment by the Trust all of its rights, title, interests, powers, claims, remedies, benefits, options and obligations under the Initial Seller/ESOP Loan Documents to the Company and the Company's assumption of the Trust's rights, title, interest, benefits, options and obligations thereunder, the issuance by the Company of the Amended and Restated Seller Note to the Seller and the execution of the Amended and Restated ESOP Loan Documents

by the Company and the Trust pursuant to the terms of the Seller Note Exchange and ESOP Loan Modification Agreement.

"Initial Seller/ESOP Loan Agreement" shall have the meaning set forth in the Recitals of this Agreement.

"Initial Seller/ESOP Loan Documents" shall mean, collectively, the Initial Seller/ESOP Loan Agreement, the Initial Seller/ESOP Note and the Initial Seller/ESOP Stock Pledge Agreement.

"Initial Seller/ESOP Loans" shall have the meaning set forth in the recitals of this Agreement.

"Initial Seller/ESOP Note" shall have the meaning set forth in the recitals of this Agreement.

"Initial Seller/ESOP Stock Pledge Agreement" shall have the meaning set forth in the Recitals of this Agreement.

"Insurance Policies" shall have the meaning set forth in Section 3.3(p) of this Agreement.

"Intellectual Property" shall have the meaning set forth in Section 3.3(r) of this Agreement.

"Interim Financials" shall have the meaning set forth in Section 3.3(g)(i) of this Agreement.

"Investor Rights Agreement" shall mean that certain agreement to be entered into by the Company, the Seller and the Trustee, acting on behalf of the Trust, to address certain post-closing matters related to the governance and operation of the Company after Closing.

"Knowledge" shall mean the actual knowledge of the Seller, Kyle Berg, Chad DuBois or the knowledge the Seller could have obtained upon making reasonable inquiry with certain other employees of the Company with operational or financial responsibilities.

"Laws" shall mean any federal, state, local, county, city, municipal, or other administrative order, constitution, law, ordinance, principle of common law, regulation, rule, restriction, statute, or treaty.

"Leased Properties" shall mean all real property which the Company leases (including subleases) or has a possessory interest.

"Leases" shall have the meaning set forth in Section 3.3(i) of this Agreement.

"Licenses and Permits" shall mean licenses, permits, certifications, franchises, authorizations, registrations, approvals, and certificates of occupancy (or their equivalent) issued or granted to the Company with respect to its business by the government of the United States or of any state, city, municipality, county, or town thereof, or of any foreign jurisdiction, or any department, agency, board division, subdivision, audit group or procuring office, commission, bureau, or instrumentality of any of the foregoing, and all pending applications therefore.

"Liens" shall mean any mortgage or deed of trust, pledge, hypothecation, assignment, lien, charge, claim, security interest, easement or encumbrance, or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including, without limitation, any lease or title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement perfecting a security interest under the Uniform Commercial Code or comparable law of any jurisdiction).

"Material Adverse Effect" shall mean any event, matter, occurrence, or action which has, or could reasonably be expected to have, an adverse impact exceeding One Hundred Fifty Thousand Dollars ($150,000) in Damages on the operations, business, assets, financial condition, or results of operation of the Company taken as a whole, excluding any effect or Damages relating to or arising out of an event, matter, occurrence or action affecting (i) the industry in which the Company conducts business or (ii) the United States or global economy generally.

"Material Contract" means any Contract to which the Company is a party, which is currently in effect and is: (a) for the purchase of materials, supplies, goods, equipment or services that involves the payment by the Company of more than $250,000 over the life of the Contract; (b) for services involving payments to the Company of more than $250,000 over the life of the Contract; (c) any severance agreement, non-competition agreement with current or former employees, other than such agreements entered into in the ordinary course of business; (d) any guaranty; (e) any loan agreement or loan document other than accounts receivable incurred in the ordinary course of business; (f) any lease for real or personal property; (g) any Contract for employment of any person; (h) any Contract pursuant to which the Company has any obligations of noncompetition, noninterference, nonparticipation or exclusivity; or (i) is otherwise material to the business of the Company which is terminable by the other party thereto as a result of the transactions contemplated by this Agreement.

"Net Working Capital" shall mean an amount equal to the current assets of the Company (excluding cash and cash equivalents) less the current liabilities of the Company (excluding current portions of the long term debt) on the Closing Date (as determined with the same methodology and components consistently with the example set forth on in Exhibit A to this Agreement), provided however that any debts of the Company for loans or lines of credit utilized to pay for any expenses associated with the transactions contemplated herein and any accrued liability for the ESOP Contributions shall not be included for purposes of the determination of the Net Working Capital.

"Objection Notice" shall have the meaning set forth in Section 2.4 of this Agreement.

"Person" means an individual, corporation, partnership, limited liability company, association, trust or any other entity or organization of any kind or character, including a governmental department, authority or agency or subdivision thereof.

"Plan" shall have the meaning set forth in the premises of this Agreement.

"Potential Contributor" shall have the meaning set forth in Section 6.5 of this Agreement.

"Pre-Closing Taxes" means Taxes of the Company for any Pre-Closing Tax Period.

"Pre-Closing Tax Period" means any taxable period ending on or before the Closing Date and, with respect to any taxable period beginning before and ending after the Closing Date, the portion of such taxable period ending on and including the Closing Date.

"PPP Loan" means a loan incurred under 15 U.S.C. 636(a)(36) (as added to the Small Business Act by Section 1102 of the CARES Act).

"Redemption Note" shall have the meaning as set forth in the recitals hereto.

"Redemption Price" shall have the meaning as set forth in Section 2.1(a) of this Agreement.

"Redemption Shares" shall have the meaning set forth in the recitals to this Agreement.

"Redemption Transaction" shall have the meaning set forth in the recitals to this Agreement.

"Related Party Agreement" shall have the meaning set forth in Section 3.3(u) of this Agreement.

"Reviewed Financials" shall have the meaning set forth in Section 3.3(g) of this Agreement.

"Seller Note Exchange and ESOP Loan Modification Agreement" shall mean that certain agreement pursuant to which the Initial ESOP Loan Modification will be consummated.

"Securities Act" shall mean the Securities Act of 1933, as amended, and the rules and regulations of the Securities Exchange Commission promulgated thereunder.

"Shares" shall mean, collectively, the ESOP Shares and the Redemption Shares.

"Synthetic Equity" shall mean any stock options, warrants, stock appreciation rights, phantom stock units, restricted stock, deferred issuance stock rights or similar interests or rights that give the holder (other than an employee participating under the Plan) the right to acquire or receive stock of the Company, or similar rights to future cash payments based on the value or appreciation in the value of the stock of the Company.

"Taxes" shall mean (a) any and all taxes, fees, charges, levies or other assessments of any nature whatsoever (whether federal, state, local or foreign), including without limitation, income, gross receipts, profits, sales, use, occupation, value added, ad valorem, transfer, franchise, withholding, payroll, employment, excise, real property, personal property, environmental (including taxes under Section 59A of the Code), customs duties, license, severance, stamp, premium, windfall profits, capital stock, social security (or similar), unemployment, disability, alternative or add-on minimum and estimated taxes, together with any interest, penalties, or additions to tax imposed with respect thereto, whether disputed or note and (b) any obligations under any agreements or arrangements with respect to Taxes described in clause (a) above or any liability for such amounts as a result of being a member of a combined, consolidated, unitary or affiliated group or of a contractual obligation to indemnify any other Person or any obligation to otherwise succeed to the tax liability of any other Person.

"Treasury Regulations" means the rules and regulations promulgated by the U.S. Treasury Department under the Code.

"Trust" shall have the meaning set forth in the premises of this Agreement.

"Trustee" shall mean Miguel Paredes, not in his individual capacity but solely in his capacity as trustee of the Trust.

## Article 2
### Redemption and ESOP Stock Purchase Transactions

2.1     Summary of Transactions.

(a)     Redemption Transaction.   Subject to the terms and conditions of this Agreement, on the Closing Date (as defined in Section 2.3 below), the Company shall redeem the Redemption Shares from the Seller in exchange for the issuance of the Redemption Note in the principal amount of $11,000,000 plus the Estimated Adjustment Amount (the "Redemption Price").

(b)        ESOP Stock Purchase Transaction.  Subject to the terms and conditions of this Agreement, simultaneously with the Redemption Transaction, on the Closing Date, The Trust agrees to pay to the Seller for the ESOP Shares an amount equal to Twenty Million Dollars ($20,000,000) (the "Purchase Price").  The Trust shall (a) pay to the Seller an amount equal to Nine Million Fourteen Thousand Two Hundred Forty-Six Dollars ($9,014,246) in immediately available funds to an account designated by the Seller with the proceeds of the Initial Company/ESOP Loan and the ESOP Contribution and (b) issued to the Seller the Initial Seller/ESOP Note in the aggregate principal amount equal to Ten Million Nine Hundred Eighty-Five Seven Hundred Fifty-Four Dollars ($10,985,754).

2.2        Actions Simultaneous.  All actions to be taken and all documents to be executed and delivered by all Parties at the Closing shall be deemed to have been taken and executed and delivered simultaneously.

2.3        Time and Place of Closing.  The closing of the Redemption Transaction and the ESOP Stock Purchase Transaction (the "Closing") shall take place on August 31, 2020 (the "Closing Date") at such place and in such manner as shall be mutually agreed upon by the Parties.

2.4        Closing Adjustment Amount, Net Cash/Debt Adjustment and Working Capital Adjustment.

(a)        On or prior to the date which is ninety (90) days following the Closing Date, the Company shall in good faith prepare (or cause to be prepared) and deliver to the Trustee and Seller a Closing Balance Sheet (as defined below) of the Company as of the Closing Date, which shall set forth the Net Working Capital of the Company as of the Closing Date (the "Closing Working Capital"), the Closing Cash, the Existing Debt, and the proposed increase or decrease to the Redemption Price based on the adjustments in this Section (the "Closing Adjustment Amount").  The Closing Balance Sheet will be prepared in accordance with GAAP.

(b)        The Company shall afford the Seller and Trustee and such Parties' advisors reasonable access to the properties, assets, reports, books, work papers, key employees, written procedures and records of the Company with respect to the Closing Balance Sheet and Closing Adjustment Amount during normal business hours upon reasonable notice as is necessary to prepare, review, verify and finalize the Closing Balance Sheet, Closing Adjustment Amount and the Closing Working Capital.

(c)        The Closing Adjustment Amount, the Closing Cash, the Existing Debt, and Closing Working Capital shall be final and binding on the Parties unless, within thirty (30) days after the Company's delivery of the Closing Adjustment Amount and Closing Working Capital unless, the Seller provides written notice to the Company and the Trustee objecting to the Closing Adjustment Amount, the Closing Cash, the Existing Debt, and Closing Working Capital and setting forth, in reasonable detail, the basis therefor and the Seller version of the Closing Adjustment Amount to the extent then reasonably known (an "Objection Notice").  If the Seller timely delivers an Objection Notice to the Company, the Company and the Seller shall work in good faith to resolve any and all disputes identified in the Objection Notice, and their written agreement shall be final and binding.  If the Company and the Seller are unable to resolve all disputes with respect to the Objection Notice, then within thirty (30) days after the delivery of an Objection Notice they shall engage an independent third party accounting firm (the "Accountants") agreeable to both parties to decide the disputed items and shall instruct the Accountants to render such decision within thirty (30) days of the date of commencement of such engagement.  The Accountants shall act as an expert and not as an arbitrator to determine, based solely on the provisions of this Agreement, the written submissions of the Company, Trustee, on the one hand, and the Seller on the other hand (which submissions shall be available to the other parties) and any documents presented at any conference referred to below, and not by independent investigation, only the specific disputed items.  The decision of the Accountants shall include

10

a statement of the Accountants' determination of each disputed item, shall contain the final and definitive Closing Adjustment Amount and Closing Working Capital, and shall be set forth in a written report delivered to the Company, Trustee and the Seller, which, absent manifest error, shall be final and binding on the Parties.  In resolving any disputed item, the Accountants shall be bound by the provisions of this Agreement and may not assign a value to any item greater than the greatest value for such item or less than the smallest value for such item claimed by either the Company and Trustee, on the one hand, or the Seller, on the other hand.  The Accountants may, at their discretion, conduct a conference concerning the disputes, at which conference each party shall have the right to present additional documents, materials and other information and to have present its advisors, counsel and accountants.  In connection with such process, there shall be no other hearings or any oral examinations, testimony, depositions, discovery or other similar proceedings.  The Accountants fees shall be paid by the non-prevailing party (either the Company or the Seller).

