UNITED STATES BANKRUPTCY COURT
DISTRICT OF NORTH DAKOTA

---

In re:

Pro-Mark Services, Inc.,

Debtor.

Chapter 7
Bky. No. 24-30167

---

Erik A. Ahlgren, as Chapter 7 Trustee of
Bankruptcy Estate of Pro-Mark Services, Inc.,
as Administrator of the Pro-Mark Services,
Inc. Employee Stock Ownership Plan, and as
Trustee of the Pro-Mark Services, Inc.
Employee Stock Ownership Trust,

Plaintiff,

v.

Connie Berg, Kyle Berg, Connie Berg
Revocable Living Trust, Kyle R. Berg
Revocable Living Trust, Chad DuBois,
Mandy Grant, and Miguel Paredes,

Defendants.

Adv. No. 24-07014

**PLAINTIFF'S RESPONSE IN
OPPOSITION TO MOTION TO
DISMISS BY DEFENDANT
MIGUEL PAREDES**

---

Plaintiff Erik A. Ahlgren, in his capacities as chapter 7 trustee of the bankruptcy estate of

Pro-Mark Services, Inc. (the "Debtor"), administrator of the Pro-Mark Services, Inc. Employee

Stock Ownership Plan (the "ESOP Plan"), and trustee of the Pro-Mark Services, Inc. Employee

Stock Ownership Trust (the "ESOP Trust" and together with the ESOP Plan, the "ESOP"), submits

this response in opposition to Defendant Miguel Paredes' Motion to Dismiss [ECF No. 30], and

states as follows:

## <u>INTRODUCTION</u>

In August 2020, Mr. Paredes caused the ESOP to purchase the Debtor's stock and become its 100% owner.  At Mr. Paredes' direction, the ESOP paid over $9 million in cash to the Debtor's then-owners, Connie and Kyle Berg, and incurred millions of dollars in liabilities for the remainder of the purchase price.

Mr. Paredes' duty, by contract and under the ERISA statute, was to ensure that the ESOP paid no more than adequate consideration for the stock.  By statute, this duty was the highest known to law.  Unfortunately, he fell short of this standard.  In closing the transaction, Mr. Paredes did not conduct meaningful due diligence into the Debtor's eligibility for government contracting programs that accounted for at least one-fourth of the company's total revenue in the four-year period before the transaction.  There were obvious red flags that the Bergs had fraudulently enrolled the Debtor in those programs.  And the penalties for fraud, once discovered by the government, would jeopardize the Debtor's existence.  But Mr. Paredes turned a blind eye, asked no questions, and closed the deal at an inflated price.

Predictably, less than two years after closing, the government discovered the Bergs' scheme, sending Pro-Mark and the ESOP into a tailspin.  The Debtor eventually filed for bankruptcy, and the ESOP's only asset—the Debtor's stock—plummeted in value to zero.  Had Mr. Paredes conducted basic, industry standard due diligence, the transaction never would have closed, and the ESOP would not have paid millions of dollars to the Bergs.

Plaintiff Erik A. Ahlgren, in his capacities as administrator of the ESOP Plan and trustee of the ESOP Trust, commenced this action against Mr. Paredes, among others, for breaching fiduciary duties that he owed to the ESOP and causing the ESOP to enter into a "prohibited

transaction" under the ERISA statute.  Mr. Paredes now moves to dismiss, but his motion misses the mark.

Plaintiff is entitled to plead his ERISA claims against Mr. Paredes and his ESOP fraud claims against the Bergs and Chad DuBois in the alternative.  At the pleading stage, Plaintiff can pursue both theories, even if they are potentially incompatible.  Further, Plaintiff has stated plausible claims for relief, he has no obligation to plead a purported "prohibited transaction" claim element that does not appear in the ERISA statute, and he has no obligation to plead around Mr. Paredes' alleged affirmative defense to the "prohibited transaction" claim.  For these reasons, the motion to dismiss should be denied.

### FACTS[1]

### I.    The Bergs Fraudulently Enroll the Debtor in the 8(a) and WOSB Programs

The Debtor was a construction company that procured and performed contracts from the federal government.  (ECF No. 11 ("Am. Compl.") ¶ 1, Adv. No. 24-07014.)  Connie and Kyle Berg, who are married, originally co-owned in the business.  (*Id.* ¶ 26.)  In 2007, Mr. Berg gifted his equity interest to Mrs. Berg, making her the 100% owner.  (*Id.* ¶ 44.)  Notwithstanding the transfer of his interest, Mr. Berg maintained all control over the Debtor as a full-time "employee" and/or "consultant."  (*Id.*)

Just four months after the transfer, the Bergs enrolled the Debtor in the 8(a) program, which is administered by the U.S. Small Business Association ("SBA").  (*Id.* ¶¶ 27, 45.)  The 8(a) program aims to award at least 5% of all federal contracting dollars to small businesses owned and controlled by socially and economically disadvantaged individuals.  (*Id.* ¶ 28.)  Enrollees receive

---

[1]    The Amended Complaint is 101 pages, with 28 counts against seven defendants.  The below factual summary only includes allegations relevant to the claims against Mr. Paredes.

ACTIVE 703613455v6

various benefits, including priority access to federal contracts set aside solely for enrollees.  (*Id.*) To qualify for the 8(a) program, the applicant business must be, among other things, a small business and controlled by the disadvantaged individual (*i.e.*, Connie Berg).  (*Id.* ¶¶ 30-32.)

Later, in 2015, the Bergs enrolled the Debtor in SBA's Women Owned Small Business ("WOSB") program.  (*Id.* ¶ 48.)  Similar to the 8(a) program, the WOSB program aims to award at least 5% of all federal contracting dollars to women-owned small businesses, and enrollees receive priority access to set-aside contracts.  (*Id.* ¶ 35.)  To qualify for the WOSB program, the applicant business must be, among other things, a small business and controlled by a woman (*i.e.*, Connie Berg).  (*Id.* ¶¶ 36-38.)

