UNITED STATES BANKRUPTCY COURT
DISTRICT OF NORTH DAKOTA

---

| | |
|---|---|
| In re:<br><br>Pro-Mark Services, Inc.,<br><br>       Debtor. | Chapter 7<br>Bky. No. 24-30167 |

---

| | |
|---|---|
| Erik A. Ahlgren, as Chapter 7 Trustee of Bankruptcy Estate of Pro-Mark Services, Inc., as Administrator of the Pro-Mark Services, Inc. Employee Stock Ownership Plan, and as Trustee of the Pro-Mark Services, Inc. Employee Stock Ownership Trust,<br><br>       Plaintiff,<br><br>v.<br><br>Connie Berg, Kyle Berg, Connie Berg Revocable Living Trust, Kyle R. Berg Revocable Living Trust, Chad DuBois, Mandy Grant, and Miguel Paredes,<br><br>       Defendants. | Adv. No. 24-07014<br><br><br>**PLAINTIFF'S RESPONSE IN OPPOSITION TO MOTION TO DISMISS BY DEFENDANTS CONNIE BERG, KYLE BERG, CONNIE BERG REVOCABLE LIVING TRUST, AND KYLE R. BERG REVOCABLE LIVING TRUST** |

---

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

FACTS ...................................................................................................................................2

I.      The Bergs Fraudulently Enroll the Debtor in the 8(a) and WOSB Programs ...................2

II.     The Bergs Sell the Debtor' Stock to the ESOP at a $31.5 Million Valuation ...................6

III.    The Bergs Conceal Their Fraud From the ESOP ...............................................................8

IV.    Post-Closing, the Debtor Files for Bankruptcy and the ESOP Value
Plummets to Zero................................................................................................................8

V.     Procedural History .............................................................................................................9

STANDARD OF REVIEW ..................................................................................................11

ARGUMENT ........................................................................................................................12

I.      Connie Berg Owed and Breached Fiduciary Duties to the Debtor ..................................12

II.     Connie Berg Could Not Ratify Kyle Berg's Fiduciary Duty Breaches ...........................16

III.    Plaintiff's Breach of Fiduciary Duty Claims Based on the Debtor's
$6.27 Million Equity Distribution Are Not Time-Barred ................................................18

IV.    Plaintiff's Allegations that the Bergs Caused the Debtor to
Defraud the Federal Government Satisfy Rule 9(b) ........................................................18

V.     Connie Berg's Representations in Section 6(d) of the ESOP Modification
Agreement and Section 5.3(c) of the Initial Seller/ESOP Loan Agreement
Were False ........................................................................................................................20

VI.    Connie Berg's Representations in Section 3.2(g) of the ESOP Purchase
Agreement Were False ......................................................................................................22

VII.   Connie Berg's Representations in Section 3.3(g)(i) of the ESOP Purchase
Agreement Were False ......................................................................................................24

VIII.  Connie Berg's Representations in Section 3.3(g)(iii) of the ESOP Purchase
Agreement Were False ......................................................................................................26

IX.    Connie Berg's Representations in Section 3.3(h) of the ESOP Purchase
Agreement Were False ......................................................................................................27

X.     Plaintiff Has Properly Pleaded Counts 25 and 28 in the Alternative to Count 21 ............28

i

XI.     Knowledge of Fraud Is Not Imputable to the Debtor ......................................30

XII.    Plaintiff's Allegations Regarding Sections 3.3(h), 3.3(j), 3.3(m), and 3.3(o)
        of the ESOP Purchase Agreement Satisfy Rule 9(b) ........................................34

XIII.   Plaintiff's "Scheme to Defraud" Allegations Satisfy Rule 9(b) ........................35

XIV.    Indemnification Is Not Plaintiff's Sole Remedy Against
        Connie Berg Under the ESOP Purchase Agreement .........................................36

XV.     The North Dakota Supreme Court Would Recognize
        Aiding and Abetting Liability ...........................................................................37

XVI.    The Bergs Owed and Breached ERISA Fiduciary Duties to the ESOP ...........40

XVII.   Plaintiff's "Prohibited Transaction" ERISA Claims Are Not Time Barred .....41

XVIII.  Plaintiff's Actual Fraud Avoidance Claims Are Plausible and Satisfy Rule 9(b) ............43

XIX.    Plaintiff's Constructive Fraud Avoidance Claims Are Plausible and
        Satisfy Rule 9(b) ..............................................................................................49

CONCLUSION ...............................................................................................................49

ii

Plaintiff Erik A. Ahlgren, in his capacities as chapter 7 trustee of the bankruptcy estate of Pro-Mark Services, Inc. (the "Debtor"), administrator of the Pro-Mark Services, Inc. Employee Stock Ownership Plan, and trustee of the Pro-Mark Services, Inc. Employee Stock Ownership Trust, submits this response in opposition to the Motion to Dismiss [ECF No. 54] filed by Defendants Connie Berg, Kyle Berg, the Connie Berg Revocable Living Trust ("CB Trust"), and the Kyle R. Berg Revocable Living Trust ("KB Trust"), and states as follows:

## INTRODUCTION

In August 2020, Connie and Kyle Berg sold their 100% equity interest in the Debtor to its employees via an "ESOP" transaction, receiving over $25 million in cash distributions from the Debtor. However, the entire transaction was premised on misrepresentations regarding the Debtor's government contracting business.

For over a decade, the Bergs had illegally enrolled the Debtor in government contracting programs that gave priority to woman-controlled businesses and small businesses, including the WOSB and 8(a) programs. But the Debtor did not qualify for those programs because Ms. Berg did not actually control the Debtor or meaningfully participate in its contracting business, and the Debtor exceeded size limitations under SBA rules and regulations. This illegal conduct inflated the Debtor's revenue and exposed the Debtor to significant liabilities. Had the Bergs disclosed their illegal participation in the government programs during the ESOP negotiations, the transaction never would have closed—let alone at a grossly inflated valuation. But the Bergs intentionally concealed their misconduct, so they could receive a windfall before their government contracting fraud came to light.

Predictably, less than two years after closing the ESOP transaction, the government uncovered the Bergs' scheme, sending the Debtor and the ESOP into a tailspin. The Debtor

eventually filed for bankruptcy, and the ESOP's only asset—the Debtor's stock—plummeted in value to zero.  At the end of the day, the Bergs absconded with millions of dollars, and the Debtor's creditors and employees have been left holding the bag.

Plaintiff Erik A. Ahlgren, in his capacities as chapter 7 trustee, ESOP administrator, and ESOP trustee, commenced this action to hold the Bergs accountable for their tortious conduct.  The Bergs now move to dismiss this adversary proceeding, but the motion lacks merit and ignores the overwhelming weight of the allegations supporting Plaintiff's claims.  As detailed below, all 24 counts against the Bergs are legally cognizable, plausible, pleaded in the alternative (as authorized), and/or pleaded with particularity (as required).  Accordingly, the motion should be denied.

## FACTS[1]

## I. The Bergs Fraudulently Enroll the Debtor in the 8(a) and WOSB Programs

The Debtor was a construction company that procured and performed contracts from the federal government.  (ECF No. 11 ("Am. Compl.") ¶ 1.)  Connie and Kyle Berg, who are a married couple, originally co-owned in the business.  (*Id.* ¶ 26.)  In 2007, Mr. Berg gifted his equity interest to Ms. Berg, making her the 100% owner.  (*Id.* ¶ 44.)  Notwithstanding the transfer of his interest, Mr. Berg maintained complete control over the Debtor and its business as a full-time "employee" and/or "consultant."  (*Id.* ¶¶ 44, 61-66.)

Just four months after the transfer in 2008, the Bergs enrolled the Debtor in the 8(a) program, which is administered by the U.S. Small Business Assoaciation ("SBA").  (*Id.* ¶¶ 27, 45.)

---

[1]     For efficiency, Plaintiff has tried to include only the allegations relevant to the claims against the Bergs.  However, because Plaintiff is responding to three separate motions to dismiss that raise similar issues, there is repetition in this fact section and the other fact sections.  To the extent relevant, Plaintiff incorporates by reference arguments and facts alleged in his responses to the other motions to dismiss.

ACTIVE 704790265v8

The 8(a) program aims to award at least 5% of all federal contracting dollars to small businesses owned and controlled by socially and economically disadvantaged individuals. (*Id.* ¶ 28.) Enrollees receive significant benefits, including priority access to federal contracts set aside solely for enrollees. (*Id.*) To qualify for the 8(a) program, the applicant business must be, among other things, a small business and controlled by a disadvantaged individual (in this case, Ms. Berg). (*Id.* ¶¶ 30-32.)

Later, in 2015, the Bergs enrolled the Debtor in SBA's Women Owned Small Business ("WOSB") program. (*Id.* ¶ 48.) Similar to the 8(a) program, the WOSB program aims to award at least 5% of all federal contracting dollars to women-owned small businesses, and enrollees receive priority access to set-aside contracts. (*Id.* ¶ 35.) To qualify for the WOSB program, the applicant business must be, among other things, a small business and controlled by a woman (*i.e.*, Ms. Berg). (*Id.* ¶¶ 36-38.)

From and after 2008, the Bergs also caused the Debtor to apply for federal set-aside contracts reserved exclusively for small businesses. (*Id.* ¶¶ 27, 41, 49.) Whether the applicant business is a "small business" depends on its revenue, plus the revenue of any affiliated businesses. (*Id.* ¶ 42.)

At the time of enrollment into the 8(a) and WOSB programs, in annual certifications to SBA, and when bidding for set-aside contracts, Ms. Berg repeatedly represented to SBA and the federal government that she owned and controlled the Debtor, that the Debtor qualified for the 8(a) and WOSB programs, and that the Debtor was a small business. (*Id.* ¶¶ 33-34, 39-40, 43, 45-48, 228.) However, these certifications were knowingly false. (*Id.* ¶¶ 45-66, 228.) Ms. Berg was the Debtor's sole owner, sole director, president, and control person on paper only. Her titles and ownership interests were a pretext so the Debtor could qualify for the financially lucrative set-

aside contacts. (*Id.*) Ms. Berg was nothing more than window dressing to circumvent eligibility requirements. (*Id.*) In fact, Mr. Berg exclusively managed and controlled the Debtor and its business operations. (*Id.*) And as a married couple, both Mr. Burg and Ms. Burg benefitted from these misrepresentations. (*Id.* ¶¶ 20, 44, 54, 65-66.)

First and foremost, Ms. Berg had no experience or expertise in construction, the Debtor's principal business and the source of work under the preferential government contracts. (*Id.* ¶¶ 56-57, 228.) Her expertise was in apparel and retail sales—a negligible source of revenue for the Debtor. (*Id.*) Additionally, contrary to her explicit representations to the government, she did not work 40 hours per week for the Debtor. (*Id.* ¶¶ 61, 228.) She also (a) had no involvement in selecting, estimating, or structuring the bids that the Debtor submitted for federal construction contracts; (b) did not engage in substantive discussions with the government contracting officers responsible for awarding, evaluating, or overseeing bids; (c) had no involvement in hiring, directing, or managing the Debtor's employees and subcontractors; (d) had no involvement in managing the Debtor's business operations; and (e) had no involvement in the Debtor's financial functions or reporting. (*Id.* ¶¶ 60-64, 228.) Ms. Berg's only involvement with the Debtor's operations related to its clothing and retail business, which constituted less than 1% of the Debtor's revenue and was not a full-time role. (*Id.* ¶¶ 49, 57, 61.)

In truth, Mr. Berg managed and controlled all aspects of the Debtor's business, which Ms. Berg never disclosed to the government. (*Id.* ¶¶ 61-66, 228.) Only Mr. Berg had experience and expertise in construction. (*Id.* ¶¶ 58-59.) He determined which government contracts the Debtor would bid for, structured the bids, estimated the costs for the bids, directed employees how to complete proposals, and communicated with government contracting officers. (*Id.* ¶¶ 62, 228.) He made all decisions for the Debtor regarding its employees, including salaries, raises, and

bonuses. (*Id.*)  He directed the activity and work of the Debtor's employees, subcontractors, and suppliers. (*Id.*)  And he managed the Debtor's financial reporting and controlled all finances of the Debtor, including company bank accounts, loans, and payroll.  (*Id.*)  All employees recognized Mr. Berg as the ultimate owner of the business and looked to him for direction—not to Ms. Berg. (*Id.* ¶ 63.)  Further, the Debtor was not actually a small business due to its extensive (but undisclosed) affiliations with other entities controlled by Mr. Berg, including, without limitation, Fed Serve, LLC, KRB Holdings, LLC, Marlin Creek Holdings, LLC, MDM Construction, LLC, OK2 Construction, LLC, Razor Consulting Solutions, Inc., Tunheim Holdings, LLC, Tunheim Construction, PMR Services, LLC, PMR II Services, BAD Investments, Thermal Air, and N40GB, LLC.  (*Id.* ¶¶ 53, 67-98.)

