UNITED STATES BANKRUPTCY COURT
DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| In re: | Chapter 7 |
| | Bky. No. 24-30167 |
| Pro-Mark Services, Inc., | |
| Debtor. | |

| | |
|---|---|
| Erik A. Ahlgren, as Chapter 7 Trustee of Bankruptcy Estate of Pro-Mark Services, Inc., as Administrator of the Pro-Mark Services, Inc. Employee Stock Ownership Plan, and as Trustee of the Pro-Mark Services, Inc. Employee Stock Ownership Trust, | Adv. No. 24-07014 |
| Plaintiff, | **PLAINTIFF'S RESPONSE IN OPPOSITION TO MOTION TO DISMISS BY DEFENDANT CHAD DUBOIS** |
| v. | |
| Connie Berg, Kyle Berg, Connie Berg Revocable Living Trust, Kyle R. Berg Revocable Living Trust, Chad DuBois, Mandy Grant, and Miguel Paredes, | |
| Defendants. | |

ACTIVE 704438649v6

## **TABLE OF CONTENTS**

INTRODUCTION ..............................................................................................................1

FACTS ............................................................................................................................2

I.      The Bergs Fraudulently Enroll the Debtor in the 8(a) and WOSB Programs ....................2

II.     The Bergs Sell the Debtor's Stock to the ESOP at a $31.5 Million Valuation .................6

III.    Chad DuBois Assists the Bergs in Concealing Their Fraud From the ESOP ....................7

IV.     Post-Closing, the Debtor Files for Bankruptcy and the
        ESOP Value Plummets to Zero ..............................................................................9

V.      Procedural History ......................................................................................10

STANDARD OF REVIEW ...............................................................................................10

ARGUMENT ................................................................................................................11

I.      Plaintiff Has Standing to Assert Counts 27 and 28 on Behalf of the ESOP ..................11

        A.      Plaintiff Has Standing as ESOP Administrator ......................................11

        B.      Plaintiff Has Standing as ESOP Trustee ..............................................15

II.     Plaintiff Has Stated a Plausible Claim for Breach of Fiduciary Duty in Count 4 ...........18

III.    Plaintiff Has Stated a Plausible Claim for Actual Fraud in Count 27 ..............................20

        A.      Contractual Privity Is Not Required for Actual Fraud ..........................................20

        B.      Plaintiff Has Plausibly Alleged Reasonable Reliance and
                May Plead Count 27 in the Alternative ..................................................20

IV.     Plaintiff Has Stated Plausible Claims for Securities Fraud in Count 28 ..........................23

CONCLUSION .............................................................................................................26

Plaintiff Erik A. Ahlgren, in his capacities as chapter 7 trustee of the bankruptcy estate of Pro-Mark Services, Inc. (the "Debtor"), administrator of the Pro-Mark Services, Inc. Employee Stock Ownership Plan, and trustee of the Pro-Mark Services, Inc. Employee Stock Ownership Trust, submits this response in opposition to Defendant Chad DuBois' Motion to Dismiss [ECF No. 55], and states as follows:

## INTRODUCTION

In August 2020, Connie and Kyle Berg sold their 100% equity interest in the Debtor to its employees via an "ESOP" transaction, receiving over $25 million in cash distributions from the Debtor. However, the entire transaction was premised on misrepresentations regarding the Debtor's government contracting business.

For over a decade, the Bergs had illegally enrolled the Debtor in government contracting programs that gave priority to woman-controlled businesses and small businesses, including the WOSB and 8(a) programs. But the Debtor did not qualify for those programs because Ms. Berg did not actually control the Debtor or meaningfully participate in its contracting business, and the Debtor exceeded size limitations under SBA rules and regulations. This illegal conduct inflated the Debtor's revenue and exposed the Debtor to significant legal risks and liabilities.

Mr. DuBois was the Debtor's vice president, and he knew about the Bergs' government contracting fraud. But he took no action to stop the ESOP transaction or protect the Debtor's interests. Instead, he actively facilitated the transaction. Pre-closing, he made material misrepresentations to the ESOP regarding the Debtor's financial condition. And post-closing, he approved millions of dollars in payments to the Bergs. Had Mr. DuBois fulfilled his fiduciary duties, the ESOP transaction never would have closed—let alone at a grossly inflated valuation.

Predictably, less than two years after closing the ESOP transaction, the government uncovered the Bergs' scheme, sending the Debtor and the ESOP into a tailspin. The Debtor eventually filed for bankruptcy, and the ESOP's only asset—the Debtor's stock—plummeted in value to zero. Mr. DuBois allowed the Bergs to abscond with millions of dollars, while the Debtor's creditors and employees have been left holding the bag.

Plaintiff Erik A. Ahlgren, in his capacities as chapter 7 trustee, ESOP administrator, and ESOP trustee, commenced this action to hold Mr. DuBois accountable for his tortious conduct. Mr. DuBois now moves to dismiss this adversary proceeding, but his motion lacks merits. All counts against him are legally cognizable, plausible, pleaded in the alternative (as authorized), and/or pleaded with particularity (as required). And Plaintiff has standing to pursue claims on behalf of the ESOP as its administrator and trustee. Accordingly, the motion should be denied.

## **FACTS**[1]

### I.    **The Bergs Fraudulently Enroll the Debtor in the 8(a) and WOSB Programs**

The Debtor was a construction company that procured and performed contracts from the federal government. (ECF No. 11 ("Am. Compl.") ¶ 1.) Connie and Kyle Berg, who are a married couple, originally co-owned in the business. (*Id.* ¶ 26.) In 2007, Mr. Berg gifted his equity interest to Ms. Berg, making her the 100% owner. (*Id.* ¶ 44.) Notwithstanding the transfer of his interest, Mr. Berg maintained complete control over the Debtor and its business as a full-time "employee" and/or "consultant." (*Id.*)

---

[1]    For efficiency, Plaintiff has tried to include only the allegations relevant to the claims against Mr. DuBois. However, because Plaintiff is responding to three separate motions to dismiss that raise similar issues, there is repetition in this fact section and the other fact sections. To the extent relevant, Plaintiff incorporates by reference arguments and facts alleged in his responses to the other motions to dismiss.

2

Just four months after the transfer in 2008, the Bergs enrolled the Debtor in the 8(a) program, which is administered by the U.S. Small Business Association ("SBA").  (*Id.* ¶¶ 27, 45.)  Enrollees receive significant benefits, including priority access to federal set aside contracts intended solely for enrollees.  (*Id.* ¶ 28.)  To qualify for the 8(a) program, the applicant business must be, among other things, a small business and controlled by a disadvantaged individual (in this case, Ms. Berg).  (*Id.* ¶¶ 30-32.)

Later, in 2015, the Bergs enrolled the Debtor in SBA's Women Owned Small Business ("WOSB") program.  (*Id.* ¶ 48.)  Similar to the 8(a) program, enrollees must be a small business and controlled by a woman (*i.e.*, Connie Berg).  (*Id.* ¶¶ 36-38.)  And again, enrollees receive priority access to set-aside contracts. (*Id.* ¶¶ 35.)

