EXECUTION VERSION

## SETTLEMENT AGREEMENT

THIS SETTLEMENT AGREEMENT (this "Agreement") is entered into as of April 11, 2025, by and among (a) Erik A. Ahlgren, in his capacities as chapter 7 trustee ("Trustee") of the bankruptcy estate of Pro-Mark Services, Inc. ("Debtor"), as administrator ("ESOP Administrator") of the Pro-Mark Services, Inc. Employee Stock Ownership Plan (the "ESOP Plan"), and as trustee ("ESOP Trustee" and together with the Trustee and the ESOP Administrator, "Plaintiff") of the Pro-Mark Services, Inc. Employee Stock Ownership Trust ("ESOP Trust" and together with the ESOP Plan, the "ESOP"), and (b) Mandy Grant. The parties are collectively referred to herein as the "Parties" or individually as a "Party."

## RECITALS

WHEREAS, on April 22, 2024, the Debtor filed a voluntary petition for relief under chapter 7 of title 11 of the United States Code in the United States Bankruptcy Court for the District of North Dakota (the "Bankruptcy Court"), Case No. 24-30167 ("Bankruptcy Case"); and

WHEREAS, on September 25, 2025, Plaintiff filed his Amended Complaint against Ms. Grant (among others) in Adversary Proceeding No. 24-07014 (the "Adversary Proceeding"), before the Bankruptcy Court.

NOW, THEREFORE, in consideration of the mutual covenants, conditions, and agreements herein, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. Recitals. The above recitals are adopted by the Parties as true and correct statements of fact and are incorporated by reference into this Agreement.

2. Settlement of Adversary Proceeding. Subject to the terms, conditions, and timing requirements in this Agreement, the Parties agree that the Plaintiff shall dismiss Ms. Grant as a party to the Adversary Proceeding with prejudice in consideration of (a) a cash payment of $1,000.00 (the "Settlement Payment") and (b) Ms. Grant's agreement to cooperate with Plaintiff as provided herein.

3. Bankruptcy Court Approval. Within fifteen (15) calendar days after the date this Agreement is executed by all Parties, the Trustee shall file a settlement approval motion under Fed. R. Bankr. P. 9019 with the Bankruptcy Court seeking entry of an order approving the terms of this Agreement. The Parties will use best efforts to obtain Bankruptcy Court approval of the settlement set forth in this Agreement, as soon as reasonably practicable. If the Bankruptcy Court does not approve the settlement by entry of a final order, this Agreement shall be null and void and of no force and effect against any of the Parties, and the Settlement Payment shall be returned to Ms. Grant, without interest.

4. Conditions Precedent. This Agreement shall be effective upon the date that the following conditions precedent have occurred: (a) all Parties have executed and delivered this

Agreement and (b) the Bankruptcy Court has entered a final order approving the settlement set forth in this Agreement.

5. Dismissal of Adversary Proceeding. Within ten (10) calendar days after Plaintiff's receipt of the Settlement Payment and the executed original Grant Affidavit (as defined below), the Parties will file a joint stipulation with the Bankruptcy Court to dismiss Ms. Grant as a party to the Adversary Proceeding with prejudice, with each Party to bear their own attorneys' fees and costs.

6. Cooperation. Ms. Grant agrees to fully and truthfully cooperate with Plaintiff in his prosecution of the Adversary Proceeding, his administration of the Debtor's bankruptcy estate, and his administration of the ESOP. Such cooperation may include, without limitation, (a) upon reasonable prior notice, appearing from time-to-time for conferences and interviews with Plaintiff and/or his counsel, and (b) providing Plaintiff with, or facilitating Plaintiff's access to, all documents, information, and other property of the Debtor or the ESOP within Ms. Grant's possession, custody, or control. In addition, Ms. Grant shall execute and deliver to Plaintiff an affidavit, in the form attached as Exhibit A (the "Grant Affidavit"), detailing her personal knowledge of certain facts relating to the Adversary Proceeding. Ms. Grant acknowledges that her agreement to fully and truthfully cooperate with Plaintiff, including her delivery of the Grant Affidavit, is a material basis for Plaintiff's willingness to enter into this Agreement. Ms. Grant further acknowledges and agrees that she shall not have, and may not assert, an administrative expense claim against the Debtor's bankruptcy estate pursuant to 11 U.S.C. § 503(b) for her cooperation hereunder.

