UNITED STATES BANKRUPTCY COURT
DISTRICT OF NORTH DAKOTA

---

| | |
|---|---|
| In re:<br><br>Pro-Mark Services, Inc.,<br><br>                    Debtor. | Chapter 7<br>Bky. No. 24-30167 |

---

| | |
|---|---|
| Erik A. Ahlgren, as Chapter 7 Trustee of Bankruptcy Estate of Pro-Mark Services, Inc., as Administrator of the Pro-Mark Services, Inc. Employee Stock Ownership Plan, and as Trustee of the Pro-Mark Services, Inc. Employee Stock Ownership Trust,<br><br>                    Plaintiff,<br><br>v.<br><br>Connie Berg, Kyle Berg, Connie Berg Revocable Living Trust, Kyle R. Berg Revocable Living Trust, Chad DuBois, and Miguel Paredes,<br><br>                    Defendants. | Adv. No. 24-07014<br><br><br>**SECOND AMENDED COMPLAINT** |

---

Plaintiff Erik A. Ahlgren, as chapter 7 trustee for the bankruptcy estate of Pro-Mark Services, Inc. ("Debtor"), administrator of the ESOP Plan (as defined below), and trustee of the ESOP Trust (as defined below), as and for his second amended complaint against Defendants Connie Berg, Kyle Berg, the Connie Berg Revocable Living Trust, the Kyle Berg Revocable Living Trust, Chad DuBois, and Miguel Paredes, individually and as trustee for the ESOP Trust (each individually, a "Defendant", and collectively, the "Defendants"), states as alleges as follows:

## PRELIMINARY STATEMENT

1.      The Debtor was a federal contractor that did construction and general contracting work for the federal government.  In August 2020, the Debtor's then-owners, Defendants Connie Berg and Kyle Berg, sold their equity interest in the company to its employees via an "ESOP" transaction.  Defendant Miguel Paredes acted as ESOP trustee in closing the transaction on behalf of the Debtor's employees.  From the transaction, the Bergs received over $25 million of cash.

2.      The ESOP transaction, however, was based on lies and misrepresentations.  For over a decade, the Bergs had illegally enrolled the Debtor in government contracting programs intended for socially or economically disadvantaged individuals, women, and small businesses, including the WOSB and 8(a) programs.   Based on the Bergs' fraud, the Debtor received millions of dollars in revenue and profits from federal contracts for which it did not qualify.  Had the Bergs disclosed their scheme during the ESOP negotiations, the transaction never would have closed— let alone at a $31.5 million valuation.  Had Defendant Miguel Paredes performed reasonable due diligence as ESOP trustee, he would have discovered the fraud before consummating the ESOP transaction.  Instead, the Bergs received a windfall, and the Debtor's creditors and employees were left holding the bag.

3.      Just two years after the ESOP transaction closed, the Bergs' scheme unraveled when the federal government raided the Debtor's headquarters.  Ultimately, in October 2023, the Debtor and the federal government entered into a non-prosecution agreement, under which the Debtor admitted that the Bergs' misconduct violated federal law and agreed to pay a $949,000 criminal fine.  But unfortunately for the Debtor, its creditors, and employees, the damage was already done.  The Debtor's business was in a tailspin, it could not obtain bonding for its construction projects, and it lost its small business certification.  In April 2024, the Debtor filed

for chapter 7 bankruptcy protection, reporting just $4.4 million in assets and more than $33.3 million in liabilities.

4.　　Plaintiff Erik A. Ahlgren, in his capacities as chapter 7 trustee and administrator and trustee of the Debtor's ESOP plan, now brings this action to hold the Bergs, Mr. Paredes, and others accountable for their breaches of fiduciary duties, misconduct, and fraud.

## JURISDICTION AND VENUE

5.　　On April 22, 2024 ("Petition Date"), Pro-Mark Services, Inc. ("Debtor") filed a voluntary petition for relief under chapter 7 of title 11 of the United States Code ("Bankruptcy Code") in the United States Bankruptcy Court for the District of North Dakota ("Bankruptcy Court"). The Debtor's bankruptcy case is pending and administered as case number is 24-30167.

6.　　On the Petition Date, Plaintiff Erik A. Ahlgren was appointed chapter 7 trustee of the Debtor's bankruptcy estate.

7.　　The Debtor established and is the sponsor of the Pro-Mark Services, Inc. Employee Stock Ownership Plan ("ESOP Plan") and the Pro-Mark Services, Inc. Employee Stock Ownership Trust ("ESOP Trust"). As of the Petition Date, the Debtor or an entity designated by the Debtor served as administrator of the ESOP Plan. Accordingly, as of the Petition Date, and pursuant to 11 U.S.C. § 704(a)(11), the Trustee is the administrator of the ESOP Plan (in such capacity, the "Administrator").

8.　　Plaintiff Erik A. Ahlgren, in his capacities as Trustee and Administrator, appointed himself to serve as trustee of the ESOP Trust (in such capacity, "ESOP Trustee").

9.　　As Administrator and ESOP Trustee, Plaintiff Erik A. Ahlgren has discretionary authority and/or control over the management of the ESOP Plan and ESOP Trust and over the management and disposition of the ESOP Plan's assets and ESOP Trust's assets.

ACTIVE 709498546v4

10.     Plaintiff Erik A. Ahlgren had no involvement with or knowledge of the Debtor, the ESOP Plan, or the ESOP Trust before his appointment as Trustee.

11.     This action arises in or relates to a case under title 11 of the United States Code.

12.     This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(a), 157(b), and 1334, and 29 U.S.C. § 1132(e).

13.     This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (H), and (O).

14.     This matter involves a federal question under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1001 et seq., as it concerns administration of conduct relating to the ESOP Plan and ESOP Trust.

15.     Venue is proper in this District under 28 U.S.C. §§ 1391(b) and 1409.

16.     This Complaint is filed under Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 7001(1), (2), (7), (8), and (9).

17.     Pursuant to Bankruptcy Rule 7008, Plaintiff consents to entry of final orders and judgments by the Bankruptcy Court.

## **PARTIES**

18.     The Debtor is a North Dakota corporation.  At all relevant times, its principal place of business was in Fargo, North Dakota.

19.     Plaintiff Erik A. Ahlgren is Trustee of the Debtor's bankruptcy estate, Administrator of the ESOP Plan, and ESOP Trustee of the ESOP Trust.

20.     Defendants Connie and Kyle Berg are natural persons domiciled in North Dakota. On information and belief, they are married.  At all relevant times before August 31, 2020, Connie Berg was the Debtor's sole owner, director, and President, and Kyle Berg was an employee and/or consultant of the Debtor.  However, as detailed below, Kyle Berg was the Debtor's true control

4

person, and Connie Berg had only a nominal role in the business to facilitate the fraudulent representations to SBA and the federal government.

21.    Defendant Connie Berg Revocable Living Trust (the "Connie Berg Trust") is a revocable living trust for which Connie Berg is the grantor/settlor.  At all relevant times, the Connie Berg Trust was and is a resident of North Dakota and owns real property in North Dakota.  On information and belief, Connie Berg routinely transfers assets to the Connie Berg Trust, including assets sought to be recovered in this adversary proceeding.

22.    Defendant Kyle R. Berg Revocable Living Trust (the "Kyle Berg Trust") is a revocable living trust for which Kyle Berg is the grantor/settlor.  At all relevant times, the Kyle Berg Trust was and is a resident of North Dakota and owns real property in North Dakota.  On information and belief, Kyle Berg routinely transfers assets to the Connie Berg Trust, including assets sought to be recovered in this adversary proceeding.

23.    Defendant Chad DuBois is a natural person domiciled in North Dakota.  From about June 2018 to July 2019, Mr. DuBois was the Debtor's controller.  In July 2019, he was promoted to Vice President.  On August 31, 2020, he was promoted to become the Debtor's President and was appointed as a director on the Debtor's board.

24.    Mandy Grant was previously a defendant in this action.  By orders dated May 7, 2025 (Bky No. 24, 30167, Doc. 215; Adv. No. 24-07014, Doc. 114), the Bankruptcy Court approved a settlement between Plaintiff and Ms. Grant, and Ms. Grant was dismissed as a defendant.

25.    Defendant Miguel Paredes is a natural person domiciled in California.  As detailed below, Mr. Paredes served as transactional trustee for the ESOP Trust.  As transactional trustee,

ACTIVE 709498546v4

Mr. Paredes was responsible for all due diligence relating to the ESOP transaction and closing the transaction on behalf of the ESOP participants.

## FACTS

26.     Kyle and Connie Berg incorporated the Debtor in 2001.  Connie Berg owned 51% of the company and Kyle Berg owned 49%.  The Debtor's original purpose was specialty retail sales.  Eventually, however, the Debtor became a construction and general contracting company that did work for the federal government.

27.     Starting in or around 2007, the Bergs caused the Debtor to fraudulently obtain federal government set-aside contracts ("Set-Aside Contracts") to which it was not entitled. Specifically, the Bergs caused the Debtor to wrongfully enroll in the 8(a) Business Development program ("8(a) Program") and the Women Owned Small Business program ("WOSB Program"), each administered by the U.S. Small Business Administration ("SBA").  The Bergs also caused the Debtor to wrongfully certify itself as a "small business."

**A.     Set-Aside Contracts for 8(A) Program Enrollees**

28.     SBA's 8(a) Program aims to award at least 5% of all federal contracting dollars to small businesses owned and controlled by socially and economically disadvantaged individuals. Businesses enrolled in the 8(a) Program receive various benefits, including the right to bid for Set-Aside Contracts specially "set aside" only for 8(a) Program participants.

29.     Participation in the 8(a) Program is limited to nine (9) years, with the goal that participants can thrive in a competitive bidding environment upon graduation from the program.

30.     To qualify for the 8(a) Program, the applicant business must satisfy three criteria. First, the business must be at least 51% owned by one or more socially and economically

6

disadvantaged persons. Second, the business must be controlled only by socially and economically disadvantaged persons.  Third, the business must qualify as a "small" business.

31.     Factors relevant to determining whether an applicant is controlled only by socially and economically disadvantaged persons include whether the purported control person (a) has the requisite management capabilities to, and actually does, manage the business, (b) works full-time for the business during normal business hours, and (c) holds the highest officer position in the company. While a non-disadvantaged individual or entity may be involved in the business, they may not exercise control over the business.

32.     To determine whether the applicant business is a "small" business, SBA measures the company's revenue together with the revenue of any affiliated businesses.  The revenue threshold varies by industry.

33.     To enroll in the 8(a) Program, the applicant business must certify to SBA in writing that it is owned and controlled by socially and economically disadvantaged persons and provide documentary evidence for each criterion.  SBA's application form cautions that an applicant is subject to criminal prosecution if the applicant provides false information or makes misrepresentations.

34.     Each year, the business must recertify with SBA to maintain eligibility in the 8(a) Program.  Additionally, each time the business applies for Set-Aside Contract via the 8(a) Program, it typically must certify that it continues to meet the eligibility criteria.

**B.     Set-Aside Contracts for WOSB Program Enrollees**

35.     Similar to the 8(a) Program, SBA's WOSB Program aims to award at least 5% of all federal contracting dollars to women-owned small businesses.  Businesses enrolled in the

7

WOSB Program receive various preferences and benefits from the federal government, including the right to bid for Set-Aside Contracts allocated only for WOSB Program participants.

36.    To qualify for the WOSB Program, the applicant business must satisfy three criteria.  First, the business must be at least 51% owned by one or more women. Second, the business must be controlled and managed on a full-time basis only by women.  Third, the business must qualify as a "small" business.

37.    Factors relevant to determining whether an applicant business is controlled only by women include whether (a) a woman holds the highest position in the business, (b) such woman has the management experience necessary to run the business, and (c) such woman is engaged in outside employment that prevents her from controlling the day-to-day business operations. While men or other entities may be involved in managing the business, they may not control the business.

38.    As with the 8(a) Program, to determine whether the applicant business is a "small" business, SBA measures the company's revenue together with the revenue of any affiliated businesses.  The revenue threshold varies by industry.

39.    To enroll in the WOSB Program, the applicant business must certify to SBA in writing that it is owned and controlled only by women and provide documentary evidence for each criterion.  SBA's application form cautions that an applicant is subject to criminal prosecution if the applicant provides false information or makes misrepresentations.

40.    Until October 2020, applicants could self-certify that they were eligible for the WOSB Program by submitting annual representations to SBA under penalty of perjury. Additionally, each time the business applies for a Set-Aside Contract via the WOSB Program, it typically must certify that it continues to meet eligibility criteria.

ACTIVE 709498546v4

C.      **Set-Aside Contracts for Small Businesses**

41.     As part of its statutory policies and mandates, SBA seeks to award at least 23% of federal contracting dollars to small businesses.  To accomplish this goal, the government "sets aside" certain Set-Aside Contracts only for small businesses.

42.     Whether the applicant business is a "small business" depends on its revenue, viewed in conjunction with the revenue of any affiliated businesses.  The revenue threshold various by industry.

43.     Each time a business applies for a Set-Aside Contract designated for small businesses, it must certify that it, in fact, qualifies as a small business.

D.      **The Bergs Fraudulently Enroll the Debtor in the 8(a) and WOSB Programs**

44.     Understanding the substantial benefits of the 8(a) Program, the WOSB Program, and small business program, the Bergs devised a scheme to fraudulently divert funds from government Set-Aside Contracts to themselves.  On August 1, 2007, Kyle Berg gifted his 49% interest in the Debtor to Connie Berg, making her sole owner on paper.  Notwithstanding the transfer of his equity interest, Kyle Berg maintained his control over the Debtor as a full-time "employee" and/or "consultant."

45.     Just over four months later, on December 6, 2007, Connie Berg applied for SBA's 8(a) Program on behalf of the Debtor.  In her application to SBA, Connie Berg claimed social disadvantage based on gender bias.  SBA accepted the Debtor into the 8(a) Program on May 23, 2008.

46.     In the Debtor's initial 8(a) Program application to SBA, Connie Berg certified that (a) she was responsible for all control, management, and business decisions of the Debtor, (b) she was the Debtor's only director, officer, management member, key employee, or owner, and (c) she

worked 40 hours per week for the Debtor.  She also certified to SBA that the Debtor earned 100% of its revenue from selling "specialty retail clothing."  Connie Berg knew that these certifications were false.

47.   From 2010 to 2016, the Debtor annually recertified to SBA that it continued to qualify for the 8(a) Program.  Connie Berg signed the recertification forms on the Debtor's behalf and certified to SBA that (a) she was the Debtor's president and 100% owner, (b) she dedicated 40 hours per week to managing the company, (c) no one other than an economically and socially disadvantaged individual holds the highest position in the business, (d) the Debtor had no affiliations with any other businesses, and (e) the Debtor continued to be eligible for the 8(a) Program.  Connie Berg knew that these certifications were false.

48.   From 2015 to 2020, Connie Berg also enrolled the Debtor in SBA's WOSB Program.  Each year, Connie Berg, on behalf of the Debtor, self-certified to SBA that (a) she managed and controlled the Debtor's daily business operation, (b) she controlled the Debtors long-term decision making and the day-to-day management and administration of the business operations, (c) she held the highest officer position in the business and managed the Debtor on a full-time basis, (d) she had the managerial experience of the extent and complexity needed to run the Debtor, and (e) the Debtor continued to be eligible for the WOSB Program.  Connie Berg knew that these certifications were false.

49.   Based on its enrollment in the 8(a) and WOSB Programs, and its claimed status as a "small business," the Debtor was awarded thousands of Set-Asides Contracts from the VA, Army, Air Force, and other federal agencies, totaling millions of dollars.  All, or the vast majority of such Set-Asides Contracts were for construction-related services, not specialty retail clothes as certified in the original 8(a) Program application.

10

50.     In reality, the Debtor did not qualify for the 8(a) and WOSB Programs, and, in many cases, was not a small business.  Connie Berg's representations to SBA were knowingly false.  Defendant Kyle Berg knew of her misrepresentations, assisted her in making them, and profited from them.

51.     Contrary to Connie Berg's initial, annual, and other certifications to SBA, she did not control the Debtor and its business.  To the contrary, Kyle Berg—a non-disadvantaged white man—controlled the Debtor and its business.

52.     The Bergs installed Connie as the Debtor's 100% owner, sole director, and president in name only so the Debtor could fraudulently obtain preferential access to Set-Aside Contracts.  Her involvement in the business was nothing more than a pretext to facilitate the Bergs' fraudulent scheme.

53.     Additionally, the Debtor did not qualify as a "small business" due to its extensive (and undisclosed) affiliations, improper joint ventures, and improper mentor-protégé relationships with various other entities owned or controlled by Kyle Berg, including, without limitation, Fed Serve, LLC, KRB Holdings, LLC, Marlin Creek Holdings, LLC, MDM Construction, LLC, OK2 Construction, LLC, Razor Consulting Solutions, Inc., Tunheim Holdings, LLC, Tunheim Construction, PMR Services, LLC, PMR II Services, BAD  Investments, Thermal Air, and N40GB, LLC.

54.     The Bergs perpetrated the government contract fraud to enrich themselves.  By fraudulently enrolling in the 8(a) and WOSB Programs, and representing that it was a small business, the Debtor received thousands of Set-Aside Contracts to which it was not entitled, ensuring a steady stream of revenue and profits to the Bergs individually.

ACTIVE 709498546v4

**E.     Connie Berg Had No Relevant Experience in Government Contracting or the Construction Business**

55.     As noted above, one factor for determining control for both the 8(a) and WOSB Programs is whether the purported control person has the relevant managerial experience to operate the business—in this case a construction business.

56.     From 2009 through 2020, the Debtor was awarded thousands of Set-Aside Contracts for construction-related services, generating millions of dollars for the Debtor.  As the purported control person, however, Connie Berg had no relevant training or experience in construction.

57.     Connie Berg's professional background was in screen printing fabric and clothing. Her work experience included employment at Logotech, a company engaged in making custom promotional products, and Creative Imprintz, a branded apparel business.  The Debtor never (or rarely) received any Set-Aside Contracts relating to clothing, screen printing, or retail sales—Connie Berg's only areas of experience.  Further, by 2014, less than 1% of the Debtor's annual revenue was attributable to clothing and related retail sales, even though the Debtor's original application for the 8(a) Program stated that the Debtor's primary business was specialty retail sales.

58.     Kyle Berg, by contrast, had extensive experience in general contracting, government contracting, and construction.  As of 2007, Kyle Berg had at least 14 years of construction experience, including employment as a vice president and project manager at CS DuBois Construction, a construction company that itself graduated from the 8(a) program in July 2007.

59.     Kyle Berg's experience, contrasted with Connie Berg's lack of relevant experience, demonstrates that Kyle Berg was the Debtor's de facto owner and control person.

ACTIVE 709498546v4

**F.      Kyle Berg, a Non-Disadvantaged White Male, Controlled the Debtor**

60.      Connie Berg also was not meaningfully involved in the day-to-day or long-term management of the Debtor.

61.      Contrary to her repeated certifications to the government, Connie Berg (a) did not work 40 hours per week for the Debtor; (b) had no involvement in selecting, estimating, or structuring the bids that the Debtor submitted for federal construction contracts, including Set-Aside Contracts; (c) did not engage in substantive discussions with the government contracting officers responsible for awarding, evaluating, or overseeing bids; (d) had no involvement in hiring, directing, or managing the Debtor's employees and subcontractors; (e) had no involvement in managing the Debtor's business operations, and (f) had no involvement in the Debtor's financials.

62.      Contrary to Connie Berg's repeated certifications to the government, Kyle Berg managed and controlled all aspects of the Debtor's business.  From 2008 through August 2020, Kyle Berg determined which government contracts the Debtor would bid, structured the bids, estimated the costs for the bids, directed employees how to complete proposals, and communicated with government contracting officers.  He also made all decisions for the Debtor as to the Debtor's employees, including salaries, raises, and bonuses.  He directed the activity and work of the Debtor's employees, subcontractors, and suppliers.   And he managed the Debtor's financial reporting and controlled all finances of the Debtor, including company bank accounts, loans, and payroll.

63.      The Debtor's employees, including senior employees and construction project managers, openly recognized that Kyle Berg—not Connie Berg—controlled the Debtor.  They considered him to be their immediate or ultimate supervisor, and they looked to him for direction

13

and answers about issues that arose during their employment. The Debtor's employees never sought guidance from Connie Berg regarding the Debtor's construction business.

64.     Connie Berg did not even have an email address with the Debtor, despite being the Debtor's purported sole director, president, and sole owner.  In the rare instances when she communicated with the Debtor's employees, she used a personal Hotmail email address.  By contrast, Kyle Berg sent thousands of e-mails from his Debtor-sponsored e-mail address to the Debtor's employees, subcontractors, suppliers, and others concerning the Debtor's strategic and day-to-day construction work, and he received thousands of e-mails from those individuals and entities regarding the Debtor's business at that same e-mail address.

65.     Connie Berg knew, but never disclosed Kyle Berg's control over the Debtor to SBA.  Instead, she, working with and at the direction of Kyle Berg, repeatedly misrepresented to SBA that she ran or supervised all aspects of the Debtor's business operations.

66.     Had the Bergs disclosed to SBA that Kyle Berg controlled the Debtor and its business relating to the government contracts, the Debtor would not have qualified for the 8(a) and WOSB Programs and would not have been awarded any Set-Aside Contracts.

**G.     Kyle Berg's Efforts to Defraud the SBA Extend Well-Beyond the Debtor**

67.     Kyle Berg has a long history, pattern, and practice of defrauding the federal government to obtain Set-Aside Contracts and other benefits.  He orchestrated and controlled multiple entities contracting with the government, proving that the Bergs' actions, representations, and certifications with the Debtor were knowing and intentional.

**i.     Razor Consulting Solutions, Inc.**

68.     Razor Consulting Solutions, Inc. ("<u>Razor</u>") is majority owned by Carla Schwartzenberger.  Beginning in around 2016, Razor registered to be part of SBA's 8(a) and

WOSB Programs based on Schwartzenberger's status as a Native American woman. Razor then applied for and was awarded numerous Set-Aside Contracts, generating millions of dollars in revenue and profit.