(d)     If the Closing Adjustment Amount exceeds the Estimated Adjustment Amount, subject to the consent of the Company's senior lender, the Company shall pay the amount of such excess to the Seller. Alternatively, if the senior lender does not consent, the principal amounts of the (i) Redemption Note and the Amended and Restated Seller Note (on a pro-rata basis), and (ii) the principal amount of the Consolidated Amended and Restated ESOP Note shall be increased by the amount of such excess.  Any such adjustment shall be effectuated within five (5) business days after determination of the final agreed upon amount of the Closing Adjustment Amount.

(e)     If the Closing Adjustment Amount is less than the Estimated Adjustment Amount, the principal amounts of the (i) Redemption Note and the Amended and Restated Seller Note (on a pro-rata basis) and the (ii) Consolidated Amended and Restated ESOP Note shall be decreased by the amount of such deficit. Any such adjustment shall be effectuated within five (5) business days after determination of the final agreed upon amount of the Closing Adjustment Amount.

(f)     If the Closing Working Capital exceeds $1,107,000, subject to the consent of the Company's senior lender, the Company shall pay the amount of such excess to the Seller.  Alternatively, if the senior lender does not consent,  the principal amounts of the (i) Redemption Note and the Amended and Restated Seller Note (on a pro-rata basis), and (ii) the principal amount of the Consolidated Amended and Restated ESOP Note shall be increased by the amount of such excess.  Any such adjustment shall be effectuated within five (5) business days after determination of the final agreed upon amount of the Closing Working Capital.

(g)     If the Closing Working Capital is less than $107,000, the principal amounts of the (i) Redemption Note and the Amended and Restated Seller Note (on a pro-rata basis) and the (ii) Consolidated Amended and Restated ESOP Note shall be decreased by the amount of such deficit. Any such adjustment shall be effectuated within five (5) business days after determination of the final agreed upon amount of the Closing Working Capital.

2.5     AAA Distribution Adjustment

(a)     The Company previously made a cash distribution of the Seller's estimated accumulate adjustment account balances ("Estimated AAA Balances") to the Seller.

(b)     Within 90 days of the Closing, the Company will deliver to the Trustee a statement setting forth the final calculation of the Company's AAA Balances (the "Final AAA Balances") and if the Estimated AAA Balance is lower than the Final AAA Balance, the amount by which the Final AAA Balances exceeds the Estimated AAA Balance shall be treated as being an additional amount of Purchase Price and the Amended and Restated Seller Note shall be increased by such amount.

(c)     The Final AAA Balances shall be final and binding on the Parties unless, within thirty (30) days after the Company's delivery of the Final AAA, the Seller delivers to the Company an Objection Notice.  If the Seller timely delivers an Objection Notice to the Company, the Company and the Seller shall work in good faith to resolve any and all disputes identified in the Objection Notice, and their written agreement shall be final and binding.  If the Company and the Seller are unable to resolve all disputes with respect to the Objection Notice, then within thirty (30) days after the delivery of an Objection Notice they shall engage an Accountants agreeable to both parties to decide the disputed items and shall instruct the Accountants to render such decision within thirty (30) days of the date of commencement of such engagement.  The Accountants shall act as an expert and not as an arbitrator to determine, based solely on the provisions of this Agreement, the written submissions of the Company and the Trustee, on the one hand, and the Seller, on the other hand (which submissions shall be available to the other parties) and any documents presented at any conference referred to below, and not by independent investigation, only the specific disputed items.  The decision of the Accountants shall include a statement of the Accountants' determination of each disputed item, shall contain the final and definitive Final AAA Balances, and shall be set forth in a written report delivered to the Company, Trustee and the Seller, which, absent manifest error, shall be final and binding on the Parties.  In resolving any disputed item, the Accountants shall be bound by the provisions of this Agreement and may not assign a value to any item greater than the greatest value for such item or less than the smallest value for such item claimed by either the Company or Trustee, on the one hand, or the Seller, on the other hand.  The Accountants may, at their discretion, conduct a conference concerning the disputes, at which conference each party shall have the right to present additional documents, materials and other information and to have present its advisors, counsel and accountants.  In connection with such process, there shall be no other hearings or any oral examinations, testimony, depositions, discovery or other similar proceedings.  The Accountants fees shall be paid by the non-prevailing party (either the Company or the Seller).

2.6     EBITDA Price Adjustment.

(a)     Once available, Company shall deliver to the Trustee the Corporation's 2020 and 2021 audited financial statements of the Company. The determination as to whether a reduction of the Redemption Price is required and the subsequent modification of the Redemption Note to effectuate either an EBITDA Price Reduction Adjustment or EBITDA Price Increase Adjustment shall be completed within 90 days after the Company delivers the 2021 audited financial statements to the Trustee.

(b)     If the Average 2020/2021 EBITDA is below the 2020/2021 EBITDA Lower Limit, the Redemption Price shall be adjusted downward (the "EBITDA Price Reduction Adjustment") in amount equal to the difference between the Average 2020/2021 EBITDA and the 2020/2021 EBITDA Lower Limit multiplied by three and the principal amount of the Redemption Note shall be automatically reduced by such amount.  In the event that the principal amount of the Redemption Note is less than the EBITDA Price Reduction Adjustment, the Seller shall repay any difference to the Company.  The EBITDA Price Reduction Adjustment shall not be greater than $3,500,000.

(c)     If the Average 2020/2021 EBITDA is above the 2020/2021 EBITDA Upper Limit, the Redemption Price shall be adjusted upward (the "EBITDA Price Increase Adjustment") in amount equal to the difference between the Average 2020/2021 EBITDA and the 2020/2021 EBITDA Upper Limit multiplied by three and the principal amount of the Redemption Note shall be automatically increased by such amount. The EBITDA Price Increase Adjustment shall not be greater than $3,500,000.

2.7     Any changes to the then outstanding principal balance of the Redemption Note or the Amended and Restated Seller Note made pursuant to Sections 2.4, 2.5 or 2.6 shall be treated as an adjustment to the Redemption Price or the Purchase Price by the Parties for tax purposes, unless otherwise required by Law and the Redemption Note and the Amended and Restated Seller Note shall be amended

and restated to reflect the new principal balance and any changes to the amortization schedule as a result of such change in the principal balance thereof.


## Article 3
## Representations and Warranties

3.1 <u>General Statement</u>. All representations and warranties are made subject to the exceptions noted in the schedule signed by each Party and attached to this Agreement (the "<u>Disclosure Schedule</u>"). The Disclosure Schedule shall be arranged in paragraphs corresponding to the lettered and the numbered paragraphs contained in this Article 3 to which the exception applies. Each matter set forth in any paragraph of the Disclosure Schedule (or any agreement, instrument or other document specifically referenced in such Section of the Disclosure Schedules to the extent a copy of the same has been delivered to the Trust prior or concurrently with the execution of this Agreement) shall be deemed to have been fully disclosed and set forth under all other paragraphs of the Disclosure Schedule to the extent the application to such other section is readily apparent based on the face of such disclosure. The Disclosure Schedule shall in all respects constitute a part of the warranties and representations of the Seller and the Company herein, and are expressly made a part of this Agreement. The disclosure of any item or matter in any paragraphs in the Disclosure Schedule shall not be taken as an indication of the materiality thereof or the level of materiality that is applicable to any representation or warranty set forth herein.

3.2 <u>Representations and Warranties of the Seller</u>. The Seller represents and warrants to the Company and the Trust that the representations and warranties set forth in this Section 3.2 are true and correct as of the Closing Date.

(a) <u>Enforceability</u>. This Agreement has been duly executed and delivered by the Seller and constitutes the Seller's legal, valid, and binding obligation, enforceable in accordance with its terms, except as limited by applicable bankruptcy, insolvency, or other similar Laws relating to creditors' rights generally, now or hereafter in effect, and general principles of equity. The Seller does not need to give any notice to, make any filing with, or obtain any authorization, consent, or approval of any court, government, or Governmental Entity, or Person in order to consummate the transactions contemplated by this Agreement.

(b) <u>No Conflicts</u>. The execution, delivery, and performance of this Agreement and the consummation of the transactions contemplated hereby do not and will not (i) to the Seller's Knowledge, violate any Laws to which the Seller is subject or (ii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any Contract or other arrangement to which the Seller is a party or by which the Seller is bound or to which any of the Shares held by the Seller are subject or result in the imposition of any Lien upon the Shares.

(c) <u>Ownership of the Shares</u>. The Seller is the owner of the Shares which the Company reflects on its stock ledger as being owned by the Seller. The Seller holds the Shares free and clear of any Liens or restrictions on transfer and has complied with all securities Laws, taxes, options, warrants, purchase rights, Contracts, equities, Liens or other restrictions whatsoever in law or in equity. Except as contemplated in this Agreement, the Seller is not a party to any option, warrant, purchase right, or other Contract that could require the Seller to sell, transfer, pledge or otherwise dispose of the Shares.

(d) <u>Capacity</u>. The Seller has the full capacity and authority and all authorizations and approvals required by Law to enter into and perform this Agreement and to sell, transfer, and deliver good, valid, and

marketable title to the Shares, free and clear of any and all Liens or rights of third parties whatsoever in accordance with the terms of this Agreement.

(e)    <u>Title</u>.  Upon consummation of the transactions contemplated by this Agreement and in accordance with the terms hereof, the Trust will acquire marketable title to the ESOP Shares owned by the Seller free and clean of all Liens or rights of third Parties whatsoever, except for Liens or rights of third parties created by the Trust.

(f)    <u>No Commission</u>.  Except as set forth in the Disclosure Schedule, no commission has been paid by the Seller in connection with the sale of the ESOP Shares to the Trust and/or the redemption of the Redemption Shares by the Company.

(g)    <u>Litigation</u>.  There is no claim, legal action, suit, arbitration, governmental investigation or other legal or administrative proceeding, nor any order, decree or judgment, in progress, pending, in effect, or to the Knowledge of the Seller, threatened relating to this Agreement or the transactions contemplated by this Agreement, and the Seller does not know of any reason for, nor have any reason to be aware of, any basis for the same.

3.3    <u>Representations and Warranties Regarding the Company</u>.  The Seller represents and warrants to the Trust that the representations and warranties set forth in this Section 3.3 are true and correct as of the Closing Date.

(a)    <u>Organization</u>. The Company (i) is a corporation, duly organized and validly existing under the laws of the State of North Dakota, (ii) is duly authorized to conduct business and is in good standing under the laws of each jurisdiction where such qualification is required; and (iii) has full corporate power and authority and all Licenses and Permits, and authorizations necessary to carry on the businesses in which it is engaged and to own and use the properties owned and used by it.  The Company has delivered to the Trustee or its legal counsel copies of the articles of incorporation of the Company and all amendments thereto, together with copies of the bylaws of the Company and all amendments thereto.  The Company is not in default under or in violation of any provision of its articles of incorporation or bylaws. The Company has no subsidiaries.

(b)    <u>Capitalization</u>. The authorized capital stock of the Company consists solely of one hundred thousand (100,000) shares of common stock, one hundred thousand (100,000) of which are issued and outstanding and held of record by the Seller.  All such issued and outstanding shares of capital stock of the Company are duly authorized, validly issued and outstanding, non-assessable.  Except as contemplated under this Agreement, there are no outstanding or authorized options, warrants, purchase rights, subscription rights, conversion rights, exchange rights, or other Contracts that could require the Company to issue or to sell any of its capital stock.  There are no outstanding or authorized stock appreciation rights, shares of phantom stock, profit participation agreements, Synthetic Equity, or similar rights with respect to the Company, and there are no voting trusts, proxies, or other agreements or understandings with respect to the voting of the capital stock of the Company.  The Company does not own, directly or indirectly, any equity or other interest in any corporation, business trust, joint stock company, partnership, limited liability company, or other business organization or association.  The ESOP Shares constitute "<u>employer securities</u>" (as that term is defined in Section 409(l) of the Code) and constitute "<u>qualifying employer securities</u>" (as that term is defined in Section 407(d)(5) of ERISA).

(c)    <u>Enforceability</u>.  The execution, delivery, and performance of this Agreement and the consummation of the transactions contemplated hereby and thereby, have been duly authorized by the Company, and this Agreement constitutes a legal, valid, and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as limited by applicable bankruptcy,

14

insolvency, or other similar Laws relating to creditors' rights generally, now or hereafter in effect, and general principles of equity.

(d)    No Conflicts.   The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby and thereby do not and will not (i) violate any Laws or other restriction of any government, Governmental Entity, or court to which the Company is subject, (ii) violate any provision of the articles of incorporation or of the bylaws of the Company, or (iii) conflict with, or result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any Material Contract or other arrangement to which the Company is a party or by which they are bound or to which any of their assets are subject (or result in the imposition of any Lien upon any of their assets) other than such breaches or violations as have been cured or otherwise waived by the counterparty thereto and the Company from liability for such breaches and other violations or such breaches or violations that would not have a Material Adverse Effect.  Except as set forth on the Disclosure Schedule, the Company is not required to give notice to, make any filing with, or obtain any authorization, consent, or approval of any government or Governmental Entity or, with respect to any Material Contract, any third party in order for the Parties to consummate the transactions contemplated by this Agreement.