Finally, the Bergs also caused the Debtor to apply for set-aside contracts reserved exclusively for small businesses. (*Id.* ¶¶ 41, 49.)  Whether the applicant business is a "small business" depends on its revenue, plus the revenue of any affiliated businesses.  (*Id.* ¶ 42.)

At the time of enrollment into the 8(a) and WOSB programs, in annual certifications to SBA, and when bidding for set-aside contracts, Mrs. Berg repeatedly represented to SBA and the federal government that she controlled the Debtor, that the Debtor qualified for the 8(a) and WOSB programs, and that the Debtor was a small business.  (*Id.* ¶¶ 33-34, 39-40, 46-48.)  However, these certifications were knowingly false.  (*Id.* ¶¶ 50-51.)   Mrs. Berg was the control person on paper only, as a pretext so the Debtor would qualify for the financially lucrative set-aside contacts.  (*Id.* ¶¶ 44, 52, 54, 55-66.)  In fact, Mr. Berg exclusively controlled the Debtor.  (*Id.*)

Mrs. Berg had no experience or expertise in construction, the Debtor's principal business and the source of work under the government contracts.  (*Id.* ¶ 56-57.)  Her expertise was in apparel and retail sales.  (*Id.*)  Additionally, contrary to her explicit representations to the government, she did not work 40 hours per week for the Debtor.  (*Id.* ¶¶ 61, 228(c).)   She also (a) had no

4

involvement in selecting, estimating, or structuring the bids that the Debtor submitted for federal construction contracts; (b) did not engage in substantive discussions with the government contracting officers responsible for awarding, evaluating, or overseeing bids; (c) had no involvement in hiring, directing, or managing the Debtor's employees and subcontractors; (d) had no involvement in managing the Debtor's business operations; and (e) had no involvement in the Debtor's financials.  (*Id.* ¶¶ 60-64, 228(c).)

In truth, Mr. Berg managed and controlled all aspects of the Debtor's business, which Mrs. Berg never disclosed to the government.  (*Id.* ¶ 61.)  Only Mr. Berg had experience and expertise in construction.  (*Id.* ¶ 58.)  He determined which government contracts the Debtor would bid for, structured the bids, estimated the costs for the bids, directed employees how to complete proposals, and communicated with government contracting officers. (*Id.* ¶¶ 62, 228(d).)  He made all decisions for the Debtor regarding its employees, including salaries, raises, and bonuses. (*Id.*) He directed the activity and work of the Debtor's employees, subcontractors, and suppliers. (*Id.*) And he managed the Debtor's financial reporting and controlled all finances of the Debtor, including company bank accounts, loans, and payroll.  (*Id.*)  All employees recognized Mr. Berg as their ultimate supervisor and looked to him for direction——not to Mrs. Berg.  (*Id.* ¶ 63.)

Further, the Debtor was not actually a small business due to its extensive (but undisclosed) affiliations with other entities controlled by Mr. Berg, including, without limitation, Fed Serve, LLC, KRB Holdings, LLC, Marlin Creek Holdings, LLC, MDM Construction, LLC, OK2 Construction, LLC, Razor Consulting Solutions, Inc., Tunheim Holdings, LLC, Tunheim Construction, PMR Services, LLC, PMR II Services, BAD Investments, Thermal Air, and N40GB, LLC.  (*Id.* ¶ 53, 67-98.)

5

Had Mrs. Berg truthfully disclosed to SBA and the federal government that Mr. Berg controlled the Debtor and the Debtor's affiliations with Mr. Berg's other entities, the Debtor would not have qualified for the 8(a) and WOSB programs, would not have qualified as a small business, and would not have received any set aside contracts. (*Id.* ¶¶ 53-54, 65-66.)   Instead, because of Mrs. Berg's false representations, the Debtor was awarded at least $70 million in federal set-aside contracts to which it was not entitled between 2008 and 2020. (*Id.* ¶¶ 99-100.)  The Bergs' fraud materially inflated the Debtor's revenue, performance, and value. (*Id.*)

## II.    The Bergs Sell the Debtor's Stock to the ESOP at a $31.5 Million Valuation

In or around 2019, the Bergs decided that they wanted to monetize Mrs. Berg's equity interest in the Debtor and exit the business. (*Id.* ¶ 104.)  They elected to do so via an "ESOP," which stands for employee stock ownership plan. (*Id.* ¶¶ 104-05.)  In a typical ESOP transaction, the existing shareholders sell their equity in the company to the ESOP in exchange for cash, notes, or a combination of both. (*Id.* ¶ 105.)  The employees, who are the beneficiaries of the ESOP, then acquire the company stock from the ESOP over time. (*Id.*)  An ESOP transaction has two basic purposes. First, it enables the existing shareholders to monetize their equity interests in the company—often as a business succession tool. (*Id.* ¶ 106.) And second, it enables the employees to become owners and reap the benefits of their hard work. (*Id.*)

In May 2020, the Bergs caused the Debtor to retain Mr. Paredes to serve as trustee of the ESOP Trust. (*Id.* ¶ 111.)  Under his engagement agreement, Mr. Paredes agreed to "(1) evaluate the proposed purchase of Company stock by the ESOP; (2) perform due diligence with respect to the Company and the proposed ESOP Transaction; and (3) act independently of the Company and its agents and representatives to negotiate on behalf of the ESOP the price, terms, and conditions of the ESOP Transaction." (*Id.* ¶¶ 112-13.)   Additionally, Mr. Paredes was charged with ensuring

that "the ESOP pays no more than adequate consideration for the Company stock, that [the proposed transaction] is fair to the ESOP from a financial point of view, and that [the proposed transaction] is in accordance with the terms of the Plan and applicable law, including, but not limited to, ERISA and the Internal Revenue Code." (*Id.* ¶ 114.)