Mr. Berg orchestrated the government contracting fraud scheme through the Debtor.  (*Id.* ¶¶ 26-27, 44-67, 228, 258, Exs. C, D.)  However, the scheme was not possible without Ms. Berg's many false statements and representations.  (*Id.* ¶¶ 44-67, 228.)  Had Ms. Berg truthfully disclosed to SBA and the federal government that Mr. Berg controlled the Debtor and the Debtor's affiliations with Mr. Berg's other entities, the Debtor would not have qualified for the 8(a) and WOSB programs, would not have qualified as a small business, and would not have received any set aside contracts.  (*Id.* ¶¶ 53-54, 65-66, 228.)  Instead, because of Ms. Berg's collusion with Mr. Berg and false representations to the government, the Debtor was awarded at least $70 million in federal set-aside contracts to which it was not entitled between 2008 and 2020.  (*Id.* ¶¶ 44-67, 99-100, 228, 258.)

The Bergs' fraud materially inflated the Debtor's revenue, performance, and value.  (*Id.*) It also exposed the Debtor to significant liabilities and legal risks.  If and when the federal government discovered the Bergs' fraud, among other things, (a) government counterparties could

ACTIVE 704790265v8

seek contractual remedies from the Debtor, including price reductions, terminations, and disgorgement, (b) competitors could protest the Debtor's contract awards, (c) the federal government could suspend or bar the Debtor from bidding on contracts, (d) the Debtor could be subject to criminal and civil liability for violating federal law, (e) bonding companies and lenders could refuse to do business with the Debtor, (f) the Debtor would suffer harm to its business reputation, and (g) the Debtor would likely incur significant legal and other professional fees dealing with all the foregoing. (*Id.* ¶¶ 102-03.) Because federal contracting was the Debtor's entire business, each of these liabilities posed a real, direct, and foreseeable threat to the Debtor as a going-concern business. (*Id.* ¶¶ 26, 102-03, 229.)

## II.    The Bergs Sell the Debtor' Stock to the ESOP at a $31.5 Million Valuation

In or around 2019, anticipating that the house of cards would eventually fall, the Bergs worked to monetize their equity interest in the Debtor and exit the business. (*Id.* ¶¶ 104, 151, 308.) They elected to do so by selling the Debtor to its employees via an ESOP, which stands for "employee stock ownership plan." (*Id.* ¶¶ 104-5.) In a typical ESOP transaction, the existing shareholders sell their equity in the company to the ESOP in exchange for cash, notes, or a combination of both. (*Id.* ¶ 105.) The employees, who are the beneficiaries of the ESOP, then acquire the company stock from the ESOP over time. (*Id.*) An ESOP transaction has two basic purposes. First, it enables the existing shareholders to monetize their equity interests in the company—often as a business succession tool. (*Id.* ¶ 106.) And second, it enables the employees to become owners and reap the benefits of their hard work in building the company. (*Id.*)

The Bergs formed the ESOP in December 2019. (*Id.* ¶¶ 104, 107-10.) Then, in May 2020, the Bergs retained Miguel Paredes to serve as trustee for the ESOP. (*Id.* ¶¶ 111, 117.) Mr. Paredes' role as ESOP trustee was to negotiate the transaction on behalf of the ESOP and its beneficiaries

(*i.e.*, Debtor's employees). (*Id.* ¶¶ 111-14.) Mr. Berg led the negotiations for the Debtor and Ms. Berg. (*Id.* ¶ 120.)

The ESOP transaction ultimately closed on August 31, 2020. (*Id.* ¶ 125.) Ms. Berg sold 37,683 shares of the Debtor's stock back to the Debtor for redemption and her remaining 62,317 shares to the ESOP. (*Id.* ¶¶ 127-28.) As a result, the ESOP became the Debtor's sole owner. (*Id.* ¶ 137.) To effectuate the transaction, the Debtor, Ms. Berg, and ESOP entered into numerous contracts, including the ESOP Purchase Agreement, the ESOP Modification Agreement, and the Initial Seller/ESOP Loan Agreement.[2]

The transaction valued the Debtor's stock at $31.5 million, based largely on fraudulent revenue from government contracts and non-disclosure of material liabilities. (*Id.* ¶¶ 99-103, 138-140, 212-16.) To date, Ms. Berg has received over $25 million in cash, including (a) a $6.2 million equity distribution from the Debtor four days before the closing date, (b) about $9 million in cash on the closing date, and (c) about $9.5 million in cash after the closing date. (*Id.* ¶¶ 138-140, 212-165.) The Debtor, directly or indirectly, funded 100% of these payments to Ms. Berg, either from its operating cash or by incurring loans. (*Id.*) Bankers Trust and Capital Credit Union collectively loaned the Debtor over $14.5 million, which the Debtor used to pay Ms. Berg. (*Id.* ¶¶ 130, 213-14.) The Debtor also issued two promissory notes to Ms. Berg in the original principal amount of about $23 million. (*Id.* ¶¶ 138-40.)

---

[2]     Together with their motion to dismiss, the Bergs submitted copies of these ESOP contracts, as well as certain related documents. (*See* Berg Decl., ECF No. 51.) Plaintiff has no objection to the Court considering these materials in deciding the motion to dismiss. However, Plaintiff has not reviewed the Bergs' submissions in detail, and reserves all rights in the event the Bergs have not submitted complete and/or accurate copies of these documents.

### III.    The Bergs Conceal Their Fraud From the ESOP

Before the ESOP closing, the Bergs never disclosed to Mr. Paredes and the ESOP that, among other things: (a) the Debtor had illegally enrolled in the 8(a) and WOSB Programs and was not a qualifying small business; (b) the Debtor had been awarded thousands of set-aside contracts, generating millions of dollars in revenue, to which it was not entitled; (c) millions of dollars of the Debtor's historical revenue and profits were attributable to their fraud on the government; (d) the Debtor had material undisclosed liabilities relating to their fraud on the government; and (e) the Debtor's $31.5 million valuation for the ESOP transaction was substantially inflated based on revenue from the government contracts procured through their fraud and undisclosed liabilities. (*Id.* ¶¶ 141-63.)

Instead, the Bergs concealed this information and made false representations to Mr. Paredes, the ESOP, and the Debtor to hide their misconduct. (*Id.*) Had the Bergs disclosed that the Debtor's business was predicated on more than a decade of fraud, the ESOP transaction and share redemption never would have occurred, let alone at a $31.5 million valuation. (*Id.*) And the Debtor never would have made the $6.2 million equity distribution to Ms. Berg. (*Id.*) The Bergs acted to enrich themselves, to the obvious detriment of the Debtor, its creditors, the ESOP, and the Debtor's employees. (*Id.*).

### IV.    Post-Closing, the Debtor Files for Bankruptcy and the ESOP Value Plummets to Zero

Less than two years after the ESOP closing date, the Bergs' government contract fraud finally caught up with the Debtor. (*Id.* ¶¶ 218-23.) In March 2022, the federal government raided the Debtor's headquarters after obtaining search warrants and a grand jury subpoena relating to the Debtor's enrollment in the 8(a) and WOSB programs. (*Id.* ¶¶ 218-23, Ex. C.) Ultimately, in October 2023, the Debtor entered into a non-prosecution agreement with the U.S. Department of

Justice's Antitrust Division and the U.S. Attorney's Office for the District of North Dakota. (*Id.* ¶¶ 224-29, Ex. D.) Under the non-prosecution agreement, the Debtor admitted that the Bergs' prior misrepresentations to SBA and the government violated federal criminal law, including 18 U.S.C. §371 (Conspiracy to Commit Offense or to Defraud United States). (*Id.*) The Debtor also agreed to pay a $949,000 criminal fine, which represented the Debtor's 8(a) and WOSB profits that it received *after* the ESOP transaction closed in August 2020. (*Id.* ¶ 227.)

Predictably, the public revelation of the investigation and resulting non-prosecution agreement severely impacted the Debtor's business and the ESOP. (*Id.* ¶ 239.) Among other things, the Debtor (1) incurred millions of dollars in legal fees, professional fees, and other fees, costs, and expenses; (2) lost several key employees and had trouble hiring new employees; (3) lost its bonding, which is necessary to secure and perform federal construction contracts; (4) defaulted on several of its existing federal contracts; (5) lost its small business certification due a challenge by a competitor premised on the Bergs' fraud, (6) suffered significant harm to its reputation as a going concern business, and (7) could not pay debt service on its loan obligations to Capital Credit Union or the agreed criminal fine. (*Id.* ¶¶ 232, 239-48.)

Ultimately, the Debtor filed for bankruptcy in April 2024, reporting just $4.4 million in assets and more than $33.3 million in liabilities. (*Id.* ¶ 248.) The ESOP, meanwhile, incurred catastrophic losses, directly harming its participants (*i.e.*, the Debtor's employees). (*Id.* ¶ 247.) The ESOP's principal asset—the Debtor's stock—now has no value. (*Id.*)

## V.     Procedural History

After the bankruptcy filing, Plaintiff was appointed chapter 7 trustee. (*Id.* ¶ 6.) By operation of law pursuant to 11 U.S.C. § 704(a)(11), Plaintiff is also the administrator of the ESOP plan. (*Id.* ¶ 7.) And pursuant to an order of the Bankruptcy Court, Plaintiff appointed himself

9

trustee of the ESOP Trust, to help ensure that all claims of the injured constituencies could be joined in one action against the wrongdoers. (*Id.* ¶ 8; *see* ECF No. 132, Bky. No. 24-30167.)

On September 25, 2024, Plaintiff, in his three capacities as chapter 7 trustee, ESOP plan administrator, and ESOP trustee, filed the Amended Complaint against the Bergs, the CB Trust, the KB Trust, Mr. Paredes, and two of the Debtor's former officers and directors, Chad DuBois and Mandy Grant. The Amended Complaint is comprehensive: 101 pages long, with 493 paragraphs, 28 counts, and 5 exhibits totaling an additional 130 pages.

The below chart summarizes the 24 counts against the Bergs and their revocable trusts:

| Count | Plaintiff's Capacity | Defendant(s) | Claim |
|-------|---------------------|--------------|-------|
| 1 | Chapter 7 Trustee | Connie Berg | Breach of Fiduciary Duty |
| 2 | Chapter 7 Trustee | Kyle Berg | Breach of Fiduciary Duty |
| 3 | Chapter 7 Trustee | Kyle Berg | Aiding and Abetting Breach of Fiduciary Duty |
| 6 | Chapter 7 Trustee | Connie Berg | Breach of Contract |
| 7 | Chapter 7 Trustee | Connie Berg | Breach of Contract |
| 8 | Chapter 7 Trustee | Connie Berg | Actual Fraud |
| 9 | Chapter 7 Trustee | Connie Berg, Kyle Berg, CB Trust, and KB Trust | Avoidance (Actual Fraud) |
| 10 | Chapter 7 Trustee | Connie Berg, Kyle Berg, CB Trust, and KB Trust | Avoidance (Constructive Fraud) |
| 11 | Chapter 7 Trustee | Connie Berg, Kyle Berg, CB Trust, and KB Trust | Avoidance (Actual Fraud) |
| 12 | Chapter 7 Trustee | Connie Berg, Kyle Berg, CB Trust, and KB Trust | Avoidance (Actual Fraud) |
| 13 | Chapter 7 Trustee | Connie Berg, Kyle Berg, CB Trust, and KB Trust | Avoidance (Actual Fraud) |
| 14 | Chapter 7 Trustee | Connie Berg, Kyle Berg, CB Trust, and KB Trust | Avoidance (Actual Fraud) |
| 15 | Chapter 7 Trustee | Connie Berg, Kyle Berg, CB Trust, and KB Trust | Avoidance (Actual Fraud) |
| 16 | Chapter 7 Trustee | Connie Berg, Kyle Berg, CB Trust, and KB Trust | Avoidance (Constructive Fraud) |
| 17 | Chapter 7 Trustee | Connie Berg, Kyle Berg, CB Trust, and KB Trust | Avoidance (Constructive Fraud) |

ACTIVE 704790265v8

| 18 | Chapter 7 Trustee | Connie Berg, Kyle Berg, CB Trust, and KB Trust | Avoidance (Constructive Fraud) |
|----|-------------------|------------------------------------------------|--------------------------------|
| 19 | Chapter 7 Trustee | Connie Berg, Kyle Berg, CB Trust, and KB Trust | Avoidance (Constructive Fraud) |
| 20 | Chapter 7 Trustee | Connie Berg, Kyle Berg, CB Trust, and KB Trust | Avoidance (Constructive Fraud) |
| 22 | ESOP Administrator and ESOP Trustee | Connie Berg and Kyle Berg | Breach of Fiduciary Duty (ERISA) |
| 23 | ESOP Administrator and ESOP Trustee | Connie Berg and Kyle Berg | Breach of Fiduciary Duty (ERISA) |
| 24 | ESOP Administrator and ESOP Trustee | Connie Berg and Kyle Berg | Prohibited Transaction / Non-Fiduciary (ERISA) |
| 25 | ESOP Administrator and ESOP Trustee | Connie Berg | Actual Fraud |
| 26 | ESOP Administrator and ESOP Trustee | Kyle Berg | Aiding and Abetting Actual Fraud |
| 28 | Chapter 7 Trustee, ESOP Administrator, and ESOP Trustee | Connie Berg and Kyle Berg | North Dakota Securities Fraud |

The Bergs now move to dismiss. But for the reasons set forth below, the Court should deny the motion.