From and after 2008, the Bergs also caused the Debtor to apply for federal set-aside contracts reserved exclusively for small businesses. (*Id.* ¶¶ 27, 41, 49.)  Whether the applicant business is a "small business" depends on its revenue, plus the revenue of any affiliated businesses. (*Id.* ¶ 42.)

At the time of enrollment into the 8(a) and WOSB programs, in annual certifications to SBA, and when bidding for set-aside contracts, Ms. Berg repeatedly represented to SBA and the federal government that she owned and controlled the Debtor, that the Debtor qualified for the 8(a) and WOSB programs, and that the Debtor was a small business.  (*Id.* ¶¶ 33-34, 39-40, 43, 45-48, 228.)  However, these certifications were knowingly false.  (*Id.* ¶¶ 45-66, 228.)  Ms. Berg was the Debtor's sole owner, sole director, president, and control person on paper only.  (*Id.*)  Her titles and ownership interests were a pretext so the Debtor could qualify for the financially lucrative set-aside contacts.  (*Id.*)  Ms. Berg was nothing more than window dressing to circumvent eligibility requirements.  (*Id.*)  In fact, Mr. Berg exclusively managed and controlled the Debtor and its

business operations.  (*Id.*)  And as a married couple, both Mr. Burg and Ms. Burg benefitted from these misrepresentations.  (*Id.* ¶¶ 20, 44, 54, 65-66.)

First and foremost, Ms. Berg had no experience or expertise in construction, which was the Debtor's principal business and the source of work under the preferential government contracts. (*Id.* ¶¶ 56-57, 228.)  Her expertise was in apparel and retail sales—a negligible source of revenue for the Debtor.  (*Id.*)  Additionally, contrary to her explicit representations to the government, she did not work 40 hours per week for the Debtor.  (*Id.* ¶¶ 61, 228.)   She also (a) had no involvement in selecting, estimating, or structuring the bids that the Debtor submitted for federal construction contracts; (b) did not engage in substantive discussions with the government contracting officers responsible for awarding, evaluating, or overseeing bids; (c) had no involvement in hiring, directing, or managing the Debtor's employees and subcontractors; (d) had no involvement in managing the Debtor's business operations; and (e) had no involvement in the Debtor's financial functions or reporting.  (*Id.* ¶¶ 60-64, 228.)  Ms. Berg's only involvement with the Debtor's operations related to its clothing and retail business, which constituted less than 1% of the Debtor's revenue and was not a full-time role.  (*Id.* ¶¶ 49, 57, 61.)

In truth, Mr. Berg managed and controlled all aspects of the Debtor's business, which Ms. Berg never disclosed to the government.  (*Id.* ¶¶ 61-66, 228.)  Only Mr. Berg had experience and expertise in construction.  (*Id.* ¶¶ 58-59.)  He determined which government contracts the Debtor would bid for, structured the bids, estimated the costs for the bids, directed employees how to complete proposals, and communicated with government contracting officers. (*Id.* ¶¶ 62, 228.) He made all decisions for the Debtor regarding its employees, including salaries, raises, and bonuses. (*Id.*)  He directed the activity and work of the Debtor's employees, subcontractors, and suppliers.  (*Id.*)  And he managed the Debtor's financial reporting and controlled all finances of

4

the Debtor, including company bank accounts, loans, and payroll. (*Id.*) All employees recognized Mr. Berg as the ultimate owner of the business and looked to him for direction—not to Ms. Berg. (*Id.* ¶ 63.) Further, the Debtor was not actually a small business due to its extensive (but undisclosed) affiliations with other entities controlled by Mr. Berg. (*Id.* ¶¶ 53, 67-98.)

Mr. Berg orchestrated the government contracting fraud scheme through the Debtor. (*Id.* ¶¶ 26-27, 44-67, 228, 258, Exs. C, D.) However, the scheme was not possible without Ms. Berg's many false statements and representations. (*Id.* ¶¶ 44-67, 228.) Had Ms. Berg truthfully disclosed to SBA and the federal government that Mr. Berg controlled the Debtor and the Debtor's affiliations with his other entities, the Debtor would not have qualified for the 8(a) and WOSB programs, would not have qualified as a small business, and would not have received any set aside contracts. (*Id.* ¶¶ 54, 65-66, 228.) Instead, because of Ms. Berg's collusion with Mr. Berg and false representations to the government, the Debtor was awarded at least $70 million in federal set-aside contracts to which it was not entitled between 2008 and 2020. (*Id.* ¶¶ 44-67, 99-100, 228, 258.)

The Bergs' fraud materially inflated the Debtor's revenue, performance, and value. (*Id.*) It also exposed the Debtor to significant liabilities and legal risks. If and when the federal government discovered the Bergs' fraud, among other things, (a) government counterparties could seek contractual remedies from the Debtor, including price reductions, terminations, and disgorgement, (b) competitors could protest the Debtor's contract awards, (c) the federal government could suspend or bar the Debtor from bidding on contracts, (d) the Debtor could be subject to criminal and civil liability for violating federal law, (e) bonding companies and lenders could refuse to do business with the Debtor, (f) the Debtor would suffer harm to its business reputation, and (g) the Debtor would likely incur significant legal and other professional fees

dealing with all the foregoing. (*Id.* ¶¶ 102-03.) Because federal contracting was the Debtor's entire business, each of these liabilities posed a real, direct, and foreseeable threat to the Debtor as a going-concern business. (*Id.* ¶¶ 26, 102-03, 229.)

## II.    The Bergs Sell the Debtor's Stock to the ESOP at a $31.5 Million Valuation

In or around 2019, anticipating that the house of cards would eventually fall, the Bergs worked to monetize their equity interest in the Debtor and exit the business. (*Id.* ¶¶ 104, 151, 308.) They elected to do so by selling the Debtor to its employees via an ESOP, which stands for employee stock ownership plan. (*Id.* ¶¶ 104-05.) In a typical ESOP transaction, the existing shareholders sell their equity in the company to the ESOP in exchange for cash, notes, or a combination of both. (*Id.* ¶ 105.) The employees, who are the beneficiaries of the ESOP, then acquire the company stock from the ESOP over time. (*Id.*) An ESOP transaction has two basic purposes. First, it enables the existing shareholders to monetize their equity interests in the company—often as a business succession tool. (*Id.* ¶ 106.) And second, it enables the employees to become owners and reap the benefits of their hard work in building the company. (*Id.*)

The Bergs formed the ESOP in December 2019. (*Id.* ¶¶ 104, 107-10.) Then, in May 2020, the Bergs retained Miguel Paredes to serve as trustee for the ESOP. (*Id.* ¶¶ 111, 117.) Mr. Paredes' role as ESOP trustee was to negotiate the transaction on behalf of the ESOP and its beneficiaries (*i.e.*, Debtor's employees). (*Id.* ¶¶ 111-14.) Mr. Berg led the negotiations for the Debtor and Ms. Berg. (*Id.* ¶ 120.)