7. Mutual Release – Estate. Upon Plaintiff's receipt of the Settlement Payment and the original executed Grant Affidavit, the Trustee, individually and on behalf of the Debtor's bankruptcy estate, and Ms. Grant, for themselves and each of their respective agents, professionals, counsel, successors, and assigns, hereby unconditionally, absolutely, and irrevocably release, waive, acquit, and forever discharge each other and each of their respective agents, professionals, counsel, successors, and assigns, from any and all claims, counterclaims, damages, liabilities, demands, obligations, costs, expenses, debts, disputes, rights, actions, proofs of claim, administrative expense claims, and causes of action, whether known or unknown, vested or contingent, direct or indirect, inchoate or matured, liquidated or unliquidated, pursuant to federal or state statute, common law, equity, or otherwise based upon or relating in any way to the Debtor, the ESOP, and/or the Adversary Proceeding.

8. Mutual Release – ESOP. Upon Plaintiff's receipt of the Settlement Payment and the original executed Grant Affidavit, the ESOP Administrator and the ESOP Trustee, individually and on behalf of ESOP, and Ms. Grant, for themselves and each of their respective agents, professionals, counsel, successors, and assigns, hereby unconditionally, absolutely, and irrevocably release, waive, acquit, and forever discharge each other and each of their respective agents, professionals, counsel, successors, and assigns, from any and all claims, counterclaims, damages, liabilities, demands, obligations, costs, expenses, debts, disputes, rights, actions, proof of claim, and causes of action, whether known or unknown, vested or contingent, direct or indirect, inchoate or matured, liquidated or unliquidated, pursuant to federal or state statute, common law, equity, or otherwise based upon or relating in any way to the Debtor, the ESOP, and/or the

2

Adversary Proceeding. Notwithstanding the foregoing, based on anti-alienation restrictions under federal law and within the ESOP plan documents, the Parties acknowledge and agree that Ms. Grant is not releasing or waiving her ESOP benefits.

9. <u>Qualified Release of Ms. Grant</u>. If it is determined by final order of this or another court of competent jurisdiction that Ms. Grant has failed to fully and truthfully cooperate with Plaintiff as provided herein, or if any portion of the Grant Affidavit is determined to be untruthful, the releases in Sections 7 and 8 of this Agreement shall be voided in their entirety. In such case, Ms. Grant acknowledges and agrees that Plaintiff may recommence the Adversary Proceeding or commence any other proceeding against her, and assert any and all claims that were or could have been brought against her as if the settlement herein had not occurred, and Ms. Grant hereby waives her right to assert the prior dismissal with prejudice. Further, Ms. Grant agrees that the statute of limitations, statute of repose, or the equivalent are tolled as of the date of this Agreement until the date of discovery of any such failure to cooperate or untruthfulness. Notwithstanding the foregoing, Ms. Grant's obligations to fully cooperate with Plaintiff shall not be interpreted in any way that would prevent her from fully defending herself in this or any other legal proceeding against claims brought by any other person or entity, whether in a criminal, civil, or administrative proceeding, and any such actions taken in defending herself in good faith in any such action will in no means be grounds to void the releases in Sections 7 and 8 of this Agreement

10. <u>Financial Information</u>. In connection with this Agreement, Ms. Grant has provided certain personal financial information to Plaintiff (the "<u>Financial Information</u>"). Ms. Grant represents and warrants the Financial Information is true and correct and accurately represents her assets and liabilities and personal financial condition. Ms. Grant acknowledges that Plaintiff has relied on the Financial Information as a material basis for his willingness to enter into this Agreement.

11. <u>No Admission of Liability</u>. Plaintiff acknowledges that this Agreement represents a compromise settlement of disputed claims to avoid the time and expense of litigation and that neither the contents of this Agreement, nor the fact of its execution, nor any fact, manner or thing in any way related to or connected with the making and executing of this Agreement, is intended to, nor shall it be construed as, an admission of liability by Ms. Grant, which liability is expressly denied.