69.    However, Razor did not qualify for the 8(a) or WOSB Programs because, like Connie Berg with the Debtor, Schwartzenberger did not "control" Razor, as required by SBA eligibility regulations. Razor and Schwartzenberger were fronts for Kyle Berg and his affiliated entities (including the Debtor) to fraudulently obtain and profit from Set-Aside Contracts to which they were not entitled and evade small business thresholds.

70.    Nearly all of Razor's Set-Aside Contracts were in construction, maintenance, and housekeeping—areas in which Schwartzenberger had no experience. Instead, her experience was in software design, development, and implementation, and general bookkeeping.

71.    Further, like Connie Berg at the Debtor, Schwartzenberger was not meaningfully involved in the day-to-day management of Razor's Set-Aside Contracts, as required by SBA regulations. Schwartzenberger's role in Razor's government contracts was limited to submitting paperwork where her signature was required and some tracking of accounts payable and receivable.

72.    Kyle Berg and his affiliated entities (including the Debtor) controlled Razor's day-to-day operations, staffing, and strategy. Tyler Kellen, an employee of the Debtor, wrote in an October 2019 email that the Debtor "basically do[es] all the work for Razor when it comes to the construction side" of the business and Razor does not "know how to do anything." Kellen also wrote that he spent at least 25 hours per week on Razor projects, while Razor employees "spend 0" hours per week on construction projects. Mandy Grant, another employee of the Debtor, wrote

in response: "***We all work for [the Debtor]*** so if we all work together we can help each other out and hopefully ease work loads for everyone . . . ."  (emphasis added).

73.    Had Razor disclosed Kyle Berg's involvement in the business, Schwartzenberger's lack of involvement and control, and Razor's dependence on Kyle Berg and the Debtor, Razor would not have been eligible for SBA's 8(a) and WOSB Programs.  Additionally, Razor's revenue would have been combined with the Debtor's revenue for purposes of calculating whether each entity was in fact a small business.  Schwartzenberger and the Bergs conspired to conceal this information from SBA.

74.    For each Set-Aside Contract awarded to Razor for construction, maintenance, and housekeeping, Razor shared a substantial portion of its profits with the Debtor.  For example, in June 2019, November 2019, January 2020, April 2020, and July 2020, Schwartzenberger emailed quarterly reports to Kyle Berg and Chad DuBois listing profits and losses for Set-Aside Contracts that the government awarded solely to Razor. The statements show that Razor allocated 49% of the net income on the contracts to the Debtor.  Razor did not disclose this profit-sharing arrangement to SBA because it would have raised serious questions regarding the Debtor's and Razor's qualifications for Set-Aside Contracts and profits paid to the Bergs.

**ii.    Fed Serve, LLC**

75.    Fed Serve, LLC ("Fed Serve") is a general contracting company that is 100% owned by Kyle Berg.

76.    In or around 2019, Kyle Berg registered Fed Serve as a "HUBZone small business" with SBA.  Fed Serve then used its HUBZone status to apply for and receive various Set-Aside Contracts generating millions of dollars in revenues and profits.  However, Fed Serve did not meet HUBZone's eligibility requirements.  Instead, Kyle Berg used Fed Serve as a front to fraudulently

16

obtain and profit from Set-Aside Contracts to which he and his entities (including the Debtor) were not entitled.

77.    Similar to the 8(a) and WOSB Programs, the HUBZone program objective is to award 3% of federal contracting dollars to small businesses located in designated historically underutilized business areas (*i.e.*, HUBZones).  To be eligible for the HUBZone program, the small business's principal office must be located in a designated HUBZone (although the business may have other offices) and at least 35% of the employees must reside in a HUBZone (although it is not necessary that the employees reside in the same HUBZone as the principal office).  Additionally, the business must qualify as a "small" business.  As with the 8(a) and WOSB Programs, SBA measures the applicant's revenue, as well as the revenue of any affiliated businesses, to determine if the applicant is a "small" business.

78.    In Fed Serve's verification to SBA, Kyle Berg listed 3950 25th St., N Fargo, North Dakota, 58102 as its principal office, which falls within a HUBZone.  However, Kyle Berg's verification was false.  That location was not actually Fed Serve's principal office.  Fed Serve leased the location from one of Kyle Berg's other affiliated entities, Tunheim Holdings, LLC ("Tunheim Holdings"), to create an office in a HUBZone for purposes of procuring government contracts.

79.    Further, Kyle Berg falsely represented to SBA that at least 35% of Fed Serve's employees reside in a HUBZone.  Fed Serve's sole employee from May 2018 through August 2020 was Anthony Luchsinger, who resided in a HUBZone.  However, Luchsinger actually worked for Tunheim Holdings.  Fed Serve "employed" Luchsinger as a pretext to satisfy the HUBZone criteria.  Although Fed Serve paid Luchsinger a salary, Tunheim Holdings reimbursed Fed Serve for some or all his salary.

17

80.     When Luchsinger moved out of the HUBZone in September 2019, Kyle Berg immediately took him off Fed Serve's payroll—demonstrating that Luchsinger was never really a legitimate Fed Serve employee.  In an email sent on September 2, 2020, Kyle Berg wrote: "[Luchsinger] will be moving out of the HUBZone so this will be his last week he will receive a check."

81.     In Luchsinger's place, Kyle Berg hired his college-enrolled son (Blake Berg), his minor son (Evan Berg), and Chad DuBois's college-enrolled daughter (Paige DuBois) as Fed Serve's new employees.  These hirings were a pretext to falsely maintain Fed Serve's eligibility as a HUBZone business.

82.     Kyle Berg also failed to disclose to SBA Fed Serve's extensive ties to his other business and affiliates, including the Debtor and MDM Construction, LLC.   Fed Serve and the Debtor were marketed as interchangeable companies, they shared resources and employees, and the Debtor provided financial support to Fed Serve.  Additionally, Fed Serve and MDM shared profits, and MDM provided financial support to Fed Serve.

83.     But for Kyle Berg's misrepresentations, Fed Serve would not have qualified for the HUBZone program.  Additionally, Fed Serve's revenue would have been combined with the Debtor's revenue for purposes of calculating whether each entity was a small business.

**iii.     MDM Construction, LLC**

84.     MDM Construction, LLC ("MDM") is owned by Daniel Walters, a service-disabled military veteran.  Walters formed MDM in 2009.

85.     Kyle Berg and Dan Walters had a long history of working together.  Before forming MDM, Walters worked as a construction project manager for the Debtor and for Estoria Homes,

ACTIVE 709498546v4

an entity owned by Kyle Berg. Additionally, Walters and Kyle Berg worked together at CS DuBois, a construction company owned by Chad DuBois.

86.    Kyle Berg and Walters also had various business ventures together. For example, they co-owned Marlin Creek Holdings LLC, N40GB LLC, 1776 Investments, and TRM.

87.    Beginning in 2011, Walter registered MDM as a service-disabled veteran-owned small business ("SDVOSB") with the VA's Center for Verification and Evaluation ("CVE"). MDM then used its SDVOSB status to apply for and receive various Set-Aside Contracts, totaling millions of dollars.

88.    However, MDM did not meet the eligibility requirements for the SDVOSB program. As with other entities owned or controlled by Kyle Berg, Walters and Kyle Berg used MDM as a front to fraudulently obtain and profit from Set-Aside Contracts to which they were not entitled.

89.    Similar to the 8(a), WOSB, and HUBZone programs, the SDVOSB program's goal is to award about 3% of all federal contracting dollars to SDVOSBs each year. To be eligible for the SDVOSB program, the applicant business must be least 51% unconditionally and directly owned by a veteran with a service disability recognized by the VA or the Department of Defense.

90.    Additionally, the business must be controlled by only service-disabled veterans. To demonstrate control, the service-disabled veteran must be the highest paid person, hold the highest officer position, and receive at least 51% of profit from the business. Factors relevant to evaluating whether an applicant is controlled by a non-service-disable veteran individual or ineligible entity include (a) whether the applicant shares employees or resources with another company, (b) whether another entity or individual provides critical financing or bonding support to the applicant, and (c) whether the extent of business relationships with another company leaves the

19

applicant so dependent on the other company that it cannot exercise independent business judgment.

91.     MDM did not qualify for the SDVOSB program because Walters did not actually "control" the business, as required by the eligibility regulations. Instead, MDM was dependent on and controlled by non-veterans, including Kyle Berg and entities controlled by Kyle Berg, including the Debtor. By way of example, MDM, the Debtor, Fed Serve, and other entities affiliated with Kyle Berg routinely bid projects together and shared profits, assets, employees, facilities, and business records. As with the Debtor, Kyle Berg is the linchpin in the fraudulent scheme.

92.     Kyle Berg and Dan Walters also had a "handshake" agreement that their various entities, including the Debtor, MDM, and OK2, would not bid against each other for projects.

93.     But for Kyle Berg's misrepresentations to the government, MDM would not have qualified for the SDVOSB program. Additionally, MDM's revenue would have been combined with the Debtor's revenue for purposes of calculating whether each entity was a small business.

**iv.     OK2 Construction, LLC**

94.     OK2 Construction, LLC ("OK2") is 51% owned by Kenneth Kurk, a service-disabled military veteran. OK2 was formed in 2015 by Kruk, Kyle Berg, and Osvaldo Cruz. Kyle Berg and Cruz are not service-disabled military veterans, and each purportedly owned 24.5% of the company.

95.     Beginning in 2016, OK2 registered as an SDVOSB. OK2 then used its SDVOSB status to apply for and receive various Set-Aside Contracts, totaling millions of dollars. However, OK2 did not meet the eligibility requirements because Kurk did not control the business. Instead,

ACTIVE 709498546v4

Kurk, Kyle Berg, and Cruz used OK2 as a front to fraudulently obtain preferential status and profit from Set-Aside Contracts to which they were not entitled.

96.     OK2 was in fact dependent on and controlled by Cruz, Kyle Berg, and Berg's affiliated entities, including the Debtor.  Although Kurk was the "majority owner" on paper, Kyle Berg and Cruz provided OK2 with repeated cash injections to support OK2's ability to obtain bonding for the construction projects it bid.  Kurk did not provide equivalent amounts of capital.  Kyle Berg and Cruz also sought and/or received profits from OK2 in excess of their ownership stakes, notwithstanding the SDVOSB requirement that Kurk receive at least 51% of the profits.

97.     As with all his affiliated entities, Kyle Berg also exercised de facto control over OK2.  Kurk routinely deferred to Kyle Berg on business decisions.  In addition, OK2 routinely relied on the Debtor's employees (including Chad DuBois) to perform necessary office work and bid for government contracts, instead of using personnel employed by OK2.  And OK2 routinely used the Debtor's facilities, as well as facilities connected to Kyle Berg and Cruz.

98.     Kyle Berg, Kurk, and Cruz affirmatively concealed from the federal government that Kurk did not control OK2.  Had they made truthful disclosures to the federal government, OK2 would not have qualified for the SDVOSB program.  Additionally, OK2's revenue would have been combined with the Debtor's revenue for purposes of calculating whether each business was a small business.

## H.     The Bergs' Fraud Inflates the Debtor's Value and Places the Company at Risk

99.     The Bergs' fraudulent scheme materially inflated the Debtor's value relating to the subsequent ESOP transaction.

100.     Millions of dollars of the Debtor's revenue came from Set-Aside Contracts awarded via the 8(a) and the WOSB Programs, and as a result of the Debtor's status as a "small business."

21

For example, from 2017 to 2020, about $38 million of the Debtor's total revenue (approximately 26.5%) and about $4.7 million of its net income derived from the 8(a) and the WOSB Programs. But for the Bergs' fraud, the Debtor would not have been eligible for such contracts and would not have received this revenue and net income.

101.    Additionally, the Debtor received substantial revenue from Kyle Berg's affiliated entities—including, without limitation, Razor, Fed Serve, MDM, and OK2.  As detailed above, Kyle Berg used these entities to defraud SBA and obtain preferential Set-Aside Contracts to which the affiliated entities were not entitled.  But for Kyle Berg's fraud, the Debtor would not have received revenue from Razor, Fed Serve, MDM, OK2, and others entities.  The Bergs' fraudulent conduct inflated the Debtor's revenue and profits, for the sole benefit of the Bergs.

102.    Not only did the Bergs' scheme inflate the Debtor's value for purposes of the ESOP transaction, it also put the Debtor's business at significant and foreseeable risk.

103.    If the federal government discovered the Bergs' fraud, among other things, (a) government counterparties could seek contractual remedies from the Debtor, including price reductions, terminations, and disgorgement, (b) competitors could protest the Debtor's contract awards, (c) the federal government could suspend or bar the Debtor from bidding on contracts, (d) the Debtor could be subject to criminal and civil liability for violating federal law, (e) bonding companies and lenders could refuse to do business with the Debtor, (f) the Debtor would suffer harm to its business reputation, and (g) the Debtor would likely incur significant legal and other professional fees dealing with all the foregoing.  All these consequences are reasonably foreseeable and would significantly impact the Debtor's ability to continue as a going concern after the closing of the ESOP transaction.

ACTIVE 709498546v4

**I.      The Bergs Orchestrate the ESOP Transaction to Fraudulently Enrich Themselves at the Expense of the Debtor's Employees and Creditors**

104.    In or around 2019, the Bergs decided that they wanted to monetize Connie Berg's equity interest in the Debtor.  They elected to do so via an ESOP transaction.

105.    ESOP stands for employee stock ownership plan.  In a typical employee stock option plan transaction, the existing shareholders sell their equity in the company to an ESOP trust in exchange for cash, notes, or a combination of both.  The employees, who are the beneficiaries of the ESOP trust, then acquire the shares of the company from the ESOP trust over time, typically financed with a loan from a third-party lender.

106.    An ESOP transaction has two basic purposes.  First, it enables the existing shareholders to monetize their equity interests in the company—often as a business succession tool.  And second, it enables the employees of the company to become its owners and reap the benefits of their hard work.

107.    On December 26, 2019, Connie Berg, in her capacity as the Debtor's sole director, executed a written consent authorizing the Debtor to form the ESOP Plan and the ESOP Trust. Connie Berg appointed Kyle Berg as the initial trustee of the ESOP Trust.

108.    The ESOP Plan in this case is governed by a plan document (the "<u>Plan Agreement</u>"), which in the Debtor's case was executed on December 26, 2019.  Chad DuBois, the Debtor's vice president, executed the Plan Agreement on behalf of the Debtor.  At all relevant times, the Debtor, or someone appointed by the Debtor, has served as administrator of the ESOP Plan.

109.    The ESOP Trust in this case is governed by a Trust Agreement executed on December 26, 2019 (the "<u>Trust Agreement</u>" and together with the Plan Agreement, the "<u>Plan</u>

Documents"). Chad DuBois, the Debtor's vice president, executed the Trust Agreement on behalf

of the Debtor, and Kyle Berg executed the Trust Agreement in his capacity as ESOP trustee.

110.    The ESOP Trust forms part of the ESOP Plan.

**J.    The Bergs Retain Miguel Paredes to Serve as ESOP Trustee**

111.    In May 2020, the Debtor retained Miguel Paredes to take over as trustee of the

ESOP Trust.  His retention was governed by an engagement letter dated May 19, 2020 (the

"Engagement Letter") between the Debtor and Paredes.  Connie Berg signed for the Debtor in her

capacity as President.

112.    Under the Engagement Letter, the parties agreed that Paredes would "act as an

independent transactional trustee for the Plan in connection with the proposed ESOP Transaction."

113.    Paredes' role as trustee was to, among other things: "(1) evaluate the proposed

purchase of Company stock by the ESOP; (2) *perform due diligence with respect to the Company*

and the proposed ESOP Transaction; and (3) *act independently of the Company and its agents*

*and representatives* to negotiate on behalf of the ESOP the price, terms, and conditions of the

ESOP Transaction."  (Emphasis added.)

114.    Additionally, Paredes was charged with ensuring that "the ESOP pays no more than

adequate consideration for the Company stock, that [the proposed transaction] is fair to the ESOP

from a financial point of view, and that [the proposed transaction] is in accordance with the terms

of the Plan and applicable law, including, but not limited to, ERISA and the Internal Revenue

Code."

115.    Paredes retained Stout Risius Ross, LLC ("Stout") to serve as the ESOP Trust's

financial advisor pursuant to an engagement letter dated May 21, 2022.  Among other things,

Stout's role was to render a "written opinion" that "[t]he consideration to be paid by the ESOP for

ACTIVE 709498546v4

its shares of Company stock pursuant to the terms of the Transaction is not greater than the Fair

Market Value of such shares" and "[t]he terms and conditions of the Transaction, taken as a whole,

are fair to the ESOP from a financial point of view."    Both are duties of Paredes under his

Engagement Letter and applicable law.

116.    Paredes also retained the law firm Benesch, Friedlander, Coplan & Aronoff LLP

("Benesch") to assist him in his duties as independent trustee for the ESOP transaction.

117.    On August 27, 2020, Connie Berg, in her capacity as the Debtor's sole director,

executed a written consent ratifying the Engagement Letter and the Debtor's appointment of

Paredes "as the transactional trustee of the ESOP Trust."

118.    Paredes received a flat fee of $38,000 from the Debtor for serving as trustee of the

ESOP Trust.

**K.    The Parties Negotiate the ESOP Transaction and Connie Berg Receives an Initial
$6.2 million Equity Distribution Before Closing the ESOP Transaction**

119.    Between approximately May 2020 and August 2020, the Bergs and Paredes

negotiated the terms of the ESOP transaction, including entering into a non-binding term sheet (the

"ESOP Term Sheet").

120.    Kyle Berg handled the negotiations.  On information and belief, Connie Berg had

little or no role in the transaction other than to reap the benefits of the Debtor's inflated value.

121.    In the ESOP Term Sheet, the Bergs and Paredes preliminarily agreed that Connie

Berg would sell 100% of her shares in the Debtor for an aggregate price of about $31 million, with

some of her shares to be purchased by the ESOP Trust and some of her shares to be redeemed by

the Debtor in conjunction with the purchase.  The Bergs knew that the Debtor's valuation was

substantially inflated due to their government contract fraud.

122.    The Bergs and Paredes also preliminarily agreed that, immediately before the closing of the ESOP Transaction, Connie Berg would receive an equity distribution from the Debtor equal to her accumulated adjustments account balance, or "AAA" balance.  The AAA balance represented the Debtor's accumulated gross income, less expenses, that had not been distributed to Connie Berg up through the closing of the ESOP transaction.  The distribution was purportedly related to the Debtor's conversion from an S-Corporation to a C-Corporation, which was a necessary precursor to the ESOP transaction.

123.    Consistent with the ESOP Term Sheet, on August 11, 2020, Connie Berg, in her capacities as the Debtor's sole shareholder and sole director, executed a written consent authorizing the Debtor to make a $6,272,060 equity distribution to herself, which represented her purported AAA balance.  No independent director approved the distribution.  Paredes did not object to the distribution.  Accordingly, the Debtor distributed $6,272,060 in cash to Connie Berg on August 27, 2020.  On information and belief, Connie Berg deposited the funds into her UBS AG bank account, account no. XXX-XX-XXX641-000 (the "UBS Berg Account").

124.    On August 27, 2020, Connie Berg, in her capacity as the Debtor's sole director, executed a written consent authorizing the Debtor to make a $335,000 contribution to the ESOP Trust for the plan year ending December 31, 2019, and a $200,000 contribution to the ESOP Trust for the plan year ending December 31, 2020.  No independent director approved the contributions. The Debtor made these contributions to the ESOP Trust on or around August 31, 2020.

**L.    The ESOP Transaction Closes on August 31, 2020**

125.    On August 31, 2020, Connie Berg, in her capacity as the Debtor's sole director, executed a written consent authorizing the Debtor to consummate the ESOP transaction.  No

26

independent director approved the transaction.  The ESOP transaction closed that same day, on August 31, 2020.  On the closing date, the Debtor had approximately 30 employees.

126.    The terms of the ESOP transaction mirrored those from the ESOP Term Sheet. Connie Berg received $31,559,000 of consideration from the ESOP Trust and the Debtor in exchange for her 100% equity stake in the Debtor.  The step-by-step details of the ESOP transaction are set forth below.

127.    Pursuant to a Redemption and ESOP Stock Purchase Agreement dated August 31, 2020 (the "ESOP Purchase Agreement"), Connie Berg sold 37,683 shares of the Debtor's stock back to the Debtor for redemption.  In exchange, she received a promissory note from the Debtor in the original principal amount of $12,094,000 (the "Redemption Note").  A true and correct copy of the Redemption Note is attached as **Exhibit A** and is incorporated by reference.

128.    Also pursuant to the ESOP Purchase Agreement, Connie Berg sold her remaining 62,317 shares of the Debtor's stock to the ESOP Trust for $10,985,754 in seller financing and $9,014,246 in cash.

129.    To evidence the seller financing, Connie Berg and the ESOP Trust entered into an Initial Seller/ESOP Loan Agreement (the "Initial Seller/ESOP Loan Agreement") and an Initial Seller/ESOP Note (the "Initial Seller/ESOP Note"), each dated August 31, 2020.

130.    The ESOP Trust funded the $9,014,246 cash purchase price entirely with money it received from the Debtor.  The Debtor obtained most of the funds with an $8,479,246 term loan from Bankers Trust (the "Bankers Trust Loan"), the proceeds of which it immediately loaned to the ESOP Trust pursuant to an Initial Company/ESOP Loan Agreement (the "Initial Company/ESOP Loan Agreement") and an Initial Company/ESOP Note (the "Initial Company/ESOP Note"), each dated August 31, 2020.  The Debtor obtained the Bankers Trust

ACTIVE 709498546v4

Loan for the sole purpose of funding the payment to Connie Berg. For the remaining balance of

the cash purchase price, the ESOP Trust used the Debtor's plan contributions for 2019 and 2020,

which were $335,000 and $200,000, respectively.