(e)    Title to Assets.  The Company has good and valid title to all of its assets, free and clear of restrictions on or conditions to transfer or assignment, and free and clear of any Liens except for those disclosed on the Disclosure Schedule.

(f)    Assets Sufficient for Operation.  The Company owns, leases, or has use of all of the assets, properties, and rights of every type and description, real, personal, tangible and intangible, necessary for the continued conduct of the business of the Company as currently conducted.  Except as set forth in the Disclosure Schedule, the Company has good and marketable title to the properties and assets used by it, located on its premises, reflected on the Financial Statements or acquired after the date thereof and prior to the Closing, in each case free and clear of all Liens except those Liens disclosed on the Disclosure Schedule. All tangible personal property owned or leased by the Company is in good working condition and repair adequate to permit the use of such personal property by the Company immediately following Closing in substantially the same manner as used by the Company immediately prior to Closing.  There is no deferred maintenance on any tangible property owned or used by the Company in its business.

(g)    Financial Information.

(i)    The reviewed financial statements of the Company for the years ended December 31, 2017, 2018 and 2019 (the "Reviewed Financials") and internally-prepared balance sheet and income statement for the seven-month period ending July 31, 2020 (the "Interim Financials", and together with the Reviewed Financials, the "Financial Statements"): (A) have been provided by the Company to the Trustee and the Independent Financial Advisor; (B) present fairly the financial position of the Company of such date and the results of operations of the Company for such period in all material respects; (C) contain no untrue statements of material fact, do not omit any material fact necessary to make such Financial Statements not misleading; and (D) are consistent with the books and records of the Company. The Financial Statements have been prepared in accordance with GAAP and present fairly the financial position of the Company and the results of operations of the Company as of such date in all material respects, provided, however, that such Interim Financial Statements are subject to normal yearend adjustments which will not individually or in the aggregate have any Material Adverse Effect.

15

(ii)     Except for (A) the liabilities reflected on the balance sheet included with the Interim Financials, (B) trade payables, accrued expenses and other liabilities incurred by the Company since the date reflected in the Interim Financials in the ordinary course of business (it being agreed that liabilities resulting from any breach of Contract or violation of Laws shall in no event be deemed incurred in the ordinary course of business) and (C) executory Contract obligations, all of which are set out in the Disclosure Schedule, the Company does not have any material liabilities or obligations.

(iii)    The financial projections furnished by the Company to the Trustee in connection with the transaction contemplated hereunder are reasonable and complete, and (1) reflect the Company's best efforts to accurately and correctly project the future operations of the Company; and (2) to the Seller's Knowledge there are no material adjustments that should be made to such financial projections to make the financial projections reasonable and complete.

(iv)    Section 3.3(g)(iv) of the Disclosure Schedules sets forth a list of all work in process, backlog and projects and an estimation of the percentage of completion and the estimated completion date of such project.

(v)    Except as set forth on the Disclosure Schedule or as otherwise contemplated herein, the business operations of the Company have been conducted in the ordinary course of business and consistent with historical practices from the date of the Interim Financials through Closing. Without limiting the generality of the foregoing, except as contemplated by this Agreement or disclosed on the Reviewed Financials or on the Disclosure Schedule, from January 1, 2020 through Closing:

    (A)    The Company has not sold, leased, transferred, or assigned (or agreed to sell, lease, transfer or assign) any of its assets, tangible, or intangible, other than for a fair consideration in arm's length transactions in the ordinary course of business;

    (B)    The Company has not entered into any Contract (or series of related Contracts) outside the ordinary course of business, requiring material payments by the Company;

    (C)    The Company has not made any capital expenditure (or series of related capital expenditures) outside the ordinary course of business or in excess of One Hundred Fifty Thousand Dollars ($150,000);

    (D)    The Company has not made any capital investments in, any loan to, or any acquisition of the securities or assets of, any other person (or series of related capital investments, loans, and acquisitions) outside the ordinary course of business;

    (E)    The Company has not delayed or postponed the payment of accounts payable and other liabilities in an amount outside the ordinary course of business;

    (F)    The Company has not issued, sold, or otherwise disposed (or agreed to issue, sell, or otherwise dispose) of any of its capital stock, or granted (or

agreed to grant) any options, warrants, or other rights to purchase or obtain (including upon conversion, exchange, or exercise) any of its capital stock, except as otherwise contemplated by this Agreement;

(G)     The Company has not declared, set aside, or paid any dividend or made any distribution with respect to its capital stock (whether in cash or in kind) or redeemed, purchased, or otherwise acquired any of its capital stock requiring payment by the Company;

(H)     The Company has not made any loan to, or entered into any other transaction with, any of its directors, officers, employees of any Affiliate thereof;

(I)     The Company has not entered into any employment Contract or modified the terms of any existing written employment Contract requiring payment by the Company of an annual salary of more than Seventy Five Thousand Dollars ($75,000), except as contemplated by this Agreement;

(J)     The Company has not, granted any increase in the base compensation of any of its directors, officers, or employees that is inconsistent with the Company's historical practices except as explicitly contemplated by this Agreement;

(K)     The Company has not adopted, amended, modified, or terminated any Benefit Plan or Contract for the benefit of any of its directors, officers, and employees except for compensation changes in the ordinary course of business and/or changes as contemplated by this Agreement;

(L)     The Company has not sold or disposed (or agreed to sell or dispose) of any inventory except in the ordinary course of business, and there has been no material write-up or write-down in the value of inventory;

(M)     The Company has not incurred any debt, liability, or obligation of any nature, whether accrued, absolute, contingent, or otherwise, and whether due or to become due, that is not included in the Interim Financials, except for ordinary trade obligations that may have been incurred after the date of the balance sheet in the normal course of business, and all debts, liabilities, and obligations incurred after the date of the Interim Financials were incurred in the ordinary course of business;

(N)     The Company has not accelerated the collection of any of its accounts receivable or offered any discounts on any accounts receivable; and

(O)     The Company has not experienced any material damage, destruction or loss (whether or not covered by insurance) to its property or any adverse change (whether or not in the ordinary and usual course of business) in the business, financial condition, net worth, assets, liabilities, personnel or results of operations of the Company.

(h)     <u>Licenses and Permits</u>.  The Company has all Licenses and Permits required to conduct its business, which Licenses and Permits are in full force and effect.  The Company has complied in all respects

with the eligibility and other requirements of any License or Permit.  Except as set forth in the Disclosure Schedule, no registration, filing, application, notice, transfer, consent, approval, order, qualification, waiver or other action of any kind (collectively, a "Filing") will be required as a result of the sale of the ESOP Shares or the Redemption Shares by the Seller in accordance with this Agreement (i) to avoid the loss of any Licenses and Permits or the violation, breach or termination of, or any default under, or the creation of any Lien on any asset of the Company pursuant to the terms of, any Law or other requirement or any Contract binding upon the Company or to which any such asset may be subject, or (ii) to enable the Company to continue the operation of its business substantially as conducted as of the Closing Date.

(i)     Real Property; Leased Property.  The Company owns no real property.  The Disclosure Schedule sets forth all Leased Properties.  The Company has made available to the Trust true and complete copies of all leases for the Leased Properties (the "Leases") and any amendments thereto.  For purposes of this Agreement the phrase "made available" means such document was uploaded to the Data Site.  The Leases provide that the rent will not be increased through December 31, 2024.  With respect to all Leased Properties, except as set forth on the Disclosure Schedule:

(i)     The Leases are in full force and effect.

(ii)     There are no pending or, to the Seller's Knowledge, threatened condemnation proceedings, lawsuits, or administrative actions relating to the Leased Properties or other matters adversely affecting, in a material respect, the current use, occupancy, or value thereof.

(iii)     All facilities located on the Leased Properties have received all material approvals from all Governmental Entities (including Licenses and Permits) required in connection with the ownership or the operation thereof and with respect to the Company have been operated and maintained in accordance with applicable Laws.

(iv)     Other than the Leases, there are no leases, subleases, licenses, concessions, or other agreements, written or oral, to which the Company is a party, granting to any party or parties the right of use of occupancy of any portion of the Leased Properties.

(v)     All facilities located on the Leased Properties are supplied with utilities and other services necessary for the operation of such facilities, including gas, electricity, water, telephone, sanitary sewer, and storm sewer.

(vi)     The Company is not in default under any of the Leases, no written notice of default has been given to, nor, to Seller's Knowledge, is there a set of facts which, with the passage of time, the giving of notice, or both, would constitute a default by either party under the Leases. Without limiting the foregoing, the Company has paid all amounts required to be paid by the Company under the terms of the Leases through the date hereof.

(j)     Litigation.  Except as set forth in the Disclosure Schedule, the Company (i) is not subject to any outstanding injunction, judgment, order, decree, ruling, or charge, and (ii) is not a party or, to the Seller's Knowledge, is not threatened to be made a party to any action, suit, proceeding, hearing, or investigation of, in, or before any court or quasi-judicial or administrative agency of any Governmental Entity or before any arbitrator.  Neither the Seller nor the directors and officers nor the employees with responsibility for litigation matters of the Company have any reason to believe that any such action, suit, proceeding, hearing, or investigation may be brought or threatened against the Company.  Section 3.3(j) of

18

the Disclosure Schedule sets forth a list of all legal proceedings to which the Company has been a party since January 1, 2015.

(k)     No Brokers.  Except as set forth in the Disclosure Schedule, the Company does not have any liability to any broker arising from or related to the transactions contemplated by this Agreement for which the Company could be or become liable or obligated.

(l)     Compensation.  Except as otherwise contemplated under this Agreement, there are no written or oral agreements to make any bonus payments or other compensation amounts to any director, officer, or employee of the Company in connection with or as a result of the transactions contemplated by this Agreement.

(m)     Compliance with Laws.  Except as set forth in the Disclosure Schedule, the Company is in compliance with all applicable Laws.  The Company has not received notice of nor, to the Seller's Knowledge, is there any action, suit, proceeding, hearing, investigation, complaint, or demand pending by any Governmental Entity against the Company alleging any failure to comply.

(n)     Tax Matters.

(i)     The Company has timely filed (or caused to be timely filed) all tax returns that the Company is required to file.  Except as set forth in the Disclosure Schedule, all the tax returns were correct and complete in all material respects, and all taxes owed by the Company (whether or not shown on any tax return) have been paid or properly accrued.  No claim has been made within the applicable statute of limitations period by an authority in a jurisdiction where the Company does not file tax returns that it is or may be subject to taxation by that jurisdiction.  There are no current Liens on any of the assets of the Company that arose in connection with any failure (or alleged failure) to pay any tax.

(ii)     The Company has not received notice of any assessment of any additional taxes for any period for which tax returns have been filed.  There is no dispute or claim concerning any tax liability of the Company either: (A) claimed or raised by any authority in writing; or (B) as to which the Seller has Knowledge.

(iii)     The Company has not waived any statute of limitations period with respect to a tax assessment or deficiency.

(iv)     The Company has not filed a consent under Code Section 341(f) concerning collapsible corporations.  The Company has not made any payments, nor is it obligated to make any payments, nor are is it a party to any agreement that under certain circumstances could obligate it to make any payments that will not be deductible under Code Section 280G.  The Company is not nor has it been a United States real property holding corporation within the meaning of Code Section 897(c)(2) during the applicable period specified in Code Section 897(c)(1)(A)(ii).  The Company has not disclosed on its federal income tax returns all positions taken therein that could give rise to a substantial understatement of federal income tax within the meaning of Code Section 6662.  The Company is not a party to any tax allocation or sharing agreement.  The Company is not a member of an affiliated group filing a consolidated federal income tax return, or has had any liability for the taxes of any person under Treasury Regulation Section 1.1502-6 (or any similar

19

provision of state, local, or foreign Law), as a transferee or successor, by Contract, or otherwise.

(v)    The unpaid taxes of the Company: (A) did not, as of the date of the Interim Financials, exceed the reserve for tax liability (other than any reserve for deferred taxes established to reflect timing differences between book and tax income) set forth on the face of the balance sheet (rather than in any notes thereto) included with the Interim Financials; and (B) do not exceed that reserve as adjusted for the passage of time through the Closing Date in accordance with the historical custom and practice of the Company in filing its tax returns.

(vi)    All monies required to be withheld by the Company for income taxes, social security, and other payroll taxes have been collected or withheld, and either paid to the respective Governmental Entities, set aside in accounts for such purpose, or accrued, reserved against, and entered upon its books except where the failure to do so would not have a Material Adverse Effect.  The Company has not received notice of nor to the Seller's Knowledge is the Company liable for any taxes or penalties for failure to comply with any of the foregoing.  No deficiencies for taxes have been claimed, proposed, or assessed, except where such deficiency would not result in a Material Adverse Effect.  There is no audit, investigation, claim, or assessment pending or, to the Seller's Knowledge, threatened against the Company for any alleged deficiency in any tax.