To assist with these duties, Mr. Paredes retained Stout Risius Ross, LLC ("Stout") to serve as the ESOP Trust's financial advisor. (*Id.* ¶ 115.) Stout's role was to render a "written opinion" that "[t]he consideration to be paid by the ESOP for its shares of Company stock pursuant to the terms of the Transaction is not greater than the Fair Market Value of such shares" and "[t]he terms and conditions of the Transaction, taken as a whole, are fair to the ESOP from a financial point of view." (*Id.*) Mr. Paredes also retained the law firm Benesch, Friedlander, Coplan & Aronoff LLP ("Benesch"). (*Id.* ¶ 116.)

From May 2020 through August 2020, Mr. Paredes and the Bergs negotiated the terms of the ESOP transaction, and Mr. Paredes and his advisors purportedly conducted due diligence into the Debtor and the proposed transaction. (*Id.* ¶ 119.) Ultimately, the transaction closed on August 31, 2020, with Mr. Paredes approving it and signing the deal documents on behalf of the ESOP. (*Id.* ¶¶ 125-40.) Mrs. Berg sold 37,683 shares of the Debtor's stock back to the Debtor for redemption and her remaining 62,317 shares to the ESOP. (*Id.*) As a result of the transaction, the ESOP became the Debtor's sole owner. (*Id.* ¶ 137.)

Mr. Paredes valued the Debtor's stock at $31.5 million based on its business at the time, and the ESOP paid Mrs. Berg over $9 million in cash at closing. (*Id.* ¶ 138.) The ESOP and the Debtor each executed promissory notes for remainder of the purchase price. (*Id.* ¶¶ 127, 134-35, 140.) The Debtor and the ESOP funded the purchase price almost entirely with debt, including a $8.48 million loan from Bankers Trust to the Debtor. (*Id.* ¶¶ 130, 139-40.) At closing, Stout

ACTIVE 703613455v6

delivered a written opinion to Mr. Paredes that the ESOP did not pay more than fair market value for the Debtor's stock and that the terms and conditions of the transaction were fair to the ESOP. (*Id.* ¶ 115.)

### III.    Mr. Paredes and His Advisors Ignore Obvious Red Flags and Fail to Conduct Any Meaningful Due Diligence Before Closing the ESOP Transaction

Before the ESOP closing, the Bergs and Chad DuBois, one of the Debtor's senior officers, never disclosed to Mr. Paredes that the Debtor had wrongfully enrolled in the 8(a) and WOSB programs and was not a small business. (*Id.* ¶ 165.) In fact, they affirmatively concealed the fraud from Mr. Paredes. (*Id.*) However, with just basic due diligence, Mr. Paredes and his advisors could have, and would have, discovered the scheme. (*Id.* ¶¶ 164-179.)[2]

First, Mr. Paredes had every reason to investigate and vet the Debtor's eligibility for the 8(a) and WOSB programs and status as small business as part of his diligence for the transaction. (*Id.* ¶ 166.) In the four-year period before the ESOP closing date, about $38 million of the Debtor's total revenue (approximately 26.5%) and about $4.7 million of its net income derived from the 8(a) and WOSB programs (*Id.*) Further, its entire business revolved around federal contracting. (*Id.*)

Second, the potential consequences for defrauding the 8(a) and WOSB programs and SBA are severe, foreseeable, and would threaten the Debtor's ability to continue as a going concern. (*Id.* ¶¶ 102-03.) Among other things, (a) government counterparties could seek contractual remedies from the Debtor, including price reductions, terminations, and disgorgement; (b) competitors could protest the Debtor's contract awards; (c) the federal government could suspend or bar the Debtor from bidding on contracts, which would effectively put the Debtor out

---

[2]    As detailed below, Plaintiff has pleaded the ERISA claims against Mr. Paredes and ESOP fraud claims against the Bergs and Mr. DuBois in the alternative.

ACTIVE 703613455v6

of business; (d) the Debtor could be subject to criminal and civil liability for violating federal law, (e) bonding companies and lenders could refuse to do business with the Debtor; (f) the Debtor would suffer harm to its business reputation; and (g) the Debtor would likely incur significant legal and other professional fees dealing with all the foregoing. (*Id.*) In determining whether the ESOP Trust paid no more than adequate consideration to Mrs. Berg, Mr. Paredes could not simply ignore the Debtor's participation in the 8(a) and WOSB programs and small business status. (*See id.* ¶¶ 102-03, 166.)

Third, there were significant and obvious red flags indicating that Mrs. Berg did not control the Debtor and, therefore, that the Debtor did not actually qualify for the 8(a) and WOSB programs. (*Id.* ¶¶ 44-45, 167-171.) Among other things, (a) Mrs. Berg's experience was in apparel and retail sales, not construction; (b) only Mr. Berg had expertise in construction, yet he purportedly worked for Mrs. Berg; (c) Mr. Berg "gifted" his equity interest to Mrs. Berg just four months before she submitted the Debtor's initial 8(a) program application; (d) the Bergs are married, yet Mrs. Berg was the Debtor's purported sole owner and control person; (e) a memorandum prepared by the Debtor's financial advisor disclosed that "[h]istorically, Connie's role at the Company has been de minimis"; (f) Mrs. Berg had little or no involvement in the ESOP transaction, did not participate in diligence calls, and was not copied on diligence emails; (g) Mr. Berg was the main point of contact for all aspects of the ESOP transaction, including all diligence; and (h) the proposed ESOP transaction contemplated that Mrs. Berg would have no ongoing involvement in the Debtor's business post-closing, while Mr. Berg would remain heavily involved as a consultant through his entity, Fed Serve. (*Id.*) All these facts were known to Mr. Paredes and his advisors before closing. (*Id.*)

ACTIVE 703613455v6

<u>Fourth</u>, in August 2020, it was widely known in the government contracting industry that fraud and abuse were prevalent in the 8(a) and WOSB programs. (*Id.* ¶ 171.) In June 2018, for example, SBA issued an audit report finding that the ability of applicants to self-certify their eligibility "expos[ed] the Program to unnecessary risks of fraud and abuse. (*Id.*) A March 2019 report by the U.S. Government Accountability Office made similar findings. (*Id.*) And the Department of Justice had prosecuted numerous contractors for fraud relating to the 8(a) and WOSB programs. (*Id.*) Fraud was not a novel or rare issue— Mr. Paredes and his advisors should have been on the look-out.