## **STANDARD OF REVIEW**

On a motion to dismiss under Rule 12(b)(6), the court must "accept all facts pled by the nonmoving party as true and draw all reasonable inferences from the facts in favor of the nonmovant." *Waldron v. Boeing Co.*, 388 F.3d 591, 593 (8th Cir. 2004). Additionally, the court must construe the complaint in the light most favorable to the plaintiff. *Ashley Cty., Ark. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

ACTIVE 704790265v8

reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

## ARGUMENT

## I. Connie Berg Owed and Breached Fiduciary Duties to the Debtor

The Bergs first argue that Count 1 should be dismissed because Ms. Berg was the Debtor's sole shareholder and, therefore, did not owe fiduciary duties to the Debtor in her capacities as director and officer as a matter of law.  (*See* ECF No. 50 ("Defs.' Mem.") at 11-12.)  But this argument fails for at least three reasons.

First and most significantly, Ms. Berg was not always the Debtor's sole shareholder.  On August 31, 2020, Ms. Berg sold all her shares of the Debtor's stock pursuant to the ESOP Purchase Agreement, and the ESOP became the Debtor's sole shareholder.  (Am. Compl. ¶¶ 127-28.) Afterwards, the parties entered into the ESOP Modification Agreement, which Ms. Berg signed for the Debtor in her capacity as "President."  (*Id.* ¶¶ 133, 136; Berg Decl., Ex. 4 at 6.)  At that time, Ms. Berg was merely an officer of the Debtor (*i.e.*, its President), ***not*** a shareholder.[3]

The purported "sole shareholder" exception thus no longer applied.  As an officer, Ms. Berg owed the Debtor fiduciary duties of "good faith," "care," and to act "in the best interests"

---

[3]      The very first recital on the first page of the ESOP Modification Agreement confirms that Ms. Berg was not a shareholder at that time:

> WHEREAS, the Company, the Lender and the Trust ***were*** parties to a transaction (the "ESOP Transaction") completed on August 31, 2020 in which the Lender ***sold*** all of the issued and outstanding shares of Common Stock of the Company owned by the Lender (referred to herein as the "ESOP Shares") to the Trust for the benefit of the Company's eligible employees . . . .

(Berg Decl., Ex. 4 at 1 (emphasis added).)

of the Debtor, not herself or Mr. Berg.  N.D. Cent. Code § 10-19.1-60.  And she breached those duties by failing to disclose her own misconduct, fraud, and self-dealing.  In essence, Ms. Berg had a duty to disclose her fraudulent conduct to the Debtor and the ESOP.  *See In re Decker*, 36 B.R. 452, 458 (D.N.D. 1983) ("It is a basic concept of corporate law that while occupying a fiduciary relationship, the officers . . . of a corporation are precluded from receiving any personal advantage without the fullest disclosure to, and assent of, all concerned.").  Had she done so, the Debtor could have stopped and unwound the ESOP transaction, clawed back the $6.27 million equity distribution and ESOP consideration paid to Ms. Berg, and not incurred the loan from Bankers Trust.  But she remained silent so she and Mr. Berg could receive their windfall.

Second, there is no "sole shareholder" exception in North Dakota because it conflicts with the plain and ordinary meaning of the North Dakota Business Corporation Act, which governs the fiduciary duties of corporate directors and officers.

N.D. Cent. Code § 10-19.1-50 is crystal clear that directors owe fiduciary duties to the "corporation," and there is no exception or carve out for when that director is also the sole shareholder.  Section 10-19.1-50(1) provides, without qualification, that directors must discharge their duties "in good faith, in a manner the director reasonably believes to be in the best interests of the ***corporation***, and with the care an ordinarily prudent person in a like position would exercise under similar circumstances."  N.D. Cent. Code § 10-19.1-50(1) (emphasis added).  Section 10-19.1-50(5) provides that a director can be personally liable "to the corporation ***or*** its shareholders" for duty breaches.  N.D. Cent. Code § 10-19.1-50(5) (emphasis added).  And Section 10-19.1-50(6) permits directors, when "considering the best interests of the corporation," to consider non-shareholder interests, including the interests of "employees, customers, suppliers, and creditors." N.D. Cent. Code § 10-19.1-50(6).

13

N.D. Cent. Code § 10-19.1-60 likewise provides that officers must discharge their duties "in good faith, in a manner the officer reasonably believes to be in the best interests of the **corporation**, and with the care an ordinarily prudent person in a like position would exercise under similar circumstances." And again, there is no carve out or exception in the statute for when that officer is also the sole shareholder.

As far as Plaintiff is aware, the North Dakota Supreme Court has never held that a director or officer who is also the sole shareholder does not owe fiduciary duties to the corporation—and the Bergs do not cite any cases. But the North Dakota Supreme Court **has** held that courts may "not add words or additional meaning to a statute." *See Larsen v. N.D. DOT*, 693 N.W.2d 39, 43 (N.D. 2005). Further, in North Dakota, "there is no common law in any case in which the law is declared by the code." N.D. Cent. Code § 1-01-06. Because the North Dakota Business Corporation Act "declare[s]" the fiduciary duty standards for directors and officers and does not contain any exception for a "sole shareholder," this Court should not (a) add words to the statute, (b) interpret the statute in a manner contrary to its clear and unambiguous language, or (c) create sole shareholder common law.

Practically speaking, Ms. Berg was never going to disclose her fraud, sue herself, or cause the Debtor to sue herself and her spouse. But that does not mean she did not owe and breach fiduciary duties to the Debtor. A corporation is "***distinct and separate*** from its individual stockholders." *Airvator v. Turtle Mountain Mfg. Co.*, 329 N.W.2d 596, 602 (N.D. 1983) (emphasis added). And the North Dakota statute is unambiguous: all directors and officers owe fiduciary duties to the corporation. Now that the Debtor is in bankruptcy, nothing in the statute, case law, or bankruptcy code prohibits Plaintiff, as chapter 7 trustee, from standing in the Debtor's shoes

14

and asserting such claim.  That is the risk a sole shareholder takes when she breaches fiduciary duties to the corporation.

Third, even if directors and officers who are sole shareholders do not owe fiduciary duties to the corporation under North Dakota law, other jurisdictions have embraced at least two exceptions that would apply here.

One is the "fraud" exception, which provides that a sole shareholder may not engage in fraud or conduct that violates public policy.  *See, e.g.*, *T-Wol Acquisition Co. v. ECDG S., LLC,* 725 S.E. 2d 605, 607 (N.C. Ct. App. 2012) ("[A] sole shareholder of a corporation is generally free to dispose of corporate assets as [s]he sees fit, except where such actions harm or defraud the corporation's creditors, or otherwise violate public policy."); *Anderson v. Benson*, N.W.2d 171, 175 (Minn. Ct. App. 1986) (sole shareholder may dispose of assets as she pleased "absent fraud or violation of public policy").

The other is the "zone of insolvency" exception, which provides that a sole shareholder owes fiduciary duties to the corporation when it is insolvent or on the brink of insolvency.  *See, e.g.*, *Kelley v. BMO Harris Bank N.A. (In re Petters Co.)*, 565 B.R. 154, 161 (Bankr. D. Minn. 2017) ("[W]hen a corporation is insolvent, or on the verge of insolvency, its directors and officers become fiduciaries of the corporate assets, which are held for the benefit of creditors."); *Brandt v. Hicks, Muse & Co. (In re Healthco Int'l, Inc.)*, 208 B.R. 288, 300 (Bankr. D. Mass 1997) ("When a transaction renders a corporation insolvent, or brings it to the brink of insolvency, the rights of creditors become paramount.").

Here, both exceptions would apply.  Ms. Berg exposed the Debtor to criminal and civil liability via her government contracting fraud, then depleted the Debtor of cash and saddled it with unsustainable debt obligations via the ESOP transaction.  (*See* Am. Compl. ¶¶ 26-163, 218-29,

15

239-49, 294-419, Ex. C, Ex. D.)  She used the Debtor's corporate form to harm government, the Debtor, its creditors, and its employees.  And now she wants to use the corporate form—and her status as the purported sole shareholder—to insulate and cleanse her misconduct.  The sole shareholder defense cannot be used to facilitate illegal activity.  *Cf.* N.D. Cent. Code § 10-19.1-08 (corporations may only be used for "lawful business purpose[s]"); *Taszarek v. Lakeview Excavating, Inc.*, 968 N.W.2d 146, 151 (N.D. 2001) (corporate form cannot be used "to defeat public convenience, justify wrong, protect fraud, or defend crime").

In addition, from the moment the Bergs began negotiating the ESOP transaction, the Debtor was in the zone of insolvency.  As detailed below, the ESOP transaction left the Debtor insolvent, with unreasonably small capital, and unable to pay its debts when due.  (*See infra* at 45-46.)  Thus, under both exceptions, Ms. Berg owed and breached fiduciary duties to the Debtor, regardless of her status as sole shareholder.

Based on the foregoing, Plaintiff has stated plausible claims for breach of fiduciary duty against Mr. Berg.

## II.    Connie Berg Could Not Ratify Kyle Berg's Fiduciary Duty Breaches

The Bergs next argue that Count 2 should be dismissed because Ms. Berg, as sole shareholder, ratified or consented to any breach of fiduciary duty by Mr. Berg.[4]  (*See* Defs.' Mem. at 12-14.) This argument fails.  As an initial matter, the notion that Ms. Berg could ratify or consent to Mr. Berg's breaches—which are the ***same*** she committed—defies common sense.  How could

---

[4]    Mr. Berg owed fiduciary duties to the Debtor, even if he was not a formal officer.  The fiduciary duties of an officer apply to any "individual exercising the principal functions of an office."  N.D. Cent. Code § 10-19.1-60.  The Amended Complaint alleges that Mr. Berg controlled and managed the Debtor's business, which are the principal functions of a corporate president.  *See* N.D. Cent. Code § 10-19.1-53 ("The president shall . . . [h]ave general active management for the business of the corporation . . . .").  (Am. Compl. ¶¶ 55-66, 256-57.)

Ms. Berg breach her own fiduciary duties to the Debtor by committing fraud and engaging in illegal conduct, yet still ratify her husband's identical breaches?

The Bergs do not cite any North Dakota caselaw to support their ratification/consent argument, and Plaintiff is not aware of any.  Additionally, while the North Dakota Business Corporation Act does not squarely address the issue, several sections support that Ms. Berg could not ratify or consent to Mr. Berg's duty breaches.

Permitting ratification in these circumstances would violate the statutory maxim that corporations must have "lawful business purpose[s]."  N.D. Cent. Code § 10-19.1-08.  In addition, N.D. Cent. Code § 10-19.1-50(5) provides that the articles of a corporation—even if approved by *all* shareholders—cannot prospectively eliminate "[a] director's personal liability to the corporation" for (a) "any breach of the director's duty of loyalty to the corporation," (b) "acts or omissions not in good faith or that involve intentional misconduct or a knowing violation of law," and (c) "any transaction from which the director derived an improper personal benefit."  N.D. Cent. Code § 10-19.1-50(5).  If all shareholders cannot prospectively eliminate a director's liability for the foregoing misconduct, then how could a sole shareholder ratify the same misconduct by an officer she conspired with?

Again, practically speaking, Ms. Berg was never going to cause the Debtor to assert claims against her husband.  But that does not mean she could ratify or consent to his duty breaches under these circumstances.  And now that the Debtor is in bankruptcy, nothing in the North Dakota statute, case law, or bankruptcy code prohibits Plaintiff, as chapter 7 trustee, from standing in the Debtor's shoes to assert such claims.

### III. Plaintiff's Breach of Fiduciary Duty Claims Based on the Debtor's $6.27 Million Equity Distribution Are Not Time-Barred

The Berg's next argue that any breach of fiduciary duty claims relating to the Debtor's $6.27 million equity distribution to Ms. Berg are time barred by the two-year limitations period under N.D. Cent. Code § 10-19.1-95(4). (*See* Defs.' Mem. at 14-15.) But this bar date only applies to claims against corporate directors. Here, Plaintiff alleges that the Bergs breached fiduciary duties relating to the equity distribution in their capacities as ***officers***. (Am. Compl. ¶¶ 250-60.)[5] Because the statute of limitations for officer claims is six years, Plaintiff's claims are timely. *See* N.D. Cent. Code § 28-01-16(2) ("The following actions must be commenced within six years after the claim for relief has accrued: . . . An action upon a liability created by statute, other than a penalty or forfeiture, when not otherwise expressly provided." (emphasis added)).

### IV. Plaintiff's Allegations that the Bergs Caused the Debtor to Defraud the Federal Government Satisfy Rule 9(b)

The Bergs next argue that Counts 1 and 2—to the extent premised on the Bergs causing the Debtor to defraud the United States—should be dismissed for lack of particularity. (*See* Defs.' Mem. at 16-17.) This argument fails.