The ESOP transaction ultimately closed on August 31, 2020. (*Id.* ¶ 125.) Ms. Berg sold 37,683 shares of the Debtor's stock back to the Debtor for redemption and her remaining 62,317 shares to the ESOP. (*Id.* ¶¶ 127-28.) As a result, the ESOP became the Debtor's sole owner. (*Id.* ¶ 137.) The transaction valued the Debtor's stock at $31.5 million, based largely on fraudulent

6

revenue from government contracts and non-disclosure of material liabilities and legal risks.  (*Id.* ¶¶ 99-103, 138-140, 212-16.)  To date, Ms. Berg has received over $25 million in cash, including (a) a $6.2 million equity distribution from the Debtor four days before the closing date, (b) about $9 million in cash on the closing date, and (c) about $9.5 million in cash after the closing date. (*Id.* ¶¶ 138-140, 212-16)  The Debtor, directly or indirectly, funded 100% of these payments to Ms. Berg, either from its operating cash or by incurring loans.  (*Id.*)  Bankers Trust and Capital Credit Union collectively loaned the Debtor over $14.5 million, which the Debtor used to pay Ms. Berg.  (*Id.* ¶¶ 130, 213-14.)  The Debtor also issued two promissory notes to Ms. Berg in the original principal amount of about $23 million.  (*Id.* ¶¶ 138-40.)

## III.    Chad DuBois Assists the Bergs in Concealing Their Fraud From the ESOP

The Bergs never disclosed their fraud on the federal government to Mr. Paredes during the ESOP negotiations.  (*Id.* ¶¶ 141-63.)  Instead, they affirmatively concealed it to enrich themselves. (*Id.*)  And they were assisted in doing so by Defendant Chad DuBois.  (*Id.* ¶¶ 180-200, 212-16.)

Mr. DuBois joined the Debtor in 2018 as its controller, was promoted to Vice President in 2019, and became the Debtor's President and director immediately after the ESOP transaction. (*Id.* ¶¶ 181, 212.)  Due to his position and background, Mr. DuBois undoubtedly knew that the Bergs had defrauded the federal government by illegally enrolling the Debtor in the 8(a) and WOSB programs and seeking set-aside contracts for enrollees and small businesses.  (*Id.* ¶¶ 75-81, 97, 181-89.)  Among other things, (1) he "oversaw" the Debtor's bids for set-aside contracts; (2) he knew the eligibility requirements for the 8(a), WOSB, and small business programs because he previously owned an 8(a) business called CS DuBois; (3) as the Debtor's controller and then Vice President, he witnessed first-hand that Mr. Berg controlled all aspects of the Debtor's the business, not Ms. Berg; and (4) he knew that Mr. Berg had a practice of wrongfully circumventing

ACTIVE 704438649v6

SBA eligibility requirements, including by hiring Mr. DuBois' own daughter to a fake position with Fed Serve so it would qualify for SBA's HUBZone program. (*Id.*)

But despite this knowledge, Mr. DuBois never told Mr. Paredes or the ESOP about the fraud and did not take any action to protect the Debtor's interests. (*Id.* ¶ 189.) Instead, he actively facilitated the ESOP transaction and the windfall to the Bergs. (*Id.* ¶¶ 189-200, 212-16.) At closing, Mr. DuBois delivered a "Statement of Representation" to Mr. Paredes's financial advisor, Stout Risius Ross, LLC ("<u>Stout</u>"), that contained numerous false representations about the Debtor's financial history and projections. (*Id.* ¶¶ 190-99.) Mr. DuBois did not disclose to Stout that the Debtor had fraudulently enrolled in the 8(a) and WOSB programs, was not a small business, had overstated revenue, and had material undisclosed liabilities. (*Id.*) Mr. DuBois knew that Stout would be using his Statement of Representation to render a fairness opinion to Mr. Paredes and the ESOP. (*Id.*)

Mr. DuBois' actions to cover up the fraud continued even after closing. From January 2021 through April 2022, he co-approved over $9.5 million in cash payments from the Debtor to Ms. Berg. (*Id.* ¶¶ 212-16.) He also caused the Debtor to incur over $6 million in new debt to Capital Credit Union to fund such payments. (*Id.*)

Had Mr. DuBois truthfully disclosed to Stout, Mr. Paredes, and the ESOP that Debtor's business was predicated on more than a decade of fraudulent misrepresentations by the Bergs, the ESOP transaction and share redemption never would have closed, let alone at a $31.5 million valuation. (*Id.* ¶ 200.) He then compounded the damage by authorizing millions of dollars in post-closing payments to Ms. Berg. (*Id.* ¶¶ 212-16.) While the Bergs were the primary perpetrators of the fraud, Mr. DuBois played a critical and knowing role.

ACTIVE 704438649v6

**IV.      Post-Closing, the Debtor Files for Bankruptcy and the ESOP Value Plummets to Zero**

Less than two years after the ESOP closing date, the Bergs' fraud—aided by Mr. DuBois—finally caught up with the Debtor.  (*Id.* ¶¶ 218-23.)  In March 2022, the federal government raided the Debtor's headquarters after obtaining search warrants and a grand jury subpoena relating to the Debtor's enrollment in the 8(a) and WOSB programs.  (*Id.* ¶¶ 218-23, Ex. C.)  Ultimately, in October 2023, the Debtor entered into a non-prosecution agreement with the U.S. Department of Justice's Antitrust Division and the U.S. Attorney's Office for the District of North Dakota.  (*Id.* ¶¶ 224-29, Ex. D.)  Under the non-prosecution agreement, the Debtor admitted that the Bergs' prior misrepresentations to SBA and the government violated federal criminal law, including 18 U.S.C. §371 (Conspiracy to Commit Offense or to Defraud United States).  (*Id.*)  The Debtor also agreed to pay a $949,000 criminal fine, which represented the Debtor's 8(a) and WOSB profits that it received ***after*** the ESOP transaction closed in August 2020.  (*Id.* ¶ 227.)

Predictably, the public revelation of the investigation and resulting non-prosecution agreement severely impacted the Debtor's business and the ESOP.  (*Id.* ¶ 239.)  Among other things, the Debtor (1) incurred millions of dollars in legal fees, professional fees, and other fees, costs, and expenses; (2) lost several key employees and had trouble hiring new employees; (3) lost its bonding, which is necessary to secure and perform federal construction contracts; (4) defaulted on several of its existing federal contracts; (5) lost its small business certification due to a challenge by a competitor premised on the Bergs' fraud, (6) suffered significant harm to its reputation as a going concern business, and (7) could not pay debt service on its loan obligations to Capital Credit Union or the agreed criminal fine.  (*Id.* ¶¶ 232, 239-48.)