12. <u>Advice of Counsel</u>. Each of the Parties agrees, represents, and warrants to the other Parties that (a) they have consulted with independent counsel of their own choice with respect to this Agreement and all matters covered by it; (b) they have been fully advised by said counsel with respect to their rights and obligations and with respect to the execution of this Agreement; (c) they have carefully read this Agreement, and know and understand the content and meaning of all provisions in this Agreement, are fully aware of the legal effect of all provisions, and have entered into this Agreement freely based on their own judgment; and (d) this Agreement was jointly drafted by all Parties, and the customary rules of contract interpretation to the effect that ambiguities are to be construed or resolved against the drafting party will not be employed in the interpretation or construction of this Agreement.

13. <u>Proper Authority</u>. Each of the Parties represents and warrants to the other Parties that (a) they have full power, authority, and legal right to execute this Agreement and to keep and observe all terms of this Agreement on their part to be observed and performed; (b) this Agreement has been duly and validly executed and delivered by them; and (c) this Agreement constitutes their legal, valid and binding obligation, enforceable in accordance with its terms.

14. <u>Enforcement of Agreement</u>. In the event that an action is commenced by any of the Parties to enforce the provisions of this Agreement, the prevailing party shall be entitled to an award, in addition to any other claims or damages, of its costs and expenses, including attorneys' fees, in connection with said action.

15. <u>Entire Agreement</u>. This Agreement and any final order of the Bankruptcy Court approving the settlement herein constitute the complete agreement among the Parties and supersede any prior agreements, understandings, negotiations, and discussions. Each of the Parties represents and warrants that they are not relying on any representation or promise not expressly set forth in this Agreement.

16. <u>Amendments</u>. This Agreement may not be altered, amended, modified or otherwise changed in any respect whatsoever except by a writing duly executed by each Party and as approved by the Bankruptcy Court, as necessary.

17. <u>Waiver</u>. No waiver of any provision of this Agreement shall be deemed, or shall constitute, waiver of any other provisions, whether or not similar, nor shall any waiver constitute a continuing waiver. No waiver shall be binding unless executed in writing by the Party making the waiver.

18. <u>Time Is of the Essence</u>. Each Party acknowledges and agrees that time is of the essence with respect to all provisions of this Agreement.

19. <u>Additional Actions</u>. Each Party agrees to execute any further documents and take any further actions as necessary to implement and effectuate the terms of this Agreement.

20. <u>Governing Law</u>. This Agreement shall be interpreted, construed and enforced in accordance with the laws of the State of North Dakota, without regard to choice-of-law provisions.

21. <u>Successors and Assigns</u>. This Agreement is binding upon and shall inure to the benefit of the Parties hereto and their respective successors and assigns.

22. <u>Miscellaneous</u>. Titles, captions, or headings in this Agreement are inserted as a matter of convenience and for reference, and in no way define, limit, extend, describe, alter, or affect the meaning of this Agreement. If any provision of this Agreement or the application thereof is held invalid, such invalidation shall not affect other provisions or applications of this Agreement and to this end the provisions of this Agreement are declared to be severable. This Agreement may be executed in counterparts, and each counterpart, when executed, shall have the effect of a signed original. Facsimile signatures and signature pages provided in the form of a ".pdf" or

similar imaged document transmitted by electronic mail (including .pdf of any electronic signature, e.g., www.docusign.com) shall be deemed original signatures for all purposes hereunder.

*[Signature Page(s) to Follow]*

ACTIVE 708007200v2

      IN WITNESS WHEREOF, each of the undersigned has executed this Agreement as of the date first set forth above.

          **ERIK A. AHLGREN, AS CHAPTER 7 TRUSTEE OF THE BANKRUPTCY ESTATE OF PRO-MARK SERVICES, INC., AS ADMINISTRATOR OF THE PRO-MARK SERVICES, INC. EMPLOYEE STOCK OWNERSHIP PLAN, AND AS TRUSTEE OF THE PRO-MARK SERVICES, INC. EMPLOYEE STOCK OWNERSHIP TRUST**

*/s/ Erik Ahlgren*
_____

          **MANDY GRANT**

_____

(*Signature Page to Settlement Agreement*)

Docusign Envelope ID: DF82284B-1A78-4199-8E2E-9CB5AB...