131.    Connie Berg deposited the funds, totaling $9,014,246, into the UBS Berg Account.

132.    Connie Berg signed the ESOP Purchase Agreement in two capacities: on behalf of

the Debtor as its "President" and individually as the "Seller" of the Debtor's stock. Paredes signed

the ESOP Purchase Agreement on behalf of the ESOP Trust in his capacity as ESOP trustee.

133.    Immediately after entering into the ESOP Purchase Agreement, the Debtor, the

ESOP Trust, and Connie Berg entered into a Seller Note Exchange and ESOP Loan Modification

Agreement dated August 31, 2020 (the "ESOP Modification Agreement"), pursuant to which they

agreed to modify, restructure, and consolidate certain obligations relating to the ESOP transaction.

134.    First, in accordance with the ESOP Modification Agreement, the Debtor agreed to

assume the ESOP Trust's obligations to Connie Berg under the Initial Seller/ESOP Note and the

Initial Seller/ESOP Loan Agreement—so that the Debtor would be directly liable to Connie Berg

rather than the ESOP Trust. To evidence such assumption, Connie Berg assigned all her rights

under the Initial Seller/ESOP Note and the Initial Seller/ESOP Loan Agreement to the Debtor, and

the Debtor issued to Connie Berg an Amended and Restated Seller Note dated August 31, 2020

(the "A&R Seller Note"), in the original principal amount of $10,985,754. A true and correct copy

of the A&R Seller Note is attached as **Exhibit B** and is incorporated by reference.

135.    Second, the ESOP Trust and the Debtor entered into an Amended and Restated

ESOP Loan Agreement (the "A&R ESOP Loan Agreement") and an Amended and Restated ESOP

Note (the "A&R ESOP Note"), each dated August 31, 2020, to consolidate all the ESOP Trust's

obligations to the Debtor into one loan. The original principal amount of the A&R ESOP Note

28

was $19,465,000, reflecting the $10,985,754 of original principal under the Initial Seller/ESOP Note and the $8,479,246 of original principal under the Initial Company/ESOP Note.

136.     Connie Berg signed the ESOP Modification Agreement in two capacities: on behalf of the Debtor as its "President" and individually as "Lender."  Paredes signed the ESOP Purchase Agreement on behalf of the ESOP Trust in his capacity as trustee.

137.     As a result of the ESOP transaction, the ESOP Plan and ESOP Trust became the Debtor's sole equity owner, holding 62,317 shares of capital stock.  The Debtor's eligible employees, meanwhile, had the right to acquire shares over time pursuant to the terms of the Plan Documents.

138.      From the ESOP transaction closing, Connie Berg received total consideration of $31,559,000 for her 100% equity interest in the Debtor, comprised of (a) $9,014,246 of cash, (b) the Redemption Note from the Debtor in the original principal amount of $12,094,000, and (c) the A&R Seller Note from the Debtor in the original principal amount of $10,985,754.  As detailed above, Connie Berg received an additional $6,272,060 as an equity distribution from the Debtor four days before the ESOP transaction closed.

139.     The Debtor either funded or is the primary/ultimate obligor for all distributions and consideration given to Connie Berg in connection with the ESOP transaction.

140.     The following diagram depicts the Debtor's capital and equity structure immediately after the ESOP transaction:

ACTIVE 709498546v4



## M.    The Bergs Concealed Their Fraud from Paredes and the ESOP Plan

141.    During the ESOP negotiations, the Bergs never disclosed to Paredes or the ESOP Trust that (a) millions of dollars of the Debtor's historical revenue and profits were attributable to their fraud on the federal government; (b) the Debtor had fraudulently enrolled in the 8(a) and WOSB Programs and was not a qualifying small business; (c) the Debtor had been fraudulently awarded thousands of Set-Aside Contracts, totaling millions of dollars; (d) the Debtor received fraudulent revenue from Razor, Fed Serve, MDM, OK2, and other entities affiliated with or controlled by Kyle Berg; and (e) the Debtor's $31,559,000 valuation for the ESOP transaction was materially inflated.

142.    Instead, the Bergs repeatedly made false representations to Paredes, the ESOP Trust, and the Debtor to conceal their fraud and obtain the highest possible share valuation and purchase price.  The Bergs acted to enrich themselves, to the knowing detriment of the Debtor, its creditors, the ESOP Plan, the ESOP Trust, and the ESOP participants.

30

143.    For example, Connie Berg made numerous false representations in the ESOP transaction documents.  Kyle Berg, who was the primary point of contact for the ESOP transaction and negotiations, assisted Connie Berg in her misrepresentations.

144.    In Section 3.2(g) of the ESOP Purchase Agreement, Connie Berg represented to the ESOP Trust and the Debtor as follows: "There is no claim, legal action, suit, arbitration, governmental investigation or other legal or administrative proceeding, nor any order, decree or judgment, in progress, pending, in effect, or to the Knowledge of the Seller, threatened relating to this Agreement or the transactions contemplated by this Agreement, ***and the Seller does not know of any reason for, nor have any reason to be aware of, any basis for the same***."  (Emphasis added.)

145.    These representations were false because Connie Berg knew that a material amount of the Debtor's revenue was attributable to fraudulently obtained Set-Aside Contracts and the ESOP valuation was, therefore, inflated.  These facts were the "basis" for various claims, legal actions, suits, arbitrations, government investigations, or other legal or administrative proceedings relating to the Debtor and the ESOP transaction, including breach of contract claims, breach of fiduciary duty claims, ERISA claims, investigations by the FBI, DOJ, and Department or Labor, and related criminal and civil claims and legal proceedings.

146.    In Section 3.3(g)(i) of the ESOP Purchase Agreement, Connie Berg represented to the ESOP Trust that, among other things, the Debtor's financial statements "present fairly the financial position of the Company of such date and the results of the operations of the Company for such period in all materials respects" and "contain no untrue statements of material fact, do not omit any material fact necessary to make such Financial Statements not misleading."

147.    These representations were false because Connie Berg knew that a material amount of the Debtor's revenue was attributable to fraudulently obtained Set-Aside Contracts and, therefore, the financial statements did not fairly present the Debtor's financial position and results, contained untrue statements of material fact, and omitted material facts necessary to make such financial statements not misleading.

148.    In Sections 3.3(g)(ii) and 3.3(g)(v) of the ESOP Purchase Agreement, Connie Berg represented to the ESOP Trust that the Debtor had no undisclosed liabilities or obligations, other than those disclosed in those sections and the corresponding disclosure sections.

149.    These representations were false because Connie Berg failed to disclose that the Debtor faced substantial liability to the federal government for, without limitation, its actions in defrauding SBA, the 8(a) Program, and the WOSB Program.

150.    In Section 3.3(g)(iii) of the ESOP Purchase Agreement, Connie Berg represented to the ESOP Trust as follows: "The financial projections furnished by the Company to the Trustee in connection with the transaction contemplated hereunder are reasonable and complete, and (1) reflect the Company's best efforts to accurately and correctly project the future operations of the Company; and (2) to the Seller's Knowledge there are no material adjustments that should be made to such financial projections to make the financial projections reasonable and complete." The term "Seller's Knowledge" is defined to include Kyle Berg's knowledge.

151.    These representations were false because Connie Berg and Kyle Berg knew that the Debtor's financial projections, among other things, (a) were inflated, (b) were based on fraudulent revenues that the Debtor could not legally maintain, and (c) did not account for the significant legal risks and liabilities the Debtor would face when their fraud was inevitably discovered.

ACTIVE 709498546v4

152.    In Section 3.3(h) of the ESOP Purchase Agreement, Connie Berg represented to the ESOP Trust that the Debtor "has complied in all respects with the eligibility and other requirements of any License or Permit."  "Licenses and Permits," in turn, is defined as "licenses, permits, certification, franchises, authorizations, registrations, approvals, and certificates of occupancy (or their equivalent) issued or granted to the Company with respect to its business by the government of the United States."

153.    This representation was false because Connie Berg knew that the Debtor had not complied with the Licenses and Permits for its active 8(a), WOSB, and small-business set-aside contacts.  For its active 8(a) contracts, the Debtor had not complied in all respects with the eligibility and other requirements of the applicable Licenses or Permits because, among reasons, Connie Berg did not actually control the Debtor and the Debtor was not a qualifying small business.  For its active WOSB contracts, the Debtor had not complied in all respects with the eligibility and other requirements of the applicable Licenses or Permits because Connie Berg caused the Debtor to falsely self-certify to the government that she controlled the Debtor and that the Debtor was a qualifying small business, which self-certifications a government "contracting officer" had to (and did) "accept."  *See* 13 C.F.R. § 127.301(a)(2) (WOSB self-certification regulation in effect from 2015 to July 15, 2020, when the Debtor enrolled in the WOSB program and applied for WOSB Set-Aside Contracts).   This acceptance constituted an "authorization[] . . . [or] approval[] . . . issued or granted to the Company with respect to its business by the government of the United States"—*i.e.*, a "License or Permit."  And for the active small-business set-aside contracts, the Debtor had not complied in all respects with the eligibility and other requirements of the applicable Licenses or Permits because, among reasons, the Debtor was not a qualifying small business.

33

154.    In Section 3.3(j) of the ESOP Purchase Agreement, Connie Berg represented to the ESOP Trust that "[n]either the Seller nor the directors and officers nor the employees with responsibility for litigation matters of the Company have any reason to believe that any such action, suit, proceeding, hearing, or investigation may be brought or threatened against the Company."

155.    These representations were false because Connie Berg knew that a material amount of the Debtor's revenue was attributable to fraudulently obtained Set-Aside Contracts and the ESOP valuation was, therefore, grossly over-inflated.  These facts were the basis for various actions, suits, proceedings, hearings, or investigations that could by brought against the Debtor, including breach of contract claims, breach of fiduciary duty claims, ERISA claims, investigations by the FBI, DOJ, and Department of Labor, and related criminal and civil claims and legal proceedings.

156.    In Section 3.3(m) of the ESOP Purchase Agreement, Connie Berg represented to the ESOP Trust that the Debtor "is in compliance with all applicable laws."

157.    This representation was false because Connie Berg knew that the Debtor did not qualify for the 8(a) and WOSB Programs, was not a small business, and was not eligible for associated Set-Aside Contracts.

158.    In Section 3.3(o) of the ESOP Purchase Agreement, Connie Berg represented to the ESOP Trust that each "Material Contract is legal, valid, binding, [and] enforceable" and will continue to be "legal, valid, binding, [and] enforceable ... on identical terms following the consummation of the transactions contemplated by the [Purchase] Agreement."

159.    These representations were false.  Many of the "Material Contracts" were Set-Aside Contracts that the Debtor was awarded by virtue of its enrollment in the 8(a) or WOSB Programs, or purported status as a small business.  Connie Berg therefore knew that these Material Contracts

34

were not legal, valid, binding, and enforceable, and would be (or could be) terminated upon discovery of the Bergs' fraud.

160.    In Section 5.3(c) of the Initial Seller/ESOP Loan Agreement, Connie Berg made the following representation and warranty to the ESOP Trust and Paredes, as trustee: "The execution, delivery, and performance of this Agreement by the Seller does not and will not . . . violate any law, regulation, judgment, or order applicable to the Seller."

161.    This representation and warranty was false because Connie Berg's execution, delivery, and performance of the Initial Seller/ESOP Loan Agreement breached her fiduciary duties under state law and ERISA, and the ESOP transaction was a prohibited transaction under 29 U.S.C. § 1106(a)(1)(A).

162.    The Bergs withheld critical information and made material misrepresentations to the Debtor, Paredes, the ESOP Trust, and ESOP Plan.  Had the Bergs truthfully disclosed that Debtor's business was predicated on more than a decade of fraud, the ESOP transaction and share redemption never would have occurred (let alone at a $31.5 million valuation) and the Debtor never would have made the over $6 million equity distribution to Connie Berg.

163.    In negotiating and consummating the equity distribution, ESOP transaction, and share redemption, the Bergs committed a fraud on the Debtor to enrich themselves.

**N.    Paredes Would Have Discovered the Bergs' Fraud with Basic Due Diligence**

164.    Paredes' job as trustee of the ESOP Trust, among other things, was to conduct due diligence into the Debtor and the proposed ESOP transaction to ensure that (a) the ESOP price, terms, and conditions were fair, (b) the ESOP Trust paid no more than adequate consideration to Connie Berg, (c) the ESOP transaction complied with ERISA and other applicable law, and the (d) the Debtor's business was as represented in the ESOP transaction documents.

ACTIVE 709498546v4

165.     Paredes failed in each of these duties.  Although the Bergs and others concealed the government contracting fraud from Paredes, he could have discovered the fraud with basic due diligence.

166.     A material amount of the Debtor's historical revenue was attributable to Set-Aside Contracts that the Debtor received via the 8(a) and WOSB Programs, and as a small business.  For example, on information and belief, about 26.5% of the Debtor's *total* revenue in the 4-year period before the ESOP transaction derived from the 8(a) and WOSB Programs.  Additionally, the Debtor's *entire* business revolved around federal contracting.  Thus, Paredes had every reason to investigate and vet, and should have investigated and vetted, the Debtor's Set-Aside Contracts and its eligibility for SBA's contracting programs.

167.     Instead, Paredes and his advisers (including Stout and Benesch) ignored significant red flags regarding the business and qualifications for these government programs.

168.     For example, only Kyle Berg had construction experience and Connie Berg's experience was in apparel and retail sales.   Yet Connie Berg was the Debtor's sole owner, sole director, and president, and Kyle Berg was just an employee and/or consultant for the business.  At a minimum, these facts should have prompted Paredes to investigate Connie Berg's involvement in the business and the Debtor's eligibility for the 8(a) and WOSB Programs and small business Set-Aside Contracts.

169.     Additionally, a Confidential Information Memorandum ("CIM") that the Debtor's financial advisor prepared for the ESOP transaction disclosed that "[h]istorically, Connie's role at the Company has been *de minimis*."  (Emphasis added.)  On the other hand, the CIM described Kyle Berg as being "involved with all significant operating decisions" and "represent[ing] the Company in major negotiations and large bids."  Paredes and his advisors (including Stout and

Benesch) received the CIM during the due diligence process for the ESOP transaction and, thus, knew that Connie Berg's historical involvement in the Debtor's business was "de minimis."  At minimum, these disclosures should have prompted Paredes to investigate Connie Berg's involvement in the business and the Debtor's eligibility for the 8(a) and WOSB Programs and small business Set-Aside Contracts.

170.    Additionally, Connie Berg had little or no involvement in the ESOP negotiations and due diligence, despite purportedly being the Debtor's sole owner, sole director, and president. She did not participate in diligence calls and was not copied on diligence emails.  Instead, Kyle Berg was the main point of contact for all aspects of the ESOP transaction, including due diligence. Additionally, when Connie Berg was copied on ESOP-related emails, she used a personal Hotmail email address, not one associated with the Debtor.  At a minimum, these facts should have prompted Paredes to investigate Connie Berg's involvement in the business and the Debtor's eligibility for the 8(a) and WOSB Programs and small business Set-Aside Contracts.

171.    Additionally, the proposed ESOP transaction structure contemplated that Connie Berg would have no ongoing involvement in the Debtor's business post-closing, while Kyle Berg would remain heavily involved as a consultant through his entity, Fed Serve.  At a minimum, Connie Berg's exit and Kyle Berg's ongoing involvement should have prompted Paredes to investigate Connie Berg's role in the business and the Debtor's eligibility for the 8(a) and WOSB Programs and small business Set-Aside Contracts.

172.    Additionally, within the federal contracting industry, it was widely known that the federal government was concerned about fraud and abuse within the 8(a) and WOSB Programs. In June 2018, for example, SBA issued an audit report finding that the ability of applicants to self-certify their eligibility "expos[ed] the Program to unnecessary risks of fraud and abuse.  A

March 2019 report by the U.S. Government Accountability Office made similar findings. The Department of Justice also prosecuted numerous contractors for fraud relating to the 8(a) and WOSB Programs. In this context, in light of the significant red flags detailed above, and given the importance of federal contracting to the Debtor's business, Paredes should have investigated the Debtor's eligibility for the 8(a) and WOSB Programs and small business Set-Aside Contracts.

173. Paredes also did not retain qualified government contractor advisors. Benesch, his legal counsel, does not have a practice group specializing in federal government contracting (the Debtor's core business) and does not have an office in Washington, D.C. Paredes should have retained legal counsel with expertise in federal government contracting, including Set-Aside Contracts for small businesses and the 8(a) and WOSB Programs.

174. Paredes' financial advisor, Stout, also failed to conduct proper diligence in connection with its valuation opinion. Among other things, Stout ignored the red flags outlined above. And, on information and belief, the Stout employees staffed on the deal did not have sufficient federal government contracting experience and expertise to understand the significance of the red flags to the Debtor's past and future operations.

175. On information and belief, Paredes and his advisors did not conduct meaningful due diligence into the Debtor's eligibility for 8(a) Program, WOSB Program, and small business Set-Aside Contracts, in breach of industry norms. Due diligence checklists circulated among the parties did not even include sections on these issues.

176. Paredes had complete access to the Debtor and its employees for purposes of his due diligence work. Under Paredes' Engagement Letter, the Debtor agreed to "make any of its officers, employees, or affiliates reasonably available to [Paredes] upon request."

ACTIVE 709498546v4

177.    With just basic diligence, including meeting the Debtor's employees, reviewing the CIM, reviewing the Debtor's financials and contracts, requesting appropriate diligence information, and reviewing the Debtor's submissions and certifications to the federal government, Paredes would have discovered that Connie Berg did not actually operate or control the Debtor, that Kyle Berg ran the Debtor's day-to-day operations, and that the Debtor had substantial affiliations with numerous entities controlled by Kyle Berg, rendering it ineligible for the Set-Aside Contracts.

178.    Had Paredes conducted basic, industry standard due diligence and retained appropriate advisors, he would have discovered that the Debtor defrauded SBA over many years and had substantial undisclosed liabilities.  He also would have discovered that the $31,559,000 valuation was grossly over-inflated, and that the ESOP Plan and ESOP Trust paid substantially more than adequate consideration for the Debtor's capital stock.

179.    Instead, because of Paredes' deficient due diligence and investigation, the ESOP Plan, the ESOP Trust, and its participants have suffered substantial losses from the ESOP transaction.

**O.    Chad DuBois Knowingly Facilitated and Consented to the Bergs' Fraud**

180.    Chad DuBois also breached his duties in connection with the ESOP transaction.

181.    The Debtor hired DuBois in June 2018 as its controller.  In July 2019, he was promoted to Vice President, and he served in that role until the ESOP transaction closed.

182.    During his time as the Debtor's Vice President, DuBois was intimately involved in the Debtor's bids for Set-Aside Contracts.  On his LinkedIn profile, DuBois touts that he "[o]versaw" the Debtor's "highly successful bidding processes."  Thus, he understood the bidding process and the importance of the government contracting to the Debtor's business.

39

183.    Given his role as the Debtor's Vice President, DuBois knew that the Debtor was enrolled in the WOSB Program, had been enrolled in the 8(a) Program, designated itself as a small business, and had applied for and received Set-Aside Contracts on those bases.

184.    DuBois also knew that the Debtor did not actually qualify for the WOSB and 8(a) Programs, was not a small business due to its various affiliations, and was not entitled to the associated Set-Aside Contracts.

185.    First, DuBois had extensive experience with and knowledge of SBA's socio-economic programs and Set-Aside Contracts, including eligibility requirements.  From 1996 to 2017, DuBois was the owner and president of CS DuBois Construction, Inc. ("CS DuBois"), where he employed Kyle Berg for over a decade.  Like the Debtor, CS DuBois was enrolled in SBA's 8(a) Program, graduating in 2007.

186.    Second, DuBois knew that Kyle Berg—not Connie Berg—controlled and managed the Debtor.  In his role as Vice President, DuBois necessarily witnessed first-hand that Connie Berg had no involvement in the business and that Kyle Berg was in charge.  Indeed, DuBois and Kyle Berg exchanged thousands of emails regarding the Debtor, while DuBois never emailed with Connie Berg regarding the Debtor except on two occasions.

187.    Third, DuBois knew that Kyle Berg had a practice of wrongfully circumventing eligibility requirements.  As detailed above, in September 2020, DuBois' 21-year-old, college-enrolled daughter began "working" at Fed Serve as a pretext so the company could maintain eligibility for SBA's HUBZone program.  On September 9, 2020, DuBois emailed Kyle Berg a copy of his daughter's residential lease, writing: "This is Paiges lease.  Let me know if it works."  Kyle Berg replied: "Yep – dead center of the HUBZone."

ACTIVE 709498546v4

188.    Fourth, at the Debtor's 341 meeting, DuBois acknowledged that he knew the Bergs had been applying for government contracts on the basis of the Debtor being woman owned/controlled and that it was general knowledge within the company.

189.    Although DuBois knew that the Bergs had fraudulently enrolled the Debtor in the WOSB and 8(a) Programs and was not a small business, he never disclosed these facts to the ESOP Trust or Paredes, and took no action to stop the ESOP transaction (including the equity distribution to Connie Berg immediately before closing and the Debtor's share redemption).   Instead, he affirmatively concealed the Bergs' fraudulent activities.

190.    On August 31, 2020, in connection with the closing of the ESOP transaction, DuBois delivered a "Statement of Representation" to Stout, which included various misrepresentations regarding the Debtor.

191.    DuBois certified that the information contained in his Statement of Representation was "true and correct" and he acknowledged that Stout would be relying on such information "to render a fairness opinion" to Paredes regarding the ESOP transaction.   However, DuBois' Statement of Representation contained numerous material misrepresentations, falsehoods, and omissions.

192.    DuBois represented that "[a]ll operating, competitive, historical financial, and other factual information disclosed to you by us is complete and accurate in all material respects, and represents the expectations of management as to the operations, prospects, competitive position, and financial results of the Company."

193.    These representations were false.   DuBois' disclosures were incomplete and inaccurate because he did not disclose that the Debtor had fraudulently enrolled in the WOSB and 8(a) Programs and was not a qualifying small business.