(o)    <u>Material Contracts</u>.  The Disclosure Schedule lists each Material Contract currently in effect as of Closing, copies of which have been made available to the Trustee.  With respect to each Material Contract: (A) the Material Contract is legal, valid, binding, enforceable, and in full force and effect against the Company; (B) the Material Contract will continue to be legal, valid, binding, enforceable, and in full force and effect on identical terms following the consummation of the transactions contemplated by this Agreement; (C) the Company is not, nor, to Seller's Knowledge, any other party is in breach or default under any of the Material Contracts, and to Seller's Knowledge no event has occurred which, with notice or lapse of time, would constitute a material breach or default, or permit termination, modification, or acceleration under a Material Contract; and (D) to Seller's Knowledge, no third party has repudiated any material provision of a Material Contract.

(p)    <u>Insurance Coverage</u>.  The Company is covered by valid, outstanding and enforceable policies of insurance covering its properties, assets and businesses against risks of the nature normally insured against by companies in the same or similar lines of business and in commercially reasonable coverage amounts (the "<u>Insurance Policies</u>"), all of which are identified in the Disclosure Schedule by insurance provider, nature of insurance, annual premium and date of expiration.  Such Insurance Policies are in full force and effect, and all premiums due thereon have been paid.  With respect to the Insurance Policies (i) the transactions contemplated by this Agreement will not cause a default under the Insurance Policies (ii) to the Seller's Knowledge, no other party to the Insurance Policies is in breach or default (including with respect to the payment of premiums or the giving of notices), and to Seller's Knowledge no default has occurred which, with notice or the lapse of time, would constitute such a breach or default, or permit termination, modification, or acceleration, under the Insurance Policies.

(q)    <u>Employee Matters</u>.

(i)    No executive or employee of the Company with general supervisory or financial responsibilities has given the Seller or any person who is responsible for human resources at the Company notice that such employee presently plans to terminate

20

employment with the Company. Except as set forth in the Disclosure Schedules, the Company has not entered into any collective bargaining agreement, labor union contracts, consulting agreements or other employment agreements and all employees are "at will" employees. To the Seller's Knowledge, no employees intend to terminate their employment with the Company as a result of the transactions contemplated herein or otherwise. The number of employees currently employed by the Company is sufficient to operate the Company's business as it has been historically conducted.

(ii)     The Company has complied in all material respects with all applicable Employment and Labor Laws. The Company has not within the past six (6) months from the Closing Date implemented a facility closing or lay off that could reasonably be expected to require notification under the Worker Adjustment Retraining and Notification Act of 1988, as amended ("WARN Act"), or any similar state statute, local law or regulation.

(iii)    Except as set forth in the Disclosure Schedule, no action, suit, proceeding, hearing, investigation, charge, complaint, claim, demand, or notice has been filed or commenced against the Company, and the Company has not received any notice alleging any failure to comply with any Employment and Labor Laws. There is no unfair labor practice complaint or charge of employment discrimination pending against the Company or, to the Seller's Knowledge, threatened with respect to any current or former employee before the National Labor Relations Board, the Equal Employment Opportunity Commission, the Department of Fair Employment and Housing or any other Federal, state, local, or foreign court or Governmental Entity. There is no employee grievance process, strike, labor dispute, work slowdown or work stoppage pending or, to the Seller's Knowledge, threatened against or involving the Company. There is no lockout of any employees by the Company and no action is currently contemplated by the Company.

(iv)     The Company has made available to the Trustee true and complete copies of all documents governing all Benefit Plans maintained by the Company as of the Closing Date. Each of the Benefit Plans has been administered in material compliance with its terms and all filing, reporting, disclosures and other requirements of ERISA and other applicable Laws. The Company does not currently, nor has it ever, maintained or contributed to a "multiemployer plan" as that term is defined in Section 3(37) of ERISA or a "defined benefit plan" as that term is defined in Section 3(35) ERISA. Except as set forth in the Disclosure Schedule, the Company does not currently maintain or have any current obligations under any other "defined contribution plan" as that term is defined in Section 3(34) of ERISA. Except as set forth in the Disclosure Schedule, the Company does not contribute to, or have any current obligations to, any "employee welfare benefit plan" as that term is defined in Section 3(1) of ERISA providing medical, health, or life insurance or other welfare-type benefits for retired or terminated employees, their spouses, or their dependents (other than in accordance with Code Section 4980B). All contributions or payments required to have been accrued or made under or with respect to any Benefit Plan have been duly accrued or made by the Company on a timely basis. Except as set forth on the Disclosure Schedule, there are no reported pending claims against the Company under any Benefit Plan or workmen's compensation, occupational safety and health, ERISA,

or similar Laws, other than claims that have arisen in the ordinary course of business.  Any plan, program, benefit or arrangement that constitutes deferred compensation within the meaning of Code section 409A and the regulations thereunder complies with the requirements of Code section 409A.

(v)    With respect to the ESOP:

(A)    The Company has duly established the Plan and the Trust and has communicated or will reasonably communicate such establishment to the employees covered thereunder.

(B)    The Plan is a "leveraged employee stock ownership plan" within the meaning of ERISA Sections 408(b)(3) and 407(d)(6), Code Sections 4975(d)(3) and (e)(7), and Treasury Regulations Sections 54.4975-7 and -11.

(C)    The Plan and the Trust documents contain such provisions as are necessary to comply with Part 4 of Subtitle B of Title 1 of ERISA given the nature of the Plan and the transactions herein described.

(D)    The Trust has been duly established and authorized by all necessary corporate actions on behalf of the Company, and in combination with the Plan, shall be an exempt trust pursuant to Code Section 501(a).  The Trustee has been duly appointed and granted full authority to act as a discretionary Trustee of the Trust and exercise trust powers thereunder. The obligations assumed by the Trust are valid and binding obligations and the obligations shall be in accordance with the terms and the conditions of the documents of the Trust. Except as expressly described in this Agreement or as necessary to fulfill applicable reporting and disclosure requirements under ERISA and the Code, the Trustee shall not need to give any notice to, make any filing with, or obtain any authorization, consent, or approval of any Governmental Entity in order to consummate the transactions contemplated by this Agreement.

(r)    Intellectual Property. The Company owns or licenses sufficient trademarks, service marks, slogans, trade names, trade dress, and the like, proprietary formulations, manufacturing methods, know-how, and trade secrets, patents, copyrights, computer software, unpatented formulations, manufacturing methods, and other know-how (collectively, "Intellectual Property") necessary to conduct its business as currently conducted and the Disclosure Schedule identifies all of the Intellectual Property which is used by the Company in conducting its business.  The Company has the right and authority to use all of its Intellectual Property as is necessary to enable it to conduct and to continue to conduct all material phases of its business in the manner presently conducted by it, and this use does not conflict with, infringe on, or violate any rights of others nor does the Company nor does the Seller have Knowledge of any new inventions or procedures that have been developed by any competitors of the Company or by any other persons which reasonably could be expected to supersede or render obsolete any of the Company's products or services.

(s)    Customers and Suppliers.  Section 3.3(s) of the Disclosure Schedule sets forth the top ten customers of the Company (as determined by revenue generated from such customer for the period beginning January 1, 2019 and December 31, 2019) and the top ten suppliers of the Company (as determined by expenditures from vendors for the period beginning January 1, 2019 and ended December

22

31, 2019), each such customer the "Company's largest customers" and each such supplier the "Company's largest suppliers". None of the Company's largest customers during the period from December 31, 2019 through the date hereof have notified or otherwise indicated to the Company that it will stop, or decrease the rate of, its purchase of products and services from the Company, and no such customer has, since December 31, 2019, ceased or decreased its purchases of any services from the Company. None of the Company's largest suppliers during the period from December 31, 2019 through the date hereof have notified or otherwise indicated to the Company that it will stop, or decrease the rate of, or increase the cost of, other than publicly announced generally applicable price increases, its supply of materials, products, or services used by the Company and no such supplier has ceased, decreased the rate of, or raised the cost of, any materials, products or services supplied to the Company, other than publicly announced generally applicable price increases.

(t)     Environmental, Health and Safety Laws. The Company and the Leased Properties are in compliance with, and do not have and do not contain conditions that may result in liability under all applicable Environmental, Health and Safety Laws. No action, suit, proceeding, hearing, investigation, charge, complaint, claim, demand, or notice has been filed, commenced, or, to the Seller's Knowledge, threatened against the Company or the Leased Properties alleging any failure to comply with, or liability under any Environmental, Health and Safety Laws. The Company has obtained and is in compliance with all Environmental Permits necessary for the conduct of the business, and all such Environmental Permits are in full force and effect. There has been no release or disposal of any Hazardous Substances in contravention of an Environmental Law or in an amount or concentration that would require the Company to perform any notification, investigation, assessment, clean up, removal, response, corrective or any other remedial action necessary to comply with or satisfy any applicable Environmental Law or Environmental claim or require the Company to pay for the cost of any such action under any Environmental Law, environmental claim or governmental order.

(u)     Agreements with Affiliates. Except as contemplated by this Agreement or as expressly set forth on the Disclosure Schedule, the Company is not a party to or bound by any Contract or understanding which imposes an obligation on the Company with respect to any Affiliate of the Company or any of its stockholders or directors, officers, or any Affiliates of the foregoing individuals, other than the obligation to pay salaries and wages (the "Related Party Arrangements") and none of the Seller, directors or officers, or other Persons own or otherwise have any rights to or interests in any asset, tangible or intangible, which constitutes a part of the material assets used in or related to the business of the Company. Any Related Party Arrangements have been negotiated on an arm's length basis, on fair market terms and for fair market value.

(v)     No Public Offering. No form of general solicitation or general advertising was used by the Company or by its representatives in connection with the offering or the sale of the ESOP Shares. No registration of such shares pursuant to the provisions of the Securities Act or any state securities or "blue sky" laws is required in connection with the offer, sale or issuance of the ESOP Shares. After giving effect to the transactions contemplated by this Agreement, the Company will not be an "investment company" within the meaning of the Investment Company Act of 1940, as amended, and the rules and regulations promulgated thereunder.

3.4     The Trust's Representations and Warranties. The Trust represents and warrants to the Seller and the Company that:

(a)     Authority. The Trust has full power and authority to execute and to deliver this Agreement and to consummate the transactions contemplated hereby.

(b)     Enforceability. This Agreement has been duly executed and delivered by the Trust and constitutes a legal, valid, and binding obligation of the Trust, enforceable against the Trust in accordance

23

with its terms, except as limited by applicable bankruptcy, insolvency, or other similar laws relating to creditors' rights generally, as now or hereafter in effect and general principles of equity.

(c) <u>Capacity</u>. The Trustee and the Trust have full power and authority and all authorizations and approvals required by Laws to enter into and perform this Agreement, and all other agreements referred to herein which the Trust and/or the Trustee are parties.

(d) <u>No Conflicts</u>. Neither the execution nor delivery of this Agreement and all other agreements referred to herein which the Trust and the Trustee are parties, nor the consummation of the transactions contemplated hereby or thereby will (i) violate any material Laws to which the Trust and/or Trustee are subject or (ii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any Material Contract or other arrangement to which the Trust and/or Trustee is a party or by which the Trust and/or Trustee are bound.

(e) <u>Consents</u>. Any authorization, consent, approval, permit, or license of, or filing with, any Governmental Entity, any lender or lessor, or any other Person required to authorize, or required in connection with, the execution, delivery, and performance of this Agreement by the Trust, has been obtained.

(f) <u>No Commission</u>. The Trust has not received a commission as a result of this transaction.

(g) <u>Exclusive Benefit</u>. The Trustee is purchasing the ESOP Shares exclusively for the benefit of the ESOP participants and beneficiaries and is using the Initial Company/ESOP Loan and the Initial Seller/ESOP Loan as a means of financing the purchase of the ESOP Shares.