Notwithstanding the materiality of the Debtor's 8(a) and WOSB revenue, the potential consequences for fraud, the obvious red flags, and the industry-known risks, Mr. Paredes did not conduct meaningful due diligence into the Debtor's eligibility for the 8(a) and WOSB programs or its status as a small business, in breach of industry norms. (*Id.* ¶ 175.) Critically, due diligence checklists circulated among the parties did not even include sections on these issues. (*Id.*) And Mr. Paredes did not meet with the Debtor's employees, who had first-hand knowledge about Mrs. Berg's lack of control and the Debtor's affiliations. (*Id.* ¶¶ 176-77.)

Furthermore, although Mr. Paredes retained advisors to assist with due diligence, they were not qualified. (*Id.* ¶ 173.) His law firm, Benesch, does not have a practice group specializing in federal government contracting (the Debtor's core business) and does not have an office in Washington, D.C.—the epicenter of federal contracting. (*Id.*) And his financial advisor, Stout, did not staff the deal with employees who had the requisite federal contracting experience and expertise to understand the significance of the red flags outlined above. (*Id.* ¶ 174.)

Had Mr. Paredes conducted basic, industry standard due diligence and retained qualified advisors, he would have discovered the Bergs' scheme, and the ESOP transaction never would

have closed. (*Id.* ¶¶ 177-78, 429.)  Instead, the ESOP purchased the Debtor's stock at a valuation of $31.5 million, a grossly inflated amount that did not account for the Debtor's fraudulent revenue and related liabilities. (*Id.* ¶¶ 179, 428.)

## IV.    Post-Closing, the Debtor Files for Bankruptcy and the ESOP Value Plummets to Zero

Less than two years after the ESOP closing date, the Bergs' fraud finally caught up with the Debtor. (*Id.* ¶¶ 218-23.)  In March 2022, the federal government raided the Debtor's headquarters after obtaining search warrants and a grand jury subpoena relating to the Debtor's enrollment in the 8(a) and WOSB programs. (*Id.* ¶¶ 218-23, Ex. C.)  Ultimately, in October 2023, the Debtor and the federal government entered into a non-prosecution agreement, under which the Debtor admitted that the Bergs' prior misrepresentations to SBA and the government violated federal law. (*Id.* ¶¶ 224-29, Ex. D.)   The Debtor also agreed to pay a $949,000 criminal fine. (*Id.* ¶ 227.)

The public revelation of the government investigation and resulting non-prosecution agreement severely impacted the Debtor's business and the ESOP. (*Id.* ¶ 239.)  Among other things, the Debtor (1) incurred millions of dollars in legal fees, professional fees, and other fees, costs, and expenses; (2) lost several key employees and had trouble hiring new ones; (3) lost its bonding, which is necessary to secure and perform federal construction contracts; (4) defaulted on several of its existing federal contracts; (5) lost its small business certification due a challenge by a competitor premised on the Bergs' fraud, and (6) suffered significant harm to its reputation. (*Id.* ¶¶ 232, 239-46.)

The Debtor ultimately filed for bankruptcy in April 2024, reporting just $4.4 million in assets and more than $33.3 million in liabilities. (*Id.* 248.)  The ESOP, meanwhile, has incurred

11

catastrophic losses, directly harming its participants (*i.e.*, the Debtor's employees). (*Id.* ¶ 247.) The ESOP's principal asset—the Debtor's stock—has no value. (*Id.*)

## V.    Procedural History

After the bankruptcy filing, Plaintiff Erik A. Ahlgren was appointed chapter 7 trustee of the Debtor's bankruptcy estate. (*Id.* ¶ 6.) By operation of law pursuant to 11 U.S.C. § 704(a)(11), Plaintiff is also the administrator of the ESOP Plan. (*Id.* ¶ 7.) And pursuant to an order of the Bankruptcy Court, Mr. Ahlgren appointed himself trustee of the ESOP Trust. (*Id.* ¶ 8; *see* ECF No. 132, Bky. No. 24-30167.)

On September 25, 2024, Plaintiff, in his three capacities as chapter 7 trustee, administrator of the ESOP Plan, and trustee of ESOP Trust, filed his Amended Complaint against Mr. Paredes, Mrs. Berg, Mr. Berg, the Connie Berg Revocable Living Trust, the Kyle R. Berg Revocable Living Trust, Chad DuBois, and Mandy Grant. Count 21 is the only count against Mr. Paredes, which Plaintiff brings in his capacities as ESOP administrator and ESOP trustee. (Am. Compl. ¶¶ 420-31.) Plaintiff alleges that Mr. Paredes breached his fiduciary duties to the ESOP under 29 U.S.C. § 1104(a)(1)(B) and caused the ESOP to enter into a prohibited transaction in violation of 29 U.S.C. § 1106(a)(1)(A), (D). (*Id.*) Mr. Paredes now moves to dismiss under Fed. R. Civ. P. 12(b)(6). (ECF No. 30.) For the reasons set forth below, the Court should deny the motion.

## STANDARD OF REVIEW

On a motion to dismiss under Rule 12(b)(6), the court must "accept all facts pled by the nonmoving party as true and draw all reasonable inferences from the facts in favor of the nonmovant." *Waldron v. Boeing Co.*, 388 F.3d 591, 593 (8th Cir. 2004). Additionally, the court must construe the complaint in the light most favorable to the plaintiff. *Ashley Cty., Ark. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009).

12

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

## **ARGUMENT**

### I. **Plaintiff Is Entitled to Plead Count 21 and Counts 25-27 in the Alternative, and All Remaining Counts Are Consistent**

Mr. Paredes first argues that the ERISA claims against him contradict the other claims in the Amended Complaint, requiring dismissal. This argument lacks merit. Most of the Amended Complaint is not contradictory, and Plaintiff is entitled to plead in the alternative.