Rule 9(b) requires the "circumstances of fraud" to "be pled with particularity." *Munro v. Lucy Activewear, Inc.*, 899 F.3d 585, 590 (8th Cir. 2018) (citing Fed. R. Civ. R. 9(b)). But this does not mean a plaintiff must allege each and every imaginable fact supporting the claim. Instead, a plaintiff simply must "plead the who, what, when, where, and how: the first paragraph of any newspaper story." *UMB Bank, N.A. v. Guerin*, 89 F.4th 1047, 1051 (8th Cir. 2024). The purpose

---

[5]     As noted above, Ms. Berg was the Debtor's President, and Mr. Berg exercised the principal functions of president, meaning they both owed fiduciary duties to the Debtor as corporate officers. *See* N.D. Cent. Code § 10-19.1-60.

ACTIVE 704790265v8

is "to enable the defendant to respond specifically and quickly to the potentially damaging allegations." *United States ex rel. Costner v. United States*, 317 F.3d 883, 888 (8th Cir. 2003).

Here, Plaintiff has alleged the first paragraph of the newspaper story, if not the entire story. Ms. Berg, acting in concert with Mr. Berg, represented to the government that she controlled the Debtor and that the Debtor met SBA's size requirements for small businesses. (Am. Compl. ¶¶ 28-53, 226-28.) But these representations were false. In fact, Mr. Berg controlled the Debtor. (*Id.* ¶¶ 51-52, 55-66, 226-28, Ex. C, Ex. D.) And the Debtor exceeded small-business size thresholds due to its affiliations with other entities owned or controlled by Mr. Berg. (*Id.* ¶¶ 53, 68-98.)

Ms. Berg made these false representations to the government on the following occasions: (i) when the Debtor applied for the 8(a) program in 2008; (ii) each year when the Debtor annually recertified for the 8(a) program until its graduation in 2017; (iii) every time the Debtor applied for an 8(a) set-aside contract; (iv) each year from 2015 to 2020 when the Debtor enrolled in the WOSB program; (v) every time the Debtor applied for a WOSB set-aside contract; and (vi) every time the Debtor applied for a small-business set-aside contract. (*Id.* ¶¶ 28-53.)

Due to Ms. Berg's false representations, the Debtor wrongfully enrolled in the 8(a) and WOSB programs, wrongfully received about $70 million in 8(a) and WOSB set-aside contracts from 2008 to 2020, and wrongfully received millions of dollars in small-business set-aside contracts. (*Id.* ¶¶ 27, 44, 49-54, 66, 99-101, 226-228.) But for Ms. Berg's false representations, the Debtor could not have enrolled in these programs or received such revenue. (*Id.*) And her false representations exposed the Debtor to significant liabilities that ultimately caused its bankruptcy, including liability to the government, loss of bonding, loss of small business status, loss of employees, and reputational harm. (*Id.* ¶¶ 102-103, 229, 239-49.)

The Bergs argue that the Amended Complaint is still deficient because Plaintiff has not identified specific set-aside contracts or specific revenue amounts. But Rule 9(b) does not require this level of detail—Plaintiff need only allege the "first paragraph of the newspaper story"—not the entire body. And regardless, the Amended Complaint does include this level of detail. *Every* 8(a) and WOSB set-aside contract was wrongful because the Debtor did not qualify for those programs from the outset, and it received at least $70 million in wrongful revenue. (*See id.* ¶¶ 27-66, 99-103, 152-53, 156-59, 228.) Nothing more is required. The Amended Complaint tells the "who, what, when, where, and how," and the Bergs have all the information they need "to respond specifically and quickly."[6]

## V.    Connie Berg's Representations in Section 6(d) of the ESOP Modification Agreement and Section 5.3(c) of the Initial Seller/ESOP Loan Agreement Were False

The Bergs next argue that Counts 7 (breach of contract), 8 (fraud), 25 (fraud), and 28 (securities)—to the extent premised on Section 6(d) of the ESOP Modification Agreement and Section 5.3(c) of the Initial Seller/ESOP Loan Agreement—should be dismissed because

---

[6]    The Bergs also argue that North Dakota's six-year statute of limitations bars any breach of fiduciary duty claim based on the Bergs' causing the Debtor to defraud the federal government before April 22, 2018 (*i.e.*, six years before the petition date). (*See* Defs.' Mem. at 15-16.) Plaintiff agrees, with one important distinction. The Bergs' misrepresentations to the federal government before April 22, 2018, are only time-barred as *standalone* breach of fiduciary duty claims. Pre-April 22, 2018, misconduct is *not* time-barred to the extent it is part of Plaintiff's claims that the Bergs breached fiduciary duties to the Debtor in connection with the ESOP transaction, including by: (a) causing the Debtor to make the $6.27 million equity distribution to Ms. Berg; (b) causing the Debtor to enter into the ESOP transaction at an inflated valuation for above-market consideration; (c) causing the Debtor to redeem 37,683 shares of Ms. Berg's stock in the Debtor at an inflated valuation; (d) causing the Debtor to incur about $11.9 million of secured debt to Bankers Trust to fund the ESOP consideration payable to Ms. Berg; (e) concealing and failing to disclose in connection with the ESOP transaction that a material amount of the Debtor's revenue was attributable to fraudulently obtained Set-Aside Contracts; and (f) personally participating in the ESOP transaction to enrich themselves. (Am. Compl. ¶ 258.)

ACTIVE 704790265v8

Ms. Berg's representations in those sections were true. (*See* Defs.' Mem. at 18-20.) This argument fails.

In Section 6(d) of the ESOP Modification Agreement, Ms. Berg represented to the Debtor and the ESOP Trust as follows: "[A]s of time of the delivery to the [Debtor] of . . . [the] Initial Seller/ESOP Loan Documents, . . . no *default or defaults* have occurred with respect to . . . the Initial Seller/ESOP Loan Agreement . . ." (Berg Decl., Ex. 4, § 6(d).) Ms. Berg argues this representation was true because there was no "Event of Default" under the Initial Seller/ESOP Loan Agreement. But Section 6(d) does not say "no *E*vent of *D*efault," which is a defined term. It says "no *d*efault or *d*efaults."

If the parties wanted to limit the scope of Ms. Berg's representation to "no Event of Default," they would have used that defined term. *See Huether v. Nodak Mut. Ins. Co.*, 871 N.W.2d 444, 447 (N.D. 2015) (affirming district court's finding that if the contract parties had "intended to use the defined term," they would have done so). Instead, by using "no default or defaults," the parties intended for the representation to cover *any* default under the Initial Seller/ESOP Loan Agreement. *See* Black's Law Dictionary (11th ed. 2019) (defining "default" as "[t]he omission or failure to perform a . . . contractual duty").

Under this plain language, Ms. Berg breached Section 6(d) of the ESOP Modification Agreement because her representation that "no default or defaults have occurred with respect to . . . the Initial Seller/ESOP Loan Agreement" was false. In fact, there was a "default" under Section 5.3(c) of the Initial Seller/ESOP Loan Agreement. In Section 5.3(c), Ms. Berg represented that her "execution, delivery, and performance of this Agreement . . . does not and will not . . . violate any law, regulation, judgment, or order applicable to the [her]." (Berg Decl., Ex. 3, § 5.3(c).)  But her execution, delivery, and performance of the agreement violated multiple laws

21

applicable to her.  The agreement was part of a "prohibited transaction" under ERISA, and she breached fiduciary duties to the Debtor and the ESOP.  (*See supra* at 12-16; *infra* at 22-23, 40-43.)

## VI.   Connie Berg's Representations in Section 3.2(g) of the ESOP Purchase Agreement Were False

The Bergs next argue that Counts 6 (breach of contract), 8 (fraud), 25 (fraud), and 28 (securities fraud)—to the extent premised on Section 3.2(g) of the ESOP Purchase Agreement—should be dismissed because Ms. Berg's representations in that section were true.  (*See* Defs.' Mem. at 20-22.)  This argument fails.

In Section 3.2(g), Ms. Berg represented to the Debtor and the ESOP Trust as follows:

> <u>Litigation</u>. There is no claim, legal action, suit, arbitration, governmental investigation or other legal or administrative proceeding, nor any order, decree or judgment, in progress, pending, in effect, or to the Knowledge of the Seller, threatened relating to this Agreement or the transactions contemplated by this Agreement, and ***the Seller does not know of any reason for, nor have any reason to be aware of, any basis for the same***.

(Berg Decl., Ex. 2, § 3.2(g) (emphasis added).)  As alleged in the Amended Complaint, this representation was false because Ms. Berg "kn[e]w" or had "reason to be aware" of multiple "bas[e]s" for "claims" or "other legal . . . proceedings" relating to the ESOP Purchase Agreement and the "transactions contemplated" by it.

Most significantly, Ms. Berg knew or had reason to be aware that the ESOP Purchase Agreement and transactions contemplated by it were "prohibited transactions" under 29 U.S.C. § 1106(a)(1)(A) and (D).  These ERISA sections prohibit an ESOP from entering into a transaction with a party in interest, like Ms. Berg, unless the ESOP pays no more than "adequate consideration."  *See* 29 U.S.C. §§ 1106(a)(1)(A), (D), 1108(e)(1).  And Ms. Berg knew that the ESOP paid substantially more than adequate consideration for her stock in the Debtor because of the fraudulent government contracting revenue and undisclosed liabilities.  (Am. Compl. ¶¶ 99-

103, 141-42, 144-45, 162-63, 277-78, 295, 298, 432-53, 463, 482.)   Entry into a prohibited transaction was an obvious "basis" for claims, investigations, and other legal proceedings.  *See* 29 U.S.C. § 1132(a) (providing that the Secretary of Labor, participants, beneficiaries, and fiduciaries may bring civil claims for prohibited transactions); § 1134(a) (providing that the Secretary of Labor may investigation ERISA violations).

Ms. Berg also knew or had reason to be aware that her facilitation of this prohibited transaction breached her fiduciary duties under ERISA, including her duty to monitor Mr. Paredes (as detailed below).  (Am. Compl. ¶¶ 277-78, 295, 298, 439, 449-451, 463, 482.)  Again, breaching her ERISA duties was an obvious "basis" for claims, investigations, and other legal proceedings. *See* 29 U.S.C. §§ 1132(a), 1134(a).

The Bergs contend that Ms. Berg's representations were nevertheless true because she could not have known that any claim or investigation "would be asserted months or years after the consummation of the ESOP Transaction."   But Section 3.2(g) says no such thing.   The representation obviously did not require Ms. Berg to predict the future.  It was enough that Ms. Berg knew or had reason to be aware of "any basis" for a claim or investigation—which she did.

The Bergs also note that Section 3.2(g) does not cover claims or potential claims against the Debtor.  Plaintiff agrees.  Section 3.2(g) covers claims and potential claims relating to the ESOP Purchase Agreement and the transactions contemplated by it—which is exactly what Plaintiff has alleged.  Ms. Berg knew that (a) the ESOP Purchase Agreement and related transactions effected a prohibited transaction and (b) she breached ERISA fiduciary duties by facilitating it.  Each was a "basis" for claims, investigations, and other legal proceedings.

23

**VII.    Connie Berg's Representations in Section 3.3(g)(i) of the ESOP Purchase Agreement Were False**

The Bergs next argue that Counts 25 (fraud) and 28 (securities fraud)—to the extent premised on 3.3(g)(i) of the ESOP Purchase Agreement—should be dismissed because Ms. Berg's representations in that section were true.  (*See* Defs.' Mem. at 22-24.)  This argument fails.

In Section 3.3(g)(i), Ms. Berg represented to the ESOP Trust, among other things, that the Debtor's financial statements from 2017 to 2020 "present fairly the financial position of the Company of such date," "do not omit any material fact necessary to make such Financial Statements not misleading," and were "prepared in accordance with GAAP."  (Berg Decl., Ex. 2, § 3.3(g)(i).)

As alleged in the Amended Complaint, these representations were false because the financial statements (i) did not disclose that at least 26.5% of the Debtor's revenue during that period was attributable to fraudulently obtained WOSB, 8(a), and small-business set-aside contracts and (ii) did not disclose foreseeable losses and liabilities stemming from this fraudulent revenue, including contract termination, competitor protests, suspension or debarment, loss of bonding, and civil and criminal liability.  (Am. Compl. ¶¶ 99-103, 141-42, 146-49, 347, 463, 482.)

Without these disclosures, the Debtor's historical financial statements did not "fairly present" its then-financial position and were "misleading."  The financial statements made it seem as if the Debtor was a profitable and successful company generating millions of dollars in revenue, when in fact much of that revenue was attributable to the Bergs' government contracting fraud and the Debtor had material undisclosed liabilities that would threaten its continued existence as a going concern.  (*Id.*)  Indeed, under GAAP, financial statements "must accrue" for contingent liabilities that are probable and reasonably estimable, and "must disclose" contingent liabilities that are "reasonably possible."  *See In re 3M Co. Sec. Litig.*, 2021 U.S. Dist. LEXIS 188321, at

ACTIVE 704790265v8

*10-11 (D. Minn. Sep. 30, 2021) (detailing GAAP requirements).   The Debtor's financial statements did neither.