Ultimately, the Debtor filed for bankruptcy in April 2024, reporting just $4.4 million in assets and more than $33.3 million in liabilities.  (*Id.* ¶ 248.)  The ESOP, meanwhile, incurred

catastrophic losses, directly harming its participants (*i.e.*, the Debtor's employees).  (*Id.* ¶ 247.)
The ESOP's principal asset—the Debtor's stock—now has no value.  (*Id.*)

## V.    Procedural History

After the bankruptcy filing, Plaintiff was appointed chapter 7 trustee.  (*Id.* ¶ 6.)  By
operation of law pursuant to 11 U.S.C. § 704(a)(11), Plaintiff, as chapter 7 trustee, is also the
administrator of the ESOP plan.  (*Id.* ¶ 7.)  And pursuant to an order of the Bankruptcy Court,
Mr. Ahlgren appointed himself ESOP trustee, to help ensure that all claims of the injured
constituencies could be joined in one action against the wrongdoers.  (*Id.* ¶ 8; s*ee* ECF No. 132,
Bky. No. 24-30167.)

On September 25, 2024, Plaintiff, in his three capacities as chapter 7 trustee, ESOP plan
administrator, and ESOP trustee, filed his Amended Complaint against Mr. DuBois, the Bergs,
Mr. Paredes, and Mandy Grant.  (ECF No. 11.)  The Amended Complaint is comprehensive:
101 pages long, with 493 paragraphs, 28 counts, and 5 exhibits totaling an additional 130 pages.

Plaintiff brings three counts against Mr. DuBois.  In Count 4, Plaintiff, as chapter 7 trustee,
alleges that Mr. DuBois breached fiduciary duties to the Debtor.  (Am. Compl. ¶¶ 266-70.)   In
Count 27, Plaintiff, as ESOP administrator and ESOP trustee, alleges that Mr. DuBois defrauded
the ESOP.  (*Id.* ¶¶ 475-81.)  And in Count 28, Plaintiff, in all three capacities, asserts state law
securities fraud claims against Mr. DuBois.  (*Id.* ¶¶ 482-93.)  Mr. DuBois now moves to dismiss,
but for the reasons set forth below, the Court should deny the motion.

## STANDARD OF REVIEW

On a motion to dismiss under Rule 12(b)(6), the court must "accept all facts pled by the
nonmoving party as true and draw all reasonable inferences from the facts in favor of the
nonmovant." *Waldron v. Boeing Co.*, 388 F.3d 591, 593 (8th Cir. 2004). Additionally, the court

ACTIVE 704438649v6

must construe the complaint in the light most favorable to the plaintiff. *Ashley Cty., Ark. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

## ARGUMENT

### I.      Plaintiff Has Standing to Assert Counts 27 and 28 on Behalf of the ESOP

Mr. DuBois first argues that Plaintiff lacks standing to bring Counts 27 and 28 on behalf of the ESOP. (*See* ECF No. 55 ("Def.'s Mot.") at 9-15.) This argument lacks merit. Plaintiff has standing as both ESOP administrator and ESOP trustee.

#### A.      Plaintiff Has Standing as ESOP Administrator

Plaintiff's standing as ESOP administrator derives directly from the Bankruptcy Code. Section 704(a)(11) provides that "[t]he trustee ***shall*** . . . if, at the time of the commencement of the case, the debtor (or any entity designated by the debtor) served as the administrator (as defined in section 3 of the Employee Retirement Income Security Act of 1974) of an employee benefit plan, ***continue to perform the obligations required of the administrator***." 11 U.S.C. § 704(a)(11) (emphasis added).

At the time of the commencement of the Debtor's bankruptcy case, the Debtor served as administrator of the ESOP. (Am. Compl. ¶ 7.) Thus, pursuant to Section 704(a)(11), Mr. Ahlgren,

as chapter 7 trustee, now acts as successor plan administrator and has an affirmative duty to "continue to perform the obligations *required* of the administrator."  One of those "required" obligations is prosecuting Counts 27 and 28 against Mr. DuBois on behalf of the ESOP.

As plan administrator, Mr. Ahlgren "has discretionary authority and/or control over the management of the ESOP Plan and ESOP Trust and over the management and disposition of the ESOP Plan's assets and ESOP Trust's assets."  (Am. Compl. ¶ 9.)  Thus, he is an ERISA fiduciary. *See* 29 U.S.C. § 1002(21)(A)(i) (defining "fiduciary").  And as an ERISA fiduciary, Mr. Ahlgren has a fiduciary duty to pursue viable ESOP causes of action against third parties.  *See Herman v. Mercantile Bank, N.A.*, 137 F.3d 584 (8th Cir. 1998) (ERISA fiduciaries have a fiduciary duty to pursue litigation that "would be successful and advantage the beneficiaries of the plan"); *Martin v. Feilen*, 965 F.2d 660, 667 (8th Cir. 1992) (same); *Harris v. Koenig*, 602 F. Supp. 2d 39, 54 (D.D.C. 2009) ("The duties of loyalty and prudence mandated in Section 404(a) of ERISA include the duty to take reasonable steps to realize on claims held in trust." (quotation omitted)); *Allard v. Coenen (In re Trans-Indus., Inc.)*, 419 B.R. 21, 39 (Bankr. E.D. Mich. 2009) ("[A] strong argument can be made that under ERISA, a plan administrator *does* have a fiduciary duty to pursue valuable claims that the ERISA Plan has against other persons.").

This fiduciary duty to pursue claims is particularly important here because the claims against Mr. DuBois (and the other defendants) are the ESOP's only material assets, and Mr. Ahlgren is the ESOP's only fiduciary.  Thus, reviewing and pursuing the claims are "required" obligations of the plan administrator under Section 704(a)(11), which Mr. Ahlgren, as chapter 7 trustee, must perform.

The chapter 7 trustee's standing as plan administrator aligns with the purpose of Section 704(a)(11).  As Mr. DuBois notes in his brief, Congress enacted Section 704(a)(11) to

12

ensure that ESOPs are not "orphaned" if the administrator files for bankruptcy, thereby denying participants "access to their benefits." *See In re Mid-States Express, Inc.*, 433 B.R. 688, 692-93 (Bankr. N.D. Ill. 2020) (quoting Termination of Abandoned Individual Account Plans, 71 Fed. Reg. 20,820 (Apr. 21, 2006)). Consistent with this purpose, Mr. Ahlgren is pursuing claims that, in all likelihood, would not otherwise be pursued. Mr. DuBois should not be let off the hook for defrauding the ESOP simply because the ESOP is now an orphan plan—that is exactly what Congress intended to prevent.[2]