IN WITNESS WHEREOF, each of the undersigned has executed this Agreement as of the date first set forth above.

**ERIK A. AHLGREN, AS CHAPTER 7 TRUSTEE OF THE BANKRUPTCY ESTATE OF PRO-MARK SERVICES, INC., AS ADMINISTRATOR OF THE PRO-MARK SERVICES, INC. EMPLOYEE STOCK OWNERSHIP PLAN, AND AS TRUSTEE OF THE PRO-MARK SERVICES, INC. EMPLOYEE STOCK OWNERSHIP TRUST**

_____

**MANDY GRANT**

Signed by: *MandyGrant*
April 14, 2025 | 2:16 PM CDT

(*Signature Page to Settlement Agreement*)

ACTIVE 708007200v2

## EXHIBIT A

Grant Affidavit

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NORTH DAKOTA

In re:

Pro-Mark Services, Inc.,                                              Bky. Case No. 24-30167

                                                                              Chapter 7

        Debtor.

---

Erik A. Ahlgren, as Chapter 7 Trustee
of the Bankruptcy Estate of Pro-Mark Services, Inc.,
as Administrator of the Pro-Mark
Services, Inc. Employee Stock Ownership Plan, and
as Trustee of the Pro-Mark Services, Inc.
Employee Stock Ownership Trust,

        Plaintiff,

v.                                                                              Adversary No. 24-07014

Connie Berg, Kyle Berg, Connie Berg Revocable
Living Trust, Kyle R. Berg Revocable Living Trust,
Chad DuBois, Mandy Grant, and Miguel Paredes,

        Defendants.

---

## AFFIDAVIT OF MANDY GRANT

---

I, Mandy Grant, hereby declare, under penalty of perjury, as follows:

1. I am a defendant in the above-captioned adversary proceeding. I make this declaration from personal knowledge to the best of my recollection.

2. From 2011 to 2024, I was an employee at Pro-Mark Services, Inc. ("Pro-Mark"). Pro-Mark was a contractor that did construction and general contracting work for the federal government.

3. During my 13 year-tenure, I held different managerial positions at Pro-Mark.

4. In 2011, I was hired as Pro-Mark's office manager. As office manager, I assisted project managers with project submittals and related documentation; submitted project billing and invoicing through government platforms; issued subcontracts based on project managers instructions; certified payroll submissions; collected third-party invoices and submitted for payment; prepared employee time reports for submission to accounting firm; administered company benefits; and performed other miscellaneous clerical duties. I served as office manager from 2011 until in or around July 2019.

5. In or around July 2019, I was appointed as the Debtor's secretary and treasurer. .

6. At all times from 2011 through August 2020, I was materially involved in managing Pro-Mark's day-to-day business operations.

7. From 2011 through August 2020, I worked an average of 40 hours per week or more, in person, at the Debtor's main office and headquarters, with a brief hiatus working at home due to COVID-19 protocols in 2020.

8. From 2011 through August 2020, I rarely communicated with Connie Berg about the Debtor's business ("Mrs. Berg"). On the occasions that I did communicate with Mrs. Berg, it was usually about her apparel and screen-printing business. I do not recall ever communicating with Mrs. Berg regarding Pro-Mark's construction and contracting business, its finances, its day-to-day operations and administration, its long-term business strategy, or any business decisions. By contrast, I routinely communicated with Kyle Berg ("Mr. Berg") regarding these issues.

9. From 2011 through August 2020, I do not recall ever receiving any requests, instructions, orders, or communications of any kind from Mrs. Berg relating to Pro-Mark's construction business. By contrast, I routinely received requests, instructions, orders, and communications from Mr. Berg relating to Pro-Mark's construction business.

2

10. From 2011 through August 2020, I do not recall Mrs. Berg attending or participating in any of Pro-Mark's managerial meetings. By contrast, Mr. Berg regularly participated in and led such meetings.