41

194.    DuBois represented that "the historical financial statements for the Company for the fiscal years ended December 31, 2015 through the fiscal year ended December 31, 2019, as well as the interim financials for the six month period ended June 30, 2019, the six month period ended June 30, 2019, June 30, 2020, and the seven month period ended July 31, 2020 (the "Interim Statements", attached herein as Appendix A), provided to you are fairly presented in accordance with U.S. GAAP and fairly present, in all material respects, the financial condition and results of operations of the Company as of the dates and for the periods indicated therein, and we know of nothing material that has occurred since the date of the most recent financial statements listed that would lead us to believe that such information is misleading or inaccurate or that require consideration as adjustments to or disclosures in the financial statements."

195.    These representations were false.  DuBois knew that a material amount of the Debtor's revenue was attributable to fraudulently obtained Set-Aside Contracts and, therefore, the historical financial statements did not fairly present the Debtor's financial position and results, contained untrue statements of material fact, omitted material facts, and required adjustments and additional disclosures.

196.    DuBois represented that "[t]he projected financial results of the Company provided to you by us (attached herein as Appendix B) were prepared in good faith and represent, to the best of our knowledge and belief, reasonable estimations of future financial performance for the periods indicated based upon assumptions that are reasonable and appropriate."

197.    These representations were false.  DuBois knew that the Debtor's financial projections, among other things, (a) were inflated, (b) were based on fraudulent revenues that the Debtor could not legally maintain, and (c) did not account for the significant legal risks and

liabilities the Debtor would face when the government contracting fraud was inevitably discovered.

198.    DuBois represented that "[w]e have disclosed to you all material information regarding the Company and the proposed Transaction necessary to assist you in rendering your Opinion and we have not omitted any information that would render any other information we have provided to you misleading, or withheld information that, in our view, could reasonably be expected to affect your analysis or the outcome of your Opinion."

199.    These representations were false.  DuBois omitted material information that was directly relevant to the ESOP transaction, including that the Debtor had fraudulently enrolled in the WOSB and 8(a) Programs and designated itself as a small business.

200.    Had DuBois truthfully disclosed to Stout, Paredes, the ESOP Trust, and the ESOP Plan that Debtor's business was predicated on more than a decade of fraud by the Bergs, the ESOP transaction and share redemption never would have closed, let alone at a $31.5 million valuation. Through his conduct, DuBois committed a fraud on the Debtor and consented to the Bergs' fraud on the Debtor.

201.    [INTENTIONALLY OMITTED].

202.    [INTENTIONALLY OMITTED].

203.    [INTENTIONALLY OMITTED].

204.    [INTENTIONALLY OMITTED].

205.    [INTENTIONALLY OMITTED].

206.    [INTENTIONALLY OMITTED].

207.    [INTENTIONALLY OMITTED].

208.    [INTENTIONALLY OMITTED].

ACTIVE 709498546v4

209.    [INTENTIONALLY OMITTED].

210.    [INTENTIONALLY OMITTED].

211.    [INTENTIONALLY OMITTED].

**P.    After the ESOP Transaction Closes, the Debtor Pays Millions More to Connie Berg**

212.    On August 31, 2020, immediately after the ESOP transaction closed, Chad DuBois was promoted to the Debtor's President and director.

213.    With DuBois in control, the Debtor made millions of dollars of principal and interest payments to Connie Berg under the Redemption Note (the "Redemption Note Payments") and the A&R Seller Note (the "A&R Seller Note Payments"), as well as a closing adjustment payment to her under the ESOP Purchase Agreement. These payments—totaling $9,542,602.39— are detailed below:

| Agreement | Type | Date (approx.) | Amount | Notes |
|---|---|---|---|---|
| Redemption Note | Interest | January 8, 2021 | $161,253.32 | Check # 60246 |
| A&R Seller Note | Interest | January 8, 2021 | $146,476.72 | Check # 60246 |
| ESOP Purchase Agreement | Closing Adjustment | February 8, 2021 | $68,599.86 | Check # 60388 |
| Redemption Note | Interest | March 26, 2021 | $120,939.99 | Check # 60583 |
| A&R Seller Note | Interest | March 26, 2021 | $109,857.57 | Check # 60583 |
| Redemption Note | Interest | June 29, 2021 | $120,939.99 | Check # 60994 |
| A&R Seller Note | Interest | June 29, 2021 | $109,857.57 | Check # 60994 |
| Redemption Note | Interest | September 30, 2021 | $120,939.99 | Check # 61468 |
| A&R Seller Note | Interest | September 30, 2021 | $109,857.57 | Check # 61468 |
| Redemption Note | Interest | December 27, 2021 | $120,939.99 | Check # 61771 |
| A&R Seller Note | Interest | December 27, 2021 | $109,857.57 | Check # 61771 |
| Redemption Note & A&R Seller Note | Principal | December 31, 2021 | $6,093,216.88 | Loan proceeds from CCU |
| Redemption Note & A&R Seller Note | Principal | December 31, 2021 | $2,000,000.00 | Wire transfer |
| Redemption Note & A&R Seller Note | Interest | April 27, 2022 | $149,865.37 | Check # 61996 |
| | | | **$9,542,602.39** | |

ACTIVE 709498546v4

214.    The Debtor funded the $6,093,216.88 principal payment to Connie Berg on December 31, 2021, with loan proceeds from Capital Credit Union ("CCU").  The Debtor obtained the CCU loan to refinance the Bankers Trust Loan.  However, instead of borrowing only the amount necessary to pay off the Bankers Trust Loan, the Debtor borrowed an additional $6,093,216.88 to make an unscheduled prepayment of principal to Connie Berg.

215.    DuBois authorized the $9,542,602.39 of payments to Connie Berg, even though he knew about her misconduct and misrepresentations in connection with the ESOP transaction and share redemption.  Such authorizations constituted a fraud on the Debtor.  Additionally, by authorizing the payments, DuBois consented to the Bergs' fraud on the Debtor.

216.    On information and belief, Connie Berg deposited the post-closing payments, totaling $9,542,602.39, into the UBS Berg Account.

217.    The Debtor only stopped making payments to Connie Berg when the FBI raided its headquarters in March 2022, as detailed below.

**Q.    The FBI Raids the Debtor's Headquarters, and the Debtor and the Federal Government Enter into a Non-Prosecution Agreement**

218.    In September 2018—two years before the ESOP transaction closed—the federal government began secretly investigating whether the Debtor had fraudulently enrolled in the 8(a) and WOSB Programs.  The investigation was prompted by the government's discovery that both the Debtor and OK2—two seemingly unaffiliated entities—were updating their company information in the government's contract procurement portal from the same computer in Fargo, North Dakota.

219.    On November 4, 2020, the United States District Court for the District of North Dakota issued a search warrant ordering Microsoft to provide access to various email accounts

ACTIVE 709498546v4

associated with the Debtor, Fed Serve, and OK2, including Kyle Berg, Chad DuBois, Mandy Grant, Kenneth Kruk, and Osvaldo Cruz.

220.    The government's investigation became public in March 2022.  On March 1, 2022, the FBI obtained multiple search warrants from the United States District Court for the District of North Dakota relating to Kyle Berg, the Debtor, Chad DuBois, Razor, Fed Serve, MDM, OK2, and others.  A true and correct copy of the search warrant relating to Kyle Berg is **Exhibit C** and is incorporated by reference into this Complaint.

221.    Also in or around March 2022, the federal government obtained a grand jury subpoena directed at the Debtor relating to the Bergs' fraudulent scheme.

222.     On March 3, 2022, FBI agents raided the Debtor's and MDM's offices and seized records and information covered by the search warrant.

223.    About one year later, on February 27, 2023, the affidavits in support of the search warrants were unsealed, and several local news outlets ran stories about their contents.  *See, e.g.*, https://www.kvrr.com/2023/02/28/documents-reveal-why-fbi-raided-west-fargo-businesses-last-march/.

224.    Ultimately, on October 26, 2023, the Debtor entered into a Non-Prosecution Agreement with the United States Department of Justice's Antitrust Division and the United States Attorney's Office for the District of North Dakota (the "Non-Prosecution Agreement").  A true and correct copy of the Non-Prosecution Agreement is attached as **Exhibit D** and incorporated by reference into this Complaint.

225.    The Debtor's independent board members, Mark Kragnes and Jack Carroll, approved the Non-Prosecution Agreement.

46

226.    Under the Non-Prosecution Agreement, the Debtor stipulated that it had violated federal criminal law—including 18 U.S.C. § 371 (Conspiracy to Commit Offense or to Defraud United States)—by fraudulently enrolling in the 8(a) and WOSB Programs and applying for associated Set-Aside Contracts.

227.    The Debtor further agreed to pay a $949,000 criminal penalty to the federal government.  This amount represented the Debtor's 8(a) and WOSB profits *after* the ESOP transaction closed on August 31, 2020.

228.    As part of the Non-Prosecution Agreement, the Debtor stipulated and admitted to the following incriminating facts:

a.    "[T]he Company misrepresent[ed] its status and eligibility for certain government contracting programs set aside for socially or economically disadvantaged individuals and/or women, amounting to approximately $70 million in federal contracts awarded to the Company from 2008 to 2020. This conduct occurred at the direction of [Kyle Berg and Connie Berg] who originally managed and owned the Company."

b.    "From 2008 through 2020 Pro-Mark, along with [Kyle Berg] and [Connie Berg] voluntarily and intentionally reached an agreement to defraud the United States, including through interfering with and obstructing in one of the United States' lawful government functions through false and fraudulent pretenses to obtain 8(a) and WOSB contracts to which they were not entitled, including by falsely claiming [Connie Berg] controlled Pro-Mark and therefore that Pro-Mark was qualified for such contracts, when Pro-Mark was not eligible to receive such contracts because it was controlled by

47

[Kyle Berg]. Pro-Mark, through false representations made or directed by [Kyle Berg and Connie Berg] between 2008 and 2020, misrepresented its status and eligibility for those programs and set-aside contracts to the SBA and to the government agencies administering the relevant contracts."

c.  "Between 2008 and 2020, [Connie Berg] was held out as the President of Pro-Mark who ran and controlled the business, when in reality she did not control or manage Pro-Mark. She was not the decision-maker at Pro-Mark with regard to federal construction projects or one of its key officers or employees. She did not manage or work 40 hours per week for Pro-Mark. In sum, [Connie Berg] did not exercise strategic or day-to-day control over Pro-Mark and had no role in making operational decisions for the Company pertaining to its federal construction business. For example, she had no role in selecting, estimating, or structuring the bids that Pro-Mark submitted for federal construction contracts, engaging in substantive discussions with the contracting officers responsible for awarding, evaluating, or overseeing bids or subsequent contracts, or in hiring or directing Company employees or subcontractors."

d.  "During that same period, [Kyle Berg], who is a non-disadvantaged man, was the individual in control of Pro-Mark who made or delegated all the strategic and day-to-day decisions concerning Pro-Mark and its federal construction business. From 2008 through 2020, Pro-Mark was not eligible for either the 8(a) or WOSB Programs because [Kyle Berg], not [Connie Berg], controlled and managed Pro-Mark. [Kyle Berg] selected which set-

ACTIVE 709498546v4

aside contracts Pro-Mark would bid on (including 8(a) and WOSB contracts), and he was extensively involved in structuring those bids, estimating their costs, and routinely directed the hiring of, activity, and work of Pro-Mark employees, subcontractors, and suppliers. Finally, he managed the Company's financials, including its bank accounts."

e.      "In August 2020, [Connie Berg] sold her entire ownership interest in Pro-Mark to Pro-Mark's employees via an ESOP for approximately $32 million. While [Connie Berg] was the sole owner of Pro-Mark on paper, [Kyle Berg] was the primary point of contact for all aspects of the ESOP transaction."

229.    The Debtor and the federal government entered into the Non-Prosecution Agreement, in part, to help the Debtor preserve its business for the benefit of the ESOP Plan, the ESOP Trust, and the Debtor's employees—who were innocent victims of the Bergs' fraud.  The Non-Prosecution Agreement provides, in pertinent part, as follows:

"[A]t least in part because of circumstances arising from the Office's investigation, Pro-Mark was unable to continue to secure bonding, which is critical to performing federal construction contracts. A conviction or a deferred prosecution agreement likely would result in the Company's continued inability to secure bonding as well as potential suspension and debarment from federal contracting, which would likely result in substantial consequences to the Company's employees and customers. This Agreement may allow the Company to preserve its financial viability, remain a viable competitor in the federal construction market, and allow employees to access their retirement benefits which have not yet vested pursuant to the ESOP . . . ."

ACTIVE 709498546v4

230.    Also in 2023, the SBA determined that the Debtor was not a qualifying small business.  The Debtor appealed the size determination to SBA's Office of Hearing and Appeals ("OHA"), but OHA affirmed the decision.  A true and correct copy of OHA's decision is attached as **Exhibit E** and incorporated by reference into this Complaint.

**R.    The Debtor Files for Bankruptcy in April 2024**

231.    The public revelation of the Bergs' fraud from and after March 2022 had catastrophic impacts on the Debtor's business and the ESOP.  These impacts were the natural, foreseeable, and likely consequences of the Bergs' fraud, which they disregarded to benefit and enrich themselves.

232.    The Debtor incurred millions of dollars in legal fees, professional fees, and other costs responding to the search warrant and grand jury subpoena, defending itself in connection with the federal investigation, seeking insurance coverage, negotiating the Non-Prosecution Agreement, paying the criminal fine, and implementing remedial measures.

233.    After the public revelation, several key employees resigned, impairing the Debtor's ability to operate.  The Debtor also had trouble hiring new and qualified employees.

234.    After the public revelation, the Debtor lost its ability to secure bonding for its construction projects.  Bonding is critical to performing federal construction contracts, and the Debtor's bonding company, Hartford Insurance, was unwilling to do business with the Debtor due to the federal investigation and fraud allegations.  The Debtor also could not find a replacement bonding company.  Without bonding, the Debtor lost millions of dollars of revenue and could not bid on many new projects.

ACTIVE 709498546v4

235. Due to the loss of bonding, the Debtor also defaulted on several of its existing government contracts. These defaults impaired the Debtor's ability to obtain new government contracts because the Debtor had to disclose such defaults when it submitted new bids.

236. The public revelation also severely harmed the Debtor's reputation, including with the federal government, subcontractors, vendors, and other entities it conducted business with.

237. The Debtor also could not maintain its pre-ESOP revenue due to its ineligibility for the 8(a) and WOSB Programs, and the loss of its "small business" certification.

238. The Debtor was also encumbered with substantial debt obligations that it could never repay, including the CCU loan, obligations to the ESOP, and obligations to Connie Berg. The obligations to Connie Berg, in particular, impaired the Debtor's ability to obtain new bonding and financing. Bonding companies did not want to do business with the Debtor given that it owed millions of dollars to an individual, Connie Berg, who defrauded the federal government.

239. The value of the Debtor's stock plummeted, directly harming the ESOP and its participants.

240. Ultimately, the Debtor filed for bankruptcy in April 2024, reporting just $4.4 million in assets and more than $33.3 million in liabilities.

241. The Debtor's insolvency and bankruptcy filing were foreseeable and inevitable consequences of the fraud and breaches of duty committed by the Defendants.

**COUNT 1**
**Breach of Fiduciary Duties (State Law)**
**Plaintiff: Erik A. Ahlgren, as Chapter 7 Trustee**
**Defendant: Connie Berg**

242. All paragraphs in this Complaint are incorporated by reference.

243. Connie Berg, as the Debtor's president and director, owed fiduciary duties of care, loyalty, and good faith to the Debtor.

244.    Connie Berg breached these fiduciary duties by, without limitation, (a) causing the Debtor to fraudulently enroll in the 8(a) and WOSB Programs; (b) causing the Debtor to fraudulently obtain Set-Aside Contracts to which the Debtor was not entitled; (c) conspiring with Kyle Berg  other entities controlled by Kyle Berg to defraud the federal government, including Razor, Fed Serve, MDM, OK2, and the Tunheim entities; (d) in her capacity as officer, failing to inform the Debtor and the ESOP of the impropriety of the ESOP transaction and the Debtor's $6,272,060 equity distribution to herself and take action to protect the Debtor's interests; (e) causing the Debtor to enter into the ESOP transaction at an inflated valuation for above-market consideration; (f) causing the Debtor to redeem 37,683 shares of her stock in the Debtor at an inflated valuation; (g) causing the Debtor to incur about $11.9 million of secured debt to Bankers Trust to fund the ESOP consideration payable to herself; (h) concealing and failing to disclose in connection with the ESOP transaction that a material amount of the Debtor's revenue was attributable to fraudulently obtained Set-Aside Contracts; and (i) personally participating in the ESOP transaction to enrich herself and Kyle Berg.

245.    As a direct and proximate cause of Connie Berg's breaches of fiduciary duties, the Debtor has suffered damages in an amount to be determined at trial.

246.    Additionally, Connie Berg's breaches of fiduciary duties were oppressive, fraudulent, and done with actual malice to enrich herself and Kyle Berg at the expense of the Debtor, its creditors, and its employees.  Accordingly, pursuant to N.D. Cent. Code § 32-03.2-11(1), Plaintiff is entitled to recover exemplary damages from Connie Berg.

**COUNT 2**
**Breach of Fiduciary Duties (State Law)**
**Plaintiff:  Erik A. Ahlgren, as Chapter 7 Trustee**
**Defendant:  Kyle Berg**

247.    All paragraphs in this Complaint are incorporated by reference.

248.     At all relevant times, Kyle Berg exercised actual control over the Debtor, including over its operations, management, and finances.  Kyle Berg exercised the principal functions of a corporate president.

249.     By virtue of such control, Kyle Berg owed fiduciary duties of care, loyalty, and good faith to the Debtor pursuant to N.D. Cent. Code § 10-19.1-60.

250.     Kyle Berg breached these fiduciary duties by, without limitation, (a) causing the Debtor to fraudulently enroll in the 8(a) and WOSB Programs; (b) causing the Debtor to fraudulently obtain Set-Aside Contracts to which the Debtor was not entitled; (c) conspiring with Connie Berg and other entities he controlled to defraud the federal government, including Razor, Fed Serve, MDM, OK2, and the Tunheim entities; (d) failing to inform the Debtor and the ESOP of the impropriety of the ESOP transaction and the Debtor's  $6,272,060 equity distribution to Connie Berg and take action to protect the Debtor's interests; (e) causing the Debtor to enter into the ESOP transaction at an inflated valuation for above-market consideration; (f) causing the Debtor to redeem 37,683 shares of Connie Berg's stock in the Debtor at an inflated valuation; (g) causing the Debtor to incur about $11.9 million of secured debt to Bankers Trust to fund the ESOP consideration payable to Connie Berg; (h) concealing and failing to disclose in connection with the ESOP transaction that a material amount of the Debtor's revenue was attributable to fraudulently obtained Set-Aside Contracts; and (i) personally participating in the ESOP transaction with Connie Berg to enrich themselves.

251.     As a direct and proximate cause of Kyle Berg's breaches of fiduciary duties, the Debtor has suffered damages in an amount to be determined at trial.

252.     Additionally, Kyle Berg's breaches of fiduciary duties were oppressive, fraudulent, and done with actual malice to enrich himself and Connie Berg at the expense of the Debtor, its

ACTIVE 709498546v4

creditors, and its employees.  Accordingly, pursuant to N.D. Cent. Code § 32-03.2-11(1), Plaintiff is entitled to recover exemplary damages from Kyle Berg.

**COUNT 3**
**Aiding and Abetting Breach of Fiduciary Duties (State Law)**
**Plaintiff:  Erik A. Ahlgren, as Chapter 7 Trustee**
**Defendant:  Kyle Berg**

253.    All paragraphs in this Complaint are incorporated by reference.

254.    As detailed in Count 2 above, Kyle Berg owed fiduciary duties of care, loyalty, and good faith to the Debtor, and he breached these duties.

255.    Alternatively, if and to the extent that Kyle Berg is found not to have owed fiduciary duties to the Debtor, he is nonetheless liable for having aided and abetted Connie Berg's breaches of fiduciary duties as detailed in Count 1 above.

256.    Kyle Berg had actual knowledge of the facts and circumstances alleged in support of Count 1 above and rendered substantial assistances to Connie Berg, thereby aiding and abetting her breaches of fiduciary duties to the Debtor.

257.    As a direct and proximate cause of Kyle Berg aiding and abetting Connie Berg's breaches of fiduciary duties, the Debtor has suffered damages in an amount to be determined at trial.

258.    Additionally, Kyle Berg's conduct was oppressive, fraudulent, and done with actual malice to enrich himself and Connie Berg at the expense of the Debtor, its creditors, and its employees.  Accordingly, pursuant to N.D. Cent. Code § 32-03.2-11(1), Plaintiff is entitled to recover exemplary damages from Kyle Berg.

ACTIVE 709498546v4

**COUNT 4**
**Breach of Fiduciary Duties (State Law)**
**Plaintiff:  Erik A. Ahlgren, as Chapter 7 Trustee**
**Defendant:  Chad DuBois**

259.    All paragraphs in this Complaint are incorporated by reference.

260.    Chad DuBois, as the Debtor's Vice President and later President and director, owed fiduciary duties of care, loyalty, and good faith to the Debtor.

261.    DuBois breached his fiduciary duties of care, loyalty, good faith by, without limitation, (a) concealing and failing to disclose in connection with the ESOP transaction that a material amount of the Debtor's revenue was attributable to fraudulently obtained Set-Aside Contracts, (b) making false statements and material omissions in the Statement of Representation, (c) permitting, causing, or allowing the Debtor to make the pre-closing equity distribution to Connie Berg, (d) permitting, causing, or allowing the ESOP transaction and share redemption to close; (e) permitting, causing, or allowing the Debtor to make the Redemption Note Payments and Seller Note Payments (each as defined above) to Connie Berg, and (d) causing the Debtor to incur the CCU loan and using proceeds to make Redemption Note Payments and Seller Note Payments to Connie Berg.

262.    As a direct and proximate cause of DuBois' breaches of fiduciary duties, the Debtor has suffered damages in an amount to be determined at trial.