(h) <u>Purchase for Own Account</u>. The ESOP Shares to be acquired by the Trust pursuant to this Agreement are being or shall be acquired for its own account and with no intention of distributing or reselling such ESOP Shares or any part thereof in any transaction that would be in violation of the articles of incorporation or bylaws of the Company, the securities Laws of the United States of America, or any state, without prejudice, however, to its right at all times to sell or otherwise dispose of all or any part of its ESOP Shares under an effective registration statement under the Securities Act, or under an exemption from such registration available under the Securities Act, and subject, nevertheless, to the disposition of its property being at all times within its control. If the Trust should in the future decide to dispose of any of its ESOP Shares, the Trust understands and agrees that it may do so only in compliance with the Securities Act and applicable state securities laws, each as then in effect. The Trust agrees to the imprinting of the following legend on the certificates representing the ESOP Shares:

THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY STATE SECURITIES LAWS. NEITHER THESE SECURITIES NOR ANY PORTION HEREOF OR INTEREST HEREIN MAY BE SOLD, ASSIGNED, TRANSFERRED, PLEDGED OR OTHERWISE DISPOSED OF UNLESS THE SAME IS REGISTERED UNDER SAID ACT AND APPLICABLE STATE SECURITIES LAWS OR UNLESS AN EXEMPTION FROM SUCH REGISTRATION IS AVAILABLE AND PRO-MARK SERVICES, INC., (THE "<u>COMPANY</u>") SHALL HAVE RECEIVED EVIDENCE OF SUCH EXEMPTION REASONABLY SATISFACTORY TO THE COMPANY (WHICH MAY INCLUDE, AMONG OTHER THINGS, AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE COMPANY).

Article 4
Closing Deliveries

4.1     Form of Documents.  At the Closing, the Parties shall deliver the documents, and shall perform the acts, which are set forth in this Article 4.  All documents to be delivered shall be in form and substance reasonably satisfactory to the Party to whom the documents are to be delivered.

4.2     The Trust's Deliveries.  The Trust shall execute and/or deliver or make available on the specified dates, and if no date is specified on the Closing Date, to the Seller all of the following:

(a)     a counterpart signature page to this Agreement duly executed by the Trustee acting on behalf of the Trust and a counterpart signature page to each of the Initial Seller/ESOP Loan Documents, Initial/Company ESOP Loan Documents, the Seller Note Exchange and ESOP Loan Modification Agreement, and the Amended and Restated ESOP Loan Documents duly executed by the Trustee acting on behalf of the Trust;

(b)     a counterpart signature page to the Investor Rights Agreement duly executed by the Trustee acting on behalf of the Trust;

(c)     written documentation with respect to the Trustee's acceptance of its appointment as Trustee of the Trust and its fiduciary status under ERISA as of the Closing;

(d)     a copy of the Fairness Opinion dated as of the Closing Date; and

(e)     any other instruments that the Seller or Company may reasonably deem necessary or desirable to effect or evidence that transfers contemplated hereby.

4.3     Seller's Deliveries.  The Seller shall execute and deliver or make available to the Trust all of the following:

(a)     one or more counterpart signature pages to this Agreement duly executed by the Seller;

(b)     stock certificates evidencing the Shares registered in the names of the Seller, and stock powers duly endorsed by the Seller to the Company and the Trust, in proper form for transfer;

(c)     Initial Seller/ESOP Loan Documents and the Seller Note Exchange and ESOP Loan Modification Agreement;

(d)     a counterpart signature to the Investor Rights Agreement duly executed by the Seller;

(e)     any other instruments that the Trust or Company may reasonably deem necessary or desirable to effect or evidence the transactions contemplated by this Agreement.

4.4     The Company's Deliveries.  The Company shall execute and/or deliver to the Trustee all of the following:

(a)     the counterpart signature page to this Agreement, the Initial Seller/ESOP Loan Documents, the Initial/Company ESOP Loan Documents, the Seller Note Exchange and ESOP Loan Modification Agreement, the Amended and Restated ESOP Loan Documents, and the Amended and Restated Seller Note duly executed by an officer of the Company;

25

(b)      a counterpart signature page to the Investor Rights Agreement duly executed by an officer of the Company;

(c)      a fully executed copy of the Redemption Note;

(d)      a fully executed copy of the amendment to the consulting agreement, by and between Fed Serve LLC and the Company, the material terms of which have been approved by the Trustee;

(e)      a management representation letter required by the Independent Financial Advisor as of the Closing Date duly executed by an officer of the Company;

(f)      a true and correct copy of the ESOP plan document and ESOP trust agreement, together with all amendments thereto, in effect as of the Closing Date;

(g)      a certificate of the Secretary of the Company dated as of the Closing, in form and substance reasonably satisfactory to the Trust, attesting to the incumbency of the members of the Board, certain officers of the Company and certifying the following deliveries to be made by the Company:

> (i)      a true and correct copy of the articles of incorporation of the Company, certified by the Secretary of the State of North Dakota and a true and correct copy of the bylaws of the Company together with all amendments thereto, in effect as of the Closing Date; and

> (ii)      a true and correct copy of the resolutions of the Company's Board of Directors authorizing the execution, delivery and performance of this Agreement, the ESOP Loan Documents and all agreements, documents and instruments to be executed, delivered and performed by the Company in connection therewith;

(h)      a certificate of existence for the Company from the Secretary of the State of North Dakota dated no more than fifteen (15) days prior to the Closing Date;

(i)      all Licenses and Permits and consents of third parties necessary for the consummation of the transactions contemplated in this Agreement;

(j)      evidence that the Company has obtained a fidelity bond to cover the ESOP and a fiduciary liability insurance policy; and

(k)      any other instruments that the Seller or Trustee may reasonably deem necessary or desirable to effect or evidence the transactions contemplated by this Agreement.

Article 5
Covenants

5.1      Maintenance of the ESOP's Tax Qualified Status.  The Company shall take any action as may be necessary to maintain the tax-qualified status of the ESOP and the tax-exempt status of the Trust under ERISA and the Code and will timely submit the Plan and Trust to the Internal Revenue Service requesting a favorable determination letter stating that the Plan constitutes a qualified plan under Section 401(a) of the Code, the Trust is an exempt trust under Section 501(a) of the Code and the Plan is a qualified employee stock ownership plan within the meaning of Section 4975(e)(7) of the Code and the Company will make such amendments to the Plan as may be required as a condition of the issuance of a favorable determination letter.  The Company shall take any action as may be necessary to maintain the tax-qualified

26

status of the Plan, to make sure that the Plan at all times satisfies the requirements of Code Section 4975(e)(7), and to maintain the tax-exempt status of the Trust under ERISA and the Code. Notwithstanding the foregoing, the Company may terminate the ESOP in its sole discretion at any time.

5.2     Payment of ESOP Loan. To the extent permitted by applicable Law, so long as the Initial ESOP Loans/Consolidated Amended and Restated ESOP Loan, as applicable, are outstanding and so long as such contributions and or dividends or distributions do not result in the imposition of any excise tax on the Company, the Company shall make contributions and/or contribute or declare and pay dividends or distributions to the ESOP each year in the form of cash or forgiveness of the Initial ESOP Loan or the Consolidated Amended and Restated ESOP Loan in an amount which is at least equal to the amount required to discharge the current obligation of the Trust under the Initial Company/ESOP Loan Agreement, Initial Seller/ESOP Loan Agreement, the Amended and Restated ESOP Loan Agreement and the Initial Company ESOP Note, Initial Seller/ESOP Note and the Amended and Restated ESOP Note, as applicable, regardless of whether the Company has net profits, subject to the applicable limits of Code Sections 404 and 415, and the Trust shall use all cash contributions and the cash dividends or distributions paid or declared by the Company (to the extent permitted by the Plan and applicable Law) to repay such current indebtedness pursuant to the Initial Company/ESOP Loan Agreement, Initial Seller/ESOP Loan Agreement, the Amended and Restated ESOP Loan Agreement and the Initial Company ESOP Note, Initial Seller/ESOP Note and the Amended and Restated ESOP Note, as applicable. The Company acknowledges that any failure of the ESOP to repay indebtedness pursuant to the Initial Company/ESOP Loan Agreement, Initial Seller/ESOP Loan Agreement, the Amended and Restated ESOP Loan Agreement and the Initial Company ESOP Note, Initial Seller/ESOP Note and the Amended and Restated ESOP Note, as applicable as the result of the Company's failure to contribute, declare or otherwise pay amounts sufficient for the ESOP to repay the Initial ESOP Loans or the Consolidated Amended and Restated ESOP Loan shall not be cause for the Company to declare a default under the Initial Company/ESOP Loan Agreement, Initial Seller/ESOP Loan Agreement, the Amended and Restated ESOP Loan Agreement, or any other instrument.

5.3     Licenses and Permits. The Trust and the Seller shall cooperate with the Company in all respects in connection with the Company's application for the transfer, renewal, or issuance of any Licenses and Permits or authorizations required in connection with the transactions contemplated by this Agreement.

5.4     Reporting and Disclosure. The Company shall timely satisfy all reporting and disclosure requirements under ERISA and the Code relating to the establishment of the ESOP, the Trust, and the transactions described in this Agreement.

5.5     Company Notification of Governmental Audit. The Company shall timely notify the Trust in writing of any governmental or other third party audit, investigation, or request for information (other than routine claims for benefits by participants under the Plan) relating to the Plan or the transactions herein described and explain the general nature of such audit, investigation or claim for information. Such notification shall be in addition to the requirements of Article 6 regarding the provision of notice of claims as therein described.

5.6     Consummation of the Initial ESOP Loan Modification. At the request of the Trustee, the Company and the Seller shall agree to consummate the Initial ESOP Loan Modification and to execute the Seller Note Exchange and ESOP Loan Modification Agreement and all of the other documents required to be executed pursuant to the terms thereof, including, without limitation, the Amended and Restated ESOP Loan Documents.

5.7     Recovery Under Insurance. With respect to any matter for which indemnification would otherwise be provided to the Trust hereunder pursuant to Article 6, the Company shall use commercially reasonable efforts to collect amounts payable to the Company under any applicable insurance policy of the

Company, and to the extent any such amounts are collected there will be no Damages suffered by the Trust for any amount so collected.

5.8    <u>Insurance</u>.  The Company shall maintain and keep in full force and effect at all times following the Closing Date (a) directors and officers liability and ERISA fiduciary insurance coverages; and (b) property, casualty, commercial and professional liability coverages, which coverages shall be similar to the term of such coverages provided under the Insurance Policies, Contracts or similar arrangements in force as of the Closing Date.

5.9    <u>409(p) Testing</u>.  The Company shall obtain a 409(p) test from a qualified administrative firm acceptable to the Trustee for each plan year of the ESOP for which the Company is taxed as an S corporation.

5.10    <u>Annual Meetings</u>.  The Company shall conduct annual shareholder meetings in accordance with the by-laws of the Company.

5.11    <u>Business Transactions with Related Entities</u>.  The Seller and the Company covenant that the Company will not conduct any business with an entity that is majority owned by the Seller or any of her family members or beneficiaries, as applicable, or any Affiliate of the Company or the Seller other than on an arms-length basis with commercially reasonable terms.

5.12    <u>Restrictive Covenants</u>

(a)    <u>Confidential Information</u>.

(i)    The Seller agrees to maintain in confidence and use their best efforts to protect and preserve the confidentiality of, not use or disclose, directly or indirectly to other persons, any Confidential Information (as hereinafter defined) for any purpose other than in the course of employment with the Company without the express written consent of the Company.  Notwithstanding the foregoing, the Seller shall be entitled to utilize Confidential Information in order to defend any claims by the Company and/or the Trust for indemnification under this Agreement and divulge such Confidential Information to their advisors or to any arbiter of such claims for indemnification in the course of defending such indemnification claims without the Company's consent.  Furthermore, in the event that the Seller is required (by deposition, interrogatory, request for documents, or similar legal or administrative process) in any legal or other governmental proceeding, or, or by any court order, law, or applicable regulation, to disclose any Confidential Information, the Seller will give the Company prompt notice of such requirement so that the Company may seek an appropriate protective order.  If, in the absence of a protective order, the Seller is nonetheless compelled in a proceeding to disclose Confidential Information, the Seller may disclose such of the Confidential Information as is required without being deemed to have breached this Agreement.

(ii)    The Seller agrees that all writings, materials, devices or any other items containing or reflecting Confidential Information, trade secrets or other proprietary information to which the Seller has gained access or acquired as a result of being an equity holder and employee of the Company and whether produced by the Seller, the Company or by others, shall be the sole and exclusive property of the Company.  The Seller further agrees to promptly deliver forthwith to the Company all such writings, materials, devices or other items in his custody, and agrees not

to copy or take any such writings, materials, devices or items or any copies or specimens or any facsimiles thereof.

(iii)    For the purposes of this Agreement, "Confidential Information" means information concerning the Company, including, without limitation: (A) customer lists and the identities of the Company's customers and prospects and its purchasing habits, needs, credit histories, pricing, contact personnel, and other information; (B) information regarding suppliers' and vendors' costs, contact personnel and other information; (C) information regarding products, discounts, pricing formulas, margins, overhead, distribution and other expenses (D) the Company's trade secrets, price lists, financial and marketing data, personnel and compensation information, and business plans; (E) information or data regarding the Company's research, manufacturing activities, technical specifications, techniques, processes, and equipment; (F) information regarding the Company's marketing plans and programs; and (G) potential acquisitions and future product or market development.  Notwithstanding anything to the contrary, Confidential Information shall not include information that (1) becomes generally available to the public other than as a result of a disclosure by the Seller or (2) becomes available to the Seller on a non-confidential basis from a source other than the Company; provided that such source is not known by the Seller to be bound by a confidentiality agreement with or other legal or fiduciary obligation to the Company.