The only claims that are in tension with the ERISA claims against Mr. Paredes are Counts 25-27. In those counts, Plaintiff alleges that Mrs. Berg, Mr. Berg, and Chad DuBois defrauded Mr. Paredes and the ESOP, or aided and abetted such conduct, in connection with Mrs. Berg's sale of 62,317 shares to the ESOP. Plaintiff acknowledges that these fraud claims and the ERISA claims against Mr. Paredes *might* be mutually exclusive. If Mr. Paredes reasonably relied on the false representations and omissions by the Bergs and Mr. DuBois in closing the ESOP transaction—which Plaintiff must establish to prove fraud against them—then Plaintiff may not be able to simultaneously prove that Mr. Paredes breached his ERISA duties of care, skill,

13

prudence, and diligence in closing the ESOP transaction.  But at the pleading stage, Plaintiff need

not conclusively choose one theory, nor concede that its either/or.[3]

Perhaps Mr. Paredes' reliance on the Bergs' misrepresentations was reasonable—or

perhaps not.  And perhaps Mr. Paredes' conduct satisfied his duties as an ERISA fiduciary—or

perhaps not.  Plaintiff is entitled to flesh out these alternative theories in discovery and at trial.

That is the exact purpose of alternative pleading.  Under Rule 8(d)(2) and (3), a plaintiff may plead

multiple claims "alternatively" and "regardless of consistency."  Fed. R. Civ. R. 8(d)(2), (3).  "Until

an action has actually reached the point of entering a judgment, Rule 8 allows a plaintiff to explore

alternative, mutually exclusive theories."  *N. Am. Bullion Exch., LLC v. CC Trading, LLC*, 412 F.

Supp. 3d 1119, 1128 (D.N.D. 2019) (internal quotation marks and citations omitted)); *see also*

*Whitney v. Guys, Inc.*, 700 F.3d 1118, 1130 (8th Cir. 2012) (acknowledging "the importance of

allowing plaintiffs to plead in the alternative").  And contrary to what Mr. Paredes argues, a

plaintiff "may [even] plead inconsistent ***facts*** in support of alternative theories of recovery."

*Babcock & Wilcox Co. v. Parsons Corp.*, 430 F.2d 531, 536 (8th Cir. 1970) (emphasis added); *see*

*Whitney*, 700 F.3d at 1130 (permitting to plaintiff to plead that "he was denied ownership" and that

"he actually is an owner").

That is exactly what Plaintiff has done here—pleaded potentially inconsistent theories in

the alternative.  The Amended Complaint carves out the "reasonable reliance" allegations from the

claims against Mr. Paredes, and vice versa.  In Count 21 against Mr. Paredes, Plaintiff carves out

---

[3]     Plaintiff does not concede that the ERISA and fraud claims are mutually exclusive and has
no obligation to do so at this stage of the proceedings.  As discussed below, the duties owed by an
ERISA fiduciary are "the highest known to law."  *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585,
598 (8th Cir. 2009).  Thus, as a matter of law, reliance that may be "reasonable" for the purposes
of a fraud claim may not satisfy the highest duty known to law owed by an ERISA fiduciary. For
now, it is enough that Plaintiff has pleaded Count 21 and Counts 25-27 in the alternative.

ACTIVE 703613455v6

Counts 25-27, which are the only counts that allege reasonable reliance by Mr. Paredes.  (Am. Compl. ¶ 420.)  And in Counts 25-27 against the Bergs and Mr. DuBois, Plaintiff carves out Count 21 and paragraphs 164-179, which detail the various shortcomings in Mr. Paredes' diligence.  (*Id.* ¶ 482.)   Nothing else is required for Plaintiff to plead these counts in the alternative.[4]

All remaining counts in the Amended Complaint are entirely consistent with the ERISA claims against Mr. Paredes.  No alternative pleading is necessary.

In Counts 1-5, Plaintiff, in the shoes of the Debtor, alleges that Mrs. Berg, Mr. Berg, Chad DuBois, and Mandy Grant breached fiduciary duties they owed to the Debtor.  (*Id.* ¶¶ 250-75.) Whether these defendants breached fiduciary duties they owed to the Debtor has no bearing on whether Mr. Paredes breached fiduciary duties he owed to the ESOP Trust.  Plaintiff can simultaneously prevail on both sets of claims.  There are no contradictory claim elements.

In Counts 6 and 7, Plaintiff, in the shoes of the Debtor, alleges that Mrs. Berg breached two contracts with the Debtor.  (*Id.* ¶¶ 276-293.)  Whether Mrs. Berg breached her contracts with the Debtor has no bearing on whether Mr. Paredes breached fiduciary duties he owed to the ESOP Trust.  Plaintiff can simultaneously prevail on both sets of claims.  There are no contradictory claim elements.

---

[4]      Under the liberal notice pleading standard, Plaintiff arguably did not even need to carve out these allegations to plead in the alternative.  *See, e.g.*, *Prairie River Home Care, Inc. v. Procura, LLC*, 2018 U.S. Dist. LEXIS 126551, *15 n.1 (D. Minn. July 30, 2018) ("The Court acknowledges that Prairie River incorporated all previous allegations of its Complaint in its count for fraudulent inducement. Taken literally, this would mean that Prairie River is alleging both that (1) Procura reasonably but wrongfully believed the Software met regulatory requirements and (2) Procura knew that the Software did not meet regulatory requirements. The contradiction is so clear that any reasonable individual would understand Prairie River to be pleading in the alternative. The incorporation of the rescission allegations into the fraudulent-inducement allegations is surely the result of imprecise drafting. The Court will construe the allegations as pleading in the alternative." (internal citation omitted)).