Citing federal securities fraud cases, the Bergs argue that failure to disclose unlawful income cannot render financial statements inaccurate.   But these cases, even if applicable, support Plaintiff's claims.   In *Doubleline Capital LP v. Odebrecht Fin., Ltd.*, the court recognized that failure to disclose unlawful income constitutes fraud if the defendant's statements could "be understood, by a reasonable investor, to deny that the illegal conduct is occurring."   323 F. Supp. 3d 393, 441 (S.D.N.Y. 2018) (quoting *Menaldi v. Och-Ziff Capital Mgmt. Grp., LLC*, 164 F. Supp. 3d 568, 581 (S.D.N.Y. 2016)).   That is exactly what Ms. Berg did here.

Throughout the ESOP Purchase Agreement, she repeatedly represented to the ESOP that the Debtor had not engaged in any fraudulent or illegal conduct relating to the WOSB, 8(a), and small-business programs, and associated set-aside contracts.   In Section 3.3(g)(ii), Ms. Berg (falsely) represented that the Debtor had no "material liabilities" other than those listed on the Disclosure Schedule—which was blank.   (Berg. Decl., Ex. 2, § 3.3(g)(ii).)   In Section 3.3(h), she (falsely) represented that the Debtor had complied with all "Licenses and Permits" for its WOSB, 8(a), and small-business set-aside contracts.   (*Id.* § 3.3(h).)   In Section 3.3(j), she (falsely) represented that she had no "reason to believe" that any actions "may be brought" against the Debtor.   (*Id.* § 3.3(j).)   In Section 3.3(m), she (falsely) represented that the Debtor "is in compliance with all applicable Laws."   (*Id.* § 3.3(m).)   And in Section 3.3(o), she (falsely) represented that all WOSB, 8(a), and small-business set-aside contracts designated as "Material Contracts" were "legal" and "valid," there were no defaults, and there were no events that would "permit termination."   (*Id.* § 3.3(o).)   Because Ms. Berg repeatedly denied that any illegal conduct was

occurring, her representation that the Debtor's financial statements were accurate—even though they did not disclose the illegal conduct and associated liabilities—was false and misleading.

## VIII.  Connie Berg's Representations in Section 3.3(g)(iii) of the ESOP Purchase Agreement Were False

The Bergs next argue that Counts 25 (fraud) and 28 (securities fraud)—to the extent premised on Section 3.3(g)(iii) of the ESOP Purchase Agreement—should be dismissed because Ms. Berg's representations in that section were true.  (*See* Defs.' Mem. at 22-24.)  This argument fails.

In Section 3.3(g)(iii), Ms. Berg represented to the ESOP Trust that the Debtor's financial projections "are reasonable and complete, and (1) reflect the Company's best efforts to accurately and correctly project the future operations of the Company; and (2) to the Seller's Knowledge there are no material adjustments that should be made to such financial projections to make the financial projections reasonable and complete."  (Berg Decl., Ex. 2, § 3.3(g)(iii).)

As alleged in the Amended Complaint, these representations were false because the projections were inflated and did not account for the significant legal risks and liabilities the Debtor would face when the Berg's fraud was inevitably discovered, including loss of existing 8(a), WOSB, and small-business contract revenue; contract termination; competitor protests; suspension or debarment; loss of bonding; and civil and criminal liability.  (Am. Compl. ¶¶ 99-103, 141-42, 150-51, 162.)

The Bergs argue that representations based on financial projections cannot be fraudulent as a matter of law.  But the relevant case law says no such thing.  Although financial projections "[g]enerally" are not "actionable as misrepresentations of fact" because they "fall within the class of statements whose truth or falsity cannot be precisely determined," it still depends "upon the facts in each case."  *Dahl v. Messmer*, 719 N.W.2d 341, 345 (N.D. 2006).  Here, Plaintiff is not

ACTIVE 704790265v8

challenging "general expressions of opinion," "puffing," or "dealer's talk" by Ms. Berg.  *See id.*

Instead, Plaintiff alleges that the projections (a) included illegal revenue and (b) did not account

for known and foreseeable liabilities resulting from Ms. Berg's intentional, fraudulent, and illegal

conduct.  (Am. Compl. ¶¶ 99-103, 141-42, 150-51, 162.)

## IX.    Connie Berg's Representations in Section 3.3(h) of the ESOP Purchase Agreement Were False

The Bergs next argue that Counts 25 (fraud) and 28 (securities fraud)—to the extent

premised on Section 3.3(h) of the ESOP Purchase Agreement—should be dismissed because

Ms. Berg's representations in that section were true.  (*See* Defs.' Mem. at 24-26.)  This argument

fails.

In Section 3.3(h), Ms. Berg represented to the ESOP Trust that the Debtor, as of the closing

date, "has complied in all respects with the eligibility and other requirements of any License or

Permit."  (Berg Decl., Ex. 2, § 3.3(h).)  "Licenses and Permits," in turn, is defined as "licenses,

permits, certification, franchises, authorizations, registrations, approvals, and certificates of

occupancy (or their equivalent) issued or granted to the Company with respect to its business by

the government of the United States."  (*Id.*, § 1.1 (defining "Licenses and Permits").)

As alleged in the Amended Complaint, Ms. Berg's representations in Section 3.3(h) were

false because the Debtor was not properly licensed or permitted for its WOSB and 8(a) set-aside

contracts.  (Am. Compl. ¶¶ 152-53.)  For both, the Debtor had never met the eligibility

requirements because Ms. Berg did not control the Debtor and the Debtor was not a qualifying

small business.  (*Id.* ¶¶ 27-66, 99-103.)

The Bergs argue that the Debtor's WOSB status was not a "License or Permit" because the

Debtor self-certified its eligibility, meaning nothing was "issued or granted . . . by the

government."  But this is wrong.  Whenever the government awarded a set-aside contract to the

Debtor based on its purported WOSB status, a government "contracting officer" had to "accept" the Debtor's "self-certification." *See* 13 C.F.R. § 127.301(a)(2) (version in effect from 2015 to July 15, 2020). This acceptance constituted an "authorization" or "approval" "issued or granted . . . by the government" to the Debtor—*i.e.*, a "License or Permit." Thus, for ***all*** the Debtor's active WOSB set-aside contracts as of ESOP closing date, there was a corresponding "License or Permit." (*See* Am. Compl. ¶¶ 159, 227 (alleging that the Debtor had active WOSB set-aside contracts as of the ESOP closing date).)

As for the Debtor's 8(a) certification, the Bergs do not dispute that this was a "License or Permit." Instead, they argue it was not covered by Ms. Berg's representation in Section 3.3(h) because the Debtor graduated from the 8(a) program in 2017. But it was covered. As of the ESOP closing date in August 2020, the Debtor still had active 8(a) set-aside contracts that were awarded before its graduation in 2017. (*See* Am. Compl. ¶¶ 159, 227 (alleging that the Debtor had active 8(a) set-aside contracts on the ESOP closing date).) Whether the Debtor had proper "Licenses or Permits" to receive those contracts falls squarely within Section 3.3(h).

## X.    Plaintiff Has Properly Pleaded Counts 25 and 28 in the Alternative to Count 21

The Bergs next argue that Counts 25 (fraud) and 28 (securities fraud) should be dismissed because (i) the supporting allegations contradict other parts of the Amended Complaint and (ii) Mr. Paredes knew, or should have known, of the fraud. (*See* Defs.' Mem. at 26-28, 34-40.) But these arguments must fail for one simple reason: Plaintiff has pleaded the relevant counts and allegations in the alternative.

In Counts 25-28, Plaintiff alleges that the Bergs, Chad DuBois, and Mandy Grant defrauded Mr. Paredes and the ESOP, or aided and abetted such conduct, by concealing the Bergs' the government contracting fraud. In Count 21, by contrast, Plaintiff alleges that Mr. Paredes breached

28

his fiduciary duties to the ESOP under ERISA by conducting inadequate due diligence and failing to discover the government contracting fraud. Plaintiff acknowledges that there may be a tension between these claims. Fraud requires reasonable reliance, and if Mr. Paredes breached his ERISA duties by conducting inadequate diligence, arguably his reliance on the other Defendants' misrepresentations was not reasonable.

But at the pleading stage, this tension is irrelevant. Plaintiff may plead multiple claims "alternatively" and "regardless of consistency." Fed. R. Civ. R. 8(d)(2), (3). Plaintiff "may [even] plead inconsistent facts in support of alternative theories of recovery." *Babcock & Wilcox Co. v. Parsons Corp.*, 430 F.2d 531, 536 (8th Cir. 1970). "Until an action has actually reached the point of entering a judgment, Rule 8 allows a plaintiff to explore alternative, mutually exclusive theories." *N. Am. Bullion Exch., LLC v. CC Trading, LLC*, 412 F. Supp. 3d 1119, 1128 (D.N.D. 2019) (internal quotation marks and citations omitted)); *see also Whitney v. Guys, Inc.*, 700 F.3d 1118, 1130 (8th Cir. 2012) (acknowledging "the importance of allowing plaintiffs to plead in the alternative").

That is exactly what Plaintiff is doing here: exploring potentially alternative theories.[7] Plaintiff has pleaded Counts 25-28 in the alternative to Count 21 and paragraphs 164-179 (which

---

[7]     To be clear, Plaintiff does **not** concede that Counts 25-28 and Count 21 are mutually exclusive and require alternative pleading. The duties owed by an ERISA fiduciary, like Mr. Paredes, are "the highest known to law." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009). Thus, as a matter of law, reliance that may be "reasonable" for the purposes of a fraud claim may not satisfy the highest duty known to law owed by an ERISA fiduciary. Additionally, some or all of Plaintiff's securities fraud claim may be actionable without proving reasonable reliance by Mr. Paredes or the ESOP. *See, e.g.*, *Barnes v. Sunderman*, 453 N.W.2d 793, 795, 797 (N.D. 1990) (stating what plaintiff must prove to prevail on "omission" securities fraud claim without mentioning reasonable reliance). For now, however, it is enough that Plaintiff has pleaded Counts 25 and 28 in the alternative to Count 21 and paragraphs 164-179.

ACTIVE 704790265v8

detail the various shortcomings in Mr. Paredes' due diligence). (Am. Compl. ¶¶ 420, 463, 482.) Nothing more is required.

If the Court were to accept the Bergs' argument, it would produce an absurd and inequitable result. All defendants who moved to dismiss attack Plaintiff's alternative pleading. The Bergs and Mr. DuBois contend that they cannot be liable for fraud because Mr. Paredes did not reasonably rely on their misrepresentations. And Mr. Paredes contends that he cannot be liable for breach of fiduciary duty under ERISA because he reasonably relied on fraudulent misrepresentations by the Bergs and Mr. DuBois. These defendants should not be insulated from liability simply because the question of reasonable reliance is unresolved at the pleading stage. And Plaintiff should not be forced to select one theory of liability before he has even conducted any discovery. These are the precise reasons why alternative pleading exists. Plaintiff is entitled to flesh out these theories in discovery and at trial.

## XI.    Knowledge of Fraud Is Not Imputable to the Debtor

The Bergs next argue that Counts 1 (breach of fiduciary duty), 2 (breach of fiduciary duty), 8 (fraud), and 28 (securities fraud) should be dismissed because Chad DuBois, Mandy Grant, the Debtor's other employees, and Lazear Capital knew of the Bergs' fraud, and such knowledge is imputed to the Debtor, barring these claims. (*See* Defs.' Mem. at 28-34, 38-40.) But this argument fails.

Chad DuBois and Mandy Grant. "A corporation is an artificial person that acts through its agents." *Erickson v. Brown*, 747 N.W.2d 34, 42 (N.D. 2008). "Generally, the knowledge of the board of directors, officers, or agents of a corporation is imputed to the corporation." *Am. Bank Ctr. v. Wiest*, 793 N.W.2d 172, 178 (N.D. 2010). However, the knowledge of an officer or director

ACTIVE 704790265v8

is **not** imputed to the corporation "in the case of a ***fraud on the corporation committed*** by or ***with the consent*** of the officer or director." N.D. Cent. Code § 10-19.1-01.2(7) (emphasis added).

Here, the knowledge of Mr. DuBois and Ms. Grant falls squarely within Section 10-19.1-01.2(7). They were officers of the Debtor, and the Amended Complaint plausibly alleges that they consented to the Bergs' fraud on the Debtor.

In the case of Mr. DuBois, he knew of the Bergs' fraud. Among other things, (1) he "oversaw" the Debtor's bids for set-aside contracts; (2) he knew the eligibility requirements for the 8(a), WOSB, and small business programs because his former entity, CS DuBois, had been part of the 8(a) program; (3) as the Debtor's controller and then Vice President, he witnessed first-hand that Mr. Berg controlled the business, not Ms. Berg; and (4) he knew that Mr. Berg had a practice of wrongfully circumventing SBA eligibility requirements, including by hiring Mr. DuBois' own daughter to a fake position with Fed Serve so it would qualify for SBA's HUBZone program. (Am. Compl. ¶¶ 75-81, 97, 181-89.) But despite this knowledge, and despite being an officer of the Debtor, Mr. DuBois took no action to stop the ESOP transaction or protect the Debtor's interests. (*Id.* ¶¶ 189-200, 268, 477-81.) Instead, he actively facilitated the transaction. (*Id.*) For example, at closing, he delivered a fraudulent Statement of Representation to the ESOP on behalf of the Debtor. (*Id.*) Post-closing, he co-approved $9.5 million of cash payments from the Debtor to Ms. Berg for the stock. (*Id.* ¶¶ 212-15.) This conduct constitutes consent.