Additionally, *every* other court that has considered this issue has found that Section 704(a)(11) gives a chapter 7 trustee standing to bring claims as the plan administrator and ERISA fiduciary. *See McLemore v. Regions Bank*, 682 F.3d 414, 420 (6th Cir. 2012) (affirming that a chapter 7 trustee has standing to bring claims "in his role as an ERISA fiduciary"); *Taunt v. Coenen (In re Trans-Indus.)*, 538 B.R. 323, 347 (Bankr. E.D. Mich. 2015) ("Section 704(a)(11), a provision added to the Bankruptcy Code by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, also gives a Chapter 7 trustee the authority to pursue litigation against third parties that an administrator of an ERISA employee benefit plan would have authority to pursue."); *Samson v. Manlove*, 2014 U.S. Dist. LEXIS 140597, at *7-12, *7 n.2 (D. Mont. Sep. 30, 2014) ("[A] bankruptcy trustee serving as a plan administrator [pursuant to Section 704(a)(11)] who qualifies as an ERISA fiduciary has standing to pursue claims on behalf of the ERISA plan participants"); *see also Mims v. Matrix Tr. Co. (In re Vantage Benefits Adm'rs)*, 2021 Bankr. LEXIS

---

[2]    The legislative history further supports that Congress intended for Section 704(a)(11) to give the chapter 7 trustee standing to assert litigation claims as successor plan administrator. *See* 151 Cong. Rec. H1993, H2049 (daily ed. Apr. 14, 2005) (statement of Rep. F. James Sensenbrenner) (stating that Section 704(a)(11) "would also make it easier to *recover excessive pre-petition compensation*, such as bonuses, *paid to insiders* of a debtor that can then be used to pay unpaid employee wage claims." (emphasis added)).

ACTIVE 704438649v6

1195, at *28 (Bankr. N.D. Tex. May 5, 2021) ("[I]t seems plausible that a trustee should be able to bring suit, if the debtor served as a plan administrator as of the time of the commencement of the case, as part of his 'obligations' under section 704(a)(11)—particularly if no other party—not a plan participant or beneficiary or the Secretary of Labor—is bringing a suit when harm is alleged.").

The *Caplin* decision that Mr. DuBois cites has no bearing on a chapter 7 trustee's standing as plan administrator.  There, the U.S. Supreme Court held that a reorganization trustee under the former bankruptcy act lacked standing to assert creditor claims because "nowhere in the statutory scheme is there any suggestion that the trustee in reorganization is to assume the responsibility of suing third parties on behalf of" non-debtors.  *Caplin v. Marine Midland Grace Tr. Co.*, 406 U.S. 416, 428 (1972).  Here, by contrast, there is an explicit statutory basis for standing—11 U.S.C. § 704(a)(11)—which did not exist when *Caplin* was decided.  And Mr. Ahlgren is not pursuing the ESOP claims in his capacity as chapter 7 trustee on behalf of the Debtor.  He is doing so in his separate capacities as ESOP administrator and ERISA fiduciary pursuant to Section 704(a)(11).  *See Taunt*, 538 B.R. at 347 ("Because a Chapter 7 trustee acting under § 704(a)(11) is a successor ERISA plan administrator, whether the trustee can bring a claim does not depend on whether the debtor could have brought the claim as of the petition date.").

There is also no support for Mr. DuBois' assertion that the chapter 7 trustee's role as ESOP administrator is limited to "ministerial" functions.  Section 704(a)(11) does not say that.  *See Argus Leader Media v. USDA*, 740 F.3d 1172, 1176 (8th Cir. 2014) (courts cannot "add" words to a statute).  And Mr. DuBois cites no supporting caselaw or authority.  To the contrary, as noted above, every other court that has considered the issue has reached the same conclusion: "required" obligations under Section 704(a)(11) include asserting litigation claims.

14

**B.      Plaintiff Has Standing as ESOP Trustee**

Mr. Ahlgren also has standing to bring Counts 27 and 28 in his capacity as ESOP trustee.

Before filing the Amended Complaint, Mr. Ahlgren, in his capacities as chapter 7 trustee and ESOP

administrator, appointed himself ESOP trustee.  (Am. Compl. ¶ 8.)  Mr. Ahlgren took this step

because he was cognizant that one or more defendants might challenge his standing under 11

U.S.C. § 704(a)(11) to pursue ESOP claims as plan administrator.  Although Mr. Ahlgren has

standing as plan administrator for the reasons outlined above, he assumed the role of ESOP trustee

to eliminate any argument as to standing.

Mr. DuBois does not dispute that an ESOP trustee would have standing to assert Counts 27

and 28 against him.  Instead, he argues that Mr. Ahlgren cannot be the ESOP trustee because he

would cease to be disinterested as chapter 7 trustee.  This is not true.

Under 11 U.S.C. § 701(a)(1), a chapter 7 trustee must be "disinterested."  "Disinterested"

means, in pertinent part, "a person that . . . is not a creditor, an equity security holder, or an

insider . . . [or] does not have an interest materially adverse to the interest of the estate or of any

class of creditors or equity security holders, by reason of any direct or indirect relationship to,

connection with, or interest in, the debtor, or for any other reason."  11 U.S.C. § 101(14)(A), (C).

"Generally, the definition [of disinterested] is construed to apply ***only to personal interests***

of the trustee, not those attributed to him in his representative or fiduciary capacity."  *Ritchie*

*Special Credit Invs., Ltd. v. United States Tr.*, 620 F.3d 847, 853 (8th Cir. 2010) (emphasis added).

Here, Mr. Ahlgren, in his ***personal*** capacity, is not a creditor, equity security holder, or insider of

the Debtor, and does not have an interest materially adverse to the estate.  Indeed, Mr. Ahlgren

"had no involvement with or knowledge of the Debtor, the ESOP Plan, or the ESOP Trust before

his appointment as [chapter 7 trustee]."  (Am. Compl. ¶ 10.)  He is, therefore, "disinterested" and can simultaneously serve as chapter 7 trustee and ESOP trustee.

Even if the definition of "disinterested" included Mr. Ahlgren's representative/fiduciary interests—which it does not—he is still disinterested.  As detailed above, 11 U.S.C. § 704(a)(11) already requires Mr. Ahlgren, as successor plan administrator, to pursue Counts 27 and 28 against Mr. DuBois.  Doing the exact same thing, but in a different representative capacity as ESOP trustee, should not impair Mr. Ahlgren's disinterestedness.

Furthermore, Mr. Ahlgren's dual roles as chapter 7 trustee and ESOP trustee do not create any material adverse interest.  "Adverse interest has been defined to include the 'possession of a predisposition under circumstances that create a bias against the estate.'"  *Ritchie*, 620 F.3d at 853 (quoting *In re AFI Holding, Inc.*, 530 F.3d 832, 845 (9th Cir. 2008)).  No such predisposition exists here.  Both the Debtor's estate and the ESOP have claims against Mr. DuBois that arise from common facts, and such claims are not mutually exclusive or in conflict.  Thus, all interests are completely aligned—prosecute the claims and recover as much as possible for all constituencies represented by Mr. Ahlgren in his various capacities.