11. From 2011 through August 2020, I rarely, if ever, witnessed Mrs. Berg come into Debtor's headquarters or interact with Pro-Mark's employees relating to Pro-Mark's business. By contrast, Mr. Berg regularly interacted with Pro-Mark's employees and was often present at Pro-Mark's headquarters.

12. To the best of my personal knowledge and experience, from 2011 through August 2020, Mrs. Berg did not work an average of 40 hours per week or more for Pro-Mark. In my roles as Pro-Mark's office manager and later secretary and treasurer, I did not witness Mrs. Berg work an average of 40 hours per week or more for Pro-Mark. If Mrs. Berg asserts that she worked an average of 40 hours per week or more for the Pro-Mark, I could not describe what she did or where she did this work.

13. To the best of my personal knowledge and experience, from 2011 through August 2020, Mrs. Berg (a) did not manage Pro-Mark on a full-time basis during normal working hours, and (b) did not devote full-time to Pro-Mark during normal working hours. In my roles as Pro-Mark's office manager and later secretary and treasurer, I did not witness Mrs. Berg manage Pro-Mark on full-time basis during normal working hours nor devote full-time to Pro-Mark during normal working hours. If Mrs. Berg asserts that she managed Pro-Mark on full-time basis during normal working hours and devoted full-time to Pro-Mark during normal working hours, I could not describe what she did or where she did this work.

14. To the best of my personal knowledge and experience, from 2011 through August 2020, Mrs. Berg (a) had no involvement in selecting, estimating, or structuring the bids

3

that the Pro-Mark submitted for federal construction contracts and set-aside contracts; (b) did not engage in substantive discussions with the government contracting officers responsible for awarding, evaluating, or overseeing bids; (c) had no involvement in hiring, directing, or managing the Debtor's employees and subcontractors; (d) had no involvement in managing the Debtor's business operations; (e) had no involvement in the Debtor's financials; and (f) was not involved in Pro-Mark's long-term decision making or day-to-day management and administration. In my roles as Pro-Mark's office manager and later secretary and treasurer, I never witnessed Mrs. Berg being involved in any of the foregoing business activities. If Mrs. Berg asserts that she was involved in the foregoing business activities, I could not describe what she did or where she did this work.

15. At all times from 2011 through August 2020, Mr. Berg was my supervisor at Pro-Mark, and I reported directly to him.

16. To the best of my personal knowledge and experience, from 2011 until the ESOP transaction closed in August 2020, Mr. Berg was Pro-Mark's final decision maker and controlled all aspects of the business, including long-term decision making and day-to-day management and administration. Mr. Berg presented himself as Pro-Mark's decision maker, and I viewed Pro-Mark as Mr. Berg's company.

17. From 2011 through August 2020, when Mr. Berg gave me instructions or directions, I don't recall him ever telling me that those instructions or directions originated from Mrs. Berg.

18. From 2011 through August 2020, I don't recall Mr. Berg ever telling me that he needed to discuss, or had discussed, any Pro-Mark business decisions with Mrs. Berg,

19. From 2011 through August 2020, Mr. Berg never told me that he needed to obtain, or had obtained, input from Mrs. Berg regarding any Pro-Mark business decisions.

4

ACTIVE 709635551v2

20. From 2011 through August 2020, I don't recall Mr. Berg ever telling me that he needed to obtain, or had obtained, direction or authorization from Mrs. Berg regarding any Pro-Mark business decisions.

21. To the best of my personal knowledge and experience, from 2011 through August 2020, Mr. Berg had final approval for (a) which government contracts Pro-Mark would bid, structured the bids, estimated the costs for the bids, directed employees how to complete proposals, and communicated with government contracting officers; (b) decisions for Pro-Mark as to its employees, including salaries, raises, and bonuses; (c) the activity and work of Pro-Mark's employees, subcontractors, and suppliers; and (d) Pro-Mark's financial reporting and all finances of Pro-Mark, including company bank accounts, loans, and payroll. In my roles as office manager and later secretary and treasurer, I never witnessed Mrs. Berg participate in these activities.