**COUNT 5**
**[INTENTIONALLY OMITTED]**

## COUNT 6[1]
### Breach of Contract
### Plaintiff:  Erik A. Ahlgren, as Chapter 7 Trustee
### Defendant:  Connie Berg

263.    On August 31, 2020, the Debtor, Connie Berg, and the ESOP Trust entered into the ESOP Purchase Agreement, which was and is a binding and enforceable contract.

264.    In Section 3.2(g) of the ESOP Purchase Agreement, Connie Berg, in her individual capacity as "Seller," made the following representation and warranty to the Debtor:

[As of August 31, 2020, t]here is no claim, legal action, suit, arbitration, governmental investigation or other legal or administrative proceeding, nor any order, decree or judgment, in progress, pending, in effect, or to the Knowledge of the Seller, threatened relating to this Agreement or the transactions contemplated by this Agreement, and the Seller does not know of any reason for, nor have any reason to be aware of, any basis for the same.

265.    This representation was false and, therefore, Connie Berg breached Section 3.2(g) of the ESOP Purchase Agreement.  Specifically, a material amount of the Debtor's revenue was attributable to fraudulently obtained Set-Aside Contracts and the ESOP valuation was, therefore, inflated.  These facts were a "basis" for various claims, legal actions, suits, arbitrations, government investigations, or other legal or administrative proceedings relating to the Debtor and the ESOP transaction, including breach of fiduciary duty claims, ERISA claims, investigations by the FBI, DOJ, and Department or Labor, and related claims and legal proceedings.

---

[1]    By order dated May 1, 2025 [ECF No. 111], the Court dismissed Count 6.  Plaintiff retains Count 6 in the Second Amended Complaint solely to preserve the issue for appeal.

ACTIVE 709498546v4

266.    Pursuant to N.D. Cent. Code § 10-19.1-01.2(7), the relevant knowledge of Connie Berg, Kyle Berg, and Chad DuBois is not imputed to the Debtor because each of them committed a fraud on the Debtor and/or consented to the commission of a fraud on the Debtor.

267.    But for Connie Berg's breach of Section 3.2(g) of the ESOP Purchase Agreement, the Debtor would not have entered into and consummated the ESOP transaction.

268.    As a direct and proximate result of Connie Berg's breach of contract, the Debtor has suffered damages in amount to be proven at trial.

269.    Additionally, pursuant to Section 8.1 of the ESOP Purchase Agreement, Plaintiff is entitled to recover its costs and reasonable attorneys' fees.

**COUNT 7**
**Breach of Contract**
**Plaintiff:  Erik A. Ahlgren, as Chapter 7 Trustee**
**Defendant:  Connie Berg**

270.    All paragraphs in this Complaint are incorporated by reference.

271.    On August 31, 2020, the Debtor, Connie Berg, and the ESOP Trust entered into the ESOP Modification Agreement, which was and is a binding and enforceable contract.

272.    In Section 6 of the ESOP Modification Agreement, Connie Berg, in her individual capacity as "Lender," represented and warranted to the Debtor as follows: "[A]s of time of the delivery to the Company of [Connie Berg's] Initial Seller/ESOP Loan Documents, . . . no default or defaults have occurred with respect to the Initial Seller/ESOP Note[ or] the Initial Seller/ESOP Loan Agreement . . . ."

273.    This representation was false because defaults had occurred with respect to the Initial Seller/ESOP Loan Agreement.  Therefore, Connie Berg breached Section 6 of the ESOP Modification Agreement.

ACTIVE 709498546v4

274.    In Section 5.3(c) of the Initial Seller/ESOP Loan Agreement, Connie Berg made the following representation and warranty to the ESOP Trust and Paredes, as trustee: "The execution, delivery, and performance of this Agreement by the Seller does not and will not . . . violate any law, regulation, judgment, or order applicable to the Seller."

275.    This representation and warranty was false because Connie Berg's execution, delivery, and performance of the Initial Seller/ESOP Loan Agreement breached her fiduciary duties under state law and ERISA, and the ESOP transaction was a prohibited transaction under 29 U.S.C. § 1106(a)(1)(A).

276.    Thus, a default had occurred under Section 5.3(c) of the Initial Seller/ESOP Loan Agreement, which in turn constituted a breach of Connie Berg's representation in Section 6 of the ESOP Modification Agreement.

277.    Pursuant to N.D. Cent. Code § 10-19.1-01.2(7), the relevant knowledge of Connie Berg, Kyle Berg, and Chad DuBois is not imputed to the Debtor because each of them committed a fraud on the Debtor and/or consented to the commission of a fraud on the Debtor.

278.    But for Connie Berg's false representation in Section 6 of the ESOP Modification Agreement, the Debtor would not have entered into and consummated the ESOP transaction.

279.    As a direct and proximate result of Connie Berg's breach of contract, the Debtor has suffered damages in amount to be proven at trial.

280.    Additionally, pursuant to Section 8 of the ESOP Modification Agreement, Plaintiff is entitled to recover its costs and reasonable attorneys' fees.

### COUNT 8
### Actual Fraud
### Plaintiff:  Erik A. Ahlgren, as Chapter 7 Trustee
### Defendant:  Connie Berg

281.    All paragraphs in this Complaint are incorporated by reference.

ACTIVE 709498546v4

282.    On August 31, 2020, the Debtor, Connie Berg, and the ESOP Trust entered into the ESOP Purchase Agreement and the ESOP Modification Agreement.

283.    In Section 3.2(g) of the ESOP Purchase Agreement, Connie Berg, in her individual capacity as "Seller," made the following representation and warranty to the Debtor:

> [As of August 31, 2020, t]here is no claim, legal action, suit, arbitration, governmental investigation or other legal or administrative proceeding, nor any order, decree or judgment, in progress, pending, in effect, or to the Knowledge of the Seller, threatened relating to this Agreement or the transactions contemplated by this Agreement, and the Seller does not know of any reason for, nor have any reason to be aware of, any basis for the same.

284.    In Section 6 of the ESOP Modification Agreement, Connie Berg, in her individual capacity as "Lender," made the following representation and warranty to the Debtor: "[A]s of time of the delivery to the Company of [Connie Berg's] Initial Seller/ESOP Loan Documents, . . . no default or defaults have occurred with respect to the Initial Seller/ESOP Note[ or] the Initial Seller/ESOP Loan Agreement . . . ."

285.    Connie Berg's representations to the Debtor were knowingly false and she omitted and suppressed material information.

286.    In contravention of her representation in Section 3.2(g) of the ESOP Purchase Agreement, Connie Berg knew of numerous undisclosed facts that were a basis for claims, legal actions, suits, arbitrations, government investigations, and other legal or administrative proceedings relating to the Debtor and the ESOP transaction, including breach of fiduciary duty claims, ERISA claims, fraud claims, investigations by the FBI, DOJ, and Department or Labor, and related claims and legal proceedings.  Without limitation, Connie Berg knew that a material

amount of the Debtor's revenue was attributable to fraudulently obtained Set-Aside Contracts, the ESOP valuation was inflated, the Debtor was undisclosed criminal and civil liability, and the ESOP transaction was a prohibited transaction under ERISA.

287.    In contravention of her representation in Section 6 of the ESOP Modification Agreement, Connie Berg knew that defaults had occurred with respect to the Initial Seller/ESOP Loan Agreement.  Specifically, in Section 5.3(c) of the Initial Seller/ESOP Loan Agreement, Connie Berg made the following representation and warranty to the ESOP Trust and Paredes, as trustee:  "The execution, delivery, and performance of this Agreement by the Seller does not and will not . . . violate any law, regulation, judgment, or order applicable to the Seller.

288.    But, as Connie Berg knew, this representation and warranty was false.  Connie Berg's execution, delivery, and performance of the Initial Seller/ESOP Loan Agreement breached her fiduciary duties under state law and ERISA, and the ESOP transaction was a prohibited transaction under 29 U.S.C. § 1106(a)(1)(A).  Thus, as Connie Berg knew, a default had occurred under Section 5.3(c) of the Initial Seller/ESOP Loan Agreement.

289.    In addition, in connection with the ESOP Purchase Agreement, the ESOP Modification Agreement, and other ESOP contracts between Connie Berg and the Debtor, and the negotiation thereof, Connie Berg omitted and failed to disclose to the Debtor the government contracting fraud, fraudulent revenue, and material undisclosed liabilities and legal risks related thereto.

290.    Connie Berg made these false representations and material omissions to deceive and induce the Debtor to enter into the ESOP transaction, so she could monetize her equity interest at an inflated valuation and siphon millions of dollars to herself.

291.    Pursuant to N.D. Cent. Code § 10-19.1-01.2(7), the relevant knowledge of Connie

Berg, Kyle Berg, and Chad DuBois is not imputed to the Debtor because each of them committed

a fraud on the Debtor and/or consented to the commission of a fraud on the Debtor.

292.    The Debtor reasonably relied on Connie Berg's representations and omissions in

agreeing to and consummating the ESOP transaction.

293.    Connie Berg's false representations and omissions amount to actual fraud, as

defined by N.D. Cent. Code § 9-03-08.

294.    As a result of Connie Berg's actual fraud, the Debtor has suffered damages in

amount to be proven at trial.

295.    Additionally, Connie Berg's actual fraud was oppressive, fraudulent, and done with

actual malice to enrich herself and Kyle Berg at the expense of the Debtor, its creditors, and its

employees.  Accordingly, pursuant to N.D. Cent. Code § 32-03.2-11(1), Plaintiff is also entitled to

recover exemplary damages from Connie Berg.

**COUNT 9**
**Fraudulent Transfer (Actual Fraud)**
**11 U.S.C. § 544(b) and N.D. Cent. Code § 13-02.1-04(1)(a)**
**Plaintiff:  Erik A. Ahlgren, as Chapter 7 Trustee**
**Defendants:  Connie Berg, Kyle Berg, Connie Berg Trust, Kyle Berg Trust**

296.    All paragraphs in this Complaint are incorporated by reference.

297.    On August 27, 2020, the Debtor made an equity distribution of $6,272,060 to

Connie Berg, paid in cash.

298.    The Debtor made this equity distribution with actual intent to hinder, delay, or

defraud creditors.  The transfer was an immediate precursor to, and part of, the ESOP transaction,

which the Bergs orchestrated to monetize Connie Berg's equity interest in the Debtor at a

knowingly inflated valuation.  The Bergs acted to enrich themselves, while placing all risk on the

ACTIVE 709498546v4

Debtor's creditors.  By the time the federal government discovered their scheme to defraud SBA—which was the natural outcome of their actions—the Bergs would have already depleted the Debtor of substantial cash via the equity distribution and ESOP transaction.  Creditors, meanwhile, would be left holding the bag—which is exactly what happened.

299.    The equity distribution had numerous badges of fraud.  First, the transfer was to or for the benefit of insiders, Connie Berg and Kyle Berg.  Second, the Bergs concealed material information regarding the Debtor's assets, liabilities, and enterprise value.  Third, the Debtor did not receive reasonable equivalent value from Connie Berg.  The transfer was simply a dividend on account of Connie Berg's equity interest in the Debtor, and the Bergs' scheme to defraud the federal government and ESOP Trust negate any value she provided to the Debtor as its "owner."  Fourth, the Debtor incurred substantial debt immediately after the transfer, including the secured debt to Bankers Trust, seller financing from Connie Berg, and the obligations to the ESOP Trust.  Fifth, the transfer left the Debtor insolvent, unable to pay its debts when due, and/or with unreasonably small capital.

300.    Connie Berg was the initial transferee of the equity distribution.

301.    Kyle Berg, as Connie Berg's husband and the Debtor's *de facto* owner and true control person, was an intended beneficiary of the equity distribution.  Additionally, on information and belief, Kyle Berg was an immediate transferee of some or all of the equity distribution from Connie Berg, and was not a good faith transferee for value.

302.    On information and belief, the Connie Berg Trust and/or the Kyle Berg Trust were immediate or mediate transferees of some or all the equity distribution from Connie Berg and/or Kyle Berg, and were not good faith transferees for value.

303.    As required by 11 U.S.C. § 544(b), the Debtor has creditors with allowed unsecured claims that arose before and/or after the Debtor made the equity distribution to Connie Berg that could avoid such transfer, including, without limitation: Firelake Construction, Inc. (Claim No. 1); M & K Porta Potties (Claim No. 2); Right Choice Electric Inc. (Claim No. 5); LaCreek Development Corporation (Claim No. 14); and Steptoe LLP (Claim No. 16).

304.    Based on the foregoing, the Debtor's $6,272,060 equity distribution to Connie Berg is avoidable under 11 U.S.C. § 544(b) and N.D. Cent. Code § 13-02.1-04(1)(a).  Plaintiff may avoid and recover the equity distribution from Connie Berg, Kyle Berg, the Connie Berg Trust, and/or the Kyle Berg Trust.

**COUNT 10**
**Fraudulent Transfer (Constructive Fraud)**
**11 U.S.C. § 544(b) and N.D. Cent. Code § 13-02.1-04(1)(b)**
**Plaintiff:  Erik A. Ahlgren, as Chapter 7 Trustee**
**Defendants:  Connie Berg, Kyle Berg, Connie Berg Trust, Kyle Berg Trust**

305.    All paragraphs in this Complaint are incorporated by reference.

306.    On August 27, 2020, the Debtor made an equity distribution of $6,272,060 to Connie Berg, paid in cash.

307.    The Debtor did not receive reasonably equivalent value from Connie Berg.  The transfer was simply a dividend on account of her equity interest in the Debtor, and her scheme to defraud the federal government and ESOP Trust negate any value she provided to the Debtor as its "owner."

308.    When the Debtor made the transfer, (a) it was engaged or was about to engage in a business or a transaction for which the remaining assets of the Debtor were unreasonably small in relation to the business or transaction or the debtor intended to incur and/or (b) believed or reasonably should have believed that the Debtor would incur, debts beyond the Debtor's ability to

ACTIVE 709498546v4

pay as they became due. The transfer depleted the Debtor of substantial cash just four days before it incurred $11.9 million of secured debt to Banker Trust, millions of dollars of seller financing obligations to Connie Berg, and obligations to the ESOP Trust. As a result of the Bergs' fraudulent scheme, the Debtor also faced substantial undisclosed criminal and civil liability to the federal government and other liabilities and expenses.

309. Connie Berg was the initial transferee of the equity distribution.

310. Kyle Berg, as Connie Berg's husband and the Debtor's *de facto* owner and true control person, was an intended beneficiary of the equity distribution. Additionally, on information and belief, Kyle Berg was an immediate transferee of some or all of the equity distribution from Connie Berg.

311. On information and belief, the Connie Berg Trust and/or the Kyle Berg Trust were immediate or mediate transferees of some or all the equity distribution from Connie Berg and/or Kyle Berg, and were not good faith transferees for value.

312. As required by 11 U.S.C. § 544(b), the Debtor has creditors with allowed unsecured claims that arose before and/or after the Debtor made the equity distribution to Connie Berg that could avoid such transfer, including, without limitation: Firelake Construction, Inc. (Claim No. 1); M & K Porta Potties (Claim No. 2); Right Choice Electric Inc. (Claim No. 5); LaCreek Development Corporation (Claim No. 14); and Steptoe LLP (Claim No. 16).

313. Based on the foregoing, the Debtor's $6,272,060 equity distribution to Connie Berg is avoidable under 11 U.S.C. § 544(b) and N.D. Cent. Code § 13-02.1-04(1)(b). Plaintiff may avoid and recover the equity distribution from Connie Berg, Kyle Berg, the Connie Berg Trust, and/or the Kyle Berg Trust.

ACTIVE 709498546v4

## COUNT 11
### Fraudulent Transfer (Actual Fraud)
### 11 U.S.C. § 544(b) and N.D. Cent. Code § 13-02.1-04(1)(a)
### Plaintiff:  Erik A. Ahlgren, as Chapter 7 Trustee
### Defendants:  Connie Berg, Kyle Berg, Connie Berg Trust, Kyle Berg Trust

314.     All paragraphs in this Complaint are incorporated by reference.

315.     On August 31, 2020, the Debtor transferred $335,000 to the ESOP Trust as a plan contribution for the fiscal year ending 2019.  The ESOP Trust then immediately transferred the $335,000 to Connie Berg as partial payment for her 62,317 shares of the Debtor's stock.

316.     The Debtor transferred $335,000 to the ESOP Trust with actual intent to hinder, delay, or defraud its creditors.  The sole purpose of the transfer was to fund the ESOP Trust's acquisition of the Debtor's stock from Connie Berg, and the transfer amount was based on the Debtor's purported valuation of about $31.5 million.  However, in authorizing and causing the transfer, the Bergs knew that the valuation was inflated because a material amount of the Debtor's revenue was attributable to fraudulently obtained Set-Aside Contracts.  The Bergs orchestrated the transfer to enrich themselves, while placing all risk on the Debtor's creditors.  By the time the federal government discovered their scheme to defraud SBA—which was the natural outcome of their actions—the Bergs would have already depleted the Debtor of cash via the equity distribution and the ESOP transaction.  Creditors, meanwhile, would be left holding the bag—which is exactly what happened.

317.     The transfer had numerous badges of fraud.  First, the transfer was for the benefit of insiders, the Bergs.  Second, the Bergs concealed material information regarding the Debtor's assets, liabilities, and enterprise value.  Third, the Debtor did not receive reasonably equivalent value.  Fourth, the Debtor incurred substantial debt immediately before and after the transfer, including the secured debt to Bankers Trust, seller financing from Connie Berg, and the obligations

ACTIVE 709498546v4

to the ESOP Trust.  Fifth, the transfer left the Debtor insolvent, unable to pay its debts when due, and/or with unreasonably small capital.

318.    The ESOP Trust was the initial transferee of the transfer.

319.    Connie Berg was the immediate transferee from the ESOP Trust, and she was not a good faith transferee for value.

320.    On information and belief, Kyle Berg was an immediate transferee of some or all of the $335,000 transfer from Connie Berg, and he was not a good faith transferee for value.

321.    On information and belief, the Connie Berg Trust and/or the Kyle Berg Trust were immediate or mediate transferees of some or all of the $335,000 transfer from Connie Berg and/or Kyle Berg, and were not good faith transferees for value.

322.    As required by 11 U.S.C. § 544(b), the Debtor has creditors with allowed unsecured claims that arose before and/or after the Debtor made the transfer to the ESOP Trust that could avoid such transfer, including, without limitation: Firelake Construction, Inc. (Claim No. 1); M & K Porta Potties (Claim No. 2); Right Choice Electric Inc. (Claim No. 5); LaCreek Development Corporation (Claim No. 14); and Steptoe LLP (Claim No. 16).

323.    Based on the foregoing, the Debtor's $335,000 transfer to the ESOP Trust is avoidable under 11 U.S.C. § 544(b) and N.D. Cent. Code § 13-02.1-04(1)(a).  Plaintiff may avoid the transfer and, pursuant to N.D. Cent. Code § 13-02.1-08(a)(2), recover it from Connie Berg, Kyle Berg, the Connie Berg Trust, and/or the Kyle Berg Trust.

**COUNT 12**
**Fraudulent Transfer (Actual Fraud)**
**11 U.S.C. § 544(b) and N.D. Cent. Code § 13-02.1-04(1)(a)**
**Plaintiff:  Erik A. Ahlgren, as Chapter 7 Trustee**
**Defendants:  Connie Berg, Kyle Berg, Connie Berg Trust, Kyle Berg Trust**

324.    All paragraphs in this Complaint are incorporated by reference.

66

325.     On August 31, 2020, the Debtor transferred $200,000 to the ESOP Trust as a plan contribution for the fiscal year ending 2020.  The ESOP Trust then immediately transferred the $200,000 to Connie Berg as partial payment for her 62,317 shares of the Debtor's stock.

326.     The Debtor transferred $200,000 to the ESOP Trust with actual intent to hinder, delay, or defraud its creditors.  The sole purpose of the transfer was to fund the ESOP Trust's acquisition of the Debtor's stock from Connie Berg, and the transfer amount was based on the Debtor's purported valuation of about $31.5 million.  However, in authorizing and causing the transfer, the Bergs knew that the valuation was inflated because a material amount of the Debtor's revenue was attributable to fraudulently obtained Set-Aside Contracts.  The Bergs orchestrated the transfer to enrich themselves, while placing all risk on the Debtor's creditors.  By the time the federal government discovered their scheme to defraud SBA—which was the natural outcome of their actions—the Bergs would have already cashed out Connie Berg's equity interest via the ESOP transaction.  Creditors, meanwhile, would be left holding the bag—which is exactly what happened.

327.     The transfer had numerous badges of fraud.  First, the transfer was for the benefit of insiders, the Bergs.  Second, the Bergs concealed material information regarding the Debtor's assets, liabilities, and enterprise value.  Third, the Debtor did not receive reasonably equivalent value.  Fourth, the Debtor incurred substantial debt immediately before and after the transfer, including the secured debt to Bankers Trust, seller financing from Connie Berg, and the obligations to the ESOP Trust.  Fifth, the transfer left the Debtor insolvent, unable to pay its debts when due, and/or with unreasonably small capital.

328.     The ESOP Trust was the initial transferee of the transfer.

ACTIVE 709498546v4

329. Connie Berg was the immediate transferee from the ESOP Trust, and she was not a good faith transferee for value.

330. On information and belief, Kyle Berg was an immediate transferee of some or all of the $200,000 transfer from Connie Berg. Further, he was not a good faith transferee for value.

331. On information and belief, the Connie Berg Trust and/or the Kyle Berg Trust were immediate or mediate transferees of some or all of the $200,000 transfer from Connie Berg and/or Kyle Berg, and were not good faith transferees for value.

332. As required by 11 U.S.C. § 544(b), the Debtor has creditors with allowed unsecured claims that arose before and/or after the Debtor made the transfer to the ESOP Trust that could avoid such transfer, including, without limitation: Firelake Construction, Inc. (Claim No. 1); M & K Porta Potties (Claim No. 2); Right Choice Electric Inc. (Claim No. 5); LaCreek Development Corporation (Claim No. 14); and Steptoe LLP (Claim No. 16).