(b)    Covenant Not to Compete.  The Seller agrees for a period to commence on the date hereof and to continue until the later of (i) the date which is five (5) years from the date hereof or (ii) the date which is two (2) years from the date Seller terminates employment with the Company (the "Restricted Period") not to own, operate or become interested, directly or indirectly, in any business or enterprise engaged in the business which the Company or an Affiliate thereof is conducting as of the date of this Agreement or at any time during the Restricted Period at any location within the States of North Dakota, Nebraska, Montana, Arizona, South Dakota and Wyoming, whether as an individual proprietor, franchisee, partner, joint venturer, stockholder, principal, investor, trustee, employee or any other similar relationship or capacity.

(c)    Non-Solicitation of Employees.  The Seller agrees during the Restricted Period not to directly or indirectly, individually, together or in concert with others, induce or influence, or seek to induce or influence any person who is employed or engaged by the Company or any of their Affiliates as an employee, agent, independent contractor or otherwise, to leave the employ or engagement of the Company or any of their Affiliates or any successor or assign thereof.

(d)    Non-Solicitation of Customers/Vendors.  The Seller agrees during the Restricted Period not to, directly or indirectly, individually, together or in concert with others, entice, contact, solicit or attempt to solicit the business of any vendors or customers of the Company or any of their Affiliates, or any potential customer of the Company with whom the Company has had substantive contact or received or submitted a proposal for services or any successor or assign thereof with respect to any products, services or activities of the Company or any of their Affiliates or encourage any such customers or vendors or potential customer or vendor to terminate, or consider terminating, their business with the Company or any of their Affiliates or any successor or assign thereof.

(e)    Remedies.  If the Seller shall at any time breach, violate or fail to comply fully with any of the terms, provisions or conditions of this Section 5.12, the Company shall be entitled to equitable relief by way of injunction (in addition to, but not in substitution for, any and all other relief to which the Company

29

may be entitled either in law or in equity) to restrain such breach or violation or to require compliance fully with the terms, provisions or conditions of this Section 5.12 without proof of actual damages.

(f)     Severability; Reformation.  The Seller agrees that each covenant of this Section 5.12 constitutes a separate and independent covenant and is severable and that the scope and time periods contained in this Section 5.12 have been carefully considered and specifically agreed to as being reasonable and necessary.  If, at any time of enforcement of any covenant of this Section 5.12, a court or an arbitrator determines that any such covenant is unreasonable and/or unenforceable under circumstances then existing, the Parties authorize such court or arbitrator to revise such covenant to cover the maximum period, scope and subject matter permitted by applicable law.  If such court or arbitrator refuses to do so, the Parties agree that the provisions of this Section 5.12 will not be rendered null and void, but rather will be deemed amended to provide for the maximum restrictions (not greater than those contained herein) reasonable and/or enforceable under applicable law.  In addition, the invalidity, illegality or unenforceability of any covenant of this Section 5.12 will not affect the validity, legality and enforceability of the remaining covenants of this Section 5.12.

5.13     Information Regarding Compliance with Representations, Warranties and Covenants. The Company and the Seller agree to provide the Trustee (or its successor) with any and all information necessary to permit the Trustee (or its successor) to determine the compliance by the Company and/or the Seller with the representations, warranties and covenants set forth under this Agreement.  Without limiting the foregoing, the Company shall deliver to the Trustee (or its successor) copies of the Company's financial statements and other information related to the operations of the Company for so long as the Trustee (or its successor) requests that such information be provided to it after the Closing.

5.14     Financial Statements. the Company shall obtain audited financial statements from an accounting firm acceptable to the Trustee (or a successor trustee of the Trust after Closing) for the fiscal years ending December 31, 2020 and December 31, 2021 and for all fiscal years thereafter otherwise, the Company shall obtain reviewed financial statements from an accounting firm acceptable to the Trustee (or a successor trustee of the Trust after Closing) unless a lender to the Company shall require audited financial statements.

5.15     Synthetic Equity.  After Closing or as otherwise agreed upon by the Parties, the Company shall adopt an equity incentive plan the form of which has been approved by the Trustee and the Company prior to the Closing Date, which will provide for the granting of stock appreciation rights to certain executive employees of the Company representing up to ten percent (10%) of the stock of the Company on a fully diluted basis, all aspects of which the Trustee has approved.

5.16     Repurchase Obligation Study.  Commencing with the plan year of the ESOP beginning January 1, 2024, the Company shall obtain a repurchase obligation study from a qualified administration firm or through a repurchase liability software program acceptable to the Trustee, and every third year thereafter, to quantify the Company's repurchase obligation under the ESOP.

5.17     Board of Directors.  Within nine (9) months of the date hereof, the Board of Directors shall consist of three (3) members, one of whom will be an "Independent Director" and at all times afterwards one third of the Board of Directors shall consist of Independent Directors.  The Independent Director shall exclude: (i) all current and former employees of the Company, (ii) family members of current and former employees of the Company and family members of the Seller, (iii) the Seller, (iv) any professionals who receive compensation from the Company within twelve months of their appointment date as a director.  All directors shall be covered by director, officer, and ERISA fiduciary insurance at all times. Within twelve months after the Closing Date, the Board of Directors shall create a nominating committee that shall nominate individuals to serve on the Board of Directors, which shall be chaired by the Independent Director.

The nomination committee shall be responsible for identifying and selecting potential candidates for service on the Board. In addition, within six months from the Closing Date, the Board of Directors shall create a compensation committee which shall be chaired by the Independent Director.

5.18    Voting Procedures.  At all after the Closing Date, the Trustee (or a successor trustee of the Trust) shall follow the voting procedures as included in the Company's Bylaws and the trust agreement of the Trust, as amended.


## Article 6
## Indemnification

From and after the Closing, the Parties shall indemnify each other as provided in this Article 6.

6.1    Seller's Indemnification Obligations.

(a)    Subject to the limitations set forth in Section 6.4 of this Agreement, the Seller shall indemnify and hold the Trust and the Trustee, and their respective representatives, officers, directors, agents, employees, successors and assigns (the "ESOP Indemnified Parties") harmless against and from all Damages which may be sustained or suffered by any of them arising out of or based upon the falsity or any breach of any representation or warranty made by the Seller in Section 3.2 of this Agreement or in any certificate, delivered pursuant hereto.

(b)    Subject to the limitations set forth in Section 6.4 of this Agreement, the Seller shall indemnify and hold the ESOP Indemnified Parties harmless against and all Damages which may be sustained or suffered by any of them arising out of or based upon (i) the falsity or any breach of any representation and warranty of the Seller in Section 3.3 of this Agreement or in any certificate, delivered pursuant hereto or (ii) any breach of the covenants of the Seller set forth in this Agreement.

(c)    The Seller shall indemnify and hold the ESOP Indemnified Parties harmless against and all Damages which may be sustained or suffered by any of them arising out of or based upon any Pre-Closing Taxes.

6.2    Company Indemnification Obligations.  From and after the Closing, the Company shall indemnify, defend, and hold harmless the Seller against and from all Damages sustained or incurred by the Seller resulting from or arising out of or by virtue of the Company's breach or failure to perform any of the Company's covenants or agreements contained in this Agreement unless such breach or failure arises solely as a result of the Seller (in her capacity as a director, officer or employee of the Company) intentionally or negligently failing to cause the Company to perform such covenant or agreement, other than an intentional breach or failure at the direction of the Board or that the Seller reasonably believed was necessary to satisfy such Seller's fiduciary duties to the Company.  For the avoidance of doubt, the Company's indemnification obligations to the Seller under this Section shall not constitute the use of plan assets of the ESOP within the meaning of ERISA.

6.3    Indemnification Claims Procedures.  The Parties intend that all indemnification claims be made as promptly as practicable.  Whenever any claim shall arise for indemnification hereunder, if a party hereto seeks indemnification under Sections 6.1 or Section 6.2, such party (the "Indemnified Party") shall promptly give written notice to the other party (the "Indemnifying Party") and, when known, the facts constituting the basis for such claim.  With respect to claims made by third parties, the Indemnifying Party shall be entitled to assume control of the defense of such action or claim with counsel reasonably

satisfactory to the Indemnified Party; provided, however, that: (a) the Indemnified Party shall be entitled to participate in the defense of such claim and to employ counsel at its own expense to assist in the handling of such claim; (b) the Indemnifying Party shall not consent to the entry of any judgment or enter into any settlement that does not include as an unconditional term thereof the giving by each claimant or plaintiff to the Indemnified Party a release from all liability in respect of such claim if, pursuant to or as a result of such consent or settlement, injunctive or other equitable relief would be imposed against the Indemnified Party or such judgment or settlement could materially interfere with the business, operations or assets of the Indemnified Party; and (c) if the Indemnifying Party does not assume control of the defense of such claim in accordance with the foregoing provisions within fifteen (15) days after receipt of notice of the claim, the Indemnified Party shall have the right to defend such claim in good faith in such manner as it may deem appropriate at the cost and expense of the Indemnifying Party, and the Indemnifying Party will promptly reimburse the Indemnified Party for such cost and expense.  Notwithstanding anything to the contrary contained in this Section 6.3, in no event shall an Indemnifying Party be entitled to control the defense of any third party claim if: (i) such third party claim involves criminal allegations or a claim relating to breach of the Trustee's fiduciary obligations under ERISA in connection with the transactions contemplated under this Agreement or (ii) an Indemnifying Party is also a party to such third party claim and, based on the advice of the Indemnified Party's outside legal counsel, an actual or potential conflict of interest exists or would reasonably be expected to potentially arise in respect of the matters subject to such third party claim if the an Indemnifying Party's legal counsel were to act as legal counsel for the Indemnified Party, in either case the Indemnified Party shall have the right to defend such claim in good faith in such manner as it may deem appropriate at the cost and expense of the Indemnifying Party, and the Indemnifying Party will promptly reimburse the Indemnified Party for such cost and expense.

6.4    <u>Limitation on Rights to Indemnification</u>.  The obligations to indemnify pursuant to this Article 6 are subject to the following limitations:

(a)    Each representation and warranty set forth in Section 3.2 and Sections 3.3(a)-(c) (the "<u>Fundamental Representations</u>") and claims for fraud shall be of no further force and effect upon the expiration of the applicable statute of limitations.  Each other representation and warranty in Article 3 of this Agreement shall survive Closing and will expire and be of no further force and effect (regardless of the date of discovery) as of the date which is eighteen months from the date hereof.

(b)    An ESOP Indemnified Party shall not be entitled to recover Damages pursuant to Section 6.1(a) and Section 6.1(b)(i) until the total amount of Damages which the Seller would otherwise be required to provide indemnification under Section 6.1(a) and Section 6.1(b)(i( (collectively) exceeds an amount equal to One Hundred Fifty-Five Thousand Dollars and 00/100 ($155,000) (the "<u>Basket</u>") and then the ESOP Indemnified Parties shall be entitled to recover only Damages in excess of the Basket; provided, however, that Damages arising from any breach of any of the Fundamental Representations, or Damages arising from fraud shall not be subject to the Basket.

(c)    Except as provided herein, the aggregate amount of indemnification obligations of the Seller to the ESOP Indemnified Parties pursuant to Section 6.1(a) and Section 6.1(b)(i) (collectively) shall not exceed an amount equal Nine Million Three Hundred Thousand Dollars and 00/100 ($9,300,000) (the "<u>Cap</u>"); provided, however, the Seller's indemnification obligations arising out of or based upon any claims for fraud and the Seller's indemnification obligations with respect to the breach of any Fundamental Representations shall not exceed the Aggregate Transaction Consideration.

(d)    The Basket and the Cap will not apply to any indemnification obligations of the Seller under Section 6.1(c) or Section 6.8 of this Agreement.

(e)     Indemnification obligations will be determined based upon the Parties' agreement as to what such obligation amounts to or the decision of a court of competent jurisdiction in the absence of such agreement, subject to the court's determination of an indemnifiable claim.

(f)     Any payment made by the Seller to an ESOP Indemnified Party pursuant to Section 6.1 or Section 6.2 in respect of any indemnifiable event shall be net of any insurance proceeds realized by and paid to such ESOP Indemnified Party in respect of such claim.  In the event that an insurance recovery is made by an ESOP Indemnified Party with respect to any Damages for which an ESOP Indemnified Party has previously been indemnified hereunder, then such ESOP Indemnified Party shall promptly make a refund to the Seller in an amount equal to the lesser of (i) the amount of such insurance recovery (net of collection expenses) and (ii) the amount previously paid by the Seller under Section 6.1 as indemnification for such Damages.