ACTIVE 703613455v6

In Count 8, Plaintiff, in the shoes of the Debtor, alleges that Mrs. Berg defrauded the Debtor. (*Id.* ¶¶ 294-305.) Whether Mrs. Berg defrauded the Debtor has no bearing on whether Mr. Paredes breached fiduciary duties he owed to the ESOP Trust. Plaintiff can simultaneously prevail on both sets of claims. There are no contradictory claim elements.

In Counts 9-20, Plaintiff, in the shoes of the Debtor, asserts that the Debtor made actual and constructive fraudulent transfers to the Bergs and their revocable trusts. (*Id.* ¶¶ 306-419.) Whether the Debtor made fraudulent transfers to the Berg defendants has no bearing on whether Mr. Paredes breached fiduciary duties he owed to the ESOP Trust. Plaintiff can simultaneously prevail on both sets of claims. There are no contradictory claim elements.

In Counts 22-24, Plaintiff, as a fiduciary of the ESOP, asserts ERISA claims against the Bergs. (*Id.* ¶¶ 432-462.) Whether the Bergs breached fiduciary duties they owed to the ESOP— or knowingly participated in such breaches—has no bearing on whether Mr. Paredes breached his own fiduciary duties to the ESOP Trust. Plaintiff can simultaneously prevail on both sets of claims. There are no contradictory claim elements.

Finally, in Count 28, Plaintiff, in the shoes of the Debtor and as a fiduciary of the ESOP, asserts state law securities fraud claims against the Bergs, Chad DuBois, and Mandy Grant under N.D. Cent. Code § 10-04-15(2). (*Id.* ¶¶ 482-93.) For the Debtor, Plaintiff challenges Mrs. Berg's sale of 37,683 shares back to the Debtor for redemption. (*Id.* ¶¶ 483-85.) And as a fiduciary of the ESOP, Plaintiff challenges Mrs. Berg's sale of 62,317 shares to the ESOP. (*Id.*)

Whether defendants are liable for state law securities fraud in connection with the Debtor's stock redemption from Mrs. Berg has no bearing on whether Mr. Paredes breached fiduciary duties he owed to the ESOP Trust. And the ESOP-portion of the count likewise has no bearing on whether

ACTIVE 703613455v6

Mr. Paredes breached fiduciary duties he owed to the ESOP Trust, as Plaintiff can prevail on some or all of that claim without proving reasonable reliance by Mr. Paredes or the ESOP.[5]

In sum, only four counts in the Amended Complaint have potentially incompatible claim elements, and Plaintiff has pleaded them in the alternative. Nothing more is required.

## II.    Plaintiff Has Stated a Plausible Claim for Relief Under 29 U.S.C. § 1104(a)(1)(B)

Mr. Paredes next argues that the Amended Complaint fails to state a claim that he breached his fiduciary duties under 29 U.S.C. § 1104(a)(1)(B). This argument also lacks merit.

Under Section 1104(a)(1)(B), an ERISA fiduciary must discharge his duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). The Eighth Circuit has characterized these fiduciary duties as "the highest known to law." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009).

"The statute's prudent person standard is an objective standard . . . that focuses on the fiduciary's conduct preceding the challenged decision" and the "process by which it makes its decisions." *Id.* at 596 (quoting *Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915, 917-18 (8th Cir. 1994)). To prevail on a claim for breach, "a plaintiff must make a prima facie showing that a defendant acted as a fiduciary, breached its fiduciary duties, and thereby caused a loss to the Plan." *Id.* at 594.

---

[5]    *See, e.g.*, *Barnes v. Sunderman*, 453 N.W.2d 793, 795, 797 (N.D. 1990) (stating what plaintiff must prove to prevail on "omission" securities fraud claim without mentioning reasonable reliance). Even if reasonable reliance is an element for any portion of Plaintiff's ESOP-related securities fraud claims, the Amended Complaint still passes muster. In an abundance of caution, Plaintiff has pleaded Counts 21 and 28 in the alternative. Count 21 carves out Count 28, and Count 28 carves out Count 21 and paragraphs 164-171. (Am. Compl. ¶¶ 420, 482.)

ACTIVE 703613455v6

The Amended Complaint is replete with factual allegations that Mr. Paredes breached fiduciary duties to the ESOP, thereby causing losses.[6]  Plaintiff's core theory is that Mr. Paredes conducted inadequate due diligence before the ESOP closing.  (*See* Am. Compl. ¶¶ 420-31.)  Had Mr. Paredes acted reasonably and prudently, he would have discovered the Bergs' decade-long scheme to defraud the federal government, and the deal never would have closed.  Instead, Mr. Paredes caused the ESOP to enter into a prohibited transaction at a grossly inflated price, resulting in catastrophic losses for the ESOP and its participants.  Numerous factual allegations support this theory.  The Amended Complaint is not "conclusory."  For example:

- Material Revenue.  About $70 million of the Debtor's total revenue from 2008-2020 derived from the 8(a) and WOSB programs.  (*Id.* ¶ 228(a).)  Additionally, in the four-year period before the ESOP closing date, the 8(a) and WOSB programs accounted for about $38 million of the Debtor's total revenue (approximately 26.5%) and about $4.7 million in net income.  (*Id.* ¶¶ 100, 166.)   The programs were a material part of the Debtor's business.

- Red Flags.  There were open and obvious red flags indicating that Mrs. Berg did not control the Debtor, rendering it ineligible for the 8(a) and WOSB programs.  (*Id.* ¶¶ 167-71.)  Most glaringly, Mrs. Berg had no construction expertise, only Mr. Berg had construction expertise, the Bergs were married yet Mrs. Berg was the purported control person, Mrs. Berg enrolled the Debtor in the 8(a) program just four months after the stock "gift" from Mr. Berg, a memorandum prepared by the Debtor's advisor described Mrs. Berg's historical role with the company as "de minimis," Mr. Berg was the contact person for all ESOP negotiations, and only

---

[6]    Mr. Paredes does not dispute that he was an ERISA fiduciary.

18

Mr. Berg would remain involved in the business post-closing.  (*Id.*)  These facts were known to Mr. Paredes before closing.