In the case of Ms. Grant, she also knew of the Bergs' fraud. Among other things, (1) she was intimately involved in the Debtor's bids for set-aside contracts for nine years; (2) as an employee of the Debtor, she witnessed first-hand that Mr. Berg controlled the business, not Ms. Berg; (3) she knew that the Debtor did not qualify for the 8(a), WOSB, and small business programs; and (4) she routinely assisted Mr. Berg in circumventing eligibility requirements on

31

behalf of the Debtor and Mr. Berg's other entities.  (*Id.* ¶¶ 201-09.)  But despite this knowledge, and despite being an officer of the Debtor, Ms. Grant likewise took no action to stop the ESOP transaction or protect the Debtor's interests.  (*Id.* ¶¶ 210-211, 272-75.)  Instead, she stood idly by. (*Id.*)  Then post-closing, she co-approved $9.5 million of cash payments to Ms. Berg.  (*Id.* ¶¶ 212-15.)  This conduct constitutes consent.

Other Employees.  Aside from Mr. DuBois and Ms. Grant, the Bergs also argue that the Debtor's other employees knew of the fraud, meaning their knowledge is imputed to the Debtor. But the Amended Complaint makes no such allegations.  To be sure, Plaintiff does allege that the Debtor's employees knew that Mr. Berg managed the business (not Ms. Berg), may have known that the Debtor applied for government contracts on the basis of being women owned/controlled, and sometimes worked for Mr. Berg's other affiliated entities (including Razor and OK2).  But this does not mean that any employees—aside from Mr. DuBois and Ms. Grant—had ***actual knowledge*** that the Bergs had fraudulently enrolled the Debtor in the federal contracting programs, then concealed that fraud in negotiating and closing the ESOP transaction.  *See* N.D. Cent. Code § 10-19.1-01.2(1) ("A person knows or has knowledge of a fact if the person has ***actual knowledge*** of it." (emphasis added)).

The Debtor was a construction company, and its regular employees had no reason to be aware of program eligibility requirements, whether the Debtor qualified, what the Bergs represented to the government, or what the Bergs represented during the ESOP transaction. Further, Plaintiff alleges that the employees "were innocent victims of the Bergs' fraud" and had no "meaningful" involvement in the scheme.  (*See* Am. Compl. ¶ 229, Ex. D ("None of [the Debtor's current] employees had a meaningful role in the criminal conduct . . . .")).  Construing

the Amended Complaint in the light most favorable to Plaintiff—as the Court must—no employee had actual knowledge of the Bergs' fraud.

Lazear Capital.   The Bergs also point to the Confidential Information Memorandum ("CIM") prepared by the Debtor's financial advisor and agent, Lazear Capital.  Yet just like with the Debtor's regular employees, nothing in the CIM suggests that Lazear Capital had "actual knowledge" of the Bergs' fraud that would be imputable to the Debtor.  To be sure, the CIM states that Ms. Berg had a "de minimis" role with the Debtor, Mr. Berg was significantly involved in managing the business, and the Debtor participated in federal contracting programs.   But this does not mean that Lazear Capital actually knew that the Bergs had fraudulently enrolled the Debtor in those federal contracting programs, then concealed that fraud in negotiating and closing the ESOP transaction.  To impute knowledge of the fraud, Lazear Capital needed to have actual knowledge of the fraud.  *See* N.D. Cent. Code § 10-19.1-01.2(1).[8]

---

[8]      To the extent the Bergs are arguing that knowledge of the fraud should be imputed to the Debtor by aggregating the collective knowledge of the Debtor's other employees and agents, this argument fails because, as detailed above, no individual employee or agent had actual knowledge of the fraud.  *See* N.D. Cent. Code § 10-19.1-01.2(1) ("A person knows or has knowledge of a fact if the person has actual knowledge of it. A person does not know or have knowledge of a fact merely because the person has reason to know or have knowledge of the fact."); *Alaska Elec. Pension Fund v. Flotek Indus., Inc.*, 915 F.3d 975, 982 (5th Cir. 2019) ("Scienter must be alleged with respect to 'the individual corporate official or officials who make or issue the statement . . . rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment.'" (quoting *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 366 (5th Cir. 2004)); *In re Medtronic Inc., Sec. Litig.*, 618 F. Supp. 2d 1016, 1035 (D. Minn. 2009) (explaining that the Eighth Circuit has implicitly rejected the concept of "collective scienter," declining to apply this concept, and "requiring instead that the Plaintiffs establish corporate scienter by adequately alleging the scienter of individual corporate officers"), *aff'd sub nom. Detroit Gen. Ret. Sys. v. Medtronic, Inc.*, 621 F.3d 800 (8th Cir. 2010).

ACTIVE 704790265v8

## XII.    Plaintiff's Allegations Regarding Sections 3.3(h), 3.3(j), 3.3(m), and 3.3(o) of the ESOP Purchase Agreement Satisfy Rule 9(b)

The Bergs next argue that Counts 25 (fraud) and 28 (securities fraud)—to the extent premised on Sections 3.3(h), 3.3(j), 3.3(m), and 3.3(o) of the ESOP Purchase Agreement—should be dismissed under Rule 9(b) for lack of particularity.  (*See* Defs.' Mem. at 40-41.)  They make three arguments: (i) Plaintiff has not "identified a single Set-Aside Contract that the Debtor fraudulently obtained," (ii) Plaintiff has not alleged what Ms. Berg "obtained" from her fraudulent misrepresentations and omissions to the ESOP Trust, and (iii) Plaintiff has not identified what "applicable laws" the Debtor violated.  Each misses the mark.

Set-Aside Contracts.  There was no need for Plaintiff to identify any "single" set-aside contract because they were ***all*** fraudulent.  As alleged in the Amended Complaint, the Debtor never qualified for the 8(a) and WOSB programs and, thus, never qualified for any associated set-aside contracts.  (Am. Compl. ¶¶ 27-66, 99-103, 152-59, 228.)  The Bergs know what set-aside contracts are at issue: all of them.

What Was Obtained.  The Amended Complaint also squarely alleges what Ms. Berg "obtained" from her false representations: $9,014,246 in cash when the ESOP transaction closed and $9,542,602.39 in cash post-closing.  (*Id.* ¶¶ 138, 141-42, 162-63, 213-17, 466.)  What further particularity is needed?

Had Ms. Berg made truthful representations to Mr. Paredes in Sections 3.3(h), 3.3(j), 3.3(m), and 3.3(o) of the ESOP Purchase Agreement, the transaction would not have closed, and Ms. Berg never would have received these windfall payments.  (*Id.* ¶ 162.)  It is common sense that any potential buyer would have cancelled the deal—or, at least, renegotiated the terms—if it knew that the Debtor's "Licenses and Permits" were invalid (Section 3.3(h)); there were potential litigation claims against the Debtor (Section 3.3(j)); the Debtor was not in compliance with "all

34

applicable laws" (Section 3.3(m)); and many of the Debtor's "Material Contracts" were not legal or valid, and could be terminated (Section 3.3(o)).

Applicable Laws.  Finally, the Amended Complaint squarely identifies the "applicable laws" the Debtor violated: 8(a) and WOSB eligibility laws, small business size laws, and set-aside contract eligibility laws.  (Am. Compl. ¶¶ 27-43, 156-57.)  The fact that Plaintiff did not include statutory citations is irrelevant because the laws are clearly identified.  The Bergs have all the information they need "to respond specifically and quickly."  *Costner*, 317 F.3d at 888.

## XIII.  Plaintiff's "Scheme to Defraud" Allegations Satisfy Rule 9(b)

The Bergs next argue that Count 28 (securities fraud)—to the extent premised on the Bergs' employing a "scheme to defraud" the Debtor and the ESOP[9]—should be dismissed under Rule 9(b) for lack of particularity.  (*See* Defs.' Mem. at 42.)  This argument fails.

N.D. Cent. Code § 10-04-15(2)(a) does not define "scheme to defraud."  But in other contexts, the North Dakota Supreme Court has defined "scheme" to mean "a design or plan formed to accomplish some purpose."  *See Dewey v. Lutz*, 462 N.W.2d 435, 441 (N.D. 1990).  Here, the Amended Complaint specifically and plausibly alleges that the Bergs designed and formed a multi-year plan to fraudulently inflate the Debtor's value and then enrich themselves.

From 2008 to 2020, the Bergs systematically defrauded the federal government, which artificially inflated the Debtor's value.  (Am. Compl. ¶¶ 27-66, 99-103, 228.)  Then, in 2019 and 2020, the Bergs formed the ESOP and sold Ms. Berg's 100% equity interest, netting over $18.5 million in cash from the transaction, plus another $6.27 million in cash via an equity distribution.  (*Id.* ¶¶ 104-40, 213-16.)  Not only did the Bergs not disclose the Debtor's fraudulent revenue and

---

[9]     "Scheme to defraud" is just one basis for Plaintiff's securities fraud claim.  *See* N.D. Cent. Code § 10-04-15(2)(a).  Plaintiff also alleges claims under Section 10-04-15(2)(b) and (c).  (*See* Am. Compl. ¶¶ 484-91.)

ACTIVE 704790265v8

associated liabilities during the transaction, but they affirmatively concealed it through false representations and material omissions.  (*Id.* ¶¶ 141-63.)  By doing so, they were able to sell the company at an undue premium (to the detriment of the Debtor's creditors and employees) before the government uncovered their unlawful behavior.  (*Id.* ¶¶ 99-103, 141-42, 229, 486-88.)  This conduct, spanning ***twelve*** years and multiple transactions, is the very definition of a scheme to defraud.

## XIV.    Indemnification Is Not Plaintiff's Sole Remedy Against Connie Berg Under the ESOP Purchase Agreement

The Bergs next argue that Count 6 (breach of contract) should be dismissed because Plaintiff's "exclusive remedy" under the ESOP Purchase Agreement is indemnification.  (*See* Defs.' Mem. at 42-43.)  But the contract says no such thing.

As detailed above, Plaintiff alleges that Ms. Berg breached Section 3.2(g) of the ESOP Purchase Agreement by making false representations to the Debtor.  The Bergs are correct that Article 6 of the ESOP Purchase Agreement contains the following provisions: (a) "From and after the Closing, the Parties shall indemnify each other as provided in this Article 6" and (b) "Except for claims for fraud, the provisions of Article 6 shall be the sole and exclusive remedy for breaches of representations, warranties and covenants contained in this Agreement."  (Berg Decl., Ex. 2, Art. 6, § 6.6(a).)

However, Article 6 is ***completely silent*** on the Debtor's remedies against Ms. Berg for representation breaches.  Section 6.1 requires Ms. Berg to indemnify the ESOP.  (*Id.* § 6.1.)  And Section 6.2 requires the Debtor to indemnify Ms. Berg.  (*Id.* § 6.2.)  But there is no provision in Article 6 requiring Ms. Berg to indemnify the Debtor or providing the Debtor with any other remedy against Ms. Berg.  (*Id.*, Art. 6.)

36

If Article 6 is, in fact, the Debtor's "exclusive remedy" for Ms. Berg's breach of Section 3.2(g), this would mean that the Debtor has ***no*** remedy against her—an absurd result that renders Section 3.2(g) meaningless.  Why would Ms. Berg even make this representation to the Debtor if the Debtor had no remedy for breach?  Under North Dakota law, contract terms are to be "construed to avoid rendering other terms meaningless.  A construction that attributes a reasonable meaning to all the provisions of the agreement is preferred to one that leaves some of the provisions without function or sense." *Schwarz v. Gierke*, 788 N.W.2d 302, 308 (N.D. 2010) (citations and quotation marks omitted).

Accordingly, the only reasonable construction of Article 6 is that it does not govern the Debtor's remedies against Ms. Berg for breach of Section 3.2(g).  If the parties wanted to limit the Debtor's remedies against Ms. Berg to indemnification or something else, Article 6 could have said that.  It does not.  Only the ESOP and Ms. Berg are so limited in their remedies.  Plaintiff is free to pursue breach of contract and seek damages.

## XV.    The North Dakota Supreme Court Would Recognize Aiding and Abetting Liability

The Bergs next argue that Counts 3 and 26 against Mr. Berg should be dismissed because North Dakota "does not recognize" independent torts for aiding and abetting breach of fiduciary duty and aiding and abetting fraud.  (*See* Defs.' Mem. at 43.)  But this argument misstates the law.

The North Dakota Supreme Court has neither adopted nor rejected these torts.  "[W]hen there is no state supreme court case directly on point, [this Court's] role is to predict how the state supreme court would rule if faced with the same issue." *Bradshaw Family Tr. Inc. v. Twin City Fire Ins. Co.*, 105 F.4th 1089, 1093 (8th Cir. 2024).  This Court must make an "educated guess when the law of the forum state is not crystal clear." *Id.*  Here, there is strong evidence that the North Dakota Supreme Court would find these causes of action cognizable.