The only ***potential*** conflict would come at the ***end*** of the litigation ***if*** Plaintiff recovers money from Mr. DuBois (either via settlement or judgment), and there is a dispute as to how the funds should be allocated between the Debtor's estate and the ESOP.  If that happens, Mr. Ahlgren can simply appoint a successor ESOP trustee to represent the interests of the ESOP at that time.  Unless and until then, there is no adverse interest, let alone a material adverse interest.  Moreover,

any settlement or distribution of settlement funds must be approved by this Court. There are thus multiple safeguards if this theoretical conflict ever ripens.[3]

Mr. Ahlgren's dual roles are analogous to a single person serving as chapter 7 trustee of jointly administered estates, which is expressly permitted under Fed. R. Bankr. P. 2009. "Ordinarily the potentiality of a conflict of interest among the creditors of the jointly administered estates 'is not sufficiently serious or frequent in most cases to warrant the selection of separate trustees.'" *Ritchie Special Credit Invs., Ltd. v. United States Tr.*, 620 F.3d 847, 853 (8th Cir. 2010) (quoting Fed. R. Bankr. P. 2009 advisory committee's note). While the dual roles may require "the trustee to balance competing interests with vigilance and guard against conflicts, . . . a single trustee is often able to maximize the return to jointly administered estates through increased economy and efficiency." *Id.* That is the exact circumstance here. Mr. Ahlgren's dual roles will maximize the return for all parties by increasing economy and efficiency. Instead of having disparate litigations, conflicting arguments, a race to the courthouse, and multiple professionals

---

[3]     For these same reasons, there is no conflict for Greenberg Traurig to continue representing Mr. Ahlgren in all his capacities in prosecuting the adversary proceeding. The job of Greenberg Traurig is singularly focused—recover from any and all potential defendants in the litigation. As required by 11 U.S.C. § 327(a), Greenberg Traurig is disinterested and does not represent an interest adverse to the estate. All interests are completely aligned in the litigation—recover the most money possible. If Mr. Ahlgren recovers money and there is a dispute as to the allocation of proceeds between the estate and the ESOP, Greenberg Traurig likely would not be involved in representing any of the constituencies to resolve that dispute. Greenberg Traurig's sole engagement at this point in time is the litigation and all parties are aligned in recovering from the defendants. A potential for future conflict of this nature is not disqualifying. *See In re Marvel Entm't Grp.*, 140 F.3d 463, 477 (3d Cir. 1998) (potential conflicts are not *per se* disqualifying); *In re Keeley & Grabanski Land P'ship*, 2013 Bankr. LEXIS 2205, at *10 (Bankr. D.N.D. May 30, 2013) (acknowledging that "potential conflicts" are not automatically disqualifying).

ACTIVE 704438649v6

incurring fees, Mr. Ahlgren can pursue all claims against all parties in one action. And any conflict would come only at the end of the litigation, if at all.[4]

## II.    Plaintiff Has Stated a Plausible Claim for Breach of Fiduciary Duty in Count 4

Mr. DuBois next argues that Plaintiff has failed to state a claim for breach of fiduciary duty in Count 4 because he has not sufficiently pleaded damages. (*See* Def.'s Mot. at 16-17.) But this argument lacks merit. At the pleading stage, Plaintiff has no obligation to precisely quantify his damages. Rather, the complaint simply must allege "facts to support a plausible claim for damages." *Farm Credit Servs. of Am., FLCA v. Haun*, 734 F.3d 800, 806 (8th Cir. 2013). Plaintiff has done just that.

Plaintiff alleges that Mr. DuBois breached his fiduciary duties to the Debtor by facilitating and causing the Debtor to enter into the ill-fated ESOP transaction and related transactions, transfers, and distributions. (*See* Am. Compl. ¶¶ 181-200, 212-215, 266-68.) The Amended Complaint alleges ample facts establishing damages. As a proximate result of Mr. DuBois' duty breaches, the Debtor was depleted of cash and became saddled with millions of dollars of unsustainable loan obligations, ultimately leading to its bankruptcy filing. Without limitation, (a) the Debtor made a $6.4 million equity distribution from its operating cash to Ms. Berg just before closing; (b) the Debtor borrowed $8.4 million from Bankers Trust to fund the closing payment to Ms. Berg, which debt, as refinanced, remains outstanding; (c) the Debtor contributed $535,000 of its operating cash to the ESOP to fund the closing payment to Ms. Berg; (d) the Debtor

---

[4]    If the Court concludes that Mr. Ahlgren lacks standing as plan administrator and cannot serve as ESOP trustee—which is not necessary or appropriate under the circumstances—the Court should not dismiss the ESOP claims against Mr. DuBois (or any other defendant). Instead, the Court should allow Mr. Ahlgren to appoint a successor ESOP trustee, who would then substitute in as plaintiff in this action.

ACTIVE 704438649v6

issued promissory notes totaling about $23 million in original principal to Ms. Berg; (e) at Mr. DuBois' direction, the Debtor borrowed another $6 million in December 2021 from Capital Credit Union to fund a post-closing paydown to Ms. Berg, which debt remains outstanding; (f) at Mr. DuBois' direction, the Debtor used $2 million of its operating cash in December 2021 to fund a post-closing paydown to Ms. Berg; and (g) at Mr. DuBois' direction, the Debtor used $1.45 million of its operating cash between January 2021 and April 2022 to fund quarterly payments to Ms. Berg. (*See id.* ¶¶ 123-24, 130, 138, 140, 180-200, 212-15, 246, 248-49.)

These allegations—taken as true and viewed in light most favorable to Plaintiff—plausibly allege damages. At Mr. DuBois' direction, with his consent, or due to his non-action, the Debtor funded ***all*** payments and distributions to Ms. Berg. (*See id.* ¶¶ 138, 180-200, 212-15.) Contrary to what Mr. DuBois argues, these cash outflows and liabilities had a direct and negative "impact upon the Debtor's balance sheet." And Mr. DuBois' analogy that the ESOP transaction was akin to a Walt Disney shareholder selling her stock to a third party at an inflated price, with no financial impact on Walt Disney, is simply inaccurate. The real analogy would be a Walt Disney shareholder selling her stock to a third party, but with Walt Disney funding the entire inflated price with its operating cash and by incurring millions of dollars in loans. Walt Disney is surely damaged in that scenario.[5]

---

[5]    In Count 4, Plaintiff also alleges that Mr. DuBois breached his fiduciary duties to the Debtor in connection with Greenstone Construction, Inc.'s size protest against the Debtor in 2023. (*See* Am. Compl. ¶¶ 230-238, 269.) Upon further review of the Debtor's books and records, Plaintiff withdraws this part of Count 4 (*i.e.*, paragraph 269 of the Amended Complaint). For the avoidance of doubt, this is the only part of Count 4 that Plaintiff is withdrawing.

19

III.    **Plaintiff Has Stated a Plausible Claim for Actual Fraud in Count 27**

A.    **Contractual Privity Is Not Required for Actual Fraud**

Mr. DuBois next argues that Plaintiff's actual fraud claim in Count 27 should be dismissed because he was not in contractual privity with the ESOP. (*See* Def.'s Mot. at 19-20.)  But this is not the law.  The North Dakota Supreme Court has held that a defendant can be liable for actual fraud under N.D. Cent. Code § 9-03-08 even if he was not a party to the contract, so long as he "participated in the contract."  *See Dewey v. Lutz*, 462 N.W.2d 435, 439-40 (N.D. 1990).