22. From 2011 through August 2020, I periodically performed services for other entities besides Pro-Mark, including Razor Consulting Solutions, Inc., Fed Serve, LLC, and OK2 Construction, LLC. I did so at the direction of Kyle Berg.

23. On October 26, 2023, Pro-Mark, the United States Department of Justice's Antitrust Division, and the United States Attorney's Office for the District of North Dakota entered into a Non-Prosecution Agreement (the "NPA"). Attachment A to the NPA is a Statement of Facts (the "Statement of Facts"). A true and correct copy of the Statement of Facts is attached as **Exhibit A**.

24. In the Statement of Facts, I am "Employee B," Mr. Berg is "Individual A," and Mrs. Berg is "Individual B."

25. To the best of my personal knowledge and experience, I have no reason to dispute that the factual statements in paragraph 12, the first and third sentences of paragraph 13, the last

5

sentence of paragraph 14, paragraph 16, and paragraph 17 of the Statement of Facts are true and correct for the period of 2011 through August 2020, when I served as Pro-Mark's office manager, secretary, and treasurer.

6

ACTIVE 709635551v2

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: 4/14, 2025

_Mandy Grant_
Mandy Grant

STATE OF North Dakota )
) ss.
COUNTY OF Cass )

Signed and sworn to me on April 14th, 2025, by Cassandra Sifuentes

CASSANDRA L SIFUENTES
Notary Public
State of North Dakota
My Commission Expires March 5, 2029

Notary Public

My Commission Expires:

7

ACTIVE 709635551v2

# **Exhibit A to Affidavit of Mandy Grant**

Statement of Facts

ATTACHMENT A

# STATEMENT OF FACTS

The following Statement of Facts is incorporated by reference as part of the non-prosecution agreement entered into by the United States Department of Justice's Antitrust Division and the United States Attorney's Office for the District of North Dakota and Pro-Mark Services, Inc. ("Pro-Mark" or "the Company") dated October 26, 2023, (the "Agreement"). Pro-Mark hereby agrees and stipulates that the following information is true and accurate. Pro-Mark also admits, accepts, and acknowledges that it is responsible for the acts of its current and former owners, officers, directors, employees, and agents as set forth in this Statement of Facts.

## Background and Relevant Entities and Individuals

### The SBA Programs

1. The United States Small Business Administration's ("SBA") Section 8(a) Business Development Program ("the 8(a) Program") was designed to help socially and economically disadvantaged business owners gain access to and succeed in the marketplace for federal government contracts. A means by which the SBA achieved this goal was by creating a set of reserved, or set-aside, federal contracting opportunities for participants in the 8(a) Program. The federal government's goal is to award at least 5% of all federal contracting dollars to small disadvantaged businesses each year through its 8(a) Program.

2. To be eligible for the 8(a) Program, a small business was required, among other things, to be unconditionally owned and controlled by one or more socially and economically disadvantaged individuals. An 8(a) Program participant was required to maintain its eligibility throughout its tenure in the program and to inform the SBA of any changes that would alter its eligibility for the 8(a) Program. Once admitted, a small business was eligible to participate in the 8(a) Program for nine years, after which it was deemed to have graduated from the program.

3. Similar to the program for businesses owned by economically and socially disadvantaged individuals, the SBA also allowed small businesses that were owned by women to compete for certain set-aside contracts. Until October 2020, a women-owned small business ("WOSB") could self-certify to the SBA that it met the criteria to participate in the WOSB program. Among other criteria, to be eligible to receive contracts set aside for WOSBs, the business had to certify that it was unconditionally owned and controlled by one or more women and to inform the SBA of any changes that would alter its eligibility to compete for federal contracts set aside for WOSBs. The federal government's goal is to award at least 5% of all federal contracting dollars to WOSBs each year.

### Pro-Mark Services, Inc.

4. Pro-Mark was incorporated in North Dakota in 2001 for the purpose of engaging in specialty and retail sales. Pro-Mark was originally owned by husband (Individual A) and wife (Individual B) (collectively, "the Original Owners"), with Individual B serving as the president of the Company. In August 2007, Individual A transferred his 49% share in Pro-Mark to Individual B, making her both the president and sole owner.