333. Based on the foregoing, the Debtor's $200,000 transfer to the ESOP Trust is avoidable under 11 U.S.C. § 544(b) and N.D. Cent. Code § 13-02.1-04(1)(a). Plaintiff may avoid the transfer and, pursuant to N.D. Cent. Code § 13-02.1-08(a)(2), recover it from Connie Berg, Kyle Berg, the Connie Berg Trust, and the Kyle Berg Trust.

**COUNT 13**
**Fraudulent Transfer/Obligation (Actual Fraud)**
**11 U.S.C. § 544(b) and N.D. Cent. Code § 13-02.1-04(1)(a)**
**Plaintiff: Erik A. Ahlgren, as Chapter 7 Trustee**
**Defendants: Connie Berg, Kyle Berg, Connie Berg Trust, Kyle Berg Trust**

334. All paragraphs in this Complaint are incorporated by reference.

335. On August 31, 2020, the Debtor "loaned" $8,479,246 to the ESOP Trust pursuant to the terms of the ESOP Purchase Agreement, the Initial Company/ESOP Loan Agreement, the Initial Company/ESOP, and the A&R Seller Note (collectively, the "Loan Documents"). The

ACTIVE 709498546v4

ESOP Trust then immediately transferred the $8,479,246 in cash to Connie Berg as partial payment for her 62,317 shares of the Debtor's stock.

336.     The Debtor incurred the obligation to loan $8,479,246 to the ESOP Trust under the Loan Documents, and then transferred $8,479,246 to the ESOP Trust, with actual intent to hinder, delay, or defraud its creditors.  The sole purpose for incurring the obligation and making the transfer was to fund the ESOP Trust's acquisition of the Debtor's stock from Connie Berg.  The transfer amount was based on the Debtor's purported valuation of about $31.5 million.  However, in authorizing and causing the Debtor to incur the obligation and make the transfer, the Bergs knew that this valuation was inflated because a material amount of the Debtor's revenue was attributable to fraudulently obtained Set-Aside Contracts.  The Bergs orchestrated the obligation and transfer to enrich themselves, while placing all risk on the Debtor's creditors.  By the time the federal government discovered their scheme to defraud SBA—which was the natural outcome of their actions—the Bergs would have already cashed out Connie Berg's equity interest via the ESOP transaction.  Creditors, meanwhile, would be left holding the bag—which is exactly what happened.

337.     The obligation and transfer had numerous badges of fraud.  First, they were for the benefit of insiders, Connie Berg and Kyle Berg.  Second, the Bergs concealed material information regarding the Debtor's assets, liabilities, and enterprise value.  Third, the Debtor did not receive reasonably equivalent value.  Fourth, the Debtor incurred substantial debt immediately before and after incurring the obligation and making the transfer, including the secured debt to Bankers Trust, seller financing from Connie Berg, and the obligations to the ESOP Trust.  Fifth, obligation and transfer left the Debtor insolvent, unable to pay its debts when due, and/or with unreasonably small capital.

338. The ESOP Trust was the initial obligee and transferee.

339. Connie Berg was the immediate transferee of $8,479,246 from the ESOP Trust, and she was not a good faith transferee for value.

340. On information and belief, Kyle Berg was an immediate transferee of some or all of the $8,479,249 transfer from Connie Berg, and he was not a good faith transferee for value.

341. On information and belief, the Connie Berg Trust and/or the Kyle Berg Trust were immediate or mediate transferees of some or all of the $8,479,246 transfer from Connie Berg and/or Kyle Berg, and were not good faith transferees for value.

342. As required by 11 U.S.C. § 544(b), the Debtor has creditors with allowed unsecured claims that arose before and/or after the Debtor incurred the obligation and made the transfer that could avoid them, including, without limitation: Firelake Construction, Inc. (Claim No. 1); M & K Porta Potties (Claim No. 2); Right Choice Electric Inc. (Claim No. 5); LaCreek Development Corporation (Claim No. 14); and Steptoe LLP (Claim No. 16).

343. Based on the foregoing, the Debtor's obligation under the Loan Documents to transfer $8,479,246 to the ESOP Trust, and its subsequent transfer of $8,479,246 to the ESOP Trust, are avoidable under 11 U.S.C. § 544(b) and N.D. Cent. Code § 13-02.1-04(1)(a). Plaintiff may avoid such obligation and transfer and, pursuant to N.D. Cent. Code § 13-02.1-08(a)(2), recover the transfer from Connie Berg, Kyle Berg, the Connie Berg Trust, and/or the Kyle Berg Trust.

**COUNT 14**
**Fraudulent Transfers/Obligation (Actual Fraud)**
**11 U.S.C. § 544(b) and N.D. Cent. Code § 13-02.1-04(1)(a)**
**Plaintiff: Erik A. Ahlgren, as Chapter 7 Trustee**
**Defendants: Connie Berg, Kyle Berg, Connie Berg Trust, Kyle Berg Trust**

344. All paragraphs in this Complaint are incorporated by reference.

345.    On August 31, 2020, the Debtor executed the Redemption Note (as amended) and other related agreements and instruments in favor of Connie Berg and incurred an obligation thereunder to pay her $12,094,000 plus interest (the "Redemption Note Obligations").  From and after August 31, 2020, the Debtor then made periodic Redemption Note Payments (as defined above) to Connie Berg, as detailed in paragraph 213 above.  The Debtor incurred the Redemption Note Obligations, and then made the Redemption Note Payments, with actual intent to hinder, delay, or defraud its creditors.

346.    The Debtor incurred the Redemption Note Obligations to purchase and redeem 37,683 shares of the Debtor's stock from Connie Berg as part of the ESOP transaction.  However, the obligation amount was based on the Debtor's purported valuation of about $31.5 million, which Connie Berg knew was inflated because a material amount of the Debtor's revenue was attributable to fraudulently obtained Set-Aside Contracts.  Connie Berg, with assistance from Kyle Berg, orchestrated the Redemption Note Obligations, and subsequent Redemption Note Payments, to enrich herself, while placing all risk on the Debtor's creditors.  By the time the federal government discovered their scheme to defraud SBA—which was the natural outcome of their actions—the Bergs would have already cashed out Connie Berg's equity interest via the ESOP transaction and received the Redemption Note Payments.  Creditors, meanwhile, would be left holding the bag— which is exactly what happened.

347.    The Redemption Note Obligations and Redemption Note Payments had numerous badges of fraud.  First, they were to or for the benefit of insiders, Connie Berg and Kyle Berg. Second, the Bergs concealed material information regarding the Debtor's assets, liabilities, and enterprise value in connection with the Debtor's incurrence of the Redemption Note Obligations. Third, the Debtor did not receive reasonably equivalent value.  The shares were worth materially

less than $12,094,000. Fourth, the Debtor incurred substantial debt immediately before and after incurring the Redemption Note Obligations, including the secured debt to Bankers Trust, other seller financing from Connie Berg, and the obligations to the ESOP Trust. Fifth, Redemption Note Obligations and the Redemption Note Payments left the Debtor insolvent, unable to pay its debts when due, and/or with unreasonably small capital.

348. Connie Berg was the obligee of the Redemption Note Obligations and the initial transferee of the Redemption Note Payments.

349. On information and belief, Kyle Berg was an immediate transferee of some or all the Redemption Note Payments from Connie Berg, and he was not a good faith transferee for value.

350. On information and belief, the Connie Berg Trust and/or the Kyle Berg Trust were immediate or mediate transferees of some or all of the Redemption Note Payments from Connie Berg and/or Kyle Berg, and were not good faith transferees for value.

351. As required by 11 U.S.C. § 544(b), the Debtor has creditors with allowed unsecured claims that arose before and/or after the Debtor incurred the Redemption Note Obligations and made the Redemption Note Payments to Connie Berg that could avoid them, including, without limitation: Firelake Construction, Inc. (Claim No. 1); M & K Porta Potties (Claim No. 2); Right Choice Electric Inc. (Claim No. 5); LaCreek Development Corporation (Claim No. 14); and Steptoe LLP (Claim No. 16).

352. Based on the foregoing, the Redemption Note Obligations and each of the Redemption Note Payments are avoidable under 11 U.S.C. § 544(b) and N.D. Cent. Code § 13-02.1-04(1)(a). Plaintiff may avoid the Redemption Note Obligations and Redemption Note

Payments and, pursuant to N.D. Cent. Code § 13-02.1-08(a)(2), recover the Redemption Note

Payments from Connie Berg, Kyle Berg, the Connie Berg Trust, and/or the Kyle Berg Trust.

**COUNT 15**
**Fraudulent Transfers/Obligation (Actual Fraud)**
**11 U.S.C. § 544(b) and N.D. Cent. Code § 13-02.1-04(1)(a)**
**Plaintiff:  Erik A. Ahlgren, as Chapter 7 Trustee**
**Defendants:  Connie Berg, Kyle Berg, Connie Berg Trust, Kyle Berg Trust**

353.    All paragraphs in this Complaint are incorporated by reference.

354.    On August 31, 2020, the Debtor executed the A&R Seller Note (as amended) and

other related agreements and instruments in favor of Connie Berg and incurred an obligation

thereunder to pay her $10,985,754 plus interest (the "Seller Note Obligations").  From and after

August 31, 2020, the Debtor then made periodic Seller Note Payments (as defined above) to

Connie Berg, as detailed in paragraph 213 above.    The Debtor incurred the Seller Note

Obligations, and then made the Seller Note Payments, with actual intent to hinder, delay, or

defraud its creditors.

355.    The Debtor incurred the Seller Note Obligations as part of the ESOP transaction.

However, the obligation amount was based on the Debtor's purported valuation of about

$31.5 million, which Connie Berg knew was inflated because a material amount of the Debtor's

revenue was attributable to fraudulently obtained Set-Aside Contracts.  Connie Berg, with

assistance from Kyle Berg, orchestrated the Seller Note Obligations, and subsequent Seller Note

Payments, to enrich herself, while placing all risk on the Debtor's creditors.  By the time the federal

government discovered their scheme to defraud SBA—which was the natural outcome of their

actions—the Bergs would have already cashed out Connie Berg's equity interest and received the

Seller Note Payments.  Creditors, meanwhile, would be left holding the bag—which is exactly

what happened.

ACTIVE 709498546v4

356.   The Seller Note Obligations and Seller Note Payments had numerous badges of fraud.  First, they were to or for the benefit of insiders, Connie Berg and Kyle Berg.  Second, the Bergs concealed material information regarding the Debtor's assets, liabilities, and enterprise value in connection with the Debtor's incurrence of the Seller Note Obligations.  Third, the Debtor did not receive reasonably equivalent value.   Fourth, the Debtor incurred substantial debt immediately before and after incurring the Seller Note Obligations, including the secured debt to Bankers Trust, other seller financing from Connie Berg, and the obligations to the ESOP Trust. Fifth, the Seller Note Obligations and the Seller Note Payments left the Debtor insolvent, unable to pay its debts when due, and/or with unreasonably small capital.

357.   Connie Berg was the obligee of the Seller Note Obligations and the initial transferee of the Seller Note Payments.

358.   On information and belief, Kyle Berg was an immediate transferee of some or all the Seller Note Payments from Connie Berg, and he was not a good faith transferee for value.

359.   On information and belief, the Connie Berg Trust and/or the Kyle Berg Trust were immediate or mediate transferees of some or all of the Seller Note Payments from Connie Berg and/or Kyle Berg, and were not good faith transferees for value.

360.   As required by 11 U.S.C. § 544(b), the Debtor has creditors with allowed unsecured claims that arose before and/or after the Debtor incurred the Seller Note Obligations and made the Seller Note Payments to Connie Berg that could avoid them, including, without limitation: Firelake Construction, Inc. (Claim No. 1); M & K Porta Potties (Claim No. 2); Right Choice Electric Inc. (Claim No. 5); LaCreek Development Corporation (Claim No. 14); and Steptoe LLP (Claim No. 16).

74

361.    Based on the foregoing, the Seller Note Obligations and each of the Seller Note Payments are avoidable under 11 U.S.C. § 544(b) and N.D. Cent. Code § 13-02.1-04(1)(a). Plaintiff may avoid the Seller Note Obligations and Seller Note Payments and, pursuant to N.D. Cent. Code § 13-02.1-08(a)(2), recover the Seller Note Payments from Connie Berg, Kyle Berg, the Connie Berg Trust, and the Kyle Berg Trust.

**COUNT 16**
**Fraudulent Transfer (Constructive Fraud)**
**11 U.S.C. § 544(b) and N.D. Cent. Code § 13-02.1-04(1)(b)**
**Plaintiff:  Erik A. Ahlgren, as Chapter 7 Trustee**
**Defendants:  Connie Berg, Kyle Berg, Connie Berg Trust, Kyle Berg Trust**

362.    All paragraphs in this Complaint are incorporated by reference.

363.    On August 31, 2020, the Debtor transferred $335,000 to the ESOP Trust as a plan contribution for the fiscal year ending 2019.  The ESOP Trust then immediately transferred the $335,000 to Connie Berg as partial payment for her 62,317 shares of the Debtor's stock.

364.    The Debtor did not receive reasonably equivalent value from the ESOP Trust.

365.    When the Debtor made the transfer, (a) it was engaged or was about to engage in a business or a transaction for which the remaining assets of the Debtor were unreasonably small in relation to the business or transaction or the debtor intended to incur and/or (b) believed or reasonably should have believed that the Debtor would incur, debts beyond the Debtor's ability to pay as they became due.  The transfer depleted the Debtor of cash at the same time that the Debtor transferred millions of dollars to the ESOP Trust to pay Connie Berg for stock in the Debtor, made a $6.2 million equity distribution to Connie Berg, incurred $11.9 million of secured debt to Banker Trust, incurred millions of dollars of seller financing obligations to Connie Berg, and incurred other obligations to the ESOP Trust. As a result of the Bergs' fraudulent scheme, the Debtor also

faced substantial undisclosed criminal and civil liability to the federal government and other liabilities and expenses.

366.    The ESOP Trust was the initial transferee of the transfer.

367.    Connie Berg was the immediate transferee from the ESOP Trust, and she was not a good faith transferee for value.

368.    On information and belief, Kyle Berg was an immediate transferee of some or all of the $335,000 transfer from Connie Berg.  Further, he was not a good faith transferee for value.

369.    On information and belief, the Connie Berg Trust and/or the Kyle Berg Trust were immediate or mediate transferees of some or all of the $335,000 transfer from Connie Berg and/or Kyle Berg, and were not good faith transferees for value.

370.    As required by 11 U.S.C. § 544(b), the Debtor has creditors with allowed unsecured claims that arose before and/or after the Debtor made the transfer to the ESOP Trust that could avoid such transfer, including, without limitation: Firelake Construction, Inc. (Claim No. 1); M & K Porta Potties (Claim No. 2); Right Choice Electric Inc. (Claim No. 5); LaCreek Development Corporation (Claim No. 14); and Steptoe LLP (Claim No. 16).

371.    Based on the foregoing, the Debtor's $335,000 transfer to the ESOP Trust is avoidable under 11 U.S.C. § 544(b) and N.D. Cent. Code § 13-02.1-04(1)(b).  Plaintiff may avoid the transfer and, pursuant to N.D. Cent. Code § 13-02.1-08(a)(2), recover it from Connie Berg, Kyle Berg, the Connie Berg Trust, and the Kyle Berg Trust.

**COUNT 17**
**Fraudulent Transfer (Constructive Fraud)**
**11 U.S.C. § 544(b) and N.D. Cent. Code § 13-02.1-04(1)(b)**
**Plaintiff:  Erik A. Ahlgren, as Chapter 7 Trustee**
**Defendants:  Connie Berg, Kyle Berg, Connie Berg Trust, Kyle Berg Trust**

372.    All paragraphs in this Complaint are incorporated by reference.

ACTIVE 709498546v4

373.    On August 31, 2020, the Debtor transferred $200,00 to the ESOP Trust as a plan contribution for the fiscal year ending 2020.  The ESOP Trust then immediately transferred the $200,000 to Connie Berg as partial payment for her 62,317 shares of the Debtor's stock.

374.    The Debtor did not receive reasonably equivalent value from the ESOP Trust.

375.    When the Debtor made the transfer, (a) it was engaged or was about to engage in a business or a transaction for which the remaining assets of the Debtor were unreasonably small in relation to the business or transaction or the debtor intended to incur and/or (b) believed or reasonably should have believed that the Debtor would incur, debts beyond the Debtor's ability to pay as they became due.  The transfer depleted the Debtor of cash at the same time that the Debtor transferred millions of dollars to the ESOP Trust to pay Connie Berg for her stock in the Debtor, made a $6.2 million equity distribution to Connie Berg, incurred $11.9 million of secured debt to Banker Trust, incurred millions of dollars of seller financing obligations to Connie Berg, and incurred other obligations to the ESOP Trust. As a result of the Bergs' fraudulent scheme, the Debtor also faced substantial undisclosed criminal and civil liability to the federal government and other liabilities and expenses.

376.    The ESOP Trust was the initial transferee of the transfer.

377.    Connie Berg was the immediate transferee from the ESOP Trust, and she was not a good faith transferee for value.

378.    On information and belief, Kyle Berg was an immediate transferee of some or all of the $200,000 transfer from Connie Berg.  Further, he was not a good faith transferee for value.

379.    On information and belief, the Connie Berg Trust and/or the Kyle Berg Trust were immediate or mediate transferees or some or all of the $200,000 transfer from Connie Berg and/or Kyle Berg, and were not good faith transferees for value.

ACTIVE 709498546v4

380.     As required by 11 U.S.C. § 544(b), the Debtor has creditors with allowed unsecured claims that arose before and/or after the Debtor made the transfer to the ESOP Trust that could avoid such transfer, including, without limitation: Firelake Construction, Inc. (Claim No. 1); M & K Porta Potties (Claim No. 2); Right Choice Electric Inc. (Claim No. 5); LaCreek Development Corporation (Claim No. 14); and Steptoe LLP (Claim No. 16).

381.     Based on the foregoing, the Debtor's $200,000 transfer to the ESOP Trust is avoidable under 11 U.S.C. § 544(b) and N.D. Cent. Code § 13-02.1-04(1)(b).  Plaintiff may avoid the transfer and, pursuant to N.D. Cent. Code § 13-02.1-08(a)(2), recover it from Connie Berg, Kyle Berg, the Connie Berg Trust, and the Kyle Berg Trust.

### COUNT 18
### Fraudulent Transfer/Obligation (Constructive Fraud)
### 11 U.S.C. § 544(b) and N.D. Cent. Code § 13-02.1-04(1)(b)
### Plaintiff:  Erik A. Ahlgren, as Chapter 7 Trustee
### Defendants:  Connie Berg, Kyle Berg, Connie Berg Trust, Kyle Berg Trust

382.     All paragraphs in this Complaint are incorporated by reference.

383.     On August 31, 2020, the Debtor "loaned" $8,479,246 to the ESOP Trust pursuant to the terms of the ESOP Purchase Agreement, the Initial Company/ESOP Loan Agreement, the Initial Company/ESOP, and the A&R Seller Note (collectively, the "Loan Documents").  The ESOP Trust then immediately transferred the $8,479,246 in cash to Connie Berg as partial payment for her 62,317 shares of the Debtor's stock.

384.     The Debtor incurred the obligation to loan $8,479,246 to the ESOP Trust under the Loan Documents, and then transferred $8,479,246 to the ESOP Trust, but did not receive reasonably equivalent value in return from the ESOP Trust.

385.     When the Debtor incurred the obligation and made the transfer, (a) it was engaged or was about to engage in a business or a transaction for which the remaining assets of the Debtor

were unreasonably small in relation to the business or transaction or the debtor intended to incur

and/or (b) believed or reasonably should have believed that the Debtor would incur, debts beyond

the Debtor's ability to pay as they became due.  The transfer depleted the Debtor of cash at the

same time that the Debtor transferred substantial funds to the ESOP Trust to pay Connie Berg for

her stock in the Debtor, made a $6.2 million equity distribution to Connie Berg, incurred $11.9

million of secured debt to Banker Trust, incurred millions of dollars of seller financing obligations

to Connie Berg, and incurred other obligations to the ESOP Trust. As a result of the Bergs'

fraudulent scheme, the Debtor also faced substantial undisclosed criminal and civil liability to the

federal government and other liabilities and expenses.

386.    The ESOP Trust was the initial obligee and transferee.

387.    Connie Berg was the immediate transferee of $8,479,246 from the ESOP Trust, and

she was not a good faith transferee for value.

388.    On information and belief, Kyle Berg was an immediate transferee of some or all

of the $8,479,246 transfer from Connie Berg, and he was not a good faith transferee for value.

389.    On information and belief, the Connie Berg Trust and/or the Kyle Berg Trust were

immediate or mediate transferees of some or all of the $8,479,246 transfer from Connie Berg

and/or Kyle Berg, and were not good faith transferees for value.

390.    As required by 11 U.S.C. § 544(b), the Debtor has creditors with allowed unsecured

claims that arose before and/or after the Debtor incurred the obligation and made the transfer that

could avoid them, including, without limitation: Firelake Construction, Inc. (Claim No. 1); M &

K Porta Potties (Claim No. 2); Right Choice Electric Inc. (Claim No. 5); LaCreek Development

Corporation (Claim No. 14); and Steptoe LLP (Claim No. 16).

391.     Based on the foregoing, the Debtor's obligation under the Loan Documents to transfer $8,479,246 to the ESOP Trust, and its subsequent transfer of $8,479,246 to the ESOP Trust, are avoidable under 11 U.S.C. § 544(b) and N.D. Cent. Code § 13-02.1-04(1)(b).  Plaintiff may avoid such obligation and transfer and, pursuant to N.D. Cent. Code § 13-02.1-08(a)(2), recover the transfer from Connie Berg, Kyle Berg, the Connie Berg Trust, and/or the Kyle Berg Trust.