(g)     Seller shall not be entitled to seek contribution from the Company for any Damages for which the Seller is required to indemnify an Indemnified Party under this Article 6.

6.5     <u>Assignment of Claims</u>.  If an ESOP Indemnified Party receives any payment from the Seller in respect of any Damages and the ESOP Indemnified Party could have recovered all or a part of such Damages from a third party (a "<u>Potential Contributor</u>") based on the underlying claim asserted against the Seller, the ESOP Indemnified Party shall assign, on a non-recourse basis and without any representation or warranty, such of its rights to proceed against the Potential Contributor as are necessary to permit the Seller to recover from the Potential Contributor the amount of such payment.  Any payment received in respect of such claim shall be distributed (i) first, to the ESOP Indemnified Party in the amount of any deductible or similar amount required to be paid by the ESOP Indemnified Party prior to the Seller being required to make any payment to the ESOP Indemnified Party, (ii) second, to the Seller in an amount equal to the aggregate payments made to the ESOP Indemnified Party, in respect of such claim, plus costs and expenses incurred in investigating, defending or otherwise incurred in connection with addressing such claim and (iii) the balance, if any, to the ESOP Indemnified Party.

6.6     <u>Sole Remedies; Setoff</u>.

(a)     Except for claims for fraud, the provisions of this Article 6 shall be the sole and exclusive remedy for breaches of representations, warranties and covenants contained in this Agreement; provided, however, that nothing contained in this Article 6 shall be construed as limiting or impairing the rights and remedies that any of the Parties may have or under federal and state securities Laws, and in equity, including but not limited to, rights to rescission or injunctive relief with respect to the performance of the covenants set forth in this Agreement or under any of the other agreements executed by the Parties in connection with the transactions contemplated under this Agreement.  If and to the extent it is determined by an agreement among an ESOP Indemnified Party and the Indemnifying Party(ies) or by a court of competent jurisdiction in a final judgment from which no appeal can be taken (or from which the Indemnifying Party(ies) determines not to appeal) that the ESOP Indemnified Party has incurred Damages as a result of any claims for indemnification under Section 6.1 of this Agreement, then such Damages shall by causing the Company to deduct such amounts from the outstanding principal balance payable by the Company to the Seller under the Redemption Note or the Amended and Restated Seller Note.

(b)     Upon setoff and withholding of amounts from the Redemption Note or the Amended and Restated Seller Note in the immediately preceding paragraph, the Company shall immediately reduce and set-off a proportional amount from the Amended and Restated ESOP Note (i.e., if the Redemption Note is offset by ten percent (10)% of principal amount, the Amended and Restated ESOP Note will also be offset by the same percentage).

(c)      The Company further covenants, and the Seller hereby consents, that in the event the ESOP Indemnified Party files an action or claim against the Company in any court of competent jurisdiction and the Company receives actual notice thereof, the Company agrees not to make any payments of principal to the Seller with respect to the Redemption Note in amounts which would cause the principal balance of the Redemption Note to be less than the amount of Damages that would be incurred if the action or claim were successful on its merits without the prior written consent of the Trustee, until there has been a final determination (from which no appeal can be or is taken) or a settlement of such action or claim.

6.7      <u>No Third Party Beneficiaries</u>.  Except as otherwise contemplated in this Agreement, no provision of this Agreement is intended to confer upon any Person other than the Parties hereto any rights or remedies hereunder.

6.8      <u>PPP Loan</u>.  The Company received a PPP Loan under the CARES Act. The Company used the funds from the PPP Loan as provided for in the CARES Act. To the extent all or any portion of the PPP Loan is not forgiven pursuant to the CARES Act (the "<u>Unforgiven PPP Amount</u>"), then the sum of (i) any such amount not forgiven, (ii) any additional taxes owed by the Company as a result thereof (including, without limitation, those lost due to a loss of a deduction), and (iii) any penalties paid by the Company, shall be offset against the then outstanding principal amount owed to the Seller under the Redemption Note or the Amended and Restated Seller Note.

Article 7
Intentionally Omitted.

Article 8
Miscellaneous

8.1      <u>Expenses/Attorney's Fees</u>.  The Company shall pay all of the Company's and the Trustee's reasonable expenses incurred in connection with the authorization, preparation, execution and performance of this Agreement, including without limitation, all fees and expenses of agents, representatives, counsel, accountants and consultants.  In the event that any action or proceeding is brought in connection with this Agreement, the prevailing party therein shall be entitled to recover its costs and reasonable attorneys' fees.

8.2      <u>Notices</u>.  All notices, requests, demands and other communications provided for hereunder shall be in writing and directed to each applicable party at the address set forth hereafter or at such other address as to which such party may inform the other Parties in writing in compliance with the terms of this Section 8.2:

| Trust | Pro-Mark Services, Inc. Employee Stock Ownership Trust<br>100 N. Barranca St., Suite 870<br>West Covina, CA 91791<br>Attn: Miguel Paredes<br>Email: mparedes@fiduciaryservices.com |
|---|---|
| Copy to: | Benesch, Friedlander, Coplan & Aronoff LLP<br>200 Public Square, Suite 2300<br>Cleveland, OH 44114<br>Attn: Shaylor Steele<br>Email: ssteele@beneschlaw.com |

Company:

Pro-Mark Services, Inc.
3275 Oak Ridge Loop E
West Fargo, ND 58078
Attn: Chad DuBois
Email: Chad@gopromark.com


Copy (which does not constitute notice) to:

Levenfeld Pearlstein, LLC
Attention: David Solomon
2 North LaSalle Street Suite 1300
Chicago, Illinois 60602
Email: dsolomon@lplegal.com


To Seller:

To the Seller at such address as
set forth in the Company's records

Notices shall be deemed properly delivered and received when (i) if personally delivered, upon receipt thereof, (ii) if sent by other electronic transmission, including e-mail, upon the time transmitted to the addresses provided above, (iii) if deposited in the United states mail, postage prepaid, registered or certified mail, on or before two (2) Business Days after its delivery by mail, (iv) if sent by a commercial overnight courier for delivery on the next Business Day, on the first Business Day after deposit with such courier for delivery on the next Business Day, on the first Business Day after deposit with such courier service or (v) if sent by registered or certified mail, five (5) days after deposit thereof in the U.S. mail.

8.3     Representations as to Compliance with Law.  Whenever a representation or warranty is made in this Agreement with respect to compliance with any Law, that representation means the applicable subject matter is in compliance with applicable Law as in existence on the date hereof and on the Closing Date and does not extend to any amendments or revisions of such Laws adopted subsequent to such dates.

8.4     Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns.  No Party shall assign any of its rights or obligations under this Agreement without the prior written consent of the other Parties and any other purported assignment shall be null, void and of no effect.  Notwithstanding anything to the contrary in this Agreement, the Parties hereto agree that the Company and Trustee each may grant a security interest under the Uniform Commercial Code or otherwise collaterally assign all of its respective rights in, to and under this Agreement and all ancillary documents executed in connection herewith to secure any indebtedness incurred by the Trustee or the Company, respectively.

8.5     Entire Agreement; Amendment.  This Agreement, including the appendices hereto and the other transaction documents contemplated by and delivered pursuant to the provisions of this Agreement, shall constitute the entire agreement between the Parties with respect to the subject matter hereof and shall supersede all previous negotiations, commitments, and writings.  The Parties hereto may, by mutual consent, amend or modify and supplement this Agreement in such manner as may be agreed upon in writing.

8.6     Waiver, Discharge, etc.  This Agreement may not be released, discharged, or modified except by an instrument in writing signed on behalf of each of the Parties hereto.  The failure of a Party to enforce any provision of this Agreement shall not be deemed a waiver by the Party of any other provision or subsequent breach of the same or any other obligation under this Agreement.

8.7     Governing Law.  This Agreement shall be construed and interpreted and the rights of the Parties under this Agreement shall be governed by the internal laws of the State of North Dakota without regard to its conflict of law provisions.  The Parties hereto hereby consent to (i) the non-exclusive jurisdiction of the courts of the State of North Dakota and any federal court sitting in North Dakota, and (ii) service of process by mail in accordance with Section 8.2.

8.8     Counterparts/Electronic Signatures.  This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which shall constitute one Agreement.  This Agreement may be executed as an original in ink, by facsimile signature (e.g., a signature reproduction by physical or electronic stamp) or any electronic signature complying with the U.S. Federal ESIGN Act of 2000.  Any counterpart containing a qualifying signature transmitted electronically (e.g., via e-mail or telecopier machine) shall be accepted as an original and shall have the same force and effect as an original.

8.9     Severability.  Any portion of this Agreement which a court of competent jurisdiction shall determine to be void or unenforceable against public policy or for any other reason, shall be deemed to be severable from this Agreement and shall have no effect on the other covenants or provisions in this Agreement.  It is agreed that such court shall be empowered to reform and construe any provision which would otherwise be void or unenforceable in a manner that will be valid and enforceable to the maximum extent permitted by law.

8.10    Action Taken as Trustee.  The Trustee has executed and delivered this Agreement and related documents, not in his individual capacity, but solely as trustee of the Trust.  The performance of this Agreement and the related documents by the Trustee and any and all duties, obligations and liabilities of the Trustee hereunder will be affected by it only in his capacity as trustee and not in his individual capacity. The Trustee does not undertake nor shall he have any individual liability or obligation of any nature whatsoever by virtue of the execution and delivery of this Agreement and the related documents or the representations, covenants or warranties contained herein, and no individual liability shall be asserted or enforceable against the Trustee by reason of any of the covenants, statements, representations or warranties contained in this Agreement.  Nothing in this Agreement shall be interpreted to increase, decrease or modify in any manner any individual liability of the Trustee to the Company or the Seller, or to any trustee, representative or other claimant by the right of the Company or the Seller resulting from the Trustee's performance of its duties under and consistent with the constituent instruments of the Plan or Trust.  Trustee does not undertake any personal liability or obligation by virtue of the signing and delivery of this Agreement.

[Signature Page Follows]

36

IN WITNESS WHEREOF, each of the Parties hereto has duly executed this Agreement on the date first set forth above.

COMPANY:

PRO-MARK SERVICES, INC.

By: _____

Name: Connie Berg

Title: President

Signature Pages to Redemption and ESOP Stock Purchase Agreement

IN WITNESS WHEREOF, each of the Parties hereto has duly executed this Agreement on the date first set forth above.

TRUST:

PRO-MARK SERVICES, INC. EMPLOYEE STOCK OWNERSHIP TRUST

By: _____

Miguel Paredes, not in his individual capacity but solely in his capacity as transactional trustee of the Pro-Mark Services, Inc. Employee Stock Ownership Trust

Signature Pages to Redemption and ESOP Stock Purchase Agreement

IN WITNESS WHEREOF, each of the Parties hereto has duly executed this Agreement on the date first set forth above.

SELLER:

_____
Connie Berg

Signature Pages to Redemption and ESOP Stock Purchase Agreement

Exhibit A

Estimated Adjustment Statement

## Exhibit A

## ESTIMATED ADJUSTMENT STATEMENT

| | |
|---|---|
| Estimated Cash on Balance Sheet | $ 1,000,000.00 |
| Cash Used for Pre-Closing Expenses | 94,000.00 |
| Total Estimated Closing Cash | $ 1,094,000.00 |
| | |
| Debt Balances | $            - |
| **Estimated Adjustment Amount** | **$ 1,094,000.00** |

**DISCLOSURE SCHEDULES**

**to the**

**STOCK PURCHASE AGREEMENT**

**by and among**

**PRO-MARK SERVICES, INC. EMPLOYEE STOCK OWNERSHIP TRUST**

**as the Buyer**

**PRO-MARK SERVICES, INC.**

**and**

**CONNIE BERG**

**as the Seller**

**August 31, 2020**

<u>Schedule 3.3(a)</u>

<u>Organization</u>

The Company has a forty-nine percent (49%) equity interest in each of PMR Services II LLC, PMR Services LLC and Fed Pro, LLC.

<u>Schedule 3.3(b)</u>

<u>Capitalization</u>

The Company has a forty-nine percent (49%) equity interest in each of PMR Services II LLC,
PMR Services LLC and Fed Pro, LLC.

Schedule 3.3(d)

No Conflicts

- To the extent any indebtedness of the Company (i) held by Capital Credit Union ("**Capital**") pursuant to that certain Business Loan Agreement Dated as of May 6, 2020, by and between the Company and Capital, and the related Promissory Note in the principal amount of $1,000,000 with a maturity date of May 6, 2021, and (ii) guaranteed by each of Seller and Kyle Berg, pursuant to those certain Commercial Guaranties in favor of Capital (the documents referred to in clauses (i) and (ii) hereof, collectively, the "**Capital Loan Documents**"), is not paid off at Closing, the consummation of the transactions contemplated by the Purchase Agreement would constitute an event of default under the Capital Loan Documents.