- Industry Risks.  It was widely known in the government contracting industry that fraud and abuse were prevalent in the 8(a) and WOSB programs.  (*Id.* ¶¶ 172.)

- Potential Liabilities.  There are significant consequences for defrauding the 8(a) and WOSB programs and SBA, including, without limitation, contract terminations, disgorgement, price reductions, contract protests, suspension or debarment from federal contracting, criminal and civil liability, loss of bonding, loss of financing, harm to business reputation, and legal and professional fees.  (*Id.* ¶ 103.)  The potential liabilities are material and would impact the fairness of the ESOP transaction.  (*Id.* ¶¶ 103, 178.)

- Unqualified Advisors.  The third-party advisors that Mr. Paredes retained were not qualified and lacked the necessary expertise in federal contracting.  (*Id.* ¶¶ 173-74.)

- No Diligence.  Mr. Paredes and his advisors did not conduct any meaningful due diligence into the Debtor's eligibility for the 8(a) and WOSB programs and small business status, notwithstanding the material red flags and potential consequences.  (*Id.* ¶ 175-77.)  They did not interview employees, and due diligence checklists did not ask any questions about these issues.  (*Id.*)

The foregoing allegations—taken as true and viewed in the light most favorable to Plaintiff—state a plausible claim for relief.  Mr. Paredes had every reason to investigate the Debtor's eligibility for the 8(a) and WOSB programs and small business status but did nothing. His process was imprudent and inconsistent with the "highest duty known to law."

ACTIVE 703613455v6

The fact that the Bergs and others may have submitted false information or made false representations to Mr. Paredes does not absolve him from liability.  An ERISA fiduciary cannot simply close his eyes and ears to material red flags and warning signs.  *See Skelton v. Radisson Hotel Bloomington*, 33 F.4th 968, 978-79 (8th Cir. 2022) ("willful blindness" breaches ERISA duty of care).  Mr. Paredes had a duty to "independently" "investigate all decisions that will affect" the ESOP, and he could not "rel[y] solely" on the Bergs' representations, particularly given the red flags.  *Schaefer v. Ark. Med. Soc.*, 853 F.2d 1487, 1490-92 (8th Cir. 1988); *see Scalia v. Reliance Tr. Co.*, 2021 U.S. Dist. LEXIS 38705, at *103 (D. Minn. Mar. 2, 2021) ("[I]gnoring red flags that management-provided projections may be inflated, and then failing to probe such projections when the fiduciary's valuation firm relies on them in its valuation is strong evidence of a failure to abide by one's fiduciary duties.").  As alleged in the Amended Complaint, he performed no such independent investigation.  (*See* Am. Compl. ¶¶ 175-79.)

The fact that Mr. Paredes retained Benesch and Stout likewise does not absolve him from liability.  Hiring outside experts "is not a magic wand that fiduciaries may simply wave over a transaction to ensure that their responsibilities are fulfilled.  It is a tool and, like all tools, is useful only if used properly."  *Roth*, 16 F.3d at 918 (quoting *Donovan v. Cunningham*, 716 F.2d 1455, 1474 (5th Cir. 1983)).  A fiduciary must "investigate the expert's qualifications" and make "certain that reliance on the expert's advice [is] reasonably justified under the circumstances."  *Scalia*, 2021 U.S. Dist. LEXIS 38705, at *96.

Here, Plaintiff has plausibly alleged that Benesch and Stout were unqualified and Mr. Paredes' reliance on their advice was unreasonable.  As detailed above, Benesch did not have a federal contracting practice group, Stout did not staff the deal with employees who had experience and expertise in federal contracting, and neither "expert" conducted any meaningful

ACTIVE 703613455v6

due diligence into the Debtor's qualifications for the 8(a) and WOSB programs and small business status.  (Am. Compl. ¶¶ 173-78.)

If, after discovery or at trial, the record indicates that Mr. Paredes' diligence was adequate, his advisors were qualified, and he prudently relied on false representations by the Bergs and others, there might be a basis for dismissal of the ERISA claims against him.  That is exactly why Plaintiff pleaded Count 21 and Counts 25-27 in the alternative.  But at the pleading stage, Plaintiff has more than satisfied Rule 8.

## III.    Plaintiff Has Stated Plausible Claims for Relief Under 29 U.S.C. § 1106(a)(1)(A), (D)

Mr. Paredes lastly argues that the Amended Complaint fails to state a "prohibited transaction" claim against him under 29 U.S.C. § 1106(a)(1)(A) and (D).  This argument likewise lacks merit.

Under Section 1106(a)(1)(A) and (D), "[a] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . (A) sale or exchange, or leasing, of any property between the plan and a party in interest [or] . . . (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan . . . ."  Section 1106(a) "supplements the fiduciary's general duty of loyalty to the plan's beneficiaries . . . by categorically barring certain transactions deemed likely to injure the . . . plan." *See Braden*, 588 F.3d at 600 (quoting *Harris Tr. & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 241-42 (2000)).

Mr. Paredes does not dispute that the ESOP's purchase of the Debtor's stock falls within the scope of Section 1106(a)(1)(A) and (D).  Instead, he argues that dismissal is required for two reasons: (1) the Amended Complaint does not allege that he had a "subjective intent to benefit" Mrs. Berg, which he contends is a necessary element for a claim under Section 1106(a)(1)(D), and

(2) the Amended Complaint establishes that the ESOP paid no more than "adequate consideration" to Mrs. Berg, which exempts the transaction from Section 1106(a)(1)(A) and (D) completely.  Both arguments fail.

Subjective Intent to Benefit.  Simply put, "subjective intent to benefit" is not a required element for a claim under Section 1106(a)(1)(D).  As Mr. Paredes concedes, the Eighth Circuit has not adopted this purported claim element.  And contrary to what he argues, district courts in this circuit have **not** uniformly adopted it.  *See Becker v. Wells Fargo & Co.*, 2021 U.S. Dist. LEXIS 90207, at \*18 (D. Minn. May 12, 2021) ("[Plaintiff] need not plead subjective intent to plausibly state her claims.").