ACTIVE 704790265v8

First, the fact that the North Dakota Supreme Court has not recognized the causes of action does not mean they do not exist. Instead, when there is no North Dakota statute[10] or case law that controls, the North Dakota Supreme Court looks to, and follows, common law from other jurisdictions. *See Burris Carpet Plus, Inc. v. Burris*, 785 N.W.2d 164, 178 (N.D. 2010); *York v. Conley (In re Estate of Conley)*, 753 N.W.2d 384, 392 (N.D. 2008). And virtually all other jurisdictions have held that tort claims for aiding and abetting breach of fiduciary duty[11] and aiding and abetting fraud[12] are cognizable.

Second, the North Dakota Supreme Court has signaled its approval of aiding and abetting liability, even if it has never formally ruled on the issue. In *Nye v. Johnson*, for example, the supreme court found that a bank was not liable for conversion because, among other reasons, it had not "aided or abetted" the primary tortfeasor. 4 N.W.2d 819, 821 (N.D. 1942). Similarly, in *Hurt v. Freeland*, the supreme court suggested that passengers can be independently liable in tort

---

[10]    The Bergs argue that North Dakota's comparative fault statute, N.D. Cent. Code § 32-03.2-02, precludes any claim for aiding and abetting liability. But the statute says no such thing. Instead, it simply "deals with the allocation of damages among those **already at fault**." *See Hurt v. Freeland*, 589 N.W.2d 551, 557 (N.D. 1999) (emphasis added). The statute has no bearing on how someone becomes "already at fault."

[11]    *See, e.g.*, *Chem-Age Indus. v. Glover*, 652 N.W.2d 756, 773 (S.D. 2002); *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001); *Witzman v. Lehrman, Lehrman & Flom*, 601 N.W.2d 179, 188–89 (Minn. 1999); *Weinstein v. CohnReznick, LLP*, 43 N.Y.S.3d 387, 390 (N.Y. App. Div. 2016); *Tubbs v. United Cent. Bank, N.A.*, 451 N.W.2d 177, 182 (Iowa 1990).

[12]    *See, e.g.*, *Bartenwerfer v. Buckley*, 598 U.S. 69, 76 (2023) ("[T]he common law of fraud . . . has long maintained that fraud liability is *not* limited to the wrongdoer."); *Tucek v. Mueller*, 511 N.W.2d 832, 837 (S.D. 1994); *Powers v. Am. Traffic Signal Corp.*, 209 N.W. 16, 17 (Minn. 1926) (under Minnesota law, "all who participated in the fraud are liable"); *Matrix Parent, Inc. v. Audax Mgmt. Co., LLC*, 319 A.3d 909, 938 (Del. Super. Ct. 2024) (listing the elements of an aiding and abetting fraud under Delaware law); *1650 Broadway Assocs., Inc. v. Sturm*, 210 N.Y.S.3d 19, 22 (N.Y. App. Div. 2024) (listing the elements of aiding and abetting fraud under New York law).

ACTIVE 704790265v8

for harm caused by an intoxicated driver if the passengers and intoxicated driver "acted in concert." 589 N.W.2d 551, 557-59 (N.D. 1999).[13] While the court found no concerted action—and therefore no liability—it did so by focusing on that the fact that the passengers had not "aided or encouraged" the driver, nor provided him with alcohol "before or during the drive." *Id.* at 558. And in *Ward v. Bullis*, the supreme court suggested that "acting in concert" liability extends to fraud claims—but declined to hold the defendant so liable based on the specific factual record. 748 N.W.2d 397, 406-08 (N.D. 2008). The strong implication from *Nye*, *Hurt*, and *Ward* is that the North Dakota Supreme Court would have found liability had the defendants aided and abetted the tortious conduct.

Third, at least two North Dakota federal district courts have already embraced the claims. *See Borsheim Builders Supply, Inc. v. Merrick Bank Corp.*, 387 F. Supp. 3d 957, 963-64 (D.N.D. 2019) (finding that plaintiff stated a plausible claim for "aiding and abetting fraud"); *Multi-Chem Grp., LLC v. 3Chem, LLC*, 2013 U.S. Dist. LEXIS 196575, at *4 (D.N.D. Aug. 7, 2013) (on motion to amend complaint, overruling defendant's objection that "North Dakota does not recognize a cause of action for aiding and abetting breach of fiduciary duty"). These decisions, while not binding, are entitled to "great deference." *See In re Villarreal*, 413 B.R. 633, 641 (Bankr. S.D. Tex. 2009) (district court opinions are entitled to "great deference").

Based on the foregoing, the North Dakota Supreme Court would likely find that claims for aiding and abetting breach of fiduciary duty and aiding and abetting fraud are cognizable. This is

---

[13]      To define "acting in concert," the North Dakota Supreme Court cited, among other authorities, the Restatement (Second) of Torts § 876, which provides, in pertinent part, as follows: "For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he . . . knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement." *Hurt*, 589 N.W.2d at 557.

ACTIVE 704790265v8

the most "educated guess." Plaintiff has thus stated plausible claims in Counts 3 and 26. And if the Court disagrees, then the Court should either construe Counts 3 and 26 as stating claims for "acting in concert" liability consistent with *Hurt* and *Ward*, or permit Plaintiff to amend the Amended Complaint to assert such claims.

## XVI.    The Bergs Owed and Breached ERISA Fiduciary Duties to the ESOP

The Bergs next argue that Plaintiff's ERISA claims in Counts 22-24 should be dismissed because they did not owe fiduciary duties to the ESOP. (*See* Defs.' Mem. at 44-48.) This is false.

"[T]hose who appoint plan administrations have an ongoing duty under ERISA to monitor the activities of their appointees." *Howell v. Motorola, Inc.*, 633 F.3d 552, 573 (7th Cir. 2011) (citing *Leigh v. Engle*, 727 F.2d 113, 134-35 (7th Cir. 1984)); *see Coyne & Delany Co. v. Selman,* 98 F.3d 1457, 1465 (4th Cir. 1996) ("[T]he power (through plan amendment) to appoint, retain and remove plan fiduciaries constitutes 'discretionary authority' over the management or administration of a plan within the meaning of § 1002(21)(A). . . . [T]his authority carries with it a duty to 'to monitor appropriately' those subject to removal."); *Scalia v. Reliance Tr. Co.*, 2021 U.S. Dist. LEXIS 38705, at *65-66 (D. Minn. Mar. 2, 2021) (recognizing duty to monitor appointees). "Admittedly, this duty is a narrow one and does not require such persons to review all business decisions" of the appointee, as such "standard would defeat the purpose of having [fiduciaries] appointed to run a benefits plan in the first place." *Scalia*, 2021 U.S. Dist. LEXIS 38705, at *66. But the "duty exists so that a plan administrator or sponsor cannot escape liability by passing the buck to another person and then turning a blind eye." *Howell*, 633 F.3d at 573.

Here, the Amended Complaint alleges that the Bergs appointed Mr. Paredes to serve as ESOP trustee. Ms. Berg signed the Debtor's engagement letter with Mr. Paredes and then executed a written consent ratifying his appointment as ESOP trustee. (Am. Compl. ¶¶ 111, 117, 446-47.)

ACTIVE 704790265v8

Mr. Berg, meanwhile, was the Debtor's true control person, the primary point of contact for all aspects of the ESOP transaction, and he orchestrated Mr. Paredes' appointment. (*Id.* ¶¶ 55-64, 107, 119-120, 170, 228(e), 437-38, 446-47.) And the Bergs, via their control of the Debtor and Ms. Berg's purported status as sole director and president, had the power to remove Mr. Paredes as ESOP trustee. (Berg Decl., Ex. 1, § 4.2 ("The [Debtor] may remove any Trustee . . . .").) Thus, the Bergs had an ongoing duty under ERISA to monitor Mr. Paredes' activities. They could not "pass the buck" or turn "a blind eye." But turn a blind eye they did, for their own benefit.

The Bergs knew the ESOP was paying substantially more than adequate consideration for the Debtor's shares because the purchase price did account for the Debtor's fraudulent set-aside revenue or undisclosed liabilities and legal risks stemming from their fraud. (Am. Compl. ¶¶ 99-103, 141-42, 162-63, 228, 439, 449-51.) Yet they never informed Mr. Paredes of these facts, did not appoint a new trustee who would perform better diligence, and allowed Mr. Paredes to close the transaction at the inflated price. (*Id.*) The Bergs thus breached their duty to monitor under ERISA. Plaintiff has stated plausible claims.

## XVII.  Plaintiff's "Prohibited Transaction" ERISA Claims Are Not Time Barred

The Bergs next argue that Plaintiff's ERISA claims in Counts 22-24—to the extent premised on the ESOP's entry into a "prohibited transaction"—are time barred. (*See* Defs.' Mem. at 48-50.) This is incorrect.

29 U.S.C. § 1113(2) provides, in pertinent part, that an ERISA claim must be brought within "three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation."[14] Courts have overwhelmingly held that this limitations period "begins to run on the

---

[14]   Section 1113 also includes an outside date for asserting claims: no later than "six years after . . . the date of the last action which constituted a part of the breach or violation." 29 U.S.C. § 1113(1). There is no dispute that Plaintiff's claims are within the 6-year window.

41

date that ***the person bringing suit*** learns of the breach or violation . . . regardless of whether any

Plan fiduciary or service provider knew of the violation before that date." *See Landwehr v. Dupree*,

72 F.3d 726, 732 (9th Cir. 1995) (emphasis added).[15]  "Actual knowledge is measured from the

standpoint of the trustees who commenced the lawsuit and ***cannot be attributed to them by the***

***knowledge of prior trustees***."  *Mason Tenders District Council Pension Fund v. Messera*, 958

Fed. Supp. 869, 882 (S.D.N.Y 1997) (emphasis added); *see CB Richard Ellis Inv'rs, L.L.C. v.*

*Sonnenblick*, 45 F. App'x 680, 681 (9th Cir. 2002) (permitting imputation could lead to abuse, such

as enabling an "unfaithful fiduciary . . . to control the starting date of the statute of limitations").

Here, Mr. Ahlgren—the person bringing the suit—"had no involvement with or knowledge

of the Debtor, the ESOP Plan, or the ESOP Trust before his appointment as" chapter 7 trustee on

April 22, 2024.  (Am. Compl. ¶¶ 5-6, 10.)  Thus, April 22, 2024, is the earliest date he could have

had actual knowledge of the ESOP transaction, and he commenced this action less than five months

later.  The claims are timely.

*Taunt v. Coenen*—a case that is virtually identical to this one—is directly one point.  538

B.R. 323 (Bankr. E.D. Mich. 2015).  There, a chapter 7 trustee acting as plan administrator under

11 U.S.C. § 704(a)(11) brought ERISA claims against several former plan fiduciaries.  *See id.* at

348-53.  The defendants moved to dismiss, arguing that the claims were time-barred because the

debtor's pre-petition knowledge of the breaches was imputed to the chapter 7 trustee.  *Id.*  But the

---

[15]    *See, e.g.*, *CB Richard Ellis Inv'rs, L.L.C. v. Sonnenblick*, 45 F. App'x 680, 681 (9th Cir. 2002) (same); *Lawrence v. Potter*, 2018 U.S. Dist. LEXIS 127805, at *26 (D. Utah July 30, 2018); *Stockwell v. Hamilton*, 163 F. Supp. 3d 484, 489 (E.D. Mich. 2016) (same); *Taunt v. Coenen (In re Trans-Indus.)*, 538 B.R. 323, 348-53 (Bankr. E.D. Mich. 2015) (same); *Mason Tenders District Council Pension Fund v. Messera*, 958 Fed. Supp. 869, 882 (S.D.N.Y 1997) (same); *District 65 Ret. Trust for Members of Bureau of Wholesale Sales Representatives v. Prudential Sec., Inc.*, 925 F. Supp. 1551 (N.D. Ga. 1996) (same); *Useden v. Acker*, 734 F. Supp. 978, 980 (S.D. Fla. 1989) (same), *aff'd*, 947 F.2d 1563 (11th Cir. 1991).

ACTIVE 704790265v8

bankruptcy court denied the motion, concluding that (a) the debtor's knowledge was not imputed to the chapter 7 trustee, and (b) the earliest the 3-year limitation period could have started to run was the date of the chapter 7 trustee's appointment, because before then, he could not have "personally known" about the violation.  *Id.*

## XVIII. Plaintiff's Actual Fraud Avoidance Claims Are Plausible and Satisfy Rule 9(b)

The Bergs next argue that Plaintiff's actual fraud avoidance claims in Counts 9 and 11-15 should be dismissed because (i) the Amended Complaint does not plausibly allege that the Debtor had actual intent to hinder, delay, or defraud creditors and (ii) the allegations are not pleaded with sufficient particularly under Rule 9(b).  (*See* Defs.' Mem. at 50-55.)  Both arguments fail.

Because fraudulent intent is rarely susceptible to direct proof, the North Dakota statute includes "badges of fraud" that can be used to infer intent.  *See* N.D. Cent. Code § 13-02.1-04(2)(a)-(k).  While "[t]he presence of a single badge is typically not sufficient to establish actual fraudulent intent . . . [t]he confluence of several badges . . . creates a presumption of fraudulent intent."  *Glob. Fin. & Leasing Servs., LLC v. Tello (In re Tello)*, 640 B.R. 181, 207 (Bankr. D.N.D. 2022).  Further, the badges are "not exhaustive, and courts are free to consider 'any factors they deem relevant to the issue of fraudulent intent.'"  *Glob. Fin. & Leasing Servs., LLC v. Tello (In re Tello)*, 640 B.R. 181, 207 (Bankr. D.N.D. 2022).  For example, in the case of a corporate debtor, fraudulent intent can be "derived from the intent of natural persons in control," because their intent is imputed to the debtor.  *Ahlgren v. Muller*, 555 F. Supp. 3d 688, 703 (D. Minn. 2021).