Here, Mr. DuBois fully "participated" in the ESOP contracts among the Debtor, the ESOP Trust, and Ms. Berg.  He signed the ESOP plan documents on the Debtor's behalf as vice president. (Am. Compl. ¶¶ 107-10.)  And on the ESOP closing date, he delivered a written Statement of Representation with false and misleading certifications regarding the Debtor's business and financial condition, which he knew that Mr. Paredes and the ESOP Trust would rely on in executing the ESOP transaction contracts.  (*Id.* ¶¶ 190-200, 477-81.)   As a matter of law, this participation is sufficient.

Alternatively, if contractual privity is required, the Court should permit Plaintiff to amend his complaint to assert a claim for deceit under N.D. Cent. Code § 9-10-02.  Claims for actual fraud and deceit are "substantially identical," expect deceit "applies when there is no contract between the parties."  *Dewey*, 462 N.W.2d at 442.   Because Plaintiff has otherwise stated a claim for actual fraud, amending Count 27 to restyle it as a deceit claim would not be futile.

B.    **Plaintiff Has Plausibly Alleged Reasonable Reliance and May Plead Count 27 in the Alternative**

Mr. DuBois also challenges Count 27 on grounds that Plaintiff has not alleged that Mr. Paredes and the ESOP Trust "reasonably relied" on his Statement of Representation, a required element for fraud (and deceit).  (*See* Def.'s Mot. at 20-22.)  This argument also fails.

20

<u>Reliance</u>.  The Amended Complaint squarely alleges that Mr. Paredes and the ESOP relied on the Statement of Representation in closing the ESOP transaction.  Mr. DuBois delivered it to Mr. Paredes' financial advisor, Stout, and acknowledged that Stout would be relying on it "to render a fairness opinion" to Mr. Paredes.  (Am. Compl. ¶¶ 115, 190-91, 477-79.)  Stout did, in fact, rely on the Statement of Representation to render its fairness opinion.  (*Id.*) And Mr. Paredes, in turn, relied on the fairness opinion to close the transaction.  (*Id.*)  Nothing more is required to allege reliance.  The fact that Mr. DuBois did not communicate the misrepresentations directly to Mr. Paredes should not matter, because he knew Stout would do so via the fairness opinion.  *See Thimjon Farms P'ship v. First Int'l Bank & Tr.*, 837 N.W.2d 327, 340 (N.D. 2013) (noting that indirect misrepresentations may be actionable if the defendant made "the misrepresentation with the intent it will be repeated or communicated to [the plaintiff]" or if the defendant had "information that gives him special reason to expect that it will be communicated to [the plaintiff], and will influence their conduct.").

<u>Reasonableness</u>.  Such reliance by Stout and Mr. Paredes was also reasonable.  Mr. DuBois was someone who should have been trustworthy.  He was the Debtor's vice president, he was slated to become the Debtor's president and director post-closing, he was slated to be an ESOP participant post-closing, and he did not otherwise have a significant financial stake in transaction (unlike the Bergs).  (Am. Compl. ¶¶ 23, 105-06, 140, 212.)  There were no apparent reasons for him to defraud the ESOP.  Quite the opposite, given his post-closing roles, he had every incentive to be honest and ensure the transaction was fair.  *See Moon v. Marine State Bank*, 230 N.W. 11, 15 (N.D. 1930) (reliance reasonable because there was nothing to "create suspicion" or make it "reasonably apparent" that statements were false).

Additionally, in the Statement of Representation itself, Mr. DuBois certified that (a) the Debtor's operating history, financial results, and projections were "true and correct" and "complete and accurate in all material respects" and (b) "we have disclosed to you all material information regarding the Company" and have not "omitted" or "withheld" any material information. (Am. Compl. ¶¶ 190-99.) As one of the Debtor's senior officers, he had the requisite qualifications and knowledge to make these certifications. Nothing more is required to plausibly allege reasonable reliance. Construing the Amended Complaint in the light most favorable to Plaintiff, Mr. DuBois was a credible source, and there were no reasons to doubt him.

In arguing that Mr. Paredes could not have reasonably relied on the Statement of Representation, Mr. DuBois points to Plaintiff's allegations that Mr. Paredes breached his fiduciary duties under ERISA by conducting inadequate due diligence and ignoring red flags. But at the pleading stage, this is irrelevant. Plaintiff may plead multiple claims "alternatively" and "regardless of consistency." Fed. R. Civ. R. 8(d)(2), (3). Plaintiff "may [even] plead inconsistent facts in support of alternative theories of recovery." *Babcock & Wilcox Co. v. Parsons Corp.*, 430 F.2d 531, 536 (8th Cir. 1970). "Until an action has actually reached the point of entering a judgment, Rule 8 allows a plaintiff to explore alternative, mutually exclusive theories." *N. Am. Bullion Exch., LLC v. CC Trading, LLC*, 412 F. Supp. 3d 1119, 1128 (D.N.D. 2019) (internal quotation marks and citations omitted); *see also Whitney v. Guys, Inc.*, 700 F.3d 1118, 1130 (8th Cir. 2012) (acknowledging "the importance of allowing plaintiffs to plead in the alternative"). That is exactly what Plaintiff has done here: pleaded Count 27 against Mr. DuBois in the alternative to Count 21 against Mr. Paredes and paragraphs 164-179.[6] (Am. Compl. ¶¶ 420, 475.) Plaintiff is

---

[6]    These paragraphs detail the various shortcomings in Mr. Paredes' due diligence.

entitled to alternatively allege that Mr. Paredes reasonably relied on Mr. DuBois fraudulent representations, and that Mr. Paredes breached his ERISA fiduciary duties by conducting inadequate due diligence.[7]

If the Court were to accept Mr. DuBois' argument, it would produce an absurd and inequitable result. All defendants who moved to dismiss attack Plaintiff's alternative pleading. Mr. DuBois and the Bergs contend that they cannot be liable for fraud because Mr. Paredes did not reasonably rely on their misrepresentations. And Mr. Paredes contends that he cannot be liable for breach of fiduciary duty because he reasonably relied on fraudulent misrepresentations by Mr. DuBois and the Bergs. These defendants should not be insulated from liability simply because the question of reasonable reliance is unresolved at the pleading stage. And Plaintiff should not be forced to select one theory of liability before he has even conducted any discovery. These are the precise reasons why alternative pleading exists. Plaintiff is entitled to flesh out these theories in discovery and at trial.

Altogether, Plaintiff's allegations—taken as true and viewed in light most favorable to Plaintiff—plausibly establish reasonable reliance.

## IV.    Plaintiff Has Stated Plausible Claims for Securities Fraud in Count 28

Mr. DuBois lastly argues that Plaintiff has failed to state a claim for securities fraud under North Dakota state law. (*See* Def.'s Mot. at 22-25.) This argument fails.