5. In December 2007, Individual B and Pro-Mark applied to the 8(a) Program for economically and socially disadvantaged individuals on the basis of gender bias. In the 8(a) Program application submitted on behalf of Pro-Mark, Individual B represented that Pro-Mark earned 100% of its revenue in the field of specialty and retail sales and that Pro-Mark was established to furnish clothing and promotional items to area businesses, organizations, and colleges. The business plan further provided that these promotional items could be customized through logos, screen-printing, and/or embroidery. Individual B also represented to the SBA that she was Pro-Mark's only director, officer, management member, key employee, or owner; that she worked 40 hours per week for Pro-Mark; and that she was responsible for "all control, management, and business decisions relating to Pro-Mark." Based on its application, Pro-Mark was accepted into the 8(a) Program in 2008.

6. After being accepted into the 8(a) Program, Pro-Mark submitted annual forms from 2008 to 2017 to the SBA certifying that it remained eligible for the program. These forms were signed and submitted by Individual B, who represented that she remained Pro-Mark's president; continued to dedicate 40 hours per week to Pro-Mark's business; and that no one other than a socially or economically disadvantaged individual held the highest position at Pro-Mark and that the individual holding that highest position at Pro-Mark worked full time at Pro-Mark. Pro-Mark continued to participate in the 8(a) Program until it graduated in 2017.

7. Beginning in 2015 and continuing until 2020, Pro-Mark, through Individual B, also began to self-certify annually to the SBA that Pro-Mark was a WOSB. In these certifications, Individual B, on behalf of Pro-Mark, represented that "management and daily business operations of [Pro-Mark] are controlled by one or more women;" that a "woman holds the highest officer position in [Pro-Mark] and her resume evidences that she has the managerial experience of the extent and complexity needed to run [Pro-Mark];" and that she "manages [Pro-Mark] on a full-time basis and devotes full-time to [Pro-Mark] during working hours."

8. Individual A held the title of Vice President of Pro-Mark from 2007 until July 2019. From 2019 through at least 2022, Individual A maintained similar roles and responsibilities as he did while Vice President of Pro-Mark in his role as a "consultant" to Pro-Mark, the terms of which were set out in a series of written consulting agreements between Pro-Mark and Company A, a company wholly owned by Individual A. Through this consulting agreement, Individual A was paid at least $30,000 more than what Individual B was making at Pro-Mark annually in 2019. In July 2019, after Individual A nominally stepped down as Pro-Mark Vice President, Employee A became Pro-Mark's Vice President and Employee B another long-time Pro-Mark employee, became its Secretary and Treasurer. Following a change in ownership of Pro-Mark effected by an Employee Stock Ownership Plan ("ESOP") in August 2020, Employee A became President of Pro-Mark in September 2020 and Employee B became Vice President of Pro-Mark in October 2022.

9. From the time it was accepted into the 8(a) Program and despite what it had represented to the SBA in its application, the majority of Pro-Mark's business was in the construction field, not the specialty and retail sales field. In June 2008, in a business plan submitted to the SBA on behalf of Pro-Mark by Individual B, Pro-Mark told the SBA that the Company, in addition to its retail and specialty sales business, had begun, in 2007, engaging in and bidding on contracts for "construction activity" to "make the most of [Individual A's] 14 years of experience." In

2014, the specialty retail sales component of Pro-Mark's business accounted for less than 1% of its annual revenue.

10. Based on its participation in the 8(a) Program and its claimed status as a WOSB, between 2008 and 2020, Pro-Mark was awarded approximately $70 million in federal government 8(a) and WOSB set-aside contracts. All of these contracts were in the field of general contracting and construction, not specialty and retail sales.