### COUNT 19
**Fraudulent Transfers/Obligation (Constructive Fraud)**
**11 U.S.C. § 544(b) and N.D. Cent. Code § 13-02.1-04(1)(b)**
**Plaintiff:  Erik A. Ahlgren, as Chapter 7 Trustee**
**Defendants:  Connie Berg, Kyle Berg, Connie Berg Trust, Kyle Berg Trust**

392.     All paragraphs in this Complaint are incorporated by reference.

393.     On August 31, 2020, the Debtor incurred the Redemption Note Obligations (as defined above) in favor of Connie Berg.  From and after August 31, 2020, the Debtor then made periodic Redemption Note Payments (as defined above) to Connie Berg, as detailed in paragraph 213 above.

394.     The Debtor incurred the Redemption Note Obligations, and then made each of the Redemption Note Payments, but did not receive reasonably equivalent value from Connie Berg. The Debtor incurred the Redemption Note Obligations and made the Redemption Note Payments to purchase and redeem 37,683 shares of the Debtor's stock from Connie Berg.  But the shares were worth a fraction of that amount.  The share valuation was inflated because a material amount of the Debtor's revenue was attributable to fraudulently obtained Set-Aside Contracts.

395.     When the Debtor incurred the Redemption Note Obligations and then made each of the Redemption Note Payments, (a) it was engaged or was about to engage in a business or a transaction for which the remaining assets of the Debtor were unreasonably small in relation to the

ACTIVE 709498546v4

business or transaction or the debtor intended to incur and/or (b) believed or reasonably should have believed that the Debtor would incur, debts beyond the Debtor's ability to pay as they became due.  The Debtor incurred the obligations at the same time that it transferred substantial funds to the ESOP Trust to pay Connie Berg for her remaining stock in the Debtor, made a $6.2 million equity distribution to Connie Berg, incurred $11.9 million of secured debt to Banker Trust, incurred millions of dollars of other seller financing obligations to Connie Berg, and incurred other obligations to the ESOP Trust. As a result of the Bergs' fraudulent scheme, the Debtor also faced substantial undisclosed criminal and civil liability to the federal government and other liabilities and expenses.

396.    Connie Berg is the obligee of the Redemption Note Obligations and the initial transferee of the Redemption Note Payments.

397.    On information and belief, Kyle Berg was an immediate transferee of some or all the Redemption Note Payments from Connie Berg, and he was not a good faith transferee for value.

398.    On information and belief, the Connie Berg Trust and/or the Kyle Berg Trust were immediate or mediate transferees of some or all of the Redemption Note Payments from Connie Berg and/or Kyle Berg, and were not good faith transferees for value.

399.    As required by 11 U.S.C. § 544(b), the Debtor has creditors with allowed unsecured claims that arose before and/or after the Debtor incurred the Redemption Note Obligations and made the Redemption Note Payments to Connie Berg that could avoid them, including, without limitation: Firelake Construction, Inc. (Claim No. 1); M & K Porta Potties (Claim No. 2); Right Choice Electric Inc. (Claim No. 5); LaCreek Development Corporation (Claim No. 14); and Steptoe LLP (Claim No. 16).

81

400.    Based on the foregoing, the Redemption Note Obligations and each of the Redemption Note Payments are avoidable under 11 U.S.C. § 544(b) and N.D. Cent. Code § 13-02.1-04(1)(b).  Plaintiff may avoid the Redemption Note Obligations and Redemption Note Obligation Payments and, pursuant to N.D. Cent. Code § 13-02.1-08(a)(2), recover the Redemption Note Payments from Connie Berg, Kyle Berg, the Connie Berg Trust, and/or the Kyle Berg Trust.

### COUNT 20
**Fraudulent Transfers/Obligation (Constructive Fraud)**
**11 U.S.C. § 544(b) and N.D. Cent. Code § 13-02.1-04(1)(b)**
**Plaintiff:  Erik A. Ahlgren, as Chapter 7 Trustee**
**Defendants:  Connie Berg, Kyle Berg, Connie Berg Trust, Kyle Berg Trust**

401.    All paragraphs in this Complaint are incorporated by reference.

402.    On August 31, 2020, the Debtor incurred the Seller Note Obligations (as defined above) in favor of Connie Berg.  From and after August 31, 2020, the Debtor then made periodic Seller Note Payments (as defined above) to Connie Berg, as detailed in paragraph 213 above.

403.    The Debtor incurred the Seller Note Obligations, and then made each of the Seller Note Payments, but did not receive reasonably equivalent value from Connie Berg.  The Debtor incurred the Seller Note Obligations and made the Seller Note Payments in connection with the ESOP Trust's purchase of 62,317 shares of the Debtor's stock from Connie Berg.  But the shares were worth a fraction of that amount.  The share valuation was inflated because a material amount of the Debtor's revenue was attributable to fraudulently obtained Set-Aside Contracts.

404.    When the Debtor incurred the Seller Note Obligations and then made each of the Seller Note Payments, (a) it was engaged or was about to engage in a business or a transaction for which the remaining assets of the Debtor were unreasonably small in relation to the business or transaction or the debtor intended to incur and/or (b) believed or reasonably should have believed

that the Debtor would incur, debts beyond the Debtor's ability to pay as they became due. The Debtor incurred the obligations at the same time that it transferred substantial funds to the ESOP Trust to pay Connie Berg for her remaining stock in the Debtor, made a $6.2 million equity distribution to Connie Berg, incurred $11.9 million of secured debt to Banker Trust, incurred millions of dollars of other seller financing obligations to Connie Berg, and incurred other obligations to the ESOP Trust. As a result of the Bergs' fraudulent scheme, the Debtor also faced substantial undisclosed criminal and civil liability to the federal government and other liabilities and expenses.

405.    Connie Berg was the obligee of the Seller Note Obligations and the initial transferee of the Seller Note Payments.

406.    On information and belief, Kyle Berg was an immediate transferee of some or all the Seller Note Payments from Connie Berg, and he was not a good faith transferee for value.

407.    On information and belief, the Connie Berg Trust and/or the Kyle Berg Trust were immediate or mediate transferees of some or all of the Seller Note Payments from Connie Berg and/or Kyle Berg, and were not good faith transferees for value.

408.    As required by 11 U.S.C. § 544(b), the Debtor has creditors with allowed unsecured claims that arose before and/or after the Debtor incurred the Seller Note Obligations and made the Seller Note Payments to Connie Berg that could avoid them, including, without limitation: Firelake Construction, Inc. (Claim No. 1); M & K Porta Potties (Claim No. 2); Right Choice Electric Inc. (Claim No. 5); LaCreek Development Corporation (Claim No. 14); and Steptoe LLP (Claim No. 16)

409.    Based on the foregoing, the Seller Note Obligation and each of the Seller Note Payments are avoidable under 11 U.S.C. § 544(b) and N.D. Cent. Code § 13-02.1-04(1)(b).

83

Plaintiff may avoid the Seller Note Obligations and Seller Note Payments and, pursuant to N.D.

Cent. Code § 13-02.1-08(a)(2), recover the Seller Note Payments from Connie Berg, Kyle Berg,

the Connie Berg Trust, and/or the Kyle Berg Trust.

**COUNT 21[2]**
**Breach of Fiduciary Duty (ERISA)**
**11 U.S.C. § 704(a)(11) and 29 U.S.C. §§ 1104, 1106, 1109, 1132**
**Plaintiff:  Erik A. Ahlgren, as ESOP Plan Administrator and as ESOP Trustee**
**Defendant:  Miguel Paredes**

410.    All paragraphs in this Complaint are incorporated by reference, except the

paragraphs comprising Counts 25-28.

411.    Plaintiff is the Administrator of the ESOP Plan and ESOP Trustee of the ESOP

Trust.  As a plan fiduciary, Plaintiff has statutory standing to bring this civil action pursuant to 11

U.S.C. § 704(a)(11) and 29 U.S.C. § 1132(a)(2), (3).

412.    Under 29 U.S.C. § 1104(a)(1)(B), a fiduciary of an ERISA plan must discharge his

or her duties "with the care, skill, prudence, and diligence under the circumstances then prevailing

that a prudent man acting in a like capacity and familiar with such matters would use in the conduct

of an enterprise of a like character and with like aims."

413.    Under 29 U.S.C. §§ 1106(a)(1)(A), (D) and 1108(b)(17)(A), "[a] fiduciary with

respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know

that such transaction constitutes a direct or indirect . . . (A) sale or exchange, or leasing, of any

property between the plan and a party in interest [or] . . . (D) transfer to, or use by or for the benefit

of a party in interest, of any assets of the plan," unless "in connection with such transaction the

plan receives no less, nor pays no more, than adequate consideration."  "Adequate consideration"

---

[2]      By order dated April 4, 2025 [ECF No. 103], the Court dismissed Count 21 in part to the
extent it is premised on 29 U.S.C. § 1106(a)(1)(D).  Plaintiff retains this part of Count 21 in the
Second Amended Complaint solely to preserve the issue for appeal.

84

is defined as "the fair market value of the asset as determined in good faith by the trustee or named fiduciary pursuant to the terms of the plan and in accordance with regulations promulgated by the Secretary." 11 U.S.C. § 1002(18).

414. At all relevant times, Paredes was trustee of the ESOP Trust and, therefore, a plan fiduciary.

415. Paredes breached his duties under 29 U.S.C. §§ 1104(a)(1)(B) and 1106(a)(1)(A), (D) by causing the ESOP Trust to enter into a prohibited transaction with Connie Berg.

416. First, Connie Berg was a party in interest with respect to the ESOP Plan and ESOP Trust because she owned more than 10% of the Debtor and was an employee, officer, and director of the Debtor. *See* 29 U.S.C. § 1002(14)(A), (H).

417. Second, Paredes caused the ESOP Plan and ESOP Trust to enter into a transaction with Connie Berg covered by 29 U.S.C. § 1106(a)(1)(A) and (D). Specifically, the ESOP Trust purchased the Debtor's stock from Connie Berg.

418. Third, the ESOP Plan and ESOP Trust paid more than "adequate consideration" to Connie Berg in exchange for the Debtor's stock. The shares were substantially overvalued because a material amount of the Debtor's revenue was attributable to fraudulently obtained Set-Aside Contracts, and the Debtor faced substantial undisclosed liabilities relating to the fraud.

419. Fourth, Paredes did not determine the fair market value of the Debtor's stock in good faith and a hypothetical prudent fiduciary would not have closed the ESOP transaction on the same terms, if at all. The Debtor's business substantially involved bidding on government contracts and there were significant red flags regarding the Debtor's qualifications for those government contracts. Had Paredes conducted even basic due diligence and retained appropriate advisors, he would have discovered that it did not actually qualify for the 8(a) and WOSB

ACTIVE 709498546v4

Programs, was not a small business, received thousands of Set-Aside Contracts to which it was not entitled, could not sustain its revenue, and faced substantial undisclosed liabilities relating to the Bergs' fraud.  As a result, the ESOP paid substantially more than Debtor's stock was actually worth.

420.    As a result of the Paredes' breaches of fiduciary duties—including, without limitation, causing or permitting the ESOP Plan and ESOP Trust to enter into a prohibited transaction—Plaintiff is entitled to recover damages, restitution, disgorgement, and other relief in accordance with 29 U.S.C. § 1109(a), in amount(s) to be determined at trial.

421.    Pursuant to 29 U.S.C. § 1132(g)(1), Plaintiff is also entitled to recover reasonable attorneys' fees and costs.

**COUNT 22**
**Breach of Fiduciary Duty (ERISA)**
**11 U.S.C. § 704(a)(11) and 29 U.S.C. §§ 1104, 1106, 1109, 1132**
**Plaintiff:  Erik A. Ahlgren, as ESOP Plan Administrator and as ESOP Trustee**
**Defendants:  Connie Berg and Kyle Berg**

422.    All paragraphs in this Complaint are incorporated by reference.

423.    Plaintiff is the Administrator of the ESOP Plan and ESOP Trustee of the ESOP Trust.  As a plan fiduciary, Plaintiff has standing to bring this civil action pursuant to 11 U.S.C. § 704(a)(11) and 29 U.S.C. § 1132(a)(2), (3).

424.    Under 29 U.S.C. § 1104(a)(1)(B), a fiduciary of an ERISA plan must discharge his or her duties "solely in the interest if the participants and beneficiaries" and "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

86

425.    Additionally, an ERISA fiduciary has a duty to ensure that the plan does not engage in a prohibited transaction under 29 U.S.C. § 1106.

426.    Additionally, those who appoint ERISA plan fiduciaries have an ongoing fiduciary duty under ERISA to monitor the activities of their appointees.

427.    At all relevant times, Connie Berg was a fiduciary of the ESOP Plan and ESOP Trust because she exercised authority and/or control over the management of the ESOP Plan ESOP Trust and over the management and disposition of the ESOP Plan's and ESOP Trust's assets.  The Debtor served as the plan administrator, and she was the Debtor's sole shareholder, director, and president.  Together with Kyle Berg, she also proposed the ESOP transaction and its structure, and appointed Paredes as trustee of the ESOP Trust.

428.    At all relevant times, Kyle Berg was also a fiduciary of the ESOP Plan and ESOP Trust because he likewise exercised authority and/or control over the management of the ESOP Plan and ESOP Trust and over the management and disposition of the ESOP Plan's and ESOP Trust's assets.  Although Connie Berg was the Debtor's sole shareholder, director, and president on paper, Kyle Berg actually managed and controlled the Debtor, which served as the plan administrator.  Together with Connie Berg, he proposed the ESOP transaction and its structure, and orchestrated the appointment of Paredes as trustee of the ESOP Trust.

429.    Connie Berg and Kyle Berg breached their fiduciary duties of loyalty, care, skill, prudence, diligence, and monitoring to the ESOP Plan and ESOP Trust by allowing the ESOP transaction to close, even though they knew that (a) the Debtor's shares were substantially overvalued, (b) the ESOP paid more than adequate consideration in the transaction, and (c) the ESOP transaction was a prohibited transaction under 29 U.S.C. § 1106.  The Bergs never disclosed during the ESOP negotiations that a material portion of the Debtor's revenue was attributable to

fraudulently obtained Set-Aside Contracts. The Bergs also failed to adequately monitor Paredes. The Bergs could have stopped the ESOP transaction or ensured that the ESOP paid no more than adequate consideration but concealed the truth to enrich themselves.

430.    Because the Bergs breached their fiduciary duties of loyalty, care, skill, prudence, diligence, and monitoring, Plaintiff is entitled to recover damages, restitution, disgorgement, and other relief in accordance with 29 U.S.C. § 1109(a), in amount(s) to be determined at trial.

431.    Pursuant to 29 U.S.C. § 1132(g)(1), Plaintiff is also entitled to recover reasonable attorneys' fees and costs.

## COUNT 23
### Breach of Fiduciary Duty (ERISA)
### 11 U.S.C. § 704(a)(11) and 29 U.S.C. §§ 1105, 1109, 1132
### Plaintiff:  Erik A. Ahlgren, as ESOP Plan Administrator and ESOP Trustee
### Defendants:  Connie Berg and Kyle Berg

432.    All paragraphs in this Complaint are incorporated by reference.

433.    Plaintiff is the Administrator of the ESOP Plan and ESOP Trustee of the ESOP Trust. As a plan fiduciary, Plaintiff has standing to bring this civil action pursuant to 11 U.S.C. § 704(a)(11) and 29 U.S.C. § 1132(a)(2), (3).

434.    As detailed above in Count 21, Paredes breached his fiduciary duties under ERISA by causing the ESOP Trust to enter into a prohibited transaction in violation of 29 U.S.C. § 1106.

435.    Under 29 U.S.C. § 1105(a), "a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (2) if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to

ACTIVE 709498546v4

commit a breach; or (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."

436.   At all relevant times, Connie Berg was a fiduciary of the ESOP Plan and ESOP Trust because she exercised authority and/or control over the management of the ESOP Plan and ESOP Trust and over the management and disposition of the ESOP Plan's and ESOP Trust's assets.  The Debtor served as the plan administrator, and she was the Debtor's sole shareholder, director, and president.  Together with Kyle Berg, she also proposed the ESOP transaction and its structure, and appointed Paredes as trustee of the ESOP Trust.

437.   At all relevant times, Kyle Berg was also a fiduciary of the ESOP Plan and ESOP Trust because he likewise exercised authority and/or control over the management of the ESOP Plan and ESOP Trust and over the management and disposition of the ESOP Plan's and ESOP Trust's assets.  Although Connie Berg was the Debtor's sole shareholder, director, and president on paper, Kyle Berg actually managed and controlled the Debtor, which served as the plan administrator.  Together with Connie Berg, he proposed the ESOP transaction and its structure, and orchestrated the appointment of Paredes as trustee of the ESOP Trust.

438.   Pursuant to 29 U.S.C. § 1105(a), Connie Berg and Kyle Berg, each as a co-fiduciary of Paredes, are liable for Paredes' breaches of fiduciary duties.

439.   First, the Bergs knowingly participated in and concealed the fact that Paredes caused the ESOP Trust to enter into a prohibited transaction.  The Bergs knew, but concealed, that the ESOP transaction price was inflated and that the ESOP Trust did not receive adequate consideration.

440.   Second, the Bergs breached their duties of loyalty and monitoring, and those breaches enabled Paredes to breach his own fiduciary duties.  The Bergs could have stopped the

ESOP transaction or ensured that the ESOP Trust received adequate consideration, but concealed the truth and failed to monitor Paredes to enrich themselves.

441.    Third, the Bergs had actual knowledge that Paredes was breaching his fiduciary duties by causing the ESOP Trust to enter into a prohibited transaction, but did nothing to remedy the breach.  Instead, they permitted and concealed the breach.

442.    Based on the foregoing, Plaintiff is entitled to recover from the Bergs damages, restitution, disgorgement, and other relief in accordance with 29 U.S.C. § 1109(a), in amount(s) to be determined at trial.

443.    Pursuant to 29 U.S.C. § 1132(g)(1), Plaintiff is also entitled to recover reasonable attorneys' fees and costs.

### COUNT 24
### Prohibited Transaction / Non-Fiduciary (ERISA)
### 11 U.S.C. § 704(a)(11) and 29 U.S.C. §§ 1106, 1132
### Plaintiff:  Erik A. Ahlgren, as ESOP Plan Administrator and as ESOP Trustee
### Defendants:  Connie Berg and Kyle Berg

444.    All paragraphs in this Complaint are incorporated by reference.

445.    Plaintiff is the Administrator of the ESOP Plan and ESOP Trustee of the ESOP Trust.  As a plan fiduciary, Plaintiff has standing to bring this civil action pursuant to 11 U.S.C. § 704(a)(11) and 29 U.S.C. § 1132(a)(3).

446.    As detailed above in Counts 22 and 23, the Bergs were plan fiduciaries, they are liable for their own breaches of fiduciary duties under ERISA, and they are liable for Paredes' breaches of fiduciary duties under ERISA as his co-fiduciaries.

447.    Alternatively, if and to the extent that the Bergs were not plan fiduciaries, they are liable for restitution and disgorgement for knowingly participating in Paredes' breaches of fiduciary duties under ERISA.

90

448.    As detailed above in Count 21, Paredes breached his fiduciary duties under ERISA by causing the ESOP Trust to enter into a prohibited transaction in violation of 29 U.S.C. § 1106.

449.    Under 29 U.S.C. § 1132(a)(5), Plaintiff may seek restitution and disgorgement from a non-fiduciary who knowingly participates in a fiduciary's breach of fiduciary responsibility. *See Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238 (2000).

450.    The Bergs, if and to the extent they were not plan fiduciaries, knowingly participated in Paredes' breaches of fiduciary duties.  The Bergs knew that the ESOP transaction price was inflated, that the ESOP Trust did not receive adequate consideration, and that the transaction was prohibited. But they concealed these facts to enrich themselves.  From the ESOP transaction, the Bergs received a windfall, including a $6,272,060 equity distribution from the Debtor, $9,014,246 in cash from the ESOP Trust when the ESOP transaction closed, the Seller Note Payments, the Reimbursement Note Payments, and additional consideration.

451.    Based on the foregoing, all funds received by the Bergs in connection with their knowing participation is subject to a constructive trust and Plaintiff is entitled to restitution and disgorgement.  As detailed above, or on information and belief, all such funds were deposited into Connie Berg's UBS Berg Account.

452.    Pursuant to 29 U.S.C. § 1132(g)(1), Plaintiff is also entitled to recover reasonable attorneys' fees and costs.

### COUNT 25
### Actual Fraud
### Plaintiff:  Erik A. Ahlgren, as ESOP Plan Administrator and as ESOP Trustee
### Defendant:  Connie Berg

453.    All paragraphs in this Complaint are incorporated by reference, except paragraphs 164-179 and the paragraphs comprising Count 21.

ACTIVE 709498546v4

454.    Plaintiff, in his capacities as Administrator of the ESOP Plan and ESOP Trustee of the ESOP Trust, has standing to bring this claim on behalf of the ESOP Plan and ESOP Trust.

455.    As detailed above, Connie Berg's representations to the ESOP Trust in Sections 3.2(g), 3.3(g)(i), 3.3(g)(ii), 3.3(g)(iii), 3.3(g)(v), 3.3(h), 3.3(j), 3.3(m), 3.3(o) of ESOP Purchase Agreement, Section 5.3(c) of the Initial Seller/ESOP Loan Agreement, and Section 6(d) of the ESOP Modification Agreement were knowingly false and she omitted and suppressed material information.

456.    In addition, in connection with the ESOP Purchase Agreement, the ESOP Modification Agreement, and other ESOP contracts, and the negotiation thereof, Connie Berg omitted and failed to disclose to the ESOP Trust and the ESOP Plan the Debtor's government contracting fraud, fraudulent revenue, and material undisclosed liabilities and legal risks related thereto.

457.    Connie Berg made these false representations and omissions to deceive and induce the ESOP Trust and the ESOP Plan to enter into the ESOP transaction, so she could monetize her equity interest in the Debtor at an inflated valuation and siphon millions of dollars to herself.

458.    The ESOP Plan and ESOP Trust reasonably relied on Connie Berg's representations in agreeing to and consummating the ESOP transaction.