- Seller has executed a Certification of Beneficial Owner in connection with the Company's loan in the principal amount of $482,100.00 under 15 U.S.C. 636(a)(36) (as added to the Small Business Act by Section 1102 of the Coronavirus Aid, Relief, and Economic Security Act) in favor of Capital and the consummation of the transactions contemplated by the Purchase Agreement may constitute an event of default thereunder.

<u>Schedule 3.3(f)</u>

<u>Assets Sufficient for Operation</u>

Financing Statement 19-000532789-6, filed by Capital on April 2, 2019 in connection with the Capital Loan Documents, which shall be terminated in connection with the transaction.

<u>Section 3.3(g)(iv)</u>

<u>See Attached</u>

<u>Schedule 3.3(g)(v)</u>

<u>Financial and Business Information</u>

(A)

On August, 27, 2020, the Company made a distribution of three vehicles and a trailer to the Seller.

(B)

None.

(C)

None.

(D)

None.

(E)

None.

(F)

The Company completed a 100-to-1 stock split of the Company's capital stock on August [___], 2020, which increased the Company issued and outstanding shares of capital stock to 100,000, all owned by Seller.

(G)

On August, 27, 2020, the Company made a distribution of three vehicles and a trailer to the Seller.

The Company has made a distribution to the Seller on August 27, 2020 in the amount $6,272,060, which is estimated to be an amount equal to the accumulative adjustment account of the Seller.

(H)

None.

(I)

None.

(J)

None.

(K)

None.

(L)

None.

(M)

None.

(N)

None.

<u>Schedule 3.3(h)</u>

<u>Licenses and Permits</u>

None.

Schedule 3.3(i)

Real Property, Leased Property

1. Lease Agreement, dated January 22, 2018, by and between KRB Holdings, LLC and the Company for the lease of premises located at1501 JF Kennedy Drive, Bellevue, Nebraska, as modified by that certain Base Rent Agreement, dated as of the date hereof, by and among the Company, KRB Holdings, LLC, Marlin Creek Holdings, LLC and BAD Investments LLP, entered into in connection with Closing (the "**Base Rent Agreement**").

2. Lease Agreement, dated April 24, 2017, by and between Marlin Creek Holdings, LLC and the Company for the lease of premises located at 4624 Creek Drive, Unit A, Rapid City, South Dakota, as modified by the Base Rent Agreement.

3. Lease Agreement, dated December 15, 2017, by and between KRB Holdings, LLC and the Company for the lease of premises located at 2211 Sheyenne Street, West Fargo, North Dakota, as amended by that First Amendment to Lease Agreement, date July 23, 2020, as modified by the Base Rent Agreement.

4. Lease Agreement, dated December 1, 2019, by and between KRB Holdings LLC and the Company for the lease of premises located at 101 South 5th Street, Emerado, North Dakota, as modified by the Base Rent Agreement.

5. Lease Agreement, dated December 20, 2018, by and between BAD Investments LLP and the Company for the lease of premises located at 300 46th Avenue NE, Unit C, Minot, North Dakota, as modified by the Base Rent Agreement.

6. Lease Agreement, dated January 2, 2020, by and between Marlin Creek Holdings, LLC and the Company for the lease of premises located at 3275 Oak Ridge Loop E, West Fargo, North Dakota, as modified by the Base Rent Agreement.

Schedule 3.3(j)

Litigation

Palomar Modular Buildings, L.L.C. has filed a civil action against the Company alleging that an amount equal to $61,104.57 is due under a subcontract agreement.

<u>Schedule 3.3(k)</u>

<u>No Brokers</u>

Lazear Capital Securities, LLC.

<u>Schedule 3.3(l)</u>

<u>Compensation</u>

None.

<u>Schedule 3.3(m)</u>

<u>Compliance with Laws</u>

None.

Schedule 3.3(n)

Tax Matters

Company has filed for a 2019 tax return deadline extension.

Schedule 3.3(o)

Material Contracts

Contract No. HHSI10220170000 (Indefinite Delivery-Indefinite Quantity Contract), dated, April 6, 2017, issued by Indian Health Service to the Company.

Contract No. 140P1420D0005 (Yellowstone National Park Manufactured Home Purchase IDIQ), dated March 27, 2020, issued by National Park Services, IMR – Northern Rockies to the Company.

Contract No. Fa452818C3004, dated April 20, 2018, issued by 5 CONS 165 Missile Avenue, Minot AFB, ND to the Company.

Contract No. FA4600-16-D-6003, dated February 9, 2016, issued by 55 Contracting SQ, 101 Washington SQ, Bldg. 40, Offutt AFB NE to the Company.

Contract No. FA4690-16-D-004 (Ellsworth MACC), dated June 30, 2016, issued by 28th Contra ting Squadron, 100 Ellsworth Street, Ellsworth AFB, SD to the Company.

Contract No. FA452819DA001 (Minot SABER Award), dated May 14, 2018, issued by FA4528 5 CONS LGCP, CP 701 723 2889, 165 Missile Avenue, Minot AFB, ND 58705.

Multiple Award Task Order Contract (Grand Forks MATOC), dated November 17, 2016, issued by 319 Contracting Flight, 575 Tuskegee Airmen Blvd, Grand Forks AFB, ND to the Company.

Contract No. 47PJ0019C0083 (Region 8 IDIQ), dated April 12, 2019, issued by GSA NC Property MGMT Team 8PSMMN to the Company.

Contract No. 47Pg0019D0011 (Region 6 IDIQ MATOC), dated April 8, 2019, issued by General Services Administration, Acquisition Management Division, 2300 Main Street, Kansas City, MO to the Company.

Contract No. 752H70120D00020 (Nationwide Construction MATOC), dated September 23, 2019, issued by Indian Health Service – DES to the Company.

Contract No. 75H70119D00008 (Billings & Portland MATOC), dated December 28, 2019, issued by Indian Health Services – DES to the Company.

Contract No. W901Uz-17-d-0004 (North Dakota National Guard IDIQ), dated August 24, 2017, issued by W5ALXT NDARNG JFHQ OUSPFO for North Dakota and the Company.

Contract No. 072382-15-B-0030 (USPS IDIQ), dated February 28, 2015, issued Western Facilities Construction CMT to the Company.

Contract No. FA4877-15-D-A003 (David-Monthan IDIQ), dated September 8, 2015, issued by 355 CONS-FA4877 to the Company.

Contract No. 1282A719D006 (Forest Service IDIQ), dated May 13, 2019, issued by Job Corps AQM to the Company.

Contract No. FA481420D0006 (MacDill IDIQ), dated March 6, 2019, issued by FA4814  6 CONS

to the Company.

Contract No. FA452820C0015 (FSC Ballistic), dated March 4, 2020, issued by FA4528 5 CONS LGCP to the Company.

Contract No. 140P1420D0005, dated January 28, 2020, issued by National Park Service – Northern Rockies MABO to the Company.

Subcontractor Agreement, dated December 11, 2018, by and between Commonwealth Electronic Company and the Company.

Subcontractor Agreement, dated August 30, 2018, by and between Common Electronic Company and the Company.

Subcontractor Agreement, dated August 6, 2018, by and between FutureNet Security Solutions and the Company.

Subcontractor Agreement, dated May 5, 2020, by and between Grunwald Mechanical Contractors & Engineers and the Company.

Subcontractor Agreement, dated October 9, 2017, by and between Grunwald Mechanical Contractors and Engineers and the Company.

Subcontractor Agreement, dated April 2, 2017, by and between Hunter Saak Investments, LLC and the Company.

Subcontractor Agreement, October 9, 2019, by and between Mainline Contracting, Inc. and the Company.

Subcontractor Agreement, dated November 25, 2019, by and between Midway Industrial Systems and the Company.

Subcontractor Agreement, dated October 3, 2019, by and between Miller Electric and the Company.

Subcontractor Agreement, dated October 5, 2018, by and between Miller Electric Company and the Company.

Subcontractor Agreement, dated October 9, 2017, by and between Nardini Fire Equipment and the Company.

Subcontractor Agreement, dated August 20, 2018, by and between RCS Construction and the Company.

Subcontractor Agreement, dated October 8, 2017, by and between Rick Electric, Inc.

Subcontractor Agreement, dated September 10, 2019, by and between Right Choice Electric and the Company.

Subcontractor Agreement, dated May 6, 2017, by and between LaCreek Development Corporation and the Company.

Strategic Consulting Agreement, dated December 3, 2018, by and between Fed Serve, LLC and the Company, as shall be amended at Closing.

Schedule 3.3(p)

Insurance Coverage

| Insurance Provider | Type | Annual Premium | Expiration Date |
|---|---|---|---|
| Liberty Mutual | Property | $3,800 | 8/30/2021 |
| Chubb | Crime | $1,182 | 8/30/2021 |
| Liberty Mutual | Inland Marine | $1,646 | 8/30/2021 |
| Liberty Mutual | General Liability | $50,854 | 8/30/2021 |
| Liberty Mutual | Automobile | $27,669 | 8/30/2021 |
| Liberty Mutual | Workers' Compensation | $13,733 | 8/30/2021 |
| Liberty Mutual | Umbrella | $39,257 | 8/30/2021 |
| Allied World | Prof & Pollution | $15,939 | 8/30/2021 |

Schedule 3.3(q)

Employee Matters

(i)

Strategic Consulting Agreement, dated December 3, 2018, by and between Fed Serve, LLC and the Company, as shall be amended at Closing.

Schedule 3.3(r)

Intellectual Property

None.

Section 3.3(s)

Customer and Suppliers

Customers

| | | |
|---|---|---|
| 1. | Offutt Air Force Base | $14,596,399 |
| 2. | Grand Forks Air Force Base | $7,014,486 |
| 3. | Indian Health Service | $3,785,439 |
| 4. | Ellsworth Air Force Base | $3,719,634 |
| 5. | Minot Air Force Base | $3,404,719 |
| 6. | General Services Administration | $283,362 |
| 7. | MacDill Air Force Base | $361,155 |
| 8. | National Park Service | $324,393 |
| 9. | Davis-Monthan Air Force Base | $259,901 |
| 10. | North Dakota Air Guard | $208,393 |

Suppliers

| | | |
|---|---|---|
| 1. | Commonwealth Electronic Company | $6,181,630 |
| 2. | Grunwald Mechanical Contractors & Engineers | $2,531,510 |
| 3. | RCS Construction | $1,966,309 |
| 4. | Miller Electric | $1,425,142 |
| 5. | LaCreek Development | $813,388 |
| 6. | Right Choice Electric, Inc. | $775,959 |
| 7. | Mainline Contracting, Inc. | $724,729 |
| 8. | FutureNet Security Solutions | $572,391 |
| 9. | Rick Electric, Inc | $399,107 |
| 10. | Nardini Fire Equipment Co., Inc. | $141,151 |

Schedule 3.3(u)

Agreements with Affiliates

1.  Strategic Consulting Agreement, dated December 3, 2018, by and between Fed Serve, LLC and the Company, as shall be amended at Closing.

2.  The principal of Fed Serve, LLC has an ownership interest in a private plane used in part for Company matters and in such cases, any fuel costs or expenses are charged back to the Company.

3.  The Base Rent Agreement.

4.  The following leases are with affiliated entities of the Seller:

    a.  Lease Agreement, dated January 22, 2018, by and between KRB Holdings, LLC and the Company for the lease of premises located at1501 JF Kennedy Drive, Bellevue, Nebraska, as modified by the Base Rent Agreement.

    b.  Lease Agreement, dated April 24, 2017, by and between Marlin Creek Holdings, LLC and the Company for the lease of premises located at 4624 Creek Drive, Unit A, Rapid City, South Dakota, as modified by the Base Rent Agreement.

    c.  Lease Agreement, dated December 15, 2017, by and between KRB Holdings, LLC and the Company for the lease of premises located at 2211 Sheyenne Street, West Fargo, North Dakota, as amended by that First Amendment to Lease Agreement, date July 23, 2020, as modified by the Base Rent Agreement.

    d.  Lease Agreement, dated December 1, 2019, by and between KRB Holdings LLC and the Company for the lease of premises located at 101 South 5th Street, Emerado, North Dakota, as modified by the Base Rent Agreement.

    e.  Lease Agreement, dated December 20, 2018, by and between BAD Investments LLP and the Company for the lease of premises located at 300 46th Avenue NE, Unit C, Minot, North Dakota, as modified by the Base Rent Agreement.

    f.  Lease Agreement, dated January 2, 2020, by and between Marlin Creek Holdings, LLC and the Company for the lease of premises located at 3275 Oak Ridge Loop E, West Fargo, North Dakota, as modified by the Base Rent Agreement.