Perhaps most importantly, the words "subjective intent to benefit" do not appear anywhere in the ERISA statute.  "Congress expresses its purpose by words. It is for [courts] to ascertain— neither to add nor to subtract, neither to delete nor to distort."  *Argus Leader Media v. USDA*, 740 F.3d 1172, 1176 (8th Cir. 2014) (quoting *62 Cases Jam v. United States*, 340 U.S. 593, 596 (1951)). "It is unreasonable to read a statute to mandate . . . [a] step that it does not mention."  *United States v. Vangh*, 990 F.3d 1138, 1140 (8th Cir. 2021).  The Court should not read words into the 29 U.S.C. § 1106(a)(1)(D).[7]

Adequate Consideration.  The "adequate consideration" argument also fails.  A transaction that is otherwise prohibited by Section 1106(a) is allowed if it is made "for adequate consideration."   29 U.S.C. § 1108(e).   However, this is an affirmative defense for which Mr. Paredes carries the burden of proof.  *See Perez v. Bruister*, 823 F.3d 250, 265 (5th Cir. 2016) ("adequate consideration" under Section 1108(e) is an "affirmative defense"); *Hans v. Tharaldson*,

---

[7]     If the Court disagrees and finds that "subjective intent to benefit" is a required element, then Plaintiff acknowledges that his Section 1106(a)(1)(D) claim would have to be dismissed. Plaintiff is not alleging that Mr. Paredes subjectively intended to benefit the Bergs.

ACTIVE 703613455v6

2011 U.S. Dist. LEXIS 151083, at *11 (D.N.D. Dec. 23, 2011) ("Under ERISA, the fiduciary bears the burden of proving by a preponderance of the evidence that the ESOP received 'adequate consideration' for its purchase of company stock.").  Plaintiff had no obligation to plead around Mr. Paredes' affirmative defense, and this is not a basis to dismiss Count 21.  *See Braden*, 588 F.3d at 601 n.10 ("[A] plaintiff need not plead facts responsive to an affirmative defense before it is raised" and does not "assume[] the burden of proof on the issue" by alleging facts relating to the affirmative defense).

Regardless, the Amended Complaint plausibly alleges that Mr. Paredes caused the ESOP to acquire the Debtor's stock for more than adequate consideration.  When stock, like that of the Debtor, has no "generally recognized market," adequate consideration is measured based on the "fair market value of the [stock] as determined in good faith by the trustee."  29 U.S.C. § 1002(18)(B).  "[I]f a trustee fails to make a good faith effort to determine the fair market value of the stock," he is liable for causing the prohibited transaction, unless he proves that "a hypothetical prudent fiduciary would have made the same decision anyway.'"  *Herman v. Mercantile Bank, N.A.*, 143 F.3d 419, 421 (8th Cir. 1998) (quoting *Roth*, 16 F.3d at 919).

Here, the Amended Complaint alleges ample facts establishing that Mr. Paredes did not make a good faith effort to determine the fair market value of the Debtor's stock and that a hypothetical prudent fiduciary would not have closed the ESOP transaction on the same terms.  In determining fair market value, Mr. Paredes (a) ignored obvious red flags regarding a material part of the Debtor's business; (b) relied on unqualified third-party advisors who lacked expertise on federal contracting; and (c) failed to conduct any meaningful due diligence into the Debtor's eligibility for the 8(a) and WOSB programs and small business status.  (*See* Am. Compl. ¶¶ 44-45, 103, 164-79.)

ACTIVE 703613455v6

Had Mr. Paredes acted prudently and in accordance with the highest duty known to law, he would have discovered the Bergs fraud, and the transaction never would have closed. Instead, Mr. Paredes caused the ESOP to pay a grossly inflated price, premised on fraudulent set-aside contract revenue to which the Debtor was not entitled and could not sustain. (*Id.* ¶¶ 99-101, 178, 428-29.) The purchase price also did not account for the Debtor's "substantial undisclosed liabilities" relating to Bergs' fraud, including potential contract terminations, disgorgement, price reductions, contract protests, suspension or debarment from federal contracting, criminal and civil liability, loss of bonding, loss of financing, harm to business reputation, and legal and professional fees. (*Id.* ¶¶ 102-03, 178, 428-29.)

These allegations—taken as true and viewed in the light most favorable to Plaintiff—firmly establish that the ESOP transaction was not for "adequate consideration." Mr. Paredes overvalued the Debtor's stock based on inadequate diligence, and no prudent fiduciary would have agreed to the same price on the same terms. Plaintiff has satisfied whatever pleading burden he has on this issue.

## **CONCLUSION**

Based on the foregoing, Mr. Paredes' motion to dismiss should be denied. If the Court is inclined to grant the motion—which, for the reasons set forth above, it should not do—dismissal should be without prejudice or with leave to file an amended pleading pursuant to Fed. R. Civ. P. 15(a). *See Wisdom v. First Midwest Bank*, 167 F.3d 402, 409 (8th Cir. 1999) ("[P]arties should usually be given at least one chance to amend their complaint.").

ACTIVE 703613455v6

Date:  November 22, 2024

/e/ *Peter D. Kieselbach*
Michael B. Fisco (Minnesota #0175341)
(*Admitted Pro Hac Vice*)
Peter D. Kieselbach (Minnesota #0397531)
(*Admitted Pro Hac Vice*)
**GREENBERG TRAURIG, LLP**
90 South Seventh Street, Suite 3500
Minneapolis, MN 55402
Telephone: (612) 259-9700
Email: fiscom@gtlaw.com
          kieselbachp@gtlaw.com

*and*

Erik A. Ahlgren (North Dakota #09561)
Ahlgren Law Office, PLLC
220 W. Washington Ave. Suite 105
Fergus Falls, MN  56537
Telephone: (218) 998-2775
Email: erik@ahlgrenlawoffice.net

ACTIVE 703613455v6