Here, the Amended Complaint alleges at least four badges of fraud, creating a presumption of fraudulent intent.  It also includes substantial allegations about the Bergs' intent to hinder, delay, or defraud the Debtor's creditors, which is imputed to the Debtor.  At the pleading stage, nothing more is required.

First, all transfers and obligations were to insiders—*i.e.*, the Bergs and their revocable trusts. *See* N.D. Cent. Code § 13-02.1-04(2)(a).

Second, the Debtor did not receive reasonably equivalent value. *See* N.D. Cent. Code § 13-02.1-04(2)(h). The sole purpose of the challenged transfers and obligations was to consummate and fund the ESOP transaction, and the amounts were premised on the Debtor's purported valuation of $31.5 million. (Am. Compl. ¶¶ 119-40.) But that valuation was substantially inflated. Among other things, it did not account for the Debtor's (a) fraudulent set-aside revenue (totaling $38 million from 2017 to 2020), (b) fraudulent net income (totaling $4.7 million from 2017 to 2020), and (c) millions of dollars of undisclosed liabilities and legal risks stemming from the fraud (including civil liability, criminal liability, debarment risk, loss of bonding risk, and reputational risk). (*Id.* ¶¶ 99-103, 141-42, 162-63, 326-27, 336-37, 346-47, 356-57, 365-66.) The Debtor thus paid materially more to Ms. Berg than the shares were worth, which is not reasonably equivalent value. *See Four Season's Healthcare Ctr. v. Linderkamp*, 837 N.W.2d 147, 150, 156 (N.D. 2013) (no reasonably equivalent value when defendant paid $50,000 for real property valued at $152,000)

Rule 9(b) does not require Plaintiff to precisely allege what the Debtor's stock was worth. That will be the subject of expert testimony later in this case. It is enough that Plaintiff has specifically and plausibly alleged why the stock was not worth anything close to $31.5 million (*i.e.*, $38 million in undisclosed fraudulent revenue, $4.7 in undisclosed fraudulent net income, and material undisclosed liabilities). The Bergs have all the information they need "to respond specifically and quickly" to the allegations. *United States ex rel. Costner v. United States*, 317 F.3d 883, 888 (8th Cir. 2003).

ACTIVE 704790265v8

The Debtor also did not receive reasonably equivalent value from Ms. Berg for the $6.27 million equity distribution, which pre-dated the ESOP closing by several days. The transfer was simply an equity dividend to Ms. Berg, with no contemporaneous exchange of value. (*Id.* ¶¶ 122-23, 307-09.) And Ms. Berg's pervasive fraudulent conduct and duty breaches negate any historical value she may have provided to the Debtor as its "owner." (*Id.* ¶¶ 99-103, 141-63, 218-229, 250-54, 294-305, 309.)

Third, the transfers and obligations left the Debtor insolvent. *See* N.D. Cent. Code § 13-02.1-04(2)(i). The Debtor lost millions of dollars of cash and incurred millions of dollars in loans and undisclosed liabilities—rendering it balance sheet insolvent. (Am. Compl. ¶¶ 99-103, 138-42, 212-16, 227, 229, 239-49, 308-09, 326-27, 336-37, 346-47, 356-57, 365-66.)

Even if the Debtor was not insolvent, at minimum, the transfers and obligations left the Debtor unable to pay its debts when due and with unreasonably small capital.[16] (*Id.* ¶¶ 99-103, 138-42, 212-16, 227, 229, 239-49, 308-09, 318, 326-27, 336-37, 346-47, 356-57, 365-66, 375, 385, 395, 405, 414.) Importantly, these tests do not require insolvency. Instead, they look at whether the Debtor's "failure was reasonably foreseeable," taking into account its "present and prospective debts, and whether the retained assets" were sufficient to keep the business afloat. *O'Halloran v. Prudential Sav. Bank (In re Island View Crossing II, L.P.)*, 604 B.R. 181, 200 (Bankr. E.D. Pa. 2019) (applying Pennsylvania's analogous uniform act). The tests cover transactions that "leave the transferor technically solvent but doomed to fail." *Id.*

---

[16]    While the enumerated "badge of fraud" is insolvency, whether a transfer or obligation left the debtor unable to pay its debts or with unreasonably small capital is also relevant to the question of fraudulent intent. *See Glob. Fin. & Leasing Servs.*, 640 B.R. at 207 ("[C]ourts are free to consider 'any factors they deem relevant to the issue of fraudulent intent.'"); *Asarco LLC v. Ams. Mining Corp.*, 396 B.R. 278, 373 (S.D. Tex. 2008) (finding that defendant's inability to pay its debts and unreasonably small assets were badges of fraud for an actual fraudulent transfer claim).

ACTIVE 704790265v8

Here, although the Debtor did not file for bankruptcy until several years later, that outcome was foreseeable from the moment the Debtor made the transfers and incurred the obligations in connection with the ESOP transaction. Due to the magnitude of the Bergs' fraud—$70 million over 12 years—it was inevitable that the government would eventually discover the scheme. (*Id.* ¶¶ 99-103, 228(a), 239.) Indeed, the government obtained its first search warrant in 2018, **two years** before the ESOP transaction. (*Id.* ¶ 218.) And once discovered, the Debtor would face significant and foreseeable consequences, including, without limitation, contract defaults, contract terminations, disgorgement, price reductions, competitor protests, suspension or debarment from federal contracting, criminal and civil liability, loss of bonding, loss of financing, harm to business reputation, and legal and professional fees. (*Id.* ¶¶ 102-03, 239.)

After the government took enforcement action in 2022, all these foreseeable consequences followed. (*Id.* ¶¶ 220-29, 239-49.) The Debtor lost its bonding and, with it, the ability to bid for new federal contracts. (*Id.* ¶¶ 229, 242, 246.) The Debtor defaulted on several of its existing contacts, further impairing its ability to bid for new ones. (*Id.* ¶¶ 243.) A competitor challenged the Debtor's small business status based on the fraud allegations. (*Id.* ¶ 232.) The Debtor had difficulty retaining employees and hiring new ones. (*Id.* ¶ 241.) The Debtor incurred millions of dollars in professional fees responding to the federal investigation (which also distracted the Debtor from its normal business operations). (*See id.* ¶ 240.) The Debtor suffered severe reputational harm with the government, vendors, subcontracts, and other counterparties. (*Id.* ¶ 245.) The Debtor could not service its inflated debt obligations to Capital Credit Union or the ESOP. (*Id.* ¶ 246.) And ultimately, the Debtor filed for bankruptcy. (*Id.* ¶¶ 247-49.) The Debtor was "doomed to fail" because of the transfers and obligations, which is a badge of fraud.

Fourth, the Debtor incurred substantial debt both before and after the transfers and obligations, including the Banker Trust loan, the Capital Credit Union loan, promissory notes to Ms. Berg, and promissory notes to the ESOP trust. *See* N.D. Cent. Code § 13-02.1-04(2)(j). (Am. Compl. ¶¶ 309, 327, 337, 347, 357, 366.) The Bergs argue that this badge of fraud cannot support actual fraudulent intent because incurrence of debt is present in every ESOP transaction. But the Bergs themselves selected the ESOP transaction. (Am. Compl. ¶ 104.) Rather than market the company and find a third-party buyer who would fund the purchase price, the Bergs selected a structure that required ***the Debtor*** to incur all the debt. (*Id.* ¶¶ 138-40, 213-14.) And because the Bergs controlled the Debtor, they authorized the incurrence of this debt. (*Id.* ¶¶ 119-40.) They also selected their negotiating counterparty, Mr. Paredes, who had no personal financial stake in the transaction other than a $38,000 flat fee. (*Id.* ¶¶ 111, 117-18.) The real parties in interest—the Debtor's employees—were not involved in negotiating the transaction. (*Id* ¶¶ 104-06, 111-18, 176-77, 229.) Thus, if anything, the ESOP structure made the fraud easier. *See Breeden v. Bennett (In re Bennett Funding Grp., Inc.)*, 220 B.R. 743, 771 (Bankr. N.D.N.Y. 1997) ("unusual transaction structure was evidence of actual fraudulent intent).

Fifth, the Bergs—who controlled the Debtor—had actual intent to hinder, delay, or defraud the Debtor's creditors, which is imputed to the Debtor. *See Ahlgren*, 555 F. Supp. 3d at 703 (fraudulent intent can be "derived from the intent of natural persons in control").

North Dakota "law does not require a person to intend the actual resulting damage of an act; as long as the act itself was intentional, the law assumes the person intends the natural and probable consequences of the act." *Capitol Indem. Corp. v. Evolution, Inc.*, 293 F. Supp. 2d 1067, 1074 (D.N.D. 2003) (citing *Ohio Cas. Ins. Co. v. Horner*, 583 N.W.2d 804, 808 (N.D. 1998)).

ACTIVE 704790265v8

Here, leaving Debtor's creditors unpaid was the natural and probable consequence of the Bergs' self-serving and intentional conduct.

As noted above, the transfer and obligation amounts were premised on the Debtor's purported valuation of $31.5 million. (Am. Compl. ¶¶ 307-08, 325-26, 335-36, 345-46, 355-56, 364-65.) However, the Bergs knew this valuation was materially inflated because it did not account for the fraudulent set-aside revenue and undisclosed liabilities. (*Id.* ¶¶ 99-103, 141-42, 162-63, 228, 326-27, 336-37, 346-47, 356-57, 365-66.) Yet the Bergs concealed these facts from Mr. Paredes and moved forward with the transaction to enrich themselves. (*Id.* ¶¶ 141-63, 463-69.) In doing so, they placed all risk on the Debtor's creditors. (*Id.* ¶¶ 307-08, 325-26, 335-36, 345-46, 355-56, 364-65.) When the federal government eventually discovered the Bergs' unlawful conduct—which was the natural and probable outcome—the Bergs would have already received millions of dollars in cash from the Debtor. (*Id.*) The Debtor's future creditors, meanwhile, would be left holding the bag. (*Id.*)

That is exactly what happened. The Debtor incurred millions of dollars in loans to fund the ESOP payments to Ms. Berg, which the Debtor now cannot repay because the business was never worth anything close to $31.5 million. (*Id.* ¶¶ 138-41, 246-49.) And the Debtor also could not pay creditors because it lost its bonding, could not bid for new contracts, lost employees, and was depleted of cash. (*Id.* ¶¶ 239-49.) As a matter of law, the Bergs intended these consequences because they were natural, probable, and foreseeable. *See Capitol*, 293 F. Supp. 2d at 1074.

The foregoing allegations—taken as true and viewed in the light most favorable to Plaintiff—satisfy Rule 9(b) and plausibly establish that the Debtor acted with actual intent to hinder, delay, or defraud its creditors.

48

## XIX.    Plaintiff's Constructive Fraud Avoidance Claims Are Plausible and Satisfy Rule 9(b)

The Bergs lastly argue that Plaintiff's constructive fraud avoidance claims in Counts 10 and 16-20 should be dismissed because they are not pleaded with particularity.  (*See* Defs.' Mem. at 55-57.)  But even if Rule 9(b) applies, Plaintiff has satisfied his pleading burden.  As detailed above, Plaintiff has alleged, in detail, why the Debtor did not receive reasonably equivalent value and why the transfers and obligations left the Debtor unable to pay its debts when due and with unreasonably small capital.  (*See supra* at 44-46.)    Nothing more is required by Rule 9(b) or Rule 12(b)(6).

## <u>CONCLUSION</u>

Based on the foregoing, the Bergs' motion to dismiss should be denied.  If the Court is inclined to grant the motion—which, for the reasons set forth above, it should not do—the Court should instead grant Plaintiff leave to file an amended pleading pursuant to Fed. R. Civ. P. 15(a). *See Wisdom v. First Midwest Bank*, 167 F.3d 402, 409 (8th Cir. 1999) ("[P]arties should usually be given at least one chance to amend their complaint.").

Date:  January 10, 2025

*/e/ Peter D. Kieselbach*
Michael B. Fisco (Minnesota #0175341)
(*Admitted Pro Hac Vice*)
Peter D. Kieselbach (Minnesota #0397531)
(*Admitted Pro Hac Vice*)
**GREENBERG TRAURIG, LLP**
90 South Seventh Street, Suite 3500
Minneapolis, MN 55402
Telephone: (612) 259-9700
Email: fiscom@gtlaw.com
          kieselbachp@gtlaw.com

ACTIVE 704790265v8

*and*

Erik A. Ahlgren (North Dakota #09561)
Ahlgren Law Office, PLLC
220 W. Washington Ave. Suite 105
Fergus Falls, MN  56537
Telephone: (218) 998-2775
Email: erik@ahlgrenlawoffice.net

50