---

[7]      To be clear, Plaintiff does ***not*** concede that his fraud claims against Mr. DuBois in Count 27 and his ERISA claims against Mr. Paredes in Count 21 are, in fact, mutually exclusive, and he has no obligation to do so at this stage of the proceedings. The duties owed by an ERISA fiduciary like Mr. Paredes are "the highest known to law." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009). Thus, as a matter of law, reliance that may be "reasonable" for the purposes of a fraud claim may not satisfy the highest duty known to law owed by an ERISA fiduciary. For now, it is enough that Plaintiff has pleaded Count 27 in the alternative to Count 21 and paragraphs 164-179. (*See* Am. Compl. ¶¶ 420, 475.)

23

N.D. Cent. Code § 10-04-15(2) provides, in pertinent part, as follows:

It shall be a fraudulent practice and it shall be unlawful: . . .

2.      For any person, in connection with the offer, sale, or purchase of any security, directly or indirectly, to:

      a.    Employ any device, scheme, or artifice to defraud;

      b.    Make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading; or

      c.    Engage in any act, practice, or course of business which operates or would operate as a fraud or deception upon purchasers or the public.

N.D. Cent. Code § 10-04-15(2).

Ms. Berg, who engaged in fraudulent practices by selling the Debtor's stock at an inflated price, is liable to the ESOP and the Debtor under the statute. *See* N.D. Cent. Code § 10-04-17(1). So too is Mr. Berg, because he was her agent and associate, and he orchestrated the scheme. *See* N.D. Cent. Code § 10-04-17(1), (6)(b). And so too is Mr. DuBois, because he was "associated with" the Bergs and "materially aided" the conduct giving rise to their liability. *See* N.D. Cent. Code § 10-04-17(6)(b).

Under Section 10-04-17(6)(b), "an individual who is . . . associated with a person liable under this section and who materially aids the conduct giving rise to the liability" is "jointly and severally [liable] with and to the same effect as" such person, unless the individual "did not know, and in the exercise of reasonable care could not have known, of the conduct by reason of which the liability is alleged to exist." N.D. Cent. Code § 10-04-17(6)(b).

Here, the Amended Complaint squarely alleges that Mr. DuBois was "associated with" the Bergs, who are "persons liable" for securities fraud. He was the Debtor's vice president and, therefore, worked for the Bergs. (Am. Compl. ¶¶ 20, 23.) Ms. Berg was his boss on paper, because she was the Debtor's sole owner, director, and President. (*Id.* ¶¶ 20.) And Mr. Berg was his actual boss, given his control of the Debtor. (*Id.* ¶¶ 20, 44, 50-52, 55-64.) Further, Mr. DuBois

24

had a long association with the Bergs.  Mr. DuBois used to own a construction company called CS

DuBois Construction, Inc. ("CS DuBois"), where he employed Mr. Berg for over a decade.  (*Id.*

¶¶ 85, 185.)

Mr. DuBois also "materially aided" the Bergs in the conduct giving rise to their liability—

namely, concealing the Debtor's ineligibility for the 8(a), WOSB, and small business programs,

and selling Debtor's stock at an inflated price.  As detailed above, he executed the fraudulent

Statement of Representation, which Stout used for its fairness opinion to Mr. Paredes.  (*Id.* ¶¶ 115,

190-200, 477-79, 482.)  He took no action to stop the ESOP transaction and share redemption.  (*Id.*

¶¶ 189, 200.)  And post-closing, he co-approved $9.5 million of cash payments from the Debtor to

Ms. Berg for the stock.  (*Id.* ¶¶ 212-15.)  Mr. DuBois played a critical role in the Bergs' fraudulent

scheme.

Finally, Mr. DuBois knew, or reasonably should have known, of the Bergs' fraudulent

conduct relating to the stock sale.  Among other things, (1) he "oversaw" the Debtor's bids for set-

aside contracts; (2) he knew the eligibility requirements for the 8(a), WOSB, and small business

programs because his former entity, CS DuBois, had been part of the 8(a) program; (3) as an

employee of the Debtor, he witnessed first-hand that Mr. Berg controlled the business, not Ms.

Berg; (4) he knew that Mr. Berg had a practice of wrongfully circumventing SBA eligibility

requirements, including by hiring Mr. DuBois' own daughter to a fake position with Fed Serve so

it would qualify for SBA's  HUBZone program; and (5) he knew that the Bergs had not disclosed

their fraud to Mr. Paredes and the ESOP.  (*Id.* ¶¶ 75-81, 97, 123, 180-89, 207.)

These allegations—taken as true and viewed in light most favorable to Plaintiff—plausibly

state a claim against Mr. DuBois for securities fraud.  He is jointly and severally liable with the

Bergs.

25

Mr. DuBois argues that the claim must fail because he was not Ms. Berg's "agent."  But Mr. DuBois is conflating two separate and distinct grounds for liability under the statute.  N.D. Cent. Code § 10-04-17(1) provides that an "agent" of the person who sold the stock is "jointly and severally liable" with the seller if such agent "participated or aided in any way in making such sale."  Plaintiff is *not* asserting a claim against Mr. DuBois under Section 10-04-17(1).  Instead, as noted above, Plaintiff asserts his claim against Mr. DuBois under N.D. Cent. Code § 10-04-17(6)(b), which imposes liability on anyone "associated with" the Bergs who "materially aided" the conduct giving rise to their liability.  Whether Mr. DuBois was Ms. Berg's "agent" has no bearing on Plaintiff's claim under Section 10-04-17(6)(b).  By the plain terms of the statute, a claim based on *association* is different than a claim based on *agency*, with entirely different claim elements.

## <u>CONCLUSION</u>

Based on the foregoing, Mr. DuBois' motion to dismiss should be denied.  If the Court is inclined to grant the motion—which, for the reasons set forth above, it should not do—the Court should instead grant Plaintiff leave to file an amended pleading pursuant to Fed. R. Civ. P. 15(a).  *See Wisdom v. First Midwest Bank*, 167 F.3d 402, 409 (8th Cir. 1999) ("[P]arties should usually be given at least one chance to amend their complaint.").

26

Date:  January 10, 2025

/e/ *Peter D. Kieselbach*
Michael B. Fisco (Minnesota #0175341)
(*Admitted Pro Hac Vice*)
Peter D. Kieselbach (Minnesota #0397531)
(*Admitted Pro Hac Vice*)
**GREENBERG TRAURIG, LLP**
90 South Seventh Street, Suite 3500
Minneapolis, MN 55402
Telephone: (612) 259-9700
Email: fiscom@gtlaw.com
        kieselbachp@gtlaw.com

*and*

Erik A. Ahlgren (North Dakota #09561)
Ahlgren Law Office, PLLC
220 W. Washington Ave. Suite 105
Fergus Falls, MN  56537
Telephone: (218) 998-2775
Email: erik@ahlgrenlawoffice.net

ACTIVE 704438649v6