### The Criminal Scheme

11. From 2008 through 2020 Pro-Mark, along with Individual A and Individual B voluntarily and intentionally reached an agreement to defraud the United States, including through interfering with and obstructing in one of the United States' lawful government functions through false and fraudulent pretenses to obtain 8(a) and WOSB contracts to which they were not entitled, including by falsely claiming Individual B controlled Pro-Mark and therefore that Pro-Mark was qualified for such contracts, when Pro-Mark was not eligible to receive such contracts because it was controlled by Individual A. Pro-Mark, through false representations made or directed by the Original Owners between 2008 and 2020, misrepresented its status and eligibility for those programs and set-aside contracts to the SBA and to the government agencies administering the relevant contracts.

12. Between 2008 and 2020, Individual B was held out as the President of Pro-Mark who ran and controlled the business, when in reality she did not control or manage Pro-Mark. She was not the decision-maker at Pro-Mark with regard to federal construction projects or one of its key officers or employees. She did not manage or work 40 hours per week for Pro-Mark. In sum, Individual B did not exercise strategic or day-to-day control over Pro-Mark and had no role in making operational decisions for the Company pertaining to its federal construction business. For example, she had no role in selecting, estimating, or structuring the bids that Pro-Mark submitted for federal construction contracts, engaging in substantive discussions with the contracting officers responsible for awarding, evaluating, or overseeing bids or subsequent contracts, or in hiring or directing Company employees or subcontractors.

13. During that same period, Individual A, who is a non-disadvantaged man, was the individual in control of Pro-Mark who made or delegated all the strategic and day-to-day decisions concerning Pro-Mark and its federal construction business. From 2008 through 2020, Pro-Mark was not eligible for either the 8(a) or WOSB Programs because Individual A, not Individual B, controlled and managed Pro-Mark. Individual A selected which set-aside contracts Pro-Mark would bid on (including 8(a) and WOSB contracts), and he was extensively involved in structuring those bids, estimating their costs, and routinely directed the hiring of, activity, and work of Pro-Mark employees, subcontractors, and suppliers. Finally, he managed the Company's financials, including its bank accounts.

14. Individual B's background, as reflected in her past experience and resumes submitted to the SBA and uploaded to SAM.gov, was in screen-printing fabric and clothing and that she was responsible for Pro-Mark's *de minimis* "Retail Sales and Marketing Division." To the extent she had any meaningful business experience or managerial experience, it was for companies engaged in making custom promotional products or clothing sales. She lacked the expertise to

3

operate, manage, or control a construction company, especially one that was able to complete multi-million-dollar construction contracts for the U.S. government successfully. In sum, she had no control of or meaningful role in Pro-Mark's construction business.

15. In contrast, Individual A had an extensive background in general contracting, government contracting, and construction, including through employment prior to Pro-Mark as a vice president and project manager at a different construction company engaged in federal construction contracts. When Pro-Mark began doing work in construction in 2007, Individual A had 14 years of construction experience.

16. Nothing in Individual A's regular direction to Pro-Mark employees indicates that Individual B had a role in any of the decision-making at Pro-Mark, and employees were not aware that Individual B was ever the source, directly or indirectly, for the directions he gave.

17. Employees at Pro-Mark, including senior employees as well as construction project managers, recognized that Individual A, not Individual B, was in control of the Company. They considered Individual A to be their immediate or ultimate supervisor, and they looked to Individual A for direction and answers about issues that arose during the course of their employment. Employees never sought guidance from Individual B regarding Pro-Mark's construction business.

18. Unlike Individual A or other Pro-Mark employees, Individual B did not have a Pro-Mark-sponsored e-mail address. To the extent she communicated with Pro-Mark employees at all, Individual B used a personal e-mail address, and the subjects of her infrequent communications rarely, if ever, the performance of the construction contracts that made up the vast majority of Pro-Mark's business.

19. In contrast, Individual A sent thousands of e-mails from his Pro-Mark sponsored e-mail address to Pro-Mark employees, subcontractors, suppliers, and others concerning the strategic and day-to-day construction work of Pro-Mark, and he received thousands of e-mails from those individuals and entities regarding Pro-Mark's business at that same e-mail address.

20. In August 2020, Individual B sold her entire ownership interest in Pro-Mark to Pro-Mark's employees via an ESOP for approximately $32 million. While Individual B was the sole owner of Pro-Mark on paper, Individual A was the primary point of contact for all aspects of the ESOP transaction.