459.    Connie Berg's false representations and omissions amount to actual fraud, as defined by N.D. Cent. Code § 9-03-08.

460.    As a result of Connie Berg's actual fraud, the ESOP Plan and ESOP Trust have suffered damages in amount to be proven at trial.

461.    Additionally, Connie Berg's actual fraud was oppressive, fraudulent, and done with actual malice to enrich herself and Kyle Berg at the expense of the ESOP and its beneficiaries.

Accordingly, pursuant to N.D. Cent. Code § 32-03.2-11(1), the ESOP Plan and ESOP Trust are also entitled to recover exemplary damages from Connie Berg.

## COUNT 26
### Aiding and Abetting Actual Fraud
**Plaintiff: Erik A. Ahlgren, as ESOP Plan Administrator and as ESOP Trustee**
**Defendant: Kyle Berg**

462.    All paragraphs in this Complaint are incorporated by reference, except paragraphs 164-179 and the paragraphs comprising Count 21.

463.    Plaintiff, in his capacities as Administrator of the ESOP Plan and ESOP Trustee of the ESOP Trust, has standing to bring this claim on behalf of the ESOP Plan and ESOP Trust.

464.    As detailed above in Count 25, Connie Berg committed and is liable to the ESOP Trust and ESOP Plan for actual fraud.

465.    Kyle Berg aided and abetted Connie Berg's actual fraud because he had knowledge of it and provided substantial assistance.  Without limitation, Kyle Berg (a) controlled and managed all aspects of the Debtor's business; (b) orchestrated the scheme to defraud SBA; (c) proposed and orchestrated the ESOP transaction and its structure to enrich himself and Connie Berg; (d) directed the appointment of Paredes as trustee of the ESOP Trust; (e) served as primary point of contact for all aspects of the ESOP transaction, including due diligence; (f) negotiated the relevant ESOP contracts, including the ESOP Purchase Agreement, the Initial Seller/ESOP Loan Agreement, and the ESOP Modification Agreement, and (g) conspired with Connie Berg to make misrepresentations to the ESOP Trust and the ESOP Plan and omit material information in the relevant contracts and during negotiations.

466.    As a result of Kyle Berg aiding and abetting Connie Berg's actual fraud, the ESOP Trust and ESOP Plan have suffered damages in amount to be proven at trial.

ACTIVE 709498546v4

467.    Additionally, Kyle Berg's conduct was oppressive, fraudulent, and done with actual malice to enrich himself and Connie Berg at the expense of the ESOP and its beneficiaries. Accordingly, pursuant to N.D. Cent. Code § 32-03.2-11(1), Plaintiff is entitled to recover exemplary damages from Kyle Berg.

## COUNT 27
### Deceit
### Plaintiff:  Erik A. Ahlgren, as ESOP Plan Administrator and ESOP Trustee
### Defendant:  Chad DuBois

468.    All paragraphs in this Complaint are incorporated by reference, except paragraphs 164-179 and the paragraphs comprising Count 21.

469.    Plaintiff, in his capacities as Administrator of the ESOP Plan and ESOP Trustee of the ESOP Trust, has standing to bring this claim on behalf of the ESOP Plan and ESOP Trust.

470.    As detailed above, Chad DuBois' representations in the Statement of Representation were knowingly false and he omitted and suppressed material information.

471.    DuBois made these false representations and omissions to deceive and induce the ESOP Trust to enter into the ESOP transaction.  He knew that Stout would be relying on his representations to render an opinion that the ESOP transaction was for adequate consideration, which Paredes, as trustee, and the ESOP Trust would, in turn, rely on to approve and consummate the ESOP transaction.

472.    Stout, Paredes, the ESOP Trust, and the ESOP Plan reasonably relied on Chad DuBois' misrepresentations and omissions.

473.    Chad DuBois's false representations and omissions amount to deceit, as defined within N.D. Cent. Code, Ch. 9-10.

474.    As a result of Chad DuBois' deceit, the ESOP Plan and ESOP Trust have suffered damages in amount to be proven at trial.

94

## COUNT 28
### North Dakota Securities Fraud
### N.D. Cent. Code §§ 10-04-15, 10-04-17
### Plaintiff:  Erik A. Ahlgren, as Chapter 7 Trustee,
### as ESOP Plan Administrator, and as ESOP Trustee
### Defendants:  Connie Berg, Kyle Berg, and Chad DuBois

475.    All paragraphs in this Complaint are incorporated by reference, except paragraphs 164-179 and the paragraphs comprising Count 21.

476.    Plaintiff, in his capacities as Administrator of the ESOP Plan and ESOP Trustee of the ESOP Trust, has standing to bring this claim on behalf of the ESOP Plan and ESOP Trust. Additionally, Plaintiff, in his capacity as Trustee, has standing to bring this claim on behalf of the Debtor.

477.    N.D. Cent. Code § 10-04-15(2) provides as follows:

It shall be a fraudulent practice and it shall be unlawful: . . .
2.      For any person, in connection with the offer, sale, or purchase of any security, directly or indirectly, to:
    a.      Employ any device, scheme, or artifice to defraud;
    b.      Make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading; or
    c.      Engage in any act, practice, or course of business which operates or would operate as a fraud or deception upon purchasers or the public.

478.    Connie Berg breached N.D. Cent. Code § 10-04-15(2) in connection with her sales of (a) 62,317 shares of the Debtor's stock to the ESOP Trust and ESOP Plan and (b) 37,683 shares of the Debtor's stock back to the Debtor for redemption.

479.    Acting in concert with Kyle Berg, Connie Berg made numerous untrue statements of material fact to the Debtor, the ESOP Plan, and the ESOP Trust, or omitted to state numerous material facts necessary to make her statements not misleading.  Among other things, Connie Berg and Kyle Berg never disclosed or affirmatively concealed that (a) millions of dollars of the

95

Debtor's historical revenue and profits were attributable to their fraud on the federal government; (b) the Debtor had fraudulently enrolled in the 8(a) and WOSB Programs and was not a qualifying small business; (c) the Debtor had been fraudulently awarded thousands of Set-Aside Contracts, totaling millions of dollars; (d) the Debtor received fraudulent revenue from Razor, Fed Serve, MDM, OK2, and other entities affiliated with or controlled by Kyle Berg; (e) the Debtor could not sustain its revenue; (f) the Debtor faced substantial undisclosed civil and criminal liability due to the Bergs' fraud on SBA; and (g) the Debtor's $31,559,000 valuation for the ESOP transaction was materially inflated.

480.    Additionally, Connie Berg's representations to the ESOP Trust and/or the Debtor in Sections 3.2(g), 3.3(g)(i), 3.3(g)(ii), 3.3(g)(iii), 3.3(g)(v), 3.3(h), 3.3(j), 3.3(m), 3.3(o) of ESOP Purchase Agreement, Section 5.3(c) of the Initial Seller/ESOP Loan Agreement, and Section 6(d) of the ESOP Modification Agreement were knowingly false, misleading, and/or omitted material information.

481.    Connie Berg and Kyle Berg defrauded and deceived the ESOP Trust, ESOP Plan, and the Debtor in connection with her sales of the Debtor's stock.  They employed a scheme to defraud the ESOP Trust, ESOP Plan, and the Debtor in order to enrich themselves.

482.    Pursuant to N.D. Cent. Code § 10-19.1-01.2(7), the relevant knowledge of Connie Berg, Kyle Berg, and Chad DuBois is not imputed to the Debtor because each of them committed a fraud on the Debtor and/or consented to the commission of a fraud on the Debtor.

483.    Pursuant to N.D. Cent. Code § 10-04-17(1), Plaintiff, in his capacities as Trustee, Administrator, and ESOP Trustee, hereby tenders to Connie Berg 100,000 shares of the Debtor's stock.

484.    Based on Connie Berg's breaches of N.D. Cent. Code § 10-04-15(2) and the foregoing tender offer, Plaintiff is entitled to recover from Connie Berg the full amount that the ESOP Trust, the ESOP Plan, and the Debtor paid to her for 100,000 shares of the Debtor's stock, together with all taxable court costs, interest as provided in N.D. Cent. Code § 10-04-17(1)(b), and reasonable attorney's fees.

485.    Pursuant to N.D. Cent. Code § 10-04-17(1) and (6)(b), Kyle Berg and Chad DuBois are jointly and severally liable with and to the same effect as Connie Berg.  Kyle Berg was an agent for Connie Berg and participated or aided her in making the stock sales to the ESOP Trust, the ESOP Plan, and the Debtor.  Additionally, Kyle Berg was associated with Connie Berg and materially aided her in her conduct giving rise to the liability.  Finally, DuBois was and is associated with Connie Berg and Kyle Berg, and materially aided one or both of them in their conduct giving rise to the liability.

486.    Based on the foregoing, Plaintiff, in his capacities as Trustee, Administrator, and ESOP Trustee, is entitled to joint and several monetary judgments against Connie Berg, Kyle Berg, and Chad DuBois for the full amount that the ESOP Trust, the ESOP Plan, and the Debtor paid to Connie Berg for the 100,000 shares of the Debtor's stock, together with all taxable court costs, interest as provided in N.D. Cent. Code § 10-04-17(1)(b), and reasonable attorney's fees.

487.    Additionally, the conduct of Connie Berg and Kyle Berg was oppressive, fraudulent, and done with actual malice to enrich themselves at the expense of the Debtor, its creditors, and its employees, and the ESOP and its beneficiaries.  Accordingly, pursuant to N.D. Cent. Code § 32-03.2-11(1), Plaintiff is entitled to recover exemplary damages from Connie Berg and Kyle Berg.

ACTIVE 709498546v4

**COUNT 29**
**Acting in Concert (State Law)**
**Plaintiff:  Erik A. Ahlgren, as Chapter 7 Trustee**
**Defendant:  Kyle Berg**

488.    All paragraphs in this Complaint are incorporated by reference.

489.    As detailed in Count 2 above, Kyle Berg owed fiduciary duties of care, loyalty, and good faith to the Debtor, and he breached these duties.

490.    Alternatively, if and to the extent that Kyle Berg is found not to have owed fiduciary duties to the Debtor, he is nonetheless liable for acting in concert with Connie Berg in connection with her breaches of fiduciary duties to the Debtor as detailed in Count 1 above.

491.    North Dakota recognizes "acting in concert" liability.  *See Ward v. Bullis*, 748 N.W.2d 397, 407-08 (N.D. 2008); *Hurt v. Freeland*, 589 N.W.2d 551, 557-59 (N.D. 1999).

492.    Kyle Berg knew that Connie Berg's conduct detailed in Count 1 above breached her fiduciary duties to the Debtor, and he gave substantial assistance and/or encouragement to her.

493.    Further, Connie Berg and Kyle Berg had a common plan to breach Connie Berg's fiduciary duties to Debtor.  They each had knowledge of such plan and its purpose, which was to enrich themselves at the expense of the Debtor, its employees, and its creditors.  In addition, Kyle Berg took affirmative steps to encourage the achievement of the result.

494.    Without limitation, Kyle Berg, acting in concert with Connie Berg, (a) caused the Debtor to fraudulently enroll in the Debtor in the 8(a) and WOSB Programs; (b) caused the Debtor to fraudulently obtain Set-Aside Contracts to which the Debtor was not entitled; (c) defrauded the federal government through various entities, including the Debtor, Razor, Fed Serve, MDM, OK2, and the Tunheim entities; (d) orchestrated the ESOP transaction and its structure to enrich himself and Connie Berg; (e) caused the Debtor to enter into the ESOP transaction at an inflated valuation for above-market consideration; (f) failing to inform the Debtor and the ESOP of the impropriety

98

of the ESOP transaction and the Debtor's $6,272,060 equity distribution to Connie Berg and take action to protect the Debtor's interests; (g) caused the Debtor to redeem 37,683 shares of Connie Berg's stock in the Debtor at an inflated valuation; (h) caused the Debtor to incur about $11.9 million of secured debt to Bankers Trust to fund the ESOP consideration payable to Connie Berg; (i) concealed and failed to disclose in connection with the ESOP transaction that a material amount of the Debtor's revenue was attributable to fraudulently obtained Set-Aside Contracts; (j) personally participated in the ESOP transaction with Connie Berg; and (k) served as the primary point of contact for all aspects of the ESOP transaction, including due diligence and negotiation of the relevant contracts.

495.    As a direct and proximate cause of Kyle Berg's concerted action with Connie Berg, the Debtor has suffered damages in an amount to be determined at trial.

496.    Additionally, Kyle Berg's conduct was oppressive, fraudulent, and done with actual malice to enrich himself and Connie Berg at the expense of the Debtor, its creditors, and its employees.  Accordingly, pursuant to N.D. Cent. Code § 32-03.2-11(1), Plaintiff is entitled to recover exemplary damages from Kyle Berg.

### COUNT 30
### Acting in Concert (State Law)
### Plaintiff:  Erik A. Ahlgren, as ESOP Plan Administrator and as ESOP Trustee
### Defendant:  Kyle Berg

497.    All paragraphs in this Complaint are incorporated by reference, except paragraphs 164-179 and the paragraphs comprising Count 21.

498.    Plaintiff, in his capacities as Administrator of the ESOP Plan and ESOP Trustee of the ESOP Trust, has standing to bring this claim on behalf of the ESOP Plan and ESOP Trust.

499.    As detailed above in Count 25, Connie Berg committed and is liable to the ESOP Trust and ESOP Plan for actual fraud.

500.    Kyle Berg is liable for acting in concert with Connie Berg in connection with her actual fraud on the ESOP Trust and ESOP Plan.

501.    North Dakota recognizes "acting in concert" liability.  *See Ward v. Bullis*, 748 N.W.2d 397, 407-08 (N.D. 2008); *Hurt v. Freeland*, 589 N.W.2d 551, 557-59 (N.D. 1999).

502.    Kyle Berg knew that Connie Berg's conduct detailed in Count 25 above constituted actual fraud on the ESOP Trust and ESOP Plan, and he gave substantial assistance and/or encouragement to her.

503.    Further, Connie Berg and Kyle Berg had a common plan to defraud the ESOP Trust and ESOP Plan.  They each had knowledge of such plan and its purpose, which was to enrich themselves at the expense of the ESOP Trust and ESOP Plan.  In addition, Kyle Berg took affirmative steps to encourage the achievement of the result.

504.    Without limitation, Kyle Berg, acting in concert with Connie Berg, (a) controlled and manage all aspects of the Debtor's business, (b) orchestrated the scheme to defraud SBA, (c) proposed and orchestrated the ESOP transaction and its structure to enrich himself and Connie Berg, (d) directed the appointment of Paredes as trustee of the ESOP Trust, (e) served as primary point of contact for all aspects of the ESOP transaction, including due diligence, (f) negotiated the relevant ESOP contracts, including the ESOP Purchase Agreement, the Initial Seller/ESOP Loan Agreement, and the ESOP Modification Agreement, and (g) conspired with Connie Berg to make misrepresentations to the ESOP Trust and the ESOP Plan and omit material information in the relevant contracts and during negotiations regarding the government contracting fraud.

505.    As a result of Kyle Berg's concerted action with Connie Berg, the Debtor has suffered damages in an amount to be determined at trial.

ACTIVE 709498546v4

506.    Additionally, Kyle Berg's conduct was oppressive, fraudulent, and done with actual malice to enrich himself and Connie Berg at the expense of the ESOP and its beneficiaries. Accordingly, pursuant to N.D. Cent. Code § 32-03.2-11(1), Plaintiff is entitled to recover exemplary damages from Kyle Berg.

### COUNT 31
### Aiding and Abetting Actual Fraud
### Plaintiff:  Erik A. Ahlgren, as Chapter 7 Trustee
### Defendant:  Connie Berg

507.    All paragraphs in this Complaint are incorporated by reference.

508.    As detailed above in Count 8, Connie Berg committed and is liable to the Debtor for actual fraud.

509.    Kyle Berg aided and abetted Connie Berg's actual fraud because he had knowledge of it and provided substantial assistance.  Without limitation, Kyle Berg (a) controlled and managed all aspects of the Debtor's business, (b) orchestrated the scheme to defraud SBA, (c) proposed and orchestrated the ESOP transaction and its structure to enrich himself and Connie Berg, (d) directed the appointment of Paredes as trustee of the ESOP Trust, (e) served as primary point of contact for all aspects of the ESOP transaction, including due diligence, (f) negotiated the relevant ESOP contracts on behalf of Connie Berg, including the ESOP Purchase Agreement, the ESOP Modification Agreement, and the Initial Seller/ESOP Loan Agreement, and (g) conspired with Connie Berg to make misrepresentations to the Debtor and omit material information in the relevant contracts and during negotiations regarding the government contracting fraud.

510.    As a result of Kyle Berg aiding and abetting Connie Berg's actual fraud, the Debtor has suffered damages in an amount to be proven at trial.

511.    Additionally, Kyle Berg's conduct was oppressive, fraudulent, and done with actual malice to enrich himself and Connie Berg at the expense of the Debtor, its creditors, and its

ACTIVE 709498546v4

employees.  Accordingly, pursuant to N.D. Cent. Code § 32-03.2-11(1), Plaintiff is entitled to recover exemplary damages from Kyle Berg.

**COUNT 32**
**Acting in Concert (State Law)**
**Plaintiff:  Erik A. Ahlgren, as Chapter 7 Trustee**
**Defendant:  Kyle Berg**

512.    All paragraphs in this Complaint are incorporated by reference.

513.    As detailed above in Count 8, Connie Berg committed and is liable to the Debtor for actual fraud.

514.    Kyle Berg is liable for acting in concert with Connie Berg in connection with her actual fraud on the Debtor.

515.    North Dakota recognizes "acting in concert" liability.  *See Ward v. Bullis*, 748 N.W.2d 397, 407-08 (N.D. 2008); *Hurt v. Freeland*, 589 N.W.2d 551, 557-59 (N.D. 1999).

516.    Kyle Berg knew that Connie Berg's conduct detailed in Count 8 above constituted actual fraud on the Debtor, and he gave substantial assistance and/or encouragement to her.

517.    Further, Connie Berg and Kyle Berg had a common plan to defraud the Debtor. They each had knowledge of such plan and its purpose, which was to enrich themselves at the expense of the Debtor.  In addition, Kyle Berg took affirmative steps to encourage the achievement of the result.

518.    Without limitation, Kyle Berg, acting in concert with Connie Berg, (a) controlled and managed all aspects of the Debtor's business, (b) orchestrated the scheme to defraud SBA, (c) proposed and orchestrated the ESOP transaction and its structure to enrich himself and Connie Berg, (d) directed the appointment of Paredes as trustee of the ESOP Trust, (e) served as primary point of contact for all aspects of the ESOP transaction, including due diligence, (f) negotiated the relevant ESOP contracts on behalf of Connie Berg, including the ESOP Purchase Agreement, the

102

ESOP Modification Agreement, and the Initial Seller/ESOP Loan Agreement, and (g) conspired with Connie Berg to make misrepresentations to the Debtor and omit material information in the relevant contracts and during negotiations regarding the government contracting fraud.

519.    As a result of Kyle Berg's concerted action with Connie Berg, the Debtor has suffered damages in an amount to be determined at trial.

520.    Additionally, Kyle Berg's conduct was oppressive, fraudulent, and done with actual malice to enrich himself and Connie Berg at the expense of the Debtor, its creditors, and its employees.  Accordingly, pursuant to N.D. Cent. Code § 32-03.2-11(1), Plaintiff is entitled to recover exemplary damages from Kyle Berg.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against the Defendants as follows:

A.    Enter judgment in Plaintiff's favor against each Defendant;

B.    On Counts 1-8 and 25-32, award Plaintiff monetary damages in amounts to be determined at trial;

C.    On Counts 1-3, 8, 25-26, and 28-32, award Plaintiff exemplary damages pursuant to N.D. Cent. Code § 32-03.2-11(1);

D.    On Counts 9-20, avoid the fraudulent transfers and obligations alleged therein, and grant the recovery of all avoided transfers from the applicable Defendants, in amounts to be determined at trial;

E.    On Counts 21-24, award Plaintiff monetary damages, restitution, and/or disgorgement, in amounts to be determined at trial;

F.    On Count 24, impose a constructive trust on the funds received by Defendants Connie Berg and Kyle Berg, and award Plaintiff restitution and/or disgorgement of such funds;

G.     On Count 28, award Plaintiff the full amount that the ESOP Trust, the ESOP Plan, and the Debtor paid to Connie Berg for the 100,000 shares of the Debtor's stock, together with all taxable court costs, interest as provided in N.D. Cent. Code § 10-04-17(1)(b), and reasonable attorney's fees;

H.     Award Plaintiff his fees, costs, disbursements, and expenses, including reasonable attorneys' fees;

I.     Award Plaintiff pre- and post-judgment interest to the greatest extent allowed by law; and

J.     Grant any other relief, including equitable relief, that may be just, proper, and equitable.

ACTIVE 709498546v4

Date:   May 20, 2025

/e/ *Peter D. Kieselbach*
Peter D. Kieselbach (Minnesota #0397531)
(*Admitted Pro Hac Vice*)
Michael B. Fisco (Minnesota #0175341)
(*Admitted Pro Hac Vice*)
**GREENBERG TRAURIG, LLP**
90 South Seventh Street, Suite 3500
Minneapolis, MN 55402
Telephone: (612) 259-9700
Email: kieselbachp@gtlaw.com
        fiscom@gtlaw.com

*and*

Erik A. Ahlgren (North Dakota #09561)
Ahlgren Law Office, PLLC
220 W. Washington Ave. Suite 105
Fergus Falls, MN  56537
Telephone: (218) 998-2775
Email: erik@ahlgrenlawoffice.net

ACTIVE 709498546v4

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 20, 2025, I electronically filed the foregoing **Second Amended Complaint** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all parties of record.

<i>/e/ Peter D. Kieselbach</i><br>
Peter D. Kieselbach (Minnesota #0397531)<br>
90 South Seventh Street, Suite 3500<br>
Minneapolis, MN 55402<br>
Telephone: (612) 259-9700<br>
Email: kieselbachp@gtlaw.com

ACTIVE 709498546v4